JOHN E. SMITH
COLIN M. STEPHENS
Smith & Stephens, P.C.
315 W. Pine
Missoula, MT 59802
Phone: (406) 721-0300
john@smithstephens.com
colin@smithstephens.com

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| UNITED STATES OF AMERICA, | Cause No. CR 17-77-BLG-SPW |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| JOHN HENRY SCHNEIDER, | |
| Defendant | |

## INTRODUCTION

John H. Schneider ("John"), offers this sentencing memorandum in support of a sentence of five years probation.  Pursuant to the Plea Agreement, John pleaded guilty on April 18, 2018 to Count III of the Superseding Indictment (Fraudulent Concealment of a Bankruptcy Asset). Doc. 36.   He faces a maximum of 5 years imprisonment, a $250,000 fine, and no more than 3 years supervised release.

The Probation Office has calculated a U.S.S.G. offense level of 17 with a sentencing range of 24-30 months PSR, ¶¶24-40, 75).  John has no objection to the advisory sentencing Guidelines calculation. John also agrees with the restitution amount listed in the PSR in the amount of $308,945.00.  PSR ¶ 85.

John requests the Court vary from the advisory sentencing Guidelines calculation and sentence him to a term of probation for five years.  This sentence fulfills the parsimony provision for a sentence that is "sufficient, but not greater than necessary."   John asks that no fine be imposed and that several hundred hours of community service be imposed instead.  John also requests interest on the restitution be waived both to allow him to pay the full amount within the timeframe of his sentence and reduce what would be an excessive amount of money in interest.  The PSR calculates John's payments will be $12,872.70/month, which equates to principal only for 24 months.  If the Court sentences John to 5 years of probation, his payment every month for 60 months would be $5,150.00, principal only.

## SENTENCING ARGUMENT

**A.     A sentence of a five years probation is appropriate considering the factors under *18 U.S.C. § 3553(a).***

Under *18 U.S.C. § 3553(a)*, the Court shall "impose a sentence sufficient, but not greater than necessary" based on the statutory objectives and relevant factors set forth in *18 U.S.C. § 3553(a)(1)-(7)*.  While the Sentencing Guidelines

are "the starting point and initial benchmark" they are advisory only, and the sentencing court must make "an individualized assessment based on the facts presented" to decide an appropriate and reasonable sentence. *Gall v. United States,* 552 U.S. 38, 49-50 (2007); *See also United States v. Carty,* 520 F.3d 984, 991 (9th Cir. 2008)(en banc) and *Kimbrough v. United States,* 552 U.S. 85 (2007).

The Supreme Court established in *United States v. Booker*, 543 U.S. 220 (2005), and reiterated in *Gall* and *Kimbrough,* that a sentencing court has broad discretion to consider nearly every aspect of a particular case and a particular defendant to fashion an appropriate sentence.

After *Gall,* the *§ 3553(a)* factors no longer must be extraordinary as was the case with the mandatory Guidelines. *Pepper v. United States,* 562 U.S. ___, S.Ct. 1229, 1245 (2011); *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc); *United States v. Ruff,* 535 F.3d 999, 1002 (9th Cir. 2008) ("extraordinary circumstances are not needed to justify a sentence outside the guidelines range"). A variance from the advisory Guidelines sentence to a sentence of five years of probation is appropriate in this case.

### 1.     The Nature and Circumstances of the Offense.

In 2012 John had been a practicing neurosurgeon for 25 years, and he was greatly overextended.  His practices in both Powell and Cody, WY would have been enough for any person to manage.  He also dreamt, however, of building and

operating a surgery center in Billings that he was working to create. With the help of legal counsel he had formed business entities, and a robust asset protection plan designed to protect his wife and three children in the event he was ever sued for malpractice – a likelihood given the high risk surgeries he was every day performing. At great expense to John, construction of the "Omni Surgery Center" in Billings had been completed in 2011 with plans to open in November of that year. Due to a number of factors it never did.

John also became embroiled in a dispute with another surgeon from Cody, WY that eventually led to costly litigation and when concluded John was the losing party. In 2011 one of John's patients, Russell Monaco, died from an overdose of painkillers following his discharge from the hospital after a surgery John had performed. In December 2013 Mr. Monaco's estate sued John, his professional corporation, the physician's assistant, Harley Morrell, and the hospital in Cody, WY. The hospital settled its case with the estate. The estate sued John under an agency theory of *respondent superior* for Harley Morrell's actions in the care of Mr. Monaco. Mr. Morrell was responsible for prescribing opioids to Mr. Monaco in addition to the fentanyl patch that John had prescribed following surgery. This was against protocols John had established for post-operative care of his patients. In the spring of 2014, Harley Morrell PA, consented to entry of a judgment against

him for $10,000,000.00 in order to facilitate legal action against John.  At the time Morrell was judgment proof.

This turn of events was significant for John, who was defending himself against the estate's claims, because he now felt particularly vulnerable.  He agreed with the assessment that Morrell's actions had been negligent.  Through his lawyers he objected to the Plaintiffs' and Morrell's joint motion for entry of consent judgment, to no avail.

At that point, in mid-2014, John received advice from his lawyers to consider consulting with a bankruptcy specialist.  John met with Harold Van Dye in Missoula and filed his bankruptcy petition on December 4, 2014.

The cumulative effect of these events created in John a sense of panic.  He perceived his life was spinning out of his control; a control that John was conditioned to having.  Against the backdrop of these several years, John's moral compass had gone askew, and he made the very poor choice in not disclosing the U.S. Bank account to Trustee Joe Womack; that bad decision now brings him before the Court for sentencing, facing the possibility of being imprisoned and, at the very least, living the rest of his life as a convicted felon.  John is ready, willing and able to pay the bankruptcy estate its due previously hidden by his crime.

**2.      History and Characteristics of John Henry Schneider.**

Despite the heights to which he rose, John came from modest means.  His impressive trajectory was not fueled by any special booster nor a head start.  It was instead propelled by his industrious nature.  John's parents struggled financially in a largely rural adjunct of Los Angeles.  John's parents passed away in their early sixties when John was in his early thirties.

Early in his life John threw himself into a variety of organized activities, while also excelling in school.  He achieved the distinction of Eagle Scout at age 16 and took a youth leadership role as Council Chief of the Scouts' national honor society, "Order of the Arrow," between the ages of 16 and 18.  John also earned a Black Belt in Tang Soo Do and graduated through the honors program at Thousand Oaks High School in California in 1978, when he was 17 years old.

Driven by his interest in science, academic achievement, and a desire to master one of the most challenging but impactful medical fields, John entered the University of Southern California (U.S.C.) on a full academic scholarship, studying biological science and genetic engineering. He graduated cum laude in 1983.

During college, John spent his summers working for Brigham Young University in their graduate level youth leadership department, teaching rigorous 30-day courses on outdoor land and water survival.  By age 23, John was the Director of expeditions and student engagement for Boulder Outdoor Survival

School, a program internationally recognized as one of the most physically and psychologically demanding non-military challenges. (https://www.boss-inc.com/)

John entered U.S.C. medical school in the fall of 1983 with a full scholarship from the U.S. Air Force and as a commissioned officer (2nd Lieutenant). John made time for direct service to his medical school serving as Senior Student Representative on the Medical Education and Curriculum Committee and the Long Range Curriculum Planning Committee. He was appointed as a student leader assigned to the Clinical Curriculum Revision Committee at the Los Angeles County Hospital. John then completed his medical degree in 1987 with numerous honors, graduating in the top 5% of his class. He achieved the AOA Honor Medical Society and the Dean's Scholar for Academic Excellence in Clinical Medicine. *See* at exhibit A, which contains copies of the diplomas and achievement awards John could still find.

John immediately began his residency program in neurological surgery at U.S.C. One of John's co-residents, Dr. Mike Levy, has written a letter to the Court about some of his experiences and observations working with John. *See*, letter from Dr. Levy dated April 15, 2018 at exhibit B. Dr. Levy provides examples of John's "diligence, integrity and significant work ethic." *Id*. The LA County Hospital, where they did rounds, was extremely busy. There were minimal resources, the training was exceptionally difficult, and there was a need for total dedication; and John gave it. John was practicing medicine in the gang war zone of Los Angeles throughout

the latter 1980s until 1994.  Dr. Levy remembered that John, while walking between hospitals during a night shift, was robbed by a gang member at gunpoint.  Afterward, Dr. Levy reported, John continued working and completed his 24-hour shift. *Id*. at p. 2.  It was during this time period John had his only other notable run-in with the law: a misdemeanor complaint in California for carrying a loaded firearm in his vehicle while in a public place. PSR at ¶ 43.

During this time John was also acknowledged for his impacts on the field of medicine by the Congress of Neurological Surgeons which granted him the Mahaley Brain Tumor Research Award in 1993. *See* at exhibit A.  John received the Internship Class of 1994 Senior Resident Award that year as well. *See* at exhibit A.

John completed his residency and fellowship in complex reconstructive spine surgeries at U.S.C. and served as Chief Resident Physician in Neurological Surgery, a faculty position, at the Los Angeles County and U.S.C.  Medical Center from June 1993 to June 1994. *See* at exhibit A.  John also fulfilled his duty to the Air Force, serving as an active duty neurosurgeon between 1994 and 1997, earning the rank of Major.  He served at the USAF's preeminent medical institution, Lackland Air Force Base in San Antonio, TX, treating active duty soldiers and their families, veterans and South San Antonio's civilian gangland population who presented with brain and spinal pathologies.  One such patient's story, a female USAF intelligence officer critically injured in a car crash, was featured in a Reader's Digest story in 1996.  *See*

attached story and a photo of John with the intelligence officer at exhibit C. The article details the severe injuries she suffered and the miracle that occurred despite those injuries.

John was released from active duty in 1997, and then honorably discharged and released from his inactive reserve status in 2008. PSR at ¶ 58, also see U.S.A.F. discharge papers within exhibit A. At the same time as his military service, he served as an Adjunct Clinical Assistant Professor of Neurosurgery at the University of Texas, San Antonio, teaching the civilian residents from this program at the Air Force trauma hospital.

Between 1997 and 2017, John was in private practice in groups and as a solo practitioner. John created and ran a number of private practices with affiliate organizations throughout the mountain west. He provided neurological and surgical services for families in and around Billings, MT, Northern WY, Bountiful, UT, and Salt Lake City, UT. Before John arrived in Billings, complex pediatric and adult brain aneurysms were transferred to larger academic institutions in Salt Lake City and Denver. Because of his training and collaboration with 5 other area neurosurgeons, however, similar patients were able to remain locally for treatment and recovery under John's surgical care. The most complex spine surgeries, traditionally requiring extensive open procedures with nearly a week of hospitalization and six months of recovery, were increasingly conducted as

outpatient surgeries using minimally invasive reconstructive techniques.   The economic cost was a fraction of the hospital charges and routinely patients returned to unrestricted work and productive family life in less than a month.

John also created the Northern Rockies Neurological Foundation, a non-profit that facilitated yearly academic conferences from 1998-2004 in collaboration among neuroscientists from both Billings hospitals.

Tragedy in his line of work always took its toll on John.  Although he has always believed neurosurgeons are to be stoic and unflinching, his wife, Michelle, attests to the emotional impact, dismay and depression he would suffer when a patient succumbed to his or her disease or experienced complications typical of neurosurgical practice.  Michelle Schneider writes of experiencing with her husband the "worrisome days after the surgery has not gone well, and the heartbreaking aftermath that come from losing a patient," and how John is "human in every sense of the word.  He gets sad, he hurts and he cries." Letter from Michelle Schneider attached at exhibit D, at p. 2.  He has said, it is inevitable in every neurosurgeon's life that a perfect brain surgery on a child's tumor can still result in disaster, or that a complex brain aneurysm surgery, successfully performed, can still result in a patient developing incapacitating strokes or even death.  This is unfortunately the nature of his work.  He knew of the discipline, difficulty, and personal sacrifice that would be required, and the potential for emotional pain when he began in his field.

John accepted and embraced those challenges.  It was, for him, an opportunity to make an impact on people's lives with truly life-altering outcomes.

John took on more responsibilities, returning to a busy academic surgical practice in 2004-2005 as an Assistant Professor and Director of Spine deformity surgeries at the University of Utah.  The motivation for this move was John's belief that every skilled surgeon remains duty-bound to mentor the next generation of healthcare providers.

With all these irons in the fire, John still took special care to forge and maintain a strong relationship with Michelle, as they raised their family together. He and Michelle have raised three hard-working, successful adult children, Brandon, Shannon and Caitlin. PSR ¶ 48. *See* at exhibit E a photo of the Schneider family taken in late May 2017 at daughter Shannon's graduation from the University of Utah.  Michelle, a neonatal ICU nurse, worked tirelessly with her husband to raise a close, loving family despite the demands of their professional lives.  As in every family, life was not without its challenges, however.  Their middle daughter required three open heart surgeries before she graduated from high school.

John's greatest regret about his crime is the pain he has caused his family.  As Michelle reports the "collateral damage that has hit our whole family is what I believe hurts him the most.  He has apologized to all of us and we, as a family, have forgiven him . . . ."  Michelle Schneider letter, exhibit D at p. 3.

Defendant's Sentencing Memorandum

John is described by those who know him outside of his professional life and his offense conduct as generous, charitable, and inclusive. Misty DeLeon was a young hair stylist in Billings when she met Michelle Schneider who became a client. Misty was a struggling, young single-mother. Misty recently recounted how John and Michelle helped her by advising, mentoring, and providing baby clothing and accessories. *See* letter from Misty DeLeon (now Firebaugh) dated July 27, 2018 attached at exhibit F. Misty is successful in her adulthood and happily married to a Billings Police officer, David Firebaugh. *See* letter from David Firebaugh dated July 27, 2018 also attached at exhibit F. Their friendship with the Schneiders remains strong.

Misty's experience with the Schneider family was no anomaly. The Schneiders became close with many people in the Billings community. Former patients invited the Schneiders to their family occasions. John mentored the son of a family friend and was recently described as a surrogate father. *See,* six additional letters from community members who have come to know John and his family also at exhibit F.

With his family, John continued to impact the community beyond his professional work. They regularly attended and donated to the Catholic Church and Faith Chapel in Billings, volunteered at church and community events based in Billings and Salt Lake City, and John went on over a dozen medical mission trips

with these religious and medical groups to Latin America, as he is functionally fluent in Spanish**.**

Since his bankruptcy John learned perhaps he and his family would be better served by rededicating his efforts toward the mission that had steered him to medicine as a young man.  Since he had received a military scholarship to medical school, and since he had served as a Major in the Air Force, it seemed fitting to return to offering his highly specialized skill to a population who perhaps could benefit from it the most.  In May 2017, John joined the surgery department at the Iowa City Department of Veterans Affairs at the University of Iowa. PSR at ¶ 61.  It was his dream job.

As the Director of Neurosurgery, he was able to use his skills to help his fellow veterans, a group too often left with subpar medical care. Notes from patients detail some of the relief John's care offered. *See* notes from Mrs. Anna S. Haines and David Baker, as well as an email from the VA in Iowa City attached as exhibit G. John's forced resignation in November 2017, following some intense media scrutiny of some of the systemic problems at the VA, was indeed unfortunate.  PSR at ¶61.

Although John has retired from his surgical practice, the industriousness demonstrated throughout his life remains strong in John today.   Since being indicted, John has worked to develop a new business and potential source of income—Provider Resolutions, LLP—a consulting agency offering Alternative

Dispute Resolution (ADR) services for medical practitioners, providers, administrators and patients. PSR at ¶60. *See at* https://provider-resolutions.com/   In 2015-2016 John earned a Masters degree in Negotiation and Dispute Resolution from the Creighton School of Law. PSR at ¶56.  Now John seeks to put his degree to work in a way that will benefit the medical profession.  John's vision is that by utilizing Alternative Dispute Resolution, fair and reasonable settlements between providers and their patients can be achieved without costly litigation.  It holds the potential to lower costs of medical care and the cost of medical insurance.

John will bring to the dispute resolution field a perspective gleaned from 30 years of practical experience coupled with his new training, to help the parties fairly resolve their disputes. John is also developing educational programs for medical and nursing students and is engaged in producing a lecture series he will deliver as core curriculum beginning this fall in the University of California healthcare training system.  John has learned from his past mistakes.  He is capable of moving forward and is working to provide services that have the potential for improving medical services on a broad scale.

As part of his plan for ADR John has recently finished writing and publishing a book on ADR for medical providers, *The Healthcare Practitioners Guide to Conflict Engagement and Dispute Resolution.* Medport Publishing July 2018. (a photo of the book's cover is attached as exhibit H.)  He is also completing two books

on litigation management and on overcoming administrative challenges for healthcare providers, respectively; both publications are anticipated for year's end. He has also reached out to the U.S. Department of Health and Human Services offering to provide training materials to health practitioners through the Department, and they have responded favorably. See letter from John to the Department dated June 13, 2018 and the Department's response attached as exhibit I.  All of this work anticipates a stream of income which will contribute to timely attention to his restitution obligation in this case.

John accepts his obligation to pay restitution.  He is well positioned to meet his obligation to pay, and to do so expeditiously. As the Court knows, it is too often that restitution is never paid. See, *U.S. v. Lagos,* 138 S.Ct. 1684, 1689 ("few victims are likely to benefit because more than 90% of criminal restitution is never collected."). A probationary sentence would best "accomplish the goals of the restitution order because it would enable [the defendant] to earn the money he is required to pay." *U.S. v. Edwards,* 595 F.3d 1004, 1016 (9th Cir. 2010)(upholding a Montana district court's ruling that an order of restitution can satisfy the *§ 3553(a)* factor of general deterrence).

John also continues to show his dedication to service in other ways, however. He is working with his son to transition the family-owned company, Medport, LLC to a non-profit organization focused on recruiting volunteers from the medical

professions and coordinating deployment of global rapid-response medical contingents to non-conflict disaster zones around the world. Once his sentence is completed, John plans to dedicate at least four weeks annually for his own deployment.

John is also volunteering for two organizations serving veterans in southern California. As a certified Master Rescue Scuba diver and trainer, John has been volunteering with Dive Veterans—an organization supporting veterans recovering from PTSD and physical disabilities, including brain and spinal injuries, through scuba therapy. (www.diveveterans.com last accessed 07.19.18). *See* copy of initial email and subsequent letter from Dr. Ola Madsen, U.S. Navy, for Dive Veterans dated July 23, 2018, and recent photo of John with some vets attached as exhibit J. John has asked to volunteer 8-12 hours per week with Dive Veterans as a Dive Instructor, Mentor, and non-treating medical consultant for a cohort of 12-15 that changes every 8-12 weeks.

Based upon his affiliation with scuba diving and with Dive Veterans, John is also aware of the WAVES Project, a non-profit dedicated to helping wounded veterans learn "the freedom and challenge of Scuba Diving." (www.wavesproject.com last accessed 07.19.18). John reached out to them recently. *See* copy of the recent email string between John and Steve Rubin of the WAVES Project and also Dr. Naomi A. Aschondo, a Doctor of Occupational Therapy

working with the Project attached as exhibit K. (The email string is organized to read in descending rather than ascending order.)

### 3. Need for a sentence to reflect basic aims of sentencing.

#### a. Seriousness of the Offense, Respect for the Law, and Just Punishment.

A felony conviction and a five year probationary sentence with conditions reflects the seriousness of John's offense, promotes respect for the law, and provides just punishment.

In *Gall,* the Supreme Court held that a below-Guidelines sentence of 36 months' probation for a drug offense was reasonable, notwithstanding the recommended Guidelines range of a term of imprisonment of 30 to 37 months. *Gall,* 552 U.S. at 41.  In that case, Brian Gall exhibited post offense rehabilitation over a three-and-a-half-year period.  He withdrew from the drug conspiracy, graduated from college and became a master carpenter earning $18/hour.  The District Court determined this behavior showed Gall would not return to criminal conduct and was not a danger to society.  As exhaustively discussed above, John has also exhibited exemplary conduct since his failure to disclose U.S. Bank account 2881 in the spring of 2015, providing assurance to this Court he will not commit further crimes and is certainly not a danger.

The Supreme Court in *Gall* also recognized that a sentence of probation is not an act of leniency, but actually a substantial restriction on liberty. *Id.* at 48. A person on federal probation suffers a status with limited freedom, deprived of constitutional freedoms and rights highly valued in our society. *Gall,* 552 U.S. at 48-49. See also, *United States v. Myers*, 353 F.Supp. 2d 1026,1032 (S.D. Iowa 2005)("Probation is not an act of leniency. Probation is a substantial restriction of freedom; it is not forgiveness, and it is not an endorsement of the offense.") Beyond the extensive limits on a probationer's freedom, another punishment inherent in probation is the proverbial hangman's noose. With any slip or violation of probation conditions, the noose can be tightened and John could be imprisoned.

In the event of a revocation this Court could impose the entirety of the sentence under the U.S.S.G. or the statutory sentence of up to five years. So, for John a probationary sentence is not just a loss of his freedoms for five years, it entails an overhanging and continuing threat of a much greater loss of his freedom should he violates any condition of his sentence.

Threat of imprisonment is a deterrent in and of itself: "Deterrence involves the prevention of criminal acts by the threat of punishment, which is addressed to the aversion to being punished." Richard G. Board, *Operational Criteria for Determining Criminal Responsibility*, 61 Colum.L.Rev. 221 (1961). Imposing a

sentence of probation will punish John.  This Court's supervisory power over him will serve as a sufficiently effective deterrent.

A prison term of even 24 months is not necessary to impress upon John the seriousness of his offense and respect for the law.  As described in *Gall,* "any term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who, the Court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life.  The defendant's post-offense conduct indicates neither that he will return to criminal behavior nor that the defendant is a danger to society."  *Gall*, 128 S.Ct. at 593.  As in *Gall,* a prison term for John, who is demonstrating post offense conduct that is positive for society, is not necessary and does not reflect the factors of *18 U.S. §3553(a)*.

### b.      Afford adequate deterrence to criminal conduct.

With respect to specific and general deterrence, the defense submits that, under the circumstances of this case and the characteristics of this defendant, the proposed sentence of probation provides adequate deterrence.  *18 U.S.C. 3553(a)* does not require the goal of deterrence be met through a period of incarceration.  See *United States v. Edwards,* 595 F.3d 1004, 1016-1017 (9th Cir. 2010) (goal of deterrence can be met through a sentence of probation with conditions).  John's crime and the government's prosecution have resulted in a felony fraud conviction

with a concomitant loss of rights, as well as the shame and embarrassment suffered as a result of the conviction. See *United States v. Howe,* 543 F.3d 128 (3rd Cir. 2008) (affirming sentence of probation with three months home confinement for wire fraud over Government objection that District Court didn't sufficiently consider general deterrence, where Guidelines range was 18 to 24 months; "a potential offender observing the sentencing proceeding would receive the message that prison time could be imposed absent those meaningful distinctions" presented by defendant's characteristics. *Id*. at 140). John has learned a very difficult lesson. The Court can be assured this felony conviction, and the collateral consequences of his conduct, are more than sufficient deterrence for him such that he will never again violate the law.

### c.      Protection of the public from further crimes of defendant.

John is no danger to the public. He has no criminal history. He has complied with all release conditions during his pretrial release. PSR ¶ 9. A term of imprisonment in the Guidelines range is not needed to protect the public from John committing further crimes. See *Edwards,* 595 F.3d at 1017 (district court did not abuse its discretion in determining probationary sentence adequately protects public).

John possesses many characteristics that support him being a very low risk of recidivism – he is 56 years old, he has been married to Michelle since 1992, he

is father to three beautiful children, he has no criminal history, a college and post-college graduate education, no substance abuse problems, has always had stable employment, and a fairly low base-offense level for a non-violent fraud offense. *See* U.S. SENTENCING COMMISSION, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28-32 (2004).

### 4. Kinds of sentence and sentencing range established by Sentencing Guidelines and pertinent policy statements.

Over the years amendments to the Guidelines include an expansion of the availability of alternatives to incarceration for offenders in fashioning a sentence. *See* U.S.S.G. App. C., amend. 738 (reason for amendment).  As Chairman of the Sentencing Commission, William K. Sessions III, explained "The Commission has heard from virtually every sector of the criminal justice community that there is a great need for alternatives to incarceration . . . Providing flexibility in sentencing for certain low-level, non-violent offenders helps lower recidivism, is cost effective, and protects the public."[1]  A sentence to five years of probation for John is certainly consistent with the goal of cost effectiveness. PSR ¶ 108.

In addition, Congress has instructed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other

---

[1] *See* U.S. Sentencing Commission News Release dated April 19, 2010 available at http://www.ussc.gov/Legislative_and_Public_Affairs/Newsroom/Press_Releases/20100419_Press_Release.htm

than imprisonment in cases in which the defendant is a first offender who has not

been convicted of a crime of violence or an otherwise serious offense . . . ." *28*

*U.S.C. §994(j)*.  In its amendments to the Guidelines, proposed in April 2018, the

Commission added language to the Application Notes to U.S.S.G. §5C1.1 to state,

"If the defendant is a nonviolent first offender and the applicable guideline range is

in Zone A or B of the Sentencing Table, the court should consider imposing a

sentence other than a sentence of imprisonment . . . ." §5C1.1, Amendment to

Application Note 4.  John is asking the Court for a downward variance from his

calculated advisory guideline offense level 17 to an offense level 11, which is in

Zone B, and impose a sentence in accordance with both the Congressional mandate

and the Commission's amendment.

### 5.     Need to provide restitution to the victim of the offense.

John agrees with the PSR's determination of restitution at $308,945.00

payable to the bankruptcy Trustee for deposit into the Estate, representing that

those monies, but for John's crime, would have been collected by the Trustee from

U.S. Bank account 2881. PSR ¶¶ 21, 85 and 92.  The PSR correctly states in the

Addendum the above restitution amount is consistent with *Lagos v. U.S.*, 2018

U.S. Lexis 3209 (2018).  In his letter to the court dated May 30, 2018, the Trustee

had requested the Court to award restitution to include his fees and costs incurred

administering the bankruptcy in this case.  The *Lagos* opinion came down the next

day, May 31st. Since then the Trustee has amended his request for restitution with the PSR writer, in line with the *Lagos* decision. PSR at ¶ 20.

Through its Victim Notification System the Department of Justice mailed a total of 1,726 letters of which approximately 1,693 were to John's former patients. The  DOJ gleaned that list from John's bankruptcy schedules wherein he and his lawyer had attempted to include any potential medical malpractice claimant no matter how remote.  From the total mailing the DOJ received 20 responses. Included in the responses is a letter from Billings attorney, Jon Moyers, indicating he represents five former patients who had made claims in John's bankruptcy. John's former employee, Harley Morrell, a physician assistant also responded.  As explained below, these six are creditors who will receive their pro rata share of the bankruptcy estate.  Their respective shares will be enhanced by the restitution John is going to pay.

The remaining 16 former patients who responded to the DOJ's mailing cannot be considered victims of John's crime as none of them have a claim in the bankruptcy proceeding.  These include four former patients who had positive remarks about the surgery they had undergone.  Nine expressed frustration and disappointment with their outcomes.  Three seemed to be neutral about their former interactions with John.  The surgeries these folks wrote about seem to all

have occurred between 2001 and 2011, though a number of them did not state any dates.

In the bankruptcy there are a total of seven personal injury claimants (including Jon Moyers' five) and one claimant, Harley Morrell, who has claimed breach of contract and wrongful discharge, about which some background is appropriate.

When Mr. Morrell's claim and the personal injury claims were filed in the bankruptcy, these were considered contingent, unliquidated claims for money. That is, John's liability for these claims had never been proven in a court of law. No evidence has been produced to a fact finder that proved any of the personal injury claimants had ever received less than the standard for medical care from John, nor has Mr. Morrell ever proven his claim. The amount of money included in each claimant's proof of claim was their lawyer's best estimate of what he or she believed the claim might be worth. As such each of these claimants are non-priority, unsecured creditors in John's bankruptcy.

As the Court knows unsecured creditors are at the end of the line for payments from the bankruptcy estate. Because the claims were contingent and unliquidated, in April 2016, the Trustee objected to Mr. Morrell's claim and to all of the personal injury claims. A trial on the merits of these claims was set for May 25-27, 2016. BK Doc. #309. Prior to the trial, on May 16, 2016, John and the

Trustee entered into a settlement agreement that effectively ended the collection lawsuit between them. BK Doc. #340-1.  On May 17, 2016, John stipulated with the Trustee to waive the discharge of his debts in the bankruptcy. BK Doc. #331. At that point, any or all of the unsecured creditors were free to pursue their claims "in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose." *28 U.S.C. §157(b)(2)(B)*.  With the assistance and advice of legal counsel, all eight of these creditors elected to proceed with negotiations for settlement with the Trustee, his legal team, and John and his lawyer.

On May 19, 2016 the Trustee filed a Motion for Approval of Compromise Settlement to settle the collection lawsuit. BK Doc. #340.  In his motion the Trustee informed the court that "[i]n settling this action, the Trustee obtained what he estimates to be over $2 million worth of real estate, $240,000 in cash and approximately $61,500 from the tax return, as well as 5% of the KBS REIT upon its liquidation." Motion at p. 10, BK Doc. #340.  The Trustee went on to explain to the court that he had involved "the PI Plaintiffs in this process and believes that there will not be any objection from those parties to the settlement." *Id*. at p. 11.  He went on to write, "Trustee believes that this Settlement, which provides for a certain recovery for unsecured creditors and brings well over $2 million in assets into the Estate, is in the best interest of creditors and the Estate." *Id*.  On that same date, the

Trustee stipulated with seven of the "PI" claimants to withdraw his objections to their claims. BK Doc. #341.

On May 23, 2016, the PI claimants elected to settle their respective cases with John, rather than continue with the ensuing litigation.  A stipulation for Withdrawal of Debtor's Objections to Personal Injury Creditors' Proofs of Claim was signed by John's attorney and by the PI claimants' attorney. BK Doc. #341. Part and parcel of that settlement was an Agreement [by the PI Creditors] for [John's] Contractual Discharge.  By settling with John, the claimants, all represented by competent counsel, elected to receive their pro rata portion of the bankruptcy estate as determined by the Trustee after the priority creditors were paid rather than pursue their claims in other courts of law.  By his restitution payment of $308,945.00 John will have paid back the money his crime withheld from the Estate and its creditors.

Given the restitution award, John asks the Court to find that his ability to make the payments over the term of his sentence would be compromised by interest charges on that much principle. *See* PSR ¶ 92.  Pursuant to *18 U.S.C. § 3612(f)(3)(A)* John respectfully requests the Court to waive interest on restitution in this case given that his ADR projects are presently in their infancy.  In addition, as a good faith showing of his intention to pay all of the restitution back to the bankruptcy estate, John will come to the sentencing hearing with a check for

$35,000.00 that he will withdraw from his pension account.  A withdrawal for which he will suffer both income tax and a 10% penalty.

## CONCLUSION

For the foregoing reasons, John Henry Michael Schneider respectfully requests this Court to impose a sentence of five years of probation with appropriate conditions including those specified at ¶¶ 91-93 of the PSR.  John is making every effort to show, not just tell, this Court he can make amends for his crime, and he can eventually pay back to the bankruptcy estate the monies he unlawfully withheld by his actions for which he now stands convicted.  John was formerly, for 53 years, a law-abiding citizen.  There should be no doubt he will be once more for the rest of his life.


RESPECTFULLY SUBMITTED this 31st day of July 2018.

SMITH & STEPHENS, P.C.

By: /s/ John E. Smith
*Attorney for Defendant*

## **CERTIFICATE OF SERVICE**

I, John E. Smith, do hereby certify that I delivered a true and correct copy of this Defendant's Sentencing Memorandum to the following individuals via the means indicated below.


Clerk of District Court ………………………………………………….CM/ECF

Colin M. Rubich……………………………………………………………CM/ECF
Assistant United States Attorney

John Henry Schneider………………………………………………………Email
Defendant


DATED this 31st day of July, 2018.

SMITH & STEPHENS, P.C.

By: /s/ John E. Smith
*Attorney for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Criminal Rule CR 12.1, I hereby certify that this Defendant's Sentencing Memorandum complies with all requirements set for in CR 12.1 in that it

1.      Does not exceed 6,500 words.  Total words are 6413;

2.      Is double-spaced in a proportionally spaced font;

3.      Is prepared in 14-point Times New Roman

Respectfully submitted this 31st day of July 2018.

SMITH & STEPHENS, P.C.

By: /s/ <u>John E. Smith</u>
*Attorney for Defendant*