2014 WY 134

**BOARD OF PROFESSIONAL RE-
SPONSIBILITY, WYOMING
STATE BAR, Petitioner,**

**v.**

**Laurence W. STINSON, WSB
No. 62918, Respondent.**

**No. D–14–0002.**

Supreme Court of Wyoming.

Oct. 29, 2014.

**Background:** Disciplinary proceedings were brought against attorney. The Board of Professional Responsibility of the state bar recommended public reprimand.

**Holdings:** The Supreme Court, E. James Burke, C.J., held that:

(1) attorney violated rules, and

(2) public reprimand was warranted.

Reprimand ordered.

**1. Attorney and Client** ⇔49

The purposes of attorney disciplinary procedure are to maintain the integrity of the bar, to prevent the transgressions of an individual lawyer from bringing its image into disrepute, and to protect the public and the administration of justice.

**2. Attorney and Client** ⇔36(1)

Attorney disciplinary proceedings are necessarily incident to the inherent power of courts to control properly their own affairs.

**3. Attorney and Client** ⇔36(1)

In an attorney disciplinary proceeding, the Board of Professional Responsibility acts as an arm of the Supreme Court in taking evidence and making findings and recommendations.

**4. Attorney and Client** ⇔57, 59.4

In an attorney disciplinary proceeding, although the Supreme Court gives due consideration to the findings and recommendations of the Board of Professional Responsibility, ultimate judgment is vested in the Court.

**5. Attorney and Client** ⇔53(2)

In determining whether attorney discipline is appropriate, the Supreme Court must be satisfied that substantial, clear, convincing, and satisfactory evidence exists to sustain the findings of the Board of Professional Responsibility.

**6. Attorney and Client** ⇔53(2)

"Clear and convincing evidence," as required to support a finding of attorney misconduct, is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable.

See publication Words and Phrases for other judicial constructions and definitions.

**7. Attorney and Client** ⇔53(2)

The clear and convincing standard must be applied consistently to each and every charge against an attorney in disciplinary proceedings.

**8. Attorney and Client** ⇔53(2)

State bar was not required to present expert testimony to prove that attorney had violated rule prohibiting attorney from filing an action or defense for a frivolous or improper purpose; determination of whether attorney had made filing for an improper purpose required review of attorney's filings and a comparison of the filings with what attorney knew when he signed the filings, and did not require use of subjective or undefined standards. Rules of Prof.Conduct, Rule 3.1(c).

**9. Attorney and Client** ⇔42

Attorney's conduct, signing and filing affirmative defenses and counterclaims that attorney knew to be false, representing deposition testimony to court as a basis for relief without first conducting reasonable inquiry into client's apparent bribery of deposition witness to give false testimony, and asserting embarrassing detailed allegations about opposing attorney's client for improper purposes, violated rule prohibiting attorney from filing an action or defense for a frivolous or improper purpose. Rules of Prof.Conduct, Rule 3.1(c).

GOVERNMENT
EXHIBIT

1

**10. Attorney and Client ⟺53(1)**

In attorney discipline proceedings, testimony of attorney's expert witnesses on whether attorney had violated rule prohibiting attorney from filing an action or defense for a frivolous or improper purpose was inadmissible, since ultimate conclusion of law was for Board of Professional Responsibility and Supreme Court to determine based on entire evidentiary record.  Rules of Prof.Conduct, Rule 3.1(c).

**11. Attorney and Client ⟺57**

In attorney discipline proceeding, the Supreme Court would review decision of the Board of Professional Responsibility, limiting attorney's proffered expert testimony, using the abuse of discretion standard of review, and Court would find an abuse of discretion only if the Board could not have reasonably concluded as it did in limiting the testimony of attorney's designated experts.

**12. Attorney and Client ⟺59.8(1)**

Public reprimand was warranted for attorney whose conduct, signing and filing affirmative defenses and counterclaims that attorney knew to be false, representing deposition testimony to court as a basis for relief without first conducting reasonable inquiry into client's apparent bribery of deposition witness to give false testimony, and asserting embarrassing detailed allegations about opposing attorney's client for improper purposes, violated rule prohibiting attorney from filing an action or defense for a frivolous or improper purpose.  Rules of Prof.Conduct, Rule 3.1(c).

**13. Attorney and Client ⟺59.5(5)**

Mitigating factors to be considered in determining sanction for attorney who filed affirmative defenses and counterclaims that attorney knew to be false, failed to inquire into client's apparent bribery of deposition witness to give false testimony, and asserting embarrassing allegations about opponent for improper purposes, were that attorney had no prior disciplinary record and had a good reputation as a competent attorney.

**14. Attorney and Client ⟺59.5(4)**

Aggravating factors to be considered in determining sanction for attorney who filed affirmative defenses and counterclaims that attorney knew to be false, failed to inquire into client's apparent bribery of deposition witness to give false testimony, and asserting embarrassing allegations about opponent for improper purposes, were that attorney had 18 years experience in practice of law and refused to acknowledge the wrongful nature of his conduct.

———

### ORDER OF PUBLIC CENSURE

E. JAMES BURKE, Chief Justice.

[¶ 1]  This matter comes before the Court upon a Report and Recommendation by the Board of Professional Responsibility of the Wyoming State Bar (the Board) for a public reprimand of Laurence W. Stinson.  Having reviewed the Report and Recommendation and Mr. Stinson's objection to it, considered the oral arguments of counsel, and performed an independent and thorough review of the Board record, the Court concludes Mr. Stinson violated Rule 3.1(c) of the Wyoming Rules of Professional Conduct and accepts the recommendation of the Board that Mr. Stinson be publicly reprimanded and that he pay costs in the amount recommended by the Board.  We further rule that the Board properly denied Mr. Stinson's motion for sanctions.

### FACTS

[¶ 2]  During the events which led to this disciplinary matter, Mr. Stinson was a shareholder in Bonner Stinson, P.C., in Cody, Wyoming.  The disciplinary matter arose out of Mr. Stinson's conduct during the firm's representation of Dr. John H. Schneider, a Cody neurosurgeon, who became embroiled in a dispute with Dr. Jimmie Biles, an orthopedic surgeon in Cody.  Dr. Biles accused Dr. Schneider of having a third party disseminate defamatory statements about him, and then, in the ensuing federal litigation, Dr. Biles accused Dr. Schneider of obstructing justice, suborning perjury, and bribing a witness.  Because the charges against Mr. Stinson relate in large part to his knowledge of his client's actions and when he obtained that knowledge, we must first outline in some

detail the facts related to the federal proceedings. We will then outline the disciplinary proceedings that resulted from Mr. Stinson's conduct during his representation of Dr. Schneider in the federal proceedings.

## A. *Federal Proceedings*

[¶ 3]   On August 29, 2011, Dr. Biles filed a complaint in Federal District Court, for the District of Wyoming, against an Indiana woman by the name of Lisa Fallon. The complaint alleged that Ms. Fallon arranged to print and direct mail a defamatory flyer about Dr. Biles to over 14,000 Wyoming residents. The flyer stated:

> **Alert**—my name is Rita and I was in Cody and broke my ankle this summer and this doctor 'fixed it". (sic) He did a terrible job and I needed two more surgeries at home and I am suing him. I looked up this doctor and found this recent arrest. If this is your doctor beware and let the hospital in Cody and your state medical board know about him. He has already been investigated for drunkenness when on call at the hospital and has a dozen lawsuits that he lost! The Wyoming board of medicine told me he has several complaints from other doctors and Physician Assistants that he was drunk at work and in the operating room. Beware! How can they let someone like this practice? You can find this on line at Park County Sheriff's department website.

[¶ 4]   The flyer followed this statement with what was alleged to be a booking photo of Dr. Biles, arrest information related to a 2010 driving under the influence charge, and accusations connecting Dr. Biles to: "Lewd act with resisting arrest;" "Illegal possession controlled substance;" and "Felony Investigation." Aside from the photo and a DWUI arrest, all information in the flyer was false.

[¶ 5]   Before filing the action against Ms. Fallon, who lives in Indiana, counsel for Dr. Biles investigated Ms. Fallon's connections with Cody, Wyoming. They found that her only connection to Wyoming was her relationship with Dr. Schneider and his wife, Michelle Schneider. Through further investigation, Dr. Biles' counsel found evidence that connected Dr. Schneider to the company that printed the flyers. Despite having found this connection, Dr. Biles' counsel made the decision to first sue Ms. Fallon and seek discovery from her before proceeding against Dr. Schneider and any other potential defendants.

[¶ 6]   In September 2011, Dr. Schneider met with Mr. Stinson and Brad Bonner to discuss the lawsuit that Dr. Biles had filed against Ms. Fallon. Dr. Schneider told Mr. Stinson and Mr. Bonner that Ms. Fallon was a close family friend who could not afford an attorney to defend against the action filed by Dr. Biles. Dr. Schneider asked Mr. Stinson and Mr. Bonner to help find an attorney to represent Ms. Fallon, and he informed them that he wished to pay the fees of that attorney. Mr. Stinson and Mr. Bonner referred Ms. Fallon to an attorney who agreed to represent her, on the condition that Dr. Schneider understood that Ms. Fallon's communications with her counsel would be privileged and that paying for Ms. Fallon's defense did not allow him to control that defense. Ms. Fallon's attorney and Dr. Schneider executed a fee agreement to that effect.

[¶ 7]   On October 7, 2011, Ms. Fallon, through her attorney, filed an answer to Dr. Biles' complaint. In that answer, Ms. Fallon admitted that she created and mailed the flyer to the over 14,000 Wyoming residents. Ms. Fallon also admitted that she did not use her own money to print and mail the flyers, but she denied that she acted at the request of a third party. Mr. Stinson received a copy of the answer.

[¶ 8]   On October 16, 2011, Mr. Stinson received self-executing discovery submitted by Dr. Biles' counsel in the action against Ms. Fallon, and according to his billing invoice to Dr. Schneider, Mr. Stinson spent over one hour reviewing that discovery. The self-executing discovery included documents that showed that Dr. Schneider ordered and paid for the mailing labels used to distribute the flyer.

[¶ 9]   On October 20, 2011, Ms. Fallon's attorney sent her an e-mail questioning her position that she and she alone was responsi-

ble for mailing the defamatory flyer. He stated:

> Plaintiffs know this was not your idea. The world knows this was not your idea. Four doctors up there had a business Schneider, Biles, Emery, and one other. They split up. The split was horrible and because of the split they do not like each other. They proceed to do mean things to each other. No nurse in Indiana, especially a nice nurse, (remember everybody likes nurses) decides one day to spend her own money and send out a flyer because she does not like the way a doctor is behaving in Wyoming. A state she has never lived. (sic) A doctor who has never treated her. She has never done this before, and now all of sudden she takes a moral crusade against Dr. Biles. Unless you are completely crazy that dog don't hunt, the boat don't float, and that story is not believable.

[¶ 10]  Ms. Fallon's attorney did not copy Mr. Stinson with this e-mail or use these terms to describe to Mr. Stinson his reaction to Ms. Fallon's version of events. Ms. Fallon's attorney did, however, sometime in October 2011, tell Mr. Stinson that he felt Ms. Fallon's version was "fanciful and doesn't make any sense." On October 21, 2011, Mr. Stinson and Ms. Fallon's attorney exchanged e-mails regarding concerns that Ms. Fallon was not being truthful in responding to interrogatories. Specifically, Ms. Fallon's attorney e-mailed Mr. Stinson:

> We talk then she has to have a time period to think—where I know she communicates with Schneider. I keep telling her this is not a game just tell the truth, but I think we will never get there on the truth level.

Mr. Stinson responded:

> I think you[r] read of circumstances is likely correct. I just told Schneider yesterday to quit talking to her at all. My advice will be ignored.

[¶ 11]  On October 31, 2011, Mr. Stinson received and reviewed Ms. Fallon's draft interrogatory responses, which had been forwarded to him by Ms. Fallon's attorney. In those responses, Ms. Fallon again stated that she alone created the flyer, but she also provided names of individuals who provided her information that she used in the flyer.

Included among those individuals was Dr. Schneider. Ms. Fallon also stated in her interrogatory responses that Dr. Schneider responded to her plans to send the flyer by stating, "Dr. Biles deserves it as he is a menace to the community of doctors and he was probably going to kill someone when he was drunk." Additionally, Ms. Fallon elaborated on the details of Dr. Schneider's providing her with the mailing list for the flyer:

> Schneider said that they were public files that anyone can use and they did not specifically come from his patient database and were not "his patients" so he had no problem just giving me a labels database from Park County and its surrounding counties. I did not pay for them and Dr. Schneider did not ask for any payment, he just mailed them to me on a stick drive.

[¶ 12]  On November 17, 2011, Dr. Biles' counsel took Ms. Fallon's deposition. The deposition was sealed by agreement of the parties, so Mr. Stinson was not able to review the deposition. Ms. Fallon's attorney understood this agreement precluded him from allowing anyone to read the deposition transcript, but he also understood he was permitted to discuss the deposition with Mr. Stinson because Dr. Biles' attorney asked him to convey to Mr. Stinson that Dr. Biles would like to resolve the matter through a financial settlement with Dr. Schneider. On November 21, 2011, Mr. Stinson met with Ms. Fallon's attorney and discussed the deposition. Ms. Fallon's attorney informed Mr. Stinson that Ms. Fallon testified that she alone was responsible for distributing the flyer but that she received the mailing list and the money to cover the cost of the mailing from the Schneiders.

[¶ 13]  On November 22, 2011, counsel for both Ms. Fallon and Dr. Biles received a letter with enclosures from the Park County Attorney. The letter enclosed copies of documents that had been printed from a stick drive that a worker in the laundry room of the West Park County Hospital in Cody found in the pocket of a man's surgical scrubs. Hospital administration sent the stick drive to the county attorney, who provided the aforementioned copies of the documents to both counsel and to law enforce-

ment. The documents found on the stick drive became known as "the laundry room documents," or the "LRDs."

[¶ 14]   The LRDs consisted of three documents. The first document was addressed to Ms. Fallon and was an eight-page document that instructed her on how to testify in her deposition. It included the following passages:

[Dr. Biles' counsel] will do everything they can to intimidate as well as befriend you with one common goal—to show this flier creation and distribution was a conspiracy directed by Dr. Schneider and Michelle to slander Biles. As we have discussed, if you are able to withstand the heat of the deposition and 'take a bullet', regardless of final economic damages in favor of Biles in any type of judgment, you will be taken care of far in excess of any paycheck. The amount he will get will be negligible and have no impact on your life.

\*       \*       \*

\* \* \* They will obviously say many times, through various ways that "it is better for you to tell the truth about your co-conspirator". Don't believe any of it—they will not befriend you or help you in any way and as soon as they "turn you", you will be treated like a prison Bitch. Please stay focused on the truths in the interrogatories and this primer. All other questions beyond what is covered here are vague recollections, influenced by your current medical condition of significant thyroid imbalance, frequent antibiotics for kidney and bladder infections and your overwhelming worry that you have cancer that they will discover when they do your surgery next month. \* \* \* Please read, read and re-read these facts, as well as the interrogatory answers and use these to answer the questions they ask briefly and to the point. \* \* \*

\*       \*       \*

Reading through the last email from [Dr. Biles' counsel], they plan to demonstrate through your answers that you had no knowledge of Biles and therefore could not have generated the idea to develop the flier or had the motivation to do so and you

must have been coerced, even by friendship with Michelle and Dr. Schneider, to take these actions. This is where you can expound and be creative in your testimony attacking him as a drunk, posing danger to the community and patients, citing your uncle being killed by a drunk driver, etc. \* \* \*

\*       \*       \*

The details of Dr. Schneider's involvement are in the interrogatory answers. Just as you had spoke with the other people listed in the interrogatories, you called me and asked my knowledge about the Biles incident. Recall the interrogatory answers and it is OK to have them in front of you and simply respond to their questions by reading your answers that way you do not have to develop anything more than is listed in the answers. YOU SHOULD FALL BACK ON THE FACT THAT YOU DO NOT FEEL WELL BECAUSE OF YOUR MEDICAL CONDITIONS THAT INCLUDE THYROID IMBALANCE AND YOU NEED YOUR ANSWERS IN FRONT OF YOU AS YOUR NOTES OF THE DETAILS OF THE PEOPLE YOU HAVE SPOKEN WITH AND THE TIMELINE SINCE YOU ARE HAVING A DIFFICULT TIME INDEPENDENTLY RECALLING THESE FACTS. [Emphasis in original.]

[¶ 15]   The second document in the LRDs was a one-page document purporting to summarize the contacts and discussions between Ms. Fallon and Dr. Schneider regarding the flyer and the lawsuit. In regard to the lawsuit, the document closes with a statement that "Nothing specific to the claim is discussed." The third document in the LRDs was a four-page document setting forth draft answers to the interrogatories that had been served on Ms. Fallon.

[¶ 16]   On November 22, 2011, Ms. Fallon's attorney forwarded the Park County Attorney's letter and the LRDs to Mr. Stinson. That same day, Mr. Stinson and Mr. Bonner met with Dr. Schneider to discuss the LRDs. Mr. Stinson described this as a "very heated" meeting during which they asked Dr. Schneider to explain the documents and in particular whether he was pay-

ing for Ms. Fallon's testimony. Mr. Stinson testified that Dr. Schneider admitted that he had typed the documents but denied that he had paid or attempted to pay for Ms. Fallon's testimony. Dr. Schneider's explanation was that he was on the telephone with Ms. Fallon as he was typing the document and was merely helping to prepare her and typing the answers as she was providing them. Mr. Stinson testified that he did not have sufficient evidence at that time that Dr. Schneider was lying to him and he resolved the doubt in favor of his client. Mr. Stinson and Mr. Bonner instructed Dr. Schneider that he was to have no further contact whatsoever with Ms. Fallon.

[¶ 17] On November 23, 2011, counsel for Dr. Biles served third party subpoenas on Dr. and Mrs. Schneider, seeking communications with Ms. Fallon, forensic expert access to the Schneiders' computers and smart phones, and records of monies paid by the Schneiders to Ms. Fallon. On December 7, 2011, Mr. Stinson, on behalf of the Schneiders, filed a motion to quash the subpoenas. Mr. Stinson stated as the basis for the motion to quash that the subpoenas were overbroad and unduly burdensome, that Ms. Fallon testified under oath that she acted alone in creating and disseminating the defamatory flyer, and that counsel for Dr. Biles had not shown any connection between the Schneiders and Dr. Biles' claims against Ms. Fallon. On January 6, 2012, the district court denied the motion to quash and ordered that the Schneiders produce the subpoenaed documents and items. In so ruling, the court explained:

> The Court is satisfied that the evidence sought pursuant to this subpoena will be relevant and significant in discovering the contours of any conspiracy giving rise to plaintiff's defamation claims. Defendant Fallon did not have any close connections in the Park County area other than the Schneider family. Following the deposition of Defendant Fallon, it appears that she claims she was solely responsible for the flyer and did not receive approval of it from Dr. Schneider prior to its dissemination. In contrast, among other things, plaintiff has asserted a belief that Defendant Fallon was acting as a conduit of

information that was funneled to her from someone in Park County and was not the initial source of the defamatory materials.

> The information sought by this subpoena would be relevant and necessary to the parties in attempting to ascertain the truth in this regard.

[¶ 18] On January 19, 2012, a hearing was held on another discovery dispute, and during that hearing, the district court ordered the Schneiders to provide all subpoenaed items by February 3, 2012. On February 29, 2012, the court issued an order finding that the Schneiders had failed to make a good faith effort to comply with the subpoena, fining the Schneiders $1000.00, and directing that they provide all subpoenaed items by March 9, 2012. On March 8, 2012, the Schneiders filed their verified supplemental response to the subpoena.

[¶ 19] On January 28, 2012, Dr. Biles served on the Schneiders a complaint alleging RICO and defamation claims against the Schneiders and a related business entity. On February 21, 2012, Mr. Stinson signed and filed, on behalf the Schneiders and their related entity, an Answer and Counterclaim. In that Answer and Counterclaim, Mr. Stinson included the following statements:

> [¶ 38a] Plaintiff has taken the deposition of Lisa Shaurette Fallon in the related case of *Biles v. Fallon*. Ms. Fallon has testified that she, and she alone, created the flier of which Plaintiff complains is defamatory. Thus, Plaintiff has obtained testimony under oath that contradicts and dispels the allegations contained in Plaintiff's complaint. As a result, the allegations contained within the complaint are known to be untrue by Plaintiff and are not made in good faith. Rather, such allegations are made as part of long-standing animosity Plaintiff has for John Schneider.

> [¶ 43b] Plaintiff is himself responsible for negative public perceptions regarding him and his personality because Plaintiff is known to and/or has: often consumed alcohol while driving; consumed alcohol while driving with employees while engaged in the course and scope of business; allows or has allowed his wife—a non-medically

trained individual—to provide point of contact care for his patients (and may bill Medicare, Medicaid and/or insurance companies for these services); engaged in medical decision-making while under the influence of alcohol; bad-mouths other physicians and medical personnel; engages in subversive conduct toward other physicians; creates conflict with his employees and the employees of other physicians; waived a gun around his office and pointed that gun at an employee and commanded that the employee "dance"; fails to pay people who provide goods and services at the ranch owned by Plaintiff (or a company he controls); has failed to uphold or fulfill contractual obligations and commitments to parties connected to ranch activities and/or business ventures and other acts which create and foster the bad reputation he created for himself.

[¶ 54]  Biles knew that his complaint was false and, despite such knowledge, recklessly published the complaint by filing the same in a public docket.

[¶ 20]  On April 23, 2012, Dr. Biles' counsel disclosed to Mr. Stinson copies of e-mail correspondence between Dr. Schneider and Ms. Fallon that had been obtained through a third-party subpoena served on Ms. Fallon's Indiana employer.  The e-mails contained communications wherein Dr. Schneider urged Ms. Fallon to avoid being deposed, provided a medical excuse to be signed by her physician to help her avoid being deposed, instructed her on how to answer deposition and interrogatory questions, advised her to be vague in answering questions ("the best answers to use are 'I do not have recollection of that'"), offered to destroy her computer hard drives by giving them the "microwave treatment," and told her she should have "a 250k plus payoff for your future."

[¶ 21]  After receiving the disclosures from Dr. Biles' counsel, Mr. Stinson and Mr. Bonner conferred with Mark Gifford, Bar Counsel, concerning their disclosure obligations under the Rules of Professional Conduct, and on April 25, 2012, Mr. Stinson and Mr. Bonner requested a hearing with the district court for the purpose of disclosing the e-mail correspondence between Dr.

Schneider and Ms. Fallon.  The following day, the court held the requested hearing, and Mr. Bonner summarized the e-mail correspondence as follows:

> In general, the emails concern Ms. Fallon's answers to interrogatories and the testimony that she would be giving in an upcoming scheduled deposition.  There is considerable communication from Dr. Schneider where—and it's to Ms. Fallon—where Dr. Schneider quite apparently is instructing Ms. Fallon on what to say, what not to say, and how to say it, both in her deposition and in her interrogatories.  There is also a document that quite apparently appears to be—and it's provided from him to her—that appears to be his proposed text of her interrogatory answers.

> While all of that is a really, really, really bad idea, I don't know if that conduct in and of itself would necessarily motivate this disclosure.  However, the emails also contain communication in which Dr. Schneider provides Ms. Fallon with a doctor's note for signature by her personal physician.  And the purpose of the note, it is stated in their communication, is to prevent Ms. Fallon from having to give her deposition in the litigation.

> Then, Your Honor, when Ms. Fallon relates in an email to Dr. Schneider that she has secured her doctor's commitment to sign the doctor's note, thus hopefully in their mind precluding the deposition, Dr. Schneider writes in a responding email, "That should be a 250k-plus payoff for your future.  Thank you."

[¶ 22]  Shortly after this disclosure, Dr. Biles' claims against Ms. Fallon and the Schneiders were settled in a confidential settlement.

**B.  *Disciplinary Proceedings***

[¶ 23]  Following the disclosures to the district court, Bar Counsel appointed Special Bar Counsel to determine whether formal charges should be filed based on the conduct of counsel during the federal proceedings. In accordance with Rule 11(d) of the Disciplinary Code, Special Bar Counsel presented the matter to the Peer Review Panel for a

determination of probable cause to justify filing a formal charge against Mr. Stinson. On April 5, 2013, the Peer Review Panel issued a Finding of Probable Cause, which stated:

> This matter came before the Peer Review Panel on April 4, 2013 upon motion of Special Bar Counsel. A quorum of the Panel reviewed the Complaint, file materials and proposed Formal Charge and, being fully advised in this matter, finds, pursuant to Disciplinary Code Section 7(c)(iii), that probable cause exists justifying the filing of a Formal Charge.

[¶ 24] On April 10, 2013, the Wyoming State Bar (the Bar), through Special Bar Counsel, filed with the Board of Professional Responsibility (the Board) a Formal Charge against Mr. Stinson. The Bar asserted two violations of the Wyoming Rules of Professional Conduct. The first charge alleged that Mr. Stinson violated Rule 3.3 by delaying disclosure to the court of his client's scheme to obstruct justice for five months after Mr. Stinson obtained actual knowledge of the scheme. The second charge alleged that Mr. Stinson violated Rule 3.1(c) by: 1) signing and filing affirmative defenses and counterclaims that alleged facts Respondent knew to be false; 2) representing Fallon's deposition testimony to the Court as a basis for relief without first conducting a reasonable inquiry into his client's apparent bribery of Fallon to give false testimony; and 3) asserting embarrassing detailed allegations about Biles for improper purposes.

[¶ 25] On October 3, 2013, Mr. Stinson designated three expert witnesses: Richard Honaker, Judge Nancy Freudenthal, and Judge Alan Johnson. The Bar filed a motion *in limine* to exclude the expert testimony on ground that the testimony calls for inadmissible legal conclusions and would invade the province of the Board. The Board granted the motion *in limine* in part and denied it in part. The Board ruled that the three experts could testify, but it limited that testimony, ordering that none of the experts could testify as to the ultimate question of whether Mr. Stinson's actions were in compliance with any Rule of Professional Conduct. We will set forth any nec-essary additional facts as they relate to the expert testimony in our discussion of Mr. Stinson's challenge to the limitations placed on that testimony.

[¶ 26] Beginning on November 6, 2013, a three-day hearing was held on the charges against Mr. Stinson. At the conclusion of the hearing, the BPR deliberated on the charges and announced its findings:

> And the Board has determined by a majority of the quorum that the Bar has proved by clear and convincing evidence that the Respondent has violated Rule 3.1[c], and the Board has determined by a majority of the quorum that a violation has not been proved by clear and convincing evidence concerning the Respondent violating 3.3(b). Therefore, that portion of the formal charge is dismissed.

[¶ 27] The Board then proceeded to hear evidence and argument on sanctions. At the conclusion of that presentation, the Board again recessed for deliberations. Following those deliberations, the Board announced that its recommended sanction was a public reprimand. The Board also recommended that Mr. Stinson be required to pay hearing costs and the $500.00 administrative fee required by the Disciplinary Code.

[¶ 28] On January 3, 2014, the Board filed with the Supreme Court its Report and Recommendation for Public Reprimand. On January 21, 2014, Mr. Stinson filed a motion for W.R.C.P. 11 sanctions against the Bar, the Peer Review Panel, and against Special Bar Counsel based on the Bar's refusal to dismiss the Formal Charge. On January 23, 2014, Mr. Stinson filed Respondent's Objections to Costs, Request for Allocation, and Request for Amended Report and Recommendation, along with a request for a hearing on the objections. On March 13, 2014, the Board issued orders denying both the motion for Rule 11 sanctions and the objection to costs.

### *ATTORNEY DISCIPLINARY PROCEDURE*

[1–7] [¶ 29] This Court considers a recommended disciplinary action according to the following principles:

The purposes of the state bar disciplinary procedure are to maintain "the integrity of the bar," "to prevent the transgressions of an individual lawyer from bringing its image into disrepute" and to "protect the public and the administration of justice." *Bd. of Prof'l Responsibility v. Casper*, 2014 WY 22, ¶ 7, 318 P.3d 790, 793 (Wyo.2014); *Bd. of Prof'l Responsibility v. Davidson*, 2009 WY 48, ¶ 17, 205 P.3d 1008, 1015 (Wyo.2009); *In re Clark*, 613 P.2d 1218, 1221 (Wyo.1980). Wyo. Stat. Ann. § 5–2–114 (LexisNexis 2013) charges this Court with adopting rules of "practice and procedure in all courts of this state, for the purpose of promoting the speedy and efficient determination of litigation upon its merits." Wyo. Stat. Ann. § 5–2–118(a)(iii) (LexisNexis 2013) further charges this Court with adopting rules establishing "practice and procedure for disciplining, suspending, and disbarring attorneys."

Pursuant to Wyo. Stat. Ann. § 33–5–104 (LexisNexis 2013), membership to the bar is by petition to the Wyoming Supreme Court. Pursuant to § 1(a) of the Disciplinary Code for the Wyoming State Bar, attorneys are "subject to the exclusive disciplinary jurisdiction of this Court and the Board . . . ." Disciplinary proceedings are "necessarily incident to the inherent power of courts to control properly their own affairs." *State Bd. of Law Examiners v. Brown*, 53 Wyo. 42, 49, 77 P.2d 626, 628 (Wyo.1938). The Board acts as an arm of this Court in taking evidence and making findings and recommendations to this Court. *Mendicino v. Whitchurch*, 565 P.2d 460, 475 (Wyo.1977). Although we give due consideration to the Board's findings and recommendations, the "ultimate judgment in these cases is vested in the Court." *Casper*, ¶ 8, 318 P.3d at 793–94, citing *Mendicino*, 565 P.2d at 466. *See also Davidson*, ¶ 1, 205 P.3d at 1012.

In determining whether discipline is appropriate in these special proceedings, this Court must be satisfied that "substantial, clear, convincing, and satisfactory evidence" exists to sustain the findings of the Board. *Mendicino*, 565 P.2d at 475. Clear and convincing evidence is "that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable." *SMH v. State*, 2012 WY 165, ¶ 19, 290 P.3d 1104, 1109 (Wyo.2012); *Meyer v. Norman*, 780 P.2d 283, 291 (Wyo. 1989). The clear and convincing standard must be applied consistently to each and every charge against the attorney. *Id.*

*Bd. of Prof'l Responsibility v. Richard*, 2014 WY 98, ¶¶ 51–53, 335 P.3d 1036 (Wyo.2014).

## DISCUSSION

[¶ 30]   Mr. Stinson objects to the Board's recommended finding that he violated Rule 3.1(c), the Board's limitation on the testimony of his expert witnesses, and the Board's recommended sanction and award of costs. We will address each of these questions separately, and as a final matter, we will address Mr. Stinson's Rule 11 motion.

### A. *Rule 3.1(c) Violation*

[¶ 31]   Rule 3.1(c) of the Wyoming Rules of Professional Conduct provides:

The signature of an attorney constitutes a certificate by him that he has read the pleading, motion, or other court document; that to the best of his knowledge, information, and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

[¶ 32]   Comments 1 and 2 to Rule 3.1 are relevant to our consideration of Mr. Stinson's conduct. Comment 1 provides:

The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure. The law, both procedural and substantive, establishes the limits within which an advocate may proceed. However, the law is not always clear and never is static. Accordingly, in determining the proper scope of advocacy, account must be

taken of the law's ambiguities and potential for change.

[¶ 33]   Comment 2 to Rule 3.1 states:

The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery.   What is required of lawyers, however, is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions.   Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail.   The action is frivolous, however, if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law.

[¶ 34]   The Board found clear and convincing evidence that Mr. Stinson violated Rule 3.1(c).   Mr. Stinson objects to the recommended Rule 3.1(c) findings on the grounds that they are unsupported by expert testimony or other clear and convincing evidence.   We will address first Mr. Stinson's argument that the Bar was required to present expert testimony on the charged violations, and then we will address whether the record contains clear and convincing evidence that Mr. Stinson violated Rule 3.1(c).

### 1.   Bar's Lack of Expert Testimony to Support Rule 3.1(c) Violation

[8]   [¶ 35]   Mr. Stinson contends that because the Bar presented no expert testimony on the question of whether he violated Rule 3.1(c), no violation of the rule can be found. In so arguing, Mr. Stinson relies on *Painter v. Abels*, 998 P.2d 931, 939 (Wyo.2000), wherein this Court held that a finding of unprofessional conduct by a medical doctor was unsupported by substantial evidence because the finding was not supported by expert testimony.   Mr. Stinson's reliance on *Painter* is misplaced.

[¶ 36]   In *Painter*, this Court rejected the finding of unprofessional conduct unsupport-

ed by expert testimony because the record left us with essentially no evidence against which to evaluate the Board of Medicine's findings.   We explained:

The Board found Dr. Painter's participation in a patient case study using an EDS machine was unprofessional conduct "contrary to recognized standards of ethics of the medical profession" under the American Medical Association's Code of Medical Ethics, *supra*, and thus a violation of § 33–26–402(a)(xxvii).   The Code of Medical Ethics, *supra*, requires that participation in any such clinical study be part of a systematic program competently designed under accepted standards of scientific research to produce scientifically valid and significant data.   The Board provided no expert testimony on this count.   We addressed virtually the same issue in *Devous v. Wyoming State Board of Medical Examiners*, 845 P.2d 408, 418 (Wyo.1993), in regard to § 33–26–402(a)(xv), (xviii), and (xxvi):

The crux of the issue is whether the record must include expert testimony with respect to [the pertinent] statutory grounds, or whether we must acknowledge and accept the expertise of the Board members in establishing standards that demonstrate infringement of the statute. . . .   If judicial review has any purpose, it must be exercised by objectively evaluating evidence in the record.   There is no way that a judicial review could reach the subjective determination of standards by individual members of the Board.

*Painter*, 998 P.2d at 939.

[¶ 37]   Our subsequent decisions have emphasized that this holding does not mean that expert testimony is required to support all findings of a professional code of conduct violation.   For example, in *Billings v. Wyo. Bd. of Outfitters and Prof'l Guides*, 2004 WY 42, ¶¶ 51–52, 88 P.3d 455, 474–75 (Wyo.2004) (*Billings II* ), we concluded that expert testimony was not required to prove the professional standard and a breach thereof where an outfitter willfully abandoned a client on a wilderness trail.   We explained:

BOARD OF PROF'L RESPONSIBILITY v. STINSON    Wyo.  411
Cite as 337 P.3d 401 (Wyo. 2014)

Neither the nature of the violation, nor the facts underlying it, involves subject matter "not within our knowledge" or requiring additional expert testimony. The state of the record is such that in reviewing the issue, we are not required merely to accept the Board's subjective expertise for a standard that demonstrates infringement of the statute. Contrary to Billings' argument, it does not appear that the Board's use of the term "abandonment" was for purposes of establishing a formal standard of care, but was the Board's factual characterization of Billings' actions.

*Billings II,* ¶ 52, 88 P.3d at 475.

[¶ 38]  Similarly, in *Penny v. State ex rel. Wyo. Mental Health Professions Licensing Bd.,* 2005 WY 117, 120 P.3d 152 (Wyo.2005), this Court held that expert testimony was not required to support findings that the license applicant violated the code of conduct applicable to social workers by practicing without a license and losing a client file. We reasoned:

We are satisfied that expert testimony was not required under the particular circumstances now before this Court because, as in *Billings II,* the nature of the alleged violations is "within our knowledge." For instance, accepting the Board's credibility determinations, the evidence is such that we are left with little if any doubt that the appellant knowingly practiced without a license and knowingly represented himself as licensed when he was not. Further, the evidence fully supports the conclusion that the appellant engaged in practices clearly identified in Wyo. Stat. Ann. § 33–38–102(a)(v) as "clinical social work," including diagnosis and counseling. And in the matter underlying the second complaint, he either lost a client's file, evidencing gross incompetence, or he refused to produce it at the Board's request, either of which was a licensing violation. Expert testimony

was not required to establish these violations.

*Penny,* ¶ 32, 120 P.3d at 170–71.

[¶ 39]  In so holding in *Penny,* we distinguished findings that require expert testimony, explaining:

Clearly, this case is wholly unlike *Billings I* and *Devous.* Here, rather than relying upon its members' individual standards, the Board meticulously detailed in its order the applicable statutory and administrative standards, including the ethical codes adopted therein. The problem identified in *Billings I* and *Devous* is the impossibility of judicial review where the record does not reveal the identified standard of professional care against which a licensee's conduct is to be measured. That problem does not exist here. Once the legislature and the administrative agency have fully identified the standard of care, it does not require expert testimony, at least in the present circumstances, to establish that standard.

*Penny,* ¶ 31, 120 P.3d at 170.

[¶ 40]  Rule 3.1(c) likewise presents a clearly identified standard. The question before us, under Rule 3.1(c), is whether, to the best of Mr. Stinson's knowledge, information, and belief, his filings in the federal proceedings were supported by fact and not interposed for an improper purpose such as to harass or publicly embarrass. This question requires that we review the filings signed by Mr. Stinson and compare his statements in those filings with what he knew when he signed the filings. The record contains the evidence that will allow us to complete this comparison, and we are therefore not presented with questions that require us to use subjective or undefined standards to formulate an answer. The Bar was therefore not required to present expert testimony on the Rule 3.1(c) question.[1]

---

1.  In relying on this Court's analysis in *Billings II* and *Penny,* we recognize that this Court is situated differently when ruling on an attorney disciplinary matter. The Board is not an administrative agency, and it is not governed by the Wyoming Administrative Procedure Act. Instead, the Board is an arm of this Court, and when ruling on an attorney disciplinary matter,

we are not acting in an appellate capacity but are instead acting on a recommended ruling, with the ultimate judgment being vested in this Court. *Richard,* ¶ 52, 335 P.3d at 1052. Nonetheless, we find the analysis in *Billings II* and *Penny* helpful, because, although this Court is the ultimate decision-maker in these matters, we have made it clear that our "determination

[¶ 41]  Having determined that expert testimony was not required to prove the Rule 3.1(c) violation, we turn next to the question of whether the record otherwise contains clear and convincing evidence that Mr. Stinson's filings in the federal proceedings violated Rule 3.1(c).

### 2.  *Evidence in Support of Rule 3.1(c) Violation*

[9]  [¶ 42]  The Board found clear and convincing evidence that Mr. Stinson violated Rule 3.1(c) and recommended the following conclusions of law:

   4.  An officer of the Court owes a duty of candor that precludes a "head in the sand" response to the evidence disclosed. While in many circumstances a lawyer may reasonably rely on what a client tells the lawyer, doing only that was insufficient in this matter after the LRD evidence surfaced showing the client likely conspired with a witness to obstruct justice.  Instead of further informing himself about the facts of his client's case, Respondent assisted Schneider in delaying production of evidence of relevant facts by filing a motion to quash the subpoenas.  Respondent then stood by as Schneider not only failed to timely produce the financial records and emails requested in the subpoenas, but also disobeyed the Court's order to produce all items requested in the Subpoena by February 3, 2012.  As a result, when Respondent filed the Answer and Counterclaims in the Second Federal Case, he not only failed to take independent action to obtain and review Schneider's records pursuant to his duty to conduct a reasonable inquiry, he knew that Schneider had failed to comply with legitimate discovery requests for that information and had disobeyed the Court's order to produce that information by a date certain.

   5.  Respondent's purpose in asserting the affirmative defenses and counterclaims in the Second Federal Case was not proper.  Respondent asserted the defenses and

counterclaims not in an effort to advocate Schneider's legitimate rights, but in furtherance of Schneider's objective to publicly embarrass and humiliate Biles beyond the harm caused by the original defamatory mailing.  Respondent did so not by pleading facts bearing on Biles' public reputation as to his professional ability or supposed criminal act—subjects addressed in the fliers mailed—but instead by seeking to publish and publicize previously confidential and private information about Biles.

[¶ 43]  Mr. Stinson's first two arguments concerning the sufficiency of the evidence focus on the Board's conclusions regarding the motion to quash that he filed on behalf of the Schneiders.  Specifically, Mr. Stinson argues that there is no evidence that he violated Rule 3.1(c) by assisting his client in delaying production of evidence by filing the motion to quash or by standing by as his client failed to timely comply with the court's order regarding the subpoena.  We do not read the Board's recommended conclusions as holding that Mr. Stinson's filing of the motion to quash was in itself a violation of Rule 3.1(c).  The Board's comments regarding the subpoena appear instead to be directed to the Board's conclusion that Mr. Stinson failed to investigate his client's connection to the dissemination of the defamatory flyer—suggesting that under the circumstances, Mr. Stinson would have been better served by educating himself with the subpoenaed information rather than seeking to prevent its disclosure.

[¶ 44]  Regardless of the intention behind the Board's conclusions of law concerning the motion to quash, however, this Court agrees with Mr. Stinson that the record does not contain clear and convincing evidence that the motion to quash was filed for an improper purpose.  Judge Johnson, who heard the motion to quash and ultimately denied the motion, testified in the Board hearing that while he did not find the motion well taken,

---

must be made upon the evidence that was presented to the Board at the hearing.'' *Bd. of Prof'l Responsibility v. Davidson,* 2009 WY 48, ¶ 8, 205 P.3d 1008, 1012 (Wyo.2009).  Using the *Billings II* and *Penny* analysis to determine the

need for expert evidence helps to ensure that this Court's ruling on a disciplinary matter is based on the evidentiary record and not on a subjective evaluation of a duty or standard of care.

he also did not find it frivolous. From our review of the record, we likewise find that the record does not contain clear and convincing evidence that Mr. Stinson assisted his client in delaying production of information, or that he stood by while his client failed to timely comply with the subpoena.

[¶ 45]  We do, however, find that the record contains clear and convincing evidence that Mr. Stinson made allegations in the Answer and Counterclaim that he filed and signed on behalf the Schneiders for which he did not have a good faith basis. We further find that the record contains clear and convincing evidence that Mr. Stinson made allegations in the Answer and Counterclaim that were made for the improper purpose of publicly embarrassing the other party to the action, Dr. Biles. Both of these actions violated Rule 3.1(c).

[¶ 46]  By the time Mr. Stinson filed the Answer and Counterclaim, he had the following information:

—the self-executing discovery of Dr. Biles, which included documentation that Dr. Schneider ordered and paid for the mailing labels that Ms. Fallon used in disseminating the defamatory flyer;

—Ms. Fallon's interrogatory responses in which she confirmed that Dr. Schneider had provided the mailing labels and also stated that Dr. Schneider had provided her with information concerning Dr. Biles and had encouraged her to send the flyer;

—reports of Ms. Fallon's deposition testimony, which reports included not only her testimony that she acted alone in disseminating the flyer, but also her testimony that the Schneiders paid the costs associated with creating and mailing the flyer;

—the expressed concerns of Ms. Fallon's attorney that Ms. Fallon was not being truthful in her testimony and discovery responses in which she took full responsibility for the flyer and that she was being coached by Dr. Schneider in responding to questions concerning her involvement;

—Judge Johnson's order denying the motion to quash in which he acknowledged Ms. Fallon's deposition testimony taking full responsibility for the flyer but still found that there was enough of a question

concerning Dr. Schneider's involvement to warrant the breadth of the subpoena; and

—the LRDs and Dr. Schneider's admission that he had created the LRDs.

[¶ 47]  We are particularly troubled by the LRDs. Neither the content nor the tone of the LRDs fits with Dr. Schneider's explanation to Mr. Stinson that in preparing the documents, he was merely acting as Ms. Fallon's scribe and providing her general instruction on what to expect when she is deposed. The LRDs instructed Ms. Fallon on how to answer deposition questions and contained assurances that she would not be hurt if she adhered to the scripted answers as well as warnings regarding the jeopardy that she would face if she deviated from the script and allowed Dr. Biles' counsel to "turn her." Despite having the LRDs and the other above-described information that implicated Dr. Schneider in flyer scheme, Mr. Stinson signed and filed the Answer and Counterclaim with inclusion of the following statements:

[¶ 38(a) ]  Plaintiff has taken the deposition of Lisa Shaurette Fallon in the related case of *Biles v. Fallon.* Ms. Fallon has testified that she, and she alone, created the flier of which Plaintiff complains is defamatory. Thus, Plaintiff has obtained testimony under oath that contradicts and dispels the allegations contained in Plaintiff's complaint. As a result, the allegations contained within the complaint are known to be untrue by Plaintiff and are not made in good faith. Rather, such allegations are made as part of long-standing animosity Plaintiff has for John Schneider.

[¶ 54]  Biles knew that his complaint was false and, despite such knowledge, recklessly published the complaint by filing the same in a public docket.

[¶ 48]  Given the LRDs and the other information available to Mr. Stinson when he prepared the Answer and Counterclaim, he had to know, at the very least, that questions remained concerning his client's connection to the dissemination of the defamatory flyer. We therefore find the evidence clear and convincing that Mr. Stinson did not have a good faith basis for including Paragraphs

38(a) and 54 in the Answer and Counter-claim.

[¶ 49]  We turn then to statements contained in the Answer and Counterclaim that we find were made for the improper purpose of embarrassing Dr. Biles.  In this regard, we are most concerned with Paragraph 43(b), which was included as an affirmative defense and states:

> Plaintiff is himself responsible for negative public perceptions regarding him and his personality because Plaintiff has known to and/or has:  often consumed alcohol while driving;  consumed alcohol while driving with employees while engaged in the course and scope of business;  allows or has allowed his wife—a non-medically trained individual—to provide point of contact care for his patients (and may bill Medicare, Medicaid and/or insurance companies for these services);  engaged in medical decision-making while under the influence of alcohol;  bad-mouths other physicians and medical personnel;  engages in subversive conduct toward other physicians;  creates conflict with his employees and the employees of other physicians;  waived a gun around his office and pointed that gun at an employee and commanded that the employee "dance";  fails to pay people who provide goods and services at the ranch owned by Plaintiff (or a company he controls);  has failed to uphold or fulfill contractual obligations and commitments to parties connected to ranch activities and/or business ventures and other acts which create and foster the bad reputation he created for himself.

[¶ 50]  Mr. Stinson contends that this paragraph was included in the Answer and Counterclaim not to cause embarrassment but rather to ensure that the pleading complied with the specificity required in federal pleadings by the *Iqbal–Twombly* standard.  The *Iqbal–Twombly* standard requires as follows:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Id.,* at 570, 127 S.Ct. 1955.  A claim has facial plausibility when the plaintiff pleads factu-

al content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.,* at 556, 127 S.Ct. 1955.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "  *Id.,* at 557, 127 S.Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

[¶ 51]  We will assume for purposes of our analysis here that the *Iqbal–Twombly* standard extends to the pleading of an affirmative defense, although that is less than certain.  *See,* 5 Charles Alan Wright and Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1274 (3d ed.) (Supp.2014) (courts are divided on whether *Iqbal–Twombly* standard extends to pleading of affirmative defenses);  *Malibu Media, LLC v. Ryder,* 2013 WL 4757266 *2 (Tenth Circuit has not addressed whether *Iqbal–Twombly* standard extends to pleading of affirmative defenses).  Even assuming the requirement of enhanced detail and specificity required by the *Iqbal–Twombly* standard applied to the pleading of Dr. Schneider's affirmative defenses, this Court is not persuaded that compliance with that standard was the motivation behind Paragraph 43(b) of the Answer and Counterclaim.  The record instead persuades us that the paragraph was included for the purpose of embarrassing Dr. Biles.

[¶ 52]  We reach this conclusion and our agreement with the Board's recommended finding for a number of reasons.  First, while Paragraph 43(b) contains significant detail concerning alleged bad behavior by Dr. Biles, it contains no detail as to how the referenced acts are alleged to be a matter of public knowledge.  This is in contrast to the allegations in Paragraph 43(a), relating to Dr. Biles' DWUI arrest, wherein the affirmative defense specified how the DWUI arrest was allegedly a matter of public record: "Park

County, Wyoming uses a public booking system that displays photographs and charges of people arrested." If insulating the affirmative defense from a motion to strike were truly what motivated the detail in Paragraph 43(b), we would expect the defense to identify how the acts are publicly known, rather than just listing alleged bad acts, most of which were wholly unrelated to the acts alleged in the defamatory flyer.

[¶ 53] We are further persuaded that the improper purpose of embarrassing Dr. Biles motivated the pleading because of the press release that accompanied the filing of the Answer and Counterclaim. The Answer and Counterclaim was filed on February 21, 2012. Mr. Stinson's billing records on the Schneider matter show that also on February 21, 2012, he spoke with Kim Sapone, an employee of Acclaim, LLP Public Relations, regarding the Answer and Counterclaim. On February 22, 2012, Ms. Sapone sent a press release to the *Cody Enterprise* and the *Billings Gazette*, which stated:

Local Surgeon's Response to Libel Allegations

Cody, WY—Dr. John H. Schneider, Neurosurgeon, filed in federal court on Tuesday in response to recent allegations of defamation of character by orthopedic surgeon, Dr. Jimmie Biles. Dr. Schneider's response not only addresses the suit brought on by Dr. Biles but will carry with it a countersuit on behalf of Dr. John H. Schneider as well as a suit on behalf of the People of Wyoming.

Court filings hold sworn testimony that proves Dr. Schneider had no involvement in the negative flyer distributed last December about Dr. Biles. The individual named in disseminating the flyer testified that she, and she alone, created the flyer. Court records also indicate that Dr. Biles has a long history of erratic, alcohol and substance abuse related behavior that has left many, including patients, the general public and Dr. Schneider, feeling victimized.

"It's a shame it had to come to this," said Dr. Schneider. "Dr. Biles has some personal demons to overcome, and I feel sorry for him. It's sad to see a man lash out at others in a desperate attempt to salvage a career that is crumbling around him. I hope he is able to get healthy and in control again someday."

Attorney for Dr. Schneider, Laurence Stinson of Bonner Stinson Law Firm, feels the suit brought on by Dr. Biles is another attempt to cause harm to Dr. Schneider "as a result of long-standing animosity and jealousy toward Dr. Schneider, his former friend, who refused to finance a ranch operation owned by Dr. Biles."

Dr. Schneider continued "We look forward to getting this over with so we can get back to our purpose—helping our patients and our community." Dr. Schneider stated that he has tried to take the higher ground in his dealings with Dr. Biles over the last several years, but "my personal integrity and my professional career demand that I not stand idly by any longer."

[¶ 54] In the hearing before the Board, Mr. Stinson denied that he approved this press release or that he provided a quote to Ms. Sapone. Mr. Stinson confirmed that he had talked to Ms. Sapone and testified that he believed he had talked to her more than once, stating, "Partly I was trying to get them to quit doing this." This testimony does not change our view of the manner in which the affirmative defenses were pled. Mr. Stinson testified that he knew of his client's animosity toward Dr. Biles. Indeed, Dr. Schneider made his intentions clear early in the federal proceedings when Ms. Fallon's attorney informed both Mr. Stinson and Dr. Schneider, by e-mail, that Dr. Biles' counsel was going to argue that Dr. Schneider was Ms. Fallon's co-conspirator in disseminating the defamatory flyer. Dr. Schneider responded, with a copy to Mr. Stinson, "I am well aware of the tact and Laurence is mounting a devastating counter suit against Biles." Mr. Stinson knew of his client's animosity, knew his client wanted to deal a devastating blow to Dr. Biles, and knew his client was working on a press release. Under these circumstances, the utmost care should have been taken in preparing the Answer and Counterclaim to ensure its compliance with Rule 3.1(c). The pleading was not so prepared and was instead crafted to

serve the improper purposes of Dr. Schneider. The record contains clear and convincing evidence that the pleading violated Rule 3.1(c).

**B.   *Limitation on Expert Testimony***

**[10]**   [¶ 55]   We addressed earlier in this opinion the reasons that the Bar was not required to present expert testimony to prove the rule violations at issue in this matter. We now turn to the related question of whether the Board erred in limiting the expert testimony that Mr. Stinson sought to introduce.

[¶ 56]   Our first task in ruling on this question is to determine the standard to be used in reviewing the Board's evidentiary rulings. Typically, we review a trial court's ruling on the admissibility of expert evidence for an abuse of discretion. *Craft v. State,* 2013 WY 41, ¶ 28, 298 P.3d 825, 833 (Wyo. 2013). As noted earlier, however, this Court sits in a unique posture in ruling on attorney disciplinary matters. We have described the division of functions between this Court and the Board as follows:

In *Meyer v. Norman,* 780 P.2d 283, 286–288 (Wyo.1989), we described the structural relationship between the Wyoming Supreme Court and the Wyoming State Bar, but we did not detail the procedure that this Court follows in reviewing and acting upon a disciplinary recommendation of the Board. Although the case arose under earlier versions of the Rules of Professional Conduct and the Disciplinary Code, the procedural holdings of *Mendicino v. Whitchurch,* 565 P.2d 460, 465–66, 475 (Wyo. 1977) remain valid; that is, the Board is an arm of this Court whose purpose is to investigate allegations of professional misconduct and to report its findings and recommendations to the Court, which is the ultimate decision-maker in attorney disciplinary matters. Sections 21(c)(iii) and (iv) of the current Disciplinary Code make it

clear that the Court's determination of appropriate discipline is its own, but that the determination must be made upon the evidence that was presented to the Board at the hearing. That process has been described as: "All attorney discipline cases require a two step analysis. First, the Court must determine whether the record supports the findings and recommendations, then it must independently determine the sanctions warranted by the facts of the case." *Idaho State Bar v. Souza,* 142 Idaho 502, 129 P.3d 1251, 1254 (2006).

*Davidson,* ¶ 8, 205 P.3d at 1012.

**[11]**   [¶ 57]   In other words, the Disciplinary Code has structured disciplinary proceedings so it is the Board that hears evidence in the first instance and compiles the record. As part of that division of duties, the Disciplinary Code authorizes the Board, through either a disciplinary judge or the Board chair, to rule on evidentiary matters in accordance with the Wyoming Rules of Evidence. See Disciplinary Code §§ 8(g)(vi), 9(b)(iii), 19(b). In performing this function, the Board is called upon to exercise the same discretion that a trial court exercises in ruling on the admissibility of evidence. Given the structure of our attorney disciplinary proceedings, the division of functions between this Court and the Board, and the discretion the Board must necessarily use in ruling on the admissibility of evidence, we see no reason to deviate from our abuse of discretion standard of review. We will thus review the Board's limitation on Mr. Stinson's proffered expert testimony using our abuse of discretion standard of review and will find an abuse of discretion only if the Board could not have reasonably concluded as it did in limiting the testimony of Mr. Stinson's designated experts. *See Stalcup v. State,* 2013 WY 114, ¶ 18, 311 P.3d 104, 110 (Wyo.2013) ("A trial court abuses its discretion when it could not have reasonably concluded as it did.").[2]

2.   We will not address the limitations the Board placed on expert testimony concerning the charged Rule 3.3 violations because the Board found no violation of Rule 3.3 and therefore those charges and the evidentiary rulings related thereto are not before the Court. We likewise will not discuss the limitations placed on Judge

Johnson's testimony. Judge Johnson's proposed opinion regarding Rule 3.1(c) addressed only the filing of the subpoena, and we have concluded that the filing of the subpoena did not violate Rule 3.1(c). Our discussion of the limitations on expert testimony will therefore be confined to the limitations on the opinions of Judge

[¶ 58]  W.R.E. 702 governs the admissibility of expert testimony and provides that such evidence is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  W.R.E. 702 (LexisNexis 2014).  The Board permitted Mr. Stinson's experts to testify subject to the following limitation:

> Neither Mr. Honaker, Judge Freudenthal, nor Judge Johnson may testify as to whether or not any actions or inactions by the Respondent were or were not ethical; were or were not in compliance with any Rule of Professional Conduct; or whether or not any specific state of mind of the Respondent or any other attorney would or would not constitute a violation of the Rules of Professional Conduct.

[¶ 59]  Mr. Stinson designated Judge Freudenthal as an expert witness who would testify in keeping with the opinions stated in her expert affidavit.  Concerning the charged violations of Rule 3.1(c), Judge Freudenthal offered the following opinions:

> 8.  I also do not believe that Mr. Stinson violated Rule 3.1(c) of the Wyoming Rules of Professional Conduct by using the Fallon deposition testimony as he understood it to be to vigorously defend Dr. Schneider.
>
> 9.  In regard to the aspect of the charge against Mr. Stinson that he should not have included the detailed allegations directed at Dr. Biles in his Answer and Counterclaim, current federal law requires more than conclusory facts to be included in a Counterclaim to avoid dismissal under the *Iqbal/Twombly* line of cases.

[¶ 60]  Judge Freudenthal was permitted to provide testimony consistent with the opinion offered in Paragraph 9 of her affidavit, so that portion of her proffered testimony is not at issue.  With respect to the opinion offered in Paragraph 8 of the affidavit, the Board adhered to its exclusion of any opinion as to whether the Answer and Counterclaim violated a rule of conduct, but Judge Freudenthal was permitted to testify:

> Q.  Okay. Did you ever believe that Mr. Stinson's use of the admissions in the Lisa

Fallon deposition in his defense of the Schneiders was improper in any way?  And I don't mean to ask that in regard to any ethical obligations.

> A.  I wasn't surprised by his use of those.  I didn't consider it improper—
>
> Q.  Okay.
>
> A.—in terms of what to expect in the course of that case.  I expected that fight.

[¶ 61]  The record shows that the Board took a similar approach in limiting Richard Honaker's testimony.  Mr. Stinson designated Mr. Honaker to provide the following opinions concerning the charged Rule 3.1(c) violations:

> b.  Mr. Stinson did not violate Rule 3.1(c) of the *Wyoming Rules of Professional Conduct* by relying upon the Fallon deposition testimony to defend Dr. Schneider and to assert a counterclaim on Dr. Schneider's behalf in *Biles v. Schneider*, United States District Court, District of Wyoming, Civil No. 11–CV–366–F.

> \*     \*     \*

> (10) Nothing changed in the case for Mr. Bonner and Mr. Stinson between late November 2011 and the afternoon of April 23, 2012, when Mr. Bonner and Mr. Stinson received documents (not the "laundry room documents") from Plaintiff's counsel that proved to them, for the first time, that their client had lied to them and in fact had attempted to manipulate the legal process through a fraudulent delay of the Fallon deposition.  At that point they made the decision to withdraw from any further representation of Dr. Schneider.

> (11) Because the Rules did not require Mr. Bonner and Mr. Stinson to withdraw earlier than April 23, 2012, they owed their client, Dr. Schneider, prior to that date, an ethical duty to represent him competently and effectively, abiding by his decisions concerning the objectives of representation.  It would have violated that ethical duty, and, in addition, likely would have constituted legal malpractice, for Mr. Bonner and Mr. Stinson to ignore the single piece of sworn testimony that existed—the deposition of Lisa Fallon—and to fail to

Freudenthal and Richard Honaker concerning    the Rule 3.1(c) violations.

use that sworn testimony to their client's advantage.

(12) Mr. Bonner and Mr. Stinson were acting as advocates for a client within the adversary system. "As an advocate, a lawyer zealously asserts the client's position under the rules of the adversary system." (*Wyoming Rules of Professional Conduct*, Preamble: a Lawyer's Responsibilities, [2] ). The adversary system only works when each party has independent counsel and is well represented, and an independent, fair, and impartial tribunal decides the issues of fact and law. As advocates for their client, it was not Mr. Bonner's or Mr. Stinson's role to weigh the evidence and to adjudicate whether or not Ms. Fallon had committed perjury in her deposition or whether Dr. Schneider, despite his protestations to the contrary, had suborned such perjury. The final result of these cases—settlement of both cases well before trial settings—bears out that the adversary system worked well, with each participant representing his or her client effectively, and that justice was done. Mr. Bonner and Mr. Stinson played their roles appropriately, with careful and prudent deliberation, and nothing they did resulted in any fraud upon the judicial system or miscarriage of justice. Rather than being prejudiced, it appears likely that the Plaintiff benefitted from the way the process played itself out. As more facts gradually came to light, the Plaintiff's cases became stronger, and voluntary settlements occurred.

(13) With regard to the aspect of the charge against Mr. Stinson that he should not have included such detailed allegations in his Answer and Counterclaim, the Bar admits that Mr. Stinson had a factual basis for those allegations. The Bar alleges that such detail was not necessary and was done only for "purposes of harassment and embarrassment" (Formal Charge, ¶ 77). Current federal law, however, requires detailed pleadings to avoid dismissal. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 [127 S.Ct. 1955, 167 L.Ed.2d 929] (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 [173 L.Ed.2d 868] (2009). Wyoming's state courts are moving in the same direction. See, for example, Rule 3 of the *Wyoming Rules of Civil Procedure for Circuit Courts*. The Answer and Counterclaim complied with current federal standards of pleading, demonstrating Mr. Stinson's competence under Rule 1.1, *Wyoming Rules of Professional Conduct*, to represent a client in the United States District Court.

[¶ 62] The hearing transcript shows that Mr. Honaker was permitted to and did testify to all of the above-designated opinions, subject only to the limitation that he not testify as to whether Mr. Stinson violated Rule 3.1(c). In particular, Mr. Honaker was permitted to testify: that an attorney "must presume the client's being honest until proven otherwise;" that there was nothing inappropriate in the manner that Mr. Stinson pled the Answer and Counterclaim; that "the pleading was, with specificity, required by the legal precedent;" and that the detail in the pleading was "a positive thing" because it put the plaintiff on notice as to where the defendant would be coming from. Mr. Honaker was also permitted to testify:

Q. Was Laurence Stinson in any way obligated to determine the reliabilities of the Fallon testimony before using it in his client's defense?

A. Well, he had a responsibility as a lawyer, if he knew it was false—you know, a lawyer cannot present false evidence to a court. That would be a terrible thing to do. So unless he knew it was false, it was something that he owed a responsibility to his client to present. It was evidence that—apparently it was favorable to his client. I think that if he reasonably believed that it was false, it still would have been proper to present it.

Q. Do you believe that he would have been obligated to use it only if he knew it was true?

A. No, to the contrary. I think a lawyer is obligated to use evidence that's favorable to their client unless they know it's false.

[¶ 63] Essentially, Mr. Stinson was permitted to present the designated opinion testimony of Judge Freudenthal and Mr. Ho-

naker almost in its entirety, with the only limitation being that neither witness was permitted provide an opinion on the ultimate question of whether Mr. Stinson violated Rule 3.1(c). We find no abuse of discretion in the Board's ruling.

[¶ 64] This Court has held that a trier of fact does not abuse its discretion when it excludes expert testimony on a question of law. *Ruby Drilling Co., Inc. v. Duncan Oil Co., Inc.,* 2002 WY 85, ¶ 22, 47 P.3d 964, 971 (Wyo.2002) ("Contract construction is a question of law and solely within the court's province."). In *Ruby Drilling,* we explained the distinction between expert testimony that may be excluded as encroaching on a question of law and that which should not be excluded:

> Ruby relies on *Samson Resources Company v. Quarles Drilling Company,* 783 P.2d 974, 977 (Okla.Ct.App.1989). The *Samson Resources* case involved a drilling contract with an explicit modification clause governing conditions which would trigger a change from a footage to a day work contract. The *Samson Resources* trial court excluded expert testimony on the industry custom and usage regarding notice of such a change intended to apprise the contracting parties of a modification of the contract from footage to day work. The *Samson Resources* appellate court found the industry evidence was relevant to proper construction of the contract. We agree with this result and point out the trial court in the appeal before us permitted testimony regarding industry custom and usage. However, the *Samson Resources* case does not support Ruby's position that its expert should have been permitted to testify as to the proper contract construction or which party he believed was obligated to ensure inclusion of specific clauses in the contract. Here, the trial court was absolutely correct and fully within its broad discretion when it precluded the attempt to have Ruby's expert witness construe the contract. Contract construc-

tion is a question of law and solely within the court's province.

*Ruby Drilling,* ¶ 22, 47 P.3d at 971.

[¶ 65] The Board's ruling on Mr. Stinson's proffered expert testimony tracked this approach. The Board allowed expert testimony on considerations that Mr. Stinson argued justified the manner in which he pled the allegations in the Answer and Counterclaim, including the legal requirements governing federal pleadings and a lawyer's obligations to a client. This testimony, by addressing the context of the pleadings, was directed at assisting the trier of fact in understanding the evidence or determining a fact in issue—the reasons Mr. Stinson pled the Answer and Counterclaim as he did. The expert opinions on whether Mr. Stinson violated Rule 3.1(c), on the other hand, are not opinions that assist the trier of fact in understanding the evidence or determining a fact in issue. They instead offer a legal conclusion, which is the province of the Board and this Court.

[¶ 66] Answering the question of whether Mr. Stinson's conduct violated Rule 3.1(c) is properly left to the Board and ultimately this Court. As we discussed earlier, Rule 3.1(c) is not a rule of professional conduct that requires definition or clarification by expert testimony because the rule sets forth an objective standard that the Board and this Court are able to apply to the facts in evidence. Importantly, our decision whether there has been a violation of the Rules of Professional Conduct must be based on the entire evidentiary record. *See Richard,* ¶ 2, 335 P.3d at 1040–41, n. 1 (emphasizing that this Court's decision is based on "an independent review of the entire record"); *Davidson,* ¶ 8, 205 P.3d at 1012 (this Court's "determination must be made upon the evidence that was presented to the Board at the hearing"). This highlights the deficiency in an expert opinion on the ultimate conclusion of law. In most cases, and certainly in this case, the expert opinions are based not on the entire evidentiary record before the Board but rather on a narrow subset of the evidence.[3] While opinions concerning factors

---

**3.** That the expert opinions offered in this matter were based on less than the entire record on which this Court must base its ultimate conclu-

sions was clear from the expert testimony. For example, Judge Freudenthal testified that she ruled only on the particular motions that were

that must be considered in preparing competent pleadings may assist the trier of fact, in this case, a legal conclusion based on less than the entire evidentiary record is not helpful. The Board thus did not abuse its discretion in limiting the expert testimony.

### C. *Determination of Appropriate Sanction*

**[12]** [¶ 67] In determining the appropriate sanction for an attorney's rule violation, this Court is guided by the American Bar Association's Standards for Imposing Lawyer Discipline (ABA Standards). *See Richard*, ¶ 70, 335 P.3d at 1055–60; *Casper*, ¶ 25, 318 P.3d at 797–801. The Board identified the following applicable standards in its Report and Recommendation for Public Reprimand:

3. ABA **Standard 3.0** lists four factors to be considered in imposing a sanction after a finding of lawyer misconduct:

(a) the duty violated;

(b) the lawyer's mental state;

(c) the potential or actual injury caused by the lawyer's misconduct; and

(d) the existence of aggravating or mitigating factors.

### *The First Factor: The Duty Violated*

4. Violations of Rule 3.1(c) fall within the **Standard 6.2**, "Abuse of the Legal Process."

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving failure to expedite litigation or bring a meritorious claim, or failure to obey any obligation under the rules of the tribunal except for an open refusal based on an assertion that no valid obligation exists:

6.21 Disbarment is generally appropriate when a lawyer knowingly violates a court order or a rule with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.

6.22 Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding.

6.23 Reprimand [i.e., "public censure" under Section 4(a)(iii) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.

6.24 Admonition [i.e., "private reprimand" under Section 4(b) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer engages in an isolated instance of negligence in complying with a court order or rule, and causes little or no actual or potential injury to a party, or causes little or no actual or potential interference with a legal proceeding.

### *The Second Factor: The Lawyer's Mental State*

5. The preamble to the ABA Standards includes the following discussion regarding mental state:

The mental states used in this model are defined as follows. The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or at-

---

brought before her and that she was not asked to do any further examination of other matters. Mr. Honaker testified to reviewing a broader base of documents, many described in only general terms, such as "e-mails produced by [Ms. Fallon's attorney]," and "e-mails produced by Mr. Stinson." It was nonetheless clear from his testimony that the documents reviewed did not include the entire record that was before the Board or this Court. For example, the press

release issued by Dr. Schneider's public relations firm was neither identified as a document that Mr. Honaker reviewed nor discussed in his analysis of Mr. Stinson's pleadings. Finally, the experts were not present for the hearing testimony of any of the witnesses, including Mr. Stinson's testimony, and that testimony therefore was not factored into their opinions regarding whether Mr. Stinson violated a rule of professional conduct.

tendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence, when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation of a care that a reasonable lawyer would exercise in the situation.

\*     \*     \*

***The Third Factor: The Potential Or Actual Injury Caused By The Lawyer's Misconduct***

7.   Under the ABA Standards, "injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury." "Potential injury" is defined as "harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

\*     \*     \*

***The Fourth Factor: The Existence Of Aggravating Or Mitigating Factors***

ABA **Standard 9.0,** entitled "Aggravation and Mitigation," provides as follows:

9.1 Generally

After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose.

9.2 Aggravation

9.21 Definition. Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.

9.22 Factors which may be considered in aggravation. Aggravating factors include:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of the victim;

(i) substantial experience in the practice of law;

(j) indifference in making restitution; and

(k) illegal conduct, including that involving the use of controlled substances.

9.3 Mitigation

9.31 Definition. Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

9.32 Factors which may be considered in mitigation.

Mitigating factors include:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure of disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependency including alcoholism or drug abuse when:

(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

(2) the chemical dependency or mental disability caused the misconduct;

(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sus-

tained period of successful rehabilitation; and

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in disciplinary proceedings;

(k) imposition of other penalties or sanctions;

(*l*) remorse; and

(m) remoteness of prior offenses.

9.4 Factors Which Are Neither Aggravating nor Mitigating.

The following factors should not be considered as either aggravating or mitigating:

(a) forced or compelled restitution;

(b) agreeing to the client's demand for certain improper behavior or result;

(c) withdrawal of complaint against the lawyer;

(d) resignation prior to completion of disciplinary proceedings;

(e) complainant's recommendation as to sanction; and

(f) failure of injured client to complain.

[¶ 68]   The Board recommended that this Court issue a public censure as the appropriate discipline in response to Mr. Stinson's rule violations.  Mr. Stinson contends that if the Court does find a rule violation, then a private reprimand is the proper level discipline.  The Bar counters that the Court should consider imposing a disciplinary suspension instead of the recommended public censure.  Based on our consideration of the four factors set forth above, we agree with the Board's recommended sanction and conclude that a public censure is the appropriate level of discipline.

[¶ 69]   In considering the first two factors, the duty violated and the lawyer's mental state, our goal is to determine whether Mr. Stinson's rule violation was committed negligently or knowingly.  If the violation was committed knowingly, that weighs in favor of a suspension, whereas a negligent violation would weigh in favor of a public censure or private reprimand.  Mr. Stinson testified as to his mental state regarding the Answer and Counterclaim and the press release that immediately followed the filing:

Q.  Weren't you concerned, when you filed your answer and counterclaim and your client used this press release, that the purpose of the answer and counterclaims were just to smear Dr. Biles in every way possible, and to do that in the media?

A.  I was concerned that Dr. Schneider had thought some things were going on with Dr. Biles we weren't able to verify, so we didn't file counterclaims on those.  With regard to the other information, I thought we had good investigative sources for that.  And as Becky mentioned in her openings, we did all those investigations.  Did I think my client was angry at Dr. Biles, yes.  And I thought Dr. Biles was angry at my client.

Q.  Did you think he was using you and your law enforcement license to put things in the court files so he could issue press releases to defame Dr. Biles further?

A.  Now or then?

Q.  When these articles came out.

A.  No, I didn't think that then.  I was too busy doing other things.  Now I think it, and I wish he wouldn't have issued press releases.  I don't like it when clients do things like that.

[¶ 70]   During the sanctions portion of the hearing before the Board, Mr. Stinson further explained:

Q.  (BY BOARD MEMBER ARNEY)  * * * Do you feel that the kind of personality Dr. Schneider was, if not overwhelmed, that you were pushed, maybe, beyond your good senses?  Did you feel—and that happens to all of us, I realize.  But did you feel pressure from him, maybe, to do things that, upon reflection, you wouldn't do again?

A.  Oh, yeah.  And you know the funny thing is, Mr. Arney, is [Dr. Biles' attorney] Dan Fleck was kind of trying to tell everybody this, but we were—we had such our—you know, our adversary hats on.  And litigation with The Spence Firm is tough.  You've done that, and it seemed like a game.  We thought we were being tricked.  He kept saying like, man, you guys got to look at this, and we on our side

were like what's this guy talking about? And I did feel that way.

\*    \*    \*

I felt conned by Dr. Schneider, but I also felt like I let myself be conned.

[¶ 71]  While Mr. Stinson arguably should have known that the allegations in the Answer and Counterclaim were not grounded in a good faith factual basis and that they were being made for an improper purpose, we accept his explanation that he did not knowingly violate Rule 3.1(c) and was instead improperly influenced by his client. For this reason, we reject the Bar's suggestion that a suspension is the appropriate level of discipline, and we turn to the final two factors to determine whether they weigh in favor of a public censure or private reprimand.

[¶ 72]  The third factor is the potential or actual injury caused by the misconduct. Mr. Stinson acknowledged in his testimony that the filing of the Answer and Counterclaim received widespread coverage in newsprint:

Q.  This press release went out on February 22nd, the next day after your filing of the answer and counterclaim?

A.  Yes.

\*    \*    \*

Q.  It goes to the Cody Enterprise, which some people don't read. It goes to—

A.  I'm going to go with most of Cody, but . . .

Q.—the Billings Gazette.

The Powell Tribune got their hands on it. You know that because they wrote an article, right?

A.  Well, I think Cody wrote—I think everybody wrote an article. I mean, at some point Casper Star–Tribune wrote an article, everything said in court was being reprinted.

Q.  Yeah.

A.  The Cody Enterprise, they're always a day behind everybody else, and the Gazette. There were articles flying. I mean, it was number one news story for a while in Cody.

[¶ 73]  Counsel for Dr. Biles testified concerning the impact that the Answer and Counterclaim and its publication had on Dr. Biles:

Q.  What impact did this strategic approach of the counterclaims have on your client?

A.  Well, it devastated him. He was—he was horribly embarrassed that he had a DUI to begin with. It was a low point for him, obviously. Then to have it brought to light was something he expected, because it was in the public. But everything that came as a result of what they did to him was certainly a horrific thing that he had happen in his life. But then to have, when he trying to vindicate himself by filing the defamation lawsuit and by exercising his rights to access the courts, then to be castigated again for simply filing that lawsuit, being called a drunk in press, saying that he has problems, saying that he needs help, those are all things that were, you know, a further insult to him, at the very time when he was trying to—rectify things.

[¶ 74]  The Answer and Counterclaim was intended, at least by Mr. Stinson's client, to be used as a source for a press release and further dissemination of the allegations against Dr. Biles. This improper use, which Mr. Stinson made possible, caused harm to Dr. Biles, and this harm weighs in favor of a public censure.

[13]  [¶ 75]  The final factor we must consider is the existence of mitigating or aggravating circumstances. The Board found two mitigating factors, and from our review of the record we agree with the finding:

10.  The Board finds the following mitigating factors: (1) absence of a prior disciplinary record and (2) good reputation as a competent attorney. Respondent called as witnesses at the hearing before the Board Judge Alan Johnson and Judge Nancy Freudenthal, the two federal judges who presided over the Federal Case [Biles v. Fallon] and the Second Federal Case [Biles v. Schneider]. It was evident to the Board from their willingness to appear and from their testimony that both judges con-

sidered Respondent to be a competent attorney of good reputation.

**[14]** [¶ 76] The Board also found two aggravating factors: 1) Mr. Stinson's substantial experience, eighteen years, in the practice of law; and 2) his refusal to acknowledge the wrongful nature of his conduct. Mr. Stinson contests the second aggravating factor identified by the Board, contending that the only evidence the Board could be relying on for this finding is Mr. Stinson's insistence on a hearing on the Formal Charge. We disagree.

[¶ 77] During the sanctions portion of the hearing before the Board, Mr. Stinson appeared to acknowledge the wrongful nature of his conduct, but then moments later, he retracted that acknowledgement and maintained that his manner of pleading the Answer and Counterclaim was proper. When asked by his counsel to discuss with the Board what he believed to be mitigating factors, Mr. Stinson testified, in part:

A. * * * I did not think you were going to find—find me culpable on the 3.3(b), but I did think so on the 3.1(c). And I thought so because as this proceeding has progressed—and I regret that. I didn't like it. And if I had to go back and do it again, that wouldn't be the pleading that I drafted. And I have learned a lot from it. So I acknowledge that, and that's kind of what I thought was going to come back.

There's obviously a lot of things in this particular circumstance I wouldn't have—would do differently, but one of them is better written communication with my own client. So I acknowledge that's a problem. And I didn't like that pleading. And that's not going to be the way it happens in the future. * * *

\*   \*   \*   \*

Q. (BY VICE CHAIRMAN BLUEMEL): * * * So you've said here that, yeah, there's some things in the pleading that I'm not pleased with and I wouldn't do it again.

A. Yes.

Q. What does that—what are you not pleased with?

A. So I don't—I think you could have found either way on it, okay? I mean, I think I—you know, I met legal pleading standards to do it. But when I look back on this case with hindsight, I don't like how that pleading was—it played like [Special Bar Counsel] was saying it played. I mean, that wasn't the intent of it. But when you look at it, it was like, wow, these allegations look like these two high school kids fighting over it. And I think I could have found some other way to do that. I'm not sure how, but I think I could have found some other way.

Q. When did you realize it?

A. Kind of had that whole prophecy as it was going on here and we were talking about it and Dan Fleck was talking about it. I'm not trying to be duplicitous with you. I think you could have found I did just fine. I think I met legal proceeding standards. I think I had factual grounds to do it, but just realize I'd do it differently.

[¶ 78] Having considered all four factors—the duty violated, Mr. Stinson's mental state, the harm caused by the violation, and the aggravating and mitigating circumstances—we agree with the Board that the appropriate sanction for the violation is a public reprimand.

**D. Recommended Order Assessing Costs**

[¶ 79] As part of its recommendation, the Board recommended that the Court enter an order reimbursing the Bar for costs incurred in this matter in the amount of $15,613.76, as supported by the Bar's Affidavit of Costs and Expenses. Mr. Stinson objects to the assessment of costs on the grounds that 1) the recommendation did not allow him an opportunity to respond to the Bar's affidavit of costs; 2) the recommendation failed to separate costs between the Rule 3.3 and Rule 3.1 charges; and 3) the recommendation failed to consider whether the Bar's costs were reasonable. We reject Mr. Stinson's objection and accept the Board's recommendation.

**1. Opportunity to Respond to Affidavit of Costs**

[¶ 80] This Court has ruled that before costs may be assessed against an attorney in

a disciplinary proceeding, that attorney must be given notice of the Bar's intention to seek those costs.

Fundamental fairness demands that sufficient notice of charges and their consequences must be provided to enable the Respondent to make meaningful choices with the respect to the need for, and the manner of, his defense without being subjected to any element of surprise. *Morgan v. United States*, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); *White [v. Board of Trustees of Western Wyoming Community College District ]*, 648 P.2d 528 [ (1982) ].

*Meyer v. Norman*, 780 P.2d 283, 290 (Wyo. 1989).

[¶ 81]  The Formal Charge the Bar filed against Mr. Stinson provided him with the notice required by *Meyer*.  The Formal Charge included a request in the prayer for relief that Mr. Stinson be required to reimburse the Bar for all costs and expenses of prosecuting the matter and for the disciplinary proceeding.  The prayer for relief was then followed by this notice regarding the costs:

NOTICE IS HEREBY GIVEN that the Wyoming State Bar intends to seek recovery from Respondent of all current and future costs of the disciplinary proceeding and investigation hereof.  Such costs include all costs of discovery, copying and postage, fees for subpoenas, process, witnesses, and mileage, and all costs of hearing, including court reporting fees, preparing a full transcript of the hearing, and travel, lodging, meals for Bar Counsel, Board members and witnesses.

[¶ 82]  Furthermore, the final decision on all disciplinary matters, including the recommended sanction and cost assessments, rests with this Court.  Disciplinary Code § 26(c) ("The BPR may recommend to the Court the assessment of those costs and fees and, if the Court imposes discipline, the Court may assess all or any part of the certified costs and fees against respondent.").  The Board recommended the assessment of costs, and Mr. Stinson has had the opportunity to object to the costs in his submissions to this Court. We thus reject Mr. Stinson's contention that

he has not been provided an adequate opportunity to be heard on the assessment of costs.

### 2.  *Apportionment of Costs*

[¶ 83]  Mr. Stinson next argues that the recommended cost assessment should be rejected because the Board did not apportion the costs between the Rule 3.1(c) charge proven and the Rule 3.3 charge that the Board found had not been proved by clear and convincing evidence.  We disagree.

[¶ 84]  The Bar charged two rule violations.  Both violations arose out of the same course of events, and resolution of both charges required an understanding of what Mr. Stinson knew concerning his client's actions and when he knew it.  That being the case, there is no practical way to apportion the costs.  We therefore find no basis to require an apportionment as a condition to assessing costs and we reject Mr. Stinson's request to impose such a requirement.

### 3.  *Reasonableness of Costs*

[¶ 85]  Mr. Stinson contends that the recommended costs should be rejected as unreasonable because the itemized costs are not costs permitted under Rule 501(a) of the Uniform Rules for District Courts. He further argues that the costs of room and board for the Board members should not be awarded in any case because such an award of costs "is a punitive measure that most assuredly has a chilling effect on respondents who wish to challenge the charges brought against them."  We again reject both of these objections.

[¶ 86]  First, the Uniform Rules for District Courts do not apply to disciplinary proceedings before the Board.  Section 11(n) of the Disciplinary Code lists the provisions of the Wyoming Rules of Civil Procedure that apply in a disciplinary proceeding.  That list does not include U.R.D.C. 501(a), and that rule is not otherwise referenced or incorporated in any section of the Disciplinary Code. Mr. Stinson's reliance on Rule 501(a) is therefore misplaced.

[¶ 87]  We are likewise not persuaded by Mr. Stinson's argument concerning the chill-

**426**   Wyo.                **337 PACIFIC REPORTER, 3d SERIES**

ing effect of an award of costs for the Board members' lodging and meal expenses incurred for the hearing. We acknowledge that the potential for an award of costs may have a chilling effect on a charged attorney's decision whether to contest the charges. We do not know, however, that the lodging and meal expenses necessarily have a greater chilling effect than any of the other costs, and the Disciplinary Code plainly allows for the assessment of costs. On the other hand, no costs may be assessed unless the Board and this Court find by clear and convincing evidence that a rule violation occurred. This should offset at least to some degree the chilling effect associated with the cost assessment. An attorney is not penalized for defending against the charges but is responsible for the costs associated with the rule violation. We thus believe the code has appropriately balanced the risk of a cost assessment, and we will not make the requested adjustment.

#### E.  *Rule 11 Motion for Sanctions*

[¶ 88]  On January 21, 2014, Mr. Stinson filed a motion pursuant to W.R.C.P. 11(b)(3), alleging there was no factual basis for the Formal Charge and seeking sanctions against the Bar, the Peer Review Panel, and Special Bar Counsel. On March 13, 2014, the Board entered an order denying Mr. Stinson's Rule 11 motion. The parties disagree whether the denial of the Rule 11 motion is before this Court, but in the interests of judicial economy and to ensure that all issues related to this matter are resolved, we will address it. Both the Board and this Court have found clear and convincing evidence that Mr. Stinson violated Rule 3.1(c). We therefore find no basis for the Rule 11 motion and affirm the denial of the motion.

**IT IS, THEREFORE, ORDERED THAT:**

1. Laurence W. Stinson is hereby publicly censured for his violation of Rule 3.1(c); and

---

4. Mr. Stinson objected to references in the Board's Report and Recommendation to information that Mr. Stinson contends was admitted into evidence subject to a stipulation that it would remain confidential. Because this Court

2. By March 1, 2015, Laurence W. Stinson shall pay costs of $15,631.76 associated with the disciplinary proceedings and an administrative fee of $500.00.[4]

[¶ 89]  **DATED** this 29th day of October, 2014.

BY THE COURT*
/s/ E. JAMES BURKE
Chief Justice

* Justice Davis took no part in the consideration of this matter. Judge Donnell participated by assignment.



2014 WY 140

**Randy GUINARD, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

**No. S–14–0075.**

Supreme Court of Wyoming.

Nov. 5, 2014.

**Background:**  Defendant was convicted pursuant to guilty pleas in the District Court, Fremont County, Norman E. Young, J., of three counts of larceny. He appealed order of restitution.

**Holdings:**  The Supreme Court, Kite, J., held that:

(1) evidence showed amount of first victim's actual pecuniary loss was $2,000, and

(2) evidence showed that second victim's actual pecuniary loss was $39,000.

Affirmed in part, reversed in part, and remanded.

---

has not adopted and incorporated the Board's Report and Recommendation and has not otherwise referenced the confidential information, we do not address this objection further.