IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION


UNITED STATES OF AMERICA,    )
                           )
        Plaintiff,     )
                           )
     vs.              )  Criminal Docket
                           )
JOHN HENRY SCHNEIDER,     )  No. CR 17-77-BLG-SPW
                           )
        Defendant.     )
_____ )


Transcript of Sentencing


Heard in Snowy Mountains Courtroom
James F. Battin United States Courthouse
2601 Second Avenue North
Billings, Montana
Wednesday - August 15, 2018
1:31 p.m. - 3:20 p.m.


BEFORE THE HONORABLE SUSAN P. WATTERS

UNITED STATES DISTRICT JUDGE


REBECCA M. SABO, RPR, CRR
United States Court Reporter
James F. Battin United States Courthouse
2601 Second Avenue North, Room 4209
Billings, Montana 59101
rebecca_sabo@mtd.uscourts.gov
(406) 855-6410

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

APPEARANCES


PRESENT ON BEHALF OF THE PLAINTIFF,
THE UNITED STATES OF AMERICA:

      Colin M. Rubich
      Assistant U.S. Attorney
      OFFICE OF THE U.S. ATTORNEY
      2601 Second Avenue North, Room 3200
      Billings, Montana 59101


PRESENT ON BEHALF OF THE DEFENDANT,
JOHN HENRY SCHNEIDER:

      John E. Smith, Esq.
      SMITH & STEPHENS
      P.O. Box 7337
      Missoula, Montana 59807-7337

PROCEEDINGS

1

2        (Open court.)

3        (Defendant present.)

4              THE COURT:  Please be seated.

5              Emily, would you please call the next matter on the

6    calendar.

7              THE CLERK:  Yes, Your Honor.

8              The Court has set aside this time to hear the matter

9    of CR 17-77-BLG-SPW, United States versus John Henry Schneider.

10   This is the time set aside for a sentencing.

11             THE COURT:  For the record, Colin Rubich appears on

12   behalf of the government, John Smith appears on behalf of the

13   defendant, and the defendant is present.

14             I have received and reviewed the presentence report,

15   the sentencing memoranda filed by counsel, the letters and the

16   victim impact statements that were provided.

17             Mr. Rubich, did you receive and review the

18   Presentence Investigation Report?

19             MR. RUBICH:  I did, Your Honor.

20             THE COURT:  And do you have any objections to that

21   report?

22             MR. RUBICH:  No, Your Honor.

23             THE COURT:  Are you recommending that the defendant's

24   offense level be decreased by 2 levels for acceptance of

25   responsibility pursuant to Section 3E1.1(a), and do you move

01:32:15PM  1   for an additional 1-level decrease for timely notification of

01:32:19PM  2   plea pursuant to Section 3E1.1(b)?

01:32:21PM  3               MR. RUBICH:  I recommend and I do so move.

01:32:24PM  4               THE COURT:  That request and motion are granted.

01:32:27PM  5        Mr. Smith, did you receive the presentence report?

01:32:32PM  6               MR. SMITH:  Yes, I did, Judge.

01:32:33PM  7               THE COURT:  Did you have an opportunity to go through

01:32:34PM  8   that report in its entirety with Mr. Schneider?

01:32:37PM  9               MR. SMITH:  Yes, I did.

01:32:39PM  10              THE COURT:  And do you have any objections to the

01:32:40PM  11  presentence report?

01:32:41PM  12              MR. SMITH:  We have no objections.

01:32:42PM  13              THE COURT:  Thank you.

01:32:43PM  14       I will adopt the presentence report without objection

01:32:46PM  15  and rely on it for purposes of calculating the advisory

01:32:50PM  16  sentencing guidelines.

01:32:51PM  17       I will accept the plea agreement that has been filed

01:32:54PM  18  in this case, and I will now summarize the applicable

01:32:58PM  19  punishments for the offense under both the United States

01:33:02PM  20  Sentencing Guidelines and the applicable statute.

01:33:04PM  21       With regard to the guidelines, the adjusted offense

01:33:06PM  22  level is 20.  And we arrive at that by beginning with a base

01:33:12PM  23  offense level of 6, adding 12 levels for the reason that the

01:33:16PM  24  loss exceeded $250,000, and then adding an additional 2 levels

01:33:22PM  25  for the reason that the offense involved the misrepresentation

01:33:26PM   1   or fraudulent action during a bankruptcy proceeding.  Then

01:33:32PM   2   subtracting 3 levels for acceptance of responsibility and

01:33:35PM   3   timely notification of plea, we arrive at a total offense level

01:33:38PM   4   of 17.  Dr. Schneider has zero criminal history points, so his

01:33:44PM   5   criminal history category is I.  The resulting advisory

01:33:47PM   6   guideline range is 24 to 30 months imprisonment.

01:33:51PM   7          Under the guidelines, Dr. Schneider is not eligible

01:33:54PM   8   for probation, he is subject to one to three years of

01:33:57PM   9   supervised release, a fine of 5,000 to $50,000, and a special

01:34:04PM 10   assessment of $100, and restitution is applicable under the

01:34:08PM 11   guidelines.

01:34:08PM 12          For the charge of Count III, Concealment of

01:34:12PM 13   Bankruptcy Assets, in violation of 18 United States Code

01:34:17PM 14   Section 152(1), the maximum punishment is five years

01:34:21PM 15   imprisonment, the maximum fine is $250,000, no more than three

01:34:27PM 16   years of supervised release, and the $100 special assessment.

01:34:31PM 17   Under the statute, Dr. Schneider is eligible for probation for

01:34:36PM 18   a period of one to five years, and, again, restitution is

01:34:39PM 19   applicable.

01:34:39PM 20          Mr. Rubich, do you agree that's an accurate statement

01:34:41PM 21   of the statutory and guideline provisions?

01:34:43PM 22          MR. RUBICH:  I do, Your Honor.

01:34:44PM 23          THE COURT:  Do you also agree, Mr. Smith?

01:34:46PM 24          MR. SMITH:  Yes, I do, Judge.

01:34:49PM 25          THE COURT:  And the restitution that, I believe, both

01:34:52PM 1   parties have agreed to is the amount of $308,945, correct?

01:34:58PM 2          MR. RUBICH:  That is correct, Your Honor.

01:34:59PM 3          THE COURT:  And your client agrees with that?

01:35:01PM 4          MR. SMITH:  Yes.

01:35:02PM 5          THE COURT:  Okay.

01:35:03PM 6          Mr. Rubich, are there any persons here who would be

01:35:06PM 7   considered a victim who wish to be heard before sentencing?

01:35:09PM 8          MR. RUBICH:  Yes, Your Honor, there are four.  The

01:35:11PM 9   first is the trustee of the bankruptcy estate, which is Joe

01:35:15PM 10  Womack; the second is an attorney on behalf of some of the

01:35:20PM 11  plaintiffs named Jon Moyers; and two individuals involved in

01:35:22PM 12  one of the malpractice suits, Mallory Monaco and Judy Monaco.

01:35:27PM 13         THE COURT:  Okay.  Please call your first witness.

01:35:28PM 14         MR. RUBICH:  Your Honor, I -- it wasn't my intent to

01:35:28PM 15  call witnesses, Your Honor.

01:35:28PM 16         THE COURT:  Oh.

01:35:30PM 17         MR. RUBICH:  I was going to allow them to make a

01:35:34PM 18  statement, as is required.

01:35:36PM 19         THE COURT:  Well, call your first one up, is what I

01:35:40PM 20  really meant to say.

01:35:40PM 21         MR. RUBICH:  Yes, Your Honor.

01:35:40PM 22         THE COURT:  Okay.

01:35:41PM 23         MR. RUBICH:  Joe Womack will be first to be heard.

01:35:45PM 24         THE COURT:  Okay.

01:35:51PM 25         JOE WOMACK:  I'm not familiar with how the

01:35:53PM   1    proceedings go in this matter, Your Honor.  Do you just wish me
01:35:56PM   2    to make a statement to the Court regarding my views on what's
01:36:00PM   3    going on here today?
01:36:02PM   4            THE COURT:  This is a victim impact statement, so --
01:36:06PM   5    and I did read the written statement that you provided to the
01:36:10PM   6    government.  But if you'd just identify yourself by name and
01:36:14PM   7    your relationship to the case, and then tell me how the case
01:36:18PM   8    has impacted you either personally or professionally.
01:36:21PM   9            JOE WOMACK:  Okay.  Thank you, Your Honor.
01:36:22PM  10            THE COURT:  Mm-hmm.
01:36:23PM  11            JOE WOMACK:  Yes.  My name is Joe Womack, I'm the
01:36:27PM  12    Chapter 7 bankruptcy trustee that was assigned to the
01:36:31PM  13    bankruptcy -- Chapter 7 bankruptcy that was filed by
01:36:37PM  14    Dr. Schneider back in 2014.
01:36:40PM  15            In terms -- I have laid out pretty much my position
01:36:48PM  16    in full in the letter that you have already read, so I'm not
01:36:52PM  17    going to go through and reiterate everything that is in there.
01:36:57PM  18    There are a couple of points that I did want to add, or make.
01:37:03PM  19            As I've been a trustee now -- a bankruptcy trustee
01:37:06PM  20    since about 1994 here in Montana, I know that many people don't
01:37:14PM  21    really like bankruptcy or the process.  They think it's a way
01:37:18PM  22    for people to get out of paying their debts and obligations,
01:37:23PM  23    and they disagree with that.  I think most individuals think
01:37:26PM  24    that there's a moral obligation as well as a legal and ethical
01:37:31PM  25    one to pay obligations that they have, so they disagree with

01:37:35PM  1    the idea that with bankruptcy they can have a discharge of

01:37:39PM  2    their obligation to pay certain debts.  So I know that the

01:37:43PM  3    process of the bankruptcy system is not necessarily popular

01:37:47PM  4    with the American public.

01:37:49PM  5          I will say, though, that I think it serves important

01:37:52PM  6    functions and a service to the people in the United States, but

01:37:57PM  7    the -- but that benefit that exists there for people comes with

01:38:03PM  8    obligations.  It's not a right, it's a privilege that's granted

01:38:07PM  9    by the government.  And with that privilege comes an obligation

01:38:12PM 10    on the part of those who participate in the program to be

01:38:16PM 11    completely honest and forthright in their filing so that any

01:38:21PM 12    assets that they have are utilized to pay creditors as set out

01:38:27PM 13    under the law.

01:38:28PM 14          The integrity of the bankruptcy system relies on the

01:38:32PM 15    enforcement of that basic fundamental principle.  And I think

01:38:37PM 16    what we have seen here today with Dr. Schneider is a complete,

01:38:41PM 17    utter abuse of the bankruptcy process, and he has admitted that

01:38:46PM 18    he deliberately, fraudulently concealed over $300,000 from the

01:38:53PM 19    bankruptcy estate.  I think that it is important that he be

01:38:59PM 20    made an example for what he has done.  I think it's important

01:39:03PM 21    that the public know that this is not a matter that is taken

01:39:09PM 22    lightly by the federal government.  That if you're going to

01:39:13PM 23    file bankruptcy, if you're going to seek the benefits of the

01:39:16PM 24    bankruptcy system, you need to adhere to what is required for

01:39:21PM 25    you to do.

01:39:23PM   1          In this case, particularly, the people that have been

01:39:29PM   2   harmed -- I mean, I'm the trustee for the estate, so that I'm

01:39:34PM   3   essentially the victim, but with the estate are the claimants,

01:39:40PM   4   people who have been hurt by this because they were his

01:39:45PM   5   patients.  He had a doctor-patient relationship with these

01:39:49PM   6   people.  He has admitted that he committed malpractice against

01:39:52PM   7   those people.  He admitted that the estate of Russell Monaco,

01:39:56PM   8   that Mr. Monaco has suffered $3 million in damages at his hands

01:40:02PM   9   by prescribing opioids that resulted in Mr. Monaco's death.

01:40:09PM  10          These are real human beings.  These are not faceless

01:40:13PM  11   credit card companies or corporations who can absorb those kind

01:40:19PM  12   of damages easily.  Those are the kind of people that we

01:40:22PM  13   usually see that are victims in a bankruptcy case.  That is not

01:40:26PM  14   the case here.  These are individuals that have suffered at his

01:40:30PM  15   hands as a neurosurgeon when he committed this malpractice.

01:40:35PM  16   And when they went to try to get compensation for that, they

01:40:39PM  17   found out that he had basically taken every penny that had he

01:40:44PM  18   in his self-insured malpractice fund and taken every penny out

01:40:49PM  19   of it and had put it -- had taken it to pay a slander/libel

01:40:56PM  20   claim that he had made against a doctor in Cody, Wyoming, named

01:41:01PM  21   Jimmie Biles.  So he looted that malpractice fund that he had

01:41:07PM  22   and then used it to pay this slander claim, and then there was

01:41:12PM  23   no money to pay these malpractice claims that he admits he

01:41:16PM  24   committed.

01:41:16PM  25          Sherry Lee is here today, the family of Russell

01:41:21PM  1  Monaco, I understand, is here today, and they'll speak here to

01:41:25PM  2  the Court, but they are real people, Your Honor, that have been

01:41:29PM  3  harmed by this man's actions.  And I think that it's egregious.

01:41:37PM  4      As a result of his concealment, the bankruptcy estate

01:41:41PM  5  had to go forward and hire attorneys on a contingency fee

01:41:46PM  6  basis, because there was no money in this estate.  Nothing.  He

01:41:49PM  7  went from $12 million in net assets, according to his financial

01:41:53PM  8  statements several years earlier, to a net worth of zero when

01:41:58PM  9  he filed this bankruptcy.

01:42:01PM  10     We had to go and try to unravel all of those things

01:42:04PM  11  and pursue these assets that he concealed, including the

01:42:09PM  12  308,000 that you're talking about restitution for here today.

01:42:13PM  13  And as a result of that, the bankruptcy estate did recover

01:42:15PM  14  assets, but we also incurred over 600,000 in attorneys' fees in

01:42:22PM  15  order to go after this guy because of his scheme.

01:42:25PM  16     I don't know -- I heard you talk about the sentencing

01:42:30PM  17  guidelines.  I don't know how that plays in with victim impact

01:42:36PM  18  statements.  But I can tell you that I truly believe that

01:42:42PM  19  Dr. Schneider needs to feel the full impact of his actions,

01:42:48PM  20  that he needs to be sentenced to the maximum here, to the full

01:42:52PM  21  five years, if that is possible.  He needs to have the full

01:42:56PM  22  fine imposed.  If he can be ordered to repay restitution for

01:43:02PM  23  the attorneys' fees that the bankruptcy estate has suffered of

01:43:07PM  24  over $600,000, as well as the 308,000, I think that that should

01:43:13PM  25  be done and so that we've got some chance of full compensation

01:43:17PM  1    here.

01:43:18PM  2              And in terms of the jail time, the time he spends in

01:43:22PM  3    prison, I've come to know Dr. Schneider fairly well through

01:43:28PM  4    these proceedings.  I don't believe that he has any regrets

01:43:31PM  5    about what he did except that he got caught.  And I think that

01:43:34PM  6    that is the only thing that punishment is going to act as a

01:43:41PM  7    deterrent to him, not only serve as an example to others, but

01:43:45PM  8    as a deterrent to him to engage in bad behavior in the future.

01:43:52PM  9              And in terms of restitution, I really think that

01:43:55PM  10   there has to be a strong incentive for him to go to the people

01:43:59PM  11   that he transferred all of his assets to, to try to get money

01:44:04PM  12   from them to make restitution.  Because I believe -- and I

01:44:09PM  13   haven't seen current financial statements or reports, but after

01:44:14PM  14   dealing with this, this guy for three and a half years, what I

01:44:19PM  15   see is someone who will put himself as an employee of one of

01:44:25PM  16   his shell corporations, working for a minimal amount of money,

01:44:29PM  17   that will allow him then to make minimal restitution payments.

01:44:34PM  18   That's what I believe.

01:44:35PM  19             Now, I hope I'm wrong.  I hope that the system can

01:44:39PM  20   provide an incentive or that he can fess up and provide

01:44:43PM  21   restitution at a level that is meaningful to Sherry Lee, who is

01:44:51PM  22   one of his -- is here today, is one of the people that suffered

01:44:54PM  23   injuries, to the family of Russell Monaco, who died, you know,

01:45:00PM  24   after receiving care and treatment from Dr. Schneider.  I hope

01:45:05PM  25   that it can be something that is meaningful here.

01:45:08PM 1          So other than that, that's what I -- that's all I

01:45:13PM 2    really have to say, Your Honor.  And I hope you will take that

01:45:15PM 3    into account in making sentence here.

01:45:18PM 4          THE COURT:  Thank you, Mr. Womack.

01:45:24PM 5          MR. RUBICH:  Your Honor, I believe next is Mr. Jon

01:45:28PM 6    Moyers.

01:45:28PM 7          THE COURT:  Okay.

01:45:35PM 8          JON MOYERS:  Good afternoon, Judge.

01:45:37PM 9          THE COURT:  Good afternoon.

01:45:38PM 10          JON MOYERS:  Mr. Womack spoke eloquently about the

01:45:42PM 11    integrity of the legal system, and I will speak to the same.

01:45:45PM 12          Fred Paoli, myself, Paul Warren, and other attorneys

01:45:50PM 13    have committed a substantial part of our professional career in

01:45:55PM 14    pursuing medical malpractice and fraudulent conveyance claims

01:46:00PM 15    against Mr. Schneider in various courts.  Behind the

01:46:04PM 16    bankruptcy, as Mr. Womack spoke, are the sufferings of these

01:46:09PM 17    individuals whose claims have not been able to receive the full

01:46:13PM 18    compensation they're entitled to.

01:46:16PM 19          In this bankruptcy, Mr. Schneider has admitted to the

01:46:20PM 20    fact of his malpractice as well as to the valuation that was

01:46:25PM 21    set out in the proof of claims that we had filed.  But at the

01:46:29PM 22    end of the day, he did not have insurance that he had committed

01:46:34PM 23    to have available to the medical facility where he practiced as

01:46:39PM 24    a neurosurgeon that would be in place to compensate the victims

01:46:43PM 25    of his malpractice.

01:46:45PM  1          We believe that as a consequence of his purposeful

01:46:50PM  2    and willful movement of funds that denied these families just

01:46:57PM  3    compensation that he should suffer the full restitution and

01:47:01PM  4    maximum fines that are permissible by this court and the

01:47:05PM  5    harshest punishment possible under the guidelines and the

01:47:10PM  6    agreement that has been reached with the government.

01:47:12PM  7          As Mr. Womack spoke, this has been a purposeful

01:47:18PM  8    effort in a complex scheme by Mr. Schneider to hide his assets

01:47:22PM  9    from those who are most deserving of the money.  We represent

01:47:27PM  10   individuals who have had their lives turned upside-down by his

01:47:31PM  11   medical errors, who will live in chronic pain, who will not

01:47:34PM  12   enjoy the benefits of their father or their husband due to

01:47:40PM  13   malpractice that he's admitted that he has committed.  There is

01:47:45PM  14   no punishment great enough for that, but we believe that this

01:47:48PM  15   Court has the ability to effect a just remedy for the errors

01:47:54PM  16   that he has made.

01:47:56PM  17         In the bankruptcy matter, Mr. Womack has spoken to

01:47:59PM  18   the decision by Dr. Schneider to withhold over $300,000 from

01:48:05PM  19   the estate.  That revelation was learned by us after we had

01:48:10PM  20   reached a settlement agreement with Mr. Schneider, an attempt

01:48:14PM  21   to resolve these bankruptcy issues as expeditiously as possible

01:48:18PM  22   to preserve what funds would be available in the estate to pay

01:48:22PM  23   these injured claimants.  Our actions would have been entirely

01:48:27PM  24   different had we known the extent of the fraud that he had

01:48:28PM  25   committed on the trustee.  And we believe as a result of that,

01:48:32PM 1  the compensation that would have been obtained in the

01:48:35PM 2  bankruptcy, had he been honest, should be paid as part of this

01:48:39PM 3  Court's sentencing against Mr. Schneider.

01:48:43PM 4          And with that, Your Honor, those conclude my remarks.

01:48:48PM 5  I appreciate your deliberation in this, and I appreciate you

01:48:52PM 6  hearing the testimony from Russ Monaco.

01:48:56PM 7          Just by a little way of background, to set the table

01:48:58PM 8  for the family's testimony, Russ Monaco was a surgical patient

01:49:01PM 9  of Mr. Schneider when he was practicing in Wyoming.  And

01:49:05PM 10 post-operatively, he prescribed a transdermal fentanyl patch

01:49:09PM 11 that we hear quite a bit about in the news.  And that, in

01:49:12PM 12 combination with other medications that had been prescribed by

01:49:16PM 13 Mr. Schneider had caused Mr. Monaco to lose his life shortly

01:49:21PM 14 after discharge from the hospital.

01:49:23PM 15         The Wyoming Board of Medicine considered that to be a

01:49:28PM 16 gross violation of the Wyoming Rules of Practice and commenced

01:49:31PM 17 an action against him that required him to -- to go to trial,

01:49:38PM 18 and that resulted in a conviction that he had violated the

01:49:42PM 19 professional standards in Wyoming, and then a revocation of his

01:49:44PM 20 license, which, for a neurosurgeon in Wyoming, in a poorly

01:49:49PM 21 served medical state, like ours, was a pretty exceptional

01:49:53PM 22 result.  But there is no doubt about the merits of any of these

01:49:57PM 23 claims that have been brought against Mr. Schneider.  And you

01:50:01PM 24 will hear now from the Monaco family about how his conduct has

01:50:06PM 25 affected them forever.

01:50:07PM   1        Thank you.

01:50:08PM   2        THE COURT:  Thank you, Mr. Moyers.

01:50:12PM   3        MR. RUBICH:  Mallory Monaco, Your Honor.

01:50:31PM   4        MALLORY MONACO:  I'm Mallory Monaco, and Russ is my

01:51:27PM   5   dad.  And I want people to understand how this whole ordeal has

01:51:32PM   6   changed my family's lives forever.

01:51:34PM   7        "My dad passed away when I was in eighth grade and my

01:51:37PM   8   sister was in fifth; we were just 14 and 10.  He left us a few

01:51:41PM   9   weeks before Christmas on December 2nd, 2011.  I remember that

01:51:46PM  10   day like it just happened yesterday.

01:51:51PM  11        "I still have all these amazing memories we shared as

01:51:54PM  12   a family, and I wish we could have had the chance to make a lot

01:51:58PM  13   more.  I am scared that since he passed away while my sister

01:52:02PM  14   and I were so young that I will forget the little memories I

01:52:07PM  15   cherish the most.  That is one of my biggest fears in life.

01:52:11PM  16        "A lot of people have asked how this affects my

01:52:14PM  17   family.  It's been really tough growing up with just one

01:52:16PM  18   parent, and my sister and I could have had two amazing parents

01:52:20PM  19   raising us.  It's also difficult knowing his death could have

01:52:24PM  20   been prevented.  I feel guilty like I could have done

01:52:27PM  21   something, and I know my mom feels the same.  I know, no matter

01:52:31PM  22   what we believe, that it's not our fault.  It's just really

01:52:36PM  23   hard accepting that he's gone because of someone's mistake.

01:52:40PM  24        "It's very hard knowing that he won't be able to see

01:52:43PM  25   all the important milestones coming up in our lives.  My mom is

01:52:48PM 1   such an incredible woman for putting herself as a mom and dad

01:52:52PM 2   role in the family.  My dad was a very quiet guy, but he always

01:52:57PM 3   made everyone he met feel like they've known him for years.  He

01:53:04PM 4   was just a sweet, generous guy who everyone loved.

01:53:06PM 5        "He was my coach in softball ever since I started

01:53:09PM 6   when I was around eight.  Him and his friends started a travel

01:53:12PM 7   team for my friends and I.  He was a great coach and a great

01:53:16PM 8   cheerleader, except to the umpires.  Softball is my dad and I's

01:53:23PM 9   thing together.  Since he passed, it was really hard for me to

01:53:26PM 10  continue playing softball with the team that he started.

01:53:29PM 11       "I played with them for two years after he passed,

01:53:33PM 12  but it just got to be too much pain and sadness that went along

01:53:37PM 13  with the game that I loved so much.  I know that if he was

01:53:40PM 14  still around, I'd still be playing my heart out on the field

01:53:45PM 15  and he would still be cheering me on.  I do miss softball, but

01:53:50PM 16  I miss my dad so much more.

01:53:55PM 17       "My sister and my dad are so alike.  It is difficult

01:53:58PM 18  knowing my dad didn't get to see her get out of her awkward

01:54:03PM 19  stages and be a part of the beautiful teenager she's becoming.

01:54:08PM 20  I know he is watching over us, but that isn't the same as him

01:54:12PM 21  being here while we grow up.  He was a great man and loved by

01:54:16PM 22  so many.  He will never be forgotten as long as we all live.

01:54:21PM 23       "He has already missed so many big milestones in our

01:54:25PM 24  lives.  But no matter what, he will always watch over us and be

01:54:27PM 25  proud of the accomplishments we have succeeded in.

01:54:30PM 1        "I know for sure he's very proud of my mom for

01:54:33PM 2  raising my sister and me all by herself, which none of us

01:54:37PM 3  thought she would ever have to do.  I know he would do anything

01:54:40PM 4  to be here with her and us again, and we would all do anything

01:54:44PM 5  for him to be here too.  And I love him so much and I wish I

01:54:51PM 6  could still tell him that."

01:55:01PM 7        MR. RUBICH:  Judy Monaco, Your Honor.

01:55:13PM 8        JUDY MONACO:  Good afternoon, Judge.

01:55:24PM 9        THE COURT:  Good afternoon.

01:55:25PM 10        JUDY MONACO:  My name is Judy Monaco, and I'm Russell

01:55:29PM 11  Monaco's mother.  I'm going to do this.  I'm going to get

01:55:34PM 12  through this.  This is the last thing I can ever do for my son.

01:55:40PM 13        "I would like to take this opportunity to tell you a

01:55:43PM 14  little bit about Russ.  Russ had two brothers, an older

01:55:48PM 15  brother, Rob, who you just saw, and a younger brother, Reece.

01:55:52PM 16  His dad and I worked hard to give our boys a good life, and we

01:55:55PM 17  were a normal, happy family.

01:55:57PM 18        "Russ graduated from West High School here in

01:55:59PM 19  Billings and went on to get his degree from North Dakota School

01:56:02PM 20  of Science.  Russ was a master machinist and was very good at

01:56:06PM 21  it.  There was nothing Russ couldn't do from his trade,

01:56:10PM 22  carpentry, or working on cars, and Russ was always there and

01:56:13PM 23  willing to help anyone that needed help from family to friends

01:56:18PM 24  or anyone.  Russ liked to hunt and fish and coach girls

01:56:22PM 25  softball.

"Russ was proud of his brothers.  Rob is a news director and photographer for Q2 TV in Billings, and Reece is a sportscaster for the University of Wyoming and the director of the Wyoming's Cowboy News Network that covers 30 stations in the state.

"Russ absolutely adored his wife, Kathy, and his two daughters, Mallory and Madison.  He also loved his dog, a Siberian Husky named Timba.  Russ loved to cook for his family and made the greatest spaghetti ever.  Russ was proud of his Italian heritage, as are his brothers.

"In 2008 Russ's dad died suddenly.  I would have not made it through this time if it had not been for Russ and his brother, Rob.  We were just beginning to get some closure and move on when the tragedy of our lives happened and Russ was taken from us.  My beautiful, happy family was now broken and nothing will ever fix it.

"I would now like to talk a little bit about what has happened since Russ died and how it has affected our lives.

"First of all, I would like you to know that it was I that instigated the lawsuit against Mr. Schneider.  I was so very angry about his incompetence as a doctor that I felt this was our only recourse.  We only wanted to provide some kind of financial security for Mallory and Madison so that their education would be provided for.  We figured that his malpractice insurance would settle and that it would be the end

of it, but what a shock when we found out that he had none.   It

is now obvious to us that Russ's life meant nothing to him.   It

is all about the money.

        "I would guess that Mr. Schneider started trying to

hide his assets days after Russ's death.   Because of his

actions, we have been put through hell as a family for the last

five years.   Just when we have had a few good months, and here

it is again in the papers for all to see, and how can we ever

forget, as if we could.   We sat in this courtroom and had to

listen to him get on the stand and lie.   Now it appears that

there will be no consequences for that.

        "Russ's birthday is May 7th.   I went to the cemetery

and sat on a bench and looked at my son's headstone.   I hope to

God that Dr. Schneider never has to know what that feels like,

but then there is no God for people like him.

        "Please, Your Honor, do not let him walk out of this

courtroom without having to suffer some serious consequences

for what he has done, not only to my family, but also for his

total disregard for the laws of this court."

        And now I'd like to read a statement from my other

son.

        "My name is Reece Monaco.   And, first, let me

apologize to the Court for not being able to be there today.

        "Russ Monaco was one of my older brothers, and

unfortunately his life was taken from him way too early.   I am

01:59:39PM 1 older now than he was when his life ended while sitting on his

01:59:44PM 2 couch in his living room for his young daughter to find him

01:59:48PM 3 while getting ready for school that morning.  I don't think

01:59:51PM 4 there is anything I can say that will be more powerful or

01:59:55PM 5 heartfelt than the comments from his wife, Kathy, or his

01:59:59PM 6 daughters, Mallory and Madison, who have had to deal with life

02:00:02PM 7 without their husband and father, just like my mother has had

02:00:06PM 8 to deal with the loss of her son, and just like my older

02:00:10PM 9 brother, Rob, and I have had to deal with life without our

02:00:14PM 10 brother, Russ.

02:00:14PM 11         "Russ was a big man with a big character, and it's

02:00:18PM 12 too bad that his daughters have had to sit in this courtroom

02:00:22PM 13 today and look at the man that is responsible for his death who

02:00:26PM 14 has such little character.  It is also absolute shame that this

02:00:31PM 15 has come down to a decision about dollars and cents and not the

02:00:35PM 16 loss of a life that was taken way too early.

02:00:38PM 17         "When I say this man has no character, all the Court

02:00:42PM 18 has to do is look at his track record.  Just ask the doctor in

02:00:46PM 19 Cody that was run down by this man's lack of character, and

02:00:50PM 20 look at the extent he went to hide his money because he knew

02:00:54PM 21 what he did to my brother, Russ, was wrong.  This man has shown

02:00:58PM 22 no remorse or regard -- regret, for his action has always

02:01:03PM 23 pointed the finger at others for his failures in which another

02:01:07PM 24 example of his -- which is another example of his lack of

02:01:11PM 25 character.

02:01:11PM 1      "Doctors are sworn to preserve life and better

02:01:16PM 2  humanity.  This man did not preserve life, and the only human

02:01:20PM 3  whose life he is concerned about bettering is his own with

02:01:24PM 4  deception and lies, no matter who he has to hurt along the way.

02:01:28PM 5      "While our family and Russ's daughters are coming to

02:01:31PM 6  grips with the sudden loss of Russ's life, this man immediately

02:01:34PM 7  began scheming and lying, blaming others and covering up his

02:01:39PM 8  assets, because that's what this is all about right now; money,

02:01:43PM 9  not a man's life.  So he hid behind the legal system and

02:01:49PM 10  enlisted the help of his family to perpetrate his lies.  He has

02:01:52PM 11  proven to be a liar and a cheat.  And when asked to tell the

02:01:56PM 12  whole truth and nothing but the truth, he sat on the stand and

02:02:00PM 13  lied to the Court, which also shows he has no character to

02:02:04PM 14  speak of, but which is also against the law; that is why he is

02:02:08PM 15  here today.

02:02:09PM 16      "Your Honor, please take into consideration this

02:02:12PM 17  man's past, his actions and lack of guilt or remorse in

02:02:16PM 18  everything he has done, and at the very least sentence him to

02:02:21PM 19  some time behind bars.  While some jail time would not be the

02:02:26PM 20  justice we are looking for, it's the least that could be done.

02:02:29PM 21  While he might think his life would be over if he goes to

02:02:34PM 22  jail -- has to do jail time, my brother Russ's life is over

02:02:38PM 23  because of the actions of this selfish, arrogant, lying,

02:02:42PM 24  unethical, worthless man.

02:02:49PM 25      "Punishment won't hurt his character, because he has

02:02:51PM   1   none.   But my brother, who at times was larger than life, had

02:02:55PM   2   his character and life taken from him by the worthless human

02:02:58PM   3   being sitting in this courtroom today.

02:03:00PM   4           "Thank you."

02:03:02PM   5           THE COURT:   Thank you.

02:03:08PM   6           MR. RUBICH:   I think that's everyone, Your Honor.

02:03:10PM   7           THE COURT:   Okay.

02:03:13PM   8           And, Mr. Rubich, you may be heard as to sentencing.

02:03:16PM   9           MR. RUBICH:   Thank you, Your Honor.

02:03:16PM   10          Obviously, I submitted a sentencing memorandum in

02:03:20PM   11  this case, and I'm not sure where to begin, because there's so

02:03:27PM   12  much to say.

02:03:28PM   13          I've been working with this case for quite some time,

02:03:33PM   14  and I've seen a lot of bankruptcy, fraudulent situations, but

02:03:37PM   15  this one is, I have to say, unique, and unique in its

02:03:42PM   16  egregiousness.   And when you -- when you look at this -- I

02:03:47PM   17  tried to lay that out in my sentencing memorandum.   You know,

02:03:49PM   18  you have to take into consideration how he ended up in

02:03:53PM   19  bankruptcy in the first place.

02:03:55PM   20          There is the bizarre litigation involving Dr. Biles

02:03:59PM   21  down in Wyoming.   I don't know what led to do that, but, you

02:04:04PM   22  know, this is a man who engaged systematically in coercing

02:04:09PM   23  another person to make fraudulent allegations against another

02:04:13PM   24  person, and then actively trying to subvert a federal court

02:04:16PM   25  proceeding that was dealing with that.

02:04:19PM  1          So to begin from that -- and that, in and of itself,

02:04:22PM  2    is concerning.  But once all of that wrapped up, Dr. Biles, who

02:04:26PM  3    is a surgeon, who ought to know that what -- the business that

02:04:30PM  4    he is engaged in by its very nature is high risk.  Anytime you

02:04:34PM  5    put someone underneath a knife, it's going to be dangerous.

02:04:38PM  6    And to do so without the benefit of insurance, which he knew he

02:04:42PM  7    did not have as a result of funneling all the money that he had

02:04:45PM  8    in his captive insurance company to pay for this defamation

02:04:50PM  9    claim, it's utterly reckless.

02:04:52PM  10         I mean, I don't understand how someone could be so --

02:04:56PM  11   and, again, I'm not getting into -- I'm not going to get in --

02:04:58PM  12   because I wasn't involved in the merits of the malpractice

02:05:02PM  13   claims.  But what I do know is the act of performing surgery on

02:05:12PM  14   someone without having a safety net in place should something

02:05:16PM  15   go wrong suggests that you have an inability to understand how

02:05:19PM  16   your actions affect other people.  It's scary, it's terrifying.

02:05:23PM  17   You know, lawyers do the same thing, we are expected to keep

02:05:30PM  18   insurance for a reason, because if we make a mistake, the

02:05:30PM  19   consequences are devastating.

02:05:33PM  20         So the fact that he did that, and the fact that he

02:05:35PM  21   did that in a way to -- and that's what should be said, is that

02:05:40PM  22   this is a guy, before bankruptcy, he has vast assets; he had

02:05:45PM  23   several luxury properties in Wyoming and here, he owned a large

02:05:49PM  24   house -- still does own a large house down in Wyoming -- or

02:05:52PM  25   sorry, in California.

02:05:53PM 1        And I don't say that to begrudge the man anything.
02:05:57PM 2   You know, if you're successful in life, that's great.  But what
02:05:59PM 3   will you do to preserve what is essentially money and things?
02:06:07PM 4   And it seems to me that Dr. Schneider was willing to do just
02:06:11PM 5   about anything, including take my insurance, I'm going to pay
02:06:15PM 6   off this settlement, despite the fact that, I assume, he must
02:06:18PM 7   have had, based on the assets that I've seen as a result of
02:06:21PM 8   this bankruptcy proceeding, more than enough assets in his
02:06:23PM 9   personal holdings to pay this thing.  But he made that
02:06:27PM 10  decision.

02:06:27PM 11       And with that background, and after he's released
02:06:31PM 12  from the Montana Insurance Commission, after he says, "I'm
02:06:34PM 13  going to pay this off.  I'm going to make this right," he
02:06:37PM 14  enters into bankruptcy.  And after all those facts are set
02:06:40PM 15  down, he has the audacity, the greed, the recklessness to
02:06:45PM 16  continue to put his own personal well-being, his own finances
02:06:50PM 17  above what -- about doing the right thing, about -- at least at
02:06:56PM 18  that point making -- doing what he could to make these people
02:07:01PM 19  whole.  It's shocking.

02:07:05PM 20       And someone who has dedicated his life to the idea
02:07:08PM 21  that this justice system, this court system means something,
02:07:12PM 22  that what we do here is important, that the rules that we have
02:07:15PM 23  set down as a society are important and that they're there for
02:07:20PM 24  a reason, it baffles me to see someone like Dr. Schneider
02:07:27PM 25  who -- he's given so many opportunities to do the right thing,

02:07:31PM   1   and just time after time after time he says, no, I'm not going
02:07:35PM   2   to do the right thing.  I'm going to do the right thing that's
02:07:38PM   3   best for me.  Because that's what matters at the end of this
02:07:40PM   4   thing.  It doesn't matter how many people I've hurt, it doesn't
02:07:43PM   5   matter what I do.
02:07:44PM   6           So from my perspective, I look at the 3553(a)
02:07:48PM   7   factors, Your Honor, and I see someone who has no respect for
02:07:50PM   8   the law.  And, in fact, we talk about lack of respect for the
02:07:53PM   9   law all the time, but I've never seen someone who gave us such
02:07:57PM  10   concrete examples of his inability to respect the law.  He
02:08:01PM  11   disrespected the federal court system down in Wyoming, he
02:08:04PM  12   disrespected the Montana Insurance Commission, then he
02:08:06PM  13   disrespects the bankruptcy proceeding.  So at multiple levels,
02:08:11PM  14   he has no regard for the administration of legal proceedings.
02:08:18PM  15   And, again, it goes back to, as far as I can tell, greed and
02:08:21PM  16   the idea that he might not get to have everything that he has.
02:08:25PM  17           And at the same time, I see someone who is unable to
02:08:31PM  18   appreciate the gravity of his actions.  How else do we get here
02:08:37PM  19   today?  So under these circumstances, Your Honor, I look at the
02:08:39PM  20   guidelines, the guidelines for me are the heartlands of where
02:08:43PM  21   we belong, and 24 months is what I'm asking for.
02:08:45PM  22           I would like to note, Your Honor -- I know there's
02:08:47PM  23   been some statements from the victims -- they would like more.
02:08:52PM  24   It would be nice if they were able to get more in restitution.
02:08:57PM  25   I can assure Your Honor that, unfortunately, after researching

02:09:00PM 1  the case law and every other thing, that 308,000 that was

02:09:04PM 2  arrived at was the maximum that the Supreme Court will allow.

02:09:07PM 3       The attorneys' fees.  There was literally just a case

02:09:11PM 4  that came down from the Supreme Court that says that because

02:09:13PM 5  the way the statute is written you cannot assign restitution

02:09:18PM 6  amounts for attorneys' fees that are not directly connected

02:09:20PM 7  with the criminal investigation.  The criminal investigation

02:09:22PM 8  was done by John Teeling and myself largely, so none of the

02:09:26PM 9  attorneys' fees can really be applied to restitution.

02:09:28PM 10       And that's the last thing that I'll say, is that the

02:09:35PM 11  amount that was used to calculate the guidelines in this case,

02:09:38PM 12  the amount of restitution, is the number.  But if you look at

02:09:42PM 13  the harm that was caused, I do think, and I do want you to

02:09:45PM 14  consider, Your Honor, that this bankruptcy proceeding was much

02:09:48PM 15  more expensive, was much more lengthy, and much more

02:09:51PM 16  complicated than it would have been absent his fraud, and that

02:09:56PM 17  had costs associated with it.  It's not restitution that we can

02:09:57PM 18  give, but it is something that I would like you to consider as

02:09:59PM 19  you contemplate a sentence.

02:10:01PM 20       So I would ask for 24 months, Your Honor, followed by

02:10:04PM 21  three years of supervised release.

02:10:06PM 22       Thank you.

02:10:08PM 23       THE COURT:  So, Mr. Rubich, what consequence was

02:10:12PM 24  there, if any, to Dr. Schneider for raiding his self-funded

02:10:21PM 25  malpractice insurance account?

02:10:24PM   1          MR. RUBICH:  Your Honor, it's my understanding -- I

02:10:26PM   2   wasn't involved in those proceedings, but I submitted that

02:10:28PM   3   letter.  It was my understanding that --

02:10:30PM   4          THE COURT:  Well, wasn't that from the Montana

02:10:33PM   5   Insurance Commission?

02:10:33PM   6          MR. RUBICH:  It was, Your Honor.

02:10:34PM   7          THE COURT:  But was that -- maybe I'm

02:10:37PM   8   misunderstanding.  I was thinking that it was in Wyoming that

02:10:41PM   9   he had that malpractice fund, but maybe it was in Montana.  I

02:10:47PM  10   know he used the funds to pay off Dr. Biles.

02:10:50PM  11          MR. RUBICH:  It's my understanding that that was

02:10:51PM  12   his -- wherever he practiced, that was how he had insurance,

02:10:55PM  13   was this Montana corporation that was regulated by the Montana

02:11:00PM  14   Insurance Commission.  If I'm incorrect, the defense can

02:11:03PM  15   correct me, but that's my understanding of how it worked.

02:11:06PM  16          THE COURT:  Well, I think Mr. Moyers knows.  Maybe

02:11:08PM  17   Mr. Moyers or Mr. Womack will help me.

02:11:12PM  18          I'm not sure that it has a whole lot of bearing, but

02:11:16PM  19   it seems to me that, you know, lawyers are required to have

02:11:19PM  20   malpractice insurance, doctors are required to have malpractice

02:11:22PM  21   insurance, all kinds of professions are required to have errors

02:11:27PM  22   and omissions insurance.  But is there a penalty for not having

02:11:31PM  23   it?  That, I don't know the answer to.

02:11:34PM  24          JON MOYERS:  There was not.  So Mr. Schneider

02:11:38PM  25   practiced in four surgical areas in Wyoming.  He was insured by

02:11:41PM 1  a captive insurance company that he had created that was under

02:11:44PM 2  his control here in Montana that was called Northern Rockies

02:11:47PM 3  Insurance Company.  He had maintained in excess of $3 million

02:11:50PM 4  in cash in that; that was for the express purpose of covering

02:11:54PM 5  victims of malpractice.  That was a part of the credentialing

02:12:00PM 6  privilege requirements of the surgical facilities that he'd

02:12:04PM 7  operated.  Wyoming, like Montana, doesn't have a state statute

02:12:07PM 8  that mandates surgeons to carry professional liability

02:12:11PM 9  insurance, but that was what he had committed every year, is

02:12:13PM 10 that he carry that insurance.  And then as the Court knows,

02:12:15PM 11 then he raided that to pay Dr. Biles.

02:12:18PM 12         When the Montana commission became aware of that

02:12:22PM 13 fraud, then they shut down -- or they suspended Northern

02:12:27PM 14 Rockies Insurance Company and entered an order requiring

02:12:29PM 15 Mr. Schneider then to repay those funds, which he never did,

02:12:32PM 16 and that matter has remained open and is unresolved.  But there

02:12:38PM 17 has been no other penalties assessed to him because of that.

02:12:42PM 18         THE COURT:  Well, what teeth does that have?  What

02:12:45PM 19 can the insurance commission do if he doesn't repay the money

02:12:49PM 20 that he promised to repay?

02:12:51PM 21         JON MOYERS:  I've asked for them to pursue that or

02:12:53PM 22 I've asked them to deputize us to pursue that.

02:12:56PM 23         THE COURT:  But I mean what can you do?  Get a

02:12:59PM 24 judgment against him and that's about it?

02:13:01PM 25         JON MOYERS:  Correct.

02:13:01PM  1        THE COURT:  Yeah.

02:13:02PM  2        JON MOYERS:  That's why we've asked -- so that's what

02:13:06PM  3  prompted the -- you know, he claimed he didn't have any other

02:13:08PM  4  assets, Mr. Womack spent a lot of time trying to figure out

02:13:12PM  5  where they were, but then that provided the basis for him to

02:13:15PM  6  claim bankruptcy.

02:13:16PM  7        THE COURT:  How much was in the fund?

02:13:18PM  8        JON MOYERS:  The fund itself had to have in excess of

02:13:21PM  9  $3 million, because the hospitals and the surgery centers

02:13:25PM  10  required him to have a 1 million/$3 million coverage, the

02:13:29PM  11  $3 million to be aggregated claims.  And so they maintained

02:13:33PM  12  a -- so he maintained an account that held $3 million, which

02:13:37PM  13  were then depleted to either pay his attorneys or to pay

02:13:44PM  14  Dr. Biles.  And that claim, under the policy that existed at

02:13:49PM  15  the time, for what it's worth, was an improper claim, so the --

02:13:52PM  16        THE COURT:  Right.  It wasn't any malpractice or

02:13:57PM  17  anything related to his medical practice.

02:13:58PM  18        JON MOYERS:  Right.

02:13:59PM  19        And then after the horse was out of the barn, then he

02:14:02PM  20  made a resolution to have that policy changed to permit payment

02:14:06PM  21  for libel claims, but it had already been paid contrary to what

02:14:11PM  22  had been the policy.  So that's why we've asked for the full

02:14:13PM  23  restitution here, because there's nowhere else to get it.

02:14:18PM  24        THE COURT:  Right.  And you can't get it here --

02:14:18PM  25        JOE WOMACK:  I agree with what Mr. Moyers said; that

02:14:23PM  1   is accurate.  We've spent a lot of time investigating this.

02:14:26PM  2   Everything is correct.

02:14:27PM  3           THE COURT:  So, Mr. Womack, as far as the $600,000

02:14:31PM  4   plus in attorney fees that the bankruptcy -- that you, as

02:14:35PM  5   bankruptcy trustee, had to -- and then the estate had to incur,

02:14:40PM  6   what is your recourse to collect that?

02:14:43PM  7           JOE WOMACK:  We have no further recourse.  We brought

02:14:47PM  8   fraudulent conveyance claims seeking to set aside, to transfer

02:14:53PM  9   of many, several -- you know, quite a few million dollars in

02:14:57PM 10   assets from Dr. Schneider into various shell entities and other

02:15:04PM 11   entities that he had set up with his wife and children as --

02:15:08PM 12   and sister originally as controlling directors or officers.

02:15:17PM 13   And our investigation showed that he had retained actual

02:15:21PM 14   control of those entities through his wife, his children.

02:15:28PM 15           We ended up compromising and settling the claim for

02:15:31PM 16   less than what -- half of what we believe we could get because

02:15:36PM 17   of the -- so many problems in pursuing it and the time.  We did

02:15:40PM 18   recover probably about, roughly $1.8 million in assets.  But --

02:15:48PM 19   and that's the basis for the attorneys' fees.  We had to hire

02:15:52PM 20   attorneys on a contingency fee to pursue those.  The attorneys

02:15:57PM 21   will be paid, but that has depleted the amount that's available

02:16:01PM 22   to pay the actual claimants in the case itself.  Had there been

02:16:06PM 23   full disclosure by Dr. Schneider and he had not entered into

02:16:09PM 24   this fraud and these schemes to conceal and transfer assets, we

02:16:14PM 25   wouldn't have had to employ attorneys, or the amount that we

02:16:18PM  1  would have had to pay would have been far less.

02:16:23PM  2          THE COURT:  Well, you'd have at least 1.8 million,

02:16:28PM  3  right --

02:16:29PM  4          JOE WOMACK:  We do have --

02:16:31PM  5          THE COURT:  -- in assets?

02:16:31PM  6          You have that, but you have to subtract the 600,000

02:16:35PM  7  in attorneys' fees.

02:16:36PM  8          JOE WOMACK:  And we have to pay the attorneys' fees

02:16:36PM  9  out of that.

02:16:37PM 10          THE COURT:  Right.

02:16:37PM 11          JOE WOMACK:  And then there's also been other costs

02:16:39PM 12  of administration of the estate.

02:16:40PM 13          THE COURT:  Sure.

02:16:41PM 14          JOE WOMACK:  So in the end, we've paid tax claims out

02:16:44PM 15  of that.  He had 150,000 in tax claims owed to the Montana

02:16:49PM 16  Department of Revenue that we've paid.

02:16:49PM 17      (Off-the-record discussion between Jon Moyers and Joe

02:16:49PM 18  Womack.)

02:16:57PM 19          JOE WOMACK:  He also incurred a fine to the Wyoming

02:17:02PM 20  Board of Medicine for revocation of his license and the

02:17:04PM 21  attorneys' fees incurred in that process.  So we are paying

02:17:09PM 22  that claim as well, and then the claims to the families.

02:17:15PM 23          And, you know, Mr. Moyers said he didn't -- I think

02:17:19PM 24  there was some talk about whether or not he actually committed

02:17:23PM 25  malpractice.  But in the bankruptcy, he admitted, or agreed to

02:17:27PM   1    the allowance of the $3 million claim by the Monaco family, a

02:17:33PM   2    million dollars by Sherry Lee and other people based on the

02:17:37PM   3    malpractice that was alleged.  So in my mind, those -- that is

02:17:43PM   4    an admission that he actually committed malpractice and that

02:17:47PM   5    those people suffered that damage.

02:17:49PM   6            Now, I suppose you can argue that that was a

02:17:53PM   7    compromise, and I'm sure it was, but at the same time it is an

02:17:56PM   8    admission of guilt, I think, of medical malpractice that he

02:18:01PM   9    committed against those people.

02:18:03PM  10            THE COURT:  Okay.  Thank you both.

02:18:07PM  11            Mr. Smith, you may be heard.

02:18:14PM  12            MR. SMITH:  Thank you, Judge.

02:18:15PM  13            Judge, a lot's been said.  I'd like to clarify a few

02:18:20PM  14    things, if I may, about the bankruptcy proceeding.  And I

02:18:26PM  15    will -- Dr. Schneider is going to allocute on his own behalf,

02:18:29PM  16    and I'll let him address some of the wrongs, some of the things

02:18:32PM  17    that he did that he's not proud of back then, but there are a

02:18:36PM  18    few things that I think need to be straightened out.

02:18:39PM  19            The bankruptcy was filed on December 4, 2014.  The

02:18:43PM  20    trustee hired Trent Gardner, a lawyer out of Bozeman, to help

02:18:48PM  21    him when he realized this was likely a sizeable bankruptcy

02:18:52PM  22    estate.  He hired Trent Gardner as early as February 20, 2015.

02:18:57PM  23    From the records that I've reviewed, it looks like, yeah,

02:19:01PM  24    sometime in February Mr. Gardner was brought on board.

02:19:03PM  25            About a month later, Mr. Gardner and the trustee on

02:19:08PM 1   March 24, 2015, filed an adversary proceedings against Kathleen

02:19:14PM 2   Burrows.  Kathleen Burrows is Dr. Schneider's sister.  Because

02:19:18PM 3   the trustee and Mr. Gardner had, in the normal course of their

02:19:22PM 4   investigation, rather easily, because you can do title

02:19:26PM 5   searches, figured out that some property in Molt, Montana, had

02:19:29PM 6   transferred from Mr. Schneider -- Dr. Schneider to Kathleen

02:19:35PM 7   Burrows.  So once they figured that out, they wanted to undo,

02:19:38PM 8   as the trustee has the power to do, undo that transfer as a --

02:19:42PM 9   when it's a called a fraudulent conveyance, I'm sure the Court

02:19:46PM 10  knows, that's a civil term for a conveyance that occurred prior

02:19:50PM 11  to the bankruptcy that the trustee can reach back and undo.  So

02:19:54PM 12  that's what the trustee sought to do.

02:19:56PM 13          Soon thereafter, probably in April, maybe as late as

02:19:58PM 14  May, but not much later, they deposed Kathleen Burrows.  At the

02:20:03PM 15  time they deposed Kathleen Burrows, she told them about this

02:20:06PM 16  Molt property, about the sale, about the money that

02:20:10PM 17  Dr. Schneider took from that sale and used it as the initial

02:20:13PM 18  seed money for account 2881 in the U.S. Bank, the account for

02:20:18PM 19  which he sits here today, the account that was not disclosed in

02:20:22PM 20  his bankruptcy.  So as early as May, they knew about the

02:20:27PM 21  account -- all about the account.

02:20:32PM 22          THE COURT:  But the funds were gone.

02:20:34PM 23          MR. SMITH:  The funds had been transferred around,

02:20:36PM 24  and they --

02:20:37PM 25          THE COURT:  They'd been transferred to his wife and

02:20:40PM   1   children's trusts.

02:20:41PM   2          MR. SMITH:  Correct.  That's right.  305,000 of it;

02:20:45PM   3   that's correct.  And so that's the money now that we've settled

02:20:49PM   4   on as -- that needs to be returned to the estate by

02:20:52PM   5   Dr. Schneider in restitution.

02:20:53PM   6          When the bankruptcy was filed in December 2014, the

02:21:00PM   7   home here in Billings was listed.  And not long after that,

02:21:04PM   8   through this process with Kathleen Burrows, and then into the

02:21:09PM   9   summer of 2015 when they finally filed the AP 1515, which was

02:21:13PM  10   the big adversary proceeding in which the trustee and his

02:21:19PM  11   lawyer, John and his lawyer basically fought over what was

02:21:23PM  12   going to be -- what were going to be the parameters of the

02:21:27PM  13   bankruptcy estate.

02:21:27PM  14          The house here in Billings and the Whispering Pines

02:21:31PM  15   Ranch -- or Whispering Winds Ranch -- I always call it pines --

02:21:35PM  16   Whispering Winds Ranch in Wyoming turned out to be 80

02:21:38PM  17   percent -- approximately 80 percent of the value -- recovered

02:21:42PM  18   value in the bankruptcy estate.  So I guess I take a little bit

02:21:45PM  19   of issue that all of these attorneys' fees and all of the

02:21:49PM  20   contingency and the expense was as a result of John Schneider's

02:21:54PM  21   fraud, because I just simply think it wasn't.

02:21:56PM  22          He had definitely set in place, years before he filed

02:22:01PM  23   bankruptcy, with lawyers advice, some estate planning, some

02:22:06PM  24   asset protection, as it were.  All right.  But all of that was

02:22:11PM  25   discovered through the process of AP 1515, which, in May of

2016, so fast forward a year, the parties entered into a settlement agreement in order to finish the AP 1515.  In addition to other assets, the settlement allowed that the bankruptcy estate would have the Schneider home and would have the Whispering Winds Ranch.

I wanted to read to the Court what the trustee wrote in his motion to the Court -- to the bankruptcy court asking the court to approve the settlement.

In that motion it was filed 5/19 of 2016, quote: While the trustee is confident in his claims, the defendants are equally confident that they have done nothing wrong and insist that any transfers were legitimate estate planning and asset protection.

The defendants are represented by able and experienced counsel, and the trustee has no doubt that defendants will fight tooth and nail on every legal and factual issue.  Further, the bulk of the available assets flow from Schneider LP, an entity formed in 2007 with debtor and Michelle Schneider as equal owners.

The defendants are adamant that, therefore, even if the trustee is fully successful in bringing the assets back to Schneider LP, the estate is only entitled to half of the value of such assets, because Michelle Schneider has a claim of ownership of half of all such assets.

By the way, Judge, Michelle Schneider was

02:23:44PM 1    independently represented by Mark Parker here -- from Billings

02:23:47PM 2    here, and I believe that was the assertion.  I wasn't a part of

02:23:52PM 3    all of this, of course.  I'm re-creating the past through some

02:23:55PM 4    of these documents.

02:23:56PM 5         But the trustee went on to say:  The bottom line is

02:23:59PM 6    that the trustee believes strongly that he will be successful

02:24:02PM 7    on many of his claims.  However, there are varying levels of

02:24:05PM 8    potential success, many of which do not result in a better

02:24:09PM 9    outcome than what is achieved in this settlement.  Further,

02:24:12PM 10   there is an enormous amount of uncertainty.  The probability of

02:24:17PM 11   success on the merits favor settlement, unquote.

02:24:21PM 12        Last week, the trustee filed a final application for

02:24:25PM 13   fees and costs with the bankruptcy court in that case.  And the

02:24:29PM 14   report -- he reports collecting 1.888, so round numbers,

02:24:38PM 15   $1.9 million in assets to the bankruptcy estate.  Judge, when

02:24:41PM 16   you add the $308,925 that Dr. Schneider is going to owe in

02:24:48PM 17   restitution, that puts the bankruptcy estate at $2.2 million.

02:25:06PM 18        Judge --

02:25:06PM 19        THE COURT:  Well, can I ask you about that

02:25:08PM 20   restitution figure --

02:25:11PM 21        MR. SMITH:  Sure.

02:25:10PM 22        THE COURT:  -- Mr. Smith?

02:25:11PM 23        MR. SMITH:  Yes.

02:25:12PM 24        THE COURT:  What is your client's plan to pay it?

02:25:14PM 25        MR. SMITH:  Well, Judge, as we promised in the

02:25:17PM  1  settlement -- I'm sorry, in our sentencing memorandum,
02:25:22PM  2  Dr. Schneider has taken $35,000 out of a retirement account
02:25:27PM  3  that he has, and he has a check today to give to the Clerk of
02:25:32PM  4  Court, once restitution is ordered, as a way of getting
02:25:37PM  5  started.
02:25:38PM  6          He -- as I have stated in our memorandum, he has
02:25:43PM  7  begun work using his master's degree in negotiation and dispute
02:25:48PM  8  resolution to start a business doing alternative dispute
02:25:53PM  9  resolution with healthcare providers.  I've explained to you in
02:25:57PM 10  our memorandum about the book that he wrote.
02:25:59PM 11          And so that is what -- he plans to go around the
02:26:02PM 12  country to, if he's free, of course, to, like, American Medical
02:26:09PM 13  Association meetings and meetings involving neurological
02:26:12PM 14  association, other medical provider meetings, and sell, not
02:26:18PM 15  just his book, buy, really, sell his services to major
02:26:23PM 16  hospitals, if possible, to help them integrate a program with
02:26:27PM 17  their personnel that will, well, smooth out the wrinkles that
02:26:33PM 18  happen when, in large hospitals, among staff, intra-hospital
02:26:39PM 19  and between hospitals and between medical providers and
02:26:44PM 20  patients, administrators and vendors, you know, there's a whole
02:26:49PM 21  slough of interrelated things that happen in a hospital
02:26:53PM 22  setting, as you might guess.  And so he -- his book -- and I
02:26:57PM 23  wanted to read a section of it -- from it to you -- is his
02:27:03PM 24  whole course of study -- here it is -- is aimed at that.
02:27:08PM 25          And, Judge, I guess the bottom line, Judge, is all of

02:27:11PM 1  the things we're talking about Dr. Schneider happened in 2011,

02:27:15PM 2  '12, '13, '14, and maybe into '15.  But since then, he has

02:27:21PM 3  tried very hard to change his life and to have a new path.

02:27:25PM 4  He's not happy -- you're going to hear from him, but he's not

02:27:28PM 5  happy with what happened during those years.  That was -- that

02:27:33PM 6  was not -- obviously, that was very bad behavior on his part,

02:27:37PM 7  but also just a bad way for him to be living his life, and it

02:27:41PM 8  got seriously out of control.

02:27:44PM 9          But in 2015 and into 2016, while this bankruptcy is

02:27:49PM 10 boiling around, and he takes the time to go to Creighton law

02:27:53PM 11 school and get a master's degree in negotiation and alternative

02:27:57PM 12 dispute resolution as a means of maybe -- well, first and

02:28:02PM 13 foremost, of learning something.  He has spent a lot of time

02:28:05PM 14 reflecting, and with introspection, and this course of study

02:28:11PM 15 really helped him with that, to understand how it was he got to

02:28:15PM 16 where he was and is now, which I think is -- that's commendable

02:28:21PM 17 that he would take that time.  I mean, everybody says he

02:28:25PM 18 doesn't care and he isn't sorry.  That isn't true.  That just

02:28:29PM 19 simply isn't true, Judge.  Yes, he's had transgressions, but he

02:28:34PM 20 wants to make good on them.

02:28:35PM 21         If I could, Judge, I just have a paragraph to read.

02:28:39PM 22 And he wrote at page 19, it's in the first chapter.

02:28:42PM 23         He says, "The underlying theme in this textbook are

02:28:46PM 24 founded in generativity theory, to create a legacy enabling

02:28:49PM 25 providers to avoid the mistakes the author witnessed or made

02:28:53PM   1   over a thirty-year neurosurgery career.  Please begin by
02:28:56PM   2   learning the art of active listening.  Empathetic attention
02:29:00PM   3   during conversation reveals your opponent's perspective and
02:29:03PM   4   dismisses your urge to interrupt, qualify, and correct their
02:29:07PM   5   understanding of events and issues.  In time you will develop a
02:29:10PM   6   deeper appreciation of inclusion, diversity of views,
02:29:14PM   7   perspective and become tolerant of opinions that may differ,
02:29:17PM   8   recognizing that in the end, we all have common needs,
02:29:21PM   9   interests and goals.  Combining the tools of leadership,
02:29:25PM  10   adherence to policy, and working from an interest-based
02:29:27PM  11   perspective, healthcare providers learn how to work through the
02:29:32PM  12   inevitable issues that occur while caring for patients.  By
02:29:34PM  13   proactively addressing problematic situations you will receive
02:29:37PM  14   a profoundly valuable personal payoff - reduced stress and
02:29:41PM  15   wasted time, efficient accurate patient care, and comfortable
02:29:45PM  16   rewarding professional satisfaction."
02:29:47PM  17          And that's just a piece of this, Judge.  But I think
02:29:50PM  18   it shows what -- you know what, I don't think -- I know
02:29:55PM  19   Dr. Schneider could not have written that paragraph in 2014.
02:30:00PM  20   His life was not -- he wasn't in a place where he could
02:30:02PM  21   recognize the things that he's come to recognize over the last
02:30:05PM  22   several years.  You know, I guess the statement comes to mind,
02:30:11PM  23   if he knew then what he knows now, we wouldn't be here, Judge;
02:30:15PM  24   but he didn't.  But, yet, he's taken the time to rehabilitate
02:30:20PM  25   himself in that way.

02:30:23PM 1    Before I go on about that, I would like to address
02:30:26PM 2 something about the personal injury claimants, or the claims
02:30:31PM 3 that were made by the personal injury -- by Jon Moyers
02:30:35PM 4 discussed and Joe Womack discussed too.
02:30:39PM 5    When those claims came into bankruptcy, Judge, as you
02:30:43PM 6 know, they were contingent, unliquidated claims for money.  And
02:30:49PM 7 during the -- they were very involved during the process that
02:30:53PM 8 AP 1515 took between the trustee and Mr. Schneider and his
02:30:59PM 9 lawyers and the trustee's lawyer.
02:31:04PM 10    The trustee, in his final application for fees, just
02:31:08PM 11 last week -- I'm sorry, I lost my place, but I will find it --
02:31:25PM 12 said it better than I said it in our -- more concisely than I
02:31:30PM 13 said it in our sentencing memorandum, Judge.  He said to the
02:31:47PM 14 Court last week, in explaining to the Court how he had come to
02:31:54PM 15 have the trustee fees that he did and the attorneys' fees that
02:31:56PM 16 he did, and he explained about the personal injury claimants.
02:32:01PM 17 And I'm sorry, it took me a second there.  He stated to the
02:32:05PM 18 Court, on August 9th of 2018, "The trustee was also successful
02:32:10PM 19 in getting the debtors' discharge denied, with no attorneys'
02:32:13PM 20 fees being charged by the trustee for this legal work."
02:32:17PM 21    It is true that John Schneider, he voluntarily, as
02:32:24PM 22 part of the discussions and settlement of AP 1515, he
02:32:29PM 23 voluntarily agreed to waive his discharge in the bankruptcy
02:32:32PM 24 proceeding.  There was some pressure from the court to do that,
02:32:35PM 25 but John did that.  And in so doing, he put the plaintiffs --

02:32:43PM   1    the personal injury claimants in a position to seek, to pursue

02:32:48PM   2    their claims in a court of law, and the trustee acknowledges

02:32:51PM   3    that.

02:32:52PM   4          This allowed creditors the opportunity to pursue the

02:32:55PM   5    debtor for any unpaid portion of their claim should they wish

02:32:59PM   6    to do so.  Originally, the PI claimants were very concerned

02:33:02PM   7    that the debtor did not receive his discharge so that they

02:33:04PM   8    could pursue him later outside of the bankruptcy.  In the end,

02:33:08PM   9    they waived their right to pursue Schneider outside the

02:33:11PM  10    bankruptcy in return for not having to prove up their claims.

02:33:15PM  11          And that's exactly what happened, Judge.  They --

02:33:18PM  12    their claims were never proven.  And I have to disagree -- I

02:33:23PM  13    mean, John Schneider was a surgeon and performed high risk type

02:33:28PM  14    surgeries.  He has never acknowledged -- he has never admitted,

02:33:33PM  15    as they say, that he committed malpractice.  I mean, that

02:33:39PM  16    whole -- that whole factual issue is way outside of a

02:33:42PM  17    bankruptcy proceeding.

02:33:44PM  18          The trustee mentioned that he allowed the PI

02:33:47PM  19    claimants' claims.  Well, okay, in a bankruptcy proceeding,

02:33:51PM  20    both the trustee in this case and John's attorney, Jim Cossitt,

02:33:57PM  21    objected to the PI claims when they were -- came in to the

02:34:01PM  22    bankruptcy estate.  And then when the settlement happened and

02:34:06PM  23    John agreed to -- that he'd waive his discharge in bankruptcy,

02:34:10PM  24    part of the deal was that both the trustee and John, through

02:34:15PM  25    his lawyer, would then take away their objections to those

02:34:21PM   1   claims and, quote, unquote, allow them.  That's a process that

02:34:25PM   2   happens in bankruptcy.  But it certainly is no admission that

02:34:28PM   3   he committed malpractice over the course of five or six, or

02:34:33PM   4   whatever -- how many claimants there are, Judge.  That's just

02:34:35PM   5   not a fair statement, I don't think.

02:34:37PM   6          The trustee also acknowledged the unsecured

02:34:44PM   7   creditors, the group that is represented by Mr. Moyers in his

02:34:48PM   8   filing last week, when he said to the judge, quote:  The group

02:34:51PM   9   of unsecured creditors that express concerns are generally

02:34:55PM  10   described as the personal injury plaintiffs, PI claimants.  The

02:34:59PM  11   PI claimants are represented by attorneys on a contingency

02:35:03PM  12   basis.  The amount recovered for the PI claimants will impact

02:35:05PM  13   the amount the PI claimant attorneys and their clients will

02:35:09PM  14   receive.  So they're motivated to cause the attorney fees and

02:35:12PM  15   trustee fees to be reduced as much as possible in order to

02:35:16PM  16   increase their respective recoveries.  Applicant is not aware

02:35:19PM  17   of the legal or factual basis of their objections.

02:35:22PM  18          So he addressed that.  And with this filing last

02:35:28PM  19   week, he gave the judge a -- basically an accounting of the

02:35:34PM  20   bankruptcy estate.  And it's true, the final report shows the

02:35:38PM  21   total recovery into the estate was one point eight eight eight

02:35:43PM  22   seven twenty-three, so approximately $1.9 million.  Of that,

02:35:48PM  23   there were administrative fees, attorneys' fees, both for the

02:35:52PM  24   trustee and for the trustee's attorney, and then trustee fees,

02:35:56PM  25   leaving, Judge, a total of $568,928, so $569,000, to be

distributed among the unsecured creditors, which includes all
of the PI claimants, as they are called.

The report -- I'll add one last thing, Judge.  The
report reflects that of the -- and maybe I should take a step
back -- of the claims -- the unsecured claims, what each
claimant will receive is approximately 7.9 percent of their
overall claim.  Okay.  That sounds like peanuts, 7.9 cents on
the dollar, right?  But that's really not atypical in a
bankruptcy proceeding, I don't believe.

And what I came to learn in preparing this case for
Dr. Schneider was, when, for instance -- well, I can just look
at them, but when the PI claimants came in to the bankruptcy,
they came in suggesting that their claims were worth
$1 million.  Harley Morrell, the PA that is claiming some kind
of contract dispute, $300,000.  I don't want to name names, but
you know, a million dollars, $1.5 million, a million dollars,
$2 million.

And, Judge, these are personal injury claims; who
knows what a jury would award.  Maybe it'd be way more, maybe
it'd be way less, maybe it'd be a defense verdict.  Those are
just estimates based upon the plaintiffs' attorneys' assessment
of his case.  And they put that claim in, I'm sure, in good
faith.  But all it does in the end is define what the pro rata
share will be for them when the dust settles and the
disbursement happens with the rest of the recovered assets.

02:38:05PM  1      So, you know, I just don't -- I mean, and, again,

02:38:08PM  2  they had a chance to go sue and try to get $2 million, or a

02:38:13PM  3  million dollars, or $1.5 million, and they huddled with their

02:38:17PM  4  attorneys and they decided, no, we want to come -- we want to

02:38:22PM  5  come back into the bankruptcy -- because when he waived his

02:38:24PM  6  discharge, they had not signed off on any settlement at that

02:38:28PM  7  point yet.  They will only a few days later, but -- and then

02:38:33PM  8  they decided, no, we'll take what we can get in the bankruptcy.

02:38:36PM  9  And I just -- that's how it really went down.  That's how it

02:38:40PM 10  went.

02:38:40PM 11      Since that time, Judge -- again, Dr. Schneider has

02:38:44PM 12  pursued this ADR.  I think it's going to be a great career,

02:38:50PM 13  second career for him, because he can really help hospitals and

02:38:54PM 14  administrators and physicians, based on his experience that

02:38:59PM 15  hasn't all been good but that he's learned a ton from, and that

02:39:04PM 16  I think he can actually have an income eventually from this,

02:39:07PM 17  because he's a very energetic guy and somebody who -- he'll

02:39:12PM 18  give his all to it.  He's already written a book about it, and

02:39:15PM 19  he's already preparing materials that can be presented in

02:39:18PM 20  classwork for nursing students and other kinds of students, and

02:39:22PM 21  medical students coming up through the system.

02:39:24PM 22      You know, he's also, Judge, using his experience from

02:39:29PM 23  numerous medical missions to Latin America, working with his

02:39:33PM 24  son, Brandon, to develop and operate a nonprofit that will send

02:39:37PM 25  medical professionals into areas around the world when disaster

02:39:41PM  1   strikes, to put stethoscopes on the ground, so to speak, in a

02:39:46PM  2   hurry, when and where they're needed most.  Puerto Rico, for

02:39:49PM  3   instance, after the last hurricane, comes to mind.

02:39:53PM  4           But perhaps the most rewarding thing that John is

02:39:56PM  5   doing right now is -- and I've given you information about

02:39:58PM  6   this, Judge, is doing the scuba diving with veterans, combat

02:40:02PM  7   veterans.  He finds amazing reward in that, because it is -- he

02:40:09PM  8   can bring his -- not only his scuba diving experience, but also

02:40:12PM  9   his medical, his neurological training to bear, because these

02:40:18PM 10   folks are suffering from post-traumatic stress, they're

02:40:22PM 11   suffering from horrific combat wounds and physical

02:40:26PM 12   disabilities.  And when he gets them in the water and it's

02:40:28PM 13   quiet under water and they're able to float, free of gravity,

02:40:32PM 14   you know, which is not like it is on land for them, and he's

02:40:35PM 15   able to help them.  And I've given you information that he's

02:40:39PM 16   going to go forward with programs, and not just diving with

02:40:42PM 17   them, but trying to help the people that are running these

02:40:46PM 18   programs establish themselves to a greater extent.

02:40:50PM 19           You've got a lot of combat veterans coming back from

02:40:53PM 20   the Middle East.  I see them all the time in my criminal

02:40:57PM 21   defense practice, because they are suffering.  This is

02:41:00PM 22   something that he can do and he can do in a specialized way

02:41:04PM 23   that I think can make a really big impact in Southern

02:41:07PM 24   California where these two groups are headquartered.

02:41:11PM 25           So I guess, Judge, over the past several years,

02:41:15PM  1  despite all the bad things that Mr. Rubich and others have to

02:41:18PM  2  say about what he did before that, I think John is trying to

02:41:21PM  3  show you that he's capable of changing, he's capable of

02:41:25PM  4  redemption, he's capable of correcting his past wrongs, he's

02:41:31PM  5  capable of helping others who are in dire need of help.  He

02:41:35PM  6  brings a multitude of skills to the table, as I've said, that

02:41:38PM  7  enable him to really make a difference.

02:41:41PM  8          Judge, his post-defense rehabilitation is

02:41:43PM  9  significant, is significant and extensive.  And he has no

02:41:48PM 10  substance abuse issues with which we deal all the time in the

02:41:52PM 11  Criminal Justice System.

02:41:53PM 12          With all of this in mind, Judge, I'm asking that you

02:41:56PM 13  sentence John to a period of five years probation, with a

02:41:59PM 14  substantial community service component in lieu of a fine,

02:42:02PM 15  leaving John to focus on his continuing work with the Dive Vets

02:42:06PM 16  and the WAVES Project and to build his ADR business so that he

02:42:11PM 17  can pay the remaining restitution.  He owes the restitution to

02:42:15PM 18  the estate, there's no question about it, so we expect that.

02:42:19PM 19  He will pay 35,000 today, plus the hundred dollar assessment.

02:42:25PM 20          Judge, I'd ask that you waive the interest on the

02:42:28PM 21  restitution, as it's a sizeable amount, even after the 35,000

02:42:32PM 22  is paid, because that would just be very difficult to pay that

02:42:37PM 23  and the principal, too.

02:42:42PM 24          Judge, John does want to address the Court and

02:42:44PM 25  exercise his right to allocution, so I'd ask that you listen to

02:42:48PM  1   John now.

02:42:49PM  2          Thank you.

02:43:00PM  3          THE DEFENDANT:  Your Honor, thank you for this

02:43:01PM  4   opportunity to speak.

02:43:03PM  5          "I am so very sorry.  Please know that, unlike what

02:43:10PM  6   was represented, I do have absolute respect for the law and the

02:43:14PM  7   bankruptcy rules.  I am embarrassed and ashamed to have

02:43:18PM  8   disrespected this process.

02:43:20PM  9          "I was wrong in failing to disclose a bank account

02:43:23PM  10  and concealing money from the bankruptcy estate and my

02:43:27PM  11  creditors.  I understand it's an insult to a judicial

02:43:31PM  12  proceeding which serves a very important function in our

02:43:34PM  13  society.

02:43:34PM  14         "I'm not here to make excuses for my past behavior,

02:43:39PM  15  but I want to let you know who I was and who, with convictions

02:43:43PM  16  of my faith, I'm trying to become.

02:43:45PM  17         "I alone am responsible for this transgression.  I've

02:43:51PM  18  always had an unwavering commitment to the rules that govern

02:43:54PM  19  our society, and I passed this on to my children.  I have

02:43:59PM  20  always been a law-abiding citizen before and after this

02:44:02PM  21  criminal act.  But there's no defense for my behavior.  Yet, I

02:44:09PM  22  would like to share with you the context in which I committed

02:44:13PM  23  this crime.

02:44:13PM  24         "This was an incredibly stressful time in my life.

02:44:18PM  25  The profound impact this stress had on my family and the

02:44:21PM 1   absolute threat, I felt, against my professional career did

02:44:26PM 2   cause me to make several bad decisions, including

02:44:30PM 3   misrepresentation of my bankruptcy finances.  There's no

02:44:34PM 4   justification for my actions.  But the rest of my life

02:44:39PM 5   demonstrated that my behavior in the bankruptcy was shamefully

02:44:42PM 6   out of character.  I've always tried to conduct myself as a

02:44:45PM 7   gentleman and an officer above reproach.  Any crime that I

02:44:50PM 8   would be guilty of is at odds with my core values and has led

02:44:56PM 9   to my psychological and spiritual reflection.

02:44:58PM 10          "Your Honor, I did not come from wealth and

02:45:02PM 11  privilege.  I worked incredibly hard for everything I've

02:45:06PM 12  earned, sacrificed decades away -- decades of time away from my

02:45:10PM 13  family.  As a young, small, chubby boy in the '60s, I grew up

02:45:14PM 14  in the rough streets of Irish Catholic South Boston at the

02:45:17PM 15  hands of a predatory Catholic church.  I was severely bullied

02:45:22PM 16  and lived through physical and emotional abuse.  In addition,

02:45:25PM 17  my parents, God rest their soul, were strict Irish Germans and

02:45:30PM 18  they could be ruthless with punishment.  I buried all that

02:45:34PM 19  psychological trauma and refused to acknowledge its effect.

02:45:39PM 20          "From those experiences, I did hold deep-seated scars

02:45:46PM 21  and the seeds of anger and resentment toward anyone that I

02:45:50PM 22  perceived a bully.  As I matured and my challenges magnified,

02:45:55PM 23  so did the intensity of my resolve for retribution when I or

02:45:58PM 24  anyone close to me were again victims of tormenters or thugs.

02:46:03PM 25          "I do, Your Honor, hold honor, integrity and respect

02:46:08PM 1  for all that are so very important.  These values are witnessed

02:46:13PM 2  in my own children's behavior.

02:46:15PM 3       "Unfortunately, when my family and my career were

02:46:20PM 4  under continuous threaten -- were continuous attack, threatened

02:46:22PM 5  by vicious competitors at a time that I was so intense and so

02:46:24PM 6  passionate about my vision, I ignored sound judgment.  I let my

02:46:31PM 7  anger and rage overwhelm my actions.  I did behave very badly;

02:46:38PM 8  escalating a conflict and then suffering the consequences of

02:46:41PM 9  that unchecked fury.  That was a childish and misguided

02:46:47PM 10  crusade.

02:46:48PM 11       "As that dispute raged, Your Honor, I was heartbroken

02:46:57PM 12  when the husband of one my employees who worked for me for

02:47:02PM 13  years, people that I considered my medical family, died on my

02:47:07PM 14  watch.  I was happy that Kathy Monaco continued to work for me

02:47:13PM 15  ten months after her husband died.  We spoke frequently, and I

02:47:19PM 16  did ask her many times to forgive mistakes that several people

02:47:24PM 17  had made that caused that tragedy.

02:47:28PM 18       "Your Honor, I do have great compassion and empathy

02:47:31PM 19  for all my patients and their families.  I'm a parent, and I

02:47:35PM 20  grieve for the children who lost parents at a young age.

02:47:41PM 21  Compounding all of this was my desire to open the Omni Center

02:47:45PM 22  after a massive financial and personal commitment.

02:47:49PM 23       "Your Honor, I haven't sought fortune and fame, but I

02:47:54PM 24  did become obsessed and competitive.  I had a vision for a

02:47:59PM 25  suite of medical services in the region, and I did pursue it

02:48:02PM 1   with blinding passion.  I overextended myself, and this caused

02:48:06PM 2   my personal and professional life to implode under that strain.

02:48:12PM 3   I burdened myself and my family with the constant stress.  I

02:48:14PM 4   was type A and intense and highly competitive, and, frankly, I

02:48:21PM 5   didn't know how to handle shock and demoralization and the

02:48:25PM 6   severe depression I felt during that time.  Exhaustion and the

02:48:29PM 7   pending doom I felt on my entire life clouded sound judgment

02:48:34PM 8   and caused me to make a criminal mistake in my bankruptcy

02:48:37PM 9   reporting.

02:48:38PM 10          "Your Honor, as a physician, I was privileged and

02:48:44PM 11  honored to serve and save thousands of lives and improve the

02:48:48PM 12  quality of life for so many.  I personally operated and was

02:48:51PM 13  responsible for over 17,000 patients.  I was blessed with a

02:48:57PM 14  technical gift and the skill to provide a very difficult

02:49:00PM 15  medical service.

02:49:03PM 16          "I am profoundly disappointed that every patient

02:49:07PM 17  didn't have a perfect outcome, and my practice was not free of

02:49:11PM 18  complications and rabidity.  Neurosurgery is an incredibly

02:49:17PM 19  risky endeavor.  Unfortunately, during all this litigation that

02:49:21PM 20  occurred between 2012 and 2014, the fatigue, regret, and

02:49:30PM 21  self-doubt I experienced overwhelmed any intelligent or logical

02:49:34PM 22  reasoning.  This was a time of absolute chaos for me and my

02:49:40PM 23  family.  I was overcome with anxiety and constant fear that

02:49:45PM 24  still exists today.  I pray for the turmoil to end.  I simply

02:49:51PM 25  don't want to fight it anymore.

02:49:53PM  1    "Your Honor, I actually believe the bankruptcy

02:49:59PM  2  process would be a simple matter, and I'd be happy to answer

02:50:02PM  3  questions about the insurance company issues that have been

02:50:06PM  4  mischaracterized.  But after filing bankruptcy, I thought I

02:50:10PM  5  could easily move on, close the Billings chapter of my life,

02:50:15PM  6  restart my medical practice and find some peace with my family.

02:50:20PM  7  I was sure I could recover and purge what were truly bizarre

02:50:25PM  8  and petty obsessions.

02:50:27PM  9    "I did not make the bankruptcy process simple,

02:50:30PM  10  however.  I sabotaged my goals and the bankruptcy process.  I

02:50:36PM  11  did want to keep funds out of the bankruptcy estate to care for

02:50:41PM  12  my family until I could get back on my feet, so I put money in

02:50:46PM  13  someone else's account, and I did try to cheat the process, and

02:50:49PM  14  I did make Mr. Womack's job harder.

02:50:54PM  15    "Your Honor, I stand before you today a man in

02:50:57PM  16  transformation.  I've learned valuable lessons from all this

02:51:01PM  17  conflict and this criminal act.  My priorities are realigned

02:51:04PM  18  and I'm blessed by His grace.  And God isn't done with me yet.

02:51:09PM  19  Having hit rock bottom with this criminal behavior, I know now

02:51:13PM  20  where to find courage, guidance, and perseverance to be a

02:51:18PM  21  righteous man.  I did take a new field of study to help me

02:51:21PM  22  understand my past, my past behavior over those difficult

02:51:26PM  23  years, and it still guides me now.

02:51:28PM  24    "I returned to my neurosurgical practice helping as

02:51:32PM  25  many people as I could, and I'm dedicated to live in peace,

02:51:36PM 1 supporting my family and repairing relationships that I

02:51:39PM 2 strained.

02:51:40PM 3       "I only wish that someone who had learned the hard

02:51:43PM 4 lessons that I have was there to mentor me during those

02:51:47PM 5 difficult years.  I now fully understand my misdeeds and

02:51:50PM 6 recognize the feeling that blinded my behavior.  Your Honor, I

02:51:54PM 7 know I spurned the rules.  And when I was arrested at church

02:51:58PM 8 with my wife, that was a disgraceful reminder that I wasn't

02:52:04PM 9 done repenting for my sins.

02:52:07PM 10      "Your Honor, I'm working hard to be the best reformed

02:52:11PM 11 man I can; a man of character, temperance and integrity for my

02:52:15PM 12 family, community and my God.  The best I can do is heartfully

02:52:20PM 13 acknowledge and apologize for my mistake, accept responsibility

02:52:23PM 14 and make restitution.

02:52:25PM 15      "I am truly sorry, Your Honor.  I can't undo the harm

02:52:29PM 16 that I've caused the people I've cared about, and I carry that

02:52:33PM 17 shame and responsibility with me every day.  All I can do now

02:52:36PM 18 is try to be a living testimonial atonement and hopefully make

02:52:41PM 19 amends where I've hurt, reconstruct personal life damage by my

02:52:47PM 20 mistakes, but always ashamed and humiliated as a criminal.  I

02:52:51PM 21 stand before you today, Your Honor, praying for the Court's

02:52:54PM 22 leniency.  This illicit experience has profoundly humbled me.

02:53:01PM 23 Whatever you decide, Your Honor, I won't allow this failure to

02:53:04PM 24 define my life.

02:53:06PM 25      "I'm working hard in my new profession, cautioned by

02:53:10PM 1   my own experience.  I remain a dedicated servant to those less

02:53:17PM 2   fortunate and in turmoil.  I strive daily, reflecting in

02:53:21PM 3   prayer, determined to be a good father, a good husband, and a

02:53:24PM 4   good man.  If anything, Your Honor, my life is a cautionary

02:53:29PM 5   tale and I share it openly.  But whatever you decide, Your

02:53:34PM 6   Honor, I accept as my due punishment."

02:53:36PM 7        Thank you.

02:53:40PM 8        THE COURT:  Well, the question before the Court today

02:53:43PM 9   is what is a sufficient, but not greater than necessary

02:53:48PM 10  sentence that will accomplish the purposes of sentencing, which

02:53:52PM 11  include punishment, deterrence, protection of the public and

02:53:56PM 12  rehabilitation.  And the sentence needs to reflect the

02:54:00PM 13  seriousness of the crime and promote a respect for the law.

02:54:02PM 14       In determining what is a sufficient, but not greater

02:54:07PM 15  than necessary sentence, I consider not only the advisory

02:54:09PM 16  sentencing guideline range but also the sentence provided for

02:54:12PM 17  by statute and also the sentencing factors that are set forth

02:54:17PM 18  in 18 United States Code Section 3553(a).  And as I will

02:54:24PM 19  explain, I find that a custodial sentence of 24 months,

02:54:28PM 20  followed by a three-year term of supervised release with

02:54:31PM 21  conditions does constitute a sufficient, but not greater than

02:54:36PM 22  necessary sentence.

02:54:36PM 23       When I look at the 3553(a) factors, beginning with

02:54:41PM 24  the nature and circumstances of the offense, it's a serious

02:54:47PM 25  offense, it's a serious offense whenever anyone lies in a

02:54:55PM 1   federal court proceeding.  And you lied, Dr. Schneider, and you
02:55:05PM 2   lied multiple times, because you were given multiple
02:55:11PM 3   opportunities to correct the original lie and did not ever
02:55:17PM 4   choose to do that.  And so concealment of these bankruptcy
02:55:22PM 5   assets is now the crime that you are convicted of, and it's
02:55:27PM 6   quite appropriate.
02:55:28PM 7          But looking at the circumstances of this particular
02:55:32PM 8   case, which I think are somewhat unique, under the guidelines,
02:55:39PM 9   I'm to consider the amount of harm that is done.  And I think
02:55:46PM 10  that the harm in this case is greater than the harm might be in
02:55:55PM 11  a typical bankruptcy case where assets are concealed.  And
02:56:02PM 12  it's -- that's because of the nature of the creditors who were
02:56:07PM 13  deprived of an opportunity to recover from you monies to make
02:56:17PM 14  them whole again.  I understand their claims have not been
02:56:21PM 15  litigated.  And despite Mr. Womack and Mr. Moyers' belief that
02:56:29PM 16  you have admitted malpractice, that's not your position.
02:56:34PM 17         But in looking at who you were, your history and
02:56:41PM 18  characteristics, which is also one of the 3553(a) factors,
02:56:46PM 19  leading up to this bankruptcy fraud, I think that what you did
02:56:56PM 20  as to the malpractice insurance account is a window into your
02:57:04PM 21  character, at least at that point in time.  I don't think that
02:57:10PM 22  you can explain away to me that monies held for malpractice
02:57:19PM 23  insurance could somehow be used to settle a claim for
02:57:25PM 24  defamation is appropriate.  I don't think that you -- well, I
02:57:32PM 25  know my imagination won't be stretched that far.

02:57:37PM    1          So I believe you raided that fund to pay that

02:57:40PM    2   settlement with Dr. Biles.  And what that ended up doing is

02:57:44PM    3   depriving these unsecured creditors of an opportunity to go

02:57:49PM    4   through the normal course of things when they believe that they

02:57:53PM    5   have suffered from medical malpractice, which is to bring a

02:57:56PM    6   lawsuit in court, and to have a hope of recovering some money,

02:58:01PM    7   if the jury agrees with their position, because they believe

02:58:05PM    8   that doctors have medical malpractice insurance, and you

02:58:10PM    9   represented that you did.

02:58:11PM   10          So I believe that that behavior, you're not on -- you

02:58:15PM   11   know, you're not convicted of anything for that, but that gives

02:58:19PM   12   me a window into the way that you were thinking in that period

02:58:22PM   13   of time, which was, for whatever reason, was just about you and

02:58:27PM   14   your own survival and not about other individuals.  And if I

02:58:32PM   15   understand the timeline correctly, Mr. Monaco had died by then.

02:58:40PM   16          Is that correct, Mr. Moyers?  By the time he raided

02:58:45PM   17   the insurance fund, had Mr. Monaco passed away?

02:58:51PM   18          JON MOYERS:  We both believe that he was aware of the

02:58:55PM   19   claim.

02:58:56PM   20          THE COURT:  Right.  That's what I heard one of you

02:58:59PM   21   say, is Dr. Schneider would be aware of the claim prior to him

02:59:05PM   22   raiding that insurance fund.

02:59:07PM   23          So, you know, I read the government's exhibit, which

02:59:15PM   24   was quite enlightening, that is the -- I'm not exactly sure how

02:59:23PM   25   these get published in the Pacific Reporter, but the opinion of

02:59:27PM  1    the Board of Professional Responsibility, which was actually a

02:59:32PM  2    proceeding against your attorney, Mr. Stinson, for his

02:59:37PM  3    professional misconduct, but it sets forth the facts

02:59:42PM  4    surrounding that whole episode with Dr. Biles.

02:59:51PM  5            And thereto, Dr. Schneider, you exhibited a real lack

03:00:01PM  6    of respect for legal process, for the law, for -- you know, you

03:00:08PM  7    talk about being a man of honor.  Well, when you take an oath

03:00:12PM  8    to tell the truth and then you lie, that's not honorable,

03:00:19PM  9    Dr. Schneider.  And the facts are set out of this whole kind of

03:00:25PM 10    sorted episode that led to Dr. Biles suing you, nothing is

03:00:31PM 11    honorable about any of your conduct in that situation either,

03:00:37PM 12    and, again, gives me kind of a window into how, at the time, at

03:00:42PM 13    least, you think, or were thinking and the extent of your

03:00:47PM 14    criminal thinking.  And then, you know, when things, I guess,

03:00:53PM 15    were kind of falling apart, but prior to the filing of the

03:00:58PM 16    bankruptcy in 2013, you get your sister to open this bank

03:01:03PM 17    account in her name and you deposit half a million dollars plus

03:01:08PM 18    in that account.  And despite the fact it's in her name, you

03:01:14PM 19    have complete control over those funds.

03:01:16PM 20            And then the bankruptcy gets filed.  At the time the

03:01:20PM 21    bankruptcy is filed, you still have a little over $300,000 in

03:01:24PM 22    that account, but you lie on your financial forms in the

03:01:29PM 23    bankruptcy and don't disclose that money to the bankruptcy

03:01:34PM 24    trustee.  And by lying to the trustee, you lie to the Court and

03:01:41PM 25    cause that bankruptcy estate to incur hundreds of hours of

03:01:51PM 1  effort to try to locate all of your assets.

03:01:56PM 2        Now, Mr. Smith argues it's not all related to that

03:02:00PM 3  account, and I think that's probably true.  That makes sense to

03:02:04PM 4  me.  But I don't get the feeling that you were really very

03:02:08PM 5  forthcoming when it came to various assets, Dr. Schneider.  And

03:02:15PM 6  so, again, your level of criminal thinking at the time, and

03:02:21PM 7  your desire, really, there's no other way to say it but to

03:02:25PM 8  defraud your creditors is pretty extreme.

03:02:34PM 9        And I remember at your change of plea, you know, we

03:02:38PM 10 go through the offer of proof and -- at plea changes, and we

03:02:45PM 11 did that at yours.  Mr. Rubich read the offer of proof, and I

03:02:49PM 12 asked you if you agreed with the offer of proof, and the

03:02:55PM 13 only -- and when people don't, I write down what they disagree

03:02:59PM 14 with.

03:03:00PM 15       And I must have asked you where the funds went after

03:03:09PM 16 you -- after your sister closed the account and gave the funds

03:03:15PM 17 from that account to you, and that's how I know, when I

03:03:22PM 18 interjected earlier in this hearing, you told me that the funds

03:03:26PM 19 went to your wife to put in your children's trust account, and

03:03:34PM 20 that was after the bankruptcy was filed and ongoing.  And you

03:03:42PM 21 knew that you had this money, you knew you were supposed to

03:03:45PM 22 disclose all of your assets.  Then you get the money back from

03:03:49PM 23 your sister.  Do you tell anybody about it?  No.  You're still

03:03:54PM 24 in that extreme criminal thinking.  And you give it to your

03:04:00PM 25 wife to put in your children's trust.

03:04:02PM  1          The home you live in is worth over $2 million, but no
03:04:07PM  2   one can touch it because you put it in a trust.  And I don't
03:04:12PM  3   begrudge your success at all, Dr. Schneider.  More power to
03:04:17PM  4   you.  That's the American way.  I don't begrudge your estate
03:04:22PM  5   planning.  But this -- you know, taking these funds in the
03:04:27PM  6   midst of the bankruptcy and placing them -- first, you hide
03:04:30PM  7   them, don't disclose them.  Then when you get them back, you
03:04:34PM  8   put them in a trust so nobody can have access to them.  So
03:04:38PM  9   there's just this continuing criminal thinking that's going on
03:04:43PM 10   over a fairly long period of time.  And now there's -- you
03:04:52PM 11   know, there's nothing left as far as that money is concerned.
03:05:01PM 12          And, frankly, you come today with $35,000; that's
03:05:06PM 13   good.  Something's better than nothing.  But I had a guy last
03:05:14PM 14   week who hardly has anything, but he had a house -- and he
03:05:19PM 15   stole money from a local business -- and he sold his house to
03:05:25PM 16   come with the $94,000 worth of restitution that he owed.  And
03:05:32PM 17   he doesn't really have much other than that.  He manages some
03:05:37PM 18   mobile homes.
03:05:40PM 19          You could certainly have access to much greater
03:05:45PM 20   assets to come in here with a check and pay your restitution
03:05:49PM 21   today.  I understand they're all in trust, but these trusts are
03:05:53PM 22   managed by your wife, your children.  And you could have the
03:06:00PM 23   means by which to come in here and pay your restitution in full
03:06:05PM 24   and really demonstrate, in good faith, how remorseful you are.
03:06:15PM 25   Thirty-five thousand dollars is what you come with today.

03:06:19PM  1      I'm -- you know, you've made a statement today.  In
03:06:24PM  2  the presentence report you had an opportunity to submit a
03:06:30PM  3  statement accepting responsibility, and it's set forth in
03:06:35PM  4  paragraph 23 of the presentence report.  I would have to say
03:06:37PM  5  that there is very little in the way of any acceptance of
03:06:43PM  6  responsibility in that very brief statement and absolutely no
03:06:54PM  7  remorse expressed.
03:06:55PM  8      I mean, we can have the lowest or highest drug dealer
03:06:58PM  9  in this courtroom, and they say -- I mean, and they're very
03:07:00PM 10  sorry.  They seem to understand what they've done and how
03:07:04PM 11  they've negatively impacted their community.  I don't really
03:07:09PM 12  get that feeling from you, Dr. Schneider.
03:07:17PM 13      And, you know, it's been a while since this crime
03:07:20PM 14  occurred.  Maybe you have had time to contemplate the extent of
03:07:26PM 15  the harm, and the extent of your criminal thinking, and lack of
03:07:33PM 16  respect and flaunting of the judicial system, but I still think
03:07:42PM 17  that you put you first.  And without some real remorse, your
03:07:57PM 18  ability to empathize with these creditors and so forth, it's
03:08:04PM 19  not really been demonstrated to me.  And I think it's only
03:08:08PM 20  through that that people -- that they understand the
03:08:13PM 21  far-reaching consequences of their criminal conduct that they
03:08:16PM 22  can understand why they shouldn't be doing stuff like that.
03:08:26PM 23      And in this case, I think that a term of custody is
03:08:33PM 24  appropriate.  It avoids sentencing disparities.  The individual
03:08:40PM 25  who comes to mind is Angela Corson Smith, and she got 27 months

03:08:46PM 1  of custody, and she had about half as much restitution.  But

03:08:52PM 2  the lying and flaunting of the law and so forth, I think that

03:08:55PM 3  this sentence achieves what the guidelines are set to achieve,

03:09:00PM 4  which is a lack -- or which is disparity in sentencing.

03:09:06PM 5        I think that it reflects the seriousness of the

03:09:13PM 6  offense, I hope it promotes a respect for the law in you, and

03:09:17PM 7  it does provide a just punishment.  You don't have any other

03:09:23PM 8  criminal history, and I've taken that into consideration in

03:09:30PM 9  giving you a low-end guideline sentence here today.

03:09:35PM 10        So it is the judgment of the Court that you be

03:09:39PM 11  committed to the custody of the Bureau of Prisons for a term of

03:09:43PM 12  24 months.  And that upon your release from imprisonment, you

03:09:47PM 13  shall be placed on supervised release for a term of three

03:09:51PM 14  years.

03:09:51PM 15        I don't know if you've thought about any facility

03:09:56PM 16  that you would like me to recommend to the Bureau of Prisons,

03:10:01PM 17  Mr. Smith.

03:10:02PM 18        MR. SMITH:  Yes, Judge.  Thank you.

03:10:03PM 19        Taft Federal Correctional Institute, which is fairly

03:10:07PM 20  near his family who will be able to visit him there.  It's in

03:10:12PM 21  Taft, California.

03:10:14PM 22        THE COURT:  I will recommend the Bureau of Prisons

03:10:16PM 23  place you at the Taft facility due to its proximity to your

03:10:20PM 24  family.

03:10:21PM 25        And then upon of your release from imprisonment, you

03:10:24PM   1   shall be placed on supervised release for a term of three

03:10:27PM   2   years.

03:10:27PM   3         Within 72 hours of your release from the custody of

03:10:32PM   4   the Bureau of Prisons, you shall report in person to the

03:10:35PM   5   probation office in the district to which you are released.

03:10:38PM   6         While on supervised release, you shall not commit any

03:10:42PM   7   federal, state, or local crimes, and shall not possess a

03:10:44PM   8   controlled substance.

03:10:44PM   9         You are prohibited from owning, using, or being in

03:10:48PM   10   constructive possession of firearms, ammunition, or other

03:10:52PM   11   destructive devices while on supervision and anytime after the

03:10:56PM   12   completion of the period of supervision unless granted relief

03:11:00PM   13   by the Secretary of the Treasury.

03:11:01PM   14         You shall cooperate in the collection of DNA as

03:11:05PM   15   directed by your probation officer.

03:11:06PM   16         Further, you shall comply with the standard

03:11:09PM   17   conditions of supervision as recommended by the United States

03:11:14PM   18   Sentencing Commission and which have been approved by this

03:11:16PM   19   court.

03:11:16PM   20         You shall also comply with the following special

03:11:19PM   21   conditions:

03:11:19PM   22         You will provide your probation officer with any

03:11:23PM   23   requested financial information and shall incur no new lines of

03:11:27PM   24   credit without prior approval of your probation officer.  You

03:11:31PM   25   must notify your probation officer of any material changes in

03:11:34PM  1    your economic circumstances that might affect your ability to

03:11:38PM  2    pay restitution, fines, or special assessments.

03:11:42PM  3           You shall pay restitution in the amount of $308,945.

03:11:48PM  4    You are to make payments at the rate of $12,872.70 per month or

03:11:54PM  5    as otherwise directed by your probation officer.  Payments

03:11:58PM  6    shall be made to the clerk of this court and shall be disbursed

03:12:03PM  7    to Joseph Womack, Mr. Womack, who is the Chapter 7 Panel

03:12:10PM  8    Bankruptcy Trustee.

03:12:11PM  9           You shall submit your person, residence, place of

03:12:14PM  10   employment, vehicles and papers to a search, with or without a

03:12:18PM  11   warrant, by any probation officer based on reasonable suspicion

03:12:21PM  12   of contraband or evidence in violation of a condition of

03:12:25PM  13   release.  Failure to submit to search may be grounds for

03:12:29PM  14   revocation.  You shall warn any other occupants that the

03:12:31PM  15   premises may be subject to searches pursuant to this condition.

03:12:35PM  16   You shall allow seizure of suspected contraband for further

03:12:40PM  17   examination.

03:12:40PM  18          What is most important to me -- two things, I guess,

03:12:49PM  19   Dr. Schneider -- is some punishment, first off, and then

03:12:52PM  20   restitution.  And in an effort to get restitution paid more

03:12:59PM  21   quickly, I'm, right or wrong, going to make a finding that you

03:13:06PM  22   don't have the ability to pay a fine and waive the fine.  But I

03:13:10PM  23   am going to order that interest be paid on the restitution

03:13:16PM  24   amount, because I do believe that you have the ability to pay

03:13:20PM  25   interest on the amount as you go forward in your endeavors.

03:13:28PM  1          You are ordered also to pay to the United States a
03:13:31PM  2   special assessment of $100 which shall be due immediately.
03:13:36PM  3          During the period of your incarceration, you are
03:13:38PM  4   ordered to pay criminal monetary penalty payments at the rate
03:13:42PM  5   of not less than $25 per quarter.  Those payments shall be made
03:13:47PM  6   through the Bureau of Prisons Inmate Financial Responsibility
03:13:50PM  7   Program to clerk of this court.
03:13:55PM  8          And I think you have a motion as to some of these
03:13:58PM  9   counts, Mr. Rubich.
03:13:58PM  10          MR. RUBICH:  Yes, Your Honor.
03:13:58PM  11          Your Honor, at this time I would move to dismiss
03:14:02PM  12   Counts I, II, IV, and V.
03:14:13PM  13          THE COURT:  That motion is granted.
03:14:14PM  14          Mr. Smith, I understand, based on the plea agreement,
03:14:19PM  15   that your client has waived his right to appeal his sentence;
03:14:22PM  16   is that correct?
03:14:22PM  17          MR. SMITH:  That is correct, Judge.
03:14:24PM  18          THE COURT:  Any legal objection to the sentence,
03:14:25PM  19   Mr. Rubich?
03:14:25PM  20          MR. RUBICH:  No, Your Honor.
03:14:26PM  21          THE COURT:  Any legal objection to the sentence,
03:14:28PM  22   Mr. Smith?
03:14:29PM  23          MR. SMITH:  No objection -- no legal objection to the
03:14:31PM  24   sentence, Judge.
03:14:32PM  25          Before we end this hearing, I'd like to address

03:14:37PM  1   voluntary surrender whenever you're ready.

03:14:39PM  2          THE COURT:  I'm ready right now.

03:14:41PM  3          MR. SMITH:  Okay.

03:14:41PM  4          Judge, Dr. Schneider, as you said, has no criminal

03:14:46PM  5   history whatsoever.  He's been released pending all the

03:14:48PM  6   proceedings in this case.  He's never missed any court, he's

03:14:52PM  7   always been very accessible to me and to the person who was not

03:14:56PM  8   supervising him but that was kind of keeping track of him from

03:15:00PM  9   the probation office, and I'd just ask that you allow him,

03:15:03PM  10  under -- at his own expense and under his own power to report

03:15:07PM  11  to wherever the Bureau of Prisons directs him to report when

03:15:10PM  12  they send him the letter.

03:15:11PM  13         THE COURT:  What's the government's position?

03:15:12PM  14         MR. RUBICH:  Your Honor, this case is a very serious

03:15:19PM  15  case, and my hesitation is twofold.  When we initially indicted

03:15:26PM  16  this individual, I put out a summons.  And after he didn't show

03:15:33PM  17  up for his initial appearance in court, I had no choice but to

03:15:36PM  18  put out a warrant for his arrest.  And apparently, according to

03:15:39PM  19  him, it was because of logistical issues and he didn't know it

03:15:42PM  20  was sent, but it gives me a distressed feeling.  And, frankly,

03:15:45PM  21  Your Honor, given the defendant's course of conduct in this

03:15:53PM  22  case, I think that it's wholly appropriate that today he goes

03:15:59PM  23  into custody and he starts his time.  So I would recommend that

03:16:04PM  24  he be arrested today.

03:16:07PM  25         THE COURT:  Well, I of course knew this would come

03:16:10PM 1   up, this issue.  And so what I was not clear about, given that

03:16:15PM 2   the summons and that whole proceeding occurred before the

03:16:20PM 3   magistrate judge, I did notice in CM/ECF that there was a

03:16:28PM 4   summons issued, and there was a hearing set, and that I believe

03:16:33PM 5   you moved to continue that hearing because service of the

03:16:36PM 6   summons had not been accomplished.  Is that correct?

03:16:39PM 7            MR. RUBICH:  So, yes, Your Honor, there were a series

03:16:42PM 8   of events.

03:16:42PM 9            THE COURT:  Right.  And I'm just trying to go through

03:16:44PM 10  them.

03:16:39PM 11           MR. RUBICH:  Yeah.

03:16:44PM 12           THE COURT:  And if I understand correctly, you then

03:16:47PM 13  asked for that hearing to be vacated, correct?

03:16:50PM 14           MR. RUBICH:  Correct, Your Honor.

03:16:51PM 15           THE COURT:  And, obviously, Dr. Schneider wasn't

03:16:55PM 16  there.  And if I understand correctly, you believed that the

03:16:58PM 17  address that you had for service of the summons was incorrect.

03:17:03PM 18           MR. RUBICH:  Initially, Your Honor.  So it was sort

03:17:05PM 19  of three-step process.  The first time we served it on one

03:17:08PM 20  of -- his former residence here in Montana; we realized that

03:17:11PM 21  wasn't correct.  Then we found -- you know, we realized it was

03:17:13PM 22  the residence in California where he's, I presume, still living

03:17:18PM 23  today, and that's where the -- during that second continuance,

03:17:21PM 24  that summons was served.  It was also not answered, and that is

03:17:26PM 25  why eventually the warrant was issued.

| | | |
|---|---|---|
| 03:17:28PM | 1 | MR. SMITH:  Judge, may I? |
| 03:17:30PM | 2 | THE COURT:  Just a second.  I'll let you respond. |
| 03:17:32PM | 3 | So the July 11th, 2017, hearing was vacated. |
| 03:17:37PM | 4 | MR. RUBICH:  Yes. |
| 03:17:38PM | 5 | THE COURT:  You issued a new summons to his residence |
| 03:17:40PM | 6 | in California. |
| 03:17:41PM | 7 | MR. RUBICH:  Correct, Your Honor. |
| 03:17:42PM | 8 | THE COURT:  And was that summons served? |
| 03:17:44PM | 9 | MR. RUBICH:  It was by registered mail, Your Honor, |
| 03:17:47PM | 10 | but it was not responded to.  So, in other words -- |
| 03:17:49PM | 11 | THE COURT:  Meaning he didn't pick it up, or what? |
| 03:17:51PM | 12 | MR. RUBICH:  Correct, Your Honor, he didn't pick it |
| 03:17:53PM | 13 | up. |
| 03:17:56PM | 14 | THE COURT:  And then -- so he didn't appear for the |
| 03:18:01PM | 15 | arraignment on August 29th, 2017 -- |
| 03:17:51PM | 16 | MR. RUBICH:  Correct, Your Honor. |
| 03:18:10PM | 17 | THE COURT:  -- as a result of that. |
| 03:18:10PM | 18 | MR. RUBICH:  Yes, Your Honor. |
| 03:18:11PM | 19 | THE COURT:  And then -- |
| 03:17:51PM | 20 | MR. RUBICH:  I was given no course but to issue a |
| 03:17:51PM | 21 | warrant. |
| 03:18:12PM | 22 | THE COURT:  -- you requested the arrest warrant. |
| 03:18:14PM | 23 | MR. RUBICH:  Yes. |
| 03:18:15PM | 24 | THE COURT:  Mr. Smith. |
| 03:18:17PM | 25 | MR. SMITH:  Judge, Dr. Schneider was not living in |

03:18:20PM   1   Encinitas at the time; his wife was living there.  Why his wife

03:18:23PM   2   didn't go pick up a registered letter, I don't know, but she

03:18:26PM   3   didn't.  And he was not even aware that there was a registered

03:18:29PM   4   letter to pick up.  He was living in Iowa City, Iowa, working

03:18:34PM   5   for the Veterans Administration and had no idea.  He had no

03:18:37PM   6   idea there was a summons or a warrant or anything of the sort

03:18:40PM   7   until he was arrested walking out of church on a Sunday

03:18:44PM   8   morning.  So he had absolutely no control over that.  Had he

03:18:47PM   9   received a summons, he would have appeared in Montana before

03:18:51PM  10   the court; I have no doubt of that.

03:19:04PM  11         THE COURT:  Well, and I know I did look at the

03:19:06PM  12   pretrial services report that would have been filed after his

03:19:11PM  13   arraignment, then, and it indicated that he was living in Iowa

03:19:15PM  14   and was not back in California.  But I don't know, it was maybe

03:19:22PM  15   six days in I don't know how long a period of time of

03:19:25PM  16   something.

03:19:25PM  17         MR. SMITH:  Pardon me?

03:19:25PM  18         THE COURT:  He hadn't been back in California for a

03:19:28PM  19   long time, and had only been there in California maybe a total

03:19:32PM  20   of six days or something over a period of time.

03:19:35PM  21         MR. SMITH:  True, Judge.  He was working very hard as

03:19:38PM  22   a neurosurgeon at the VA facility in Iowa City.

03:19:43PM  23         THE COURT:  Okay.  I'll allow you to self-surrender,

03:19:50PM  24   Dr. Schneider.  You'll receive a letter from the United States

03:19:53PM  25   Marshals telling you what facility.  Because I recommend Taft,

03:19:55PM 1  but that doesn't necessarily mean that's where you're going.

03:19:58PM 2  So they will send you a letter telling you where and when to

03:20:02PM 3  appear.  If you fail to appear as ordered, then a warrant will

03:20:06PM 4  be issued for your arrest and the marshals will get you there.

03:20:09PM 5        We have a marshal here in the courtroom, and I'm sure

03:20:13PM 6  he'll confirm the address where the letter can go.  I don't

03:20:18PM 7  want any excuses about you didn't get the letter.

03:20:21PM 8        Do you understand what I'm saying, Dr. Schneider?

03:20:24PM 9        THE DEFENDANT:  Yes, Your Honor.

03:20:24PM 10        THE COURT:  Where you are living is the address you

03:20:27PM 11  give to the marshal here.  And then when you get the letter,

03:20:32PM 12  you comply with the directions contained therein.

03:20:36PM 13        THE DEFENDANT:  I understand.

03:20:36PM 14        THE COURT:  We're adjourned.

03:21:07PM 15        (Whereupon, the Court adjourned at 3:21 p.m.)

03:21:07PM 16                --oo0oo--

17

18

19

20

21

22

23

24

25

<u>REPORTER'S CERTIFICATE</u>

I, REBECCA M. SABO, a Registered Professional Reporter and Certified Realtime Reporter, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of the transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Billings, Montana, this 29th day of August, 2018.


<u>/s/ Rebecca M. Sabo</u>

Rebecca M. Sabo, RPR, CRR
United States Court Reporter