# APPENDIX H

Monaco medical malpractice claim and Expert independent review of facts

# Edson O. Parker, MD

Diplomate, American Board of Anesthesiology
Diplomate, American Board of Pain Medicine
Anesthesiology & Pain Medicine  VASNHS

PO Box 29209, Las Vegas, NV  89126  USA
Tel 702.499.9994
eoparker@aol.com

April 2, 2014

Stephenson D. Emery, Esq.
Williams, Porter, Day & Neville, PC
159 N. Wolcott St., Suite 400
PO Box 10700
Casper, WY  82602

Tel:  307-265-0700

semery@wpdn.net

**Re: Expert Medical Report for Monaco v. Schneider**

Dear Mr. Emery,

    This report is based on my review of medical records which you sent to me on January 28, February 23, March 10 and March 17, 2014.  Opinions stated herein are within a reasonable degree of medical probability.  I am a medical doctor licensed to practice medicine in the States of Nevada, California, Utah and Georgia.  I am Board Certified in both Anesthesiology and Pain Medicine, as indicated on my Curriculum Vitae, which describes in detail my education, training, certifications, experience, publications and presentations. Furthermore, having practiced both as an Anesthesiologist and as a Pain Medicine Specialist in my own office, the Pain Institute of Nevada from 1989 until 2005, and currently practicing as a Pain Medicine Specialist in the Veterans Administration, I am very familiar with the practice of medicine in both hospitals and private clinical practice and am qualified to render an opinion in this case.

    You have requested that I render opinions on the medical care provided to Mr. Russell Monaco concerning treatment during his hospitalization for lumbar spine surgery from 11/28/11 to 12/1/11 and his subsequent death on the morning of 12/2/11, specifically addressing deviations from the standards of care as they apply to postoperative pain management in this patient.

**I.Factual Summary**: At your request, I have reviewed the following medical and billing records concerning this case, which you provided to me:

1. Billings Clinic (Family Practice) – 8/16/11 to 11/22/11
2. John H. Schneider, MD – 11/28/11 to 12/1/11
3. West Park Hospital, Cody Wyoming – 11/28/11 to 12/1/11
4. Kenneth W. Kulig, MD - Deposition 5/20/13
5. Transdermal Fentanyl FDA Black Box Warning
6. Report of Postmortem Examination/Thomas L. Bennett, MD – 1/25/12
7. Four Medical Articles/Studies/Letters Concerning Fentanyl TTS for Post-Op Pain
8. Donlin M. Long, MD, PhD Letter – 8/23/12

84

9. Answer to First Amended Complaint – 1/9/14 – By Dr. Schneider and Northern Rockies Neuro-Spine (NRNS)
10. Respondent's Proposed Findings of Fact and Conclusions of Law – 1/17/14
11. Schneider Pre-Op Neuro Orders; Schneider Post Op Orders; Schneider Inpatient Standing Orders for WestPark Hospital
12. Target Pharmacy Records, Billings, MT – 5/22/09 to 8/30/11
13. Northern Rockies Neuro-Spine (NRNS) Prescription Protocol

**II. History**: Mr. Monaco was a 47 year old man with several significant medical conditions, to include morbid obesity (283 pounds day of surgery), diabetes, hypertension, hyperlipidemia and allergy to morphine. He was admitted to West Park Hospital on 11/28/11 for urgent lumbar spinal decompression surgery for severe spinal stenosis and progressive decline in his lumbosacral neurological function, with severe back and leg pain. He was taken to surgery that same day, having a bilateral L23, L34 and L45 laminectomy, facetectomy and foraminotomy, without any described complications. He was going to be discharged home the next day, on 11/29/11, but developed increasing back pain that day, could not ambulate independently, and that planned discharge was cancelled by Dr. Schneider. Mr. Monaco developed "the worst pain of his life" shortly after midnight on 11/30/11 and required increased pain medication, receiving at least 14 doses of various pain medications during the next 24 hours, including oral oxycodone, hydrocodone, Dilaudid, IM Demerol and the transdermal fentanyl patch at 08:09 hrs that morning. Dr. Schneider visited Mr. Monaco at 15:00 hrs on 11/30/11, counseled Mr. Monaco and his wife on the use of analgesics after discharge (fentanyl patch and one Percocet prn every eight hours for breakthrough pain). Mr. Morrell visited Mr. Monaco at 07:00 hrs on 12/1/11, found him medically stable, excellent pain control, oxygen saturation of 94% on room air, was walking independently and wrote discharge orders, to include prescriptions for post-discharge medications, to include Dilaudid, Percocet, Valium and transdermal fentanyl patches. Dr. Schneider came to visit Mr. Monaco at 07:50 hrs, but Mr. Monaco was not in his room. Dr. Schneider noted the discharge orders. Dr. Schneider did not see any evidence of the prescriptions for Mr. Monaco written by Mr. Morrell, because Mr. Morrell gave those prescriptions directly to Mr. Monaco. Mr. Monaco was discharged from all inpatient services and medications at 07:00 hrs on 12/1/11 by Mr. Morrell. He was eventually discharged home at 10:30 hrs. Please refer to para III. 2. for specific events leading up to his discharge.

**III. Discussion**: In my opinion there are two major issues involving the standard of care which had a direct impact on Mr. Monaco's death: 1) the use of strong opioid medication for his post-operative pain management and 2) his discharge from the hospital in less than optimal condition. This discussion will not cover information in all the documents reviewed, but summarize the pertinent data.

1. **Post operative pain management with strong opioid medications**:
    a. **Prescription of transdermal fentanyl for post-operative treatment of pain:**
        i. It is not new nor unprecedented (see articles under para I.7. above), and is as effective as IV morphine in post-operative patients who cannot take oral medications, requiring those medications be delivered by some other route, i.e., IV, transdermal, rectal.

3

ii. The FDA "Black Box Warning" does not prohibit the use of nor indicate the use of transdermal fentanyl in Mr. Monaco's specific case was below the standard of care.
   1. He was opioid tolerant, not only from the hydrocodone he had been taking for several weeks before surgery, but from the strong opioids he had received intraoperatively (fentanyl 300 mcg) and those starting immediately postoperatively.
   2. His pain was not acute, it was a post-surgical increase of his chronic low back pain
   3. It was not post-operative pain of the type described in the black box warning, i.e., not pain in an opioid naïve patient, departing an out-patient surgery center after a surgical procedure, to return home, without any medical monitoring of any type, a clearly dangerous situation. The Black Box Warning was designed to prevent scenarios potentially harmful to patients, e.g., surgeon discharging an opioid-naïve patient home after having a hernia operation in a surgery center on a transdermal fentanyl patch. This clearly did not occur in this case with Mr. Monaco.
   4. His pain was not mild. Shortly after midnight on 11/30/11, prior to implementation of the transdermal fentanyl, the patient described back and leg pain as the worst pain of his life. The intermittent oral and IV opioid analgesics were not working and he needed a stronger, sustained type of opioid (IV or transdermal). With the intent to discharge him home, an IV system was not practical. The transdermal system was ideal.
iii. Dr. Schneider was conservative and selective in using transdermal fentanyl for post-operative pain control, prescribing it to only 19 out of 1900 patients (1%) of his patients in the first two weeks postoperatively.
iv. Mr. Monaco had difficulty tolerating strong oral opioid analgesics and could not be discharged without having a strong baseline (constant blood level) of opioid analgesic medication, unless he was able to use some type of IV PCA opioid analgesic (such as morphine) at home, a very undesirable option, especially with his refusal to follow medical advice, such as refusing to use home oxygen.
v. Dr. Kulig, who has not and does not actively treat patients for pain conditions as discussed in this case (as I have done for many years), states in his deposition, "the fentanyl patch is not to be used for the management of acute pain or post-op pain, and his pain was both of those, and the fentanyl patch would, in my opinion, not have been a good choice to use at that time." That statement is not correct - Surgery was completed/patient entered the PACU at 16:28 hrs on 11/28/11. The transdermal fentanyl patch was ordered at 07:00 hrs on 11/30/11 (applied at 08:09 hrs), over 36 hours after completion of surgery, simply and clearly not used for immediate post-operative pain

4

as is the intended meaning of the black-box warning. Due to Mr. Monaco's severe pain shortly after midnight on 11/30/11, as described in para ii. 4. above, the transdermal fentanyl was not only a good choice, it was an excellent choice.

b. **Prescription of multiple analgesic medications to be used in addition to the transdermal fentanyl** for a patient with chronic low back pain, on which is added the moderate to severe pain associated with lumbar spine surgery, is not only not unusual, it is routine. I make this statement based on my experience of working with a group of spine surgeons for 15 years and managing thousands of their patients personally - pre, intra and postoperatively. Some patients do not require a lot of post-operative analgesics, but most do. As Dr. Schneider states multiple times in numerous documents, he and his PA-C, just as I always did, counseled and admonished their patients to be very careful with the "prn" (as needed) medications, to avoid overdosing themselves. We want the patient to be as comfortable as possible, but not endanger themselves. With that goal in mind, even though prescribing multiple controlled substance analgesic medications may be routine, there must be some rationale or protocol followed in prescribing such medications to prevent such potential risk to the patient. Dr. Schneider had such a protocol in his NRNS practice, a "Prescription Protocol". In prescribing the Dilaudid, Percocet, Valium and transdermal fentanyl patches for Mr. Monaco on the morning of his discharge, Mr. Morrell violated the NRNS Prescription Protocol, i.e., In compliance with the Prescription Protocol, Mr. Morrell could have prescribed Dilaudid or Percocet or transdermal fentanyl patch, but not all three of those medications together. One critical point must be understood by those not in the health care field – It is routine medical practice to prescribe patients in pain (not just spine surgery patients) an amount of pain medication, such as hydrocodone 5 or 10 mg pills, to take 3 to 4 times per day as needed for pain, dispense #120. It is expected the patient will comply with the prescription. It is also understood by health care providers, but rarely verbalized, that any such patient given that very common analgesic prescription has the capability to take all those pills at one time and end their life. That risk is always present and it is not below the standard of care to prescribe that amount of medication. It is well-documented that Dr. Schneider, Mr. Morrell and the Nurses all counseled Mr. Monaco and his wife on the proper use of his strong analgesic and other medications. How the patient and his family actually manage the patient's medications at home is beyond the control of medical providers. During my 32 years of medical practice, several patients for whom were prescribed strong opioid analgesic medications did die due to taking excessive doses of those medications and there was never any inference from anyone that the prescribing of those medications was at fault.

87

5

2. **Hospital events on the morning of discharge:** Unfortunately, many documents and deposition testimony on what transpired the morning of discharge, 12/1/11, do not all correlate, e.g., Mr. Morrell acknowledges receiving a call from Nurse Fulkerson, but he denies being informed by Nurse Fulkerson of Mr. Monaco's precise oxygen saturation level, etc.

   a. **Administration of IM Demerol/Phenergan combination to the patient after he was ordered to be discharged from the hospital at 07:00 hrs.** There is conjecture whether he received one or two injections of that Demerol/Phenergan combination, i.e. one injection at 07:30 or 07:40 hrs and a second one at 10:00 hrs on 12/1/11, when there was only one order written for that medication. There is no conjecture about the 10:00 hrs injection, as the discharge Nurse testified to that fact, leaving the administration of the first injection in some question. With discharge orders written by Mr. Morrell at 07:00 hrs, neither of those injections should have been administered to Mr. Monaco by the nursing staff, especially the second dose. Thus, even if the first injection was not actually given, the second injection at 10:00 hrs should not have been given. Not only was the injection at 10:00 hrs not indicated as it appears to not have been ordered, but it was not indicated clinically – Ms. Monaco, the patient's wife, testified that at the time of the 10:00 hrs injection, Mr. Monaco was obtunded, he was extremely lethargic and barely able to be aroused at the time of his discharge at 10:30 hrs. Nurse Fulkerson noted that shortly after 09:00 hrs on 12/1/11, one hour before his IM Demerol/Phenergan injection at 10:00 hrs, his oxygen saturation declined to 75% on room air. Nurse Fulkerson testified that Mr. Monaco was not stable for discharge home, which she did not discuss with her charge nurse. The patient was also given oral Dilaudid, Percocet and Valium after 07:00 hrs, but prior to discharge at 10:30 hrs.

   b. **Discharge of Mr. Monaco from the hospital in a compromised medical condition:** Mrs. Monaco testified that Mr. Monaco became progressively more lethargic after her arrival on the date of discharge (12/1/11) and that he was extremely lethargic and barely able to be aroused at the time of his discharge at 10:30 hrs. When Mr. Monaco was off oxygen supplementation, he continued to trigger the low pulse oximetry monitor in his room throughout the day and never regained a normal state of consciousness. Nurse Fulkerson noted and documented that shortly after 09:00 hrs on 12/1/11 that Mr. Monaco's oxygen saturation declined to 75% upon a room air challenge. Nurse Fulkerson stated she called the offices of Dr. Schneider and spoke directly to Mr. Morrell about Mr. Monaco's low oxygen saturation level. Mr. Morrell acknowledged he received a call from Nurse Fulkerson, but denies being informed of Mr. Monaco's precise oxygen saturation levels, only that they had dropped. Mr. Morrell's conversation was overheard by Lisa Parker in Dr. Schneider's office, who testified that Mr. Morrell made the decision to send Mr. Monaco home without oxygen supplementation without speaking with Dr. Schneider. Thus, Mr. Monaco was discharged home by the Westpark

6

Hospital Nursing staff in an obtunded state, hypoxic on room air, in violation not only of both Dr. Schneider's and West Park Hospital's discharge policies, but contravening even minimum medical practice standards, no matter what order was given by a medical provider to discharge the patient.

**IV. Conclusions**:

My conclusions are based on my extensive experience not only as an Anesthesiologist, but as a Pain Medicine Specialist in my 30+ years as a physician. Unlike other respondents in this case, as an Anesthesiologist, I have personally administered anesthesia and post-operative pain management treatment to hundreds of patients who have undergone spine surgery, just like Mr. Monaco. As a Pain Medicine Specialist, I have personally prescribed strong opioid analgesics, including all the medications discussed in this case, to thousands of patients during their ongoing treatment for years.

1. **The post-operative pain management with strong opioids by Dr. Schneider was not below the standard of care.** The supervision of and coordination with his PA-C Mr. Morrell did not reach the level of violating the standard of care and in and of itself, it did not cause patient harm.

2. **Discharge from West Park Hospital on the morning of December 1, 2011,** was clearly below the standard of care – It should never have taken place. No matter what the physician or his assistant ordered, the hospital nursing staff should not have discharged Mr. Monaco in his obtunded and hypoxic condition, especially when he had stated he would not use supplemental oxygen, which he needed to maintain adequate life-sustaining oxygenation, even if it was ordered. A hospital is a safe environment for patients, in which it is expected they will receive appropriate treatment for their medical conditions and not be sent away if doing so places them in a position of continued or increased serious and life-threatening illness. Although his condition was not immediately life threatening, it was no different from a patient experiencing slow, but active bleeding after surgery, in which case the cause for aborting the discharge would be very obvious. Mr. Monaco's case may have been less dramatic, but was clearly no less life threatening. In and of itself, his discharge from the hospital, in violation of its own discharge criteria, was clearly below the standard of care and did lead to the ultimate patient harm, i.e., death.

3. **Incorrect use of post-discharge analgesic and anxiolytic medications taken by the patient and administered by his wife.** In contravention to instructions given by Dr. Schneider, Nurses at the hospital and a pharmacist, as determined by pill count of medication containers, at home after discharge, Mr. Monaco ingested 6 Percocet (oxycodone 7.5 mg), 3 Valium 5 mg and 1 Dilaudid 4 mg. The oxycodone and Dilaudid, combined, equaled approximately 90 mg of morphine ("morphine equivalents"), a substantial amount of opioid. As stated in para III. 1. b. above, the patient and family/caregivers at home are responsible for medicating the patient, a status which is beyond the control and responsibility of any health-care providers. We can counsel patients to do the right thing, but once they leave our controlled

7

==medical environment, we cannot make them do it and cannot be responsible for their noncompliance with our instructions to them to maintain good medical care in their home environment.==

My opinions expressed throughout this report are made to a reasonable degree of medical probability. Furthermore, I reserve the right to modify my opinions if and when additional information becomes available.

Respectfully Submitted

*Edson O Parker, MD* (signature)

Edson O. Parker, MD