EXHIBIT K

Monaco case – Wyoming Board of Medicine – Findings of fact and Conclusions of law.

IN THE OFFICE OF ADMINISTRATIVE HEARINGS
UPON REFERRAL FROM

THE WYOMING BOARD OF MEDICINE

| | | |
|---|---|---|
| DAVID M. SKOLNICK, D.O. and | ) | |
| MS. CISSY DILLON, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | OAH DOCKET NO.12-110-052 |
| v. | ) | (BOM DOCKET NO. 12-08) |
| | ) | |
| JOHN H. SCHNEIDER, JR., M.D., | ) | |
| | ) | |
| Respondent. | ) | |

---

**RESPONDENT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

---

Respondent, John H. Schneider, Jr., M.D., by and through his attorneys, Stephen H. Kline

and Stephenson D. Emery, hereby submits his Proposed Findings of Fact and Conclusions of

Law:

## A. FINDINGS OF FACT

1) John H Schneider M.D. is a board certified, spine fellowship trained, neurosurgeon who has practiced in Wyoming since October 1997. He maintains license number 5973A. He also presently holds licenses in the states of Utah and Montana. (Ex. L-8 p. 1, lines 9-11 and Trial Tr. Vol. 1 p. 62, line 16 though page 64 line 15).

2) Dr. Schneider's area of concentration is in treating complex spinal degenerative conditions including, but not limited to, reconstructive spine surgeries. (Trial Tr. Vol. 1 p. 62, line 16 through p. 63, line 25; Trial Tr. Vol. 1,  p. 68, lines 11 through 21; Trial Tr. Vol. 2,  p. 412, line 15 and p. 414, line 21).

3) Dr. Schneider's practice includes extensive experience with the care and management of complex high demand pain patients for whom he performs both pain management surgeries and medical pain management. (Trial Tr. Vol. 1 p. 65, line 12 through p. 69, line 7; Trial Tr. Vol. 2, p.412, lines 15 through p. 415, line 10).

1

4)  Dr. Schneider worked closely with world renounced neurosurgical pain management expert
    Dr. John Oakley, co- creating the Northern Rockies Pain Center in Billings Montana in
    1999. Dr. Schneider's training, years of work with his large patient population, and
    experience with Dr. Oakley form the frame work of the surgical and medical pain
    management that Dr. Schneider uses in his ongoing practice.  (Trial Tr. Vol. 1, p. 67, line
    20 through p. 68, line 21; Trial Tr. Vol. 2, p. 412, line 15 through p. 415, line 10).

5)  Dr. Schneider held an unrestricted license to practice in Wyoming from 1997 until January
    28, 2012.  (Ex. L-8, p. 1, line 10;  Ex. L-18, p. 2, line 4; Trial Tr. Vol. 1, p. 64, lines 5-9).

6)  On January 28, 2012, following the death of Russell Monaco, a post-surgical patient of Dr.
    Schneider's, the Wyoming Board of Medicine issued a Temporary Suspension Order
    pursuant to Wyoming Statute §16-3-113(c), Wyoming Statute §33-26-404(c), and Board
    Rules and Regulations, Chapter , Section 4(d).  That suspension involved allegations of
    violations of the Wyoming Medical Practice Act relative to the care and management of
    Mr. Monaco.  (Ex. J-2).

7)  Prior to the action taken by the Wyoming Board of Medicine in January 2012, Dr.
    Schneider had never had any disciplinary action taken against his medical license in any
    state.  (Trial Tr. Vol. 1, p. 64, lines 21-24).

8)  Following the emergency suspension of his license, on February 10, 2012, Dr. Schneider
    participated in an informal interview with the Petitioners. At the informal interview, Dr.
    Schneider responded to the questions posed by the Petitioners, Dr. James Anderson and PA
    Johnson, as well as Board prosecutor Bill Hibbler.  Following the informal interview, Dr.
    Schneider entered into a Consent Decree with the Wyoming Board of Medicine in order to
    secure reinstatement of his license.  Pursuant to the consent decree, Dr. Schneider accepted
    a restriction placed on his Wyoming license.  That restriction required Dr. Schneider not to
    prescribe the drug fentanyl for an unspecified period of time. (Ex. K-1, pp. 1-52; Ex. L-11).

9)  Dr. Schneider also agreed to take an educational course at Vanderbilt University related to
    narcotic prescription.  Dr. Schneider completed that course on March 2, 2012.  Finally, Dr.
    Schneider agreed to have all of his discharge summaries and discharge medications
    reviewed for a period of six months by Dr. Steven Mainini, a pulmonary and critical care
    physician practicing in Cody Wyoming.  Dr. Mainini monitored Dr. Schneider's surgeries
    and prescribing practices for the designated time ending in September 2012 and found no
    problems. (Ex. L-11; Ex. L-19 through L-22; Trial Tr. Vol. 2, p. 264, lines 13-15).

10) Dr. Schneider has continued to practice medicine since that time without restriction in
    Wyoming other than the condition not to prescribe fentanyl.

11) On April 9, 2012, the Wyoming Board of Medicine brought the Complaint herein.

12) The allegations in the Complaint again surround the death of Russell Monaco in the late
    evening hours of December 1, 2011 or the early morning hours of December 2, 2011 and
    Dr. Schneider's care and treatment of Mr. Monaco.  Harley Morrell PA-C, a mid-level

2

provider licensed by the state of Wyoming and employed by Dr. Schneider's practice, also participated in the care and treatment of Mr. Monaco during and following the back surgery in question. At the time that Mr. Morrell treated Mr. Monaco, Mr. Morrell had worked for Dr. Schneider for five years and had over 15 years of physician assistant experience. (Ex. W-3 p. 7, lines 1 through 7; Ex. W-5, p. 16, line 3).

13) In November 2011, Russell Monaco and his wife Kathy lived in Billings Montana. During the relevant periods of time in question, Kathy Monaco worked for Dr. Schneider in his medical records department. (Ex. K-7, line 12; Ex. T-3, pp. 6 through 8, line 9).

14) Russell Monaco worked as a machinist and had experienced problems with back pain for nearly 20 years. He had undergone a lumbar spine operation in 1994 and was not truly pain free from that point on. Most recently, Russell Monaco began suffering from severe lower back pain following a lifting incident at a softball tournament in Billings, Montana in August 2011. (Exs. B-1, B-2, T-4, p. 9 through p. 10;. Ex. T-5, p. 13 lines 17-18; Ex. W-8, p. 27, lines 22 through p. 28, line 14).

15) At the time of his injury, Mr. Monaco saw his primary care physicians at the Billings Clinic concerning his back pain. He was prescribed a narcotic, Vicodin (hydrocodone), for relief. Subsequently, Russell Monaco deteriorated medically with numerous visits to his primary care provider and the emergency room at the Billings Clinic beginning in November of 2011. (Exs. B-1 through B-18; Ex 14, p. 6, lines 1-8; Ex. 14, pp. 16 -17).

16) Mr. Monaco underwent two MRIs and was diagnosed by his primary care provider at the Billings Clinic with disc disease, disc herniation and compression of his nervous system on or about November 20, 2011. At that time he was given a refill of his prescription for Vicodin. (Exs. B-4, B-5, B-10, B-12 through B-18; Ex. 14-K, pp. 4 -26).

17) On November 20, 2011, Mr. Monaco's primary care physician referred him to Dr. Eugen Dolan, a neurosurgeon with the Billings Clinic. The consultation was set up for Mr. Monaco on an urgent basis because of the possibility that Mr. Monaco might require surgery on his lower back. Dr. Dolan is the physician who performed Mr. Monaco's lumbar surgery in 1994. Russell Monaco cancelled his appointment with Dr. Dolan indicating that he and Kathy Monaco had plans to visit friends in Cody Wyoming over the Thanksgiving holiday. Kathy Monaco further testified that Dr. Dolan was older when he did the surgery in 1994 and that the Monaco's did not wish to have him perform surgery on Russell Monaco in 2011. (Exs. B-17, B-18; Ex. T-6, p. 17, lines 22-25; Ex. T-17 p. 64, lines 1-5).

18) Russell Monaco signed a HIPAA release form on November 20, 2011 at the Billings Clinic to obtain all of Mr. Monaco's medical and imaging records. Those records were picked up sometime within the next two days. (Ex. T-7, p. 21, lines 11-13; Ex. T-16, p. 57, line 19 through p. 58 lines 1-15).

19) During the month of November 2011, Mrs. Monaco called Russell Monaco's insurance company, EBMS, to inquire if Mr. Monaco was eligible for medical provider coverage

3

should they choose to have Dr. Schneider perform the surgery. No evidence was presented by any witness that Dr. Schneider was aware of the Monaco's feelings about Dr. Dolan or that the call to Mr. Monaco's insurance carrier was made with the knowledge or authorization from Dr. Schneider or anyone else at Northern Rockies Neuro-Spine. (Ex. T-7, p. 24, lines 1-25 through T-8 p. 26, line 16; Ex. T-14, p. 49, line 15 through p. 51, line 9; Exs. T-44 through T-46).

20) No evidence was presented indicating that Dr. Schneider was ever made aware of any issues regarding Mr. Monaco's insurance benefits or ever had a conversation about the availability of Mr. Monaco's insurance to cover consultation or surgical services at Dr. Schneider's surgical location in Cody Wyoming. Specifically, Kathy Monaco testified that neither she nor Russell Monaco ever discussed anything to do with Russell Monaco's insurance coverage with Dr. Schneider. (Ex. T-8, p. 14, line 14 through p. 26, line 16; Ex. T-14, p. 49, line 15 through p. 51, line 9; Ex. T-28, p. 107, lines 9 – 16; Ex. T-28, p. 108, lines 3 – 18).

21) Although during this time frame, Mr. and Mrs. Monaco apparently indicated to members of Mr. Monaco's family that they would be traveling to Cody for surgery by Dr. Schneider, no evidence was presented indicating that Dr. Schneider was aware of the Monaco's preference or intention to have surgery performed by him. Kathy Monaco and Dr. Schneider both testified that Dr. Schneider was unaware that the Monaco's would seek consultation with Dr. Schneider before Kathy Monaco called him on the morning of November 28, 2011. (Ex. T-19, p. 70, line 17 through p. 71, line 9; Ex. U-3, p. 6, line 20 through p. 7, line 10; Ex. U-8, p. 23, lines 14-25).

22) Russell Monaco and Dr. Schneider never met prior to November 28, 2011, although Dr. Schneider became aware of Mr. Monaco's spine pathology for the first time on November 21, 2011. On that date, Kathy Monaco emailed Dr. Schneider and asked if he would review Mr. Monaco's lumbar and thoracic MRI scans that had been obtained on November 20, 2011. When Kathy Monaco made this request she was in Billings, Montana and Dr. Schneider was in the operating room in Cody Wyoming. (Ex. II; Ex. K-10, line 10; Ex. T-6, p. 18, line 13 through p. 20, line 10; Ex. T-17, p. 64 lines 7 -19).

23) Dr. Schneider agreed to look at the MRI scans, and the MRIs were pushed via the PACs system to West Park Hospital for his review. Dr. Schneider accessed these MRI scans and reviewed them at 4:50 p.m. on November 21, 2011. He reviewed the MRI scans with Dr. Gregory Cross, a radiologist at West Park Hospital. (Ex. II; Ex. T-6, p. 19, lines 9–25; Ex. T-17, p. 64 lines 7-19; Trial Tr. Vol. 2, p. 320, lines 20-25).

24) Dr. Schneider called Kathy Monaco at the Billings, Montana office of Northern Rockies Neuro-spine to discuss what he and Dr. Cross saw from their review of Russell Monaco's MRI scans on November 22, 2011. At that time, Dr. Schneider did not have a MRI report or medical records on Mr. Monaco. (Trial Tr. Vol. 1, p. 93, lines 8 -15; Trial Tr. Vol. 1. p. 94, lines 12-13; Trial Tr. Vol. 2. p. 318, lines 3-5;  Ex. T-7, p. 21, lines 17 -20;  Ex. T-18, p. 65, lines 18 -24; Ex. T-21, p. 80, lines 11 -18).

4

25) Dr. Schneider inquired as to the medical status of Russell Monaco, and Kathy Monaco indicated Mr. Monaco was in severe pain, had difficulty walking, and had been seeing his physicians and emergency room physicians at the Billings Clinic. Dr. Schneider offered his concern to Mrs. Monaco about the severity of Russell Monaco's nerve compression and discussed with her issues surrounding the three herniated discs seen in his thoracic-lumbar MRI scans from November 20, 2011. Dr. Schneider offered assistance in any way Mrs. or Mr. Monaco desired. (Ex. T-6, p. 20, lines 3-7; Ex. T-7, p. 22, lines 14 -17; Ex. T-8, p. 27, lines 3–17; Ex. T-15, p. 55, line 9; Ex. T-17 p. 64, lines 5-20; Ex. T-18, p. 66, lines 3–12; Ex. T-18, p. 67, lines 6-10).

26) Kathy Monaco was aware that Dr. Schneider would be in Cody Wyoming through the Thanksgiving holiday and had a block surgical schedule at West Park Hospital on Monday November 28, 2011. She was further aware that if Mr. Monaco had trouble, it was acceptable for her to give Dr. Schneider a call. (Ex. T-18, p. 67, lines 14-19; Ex. T-19, p. 70, lines 2-24 through p. 71, line 19; Ex. T-20, p. 74, lines 10 -15; Trial Tr. Vol. 1 p. 94, lines 10 -25).

27) Dr. James Girolami, M.D. and other health care providers at the Billings Clinic, impressed upon Mr. and Mrs. Monaco the severity of Russell Monaco's lumbar disease and discussed the potential for cauda equina syndrome with him. They expressed to Mr. Monaco the need for surgical consult and the potential need for urgent surgical intervention should his condition deteriorate. Mr. Monaco was advised to seek immediate help if his condition deteriorated and/or if he developed incontinence. (Ex. N-10, p. 33, lines 7 through page 34 line 20; Ex. N-11, p. 37, line 22 through p. 38, line 4).

28) At the time that Dr. Schneider first spoke with Kathy Monaco about Russell Monaco's MRI results on November 22, 2011, Russell Monaco had already cancelled his appointment with Dr. Dolan. Russell Monaco had also already told Dr. Ryan Schwanke he didn't want surgery because he was "leaving for Cody tomorrow" for the Thanksgiving holiday. The health care providers at the Billings Clinic told Mr. Monaco to take his MRI scans and records and report to the Cody emergency room if he developed problems with bladder dysfunction and/ or neurological deterioration as this would constitute an emergency situation. (Trial Tr. Vol. 1 p. 94, lines 10-25; Ex. T-19, p. 69, line 24 through p. 71, line 19; Ex. T-20, p. 74, lines 10-15).

29) Kathy Monaco also told Dr. Schneider that the Monaco's were going to spend Thanksgiving visiting friends in Cody, Wyoming. Dr. Schneider told Kathy Monaco she was welcome to call him if Mr. Monaco deteriorated medically when they were in Cody over the Thanksgiving holiday. (Ex. T-8, p. 27, lines 3-19; Ex. T-13, p. 46, line 15 through p. 47, line 5; Ex. T-18, p. 67, lines 14-19).

30) Dr. Schneider did not receive any communication from Kathy Monaco or her husband about their desire for Dr. Schneider to see or treat Russell Monaco until Monday morning November 28, 2011 prior to Dr. Schneider's start of his regularly scheduled surgical cases. Prior to that phone call, Mr. Monaco was not scheduled for consultation or surgery by Dr.

Schneider. (Ex. T-8, p. 28, lines 5-25; Ex. T-19, p. 69, line 24 through p. 71, line 19; Ex. T-20, p. 74, lines 10-15; Ex. T-21, p. 77, line 11 through p. 79, line 9).

31) On the morning of November 28, 2011, Kathy Monaco contacted Dr. Schneider by phone indicating that she and Mr. Monaco were staying at a hotel in Cody Wyoming and that Mr. Monaco was in severe pain and having extreme difficulty walking. They also indicated that on the night of November 27, 2011 Mr. Monaco suffered an incident of urinary incontinence. In that phone call, Kathy Monaco requested a consultation by Dr. Schneider at West Park Hospital. (Ex. T-8 , p. 27, lines 3-19; Ex. T-8, p. 28, lines 5-25; Ex. T-21, p. 77, line 11 through p. 79, line 9).

32) Dr. Schneider agreed with the request for a consultation and requested that Kathy and Russell Monaco go to the emergency room at West Park Hospital. Kathy and Russell Monaco arrived at West Park Hospital at approximately 9:30 a.m. Dr. Schneider was called in the operating room and informed that Mr. Monaco was awaiting consultation in the emergency room. (Ex. T-8, p. 28 through Ex. T-9, p. 29, line 9; Trial Tr. Vol. 1, p. 224, line 9-20; Trial Tr. Vol. 2, p. 325, lines 8-16; Trial Tr. Vol. 2, p. 326, lines 3-9; Trial Tr. Vol. 2, p. 330, line 22 through p. 331, line 7).

33) Dr. Schneider was in surgery and requested that Mr. Monaco be placed in a room on the third floor of West Park Hospital so that Dr. Schneider could assess him following the current surgical procedure being performed by Dr. Schneider. Russell Monaco and Kathy Monaco were subsequently sent to the admissions desk from the emergency room and spoke with clerk Sandra Jones. Sandra Jones testified that at the time he presented to her, Russell Monaco was in severe pain. She does not recall him saying that he was "there for surgery". (Trial Tr. Vol. 1, p. 224, lines 9-20; Trial Tr. Vol. 1, p. 227, lines 1-8; Trial Tr. Vol. 1, p. 232, lines 8-20; Trial Tr. Vol. 2, p. 325, lines 21-24; Trial Tr. Vol. 2, p. 326, lines 3-9).

34) Dr. Schneider called in routine orders from the operating room to the nurses' station for Russell Monaco in anticipation of the possibility that Mr. Monaco would require surgery on his spine following the consultation and based upon his prior review of Mr. Monaco's MRIs and Kathy Monaco's description of his condition on that morning. (Trial Tr. Vol. 1, p. 225, lines 18-20; Ex. C-6).

35) Dr. Schneider consulted with Mr. Monaco on November 28, 2011 at approximately 10:30 a.m. on the third floor of West Park Hospital where he had been admitted for observation. At that time Dr. Schneider reviewed medical records provided to Dr. Schneider by Kathy Monaco. Dr. Schneider's report of that consultation summarized the known neurological problems occurring with disc herniation compressing the thoracic and lumbar spine. (Ex. A-2 through A-5; Ex. T-9, p. 29, line 4-25; Trial Tr. Vol. 1, p. 109 line 16 through p. 110, line 8).

36) Dr. Schneider documented progressive neurological decline in Mr. Monaco's history noting a two month process of urgency with an episode of overflow incontinence occurring on Sunday November 27, 2011. Dr. Schneider also documented on his physical examination

6

138

right leg weakness and a-reflexia as well as severe back and leg pain with motion on Mr. Monaco. Mr. Monaco was in too much pain to ambulate for Dr. Schneider. (Ex. A-2 through A-5; Ex. B-1 through B-18; Ex. T9, p. 30, lines 7 -17; Trial Tr. Vol. 1, p. 107, line 18 through p. 109, Line 6; Trial Tr. Vol. 1, p. 112, line 14 through p. 113, line 19).

37) Dr. Schneider diagnosed Mr. Monaco with morbid obesity, type two diabetes, osteoarthropathy and mild hypertension, but he did not find other major medical confounding factors. Mr. Monaco showed no signs of myelopathy on his physical examination. (Ex. A-2 through A-3; Ex. B-3; Trial Tr. Vol. 1, p. 107, line 18 through p. 109, line 6; Trial Tr. Vol. 1, p. 112, line 14 through p. 113, line 19).

38) Mr. Monaco gave Dr. Schneider a history of progressive back pain as his most severe symptom. His history additionally included one episode of resolving left low abdomen pain, radiating pain into both legs with lower motor neuron weakness in his right leg, as well as incontinence. Dr. Schneider believed that Mr. Monaco's symptoms were explained by high grade spinal stenosis and disc herniation from L2/3 degenerative disc disease. (Ex. B-6; Trial Tr. Vol. 1, p. 107, line 18 through p. 109, line 6; Trial Tr. Vol. 1, p. 112, line 14; through p. 113, line 19).

39) Dr. Schneider previously had discussed Russell Monaco's left sided thoracic herniated discs with Kathy Monaco in his conversation with her on November 22, 2011. Dr. Schneider noted the progressive deterioration in neurological function seen on physical examination when reviewing the notes from the Billings Clinic from November 18, 2011 through November 22, 2011 and documented a rapid progression in right-sided leg weakness from the L2/3 stenosis. (Ex. A-2, A-3; Ex. B-1 through B-18; Ex. T-18, p. 66, lines 4-6).

40) One of Mr. Monaco's treating physicians, James Girolami, M.D. testified that he had warned Mr. Monaco on November 15, 2011 of the potential emergency related to incontinence and cauda equina syndrome and advised him that if he experienced incontinence or a weakening in his legs that it might require emergency surgery. Dr. Schneider determined from his examination that in fact Mr. Monaco was exhibiting progressive symptoms that were related to cauda equina syndrome and that he should be treated through a lumbar laminectomy. (Exs. A-2, A-3, A-6, A-7, B-4, B-5, B-18).

41) Based upon Dr. Schneider's examination, the high-grade circumferential spinal canal stenosis at L2/3, the unilateral progressive leg weakness on the right, the progressive neurogenic bladder dysfunction from denervated bladder, and the old calcified thoracic herniated disc isolated on the left, Dr. Schneider determined the highest probability of the cause of Mr. Monaco's symptoms was spinal nerve compression. (Exs. A-2, A-3, B-16, B-17).

42) The thoracic disc herniation found at T11/12 and T12/L1 occurred on the left side only and was old and calcified. The calcification of the thoracic disc herniations signified that they were long standing. The evidence in the case suggests that the calcifications date back to at least 2007. (Exs. B-12, B-13; Trial Tr. Vol. 2, p. 275 through p. 276, line 9).

7

43)  Mr. Monaco reported no acute trauma or fall after the MRIs of November 20, 2011, and thus Dr. Schneider determined that the MRIs from November 20, 2011 accurately described radiographically the etiology of his clinical deterioration on November 28, 2011. (Ex. A-2, A-3, A-6, A-7, B-9, B-12, B-13, B-16, B-17, B-18; Trial Tr. Vol. 2, p. 275 through p. 276  line 9).

44)  Having diagnosed that Mr. Monaco had progression of disease and not an acute change in his condition, Dr. Schneider determined that a repeat MRI scan on November 28, 2011 of the lumbar and thoracic spine was an expensive and unnecessary test. (Trial Tr. Vol. 2, p. 277 line 4 through p. 278 line 12).

45)  Mr. Monaco noted a 2 month history of urgency, a sign of a progressive bladder dysfunction.  Mr. Monaco told Dr. Schneider that he experienced his first episode of overflow incontinence on Sunday November 27, 2011.  Dr. Schneider determined that this was most likely the end result of progressive bladder denervation and not an acute change to Mr. Monaco's rapidly progressive neurological decline.  The bladder denervation resulted from a lower motor neuron pathology and not a spinal cord injury pathology. (Trial Tr. Vol. 3, p. 440 lines 15-25; p. 441 line 16 through p. 442 line 6;  Ex. A-2, A-3, B-1 through B18; Ex. T-8 p. 27, lines 22-25).

46)  Dr. Schneider found no symptoms from his history or physical examination that supported a diagnosis of spinal cord compression. (Ex. A-2, A-3, B-1 through B-18; Ex. T-8 p. 27, lines 22-25; Ex. Trial Tr. Vol. 3 p. 448, lines 2-8; Ex. Trial Tr. Vol. 3 p. 439, lines 17 -25).

47)  Dr. Schneider determined that the isolated left sided thoracic disc disease was chronic and was not causing severe enough neurological compression in the spinal cord to cause ischemia and was not causing spinal fluid obstruction. (Exs. B-14, B-15).

48)  Dr. Schneider's determination that the thoracic disc disease was not likely causing Mr. Monaco's symptoms of progressive neurological decline was confirmed by Mr. Monaco's complete resolution of leg weakness and bladder incontinence within 24 hours of the surgery performed by Dr. Schneider. (Exs. C-14 through C-16; Ex. C-19 through C26; Trial Tr. Vol. 1, p. 116 lines 3-20).

49)  Petitioners' neurosurgical expert, Dr. Saul Schwarz, agreed that the surgery performed by Dr. Schneider on November 28, 2011 was necessary.  Dr. Schwarz also agreed that to perform an operation relating to the thoracic disc disease would require a second and distinct operation from the one performed by Dr. Schneider and that the second operation would be much more expensive and far more difficult than the lumbar operation.  He further testified that it could be done at a later date if shown to be necessary. (Trial Tr. Vol. 1, p. 137, lines 1-3; Trial Tr. Vol. 3, p. 433 line 21 through p. 435 line 19).

50)  Dr. Schneider discussed his recommendation for lumbar laminectomy with Mr. and Mrs. Monaco for the first time on November 28, 2011.  After hearing the risks of surgery, Mr. and Mrs. Monaco discussed the desire for surgery between themselves, and they

determined they wanted Dr. Schneider to perform this surgery on Mr. Monaco. (Ex. T-9, p. 29, line 4 through p. 30, line 3).

51) Dr. Schneider determined the surgery was an urgency/emergency based upon the diagnosis of cauda equina syndrome. All of the literature introduced at the hearing in this matter supports the diagnosis and the fact that it requires urgent or emergency surgery. (Exs. A-25 through A-39).

52) Dr. Schneider obtained a detailed consent for surgery on November 28, 2011 for a multilevel lumbar laminectomy. Dr. Schneider also dictated a detailed history and physical consultation note on November 28, 2011. (Exs. A-2 through A-5, A-17 through A-18).

53) Before performing the surgery, Dr. Schneider made a courtesy call to the Billings Clinic although he was placed on hold and never spoke to any of Mr. Monaco's treating physicians. (Exs. A-2, A-3; Ex. Q-4 p. 10, line 1 through p. 11, line 21).

54) Dr. Schneider placed Mr. Monaco into the fourth surgery position on November 28, 2011. Dr. Schneider began his second surgery of the day immediately after he completed his consultation on Mr. Monaco. Dr. Schneider's third case was performed on an elderly patient and was less than one hour long. Dr. Schneider deemed that surgery should be completed before bringing Mr. Monaco into surgery. (Trial Tr. Vol. 1, p. 45, line 25 through p. 46, lines 1-4; Trial Tr. Vol. 1, p. 128, lines 21-25; through p. 130, line 11).

55) Russell Monaco was brought to the operating room at West Park Hospital at 2:30 p.m., four hours after Dr. Schneider's consultation. Mr. Monaco had a successful lumbar laminectomy from L2 to L5 without complications. The operation was performed by Dr. Schneider with assistance by Harley Morrell PA-C. Mr. Monaco had a successful return of all neurological function within 24 hours following the back surgery performed by Dr. Schneider on November 28, 2011. (Exs. A-2, A-3, A-6, A-7, A-14, C-3, C-4, C-11, C-12, C-14, C-16, C-19 through C-26).

56) Mr. Monaco received an epidural anesthetic injection after his laminectomy and with a small amount of additional narcotics remained comfortable postoperatively for 18 hours. (Exs. A-6, A-7).

57) Mr. Monaco failed to rise and ambulate from his bed on November 28th or the morning of November 29th. He remained medically stable off supplemental oxygen however and was considered for discharge on November 29th. (Exs. C-7, C-8, C-15; Ex. P-31 through P-38).

58) Dr. Schneider wrote discharge orders for Russell Monaco, and Harley Morrell supplied Mr. Monaco with Percocet and Valium for postoperative pain control the morning of November 29, 2011. (Ex. C-7; Trial Tr. Vol. 1, p. 150, line 12 through p. 151 line 17).

59) Mr. Monaco failed to independently ambulate on November 29th, noting a steady increase in back pain throughout the day. He also required a single bladder catheterization on the

29th. Mr. Monaco's discharge was canceled for November 29th, and he was converted to in-patient status. (Trial Tr. Vol. 1, p. 153, lines 11-25; Ex. P-27).

60) The narcotics given to Mr. Monaco postoperatively were unable to control Mr. Monaco's acute and persistent sub-acute pain during his hospital stay, and Mr. Monaco developed severe back pain radiating into his anterior thighs on November 30th at approximately 1:30 a.m. while urinating. Mr. Monaco described the pain he experienced after the epidural anesthetics wore off as the worst pain of his life. The pain was so severe that he cried because of its severity. He required multiple additional narcotics and benzodiazepines to get adequate pain control. (Exs. C-6 through C-10, C-38 through C-48, C-57 through C-59, C-64 through C-66; Ex. P-28; Ex. T-10, p. 32, line 23 through p. 34 line 8; Ex. FF-19; Ex. 15, p. 36, lines 17-21).

61) On November 30th at 7:00 a.m. Mr. Morrell made rounds. At that time, Mr. Monaco's pain was reduced, but Mr. Monaco had developed high output in the lumbar Jackson Pratt drain. Mr. Morrell initially wrote orders for increased activity by Mr. Monaco on November 30th, however after phone consultation with Dr. Schneider, Mr. Monaco was placed back at moderate bed rest because of concerns by Dr. Schneider of possible spinal fluid leakage. Mr. Morrell also prescribed Mr. Monaco a 50 µg fentanyl patch at 07:00 a.m. on November 30, 2011 to address the sub-acute and chronic pain aspects of Mr. Monaco's clinical condition, using other narcotics for acute pain. (Exs. A-2, A-3, B-1, B-2, B16, B-17, C-8, C-10, C-12, C-13, C-15, C-38; Ex. W-8, p. 27, line 22 through p. 28, line 14; Ex. 15, p. 36, lines 18-21; Trial Tr. Vol. 1, p. 72, line 9 through p. 74, line 3; Trial Tr. Vol. 1 p. 158, lines 5-14; Trial Tr. Vol. 1 p. 165 lines 4-13).

62) Mr. Morrell was aware that Mr. Monaco had a long history of back pain, and Mr. Morrell was further aware that Mr. Monaco used significant amounts of Vicodin during the month prior to this admission. (Exs. A-2, A-3, B-1, B-2, B-16, B-17; Ex. T-4, p.10, lines 9-19; Ex. W-8, p. 27, line 22 through p. 28, line 14).

63) Mr. Monaco had significant fluctuation in his pain levels (from 2/10 to 8/10) on November 30th despite receiving multiple pain medications, including Demerol and Phenergan IM, Percocet, Dilaudid, Valium and a fentanyl patch. (Exs. C-38 through C-48, C-57 through C-59, C-64 through C-66, Ex. D-2; Ex. 15, p. 36, lines 18-21).

64) At 1:00 p.m. on November 30th, while Mr. Monaco slept without oxygen, his oxygen saturation levels declined to 80%. Mr. Monaco's nasal cannula was replaced by the nursing staff, and Mr. Monaco's oxygen saturation levels returned to 93% oxygen. (Ex. C-46).

65) Dr. Schneider made rounds at 3 p.m. on November 30, 2011. At that time, Dr. Schneider reviewed Mr. Monaco's postoperative course, his medications, his high narcotic demand, his event of oxygen desaturation on narcotics, and the resolution of the fluid output in the Jackson Pratt drain. Dr. Schneider became aware of the placement of the fentanyl patch after reviewing Mr. Monaco's clinical course and orders at 3 p.m. on November 30th. (Trial Tr. Vol. 1, p. 164, line 8 through p. 169, line 25; Ex. C-16; Ex. W-20, p. 75, lines 9-

12).

66) Dr. Schneider found Mr. Monaco asleep at 3 p.m. on November 30th without supplemental oxygen. His oxygen saturation level was at 92%. Dr. Schneider awoke Mr. Monaco and proceeded to discuss multiple aspects of his post-operative care for over thirty minutes. Dr. Schneider recalls Kathy Monaco being present during this discussion. (Trial Tr. Vol. 1, p. 164, line 8 through 169, line 25; Ex. C-16; Ex. W-20, p.75, line 9 through p. 76, line 16; Ex. W-50).

67) Mr. Morrell and Nurse Fulkerson, Mr. Monaco's primary nurse provider during the dayshift, were also present for part of this conversation. (Trial Tr. Vol. 1, p. 172, lines 2-23; Ex. P-12, p. 42, line 3-6; Ex. W-20, p. 75, line 9 through p. 76, line 16; Ex. W-27, p. 103, line 21 though W-28, p. 105, line 11; Ex. W-50 through W-51).

68) Dr. Schneider discussed with Mr. and Mrs. Monaco at length the expectation of considerable pain following extensive back surgery, the need for mobilization, and the high risk of multiple narcotics causing respiratory suppression.  Mr. Monaco was informed that he could anticipate issues based upon his demand and requirements for narcotics. (Trial Tr. Vol. 1, p. 164 line 8 through p. 169, line 25; Trial Tr. Vol. 1, p. 172, lines 2-23; Trial Tr. Vol. 1 p. 177, lines 1-25; Trial Tr. Vol. 1, p. 178 lines 1-19; Ex. C-16; Ex. K-25; Ex. W-20, p. 75, line 9 through p. 76, line 16; Ex. W-27, p. 103, line 21 through W-28, p. 105, line 11; Ex. W-50 through W-51).

69) Dr. Schneider informed Mr. Monaco that his home use of medication should be limited to the fentanyl patch with no more than one Percocet given from prescriptions received on November 29, 2011 for acute breakthrough pain every 8 hours following discharge. (Trial Tr. Vol. 1, p. 164 line 8, through p. 169, line 25; Trial Tr. Vol. 1, p. 172, lines 2-23; Trial Tr. Vol. 1 p. 177, line 1 through p. 178 line 19; Trial Tr. Vol. 1 p. 194, lines 1-9; Ex. K-25; Ex. W-32, p. 121, lines 19-24).

70) Mr. Monaco agreed to increase his activity and decrease his medication use. If Mr. Monaco followed this plan, it was anticipated that he could be discharged on December 1st. Dr. Schneider noted Mr. Monaco was comfortable at 3 p.m. on November 30, 2011. (Trial Tr. Vol. 1, p. 172, lines 2-23; Trial Tr. Vol. p. 177, line 1 through p. 178 line 19; Ex. C-16; Ex. K-25).

71) Mr. Monaco had levels of pain of as high as 7/10 throughout the night of November 30 and December 1, 2011 and still required parenteral narcotics. (Ex. D-2; Ex. FF-19).

72) Mr. Morrell made rounds at 07:00 a.m. on December 1st and evaluated Mr. Monaco. Mr. Morrell noted that Mr. Monaco was medically stable and had excellent pain control using the fentanyl patch. Mr. Morrell concluded that Mr. Monaco met discharge criteria off oxygen. Mr. Monaco had an oxygen saturation level of 94% on room air and was walking independently and without significant pain. Mr. Monaco was also noted by the nursing staff to be ambulatory and stable off oxygen the morning of December 1, 2011 as reflected by the nursing assessment done at 07:40. (Ex. C-16, C-19 through C-26; Ex. W-50 through

11

143

W-51; Trial Tr. Vol. 1 p. 180, line 1 through p. 181, line 8).

73) Mr. Morrell wrote out additional prescriptions for Dilaudid, Percocet, Valium and fentanyl patches, giving the prescriptions directly to Russell Monaco and making no note in the orders or discharge paperwork regarding these additional medications. (Exs. C-16, C-51, C-52; Ex. D-4; Ex. K-37, lines 10-23; Exs. W-50, W-51).

74) Mr. Monaco was ambulatory and not in his room at 07:50 a.m. on December 1, 2011 when Dr. Schneider arrived at West Park Hospital to make rounds. Dr. Schneider noted Mr. Morrell's discharge orders and the 07:40 a.m. nursing assessment. He also received a direct report from Nurse Fulkerson. The records reflect that Dr. Schneider discussed Mr. Monaco's medical status with Nurse Fulkerson on December 1st at 07:50 a.m. (Ex. C-24; Ex. P-20, p. 72, lines 12-25; Trial Tr. Vol. 1 p. 180, line 1 through p. 181, line 8; Trial Tr. Vol. 1 p. 184, lines 2-10; Trial Tr. Vol. 1 p. 207, lines 21, through p. 208 line 1).

75) Dr. Schneider recovered the disassembled chart from the ward clerk's station and added a single order to the discharge preprinted order sheet for Mr. Monaco "to follow up with his primary care physician for sleep studies" as Dr. Schneider felt Mr. Monaco's body habitus may indicate he is at a potential higher risk for obstructive sleep apnea. (Trial Tr. Vol. 1 p. 182, lines 13-24; Trial Tr. Vol. 1 p. 184, lines 15 -24; Trial Tr. Vol. 1 p. 189, lines 23-25; Ex. A-8, line 9; Ex. T-9, p. 32, lines 9-15).

76) Dr. Schneider never saw any evidence of the additional prescriptions written by Mr. Morrell on December 1, 2011 and anticipated Mr. Monaco would follow his orders, restricting home medications for pain to the fentanyl patch for sub-acute and chronic pain and the one Percocet every 8 hours for acute breakthrough pain. (Exs. A-8, A-9; Ex. K-29, lines 12-14; Trial Tr. Vol. 1 p. 184,  through p. 191 line 2; Trial Tr. Vol. 1 p. 194, lines 1-9).

77) Dr. Kenneth Kulig M.D., a toxicologist retained by the Board of Medicine, testified that transdermal fentanyl in an otherwise reasonably healthy 47 year male such as Mr. Monaco should reach steady-state blood level concentration at 24 hours. Dr. Schneider noted that at 24 hours post application of the fentanyl patch, Mr. Monaco was stable off oxygen supplementation with saturation levels of 94%. (Trial Tr. Vol. 1 p. 207, line 21 through p. 208, line 4;  Ex. K-49, lines 17-24; Ex. DD-6, p. 18, lines 3-6).

78) Mrs. Monaco arrived at West Park Hospital on December 1st after 8 a.m. and did not see Harley Morrell or Dr. Schneider on that date. (Ex. T-11, p. 39, lines 14-25).

79) Mr. Monaco was discharged from all in-patient services and medications at 07:00 a.m. on December 1st by Harley Morrell. (Exs. C-5, C-10, C-51, C-52; Trial Tr. Vol. 2, p. 256, lines 6-25).

80) In addition to the continued transdermal patch of fentanyl, the only other medication that Harley Morrell ordered appearing in the medical records was a single Demerol/Phenergan

injection at discharge.  (Exs. C-5, C-10, C-51, C-52; Trial Tr. Vol. 2, p. 256, lines 6-25).

81)   Mr. Morrell's medical orders should have terminated the use of in-patient medications at 07:00 a.m.  Despite this fact, the discharge medications Demerol and Phenergan, written by Mr. Morrell, were accidently given twice by the nursing staff, once at 07:40 a.m. and again at 10 a.m.  (Exs. C-10, C-51, C-52; Ex. D-2, D-3; Ex. T-12, p. 41, line 9 through p. 43, line 9; Trial Tr. Vol. 2, p. 256, lines 6-25).

82)   The West Park Hospital records show that in addition to his continued use of the fentanyl patch placed on November 30, 2011, Dilaudid, Percocet and Valium were given to Mr. Monaco despite discharge orders terminating these medications at 07:00 a.m.  (Trial Tr. Vol. 1, p. 164 lines 21-25; Trial Tr. Vol. 2, p. 305, line 24 through p. 306, line 5;  Ex. D-2, D-3; Ex. C-10).

83)   Mrs. Monaco testified that Mr. Monaco became progressively more lethargic after her arrival on the date of discharge and that he was extremely lethargic and barely able to be aroused at the time of his discharge at 10:30 a.m.  When Mr. Monaco was off oxygen supplementation, he continued to trigger the low pulse oximetry monitor in his room throughout the day and never regained a normal state of consciousness.  (Ex. T-12, p. 41, line 9 through p. 43, line 9; Ex. T-12, p. 44, line 21 through p. 45, line 19; Ex. U-5, p. 14, line 2 through U-6, p. 17, line 5).

84)   Despite his obtunded state, no family member of Russell Monaco attempted to call Dr. Schneider's practice. (Ex. T-12, p. 44, line 21 through p. 45, line 19; Ex. T-24, p. 90, lines 19-25).

85)   Nurse Fulkerson noted shortly after 09:00 a.m. on December 1st that Mr. Monaco's oxygen saturation declined to 75%.upon a room air challenge. Nurse Fulkerson documented this prior to Mr. Monaco's discharge. (Ex. P-14, p. 47, lines 16-18; Ex. P-15, p.52, line 19 through p. 53, line 4; Ex. P-24).

86)   Nurse Fulkerson called the offices of Dr. Schneider and spoke directly with Harley Morrell about Mr. Monaco's oxygen saturation level. (Ex. P-14, p. 47, lines 16-18; Ex. P-15, p. 52, line 19 through p. 53 line 4; Ex. P- 24).

87)   Mr. Morrell acknowledges that he received a call from Nurse Fulkerson, but he denies being informed by Nurse Fulkerson of Mr. Monaco's precise oxygen saturation level. Mr. Morrell testified that Nurse Fulkerson informed him that Mr. Monaco's saturation levels had dropped and asked whether he should be discharged with home oxygen.  (Ex. W-23, p. 88, lines 14-25).

88)   Nurse Fulkerson testified that she does not recall doing any other neurological or documented comprehensive clinical assessment of Mr. Monaco after her nursing assessment of 07:40 a.m. was done.  (Ex. P-11, p. 35, line 8 through p. 36 line 11; Ex. P-12, p. 39, line 10 through p. 42, line 6).

89) After making rounds at West Park Hospital at 0750, Dr. Schneider was in clinic the morning of December 1st beginning at 08:30 a.m. (Ex. C-16; Ex. Q-8, p. 28, lines 9-25; Ex. W-72).

90) Nurse Fulkerson called Dr. Schneider's office about Mr. Monaco speaking directly to Harley Morrell. Nurse Fulkerson testified that she does not recall hearing Mr. Morrell speak with Dr. Schneider while she was on the phone with Mr. Morrell. Mr. Morrell's conversation with Nurse Fulkerson was overheard by Lisa Parker, Practice Manager at Northern Rockies Neuro-Spine. Lisa Parker testified that Mr. Morrell made the decision to send Mr. Monaco home without oxygen supplementation without talking with Dr. Schneider. (Trial Tr. Vol. 2, p. 342, lines 1-10; Ex. P-13, p. 46, lines 8 -17; Ex. P-14, p. 48, line 22 through p. 50, line 15; Ex. P-15, p. 52, line 19 through p. 53, line 4; Ex. Q-4, p. 12, line 2 through Q-5, p. 16, line 15; Ex. Q-8, p. 26, lines 13-21).

91) Upon hanging up, Mr. Morrell informed Lisa Parker that the phone call was about Mr. Monaco and that he was stable medically for discharge. Mr. Morrell informed Dr. Schneider later that day that Mr. Monaco had been discharged and never mentioned the phone call from Nurse Fulkerson. Mr. Morrell also did not notify Dr. Schneider of additional medications given to Mr. Monaco at the time of discharge. (Ex. Q-5, p. 14, lines 12-17; Ex. Q-5, p. 15, lines 13-20; Trial Tr. Vol. 1, p. 195, line 1 through p. 197, line 12).

92) Mr. Monaco developed progressive neurological decline with obtundation and difficulty maintaining arousal after Mr. Morrell and Dr. Schneider's consultations on December 1, 2011. (Ex. T-11, p. 39, lines 5-25; Ex. T-12, p. 41, line 5 through p. 42, line 17; Ex. T-13, p. 45 lines 9-12; Ex. U-9, p. 28, lines 16 -21; Trial Tr. Vol. 1, p. 209, line 10 through p. 212, line 3; Trial Tr. Vol. 2, p. 409 line 8 through p. 411 line 21).

93) Mr. Monaco did not meet Dr. Schneider's or West Park Hospitals' criteria for discharge as of 10:00 a.m. on December 1, 2011 when he was sent home by private vehicle driven by Mrs. Monaco. Nurse Fulkerson acknowledged Mr. Monaco was not stable for discharge home, however she further acknowledged that the record does not reflect that she discussed Mr. Morrell's orders with her supervisor, the charge nurse. The failure to discuss Mr. Morrell's order with her supervisor was a violation of hospital discharge protocol. (Ex. 16, p. 6; Exs. C-11, C-13, C-51, C-52; Ex. L-4; Ex. P-14, p. 50, line 7 through p. 52 line 8; Ex. P-15, p. 54, lines 17-23; Ex. T-12, p. 43, lines 19-24).

94) Because of the lack of knowledge of Mr. Monaco's decline, Dr. Schneider did not know to cancel the discharge orders on Mr. Monaco. Continued administration of narcotic medications, in addition to a fentanyl patch, contributed to obtundation and lethargy. (Trial Tr. Vol. 1, p. 69, lines 9-25; Trial Tr. Vol. 1, p. 209, line 10 through p. 214, line 14; Trial Tr. Vol. 2, p. 409 line 8 through p. 411 line 15; Ex. T-11, p. 39, lines 5-25; Ex. T-12, p. 41, line 5 through p. 42, line 17; Ex. T-13, p. 45 lines 9-12; Ex. U-9, p. 28, lines 16-21).

95) Upon arriving back in Billings, Kathy Monaco filled prescriptions for Percocet, Valium, Dilaudid, Keflex, and additional fentanyl patches written by Harley Morrell. Mr. Monaco remained in a sedated state at home. (Ex. T-12, p. 44 lines 4-20; Ex. T-13, p. 45 lines 9-12;

Ex. U-9, p. 28, lines 16 -21).

96) Nurse Fulkerson testified that she had discussed the potential dangers of narcotics upon discharge of Mr. Monaco as well as the potential signs of medical deterioration and instructions to call medical personnel if there were problems with Kathy Monaco upon Russell Monaco's discharge. (Ex. P-12, p. 39, lines 10–23).

97) The pharmacist also discussed with Kathy Monaco the dangers of the multiple narcotics taken simultaneously when she obtained these medications at Billings Pharmacy. (Ex. FF-28).

98) Nonetheless, Kathy Monaco continued to administer oral narcotics outside of the instructions for the use of these medications as directed by Dr. Schneider in their November 30, 2011 bedside meeting. (Trial Tr. Vol. 1, p. 177, line 2 through p. 178, line 7; Trial Tr. Vol. 1, p. 238, lines 10-15; Ex. 19, pp. 1-9; Ex. P-17, p. 61, lines 5-25; Ex. T-25, p. 94, lines 4-6; Ex. Z).

99) Based upon the pill count conducted by the coroner, there were six Percocet, one Dilaudid and three Valium missing from the prescriptions that were filled around 3 p.m. on December 1, 2011. (Ex. Z-54).

100) Kathy Monaco testified she last saw Russell Monaco alive at approximately 9:30 p.m. on December 1, 2011. She testified she found Mr. Monaco unresponsive and apparently deceased on the morning of December 2, 2011. (Ex. T-13, p. 45, lines 10-22).

101) Dr. Schneider has reviewed Russell Monaco's postmortem toxicology report and agrees with Dr. Thomas Bennett, the forensic pathologist who did the autopsy on Russell Monaco. Dr. Bennett testified that mixed drug overdose was the etiology of Mr. Monaco's death. Dr. Bennett testified that the use of fentanyl alone did not cause Mr. Monaco's death. Dr. Schneider agrees with that testimony as well. (Trial Tr. Vol. 1, p. 244, line 4 through p. 245, line 11; Ex. Z-16, p. 58, lines 19-21; Ex. Z-17 p. 62, lines 7-17).

102) Dr. Schneider responded to a request for medical records and discharge medications from the Wyoming Board of Medicine. That response reflected that Dr. Schneider had 1900 surgical cases from January 2009 to January 2012, and 3500 patient encounters during the same period. Dr. Schneider's records indicate that only 19 transdermal fentanyl prescriptions were written by him within 14 days following surgery on this patient population. The records further reflect that only four patients received fentanyl within a 48 hour period postoperatively and each of these had received fentanyl preoperatively. (Ex. I-1, I-2; Ex. L-66; Ex. L-124 through L-164).

103) This total number of prescriptions of fentanyl written by Dr. Schneider demonstrates that the use of fentanyl medication in his surgical practice was not common. The percentage of use based upon surgical and medical encounters is 19/3500 or 0.56% of patients. (Ex. L-124 through L-164).

15

104) Harley Morrell independently prescribed fentanyl for six patients from January 2009 to January 2012 within 14 days following surgery. The number of his fentanyl prescriptions as a percentage of encounters was 0.17%. (Ex. L-165).

105) Dr. Kulig testified as to protocols and methods within hospitals that regulate medications on the hospital formulary. Dr. Kulig's testimony confirmed that hospital pharmacy boards, if they choose, have the ability to restrict the use of medications not deemed appropriate or safe during hospitalizations. West Park Hospital never restricted the use of fentanyl patch medication on inpatient and postoperative case management. West Park Hospital, presumably knowing of the black box warning concerning the use of fentanyl, did not consider Dr. Schneider's or Mr. Morrell's use of this medication alone, in the in-patient setting of Mr. Monaco's case, a concern. (Ex. DD-11 p. 39, line 22 through p. 40, line 10; Ex. DD-12 p. 41, line 20 through p. 43, line 2; Trial Tr. Vol. 2, p. 404, line 18 through p. 408, line 4).

106) Dr. Davis Swan, M.D, a Board certified cardiothoracic anesthesiologist with over 30 years' experience, testified that it is unclear what the fentanyl black box warning refers to with respect to being contraindicated during the post-operative period as it is undefined. Dr. Kulig, Dr. Schneider, and Dr. Schwarz, all testified that there is no definition of the term "postoperative period" in the black box warning. Dr. Swan testified however that the medical postoperative period is 24 hours following general anesthesia. Dr. Swan testified that after 24 hours, transdermal fentanyl applications would not interact with anesthetics from Mr. Monaco's operation as the anesthetics would be out of his system. (Trial Tr. Vol. 1, p. 73, lines 4-21; Trial Tr. Vol. 1, p. 166, line 7-21; Trial Tr. Vol. 1, p. 168, line 6-14; Trial Tr. Vol. 2, p. 295, line 22 through p. 296, line 14; Trial Tr. Vol. 2, p. 404, line 18 through p. 408, line 4; Ex. 15 p. 34, lines 2-13; Ex. DD-5 p. 16, lines 19-21; Ex. 15, p. 26, lines 10-16; Ex. 15 p. 33, line 17 through p. 34, line 13).

107) The fentanyl from the patch reached its peak serum concentration in Mr. Monaco between 12-24 hours after the application of the fentanyl patch, before or at least by 8:00 a.m. on December 1st. (Ex. DD-6, p. 18, lines 3-4; Ex. K-30, lines 22-25; Ex. K-49, line 17-24; Ex. Z-21, p. 78, line 12-22 and p. 80, line 11-22).

108) Russell Monaco began utilizing significant amounts of narcotics after he began medically deteriorating on November 18, 2011. Russell Monaco's pre-hospitalization exposure to significant amount of narcotics after August of 2011 may have caused him to develop a tolerance to narcotic medication and a resistance to the analgesic effects of narcotics used during in patient hospitalization from November 28, 2011 through December 1, 2011. (Exs. B-1 through B-18, D-5 through D-15; Ex. DD-5, p.16, lines 19-21; Ex. p. 79, line 9; Ex. 15, p. 31, lines 6-25; Ex. 19).

109) Russell Monaco responded poorly for analgesia to typical postoperative doses of narcotics classically used for acute, sub-acute and chronic pain during his hospital admission, requiring escalation of narcotic dosage and potency to control pain, the 5th vital sign. (Ex. D-1 through D-4; Ex. C-19 through C-50).

16

110) Mr. Monaco developed respiratory depression when the narcotics given by way of the fentanyl patch were added to other potent parenteral and oral narcotic and benzodiazepine medications. (Trial Tr. Vol. 1, p. 220, lines 1-20; Trial Tr. Vol. 2, p. 301, lines 14-25; Trial Tr. Vol. 2, p. 409, line 8 through p. 410, line 13; Ex. Z-20, p. 76, lines 18 – 21).

111) A postoperative medication protocol had been in place at Northern Rockies Neuro-Spine since 2009. That protocol does not allow for the prescription of both Dilaudid and fentanyl at discharge. Mr. Monaco's use of postoperative oral medications in addition to fentanyl patch, other than a periodic Percoset for breakthrough pain, was against Dr. Schneider's medical protocol, and Mr. Morrell violated this protocol without Dr. Schneider's knowledge. (Ex. D-4; Trial Tr. Vol. 1, p.164 line 9-22; Trial Tr. Vol. 1, p. 166 line 7 through p. 169, line 15; Trial Tr. Vol. 1, p. 172, lines 2-23; Trial Tr. Vol. 1 p. 177, line 1 through p. 178 line 19; Trial Tr. Vol. 1 p. 194, lines 1-9; Trial Tr. Vol. 1, p. 217, lines 1-25; Trial Tr. Vol. 2, p. 403, lines 1-5;  Ex. K-25; Ex. J-3; Ex. L-6, lines 2-6; Ex. L-123; Ex. W-68; Ex. Z-42, p. 1-2; Z-54).

112) Mr. Monaco's insurer, EBMS, denied an insurance reimbursement request for Dr. Schneider's care and treatment of Mr. Monaco, including the surgery which was performed.  Dr. Schneider has never received payment for professional fees associated with the care and management of Mr. Monaco. (Exs. A-20, A-21; Ex. E).

113) Dr. Schneider outsources his professional service billing and collection. The billing company, Rocky Mountain Medical Services, independently and without review by Dr. Schneider, determines the ICDM-9 codes which apply to each of Dr. Schneider's consultations and surgery admissions. Rocky Mountain Medical Services completed HCFA form 1500 and submitted this form to EBMS following Mr. Monaco's surgery. It did not code the ICDM9 code for cauda equina syndrome correctly. (Ex. H; Trial Tr. Vol. 2, p. 389, line 1 through p. 392, line 8; Trial Tr. Vol. 2, p. 400, lines 8-21).

114) Dr. Schneider provides procedural CPT codes for his surgery to the billing company, not ICDM9 codes. (Ex. H; Trial Tr. Vol. 2, p. 399, lines 14-23).

115) Regardless, pursuant to the policy, Dr. Schneider would not have been paid as an out of network provider unless Mr. Monaco had a condition which was defined as a life or death emergency. (Trial Tr. Vol. 2, p. 252, line 9 through p. 254, line 17; Trial Tr. Vol. 2, p. 400, lines 8-21;  Exs. E-4, E-5).

116) Despite accurate ICDM9 coding, West Park Hospital's claim for reimbursement was also denied by the insurance company, confirming the assertion that Dr. Schneider's admission and services would never have gotten reimbursed as an out of network provider. (Exs. C-53 through C-67; Exs. E-4, E-5; Trial Tr. Vol. 2, p. 400, lines 8-21; Trial Tr. Vol. 2, p. 252, line 9; p. 254, line 17).

117) Dr. Schneider did not bill Mr. Monaco's estate for his services.  West Park Hospital sent a copy of Mr. Monaco's hospital bill to Dr. Schneider's office manager, however Dr. Schneider never offered to pay this bill, and neither Dr. Schneider nor his office manager

ever paid the West Park hospital bill.  They also never reimbursed the Monaco's estate for the West Park Hospital bill.  (Exs. C-53 through C-67; Trial Tr. Vol. 2, p. 392, lines 19-25; Trial Tr. Vol. 2, p. 393, line 12 through p. 394, line 2).

## B.  CONCLUSIONS OF LAW

### Counts I through VIII

1.  The Board of Medicine failed to prove by clearing and convincing evidence that Respondent violated Wyo. Stat. Ann § 33-26-4-2(a)(xviii) through the willful and consistent utilization of medical services or treatments which were inappropriate or unnecessary and/or (xxii) by practicing medicine below the applicable standard of care.

2.  Although Respondent operated on Russell Monaco without speaking to one of his primary care physicians, no evidence was presented indicating that it is below the standard of care for a specialist to operate on a patient before speaking to one of his primary care physicians. Additionally, no evidence was presented indicating that the operation on Mr. Monaco was inappropriate or unnecessary.  Dr. Schneider adequately explained why he didn't obtain additional imaging, and Petitioner's experts acknowledged that the surgery that was performed was necessary and appeared to resolve Mr. Monaco's neurological decline.

3.  Respondent utilizes fentanyl infrequently in his practice, and there has been no evidence presented indicating that the use of fentanyl in other situations has been inappropriate.  The use of a fentanyl patch in Mr. Monaco's situation came after he experienced the worst pain of his life and as treatment for subacute/chronic pain.  The black box warning does not set a standard of care, and it does not define the post-surgical period.  The use of fentanyl came after the narcotics from the surgery were gone from Mr. Monaco's system and other narcotics failed to control his pain.  It was used in a controlled setting and after Russell and

18

Kathy Monaco were made aware of the risks of respiratory suppression.  The Board of Medicine failed to prove by clear and convincing evidence that Dr. Schneider was aware of the narcotics prescribed and given to Mr. Monaco upon discharge on December 1, 2011 or of Mr. Monaco's greatly reduced oxygen saturation level. The appropriate treatment for oxygen desaturation while the patient was obtunded and lethargic was not oxygen supplementation at home. The appropriate treatment would have been the complete removal of all narcotics, a CAT scan of the brain to rule out acute cerebral bleed, and further pulmonary and medical evaluation for multiple etiologies of obtundation and lethargy.  (Trial Tr. Vol. 1, p. 209, line 10 through p. 214, line 14; Trial Tr. Vol. 1, p. 218, line 1 through p. 221).

### Counts IX through XIV

4.  The Board of Medicine failed to prove by clear and convincing evidence that Respondent violated Wyo. Stat. Ann. §33-26-402(a)(xxvii)(B) by failing to conform to the applicable standard of care.  No witness testified that Dr. Schneider's decision to operate on Russell Monaco without talking to his primary care physicians fell below the standard of care under the circumstances of this case or that the operation that was performed was unnecessary or negligently performed.  The only testimony from any witness regarding a violation of a standard of care came from Dr. Schwarz and related to the failure to obtain additional imaging on the morning of November 28, 2011.  The substantial evidence indicates that Dr. Schneider's decision to operate without further costly and unnecessary imaging was reasonable. (Exs. A-2, A-3, A-6, A-7, B-12, B-13).

5.  Dr. Kulig's and Dr. Schwarz' concerns related to the use of fentanyl and other narcotics did not go to the standard of care.  Petitioner's experts did not and could not testify that Dr. Schneider's practice with respect to the use of fentanyl patches fell below the standard of

care. While the combination of drugs given to and utilized by Mr. Monaco on December 1, 2011 caused fatal respiratory suppression, the Board of Medicine did not prove by clear and convincing evidence that Dr. Schneider was aware of the prescriptions for additional narcotics beyond the fentanyl patch upon discharge home or of Mr. Morrell's going outside of the office protocol in that regard. Additionally, the substantial evidence in the case supports Dr. Schneider's testimony that he was never made aware of Mr. Monaco's respiratory suppression off of supplemental oxygen after 7:50 a.m. on the morning of December 1, 2011.

6. Black box warnings do not establish a standard of care. Regardless, Dr. Schneider did not violate the black box warning for the use of fentanyl patches with respect to Mr. Monaco as fentanyl was not used in the postoperative period for medical restrictions relating to anesthetic medication and fentanyl was not utilized to manage Mr. Monaco's acute pain. (Ex. G-1; Ex. 15, p. 33, lines 17-23; Trial Tr. Vol. 1, p. 164 lines 21-25; Trial Tr. Vol. 1, p. 166, lines 7-21; Trial Tr. Vol. 1, p. 168, lines 6-14; Trial Tr. Vol. 2, p. 295, line 22 through p. 296, line 14; Trial Tr. Vol. 2, p. 305, line 24 through p. 306. Line 5).

## Counts XVII through XIX

7. The Board of Medicine failed to prove by clear and convincing evidence that Respondent violated §33-26-402(a)(xxvii)(C) by willful or careless disregard for the health, welfare of safety of a patient. While the combination of drugs given to and utilized by Mr. Monaco on December 1, 2011 caused fatal respiratory suppression, the Board of Medicine did not prove by clear and convincing evidence that Dr. Schneider was aware of the prescriptions for additional narcotics beyond the fentanyl patch upon discharge home or of Mr. Morrell's going outside of the office protocol in that regard. Additionally, the substantial evidence in

the case supports Dr. Schneider's testimony that he was never made aware of Mr. Monaco's respiratory suppression off of supplemental oxygen after 7:50 a.m. on the morning of December 1, 2011.

## Counts XX through XXIV

8. The Board of Medicine failed to prove by clear and convincing evidence that Respondent violated Wyo. Stat. Ann. §33-26-402(a)(xxvii)(D) by engaging in conduct or practice that is harmful or dangerous to the health of a patient or the public as set forth above.

## Count XXV

9. The Board of Medicine failed to prove by clear and convincing evidence that Respondent violated Wyo. Stat. Ann. §33-26-402(a)(xxvii)(E) by engaging in conduct intended to or likely to deceive, defraud or harm the public.

10. The Board of Medicine did not prove by clear and convincing evidence that Dr. Schneider had a prearranged plan to operate on Russell Monaco under the guise of emergency surgery so that Mr. Monaco's insurance carrier would provide medical insurance coverage.

## Count XXVI

11. The Board of Medicine failed to prove by clear and convincing evidence that Respondent violated Wyo. Stat. Ann. §33-26-402(a)(xxvii)(F) by using false, fraudulent or deceptive statements in a document connected with the practice of medicine, including intentional falsification of a patient or health care facility record.

12. The Wyoming Board of Medicine has failed to prove by clear and convincing evidence that Dr. Schneider falsely asserted in medical records or documents any information provided to the Board or EBMS related to Russell Monaco's presentation under emergency conditions to

21

West Park Hospital or that any type of prearranged plan existed concerning Mr. Monaco's presentation.

13. The Board of Medicine did not prove by clear and convincing evidence that Dr, Schneider participated in a scheme to inappropriately identify Mr. Monaco's acute cauda equina syndrome as urgent or emergent. Based upon the definition and recommendations by the federal government HHS, cauda equina syndrome is a surgical emergency. Mr. Monaco met all criteria for cauda equina syndrome. (Ex. A-2, A-3, B-1, B-4, B-5, B-10, B-12 through B-18;  Ex. 14, p. 13, line 8; Ex. 14, p. 20, line 7; Ex. 14-K, pp. 4-26; Ex. T-6, p. 17, lines 22-25; Ex. T-28, p. 107, lines 9–16; Ex. T-28, p. 108, lines 3–18; Ex. T-44 through T-46).

## Count XXVII

14. The Wyoming Board of Medicine failed to prove by clear and convincing evidence that Respondent violated Wyo. Stat. Ann. §33-26-402(a)(xxvii)(T) by using or engaging in fraud or deceit to obtain third party reimbursement.

15. The Wyoming Board of Medicine has failed to present any information indicating that Dr. Schneider was aware of any plan to collect insurance benefits through fraud or deceit or that Dr. Schneider participated in any attempt to deceive Mr. Monaco's insurance company. In fact, inaccurate coding by the billing service retained by Dr. Schneider's made it less likely that benefits would be paid.

## Count XXVIII

16. The Wyoming Board of Medicine failed to prove by clear and convincing evidence that Respondent violated Wyo Stat. Ann. §33-26-402(a)(xv) by failing to supervise a nonphysician to whom he has delegated medical responsibilities.  The evidence supports that Mr. Morrell had appropriate training and experience to handle the position of physician's

22

assistant which he held with Dr. Schneider.  No evidence has been presented indicating that Harley Morrell previous to December 1, 2011 had given Dr. Schneider any reason to believe that he was unaware of the issues surrounding respiratory suppression and the use of narcotics, including fentanyl patches. The evidence presented at the hearing shows that prior to November 28, 2011, Dr. Schneider had a protocol in place that would have prevented the death of Mr. Monaco and that Mr. Morrell was aware of that protocol.  The clear and convincing evidence also supports the fact that Mr. Morrell knew of the dangers of respiratory suppression and the use of narcotics.  The substantial evidence supports the fact that Mr. Morrell was present on November 30, 2011 in Mr. Monaco's room when Dr. Schneider reviewed that protocol with Mr. Monaco.  Finally, the Board of Medicine has failed to prove by clear and convincing evidence that Dr. Schneider was aware of the precipitous drop in oxygen saturation level following his rounds at West Park Hospital on December 1, 2011 or that he had reason to know that Mr. Morrell and West Park Hospital would send Mr. Monaco home with his oxygen saturation levels below 90%.

## **Determination**

17. The Wyoming Board of Medicine has found no violations by Dr. Schneider of the Medical Practice Act or its regulations based upon Dr. Schneider's care and treatment of Russell Monaco.

18. The restriction of Dr. Schneider prescribing fentanyl is hereby lifted.

DATED this 17th day of January, 2014.

By _____

Stephen H. Kline, #5-1761
Kline Law Office, P.C.
P.O. Box 1938
Cheyenne, WY 82003-1938
(307) 778-7056
(307) 635-8106

Stephenson D. Emery, Esq. # 5-2321
Williams, Porter, Day & Neville, P.C.
P.O. Box 10700
Casper, WY 82602

Attorneys for Respondent

24

## CERTIFICATE OF SERVICE

I certify the foregoing Respondent's Proposed Findings of Facts and Conclusions of Law was served upon all parties to this action on this 17th day of January, 2014, and that copies were served as follows:

Deborah Baumer, Hearing Examiner     [   ] U.S. MAIL
State of Wyoming, OAH     [   ] FEDEX
2020 Carey Ave., Fifth Floor     [   ] FAX
Cheyenne, WY 82002     [ X ] HAND DELIVERED
    [ X ] EMAIL

Bill G. Hibbler
Special Assistant Attorney General     [   ] U.S. MAIL
P.O. Box 2143     [   ] FEDEX
Cheyenne, WY 82003-2143     [   ] FAX
    [ X ] HAND DELIVERED
    [   ] EMAIL

Kevin D. Bohnenblust     [   ] U.S. MAIL
Executive Director     [   ] FEDEX
Wyoming Board of Medicine     [   ] FAX
130 Hobbs Ave., Suite A     [ X ] HAND DELIVERED
Cheyenne, WY 82002     [   ] EMAIL


_____
Gina Ferro, Paralegal
Kline Law Office, P.C.