EXHIBIT R

Womack testimony.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____

In Re:                                        Case No. 14-61357

JOHN HENRY SCHNEIDER,

          Debtor.

_____

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Billings, Montana
April 26, 2016

Transcript Services:

Jonny B. Nordhagen
Nordhagen Court Reporting
1734 Harrison Avenue
Butte, Montana
(406) 494-2083
qa@mtqa.net

Proceedings recorded by electronic recording;
transcript produced by reporting service.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 2 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 3 of 239

2

```
1                    I N D E X

2    WITNESSES:                                    PAGE:

3    JOSEPH WOMACK:

4        Direct Examination by Mr. Gardner    .  .  .    20

5        Cross-Examination by Mr. Cossitt     .  .  .    95

6        Cross-Examination by Mr. Parker      .  .  .   113

7        Cross-Examination by Mr. Patten      .  .  .   127

8        Cross-Examination by Mr. James       .  .  .   145

9        Cross-Examination by Mr. York        .  .  .   165

10       Recross-Examination by Mr. Parker    .  .  .   168

11       Recross-Examination by Mr. Patten    .  .  .   168

12   MICHAEL KAKUK:

13       Direct Examination by Mr. York       .  .  .   116

14       Cross-Examination by Mr. Soueidi     .  .  .   120

15       Cross-Examination by Mr. Patten      .  .  .   123

16       Cross-Examination by Mr. Cossitt     .  .  .   123

17       Redirect Examination by Mr. York     .  .  .   125

18   MICHELLE SCHNEIDER:

19       Direct Examination by Mr. Parker     .  .  .   170

20   JOHN HENRY SCHNEIDER:

21       Direct Examination by Mr. Cossitt    .  .  .   174

22       Cross-Examination by Mr. Gardner     .  .  .   208

23       Cross-Examination by Mr. Parker      .  .  .   211

24       Cross-Examination by Mr. Patten      .  .  .   211

25       Cross-Examination by Mr. James       .  .  .   213
```

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 3 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 4 of 239

3

1                       I N D E X (continued)

2    WITNESSES:                                              PAGE:

3    MALLORY MONACO:

4        Direct Examination by Mr. Patten      .   .   .    220

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    SCHNEIDER BANKRUPTCY

2                    BILLINGS, MONTANA

3                         - - -

4            BE IT REMEMBERED THAT this matter came on for

5    hearing on April 26, 2016, in the United States Bankruptcy

6    Court, District of Montana, The Hon. Ralph B. Kirscher,

7    presiding:

8

9    The following proceedings were had:

10

11           THE COURT:  I believe that gets us to the

12   remaining matter, In Re:  Schneider, 14-61357.

13           This is on several matters:  Trustee's motion to

14   approve compromises and settlements and the objections

15   thereto, and also I believe that there is a pending request

16   for judicial notice and an objection thereto as well.

17           Counsel, please correct me if I'm in error about

18   that or if, in fact, there are other matters as well that

19   just don't show up on my calendar.

20           I will also have all counsel state their

21   appearances for the record.

22           MR. GARDNER:  Trent Gardner for the trustee.

23           And I believe the Court is correct.  There's two

24   motions to approve settlements, there is an outstanding

25   objection to a request for judicial notice.  I think that's

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 5 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 6 of 239

5

1    an issue that should probably be dealt with as the evidence

2    comes in and if there's issues related to it.

3            THE COURT:  Okay.

4            TRUSTEE WOMACK:  Your Honor, Joe Womack, trustee,

5    and also acting as counsel in AP-20, the motion to approve

6    compromise and settle for purpose -- of the discharge.

7            For purposes of the hearing, since I will be

8    testifying, we're requesting that Mr. Gardner act as

9    counsel in asking me questions during that testimony.

10           THE COURT:  Okay.

11           MR. COSSITT:  All right.  Jim Cossitt, Kalispell,

12   Montana, appearing on behalf of Dr. John Schneider, the

13   debtor.

14           With respect to the Court's inquiry regarding

15   judicial notice, the Court should note that at Docket 288,

16   we have filed an objection to the request for judicial

17   notice by Meridian Surgical Partners along with a request

18   to be heard under Rule 201.

19           Our view diverges from the trustee.  We think

20   that it would be more appropriate and germane for the Court

21   to address some of those issues at the outset of today's

22   hearings so as to -- for two reasons:  1, to clarify what

23   the rules of the game are with respect to the Court's

24   attitude towards judicial notice; and No. 2, to perhaps

25   expedite the introduction of evidence by clarifying this at

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 6 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 7 of 239

6

1    the front end.  Thank you.

2             MR. YORK:  Aaron York for the Office of the US

3    Trustee.

4             THE COURT:  Mr. Parker.

5             MR. PARKER:  Mark Parker for Schneider Limited

6    Partnership, Schneider Management, LLC, Michelle R.

7    Schneider personally; and as trustee of the Brandon

8    Schneider Benefit Trust, the Shannon Schneider Benefit

9    Trust, the Caitlin Schneider Benefit Trust, and the

10   Michelle Schneider Revocable Trust.

11            THE COURT:  Okay.

12            MR. JAMES:  Doug James for Meridian Surgical

13   Partners, LLC, and Meridian Surgical Partners Montana, LLC.

14            THE COURT:  Okay.

15            MR. SOUEIDI:  Joe Soueidi for Meridian Surgical

16   Partners, LLC, and Meridian Surgical Partners Montana, LLC.

17            MR. PATTEN:  Andy Patten on behalf of the medical

18   malpractice claimants.

19            MR. MOYERS:  And I'm Jon Moyers.  I represent the

20   medical malpractice claimants.

21            THE COURT:  Your last name, I didn't catch it.

22            MR. MOYERS:  Moyers.

23            THE COURT:  Okay, okay.  I believe it's Mr. James

24   that has the request for judicial notice.  Why don't we

25   take that up.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 7 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 8 of 239

7

1          MR. JAMES:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. JAMES:  Doug James on behalf of Meridian.

4          We filed a request for judicial notice asking

5     this court to take judicial notice of a number of documents

6     to the extent permitted by the Federal Rules of Evidence.

7     The Court entered an order acknowledging that it would take

8     judicial notice of those matters to the extent permitted by

9     the Federal Rules of Evidence.

10          The trustee and Dr. Schneider subsequently

11     objected stating that the Court should not take judicial

12     notice of these documents beyond the extent permitted by

13     the Federal Rules of Evidence.  So I'm not sure what the

14     objection is here.  It seems nonsubstantive.

15          We would argue that the exhibits that we asked

16     the Court to take judicial notice of, that included

17     Dr. Schneider's bankruptcy schedules and amended bankruptcy

18     schedules.  But those are also admissions against interest

19     of a party and they are sworn testimony, so substantively,

20     those two documents differ than the others.

21          We have simply asked the Court to take judicial

22     notice that those documents were filed, and we have not

23     asked the Court to take judicial notice of the facts

24     contained therein or after their veracity.  Although, as we

25     have noted with the brief that we filed yesterday, the

1    trustee has testified in support of many of those facts and

2    confirmed them, and so we're prepared to put that evidence

3    on today, but that is not a matter of judicial notice.

4            So that's all I have, Your Honor.

5            THE COURT:  Okay.  Thank you, Mr. James.

6            Mr. Cossitt.

7            MR. COSSITT:  Thank you, Your Honor.  The record

8    before the Court does reflect that there are a couple of

9    requests for judicial notice, but we've only objected to

10   one with our request to be heard.

11           The basic thrust of the judicial notice doctrine

12   and the basic thrust of my client's concern -- excuse me

13   for a moment.  I left my notes over at the counsel table.

14           THE COURT:  You may pick them up.

15           MR. COSSITT:  The basic thrust of my client's

16   concern with respect to using this process to short-circuit

17   the traditional introduction of evidence is that the

18   Court's orders approving judicial notice indicate that it,

19   that the request was granted to the extent permitted by the

20   federal rules.

21           The federal rules and the cases construing the

22   rules are, frankly, a hodgepodge.  I spent a considerable

23   amount of time going through Judge Russell's Bankruptcy

24   Evidence Manual with respect to the various types of

25   documents which the proponents of judicial notice have put

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 9 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 10 of 239

9

1  before the Court in these requests.  And frankly, I haven't

2  briefed each and every one of the types of documents; I

3  focused on what I thought was the most -- the one that was

4  most troublesome and prejudicial.

5        But the -- what, what we seek to clarify here is

6  the Court's understanding.  We seek to clarify at the

7  outset so that the lawyers involved in these proceedings

8  understand just how much weight the Court is going to give

9  the documents that -- for which it granted judicial notice.

10        And overall, I'm requesting the Court reconsider

11  its order granting judicial notice, and in support of this

12  request cite to the Court Russell's Evidence Manual

13  Volume II, Paragraph -- or Section 2.01:2:  Facts subject

14  to judicial notice.

15        And I'll briefly read some of it into the record

16  with the Court's permission.  Rule 201 governs only

17  judicial notice of adjudicative facts.  Adjudicative facts

18  usually answer the questions of who did what, where, when,

19  how, why, and with what motive or intent; adjudicative

20  facts are roughly the kind of facts that go to a jury in a

21  jury case.

22        Then I'm going to skip some material:

23        Requests for judicial notice of an adjudicative

24  fact should rarely arise at trial in civil litigation.

25  Where a fact is generally known or capable of accurate and

1    ready determination, the fact is the proper subject of

2    either a stipulation or a request for admission pursuant to

3    Rule 7036 or Federal Rule 36.

4             Then Judge Russell goes on to admonish, admonish

5    his readers that:

6             The Advisory Committee notes make clear that

7    extreme caution should be used in the taking of judicial

8    notice of adjudicative facts because of the traditional

9    belief that the taking of evidence subject to established

10   safeguards is the best way to resolve controversies

11   involving disputes of fact.

12            And he cites a Fifth Circuit case, Hardy vs.

13   Johns-Manville, stated the proposition as follows (quoted

14   as recorded):

15            "Judicial notice applies to self-evident truths

16   that no reasonable person could question, truisms that

17   approach platitudes or banalities.  The proposition that

18   asbestos causes cancer, because it is inextricably linked

19   to a host of disputed issues; can mesothelioma arise

20   without exposure to asbestos, is the sale of asbestos" -

21   yada-yada-yada, it goes on - "is not at present so

22   self-evident as a proposition to be subject to judicial

23   notice."

24            With Judge Russell's commentary, the basis of

25   our -- forms the basis of our objection.  It's a doctrine

1     that's to be used sparingly.  We believe that it is being

2     attempted to be used in this proceeding to bypass

3     traditional evidentiary safeguards of authentication, best

4     evidence rule, and a lot of those documents are chock-full

5     of hearsay.

6                Consequently, we filed our objection.  I've tried

7     to give the Court some authority as to why it should

8     reconsider its opinion -- or its order, particularly with

9     respect to the letter from the Commissioner of Securities

10    and Insurance, which is chock-full of hearsay.  And we

11    would request the Court reconsider its orders with --

12    across the board with respect to judicial notice and rely

13    on the traditional methods of introduction of evidence with

14    respect to the appropriate safeguards.

15                THE COURT:  Okay.  Your objection is overruled.

16                Let me tell you -- and you've been practicing

17    before me long enough, Mr. Cossitt, as well as all the

18    other attorneys in this room.  You know, a long time ago,

19    we saw some requests for judicial notice, and I am going to

20    follow the rules of evidence as to what is and isn't

21    admitted.

22                It seemed at that point in time, it is -- the

23    course would be, rather than just a flat denial of

24    everything, a granting of -- to the extent they're allowed

25    by the rule.  These are all bench trials.  I'm going to

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 12 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 13 of 239

12

1    look at them and I'm going to decide, based upon the

2    evidence, what is and isn't permissible.

3           And as it relates to documents that are filed,

4    the traditional things that one takes judicial notice about

5    that are, in fact, unquestionable -- you know, what was the

6    weather on December 26th?  I mean, you can look at it, you

7    know what it was.

8           Or if there's a document that's been filed, I am

9    not going to necessarily consider the truth of the matter

10   asserts therein because I think that is subject to

11   testimony and subject to cross-examination.  So the things

12   that I take judicial notice of is pretty much a filing,

13   it's in the docket.

14          Now, there was a question raised about schedules

15   and amended schedules.  I think that might be a little

16   different; although, at times I've, even from the bench,

17   said, "I'm not going to, I'm not going to take what's in

18   there as truth unless you put on some evidence," because

19   maybe there was a mistake.  So I'm very cautious about.

20          But one way to deal with those - and I think most

21   of the attorneys that have come before me understand that

22   process - that I'm not going to use it if it's not

23   appropriate.  And so that's where I'm at.

24          So the motion stands as granted and -- or the

25   request, but I certainly would entertain testimony on any

1    issue that someone feels is appropriate, and

2    cross-examination.  Now, trial is -- cross-examination is a

3    very important process of our judiciary.

4              MR. COSSITT:  Thank you very allowing us to be

5    heard.

6              THE COURT:  Sure, thank you.

7              Okay.  On to the two motions, one involving

8    basically, what, 15-15; and the other, 15-20.

9              And as I understand it, 15-15 is subject to

10   approval of 15-20 as a term in the settlement in 15-20.  Is

11   that correct?

12             If I don't approve 15-20, 15-15 isn't effective?

13             MR. GARDNER:  Yes, Your Honor.  Trent Gardner for

14   the trustee.

15             There is a settlement agreement before the Court

16   in AP 15 - it's called, being called the "fraudulent

17   transfer action" or the "substantive consolidation action"

18   - and a settlement agreement that was reached at the same

19   time in AP 20, the non-discharge action.  Both settlement

20   agreements have a condition in them that they are

21   contingent on approval of the other settlement.

22             THE COURT:  Okay.

23             MR. GARDNER:  And as I understand it, I don't

24   believe anybody has produced any substantive objection to

25   AP 15, but I think we'll need to walk through both of them.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 14 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 15 of 239

14

1          THE COURT:  Well, the concern I have is, you

2    know, 15-15 gets approved -- say for argument it gets

3    approved.  My feeling is -- here's where -- let me give you

4    a little background.

5          I'm really, I'm really concerned that we've put

6    this thing off for mediation, I get a report in mediation,

7    "All the parties agree, everything's settled," they filed

8    a -- you filed the motions to compromise and settle, and

9    suddenly we've got all kinds of objections.

10          To me, that's not a successful mediation because

11   not all the parties agreed.  And so that's why I'm asking

12   whether 15-15 can stand alone because there's no objection

13   to it.  But it can't under the terms of the 15-20

14   settlement.

15          MR. GARDNER:  We are very concerned about the

16   time and the process and everything, too.  That contingency

17   was not put in and was not something that the trustee -- at

18   the trustee's request.  It was at the defendant's request,

19   and it was something that was put in.

20          We felt that we had very substantial assets that

21   needed to be in the settlement and that it needed to be put

22   before the Court, and these were the terms on which we

23   could agree.

24          THE COURT:  But, then, under the A & C factors,

25   I've got to look at the interest of creditors, and I've got

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 15 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 16 of 239

15

1    all these creditors saying, "What are you doing?  Judge,

2    there's know you can approve this.  They're buying a

3    discharge."

4              MR. GARDNER:  And --

5              THE COURT:  Which the way it's structured right

6    now, I think you could argue that.

7              MR. GARDNER:  There's certainly arguments to be

8    made.

9              From the trustee's perspective, he very much and

10   very deeply considered the interests of the creditors; he

11   talked to the primary creditors' counsel before mediating;

12   he had an understanding that if there were substantial

13   assets on the table, of course no delineation of that, that

14   it was possible that creditors would consent to a

15   settlement of both actions.  He never would have entered

16   into this settlement if he didn't think it was a

17   possibility at the mediation.

18             THE COURT:  But isn't the 450 really part of

19   15-15?

20             MR. GARDNER:  The 450 is Michelle Schneider's

21   interest in the Billings house and the combined homestead.

22             THE COURT:  Which has nothing to do with

23   discharge.

24             MR. GARDNER:  They're, they're assets that -- we

25   do have claims to the Billings house in AP 15.  It's not at

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 16 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 17 of 239

16

1    all clear if we could have got to this portion that we're

2    in -- so the 450 we feel is assets that were contributed

3    from outside sources for the purpose of that discharge.

4        It's, it is a tricky issue and it's not the ideal

5    situation to be coming before this court, but the trustee

6    considered everything.  And there is a lot of assets on the

7    table, there's a lot of potential for waste, and it's a

8    substantial recovery that we felt needed to be brought

9    forward.

10        THE COURT:  But I've got U.S. Trustee telling me

11   they want to proceed, they'll take over the course on

12   15-20.  I've got obviously a number of creditors here that

13   seem more than happy to pursue -- take the risk and not

14   worry about what's recovered in the bankruptcy and, if no

15   discharge is entered, to proceed against Defendant/Debtor

16   otherwise.  Whether they get anything, who knows what, what

17   they will get?

18        You know, you're the first one up, so you're

19   getting some of these questions, but I guess I'm just, I'm

20   concerned.  Obviously, I'll hear the evidence and I'll see

21   if it meets the A & C factors.  Obviously, compromise under

22   9019 is not a trial on the merits, it's not a mini-trial,

23   anything of that nature.  You've got to come forward with

24   you're a & C factors and substantiate them.

25        But I have some real reservations, and maybe that

 1    will assist in you presenting your case and everyone else

 2    presenting their case as to where I'm -- my concerns in

 3    this matter.  Because the way it's structured right now, I

 4    just think that there's the argument that it's merely

 5    buying one's discharge, and that's a horrible precedent

 6    that I'm going to be very cautious about.

 7              Now, if the 450 was in 15-15, that's another

 8    question, but it's not, and it ties to 15-20.  And I --

 9    I'll let the evidence, I guess, tell me what may be the

10    more appropriate manner in handling this.

11              MR. GARDNER:  It is a difficult situation because

12    they are tied together.  And the reason the trustee's here

13    is he believes firmly that this result will provide a

14    better net benefit to creditors than litigating these

15    issues for years.

16              THE COURT:  But how can, how can I understand it

17    or appreciate that when I've got a roomful of creditors

18    that are saying "no"?

19              MR. GARDNER:  I fully understand that, Your

20    Honor.  We reached a settlement.  We thought --

21              THE COURT:  Were the creditors involved in the

22    settlement?

23              MR. GARDNER:  They were not involved in the

24    mediation.  Like I say, they were --

25              THE COURT:  Why not?

1    MR. GARDNER: Well, because they weren't parties

2    to the adversary proceedings. They weren't parties to the

3    proceedings, so I -- the trustee conferred with them before

4    the mediation. We conferred with the personal injury

5    plaintiff's counsel who make up the bulk of the claims in

6    this case, those people who have those med-mal claims, and

7    we talked to them immediately after the mediation.

8         We believed there, there was a chance they would

9    agree to it, and they decided they would rather have the

10   opportunity to have Dr. Schneider not get his discharge and

11   pursue him. This wasn't something the trustee did without

12   consulting and conferring and taking into account. At the

13   end of the day -- (inaudible.)

14        THE COURT: Well, he had to because he knew he

15   had to satisfy the fourth factor of A & C.

16        MR. GARDNER: Well, it wasn't just a matter of

17   trying to satisfy the fourth factor of A & C; it was a

18   matter of taking everything into consideration. Yes, you

19   have to follow the factors, but it's what Mr. Womack does

20   in -- you know, so regardless of the factors, he was taking

21   into account their feelings and their views. And at the

22   end of the day, they had to make a decision, and they

23   decided they would object to the settlement of the

24   discharge action.

25        THE COURT: Yeah. Well, I can certainly

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 19 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 20 of 239

19

 1   understand the efforts to try to mediate with the parties

 2   that were in the litigation to resolve 15-15, which is --

 3   has been referred to district court under a Stern issue.

 4   And so you've got a jury trial looming there that is

 5   proceeding.

 6           MR. GARDNER:  And a trial in this court on the

 7   substantive consolidation issue.

 8           THE COURT:  True.  And also, you've got this

 9   adversary case set for trial in May, even though it's --

10   I've held it in abeyance, but we've got a month yet to get

11   ready for trial.  We've got it scheduled for a three-day

12   trial on discharge.  So, you know, I don't see any reason

13   we can't use that date.

14           MR. GARDNER:  And I won't weigh in on that date

15   because I'm not counsel in that.

16           THE COURT:  Okay, okay.  Well, I can see

17   attorneys kind of looking at each other like, Oh, no,

18   but --

19           MR. GARDNER:  There's also the separate Meridian

20   arbitration set for June, which --

21           THE COURT:  Yeah.

22           MR. GARDNER:  -- who appears in that case is

23   dependent upon the AP 15 settlement.

24           THE COURT:  Okay.  Well, I've probably taken up

25   enough dialogue.  We should probably go forward with the

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 20 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 21 of 239

20

 1    evidence as to the motions and the objections.

 2              So would you like to call your first witness?

 3              MR. GARDNER:  Yes.  I call Joseph Womack, the

 4    Chapter 7 trustee.

 5              THE COURT:  Okay.  Mr. Womack, if you would come

 6    to the podium to be sworn, please.

 7                   JOSEPH WOMACK, TRUSTEE, SWORN

 8              THE COURT:  Mr. Womack, I think -- (inaudible.)

 9    I don't see another one, so you may proceed.

10              MR. GARDNER:  Thank you, Your Honor.

11                        DIRECT EXAMINATION

12    BY MR. GARDNER:

13    Q.  Please state your name.

14    A.  Joe Womack.

15    Q.  And how are you employed?

16    A.  I'm an attorney with Waller & Womack, PC, and I serve

17    as a Chapter 7 bankruptcy panel trustee for the Bankruptcy

18    Court for the District of Montana.

19    Q.  And how long have you been a Chapter 7 panel trustee?

20    A.  About 20 years.

21    Q.  And how many Chapter 7 cases have you been appointed as

22    trustee in?

23    A.  I don't know the exact number, but in excess of 4,000.

24    Q.  Besides being a Chapter 7 trustee, do you do -- engage

25    in other -- practice law in other areas?

 1   A.  Yes.  I represent other trustees, creditors, debtors.

 2   I also have a small private practice, a general civil

 3   practice that I engage in the practice of law.

 4   Q.  And what is your involvement in the Dr. Schneider

 5   bankruptcy?

 6   A.  I was appointed as the Chapter 7 panel trustee for the

 7   case when it was filed in December of 2014.

 8   Q.  And give me a brief overview of, from your involvement,

 9   kind of what is -- what you've done in this case.

10   A.  I have gone -- well, first of all, I reviewed

11   schedules, statement of affairs that were filed and began

12   assessing assets/liabilities that were listed in those

13   schedules, began to try to get more information about the

14   claims that were listed by Dr. Schneider and the assets

15   listed, and began trying to get information regarding his

16   financial situation before the bankruptcy was filed, and

17   determined whether or not there were assets that could be

18   recovered for the benefit of creditors.

19           MR. COSSITT:  Your Honor, I'm so sorry to --

20           THE COURT:  Mr. Cossitt.

21           MR. COSSITT:  I'm so sorry to interrupt Counsel's

22   direct examination.

23           I neglected to make a motion to exclude

24   witnesses.  I believe there's a number of people in the

25   courtroom that are nonparties that are contemplated to be

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 22 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 23 of 239

22

1    witnesses.  I intended to make this motion at the outset,

2    and I apologize for interrupting Counsel's direct

3    testimony.

4             THE COURT:  Yeah.  With the motion, anyone that's

5    a witness that is nonparty, I do exclude you from the

6    courtroom.

7             Is there only one?

8             MR. PATTEN:  No.  Mallory --

9             THE COURT:  Why don't you take a moment and sort

10    through who needs to go and who needs to stay.

11             UNIDENTIFIED SPEAKER:  Okay -- (inaudible.)

12             THE COURT:  I appreciate, Mr. Cossitt, you making

13    that request.

14             MR. COSSITT:  And I apologize again, Your Honor.

15             THE COURT:  And I think you can proceed.  You may

16    proceed.

17             MR. GARDNER:  Thank you, Your Honor.

18    Q.  (By Mr. Gardner)  Did you also hold 341 meetings?

19    A.  Yes, a number of them.

20    Q.  And did you seek documents besides from the debtor,

21    from other sources?

22    A.  Yes.  If, if you're looking at an entire overview of

23    the case, we subpoenaed documents from a number of

24    different sources pursuant to 2004 examination, requested a

25    lot of documents from the debtor and through his counsel as

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 23 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 24 of 239

23

1  well and have done that throughout the proceedings in this

2  bankruptcy.

3  Q.  And some of those third-party sources, did they include

4  law firms?

5  A.  Yes.  Dr. Schneider was represented by a law firm in

6  Wyoming, the Greear - Clark firm, I believe it is, where he

7  was engaged in asset protection and estate planning work.

8  We requested documents from them.

9      We requested documents, subpoena documents from his

10  accountant's two primary firms.  One was Western Sage down

11  in Wyoming, and another was an accountant by the name of

12  Pat Boyle in Montana.

13      We got 2004 subpoenas and obtained bank records from a

14  number of different sources:  U.S. Bank, Stockman Bank,

15  any, any bank that we thought that Dr. Schneider had had

16  any involvement with, during his, his time prior to the

17  filing of the bankruptcy and immediately afterwards.

18  Q.  And at some point, based on your investigation, did you

19  retain separate counsel to investigate potential avoidance

20  in other actions?

21  A.  I did.  Actually, fairly early on we retained the Goetz

22  law firm and yourself and the associates in the firm to, to

23  file Adversary AP 15-15, which was to avoid various

24  transfers of property, substantially consolidate entities

25  that Dr. Schneider had set up, and try to obtain those

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 24 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 25 of 239

24

 1    assets for the benefit of the estate.

 2    Q.  Was there also another adversary proceeding filed

 3    related to the Molt property?

 4    A.  There was.  Actually, the first adversary proceeding

 5    that was filed was against Kathleen Burrows and with --

 6    related to some property located near Billings and Molt

 7    about 20 - 30 miles away where it appeared that there had

 8    been preferential transfers of property and/or money to

 9    Kathleen Burrows, who is Dr. Schneider's sister, within one

10    year prior to the time of the -- or within a couple of

11    years prior to the time of the filing of the bankruptcy.

12    Q.  And what was the result of that Burrows adversary

13    proceeding?  I believe it was AP No. 8.

14    A.  We ultimately settled that proceeding.  Doc -- or

15    Kathleen Burrows paid $75,000 to the estate in exchange for

16    dismissal.

17        She also provided -- in the course of that adversary

18    proceeding, we obtained testimony from her regarding

19    transactions or dealings with Dr. Schneider prior to the

20    filing of his bankruptcy and shortly after the filing of

21    his bankruptcy.  And she paid those proceeds, and then we

22    dismissed the adversary proceeding.

23    Q.  All right.  Your investigation and handling of the case

24    along with your counsel, I mean, are we talking about

25    gathering and reviewing thousands of documents or tens of

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 25 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 26 of 239

25

1    thousands of documents?

2    A.   It's literally thousands, it could be in the tens of

3    thousands.   It's been a very substantial -- well, I would

4    say it's tens of thousands of documents.   It's, it's been a

5    very large number of documents that we have obtained and

6    reviewed as part of this so far.

7    Q.   Did you also file a non-discharge action against

8    Dr. Schneider?

9    A.   Yes.   This is AP 15-20.   I filed that seeking to deny

10   Dr. Schneider's discharge for violation of various

11   provisions of 11 USC Section 727.

12   Q.   Now, there's also the issue of the Meridian

13   arbitration.   Can you briefly tell me what the Meridian

14   arbitration is?

15   A.   Dr. Schneider listed a claim against Meridian Surgical

16   Partners of Montana and Tennessee, I believe, claiming that

17   they had breached -- or that they were liable for damages

18   to him in excess of $10 million with respect to the

19   building, construction, and operation of an outpatient

20   surgical center in Billings, Montana.

21        That surgery center was built in Montana, here in

22   Billings.   It was never operated.   They were unable to get

23   what is called a "transfer agreement" with the local

24   hospitals.   As a result, they could not conduct surgical or

25   medical procedures in the facility.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 26 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 27 of 239

26

1        And without that transfer agreement, if there was a

2    problem with the patient, they had the -- they needed to

3    have the ability to take him to the emergency room in the

4    hospital.  And if they did not -- if they were not able to

5    do that, if they didn't have a transfer agreement with

6    either the Billings Clinic or St. Vincent's Hospital, they

7    could not, they could not open and treat patients or

8    conduct medical services there.  So that never occurred.

9        There was an arbitration provision in the various

10   contracts that were involved.  For a number of years now,

11   that -- there have been contract disputes and claims made

12   back and forth regarding that entire transaction including

13   Dr. Schneider's claim that he was owed several millions,

14   multiple millions of dollars in lost earnings revenue as a

15   result of Meridian's breach of those agreements.

16   Q.   Now, does Meridian also have, I believe a $3 million

17   claim in this bankruptcy against Dr. Schneider

18   individually?

19   A.   That's correct.  As part of the, as part of the

20   arbitration proceeding, they filed a counterclaim against

21   Dr. Schneider asserting a $3 million claim.  They then

22   filed a proof of claim in the bankruptcy proceeding

23   claiming $3 million in damages caused by Dr. Schneider.

24   Q.   And was Dr. Schneider an investor in Meridian?

25   A.   Not personally, no.  There was no contractual

1    relationship that I could discover between Dr. -- a direct

2    contractual relationship between Dr. Schneider and either

3    of the two Meridian defendants and counter-claimants.

4    Either way, Meridian had no contractual agreement with

5    Dr. Schneider and Dr. Schneider did not with him.

6    Q.  And who was the investor in Meridian?

7    A.  There were a number of doctors from the Cody area,

8    Wyoming, that were investors of -- physician's assistants

9    and others.

10        The primary entity related to Dr. Schneider was

11   Schneider Limited Partnership, which is a separate legal

12   entity, and that is the investor in the Omni center,

13   surgical center transaction or business.

14   Q.  So are there also claims in the arbitration back and

15   forth between Meridian and Schneider Limited Partnership?

16   A.  Yes.

17   Q.  And are all the other doctor investors also involved in

18   the arbitration?

19   A.  They are.

20   Q.  Is it a rather complex arbitration?

21   A.  Very complex.  It's been a lot of discovery, a lot of

22   depositions, a lot of documents going back and forth.

23   Q.  When is the arbitration set for this matter?

24   A.  Yeah.  It's been going on for a couple of years now,

25   and the arbitration proceeding is set for a two-year

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 28 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 29 of 239

28

1   trial -- or, excuse me, a two-week trial in Minnesota in

2   June, around the 10th of June, I believe.

3   Q.  Now, in this settlement that we're talking about, what

4   happens to Dr. Schneider's individual claims against

5   Meridian?

6   A.  The individual claim of Dr. Schneider is currently held

7   by the bankruptcy estate, obviously.  In the settlement

8   proposed under AP 15, he takes that claim and can proceed

9   against Meridian in the arbitration.  He has a duty to

10  defend, and he cannot settle AP 15 without it taking care

11  of the bankruptcy claim for $3 million.

12  Q.  Did you mean settle his individual claims in the

13  arbitration without doing that?

14  A.  Correct.  We didn't want him to be able to go to

15  Meridian and say, "Okay, you can pay me some money and then

16  you can go into the bankruptcy and still have the

17  $3 million claim in the bankruptcy."

18  Q.  What's, what's your view of the individual claims in

19  the arbitration, both Meridian's against Dr. Schneider and

20  Dr. Schneider's against Meridian?

21  A.  I don't think that Dr. Schneider's claim really has any

22  great value nor do I think that Meridian's claim has

23  significant value against Dr. Schneider and the estate.

24      Dr. Schneider 's claim is based on a loss of a stream

25  of income over 10 years.  There are a lot of problems.

1      First, they were not -- there was no - (inaudible) -

2   contract.

3      Second, he's got a duty to mitigate.  And to say that

4   he lost all of his money through this loss of ability to

5   provide neurological -- or neurosurgical services --

6   Q.  What about Meridian's claim against Dr. Schneider

7   individually?  What's your view on the merits of that?

8   A.  Well, I don't think that's particularly good, either,

9   for the same reason.  Meridian, however, did file for

10   relief from the automatic stay in order to liquidate that

11   claim as part of the arbitration, so in order to deal with

12   that proof of claim, it's necessary that somebody get

13   involved in the Meridian arbitration and be ready to go to

14   Minnesota for two weeks and deal with that.

15   Q.  So with this pending settlement, the issue of who goes

16   and deals with those individual claims, is that up in the

17   air right now?

18   A.  It is, and it's very important that we get it decided

19   quickly.  The discovery is set to close in the arbitration

20   around May 10th or 15th, I believe it is, so there's a need

21   to get something done in that regard as well as get ready

22   for Minnesota in June.

23           MR. GARDNER:  Your Honor, may I approach with

24   exhibits?

25           THE COURT:  You may.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 30 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 31 of 239

30

1              MR. GARDNER:  In order to short-circuit a little

2     bit, I would move the admission of Trustee's Exhibits 1

3     through 6.

4              THE COURT:  Are there others or do you want me to

5     deal with those first?

6              MR. GARDNER:  I was just going to deal with those

7     first.

8              THE COURT:  Okay.

9              MR. GARDNER:  The others I'll address as I go.

10             THE COURT:  Any objection to Trustee's Exhibits 1

11    through 6?

12             UNIDENTIFIED SPEAKER:  No objection.

13             UNIDENTIFIED SPEAKER:  No objection.

14             THE COURT:  Hearing no objection, they're

15    admitted.

16    Q.  (By Mr. Gardner)  Mr. Womack, could you look under

17    Tab B in, in that notebook, Exhibit 21?

18             MR. GARDNER:  This is Meridian's Exhibit 21.

19    It's Doc No. 285-33.  It's the first amended complaint in

20    AP 15.  And I would move its admission.

21             THE WITNESS:  Yes, okay.

22             THE COURT:  You're offering Exhibit 21?

23             MR. GARDNER:  Yes.

24             THE COURT:  Any objection?

25             (No audible response.)

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 31 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 32 of 239

31

1          THE COURT:  Hearing none, Exhibit 21 is admitted.

2     Q.  (By Mr. Gardner)  Can you --

3          THE COURT:  Mr. Gardner, do you have these -- I

4     was just looking for the docket entry where you got your

5     exhibits.

6          MR. GARDNER:  My docket entry is 290, I believe.

7          THE COURT:  Two ninety, okay.

8          MR. GARDNER:  Yeah, 290-1 through 6.

9          MR. JAMES:  Excuse me, Your Honor.  We have a

10    paper copy of Meridian's exhibits which Mr. Gardner is

11    referring to.  Would the Court like a paper copy?

12         THE COURT:  Oh, if you have an extra copy, sure,

13    you may approach.

14         Just so there's no question for the record, the

15    exhibits in the docket are the official exhibits, so --

16    thank you.

17         MR. GARDNER:  May I proceed?

18         THE COURT:  You may.

19    Q.  (By Mr. Gardner)  Would you briefly describe to me

20    AP 15 and what it was -- or is?

21    A.  This exhibit is the first amended complaint filed in

22    AP 15-15.  This is -- was the fraud/alter ego complaint

23    filed by myself against Schneider Limited Partnership,

24    other entities and individuals.

25    Q.  And generally describe to me kind of the facts and what

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 32 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 33 of 239

32

1    led to the filing of this complaint, briefly.

2    A.  I'll try.  Basically, it was:  After investigating this

3    matter, I believed that Dr. Schneider, his wife, his

4    attorneys, other individuals had been involved in a series

5    of transactions that were designed to shield effectively

6    100 percent of his nonexempt assets from creditors over the

7    course of a two-and-a-half - three-year period prior to the

8    filing of his bankruptcy.

9        He engaged in multiple transactions and directed

10   multiple transactions in order to accomplish that goal.

11   This complaint was designed to try to set those transfers

12   aside and obtain assets for the benefit of the creditors of

13   the estate.

14   Q.  And I want to briefly talk about some of the claims.

15   On page 22, Count 1, substantive consolidation, tell me

16   about that claim.

17   A.  Dr. Schneider had a number of -- two primary entities

18   that he used in this -- in these series of transactions

19   that he engaged in -- or three, I guess would be more

20   proper:  We had Schneider Limited Partnership; Schneider

21   Management, which is the managing entity of Schneider

22   Limited Partnership; and he had a third entity called

23   "MedPort, LLC."

24   Q.  And the ownership of Schneider LP, what was it roughly,

25   the underlying ownership of it?

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 33 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 34 of 239

33

1    A.   Schneider LP or Schneider Limited Partnership was

2    49-point-something percent with Michelle Schneider, his

3    wife; and 49 percent, roughly, and some extra with John

4    Schneider -- excuse me, John Schneider Revocable Trust and

5    Michelle Schneider Revocable Trust as to her interest; and

6    then Schneider Management held about a 1 percent interest

7    in Schneider LP.

8    Q.   And what about Schneider Management?  What was the

9    ownership of that?

10   A.   That was originally held by John Schneider, I believe.

11   Was it not?

12   Q.   (Inaudible.)

13   A.   Or if I'm mistaken about that, correct me.  Ultimately,

14   it went to Kathleen Burrows and then over to Michelle.

15   Q.   For the management of Schneider Management.  But the

16   underlying ownership, was it also 50/50 between the John

17   trust and Michelle trust?

18   A.   Yes, yes, but the person acting as the manager was

19   changed over time.

20   Q.   And as to MedPort, did -- on paper, did John Schneider

21   ever own any interest in MedPort?

22   A.   He did not.

23   Q.   And who -- it's changed over the years, but generally,

24   who held the ownership of MedPort?

25   A.   Michelle Schneider and Brandon Schneider, their son,

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 34 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 35 of 239

34

1  primarily.  And I think the children had -- or, excuse me,

2  the trusts also were involved with --

3  Q.  That would be the children's revocable trust?

4  A.  That's correct.  There were revocable trusts for each

5  of their children set up in 2012, and those trusts held

6  interests in MedPort.

7  Q.  Did you say "revocable" or "irrevocable"?

8  A.  They were irrevocable trusts.  I apologize.

9  Q.  So what was the point of Count 1, substantive

10  consolidation?

11  A.  We believe that they were operating these entities as a

12  single economic unit, and so we were seeking to pull all of

13  the assets involved in each of those entities into the

14  bankruptcy estate along with Dr. Schneider for the benefit

15  of creditors.

16  Q.  Okay.  And Count 2 is alter ego and reverse piercing.

17  Is that roughly similar theories with similar goals?

18  A.  Correct.

19  Q.  Okay.  Now, there's also various fraudulent transfer

20  claims.  What were some of the assets that you were going

21  after via these fraudulent transfer claims?

22  A.  Okay.  The primary assets were what is known as the

23  "Whispering Winds Ranch," which is property located between

24  Powell and Cody, Wyoming, that had substantial value; there

25  was the Tommy Armour house, which is their personal

1    residence located in Billings, Montana; and then there

2    were -- there's the MedPort property.

3         They purchased a residence in California, the entity

4    itself purchased that residence in California where

5    Michelle Schneider resided with Dr. Schneider and their

6    children.

7    Q.   And if you --

8    A.   There were a lot of other assets that I'm not touching

9    on.  Relatively speaking, they're, they're not

10   insubstantial, but relative to those assets, their value is

11   significantly less.

12   Q.   Okay.  And so those are the main assets you've

13   identified now.  The complaint lays out the various paths,

14   I believe, through which you believe the money has gone to

15   end up in these assets.  Was there a loan from Schneider

16   Limited Partnership to MedPort that you were trying to

17   avoid as well?

18   A.   Yes.  MedPort borrowed money from Schneider Limited

19   Partnership and then used those funds to -- it was in

20   excess of the 2 million bucks.  They used those to purchase

21   the house in California.  Originally, there was a note back

22   from MedPort to Schneider Limited Partnership that was

23   subsequently amended that required no payments for a

24   significant period of time, including interest or

25   principal.

1  Q.  And roughly speaking, was there somewhere between 3 --

2  somewhere north of $3.5 million went from Schneider Limited

3  Partnership to MedPort?

4  A.  Yes.  The house was purchased for about 1.9, and the

5  other money, I'm not sure where it's gone.

6  Q.  Okay.  Are there also other claims?  I don't want to

7  walk through every claim in the amended complaint, but are

8  there claims for breaches of duties, and conspiracy, and

9  negligence, and things of that nature?

10  A.  Yes.

11  Q.  And all aimed at recovering assets that either flew --

12  flowed from Dr. Schneider or Schneider Limited Partnership?

13  A.  Yes.

14  Q.  Would you say that AP 15 is a complicated case?

15  A.  Very complicated, it's very complicated.

16  Q.  What has occurred so far?

17  A.  Well, got the complaint filed.  There have been -- was

18  a motion to withdraw the reference.  Judge Waters in the

19  Federal District Court - (inaudible) - rule on that.

20      At this point, we haven't engaged in substantial

21  discovery relative to AP 15.  We are still at the point

22  where we need a -- the mediation kind of derailed

23  everything in terms of going forward.  We're really at the,

24  at the beginning of the process.

25  Q.  The order on the motion to withdraw the reference that

1   Judge Waters issued, it's Tab 6 under Tab A in that

2   notebook if you, if you need to look at it.  It's --

3   A.  (Inaudible.)

4   Q.  -- 290-6.  Basically, what does that order mean for

5   AP 15?

6   A.  Well, it means that the Bankruptcy Court and --

7   currently, Judge Kirscher is to deal with pretrial matters

8   relative to discovery and is to actually try the issue of

9   substantive consolidation that's been presented.  The

10  actual jury trial, though, of this matter will be held in

11  front of Judge Waters at the federal district court level.

12  Q.  Okay.  So, in essence, we're going to have to have a

13  hearing or trial on the substantive consolidation claims in

14  the bankruptcy court?

15  A.  Yes.

16  Q.  And then anything that's remaining, we're going to have

17  to have a jury trial in district court?

18  A.  Yes.

19  Q.  I think you mentioned we have not yet engaged in

20  substantial discovery.  Is that accurate?

21  A.  That's correct.

22  Q.  Do you anticipate that there will be substantial

23  additional discovery?

24  A.  I do.  This is, in significant part, an accounting

25  case, and we're going to have to retain forensic

 1    accountants.  We're going to have to engage in large

 2    numbers -- we're going to have to engage in a lot of

 3    discovery relative to that accounting that's provided in

 4    the transfers that occurred and the accounting that

 5    occurred between the entities.  We're going to have to take

 6    depositions of the accountants that have been involved in

 7    this matter.

 8        To the extent that it's permitted, we will need to

 9    engage in discovery of the attorneys that were involved

10    with Dr. Schneider.  There's a lot of issues with respect

11    to that on attorney-client privilege and who holds it,

12    whether it's myself or Dr. Schneider.

13        Kathleen Burrows is in California.  I'm sure that -

14    (inaudible) - counsel will want to take her deposition.

15    That will have to be taken care of.

16        We have all kinds of documents from various banks that

17    are at issue in these cases that we'll have to wind through

18    in terms of making sure that we can get all those admitted

19    into evidence.

20    Q.  Are there complicated jurisdictional and Stern issues?

21    A.  Complicated -- sorry?

22    Q.  Jurisdictional and Stern issues.

23    A.  Yeah.  It's, it's -- there's a lot of -- there's going

24    to be appeals, I guess is what's going to happen, from

25    various rulings that occur.

1   Q.  Substantive consolidation, is that a rather complicated

2   issue?

3   A.  Oh, yes.

4   Q.  And are there also numerous issues related to the

5   corporate interests involved and the ownership and the

6   spousal interests in the assets?

7   A.  Yeah, there are a lot of issues with respect to that.

8   This isn't a simple case where it was just all owned by

9   Dr. Schneider.  His wife Michelle had an interest in

10  Schneider Limited Partnership that goes back some years

11  through her revocable trust and Dr. Schneider's revocable

12  trust, and then you have the marital interest in the house

13  in Montana, the marital -- the -- her interest in MedPort

14  as the spouse.  There's going to be a lot of issues to wind

15  through.

16  Q.  Are the funds being vigorously defended?

17  A.  Yes, they are.  Counsel on the other side, they're good

18  attorneys, they're smart, they do a good job, they're

19  thorough.  So far, they have fought us every -- as much as

20  they can every step of the way, and I fully expect that

21  they will continue to do that as this proceeds.

22  Q.  Do you anticipate that AP 15 will be lengthy

23  litigation?

24  A.  I do, to finally go through and be able to -- I

25  think -- I believe we ultimately will recover, but I have

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 40 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 41 of 239

40

1    concerns about that recovery.  For example, Whispering

2    Winds Ranch is vacate now.  There's maintenance, property

3    tax.  We want to get that, we want to get it liquidated, we

4    want to get the assets for the estate.  The Tommy Armour

5    house is also vacant in Montana, here in Billings.

6         There's a lot of expenses associated with real

7    property.  Those assets need to be dealt with as quickly

8    and as soon as possible.

9    Q.  And as far as the litigation, do you have any doubt

10   that if you're successful, there will be a subsequent

11   appeal?

12   A.  I have no doubt.

13   Q.  All right.  The settlement, tell me about how the

14   settlement came about.

15   A.  Well, I think all the attorneys recognized that this

16   was going to be a very expensive procedure.  You know, your

17   firm has this on a contingency fee basis, but the costs of

18   litigation are going to be substantial.  I have no doubt

19   that that -- the costs for AP 15 will eat up all of the

20   money that the estate currently has from the Burrows -

21   (inaudible) - and the sale of some other smaller motorized

22   vehicles.

23   Q.  Is it, is it essentially -- is that the case on both

24   sides?

25        On your side, it's eating up whatever assets the estate

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 41 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 42 of 239

41

1   has.  On the defendant's side, does the ongoing litigation

2   affect the potential for the value of your future recovery?

3   A.  Well, I believe so because the defendants are -- they

4   need to pay their attorneys, and so they're going to be

5   using assets in every way that they can in order to get

6   their counsel paid.  And this is going to be expensive

7   litigation that's going to go on for a long time, and I

8   have no doubt that it will eat up substantial amounts of

9   assets that we would like to recover right now in the case,

10  so --

11  Q.  Meaning that there's a, kind of a finite pool of

12  assets, does every dollar spent on litigation decrease --

13  A.  Yes.

14  Q.  -- what's available for ultimate recovery?

15  A.  Yes.

16  Q.  So the decision was made to engage in a mediation.  Who

17  was retained to act as mediator for that?

18  A.  A Leif -- I forgot his last name.  He's --

19         THE COURT:  Clark?

20         THE WITNESS:  Yes, thank you.  He's a very good

21  mediator.  We've talked back and forth, reached an

22  agreement regarding -- (inaudible.)

23  Q.  (By Mr. Gardner)  Is he a retired judge?

24  A.  Sorry?

25  Q.  Is Leif Clark a retired judge?

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 42 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 43 of 239

42

1   A.  Yes, a bankruptcy judge from Texas.

2   Q.  Okay.  And before engaging in the mediation, did you

3   consider the creditors' interests or views or talk to their

4   counsel at all?

5   A.  I did, and I just want to explain a little bit about

6   that.  Okay?

7       I -- the counsel on the other side, the defendants,

8   wanted to also engage in mediation with respect to AP 20,

9   the dischargeability complaint, and do those both at the

10  same time.  Before I agreed to that, I talked with the,

11  what I'll call the "personal injury claimant's counsel."

12  Andy Patten primarily is who I was speaking with.

13      It was my understanding, based on conversations, that

14  if we were able to get a substantial amount of assets in

15  the case on the table, that they would consider consenting

16  to the settlement notwithstanding the fact that

17  Dr. Schneider wanted to receive his discharge.

18      Now, I didn't have a written agreement or anything like

19  that - they wanted to look at the final product - but that

20  was my understanding going into the settlement.

21  Q.  And to be fair, they certainly didn't say, "Yeah, we'll

22  agree," or anything, but from your understanding, was it a

23  possibility?

24  A.  Definitely a possibility.  And I did know that I was

25  going to receive an objection from Meridian and the U.S.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 43 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 44 of 239

43

1    Trustee's Office, but given the nature of Meridian's claim

2    and my view on that claim and the deference to the

3    interests of the creditors, I decided to proceed forward

4    anyway.

5    Q.   Okay.  And where was the mediation held?

6    A.   At the Northern Hotel here in Billings.

7    Q.   And how long did the mediation last?

8    A.   Two long days.  We didn't finally get the agreement

9    signed until around midnight on the second day.

10   Q.   And was -- sort of very -- I don't want to get into

11   specifics, but during that process, did you, and your

12   counsel, and the mediator, and those involved engage in a

13   thorough, an in-depth consideration of all of the issues

14   attendant to this litigation?

15   A.   Yes, we did.  I think so, I think we really did.

16   Q.   And at the end of the day, a settlement was reached.

17   You talked earlier about the primary assets.  Sorry, I'm

18   getting an echo.

19        Could you look at Trustee's Exhibit 2?  This is

20   Document 290-2.  And could you turn to page 19?

21   A.   Yes.

22   Q.   What is that document?

23   A.   Well, before we agreed to a settlement, we wanted a

24   sworn statement from Dr. Schneider and Michelle regarding

25   the assets that they held, primary assets that they held.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 44 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 45 of 239

44

1   So in the course of that, this was provided to us, and it

2   was attached to the settlement agreement.

3   Q.  This is a list of assets of the debtor, Michelle, and

4   the various entity defendants that they were asked to come

5   up with for, for purposes of settlement, correct?

6   A.  That's correct.

7   Q.  And generally, is this list consistent with what you

8   had previously identified in your investigations as the

9   universe of potential targets for recovery?

10  A.  Yes.  As I mentioned earlier, it's not down to the

11  penny, it doesn't take care of minor -- some smaller assets

12  like vehicles, that sort of thing, but in terms of the

13  major assets, it is consistent.

14  Q.  And as far -- you talked earlier about three major

15  assets.  I want to, I want to run through those really

16  quick.  There was first the Billings house.

17  A.  Yes.

18  Q.  And what's your value on the value of the Billings

19  house?

20  A.  I think it's worth about 650,000, roughly.

21  Q.  Okay.  And is that owned by John and Michelle?

22  A.  Yes, hm-hmm.

23  Q.  And is there an encumbrance on the Billings house as

24  well?

25  A.  Yes.  The children's trusts hold a -- have a judgment

1    lien that they obtained from Wells Fargo Bank that is

2    against the house.

3    Q.   And is that somewhere in the 650,000 to $700,000 range?

4    A.   Yeah, it's a little less than that.  It's -- there's a

5    little bit of equity in the house over and above that,

6    but --

7    Q.   And then the second asset was the Whispering Winds

8    Ranch.  What is that?

9    A.   Okay.  At the time that the bankruptcy was filed but

10   prior to the settlement, it consisted of the main house,

11   the riding arena, a barn, acreage down in that area, a

12   guesthouse, and some acreage associated with that.

13       I'm -- it was worth a substantial amount of money, you

14   know, well over a million bucks, a million bucks.

15   Q.   Okay.  And since the bankruptcy has been filed, the

16   guesthouse and a small portion of the acreage has been

17   sold?

18   A.   That's correct.

19   Q.   And there was an agreement that those funds would be

20   held in trust pending the outcome?

21   A.   Yes.

22   Q.   And how much are those funds?

23   A.   I was afraid you were going to ask that.  I'm trying to

24   remember.  I'm thinking it was in the neighborhood of 350.

25   Is that right?

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 46 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 47 of 239

46

```
 1                  THE COURT:  You have to answer the question.

 2                  THE WITNESS:  Yes, 350,000.  Sorry.

 3   Q.  (By Mr. Gardner)  And those are in my trust account, so

 4   I would know the exact number better than you?

 5   A.  That's correct.

 6   Q.  You're correct.

 7   A.  Thank you.

 8                  THE COURT:  Let's just keep straight who's

 9   testifying here.

10                  MR. GARDNER:  I apologize, Your Honor.

11   Q.  (By Mr. Gardner)  The remainder of the Whispering Winds

12   Ranch is still on the market, correct?

13   A.  It is.

14   Q.  And what -- do you recall approximately what kind of

15   value you placed on the Whispering Winds Ranch or what it's

16   on the market for?

17   A.  I believe it was about 1.2 million, right in that

18   neighborhood.  It's subject to what we can get for it.

19   1.5, right in that neighborhood.

20   Q.  Okay.

21                  THE COURT:  Excuse me.  Is that listed?

22                  THE WITNESS:  Sorry?

23                  THE COURT:  Is it listed?

24                  THE WITNESS:  It is, Your Honor.

25                  THE COURT:  Okay.
```

1            MR. GARDNER:  It's listed for 1.749.

2            THE WITNESS:  We think, we think we can get that

3    much, or maybe 1.5.

4            THE COURT:  What's it listed for?

5            THE WITNESS:  It's listed for 1.7.  We may have

6    to take a little bit less to get it sold sooner than later.

7            THE COURT:  There's debt on the property?

8            THE WITNESS:  Sorry?

9            THE COURT:  Any debt?

10            THE WITNESS:  No.

11    Q.  (By Mr. Gardner)  Is there a mortgage against the

12    property, though?

13            THE CLERK:  Excuse me, we have lost our recording

14    equipment again, Judge.  One minute, please.

15            THE COURT:  Okay, just a moment.

16            (Pause in proceedings.)

17            THE CLERK:  Judge, we're back on.  If you could

18    go back to the amount that it was listed for, is when we --

19    our equipment shut down.

20    BY MR. GARDNER:

21    Q.  Mr. Womack, do you recall approximately what the

22    remainder of the Whispering Winds Ranch was listed for?

23    A.  About $1.7 million.

24    Q.  Okay.  And is it your understanding that the realtor

25    believes he can achieve somewhere near that number in the

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 48 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 49 of 239

48

1   sale?

2   A.  Yes.

3   Q.  Now, could you -- we're looking at Trustee's Exhibit 2.

4   Could you look at page 2 of that document?

5   A.  Page 2?

6   Q.  Yes.

7   A.  Okay.

8   Q.  And these are the terms of the settlement.  Could you

9   look at Paragraph 2(d)?

10   A.  Yes.

11   Q.  (Quoted as recorded):  "MedPort shall release its

12   mortgage against the Wyoming property."

13       Does that refresh your recollection about whether or

14   not there was a mortgage against the Whispering Winds

15   Ranch?

16   A.  Yes.

17   Q.  And it was held by MedPort?

18   A.  Yes.

19   Q.  Okay.  And then the other major asset, I believe you

20   mentioned the California house.

21   A.  Yes.

22   Q.  And who is that owned by?

23   A.  MedPort.

24   Q.  And do you recall approximately what the purchase price

25   of that home was?

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 49 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 50 of 239

49

1    A.  1.2 million, I believe.

2    Q.  Okay.  Now, I want to walk through the specific terms

3    of the settlement for AP 15, and we'll just walk through

4    these paragraphs.  Paragraph 2(a), in settlement of AP 15,

5    what happens to the Billings house?

6    A.  It becomes property of the bankruptcy estate.  That

7    includes Michelle's one-half interest, Dr. Schneider's

8    one-half interest.  The liens against that property held by

9    the irrevocable children's trust is released so that the

10   entire value comes into the bankruptcy estate.

11   Q.  And that happens through the settlement of both AP 15

12   and AP 20, correct?

13   A.  Correct.

14   Q.  And as far as AP 20, what portion was attributed to

15   AP 20, the settlement of that?

16   A.  We estimated that at $450,000, based on the $250,000

17   homestead exemption that could be claimed by John and

18   Michelle Schneider, and the one-half interest in the

19   remainder equity property held by Michelle Schneider.

20   Q.  Okay.  So any equity above that 450 is attributable to

21   the AP 15 settlement?

22   A.  That's correct.  That's the difference between the 450

23   and the 650.

24   Q.  Okay.  And 2(b), I think you already mentioned that the

25   children's trust released the judgment lien.  Correct?

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 50 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 51 of 239

50

1    A.   That's correct.

2    Q.   2(c), what is 2(c)?  What happens with the Whispering

3    Winds Ranch?

4    A.   The Whispering Winds Ranch also comes into the

5    bankruptcy estate.  Any mortgage or liens held by MedPort

6    or any other entities are released so that the estate has

7    that property free and clear of, of those interests.

8    Q.   And at -- on the Whispering Winds Ranch, is it your

9    understanding that the realtor has actually had some

10   inquiry and interest in recent weeks?

11   A.   Recently, he has.  Actually, and I want to say that the

12   realtor did indicate recently that he felt that if we're

13   patient, we could get the full listing price for that.  We

14   need to be patient about that.

15   Q.   Okay.

16         THE COURT:  Mr. Gardner, could you go back on the

17   Billings house and just clarify again with just a couple of

18   questions, maybe, as it relates to the 450, the 200, the

19   650, and the allocation that has been commented about

20   between 15-15 and 15-20?

21         MR. GARDNER:  Yes.  And, Your Honor, if you want

22   to clear something up if I don't ask it correctly, feel

23   free to interrupt me.

24   Q.   (By Mr. Gardner)  What is the value of the Billings

25   house?

1   A.  About 650,000 is our estimate.

2   Q.  And do the debtor and Michelle Schneider claim a

3   $250,000 homestead in that house?

4   A.  They do.

5   Q.  And does Michelle Schneider also claim a half-interest

6   in any equity above the 250,000?

7   A.  She does.

8   Q.  And so if the value is 650,000 and the homestead is

9   250,000, there's how much in equity?

10  A.  Four hundred thousand.

11  Q.  Okay.  And so Michelle claims 200,000 of that equity?

12  A.  Correct.

13  Q.  Okay.  And so as far as AP 20 from the Billings house,

14  what value is attributed to the settlement of AP 20?

15  A.  Dr. Schneider's half-interest in the house, including

16  the homestead portion -- or, excuse me, the $250,000

17  homestead declaration portion from both Michelle and

18  Dr. Schneider, and the $200,000 from Michelle for her

19  equity interest over and above the homestead.

20  Q.  Okay.  So that's attributable to what was provided to

21  settle the discharge action, correct?

22  A.  Right.  Our analysis was that it would be difficult, if

23  not impossible -- it would be very difficult; not

24  necessarily "impossible," but difficult to get Michelle's

25  half interest in that homestead property.  And it would

1    all -- it would be equally difficult and probably

2    impossible to get the homestead portion of that property.

3    Q.  Okay.  And that's why it was attributable to settlement

4    of the non-discharge action.

5    A.  That's correct.

6    Q.  Okay.

7    A.  We wanted something that was something that we didn't

8    think creditors or the estate could get either through

9    AP 15 or, if discharge is denied, in subsequent actions by

10   creditors or the estate, some property and value that they

11   could get.

12   Q.  Okay.  And so the remaining, you believe, value is

13   200,000, and that is the debtor's interest in the equity

14   which is attributable to AP 15?

15   A.  That's correct.

16              MR. GARDNER:  Okay.  Your Honor, did --

17              THE COURT:  Yeah, thank you.

18   Q.  (By Mr. Gardner)  2(e) on the settlement agreement is

19   simply a cooperation clause.

20      2(f) deals with the approximately $350,000 in the trust

21   account.  And tell me what happens with that 350,000.

22   A.  Well, 60,000 goes to the estate and 290 to Michelle,

23   but if we have -- we also -- that interacts with (g) and

24   (h) below.

25   Q.  And tell me about that.  (g) and (h) deal with this

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 53 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 54 of 239

53

1    thing called a "KBR REIT."   What is that?

2    A.   Schneider Limited Partnership had an investment in a

3    real estate investment trust of some sort.   There were some

4    questions about being able to liquidate that interest, how

5    long it might take to do that.   So we had a dollar value

6    for that investment trust.   It was agreed that we would get

7    the proceeds from that.

8    Q.   What was the dollar value of that?

9    A.   It was about $180,000.

10   Q.   And if it turned out that that investment was illiquid,

11   couldn't be liquidated, then what happened?

12   A.   We would get the money from the money -- get the money

13   from the Goetz law firm trust account rather than that.

14   Q.   Okay.   So in the event the KBR REIT is illiquid and

15   can't be liquidated, then the estate gets 240,000 from the

16   moneys held in the trust account, correct?

17   A.   That's correct.

18   Q.   And Michelle would get the remaining 110,000.

19   A.   That's right.

20   Q.   All right.   2(i), there's a $123,000 tax refund.   What

21   happens with that?

22   A.   Split between the parties, between the trustee, the

23   estate, and Michelle Schneider.

24   Q.   Okay.   2(k), the assignment of the interest in

25   Schneider LP and Schneider Management, what happens with

1    that?

2    A.   That all goes to Michelle Schneider.

3    Q.   Okay.  And as it stands now, is there -- other than the

4    note from MedPort and the assets the estate's getting in

5    the settlement, is there much value left in those entities?

6    A.   Not in -- well, not in my opinion.  There is --

7    Schneider Limited Partnership does have a claim against

8    Meridian that it's pursuing, and so that -- it will retain

9    that.  I don't, I really don't have -- I don't know --

10   there's a lot of factual issues in that claim.  I couldn't

11   attribute any of significant value to Schneider Limited

12   Partnership's --

13   Q.   That's in the Meridian arbitration.  And there's claims

14   by it against Meridian and also by Meridian against,

15   against the entity?

16   A.   Right.

17   Q.   Okay.  And so the estate's assigning those to Michelle,

18   correct?

19   A.   Correct.  There's also a lot of expense attendant to

20   pursuing those claims on behalf of Schneider Limited

21   Partnership.

22   Q.   2(l), tell me about Paragraph 2(l).  First of all, it

23   says:

24           The trustee shall abandon any and all interest in

25   any claims that the estate might have against the following

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 55 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 56 of 239

55

1    third parties.

2        (i) is:  Claims against any third-party professionals

3    who are prepared to advise the debtor on any matter prior

4    to the commencement of the bankruptcy estate.

5        Did you investigate potential claims that would fall

6    within those categories?

7    A.  Yes.

8    Q.  And what, what kind of third parties are we talking

9    about as potential targets in those claims?

10   A.  Attorneys and accountants.

11   Q.  And based on your investigation, did you perceive a lot

12   of value to the estate?

13   A.  No.

14   Q.  And did you perceive that possibly there's potential

15   claims?

16   A.  Yes.

17   Q.  Why did you not perceive that there was substantial

18   value to the estate in those claims, and thus you were

19   willing to assign them as part of this settlement?

20   A.  Because if we're successful in AP 15 and setting aside

21   all of these transfers and recovery against them, then the

22   work that they did with respect to the estate planning and

23   asset protection wasn't very good and the estate wasn't

24   really harmed necessarily by that.  On the other hand, if

25   we were not successful and they did a good job, then there

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 56 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 57 of 239

56

1    wasn't any malpractice.

2    Q.  And would persuing those claims require substantial

3    additional litigation?

4    A.  Substantial additional litigation.  They would be

5    vigorously defended.  The costs would be high, and I didn't

6    think it was worth it to the estate to go after them at

7    this -- (inaudible.)

8    Q.  And given the ongoing litigation expenses of AP 15,

9    does the estate have enough funds to also fund separate

10   litigation against other third parties?

11   A.  No.  The only way we would have enough funds to do that

12   is if we were successful in AP 15.  Then we would be

13   looking at statute of limitation issues, problems in that

14   regard.

15   Q.  Okay.  So your conclusion was:  Overall, it was not

16   something of substantial value you were giving up in the

17   settlement?

18   A.  That's correct.  But it was worth something to

19   Dr. Schneider and Michelle, so we gave that to them.

20   Q.  And what about (2), claims of Schneider LP, Schneider

21   Management, MedPort, BSC, NRMS, and the children's trusts?

22   A.  Well, we already talked about those.  Those were just

23   generally designed to clean up any possible claims that any

24   of those entities might have against any other individual.

25   The only principal one that I saw there was Schneider

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 57 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 58 of 239

57

 1   Limited Partnership against Meridian.

 2   Q.  And the point of the settlement was to give a clean

 3   break between the estate and these various entities it's

 4   settling with?

 5   A.  That's right.  I mean, you know, MedPort had a lien

 6   against the Whispering Winds Ranch, and the children's

 7   trusts had liens against the house in -- Tommy Armour

 8   house.  That obviously is being given up, those are gone.

 9   Any other claims they might have between each other, they

10   can just deal with it all.

11   Q.  Okay.  And then (n) -- or actually, (l)(iii), the

12   claims against Meridian --

13   A.  Right.

14   Q.  -- is that what you talked about earlier, first on the

15   individual claims the -- that are assigned to the debtor?

16   A.  Yes.

17   Q.  And in return for getting those individual claims, what

18   does the debtor have to do with respect to Meridian's claim

19   back against the estate?

20   A.  That's dealt with in Paragraph 3(ii):  In the event the

21   estate's claims abandoned to him or settled, the settlement

22   requires that Meridian withdraw its proof of claim in the

23   Schneider bankruptcy estate.

24   Q.  Okay.  And is the debtor also required to fully defend

25   that claim in good faith?

1    A.  Yes.

2    Q.  Okay.

3              THE COURT:  What if, what if he doesn't?

4              THE WITNESS:  Good question, Your Honor.  I think

5    we would have a claim against him for breach of the

6    agreement, but beyond that, there's no provision in the --

7    specifically talking about liquidated damages or otherwise.

8    Q.  (By Mr. Gardner)  The claim back against him, those two

9    claims in that arbitration, are they essentially mirrors of

10   each other?

11   A.  Basically.

12   Q.  And so if Dr. Schneider is successful in pursuing his

13   individual claim against Meridian, does that essentially,

14   in effect, defeat Meridian's claim back against the estate?

15   A.  Yeah.

16   Q.  And was that a consideration in agreeing to this

17   provision?

18   A.  Yes.

19   Q.  I mean, in essence, can you envision a scenario where

20   the liability goes both ways?

21   A.  Yes.  If there is liability, I would think that it

22   would go both ways.  I think Meridian might have a claim

23   against Schneider and Schneider against him.

24             THE WITNESS:  This has been a difficult area for

25   me, Your Honor.  Early on, I assessed the claim, decided I

1   didn't have any money to defend it.  I talked to a number

2   of attorneys about handling it on a contingency fee basis.

3   They all refused.

4          So Meridian filed its motion to modify stay, and

5   so we agreed to that so they could go forward with the

6   arbitration and deal with that.  I just don't have the

7   money to participate in the arbitration.  I'm aware of the

8   problems associated with that.  (Inaudible) -- $3 million

9   claim in the bankruptcy, and I feel like I'm a little bit

10  hogtied in terms of dealing with it.

11  Q.  (By Mr. Gardner)  Addressing the judge's concern,

12  Dr. Schneider has an incentive to vigorously pursue his

13  claim, individual claim against Meridian because he's

14  getting that in this settlement, correct?

15  A.  Yes.  And it's my understanding and belief that he

16  believes that that claim has value and that he intends to

17  do that.

18  Q.  And in vigorously pursuing that claim against Meridian,

19  if he's successful on that, in effect doesn't that

20  necessarily defeat their claim against, back against the

21  estate?

22  A.  Right, their claims and counterclaims against each

23  other, they derive from the same factual set of facts.

24  Q.  And did that provide you some confidence that the claim

25  against the estate will, in fact, be defended in good

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 60 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 61 of 239

60

1     faith?

2     A.   Some.

3             THE COURT:  Well, was that claim against him a

4     prepetition claim that will be discharged?

5             THE WITNESS:  Yes, but the concern was that the

6     claim against -- against him, it could be discharged, but

7     there's a right of offset, is there not, even so regardless

8     of the discharge within the arbitration?  I think.

9             And my concern was if the -- now, if he -- if

10    they're successful against him and he's not against them,

11    so be it, then that's a claim the bankruptcy estate --

12    (inaudible.)

13    Q.   (By Mr. Gardner)  And let's, let's touch on that a

14    little more.  As you understand the Meridian litigation,

15    would it be fair to say that there's Dr. Schneider and

16    Schneider LP and the other investors who claim that the

17    center failed because of what Meridian did?

18    A.   What they failed to do.

19    Q.   Or what they failed to do.  On the other side of it, is

20    Meridian claiming that it failed because of what

21    Dr. Schneider did?

22    A.   Yes.

23    Q.   Okay.  And so in order to be successful, Dr. Schneider,

24    Schneider LP, and the other investors all have to prove

25    that it failed because of what Meridian didn't do versus

```
 1    what Dr. Schneider did, correct?

 2    A.  Yes.

 3    Q.  And so besides Dr. Schneider defending his actions, are

 4    the other investors also --

 5              MR. JAMES:  I'm going to object, Your Honor.

 6    These questions are leading, and it would appear that

 7    Mr. Gardner is testifying rather than the trustee.

 8              THE COURT:  I'll sustain that.

 9              MR. GARDNER:  Okay.

10    Q.  (By Mr. Gardner)  You're more familiar with the

11    Meridian litigation than I am, correct?

12    A.  Yeah, I think so.  I've been --

13    Q.  Do the other parties on the same side of the "v." as

14    Dr. Schneider --

15              THE CLERK:  Excuse me, Mr. Gardner, I'm going to

16    stop you again.  We've lost our recording.

17              I'm so sorry, Judge.

18              (Pause in proceedings.)

19              THE CLERK:  Mr. James, if you could please state

20    your objection again.

21              MR. JAMES:  Yes.  Doug James, object on the

22    grounds that the questions are leading and that Mr. Gardner

23    appeared to be testifying instead of the trustee.

24              THE COURT:  And I sustained it.

25              But I have a question for you, Patti.  This is as
```

1    it relates to CourtSpeak and not as to our recording

2    system, right, FTR Gold?

3              THE CLERK:  No, Judge.  We're having trouble with

4    FTR Gold.  They put a new computer in here.

5              THE COURT:  Okay, okay.

6              THE CLERK:  And we've had Ali [phonetic] down

7    here twice, Your Honor, and she can't really figure it out.

8    It quits for like 30 seconds and then starts up again.  So

9    I'm deeply sorry to all the parties.

10             THE COURT:  (Inaudible) -- posted.

11             THE CLERK:  Will do, Your Honor.

12             THE COURT:  Mr. Gardner, I think you had then

13   went on to indicate that Mr. Womack had probably as much

14   information about the Meridian claims as anyone, and you

15   were --

16             MR. GARDNER:  Certainly more so than me.  I'm

17   just trying to ask the right questions, and I'll rephrase

18   the question.

19             Are we back on?

20             THE COURT:  We are back on, as I understand it.

21             MR. GARDNER:  Oh, okay.

22   Q.  (By Mr. Gardner)  In agreeing to assign this claim to

23   Dr. Schneider as part of the settlement and getting back

24   his covenant that he would defend the claims in good faith,

25   besides his personal incentive to defend those claims as

1    part of his prosecution, were there any other factors about

2    the arbitration that gave you some comfort that the claims

3    against the estate would be adequately defended?

4    A.   Some comfort.  I want to -- I mean, I need to be clear

5    here.  I'm not confident that Dr. Schneider is capable of

6    adequately defending this really, but there are some, there

7    are some factors that make me - (inaudible) --

8              THE COURT:  Mr. Womack, you might pull that mic a

9    little closer.

10             THE WITNESS:  -- yeah, that, that they'll be

11   dealt with properly.

12             As I testified earlier, Meridian Surgical

13   Partners, there were two entities.  There was one from

14   Nashville, Tennessee, and then there was one formed in

15   Montana for the purposes of working with doctors from the

16   Cody area, including Dr. Schneider, to build the Omni

17   center, surgical center.

18             Part of that required that they get transfer

19   agreements in order to transfer patients, if they needed

20   them, to emergency room and hospital care services.  They

21   never were able to get that.  So even though they built the

22   surgical center, they were never able to open because they

23   did not have a transfer agreement.

24             The whole transaction broke down at that point in

25   time and the parties were then engaged in determining who

1    was at fault, who was responsible for getting the transfer

2    agreement, and why it wasn't obtained.

3         The doctors and the investors in the project --

4    the actual investors in the project were blaming Meridian

5    Surgical Partners, the two entities, saying that they were

6    responsible to get it.  And Meridian Surgical Partners

7    first denied that they were primarily responsible and then

8    they also have pointed to Dr. Schneider and said that his

9    actions throughout this transaction were responsible for

10   the denial of the transfer agreement.

11        They have pointed to the fact that he was a

12   surgeon in Billings, Montana, at both -- had privileges at

13   both hospitals.  He left, under what circumstances are

14   unclear.  He was not able to go back and have privileges

15   there.  He was not willing to go back and obtain privileges

16   there for purposes of the Omni center because he would be

17   on all for 24 hours a day.

18        The medical doctors were saying that Meridian

19   assured them that they would be able to get it, the

20   transfer agreement, and they would be able to open without

21   any of them having to be admitted and be on call for 24

22   hours a day.

23        So when Dr. Schneider had problems in Wyoming

24   with what I'll refer to as "Jimmie Biles libel litigation,"

25   it became public that, that -- that's a whole other story,

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 65 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 66 of 239

65

1    but he lost his -- he was sued by an orthopedic surgeon

2    named Jimmie Biles for slander and libel.  Ultimately, that

3    case was settled.  His attorney was censured for failure,

4    for basically failing to disclose --

5              MR. COSSITT:  Objection, Your Honor.  This answer

6    goes far beyond the scope of the question, and it's

7    rambling, and now it's getting into information that is not

8    necessary for the Court's consideration under the

9    four-factor test.

10             But the initial objection is:  Far outside the

11   scope of the question.

12             THE COURT:  I'll sustain that.

13             THE WITNESS:  Sorry, Your Honor.  I'm just trying

14   to get some background --

15             THE COURT:  I understand.

16             THE WITNESS:  -- as to what happened --

17             THE COURT:  I understand.

18             THE WITNESS:  -- and what the substance of the

19   Meridian arbitration claims and defenses are.

20   Q.  (By Mr. Gardner)  Are there other parties represented

21   by counsel in the Meridian arbitration that also have an

22   interest in defending Dr. Schneider's action and proving

23   that it was Meridian's fault?

24   A.  Yeah.  Schneider Limited Partnership is one of those

25   parties and the other medical doctors are involved in that.

1    And they defend and state that it was not Dr. Schneider's

2    actions that resulted in the failure to get the transfer

3    agreement.

4    Q.   And is that something you considered in agreeing to

5    this provision of the settlement?

6    A.   Yeah, it was.

7    Q.   Okay.  Paragraph 2(m):  The trustee shall abandon any

8    and all interest in MedPort, NRNS, and BSC.

9        To your knowledge, is there anything -- does BSC have

10    anything?

11    A.   Nothing.

12    Q.   What about NRNS?  What was Dr. Schneider's surgical

13    practice.

14    A.   The "NRNS" stands for Northern Rockies neurological --

15    or Neuro-Spine.  That was the operating entity that

16    Dr. Schneider used to work as a surgeon.  That entity does

17    have some claims that were noted by Dr. Schneider in his

18    schedules; however, if I, if I take over Northern Rocky

19    Neuro-Spine, there are a lot of issues with respect to

20    that:  HIPAA issues regarding patient records, there are

21    problems with those claims, and it was my evaluation that

22    the value of any claims that NRNS had were far exceeded by

23    its potential liabilities and costs of administration.

24    Q.   Now, the third one is MedPort.  You're abandoning any

25    claim to MedPort on -- essentially, what does MedPort own?

```
 1    A.  The house in California.

 2    Q.  And you're giving up your claim to that house, correct?

 3    A.  That is correct.

 4    Q.  Is, is that really the meat and potatoes of the

 5    settlement?

 6    A.  It is.

 7    Q.  Okay.  And that was -- so you get the other major

 8    assets for the estate that you had identified, and they

 9    keep the house in California.

10    A.  That's right.

11    Q.  Okay.  Is the settlement -- well, we should probably

12    walk through the rest of these provisions.

13        2(n), they stipulate that the, the causes of actions

14    asserted by the trustee are property of the bankruptcy

15    estate to the exclusion of any creditor.  What was the

16    purpose of that provision?

17    A.  Defendants wanted to ensure that they would not be

18    faced with, excuse me, other claims made by creditors

19    outside the bankruptcy against them.  And I'm not talking

20    about Dr. Schneider but the other entities that creditors

21    would not go against Schneider Limited Partnership,

22    MedPort, and the other entities that were not owned or

23    controlled by Dr. Schneider, and that any of these claims

24    were solely property of the bankruptcy estate.

25    Q.  Because the trustee and the estate had already brought
```

1    these claims in AP 15, correct?

2    A.   Right.

3    Q.   And so they wanted assurance that they wouldn't face

4    the same litigation they were settling from some other

5    party; is that --

6    A.   That is my understanding.

7    Q.   (o):  The trustee shall request an order of the Court

8    that authorizes and directs the trustee not to share with

9    any other person or entity any work product with respect to

10   this adversary.

11       It also contains a substantial exclusion allowing you

12   to comply with your duties in any order of the Court.  Tell

13   me about that provision.

14   A.   Again, they were concerned about tangential claims

15   being brought against attorneys, entities; did not want the

16   work product and information that I obtained to be shared

17   with other parties so that they could be used for those

18   purposes.

19       However, I pointed out that as a trustee, I've got a

20   substantial number of duties that require me to provide

21   information to taxing authorities, to the U.S. Trustee's

22   Office, whether it be pursuant, you know, to any kind of

23   concerns that they may have, other federal agencies.  So if

24   I have a job to do as a trustee, then I can provide the

25   information and give that to them.

1    Q.  And it also provides that you can comply with court

2    orders and enforceable subpoenas, obviously, correct?

3    A.  Of course.

4    Q.  (p):  The trustee agrees in good faith to seek Court

5    approval of this agreement.

6        That's self-explanatory.

7        (Quoted as recorded):  "The trustee agrees he will

8    accept assignment of real estate listing agreements

9    executed with respect to the Billings house and the Wyoming

10   property."

11       What was the purpose of that?

12   A.  Well, Dr. Schneider went out and listed the house in

13   Billings for sale and --

14            MR. COSSITT:  Objection, Your Honor; relevance.

15   This testimony, while interesting, is not relevant to the

16   four legal standards in the A & C factors test and

17   accordingly is outside the scope of relevance for this

18   proceeding.

19            THE COURT:  I'm going to overrule that because,

20   in fact, there's an assignment of these agreements to the

21   trustee under this agreement.  I want to know what's going

22   on.

23            THE WITNESS:  Dr. Schneider and Michelle went and

24   listed the Tommy Armour house for sale with a realtor and

25   signed a listing agreement with him postpetition.  They

1    were concerned about that, that I would take that over so

2    that the realtor, Ron Thom, would not have a claim against

3    them.

4    Q.  (By Mr. Gardner)  And the Wyoming property is on the

5    market as well.  That's owned by the children's trust, and

6    so they just didn't want any breach provisions against the

7    trust for that listing agreement?  Is that accurate?

8    A.  Yeah, same reason.

9    Q.  On (r), the caveats to the - (inaudible) - releases,

10   what is (r)(i)?

11   A.  Well, that's the disclosure provision that if, if an

12   asset has not been disclosed, as set forth in the exhibit

13   that we talked about earlier, that I was not precluded from

14   pursuing that asset or claim against the defendants.

15   Q.  So if there are other assets which you have not been

16   made aware of yet that are out there, then you still have

17   the power to go after them, correct?

18   A.  Correct.

19   Q.  Okay.  Three is general mutual release of claims

20   language.

21       Four, that's the contingency provision --

22   A.  Correct.

23   Q.  -- that implementation of this settlement is contingent

24   on approval of the AP 20 settlement.  Whose -- who demanded

25   that provision?

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 71 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 72 of 239

71

1    A.  The defendants did.  Dr. Schneider's counsel required

2    that in order to reach any settlement agreement.

3    Q.  Were you opposed to such a provision?

4    A.  Yes.

5    Q.  Was it a necessary provision in order to finalize the

6    settlements?

7    A.  Yes.  If I had not done that, nothing would have

8    happened.

9    Q.  So if AP 20 is not -- that settlement is not approved

10   under the terms of this settlement agreement, this

11   settlement agreement is also void.

12   A.  That's correct.

13   Q.  Okay.  Tell me about AP 20.

14   A.  Okay.  Well, I've already talked about the claims that

15   were brought in AP 20.  Pursuant to that, we -- as

16   discussed, the estate gets a value that we put at about

17   $450,000.  Dr. Schneider is entitled to receive his

18   discharge in the case.

19   Q.  Okay.  Does AP --

20   A.  (Inaudible.)

21   Q.  Does AP 20 involve a lot of the same factual issues as

22   AP 15?

23   A.  Yes, and some additional ones.

24   Q.  Okay.  Do you consider AP 20 to be complex?

25   A.  It -- not as complex as AP 15, frankly.  I think that I

1    can bring AP 20 to conclusion without it being as

2    complicated as AP 15, but I'm sure that defense will be

3    vigorous, will require significant discovery and a number

4    of witnesses, expert witnesses in order to fully litigate

5    it.

6    Q.  Okay.  And who has the burden of proof in AP 20?

7    A.  I do.

8    Q.  And are you being paid by -- on an hourly basis by the

9    estate to pursue this?

10   A.  Yes.

11   Q.  And do you have any doubt there will be an appeal if

12   you're successful in AP 20?

13   A.  I'm sure that it will be appealed.  Dr. Schneider is --

14   he wants to try to get a discharge if at all possible.  His

15   counsel are good, and they'll use every legal means that

16   they have to try to get him that discharge.

17   Q.  The settlement that was reached, it's Trustee's

18   Exhibit 1.  Was that reached through the same mediation

19   process?

20   A.  Yes.

21   Q.  Okay.  And you -- we've, I think we've covered what the

22   estate is getting out of the settlement of the

23   non-discharge action.  So between the two settlements of

24   AP 15 and AP 20, can you roughly estimate the value to the

25   estate that you believe is being provided?

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 73 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 74 of 239

73

1   A.   About 2.5 million bucks.

2   Q.   Okay.  And in your investigation of the universe of

3   assets that are remaining out there that you think you have

4   claims to or essentially all of the assets of the

5   defendants in the actions, about how much did they add up

6   to?

7   A.   Well, around $4 million, a little over $4 million.

8   Q.   Okay.  And so based on the investigation that you've

9   done, are you getting more or less than half of what you

10  perceive potential assets out there at this time are?

11  A.   I believe we're getting more than half, so I feel like

12  it's a fair settlement from a dollars standpoint.

13  Q.   Okay.  That's where I want to go now, are the four

14  factors.  We've talked about a lot of this, but I want to

15  touch on all of them.

16       The first factor is probability of success on the

17  merits.  Let's first talk about AP 15.  What's your view on

18  the probability of success on the merits on AP 15?

19  A.   I think we'll win, but I think that there are a lot of

20  issues and the amount of the recovery is questionable in

21  AP 15.  I think that it could be less than what we've

22  agreed to settle for here.

23  Q.   Let's zero in on that.  There's a multitude of claims

24  in AP 15, correct?

25  A.   Yes.

1    Q.  And do you believe you'll be successful on some of

2    them?

3    A.  Yes.

4    Q.  Do you -- are there numerous complicated issues?

5    A.  There are many complicated issues with accounting,

6    legal issues between husband and wife, corporations,

7    transfers; a lot of complications.

8    Q.  And are the defendants -- do they have a lot of

9    affirmative defenses and are they vigorously defending?

10   A.  Yes, they are.

11   Q.  Is it going to require substantial expert testimony?

12   A.  Yes.  As we've already -- as I've already testified to,

13   we're going to have to retain forensic accountants to

14   assist us.  That will be expensive.  The other side will do

15   the same.  It will require numbers of -- quite a few

16   depositions be taken.  It's, it's going to take a long time

17   to go through and deal with all the legal issues, factual

18   issues, all those things.

19   Q.  And is whether or not you're successful in the

20   litigation going to depend to some extent on how that

21   expert testimony comes in?

22   A.  Yes.

23   Q.  Now, you talked about that you do believe you'll be

24   successful on some claims or even a good portion of, of the

25   claims.  Even if you are successful on a good portion of

1    the claims, do you believe they'll -- the ultimate recovery

2    from the estate will be better than what this settlement

3    is?

4    A.  I don't think so.  I think that that's where everybody

5    that's opposed to this is, I think they're under a --

6    there's a husband and wife involved here.  Michelle

7    Schneider has an interest that, that existed prior to the

8    time that Dr. Schneider's problems began.  I have a hard

9    time believing that the Court's going to totally ignore

10   that and say that the estate can hit a home run and get

11   everything that we've got here.

12       So I think that what we've negotiated here as far as a

13   settlement is as much or more than what we could get -- is

14   likely we could get at trial.  That's not to say that we

15   couldn't get more, but I think that this is, this is a good

16   result that we have here today for AP 15.

17   Q.  And would it be fair to say that there's, there's

18   numerous conditions and factors that go in -- when you say,

19   "yeah, we'll be successful on the merits of some of the

20   claims," is there just a multitude of varying levels of

21   success and how that greatly affects the overall recovery?

22   A.  Yes.  I can't even go through them all.  There's so

23   many factors involved here.

24   Q.  And so the bottom line in probability of success on the

25   merits, would it be fair to characterize it as:  Yeah,

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 76 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 77 of 239

76

```
 1    you'll succeed, you'll --

 2              MR. JAMES:  Objection, Your Honor.  Again, these

 3    questions are leading and --

 4              THE WITNESS:  I think I've already testified

 5    to --

 6              THE COURT:  Just a moment.

 7              MR. JAMES:  -- you're, you're testifying rather

 8    than the trustee.

 9              THE COURT:  I'll sustain that.

10              MR. GARDNER:  Okay.

11              THE COURT:  You can rephrase your question.

12              MR. GARDNER:  All right.

13    Q.  (By Mr. Gardner)  Are you at all confident that success

14    on the merits of some of the claims will lead to a better

15    net result?

16    A.  No, I'm not.

17    Q.  Okay.  On AP 20 -- or -- AP 20, the non-discharge

18    action, do you believe in your claims?

19    A.  Yes.

20    Q.  Do you believe the defense will fight hard?

21    A.  Yes.

22    Q.  Is it an important matter to Dr. Schneider?

23    A.  Very important.

24    Q.  Is there risk of loss in that AP 20 litigation?

25    A.  There's always risk of loss in any litigation.
```

1    Q.   The second factor is the difficulties, if any,

2    encountered in the collection of any judgment that might be

3    obtained.

4         As to AP 15, even if you are ultimately successful,

5    what are some of the concerns you have about actually

6    collecting on judgments at the end of the day?

7    A.   Depletion of assets, hiding of assets, assets being

8    depleted and, and disappearing over time, expenses involved

9    in real property, maintaining -- paying property taxes,

10   those kinds of things until they can get liquidating, all

11   those kinds of things.  We've talked about that earlier,

12   and those are all concerns that I have.

13   Q.   This -- breaking them down one at a time, this universe

14   of assets that we have, the defendants, the various

15   entities, they have some liquid assets.  Do you believe any

16   of those presently liquid assets will be available years

17   down the road if you're successful in getting a judgment?

18   A.   Not if it goes on for a couple of years.  I mean, for

19   example, the real estate trust money that's available, I

20   think they can go at -- they can, they can get into that

21   and they'll try to spend it.

22        We do have the money tied up from the sale of the

23   property, so that's protected, but yeah, I have concerns

24   about them liquidating property and taking it and spending

25   the money.  It's assets -- it's easy -- you know, it's not

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 78 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 79 of 239

78

1    easy to get a judgment, but just because you have a

2    judgment doesn't mean you're going to be able to collect on

3    that judgment.

4    Q.  Well, and will all of the defendants during the course

5    of this litigation have attorney's fees to pay?

6    A.  Absolutely, and they're also going to have costs of

7    litigation to pay for:  Expert witnesses themselves, costs

8    and expenses of travel, depositions, transcription, all of

9    those things.

10   Q.  And, now, as far as the real estate that's potentially

11   available to satisfy judgments, do you have concerns about

12   maintaining the value of that real estate or the expense of

13   upkeep on that real estate and who's going to do it during

14   the pendency of the litigation?

15   A.  I do.  The Whispering Winds Ranch is even a bigger

16   concern than the Tommy Armour house.  It's, it's out in

17   the, you know, it's out in the rural area, it's got

18   acreage, it has the big riding arena as well as a home.

19   It's a log house that needs to be chinked and sealed, the

20   rats kept out of it.  You know, somebody has to go in and

21   take care of those things until we can hopefully get it

22   sold.

23       If you lease it out, there's concerns about tenants.

24   There's, there's alfalfa pasturage, there's grazing land --

25   or area, there's a trout pond that needs to be aerated

1    that's going to get taken over with weeds and algae.

2    There's just a lot of practical expenses and problems that

3    go along with the real estate, particularly the Whispering

4    Winds Ranch.

5        There are some concerns about the Tommy Armour

6    property.  I've talked with the neighbors.  They were

7    concerned that the yard wasn't being maintained as well as

8    it should be; although, Doc Schneider has done some work on

9    that, but again, it didn't look -- it needed some work and

10    tending.  It's going to need mowing, watering, you know,

11    weeding.  All those kind of things have to be taken care of

12    until it gets sold.

13    Q.  And if, if these --

14          THE COURT:  Well, but aren't those the things

15    that you're going to be doing anyway if this settlement is

16    approved?

17          THE WITNESS:  I am, but then there's no question

18    that I can get it done.

19          THE COURT:  Who's --

20          THE WITNESS:  You're right.

21          THE COURT:  Who's paying insurance and taxes at

22    this point in time on the real property?

23          THE WITNESS:  Dr. Schneider has done that so far.

24          THE COURT:  You have verification of that?

25          THE WITNESS:  We did ask for that.  I believe we

1    did get the insurance policy on both properties.  You know,

2    Judge, I haven't checked on that lately.  I should

3    double-check and make sure the policy is current, Your

4    Honor.

5              THE COURT:  Okay.

6    Q.  (By Mr. Gardner)  Moving forward, if the litigation

7    goes on, is there uncertainty about who will do that in the

8    future and who's responsible for it?  Is that, is that a

9    concern of yours?

10   A.  Yeah, it is.

11   Q.  Okay.

12             THE COURT:  As far as transfers, would injunctive

13   relief be a possibility even though that doesn't take care

14   of the maintenance and taxes and insurance?

15             MR. GARDNER:  We, we do have a claim for that in

16   AP 15.  And if it's not approved, if the settlement's not

17   approved and something's not done, that is certainly a step

18   we will take.  Yes, it's a possibility.

19   Q.  (By Mr. Gardner)  I guess just to summarize, do you

20   have concerns about, even in the likelihood of a

21   substantial judgment, your ability to collect on such a

22   judgment in the future?

23   A.  I do.  And I need to -- I want to be able to move

24   forward as soon as possible one way or another regarding

25   that.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 81 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 82 of 239

81

1   Q.  In AP 20, this factor, difficulties in collecting, is

2   that an issue in the settlement of AP 20?

3   A.  No.  I'm not seeking any money, any property as part of

4   that denial of discharge claim.

5   Q.  So if you're successful in AP 20, there's no recovery

6   for the estate.

7   A.  Yes.

8   Q.  The third factor is the complexity of the litigation

9   involved in the expense, inconvenience, and delay

10  necessarily attending it.

11      Was this a very important factor in your consideration

12  of this settlement?

13  A.  Yes and no.  I mean, it is, it is going to be complex

14  in the defense.  In terms of my proceeding forward, there

15  are basic claims that, frankly, I think I can prevail on

16  based on allegations.  I know there's a risk, but there are

17  allegations that, that I believe I can prevail on that will

18  result in Dr. Schneider losing his discharge.

19  Q.  Okay.  On AP 20 -- let's talk about AP 15.  Are you

20  concerned about --

21  A.  Oh, I'm sorry, you're talking about AP 20?

22  Q.  Well, we'll talk about both of them.

23  A.  Okay.

24  Q.  On AP 15, are you concerned about the complexity

25  involved, the expense, the inconvenience, and the delay?

1   A.  Yes, very, very concerned about AP 15.  It's going to

2   be very expensive, very complex, it's very time-consuming

3   to proceed forward, and the recovery is uncertain.

4   Q.  As far as a time frame and the delay we're talking

5   about, give me an idea of when you think it would be

6   possible that you would actually have finality to AP 15?

7   A.  Factoring in appeals, two years.

8   Q.  And until you were able to fully resolve AP 15 -- I

9   want to note for the record I saw a smile on Judge

10  Kirscher's face when you said "appeal in two -- within two

11  years."

12      Do you have any confidence that that process could be

13  completed in two years?

14  A.  For AP 15?

15  Q.  Yes, the jury trial and the appeals process and

16  everything attendant to that.

17  A.  No.  I can hope.

18  Q.  And until AP 15 is, is resolved, is there any

19  distribution or funds to distribute to creditors?

20  A.  No.

21  Q.  Does the estate have funds in it right now?

22  A.  Yes.

23  Q.  What will happen to those funds as AP 15 goes on and

24  experts are required and the expenses of the litigation?

25  A.  They're going to be eaten up for administrative

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 83 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 84 of 239

83

1    expenses attendant -- you know, that go along with the

2    litigation of AP 15.

3    Q.   Okay.  We've talked a lot about the complex issues and

4    the various things attendant with AP 15.  Do you have

5    anything to add on that topic?

6    A.   No, not really.

7    Q.   Okay.  Is there a possibility of multiple appeals; in

8    other words, appeals at different points in the -- this

9    process?

10   A.   Yeah, I believe so.  I think we've got the substantive

11   consolidation.  I think there could be appeals that go

12   along with that and then the jury trial after that.  We've

13   dodged the bullet on one possible deal already.  Hopefully,

14   we'll dodge it on some others.

15   Q.   Okay.  And so we've talked about the expense to the

16   estate.  Is there also a concern about the expense and

17   delay on the other side and the funds defendants need to

18   pay their attorneys.  Does that dispute diminish your

19   potential recovery?

20   A.   Right, and I've already testified about that.  And, and

21   that's going to be potentially another fight.  I'm sure

22   that the defendants are going to want to be able to use

23   funds that maybe are held or technically owned by other

24   entities before there's a final decision in this case so

25   that they can defend the case.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 84 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 85 of 239

84

1       For example, the money that you've got held in trust,

2    we've agreed that it's going to be held in trust, but they

3    may try to get access to that.  As well they might try to

4    get access to funds from Whispering Winds Ranch, which is

5    not owned by Dr. Schneider, and they might want to get the

6    exempt portion of the money from the Tommy Armour house in

7    order to defend.  That's a factor I put in -- I took into

8    account in this case.

9    Q.  There's also, under this third factor, the issue of

10   Meridian.  If, if the settlement's not approved, what's

11   the -- what effect is the expense of the Meridian

12   arbitration going to have on the estate?

13   A.  Well, if it's not approved, I don't think I've got any

14   choice but to get involved in the Meridian arbitration and

15   look to getting ready to go to Minnesota to defend.  I

16   don't want that 3 million -- I don't consider the

17   $3 million claim to be valid that they filed in the case,

18   and I'm going to need to defend it.

19   Q.  And is the estate going to have to pay you hourly to do

20   that?

21   A.  Yes, plus costs.

22   Q.  And so that will occur in the next couple of months?

23   A.  Yeah.  The -- well, it's going to start right up.  I

24   mean, I need to know right away so that I can get going on

25   that.  I mean, I can try to move -- I could try to continue

1   the trial on that, but I can tell you that the arbitrator

2   is not going to be inclined to agree to that.

3       He -- this has been going on for over two years.

4   There's been a lot of discovery and a lot of work done.

5   And, I mean, I've been monitoring it, I get discovery,

6   emails.  All of those come through that I have reviewed,

7   but I mean, this has been continued a number of times, and

8   the arbitrator and the parties want this brought to a head

9   and resolved.  So I need to know where I'm at with that so

10  I can get going on it.

11  Q.  And those expenses attendant to the Meridian

12  arbitration, is that going to eat into estate assets that

13  would otherwise be available to continue pursuing AP 15?

14  A.  Yes.

15  Q.  Do you have any idea right now how much in funds the

16  estate has?

17  A.  It's around 80,000 - $85,000 right now.  We sold some

18  personal items and got the $75,000 from Kathleen Burrows's

19  settlement, and that's about where we're at now.  And that

20  is being eaten up with bank fees and charges.

21  Q.  Okay.  And do you believe that's enough for the estate

22  to pay you to defend the Meridian arbitration hourly and

23  all your costs, and then also pay all the litigation costs,

24  not attorney's fees but just litigation costs and expenses

25  in AP 15?

1   A.  No.  It's going to run more than that, I'm sure.  Plus

2   I've got to pursue the discharge in AP 20, so there's going

3   to be litigation, attorney's fees, costs -- attorney's fees

4   and costs in that case as well, so I'm sure that the

5   80,000 - 85,000 will be eaten up and gone.

6   Q.  Now, all of these things that we've talked about, are

7   these things you've considered in ultimately agreeing to

8   this settlement and to bring these settlement proposals

9   before the Court?

10  A.  Yeah.

11  Q.  And in your business judgment, do you believe this is a

12  good outcome for the estate and the creditors?

13  A.  I believe it is.  I think it's reasonable.

14  Q.  The fourth factor is:  The paramount interest of

15  creditors and a proper deference to their reasonable

16  view -- views.

17      Do you feel like during this process, you gave

18  deference to the views of the creditors?

19  A.  I did.  When I went into the arbitration -- or, excuse

20  me, the mediation, that was, that was my concern.  I

21  thought that this would be enough for them to support it.

22  They've objected now, so I've taken that into account.  I

23  hope they reconsider.  I think this is a good amount for

24  them, I think it's a reasonable amount, and I think it's, I

25  think it's a good settlement.

1      So considering their interest, I know they have to make

2   their own decision, but I think it's, I think it's a -- for

3   them, I think this is a good result.

4   Q.  Given the potential waste in assets available for

5   recovery and the spending by both sides on attorney's fees

6   and expenses and all the other issues - increased

7   attorney's fees and litigation costs and all of that - if

8   you were -- carry both of these adversary proceedings

9   through to their conclusion and through the appeals and all

10  that process and were extremely successful in doing so, do

11  you have any confidence that even in that scenario at the

12  end of the day, you would recover more for the creditors

13  than the settlement provides?

14          MR. JAMES:  Objection.  Again, Your Honor, I

15  apologize, but this is a very leading question and --

16          THE COURT:  I'm going to sustain and allow him to

17  rephrase it, because I'm sure he can.

18  Q.  (By Mr. Gardner)  What are your thoughts on what the

19  recovery for, the net recovery for creditors would be if

20  you were successful in carrying this litigation through the

21  process versus what is recovered in this settlement?

22  A.  Well, I'm really worried about that and how much I

23  could get.  All I can say is I've seen cases like Tim

24  Blixseth where they have a multi, multimillion-dollar

25  judgment against him in the Yellowstone Club case, and they

1    haven't been able to recover anything from him.  He's

2    sitting in jail, he won't say what happened to his assets,

3    where they went.  He's being punished, but the creditors

4    aren't getting anything out of it.  And that's a concern to

5    me, and it happens.

6        And Dr. Schneider, I think, is a very strong-willed and

7    stubborn individual, and I'm of concern that the same thing

8    could happen here.  I would hate to see that kind of a

9    result for the people that have -- the creditors,

10   particularly the personal injury creditors, that have been

11   hurt by his actions here, the Monaco estate and the others

12   that have been, that have been harmed.

13       I understand their concerns and why they don't feel

14   that it's been enough.  I think there are some practical

15   realities that, that people need to consider in this, and

16   that's what I'm, that's what I'm worried about in this

17   case.

18   Q.  And given your experience and your handling in this

19   case and your experience with the debtor, what's your view

20   on future recovery if Debtor is not granted his discharge?

21   A.  Well, I don't think that they're going to be able to

22   get money from his future earnings, per se.  I think that

23   from everything I've learned and seen and discussions I've

24   had, he's not able to practice as a neurological surgeon

25   any more, really, in the United -- at least certainly not

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 89 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 90 of 239

89

1    in Wyoming or Montana.

2        And what he's going now is providing some instructional

3    services to out-of-the-country clients doing demonstrations

4    on cadavers and being paid for that.  So I don't think he's

5    going to be earning the kind of money that he's earned in

6    the past, so I think that their ability to recover from him

7    is going to be limited, it's going to be difficult.  And I

8    think he's going to play the OJ Simpson and the Tim

9    Blixseth game of hiding, of hiding assets and not really

10   earning anything.

11       He does have a retirement account, but it's exempt.  I

12   don't think they're going to be able to get at that.

13       And so, so I don't think there's a lot that, that the

14   creditors are going to be able to get even if his discharge

15   is denied.  I think they should consider that.

16   Q.  And obviously, by the response you've received, the

17   issue of settling a non-discharge action is controversial.

18   Is it something that you considered or chose to do lightly?

19   A.  No, not at all.  As a trustee, honest debtors are

20   really important, and they shouldn't be allowed to get a

21   discharge unless they're honest.  I understand that.  That

22   was, that was something that I struggled with in this case.

23       Given everything that has happened, excuse me, I would

24   not have gone into this if I had -- and done this had I

25   thought that the creditors would be so opposed to the

1   settlement, frankly, but -- because, you know, they're the

2   ones that want to pursue him later and go after him and

3   have the right to do that, and I understand that.

4       So it is an important policy consideration, and I did

5   consider that in the terms of the mediation, but at the end

6   of the day, I had a good-faith duty to present this

7   settlement to the Court, to present it to the creditors for

8   consideration, and that is what I have done.

9       And, and I do believe that overall, the benefits

10  outweigh the negatives, and it should be approved.

11              MR. GARDNER:  Thank you.  I have nothing further.

12              THE COURT:  You know, before you leave, I guess

13  I'll ask, because it may not have any applicability but I

14  want to ask the question in the event it does:  You know,

15  under Mickey Thompson, a Ninth Circuit case, is any of this

16  -- does any of it constitute a sale of claims under 363

17  that warrants or requires additional consideration as to

18  the prospect of maximizing any of the claims that might be

19  sold such as -- to maximize them under the auction process

20  or anything else under the fair and equitable standard?

21              MR. GARDNER:  There, there is a 363 sale of, I

22  believe -- let me -- the only 363 sale is the 363 interest

23  in Schneider, LP, and Schneider Management.  Those are sold

24  pursuant to 363(f) to Michelle Schneider, whatever

25  interests the estate has in Schneider Limited Partnership.

1              Given its incorporation into an extremely

2     complicated and multi-pronged settlement, I don't believe

3     it requires an auction process for that.

4              THE COURT:  Or other process to maximize that in

5     case there are other persons/entities that want to

6     auction it to, to pay a higher price?

7              MR. GARDNER:  The -- it doesn't work because it's

8     part of such a multi-pronged settlement.

9              THE COURT:  Okay.

10             MR. GARDNER:  And I believe there's numerous

11    cases out there where the courts have approved, in a

12    similar scenario, a portion of the settlement being done

13    through a 363 sale.  In fact, I think in In Re: Amen, when

14    we had the contested settlement with the Lowe/Amen

15    membership interest -- this portion of the motion and

16    settlement agreement related to the 363 sale portion I

17    believe is the same as what we did in the In Re: Amen case,

18    which was contested.

19             THE COURT:  Okay.  I just want to make sure we

20    cover it.

21             Mr. James.

22             MR. JAMES:  Your Honor, if I might respond to the

23    Court's question on that last point very briefly, I would

24    argue that the bankruptcy estate's claim against Meridian

25    would also fall into that category.  And were -- the

1    settlement that will transfer that claim to Dr. Schneider,

2    were that claim to be auctioned or something done to

3    maximize its value, it might actually have resulted in some

4    money for the estate versus simply giving it to

5    Dr. Schneider here.

6          THE COURT:  Okay.  Well, I'll allow parties to

7    develop that as testimony or, or through other evidence, if

8    they wish.

9    Q.  (By Mr. Gardner)  Mr. Womack, do you have any comment

10   on that?

11   A.  Yes.  I did consider that, Your Honor, with respect to

12   the settlement and, and whether or not auctioning, for

13   example, the Meridian claim would, would result in more

14   money.  I think Meridian would like to settle this and they

15   might be interested in that, but in looking at the global

16   settlement and the amount of money that we would get, my

17   judgment is, is that trying to fragment this and do those

18   sorts of would not result in a greater settlement for the

19   estate than what we've got now, the $2.5 million for the

20   estate, gross.

21         THE COURT:  And you're basing that on now your

22   investigation and conclusion that the aggregate assets of

23   the estate may be around 4 million?

24         THE WITNESS:  Yes.

25         THE COURT:  Okay.  Even though the assets were

```
 1    scheduled at higher value.

 2            THE WITNESS:  Significantly higher, far higher.

 3    But, for example, the --

 4            THE COURT:  But we're still dealing with apples

 5    to apples, the same assets, or have there been assets

 6    disappeared?

 7            THE WITNESS:  No, they're the same.

 8            THE COURT:  Okay.

 9            THE WITNESS:  They're basically the same assets.

10    The things that really raised the value of the estate were

11    the claims that Dr. Schneider scheduled that were actually

12    held by Northern Rockies Neurological Spine and the claim

13    against Meridian that he had personally, you know, for that

14    lost income stream for 10 years.  That one was huge.  And

15    to me, it's just worthless.

16            THE COURT:  Okay, thank you.  Who would like to

17    go first in -- Mr. Cossitt.

18            MR. COSSITT:  You know, with the Court's

19    permission, we actually have a common interest --

20            THE COURT:  You do.

21            MR. COSSITT:  -- in getting the settlement

22    agreement approved.  And if that's a -- yes.

23            THE COURT:  I think it's appropriate you would go

24    next given that commonality.

25            MR. COSSITT:  Thank you -- (inaudible.)
```

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 94 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 95 of 239

94

1            MR. JAMES:  Your Honor - I apologize,

2   Mr. Cossitt, if I might - just a procedural objection, Your

3   Honor.

4            We are before the Court on the trustee's motion

5   to approve these two adversary settlements.  The trustee is

6   the moving party.  There are a number of creditors here who

7   are objecting, who are obviously opposing that.

8   Mr. Cossitt's client, Mr. Parker's clients are neither the

9   movants nor are they objecting, so I would question their

10  participation in this hearing -- (inaudible.)

11           THE COURT:  But they are signers, but they are

12  signers to the agreements, correct?

13           MR. JAMES:  Correct.  They have not joined in the

14  motion.  As I said, it is solely the trustee's motion that

15  is before the Court and the objection of these creditors.

16           THE COURT:  Well, I'm going to let Mr. Cossitt go

17  next, and then Mr. Parker, and then all of the creditors,

18  and the trustee will go after that.  Okay?

19           And obviously, we're going to go into the

20  afternoon, so --

21           MR. COSSITT:  Your Honor, before I get started,

22  I'm aware that the witness has been on the stand for an

23  extended period of time.  I guess should I just get moving?

24           THE COURT:  Are you okay?

25           THE WITNESS:  How long are you going to be,

```
 1    Mr. Cossitt?

 2              MR. COSSITT:  We'll be right up until noon,

 3    Mr. Womack.

 4              THE WITNESS:  I'll be fine with that.

 5              MR. COSSITT:  Okay.

 6                        CROSS-EXAMINATION

 7    BY MR. COSSITT:

 8    Q.  Mr. Womack, let's, let's focus on Adversary No. 15-15,

 9    okay --

10    A.  Yes, sir.

11    Q.  -- the collection case?

12         All right.  What is your estimate, if you get an

13    opinion from this court denying approval of the proposed

14    settlement, what's your estimate of the amount of -- length

15    of time from today until trial; discovery, pretrial

16    motions, yada yada?

17    A.  At least a year.

18    Q.  Okay.  And once you get to a trial, what's your

19    estimated length of trial?

20    A.  Oh, I think it could take more than a week, 10 days -

21    2 weeks.  It will be a long trial with all the expert

22    witness and the financial documents and everything that

23    needs to come in.

24    Q.  It's fact-intensive.

25    A.  It is fact-intensive.
```

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 96 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 97 of 239

96

1    Q.  Do you have a -- and you've opined that one party or

2    the other is likely to appeal some kind of a decision at

3    the conclusion of the trial process?

4    A.  Oh, yes, one or the other will.

5    Q.  Okay.  And on top -- and in considering those opinions,

6    you're also considering this weird dance back and forth

7    between the district court and the bankruptcy court, right?

8    A.  Yes.

9    Q.  The Stern vs. Marshall dance?

10   A.  Yes.

11   Q.  Have you formed on opinion with respect to the clarity

12   and certainty with both this court and other courts are

13   interpreting the Stern vs. Marshall doctrines?

14   A.  I think that there's a lot of uncertainty regarding the

15   Stern vs. Marshall doctrine.  I think it is still being

16   fully developed and ferreted out.  There are issues that

17   can be appealed with regards to any decisions that are made

18   in that regard.

19   Q.  You know, would it be --

20              THE COURT:  You know, let's clarify, though:

21   15-15's already at the district court.

22              MR. COSSITT:  I guess, Your Honor, I'm eliciting

23   testimony on the whole kit and caboodle --

24              THE COURT:  Oh, okay.

25              MR. COSSITT:  -- 15-15 and 15-20.  And I guess I

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 97 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 98 of 239

97

1    would like to elicit a little testimony from the witness

2    here about:  Although that's the Court's view, how lawyers

3    view it and argue back and forth, you know, in terms of

4    the --

5              THE COURT:  Well, there's no argument about where

6    15-15 is.

7              MR. COSSITT:  Okay.

8              THE COURT:  We're in pretrial, and it's been

9    already sent to withdrawal of reference.  It's done by

10   Judge Waters.

11             MR. COSSITT:  Okay.  Thanks, Judge.

12             THE COURT:  I mean, AP 20 is a different matter,

13   and that's clearly my jurisdiction.

14             MR. COSSITT:  It is.

15   Q.  (By Mr. Cossitt)  But you've considered the Stern vs.

16   Marshall dance - I call it the "Stern vs. Marshall dance" -

17   uncertainty and complexity in the opinions that you've

18   expressed here today?

19   A.  Yes.

20   Q.  Okay.  How do you intend -- in Adversary 15-15, you're

21   aware that there's an advice of counsel defense in there,

22   correct?

23   A.  There's -- I'm sorry?

24   Q.  An advice -- that Dr. Schneider and the other

25   defendants have pled advice of counsel as one of the

1   defenses?

2   A.  Yes.

3   Q.  You're aware that their position is, "Look, we've paid

4   a bunch of lawyers in Wyoming for an asset protection plan

5   and an estate plan," right?

6   A.  Yes.

7           MR. JAMES:  Objection, Your Honor.  These

8   questions are leading.  This is not an adverse witness.

9   They have a joined interest, as Mr. Cossitt has said.  We

10  would prefer that the trustee be allowed to testify.

11          THE COURT:  Sustained.

12  Q.  (By Mr. Cossitt)  Do you -- have you formed -- you've

13  read the answers, right?

14  A.  Yes.

15  Q.  You've looked at the affirmative defenses made in

16  15-15?

17  A.  Yes.

18  Q.  Have, have the Schneider entities and clan asserted

19  advice of counsel?

20  A.  Yes.

21  Q.  What's your plan to overcome that at trial?

22  A.  I haven't, I haven't considered that yet.  I haven't

23  discussed that with Mr. Trent -- or Mr. Gardner in detail;

24  "Mr. Trent."

25  Q.  Do you consider it a problematic or troublesome

1    defense?

2    A.  Not completely.  I mean, it's, it's going to be an

3    issue we're going to have to deal with, but I believe we

4    can overcome it.

5    Q.  Can you envision the defendants parading experts in

6    front of the -- at the trial saying, "You know what?  This

7    is an acceptable thing to do for physicians?"

8    A.  Yeah, I'm sure that they're going to do that.

9    Q.  Do you know approximately when the asset protection or

10   estate plan was set up?

11   A.  I believe so, yes.

12   Q.  When?

13   A.  The, the first time that I saw any kind of an estate

14   planning or asset protection planning work being done was

15   in about 2007.  There might have been some before then, but

16   it wasn't significant.  The majority of the asset

17   protection and estate planning was done beginning in 2011

18   and 2012.

19   Q.  The plan documents were set up back in 2007, weren't

20   they?

21   A.  No.  The only thing that was set up in 2007 was the

22   Schneider Limited Partnership.  There was a trust -- or

23   another entity set up at BC -- let's see, Brandon, Caitlin,

24   something trust, but it never really had much.

25       The real, the real estate planning and asset protection

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 100 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 101 of 239

100

 1    documents started being discussed and formed in 2011 and

 2    then in 2012.  The irrevocable trusts for the children were

 3    set up in 2012.  The MedPort had been set up sooner but

 4    didn't have anything in it and it wasn't utilized as part

 5    of this whole thing until after 2011.

 6    Q.  Could you give us your assessment of the probability of

 7    success on the merits in Adversary 15-15?

 8    A.  You're asking me to give a percentage?

 9    Q.  I am, within 10 percent.

10    A.  Well, I believe we'd have -- that we will be successful

11    to some degree.  I would put that at better than 80

12    percent.  But as to how much we would be able to recover,

13    it's 50/50.  I couldn't tell you.  I couldn't say that

14    we're going to -- I could not say that we're going to get

15    more than we're getting here today with any assurance.

16    Q.  So you believe the success of merits on some components

17    of the litigation would be in the neighborhood of

18    80 percent; is that correct?

19    A.  At least on, on some component of it, yeah.

20    Q.  All right.  And others are lower.

21    A.  Yes.

22    Q.  Okay.  Overall, can you give me an opinion as to your

23    assessment of the, the overall success or -- the overall

24    chances of success on the merits?  Can you reduce that to a

25    number for me?

1    A.  Well, I'm not -- I mean, there's different parts.

2    There's liability, setting aside the different entities,

3    you know, getting access and recovering assets.  I'm not

4    sure exactly what you're asking.

5    Q.  I'll withdraw the question, then.

6    A.  Okay.

7    Q.  With respect to deference to the creditors' views,

8    you're aware there's a number of contingent claims in this

9    case, right?

10   A.  Yes.

11   Q.  And you've filed objections to them, right?

12   A.  Yeah.

13   Q.  Now, there -- what is a contingent claim?

14   A.  It means that it hasn't been decided that it has --

15   that it's allowed, that it's subject to defenses.  It

16   hasn't been litigated, gone to judgment.  It's not -- it's

17   also objected to by the creditor -- or the debtor, rather.

18   He doesn't believe that he's liable on the claim.  So it

19   still has to be litigated -- (inaudible.)

20   Q.  So a contingent claim is one in which liability has not

21   been determined?

22   A.  Yeah.

23   Q.  Okay.

24   A.  Yes.

25   Q.  And, then, do you know what an unliquidated claim is?

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 102 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 103 of 239

102

1   A.  Yes.

2   Q.  What's an unliquidated claim?

3   A.  The amount of the claim has not been determined in some

4   fashion.

5   Q.  Okay.  Now, you looked at Attorney Patten's objection

6   to this settlement, right?

7   A.  Yes.

8   Q.  Is, is each and every claim that he asserts objections

9   on behalf contingent and unliquidated?

10  A.  Yes.

11  Q.  And you spoke -- did I understand your earlier

12  testimony to be that you spoke with Attorney Patten before

13  you showed up at the mediation?

14  A.  Yes.

15  Q.  At the time you showed up at the mediation, did you

16  have an agreement with him that his clients were going to

17  buy into this?

18  A.  No.

19  Q.  In the context of showing up and negotiating the

20  settlement, you were clearly aware of the four-factor test

21  at the time we were at that mediation, right?

22  A.  Yes.

23  Q.  So what deference does a Chapter 7 panel trustee give

24  to $7 million worth of claims which are disputed as to

25  liability or contingent and unliquidated?

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 103 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 104 of 239

103

1        How do you stir that into the mix of your duty to

2   negotiate a settlement consistent with the fourth factor in

3   the four-factor test?

4   A.   Well, I understand your question and your concern.

5   They are contingent, unliquidated, disputed, but they

6   assert claims that on the -- first of all, if a claim is

7   asserted on its face, it's given some credence.

8        And based on my investigation, preliminary

9   investigations of those claims and what occurred,

10  particularly with respect to the Monaco claim, it appeared

11  to me that they had, they had valid -- they had claims that

12  could be legitimately, in good faith, brought and had some

13  reasonable chance of success.  So, so that is how I looked

14  at that in determining this.

15       I mean, you're asking me to, to kind of look into the

16  future and predict, but as a trustee, I have to do that

17  sometimes, and --

18  Q.   I guess what I'm asking is:  You show up at a -- a

19  Chapter 7 trustee shows up at a mediation to hammer out a

20  settlement deal, and you've got a bushel basket full of

21  claims, say 20 of them.  Ten of them are garden variety,

22  uncontested contract claims, the other ten are contingent

23  and unliquidated.

24       As a trustee, do you give greater weight to the views

25  of the contract claim holders for which there's no

1  reasonable basis for dispute, and do you give less weight

2  to people whose claims are subject to serious dispute?

3  A.  I would give greater weight to the contract claims, but

4  I also still have to consider the other claims.

5  Q.  And did you try to do the best job possible in weighing

6  these competing considerations at the settlement -- or at

7  the mediation meeting?

8  A.  I did.

9  Q.  At the conclusion of the settlement meeting, the

10  mediation, were you under the belief that the personal

11  injury claimants would be on board with this settlement?

12  A.  I thought they would.  I thought that the amount was

13  sufficient to -- and given all the other factors, that they

14  would be on board with it.

15  Q.  Let's turn our attention to Adversary No. 15-20.

16  A.  Yes.

17  Q.  (Inaudible) -- discharge case.

18  A.  Yes.

19  Q.  Could you give me your best estimate of the amount of

20  time it would take from today to trial?  That would be

21  discovery, dispositive motions, that kind of pretrial

22  skirmishing.

23  A.  That's going to be difficult.  We have a trial date

24  currently.  And if the Court holds us to that trial date,

25  then that's when it's going to be, so we'll deal with it

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 105 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 106 of 239

105

1    that way.

2        If, if the Court is -- will allow the trial date to be

3    continued in light of everything that took place, we're

4    going to need several months to engage in discovery and

5    then get ready for trial.

6        So under the first scenario, trial is in May.  Under

7    the second scenario, the trial wouldn't probably be until

8    September, would be my estimate.

9    Q.  And do you have an estimate for the amount of time it

10   would take to try Adversary 15-20?

11   A.  Yeah, I think I can -- I think it can get done in two

12   days at the most.  It depends, in part, on what I decide to

13   pursue in terms of facts in order to deny discharge.

14   Q.  And you, you -- I think you testified earlier you

15   expected if the debtor loses, he'll probably take that up

16   on appeal.

17   A.  I'm sure.

18   Q.  Okay.  What do you have for a cost estimate with your

19   seven months of -- excuse me.  Seven months of pretrial

20   skirmishing, two days of trial, what's your cost estimate

21   for that litigation package?

22            MR. JAMES:  Objection.  I believe the question

23   misstates the witness's testimony about the length of

24   pretrial preparation.

25            THE WITNESS:  You know, I'm --

1           THE COURT:  I'll sustain as to that.  I'll let

2    you answer the question, if you can.

3           THE WITNESS:  You know, I -- it's really hard.  I

4    haven't put a pencil to it.  I'm sure it will be -- you

5    know, it could be $10,000 to get it done.  Certainly

6    including my attorney's fees/costs, it could be more,

7    15,000 - 20,000.  It's hard.  I haven't sat down and just

8    tried to analyze that carefully.  It depends, in part, on

9    what Defendants do and the kind of discovery they want to

10   engage in.  There's a lot of factors involved in that.

11   Q.  (By Mr. Cossitt)  Who has the burden of proof on those

12   claims?

13   A.  It's on me.  I have the burden of proof.

14   Q.  Do you have an estimate of your chances of success on

15   the merits?

16   A.  Yes.

17   Q.  What is it?

18   A.  I think it's over 90 percent, but I've been wrong

19   before.

20   Q.  There, there won't be any judgment collection by the

21   bankruptcy estate if it prevails on that, will there?

22   A.  No.

23   Q.  What's the practical reality of that litigation's

24   complexity?  Is it complicated litigation?

25   A.  Again, it depends on what claims I go forward on.  As

1    the complaint currently stands, it's complicated and it

2    will take a lot of time to engage in discovery and to try

3    it, certainly longer than two days to complete it.

4    Q.  Will it be inconvenient for the bankruptcy estate to

5    have to deal with this adversary proceeding?

6    A.  Inconvenient?

7    Q.  Yeah.  That's one of the factors in the four-factor

8    test, sir.

9    A.  Well, I mean, it's part of my job.  I wouldn't really

10   consider it inconvenient.

11   Q.  Will it result in delay of the other tasks that are at

12   hand to administer this estate?

13   A.  I think I can deal with all of it.

14   Q.  Okay.  Let's assume that the discharge denial is

15   prosecuted successfully.  What does that mean?

16   A.  That means that Dr. Schneider will not get a discharge

17   of certain claims that are asserted in the case.

18   Q.  So he does not receive a bankruptcy discharge.

19   A.  Right.

20   Q.  And do you know what the legal effect of that is?

21   A.  Well, I think so.

22   Q.  What does it allow the -- let's focus on the personal

23   injury creditors.  So assuming that he doesn't get a

24   discharge, what do the personal injury creditors do after

25   that?

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 108 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 109 of 239

108

1    A.   Well, they still have to liquidate their claim.

2    Q.   And they do that one by one, don't they?

3    A.   Right.   And they'll have --

4    Q.   And where do they do that?

5    A.   They'll have to do that in the court where they, they

6    would have had to bring the claim originally.

7    Q.   Outside of the bankruptcy court system.

8    A.   Right, state.   I think it's -- I think all those claims

9    are in state district court down in Wyoming, if I'm not

10   mistaken, or one maybe in -- (inaudible.)

11   Q.   So if the discharge gets denied, we have individual

12   creditors going back to whatever forum they were in before

13   this bankruptcy proceeding was started, right?

14   A.   Yeah, yeah.

15   Q.   And they, they individually prosecute their claims and

16   consume judicial resources and other resources to prosecute

17   their claims one by one in whatever forum they happen to be

18   in.

19   A.   That's, that's one -- yeah, that's a very likely

20   scenario.

21   Q.   And then outside of bankruptcy, it's generally a race

22   to the assets, isn't it?

23   A.   Yes; although, the automatic stay would preclude them

24   from going after any assets of the bankruptcy estate.

25   Q.   Well, but I'm not talking about the bankruptcy estate's

1    assets.  I'm referring to prosecuting claims against a

2    defendant and then chasing the assets.  There's no

3    automatic -- assets of the defendant, not the estate.

4    A.  Correct.

5    Q.  Okay.  So instead of one set of transaction costs here

6    in bankruptcy court, these folks would be getting into

7    multiple sets of transaction courts -- or transaction costs

8    in other forums other than the bankruptcy court forum.

9    A.  Yes.

10   Q.  What does, what does a lis pendens under Montana law

11   do?

12   A.  Gives notice that the estate -- or that there's an

13   action concerning property, real property, and gives notice

14   of your claim against that property.

15   Q.  But it's not an injunction, is it?

16   A.  No.

17   Q.  Nor is it any sort of a prejudgment remedy.

18   A.  Not per se.  I think it ties up property as a practical

19   matter because it's difficult to sell, given title issues

20   that go along with that.

21   Q.  But all it does is, is cloud the title, right?

22   A.  It does.

23   Q.  It doesn't entitle anybody to tie up assets or income

24   or sale price - (inaudible) - does it?

25   A.  The lis pendens itself?  No.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 110 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 111 of 239

110

1   Q.  One would have to go get an injunction or attachment or

2   other prejudgment remedy.

3   A.  Yes.

4           MR. JAMES:  Objection, Your Honor, to this line

5   of questioning as to both leading and relevance.

6           THE COURT:  I'm going to overrule that.

7           MR. COSSITT:  May I approach the witness, Your

8   Honor?

9           THE COURT:  You may.

10          MR. COSSITT:  The record should reflect that I'm

11  going to give the witness a copy of a document that's filed

12  at Docket No. 212-1 and ask him to identify it.

13          THE WITNESS:  Yes, I -- it's a letter I sent to

14  Dr. Schneider regarding some documents, boxes of documents

15  that he had dropped off at my office and that I was asking

16  him to pick up and take care of.

17  Q.  (By Mr. Cossitt)  Okay.  In that letter, did you demand

18  payment from him?

19  A.  I did.

20  Q.  How much did you demand from him?

21  A.  I do not recall.  I'd have to look at the letter again.

22  Q.  Did you have a legal or contractual basis to demand

23  payment from him?

24  A.  Yes.

25  Q.  What was it?

1                 UNIDENTIFIED SPEAKER:  Your Honor, I object.

2                 THE COURT:  Yeah, I'm wondering where we're

3      going.

4                 MR. COSSITT:  We're going -- one of the four

5      factors in the four-factor test is the complexity of the

6      litigation.  And going forward, I guess if this doesn't

7      settle, this litigation and the administration of this case

8      may get more complicated with the debtor having some other

9      things under consideration with respect to the way he's

10     been treated by this trustee.

11                And we'd like a little bit of latitude to put

12     some evidence into the record to give the Court the flavor

13     of things that are under consideration on the debtor's side

14     in terms of matters that go to the heart of the

15     administration of this case and complexity that might get

16     injected into it.

17                THE COURT:  Well, I'm -- Mr. Patten.

18                MR. PATTEN:  The witness has --

19                THE COURT:  You need to be closer to a mic.

20                MR. PATTEN:  If the witness hasn't testified that

21     he's taking these things into account, I don't see what the

22     relevance is.  So there's a foundation issue that it's

23     something that the witness took into account and considered

24     in proposing the settlement.

25                THE COURT:  Yeah, I guess that's what I'm

1    struggling with, is how this links to administration in the

2    regulation to the compromise/settlement - I see them

3    separate and distinct - and that you could raise those in

4    any event regardless of the settlement.

5            MR. COSSITT:  Well, again, Your Honor, our view

6    is that under the four-factor test, the Court's

7    consideration includes the delay and inconvenience of

8    the -- or of the litigation - (inaudible) - estate, so

9    that's our response.  We would like a little latitude to

10   continue with it.  And alternatively, I'll elicit some of

11   the same testimony when I put my client on the stand, or

12   attempt to.

13           THE COURT:  I'm going to sustain the objection.

14           MR. COSSITT:  Okay, thank you.  I'll just review

15   my notes, and I may well conclude here in a minute.

16           THE COURT:  Okay, thank you.

17           MR. COSSITT:  That does conclude my examination.

18           THE COURT:  Okay.

19           MR. COSSITT:  Thank you.

20           THE COURT:  Thanks.

21           THE WITNESS:  We could go on, from my

22   perspective, Your Honor.

23           THE COURT:  Well, let me just see where

24   Mr. Parker is.  Do you have questions, Mr. Parker?

25           MR. PARKER:  I can be done by noon.

```
 1              THE COURT:  Okay.

 2              MR. PARKER:  I can be done by noon.

 3              THE COURT:  All right, I'll let you go.  I'll let

 4   you go, and then we will then take a break for lunch, and

 5   then we will start with the opposition.

 6                          CROSS-EXAMINATION

 7   BY MR. PARKER:

 8   Q.  Mr. Womack, I'm sure you have read the objections posed

 9   by Mr. Patten's clients.

10   A.  Yes; yes, I have.

11   Q.  And you've read the substance of the objection and the

12   nature of what he believes his claims are worth and the

13   objections of the, of his clients, correct?

14   A.  Yes.

15   Q.  Did you see anything new in any of those filings that

16   you didn't consider when you entered into this settlement

17   agreement?

18   A.  No.

19              MR. PARKER:  That's all I have, Your Honor.

20              THE COURT:  Okay, thank you.  It is, what,

21   5-to-12.  Let's break for lunch.  We'll reconvene at 1:30

22   here.

23              So, Mr. Womack, you may step down.

24              THE WITNESS:  Thank you, Your Honor.

25              THE COURT:  You can leave your exhibits if you
```

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 114 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 115 of 239

114

1    want, or you can take them with you, whatever you prefer.

2              So with that, Court is in recess.

3              (The lunch recess was taken.)

4              THE COURT:  Good afternoon.  Please be seated.

5              Mr. York.

6              MR. YORK:  Good afternoon, Your Honor.  Aaron

7    York for the Office of the United States Trustee.

8              THE COURT:  Okay.

9              MR. YORK:  We do have one witness that we wanted

10   to put on in our case in chief.  It's Mr. Michael Kakuk

11   from the Commissioner of Securities and Insurance in

12   Montana.

13             It's a pretty short presentation on my end.  I

14   think Mr. Cossitt has a couple minutes of

15   cross-examination.  But because Mr. Kakuk lives in Helena

16   and he's sitting out there with a relatively short amount

17   of testimony, I polled the other lawyers in, in the

18   courtroom, and they were gracious enough to indicate that I

19   could put him on now if, if Your Honor was in agreement

20   with that.

21             THE COURT:  No problem.  Call him, sure.

22   Let's -- we'll do that.

23             MR. YORK:  Let me get him.

24             THE COURT:  While he's getting the witness, I'll

25   just note that this is a continuation of the trustee's

1   motion to approve compromises and settlements in 14-61357,

2   In Re: Schneider.

3           If the witness would come to the podium to be

4   sworn by the clerk, who will appear on the video, please.

5                   MICHAEL KAKUK, WITNESS, SWORN

6           THE COURT:  Mr. York, is there, is there a

7   monitor on in that podium?

8           MR. YORK:  A monitor on in the podium?

9           THE COURT:  Yeah.  No?

10          MR. YORK:  (No audible response.)

11          THE COURT:  There isn't, okay.

12          MR. YORK:  Yeah, I don't see one.

13          THE COURT:  Yeah, I thought they were going to --

14   okay.

15          MR. YORK:  Your Honor, can I approach the witness

16   with a binder of exhibits?

17          THE COURT:  Certainly.

18          MR. YORK:  And I believe -- does Your Honor have

19   the Meridian witness binder as well?

20          THE COURT:  I do.

21          MR. YORK:  Thank you.

22          THE COURT:  You know, I was misleading to

23   Mr. James or whoever it was that was up when I had

24   mentioned about the camera.  Actually, I think the camera

25   is right around the corner there.  You might see it up on

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 116 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 117 of 239

116

 1    the wall toward the window.

 2              MR. YORK:  Right.

 3              THE COURT:  This one, I think, is on the witness

 4    or on the bench.  So just to clarify, if you were looking

 5    to -- want to get a frontal shot on the camera, you can.

 6                      DIRECT EXAMINATION

 7    BY MR. YORK:

 8    Q.  Mr. Kakuk?

 9    A.  Yes.

10    Q.  What is your position?

11    A.  I'm an attorney with the CSI, which is the Commissioner

12    of Securities and Insurance Office of the Montana State

13    Auditor.

14    Q.  And how long have you held that position?

15    A.  For roughly two years now - almost three.

16    Q.  And in general, could you describe for the Court what

17    your office does?

18    A.  Sure.  Well, it's officially called the "Montana State

19    Auditor's Office," but we've christened it also the

20    "Commissioner of Securities and Insurance" because those

21    are the areas of the law that we regulate, insurance

22    companies and securities.

23              THE COURT:  You know, I may have missed it or was

24    thinking of something else.  Did you ask for his name?

25    Q.  (By Mr. York)  Could you please state your name for the

1   record?

2   A.  Of course.  Michael Allen Kakuk, K-A-K-U-K.

3   Q.  Thank you.

4          THE COURT:  Thank you.

5          MR. YORK:  Thank you, Your Honor.

6   Q.  (By Mr. York)  And, Mr. Kakuk, has your office had

7   prior involvement with Dr. John Schneider?

8   A.  Yes, we have.

9   Q.  And how did your office first come to have involvement

10  with Dr. Schneider?

11  A.  Dr. Schneider -- sorry, "Schneider"?

12  Q.  Schneider [pronouncing].

13  A.  Schneider.  Dr. Schneider started a captive insurance

14  company that was regulated by our office back in 2008.

15  Q.  And what was the name of that captive insurance

16  company?

17  A.  Northern Rockies Insurance Company.

18  Q.  And as -- did you, did your office issue a certificate

19  for that entity to operate in Montana?

20  A.  Yes, we did.

21  Q.  And what do pure captive insurance companies do?

22  A.  Well, a pure captive, you can think of it kind of like

23  a private holding company for one person.  They insure

24  risks of a parent company.  In this case, Dr. Schneider

25  used the company to insure the risks of his medical

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 118 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 119 of 239

118

1    malpractice -- or, sorry, the medical malpractice insurance

2    for his medical practice.

3    Q.  And do you, do you know what Dr. Schneider's

4    relationship was with Northern Rockies Insurance Company?

5    A.  He was the, technically the owner of the, of the

6    captive.

7    Q.  Now, I understand that your office issued an order of

8    suspension against NRIC in February of 2013.

9    A.  That's correct.

10   Q.  Why did the CSI issue an order of suspension against

11   NRIC?

12   A.  There were a couple of reasons.  We had multiple

13   concerns with the operations of NRIC.

14        First of all, we had received notice from his captive

15   manager, Ace Harris [phonetic], that, that they were fired,

16   essentially, and were no longer a captive manager.  And a

17   captive manager is required for a captive, so that started

18   our involvement.

19        And then we learned about that there was essentially

20   one claim that was paid by Dr. Schneider, a claim for

21   essentially a defamation case, and that depleted all the of

22   the funds in the company.  We had concerns about how and

23   why that claim was paid and also, then, that the company

24   had no -- had insufficient funds to continue.

25   Q.  So the defamation claim was paid with the, with

1    funds -- the defamation claim depleted funds available for

2    other claimants?

3    A.   Correct, yes.

4    Q.   How did Dr. Schneider respond to the order of

5    suspension by your office?

6    A.   Through his counsel, there were communications between

7    his attorneys and our office.  They attempted to resolve

8    our concerns through those communications, which included

9    an affidavit that was signed by Dr. Schneider and notarized

10   and submitted to our office.

11   Q.   Can I ask you to turn to Exhibit 12 in the Meridian

12   binder that I just gave to you?

13   A.   I have it.

14   Q.   Do you recognize Exhibit 12?

15   A.   Yes.  This is a copy of the affidavit that was

16   submitted to our office.

17   Q.   By Dr. Schneider?

18   A.   Correct, by Dr. Schneider through a letter from his

19   attorney.

20          MR. YORK:  Your Honor, I'd move for the admission

21   of Meridian Exhibit 12.

22          THE COURT:  Any objection?

23          (No audible response.)

24          THE COURT:  Exhibit 12 is admitted.

25          MR. COSSITT:  I'm sorry, I object.  Where on the

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 120 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 121 of 239

120

 1    docket is it located?

 2              MR. YORK:  It's Exhibit 12 to Meridian's

 3    exhibits.

 4              MR. GARDNER:  Two eighty-five, Judge.

 5              THE COURT:  Two eighty-five, yeah.

 6              MR. COSSITT:  Eighteen?  No objection.

 7              THE COURT:  Admitted.

 8              MR. YORK:  Mr. Kakuk, would you please turn to

 9    page 4 of Exhibit 12?

10              THE WITNESS:  Yes.

11    Q.  (By Mr. York)  Would you go ahead and read that

12    paragraph, Roman Numeral V, please?

13    A.  Yes:  It is my desire and intention to close NRIC as a

14    functioning entity and resolve the Wyoming-related

15    litigation to the best of my ability using my own

16    resources.  I do not know if any further Wyoming claims

17    will be made other than those listed above.

18    Q.  And that was an affidavit that Dr. Schneider submitted

19    to your office.

20    A.  Correct.

21              MR. YORK:  No further -- I'll pass the witness.

22              THE COURT:  Okay.  Anyone have questions?

23              MR. SOUEIDI:  Your Honor, Joe Soueidi with

24    Meridian.

25                        CROSS-EXAMINATION

```
 1    BY MR. SOUEIDI:

 2    Q.  Mr. Kakuk, would you just briefly summarize what the

 3    affidavit said, just very briefly, that Mr. Schneider

 4    signed?

 5    A.  The entire affidavit?

 6    Q.  Just briefly, the general idea of it.

 7    A.  Sure.  We had asked for a description of what his

 8    current business was, what claims were pending against the

 9    company, whether there were any additional funds, what his

10    intentions were to do with the company, and how the pending

11    claims would be resolved.  Those were our concerns, and he

12    attempted to address those in the affidavit.

13    Q.  In your opinion, do you think the proposed settlement

14    between Dr. Schneider and the trustee, which allows for

15    discharge of Dr. Schneider's debts, is fair and equitable?

16              MR. GARDNER:  Your Honor, I object.  (Inaudible)

17    -- not a party to the bankruptcy - (inaudible) - not an

18    expert witness -- (inaudible.)

19              THE CLERK:  Excuse me, we're not picking you up

20    on the record.

21              MR. GARDNER:  I apologize.

22              THE COURT:  Is your mic on?

23              UNIDENTIFIED SPEAKER:  Mic's off.

24              MR. GARDNER:  No.  Is that better?

25              THE CLERK:  Much better.  Thank you.
```

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 122 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 123 of 239

122

1      MR. GARDNER:  I object on relevance.  He's not a

2 party and his opinion is not relevant to this.

3      MR. COSSITT:  We object also in that neither the

4 U.S. Trustee nor the department are creditors in this case.

5      Although the U.S. Trustee's a party in interest,

6 the opinions that are being elicited are not from anybody

7 who's a creditor, so they lack standing to object to

8 discharge.

9      Further object to lack of foundation.  We've got

10 a witness on the witness stand who is a lawyer for a state

11 agency, and there's been no foundation laid that this is

12 the opinion of the agency or that there was any internal

13 deliberations which resulted in a final agency opinion on

14 this.  We have an opinion of an individual lawyer from a

15 state agency that purports to speak for the entire agency.

16      On those bases, we object and request the Court

17 sustain it.

18      THE COURT:  I'll sustain both objections.

19 Q.  (By Mr. Soueidi)  Is -- excuse me.  Was Dr. Schneider's

20 affidavit submitted to your office?

21 A.  Yes, it was.

22 Q.  And it's holding your formal records there?

23 A.  Correct.

24      MR. SOUEIDI:  Okay.  No further questions, Your

25 Honor.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 123 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 124 of 239

123

```
 1              THE COURT:  Mr. Patten.

 2              MR. PATTEN:  Thank you, Your Honor.

 3                        CROSS-EXAMINATION

 4   BY MR. PATTEN:

 5   Q.  Mr. Kakuk, would you look at page 3 of the exhibit?

 6   A.  Yes.

 7   Q.  Thomas vs. Schneider was one of the claims that was

 8   pending at the time?

 9   A.  Yes.

10   Q.  And Monaco Estate vs. Schneider was one of the claims

11   pending at the time?

12   A.  Correct.

13   Q.  Do you have any knowledge of whether Dr. Schneider used

14   the best of his ability and resources to resolve the claims

15   of either Thomas or Schneider -- or, excuse me, of Monaco?

16   A.  It's my understanding that those claims have not been

17   resolved.

18              MR. PATTEN:  Okay, thank you.

19              THE COURT:  Mr. Cossitt.

20                        CROSS-EXAMINATION

21   BY MR. COSSITT:

22   Q.  Mr. -- is it "Kakuk"?

23   A.  Kakuk [pronouncing].

24   Q.  Kakuk, excuse me.

25   A.  No worries.
```

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 124 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 125 of 239

124

1    Q.  That final paragraph that you read into the record

2    talks about his, Dr. Schneider's desire and intention,

3    right?

4    A.  Correct.

5    Q.  And it talks about the best of his ability, right?

6    A.  Correct.

7    Q.  Okay.  The affidavit doesn't set any standards by which

8    to measure best efforts or best abilities, does it?

9    A.  I don't believe so, no.

10   Q.  So what standards or criteria did the department use in

11   formulating the opinions that you've expressed here today?

12   A.  I'm sorry, could you repeat the question?

13   Q.  The opinion that you've expressed today, I believe, was

14   that it's your view or the department's view that

15   Dr. Schneider has not used the best of his ability to try

16   to resolve these claims.  Did I misunderstand your

17   testimony?

18   A.  No.  I don't believe I testified to that today, but

19   that is my opinion.

20   Q.  Okay.  And you agree, though, that the affidavit that

21   was submitted to the department contains no standards,

22   right?

23   A.  Correct.

24   Q.  Does that imply that any performance of that "best of

25   my ability" stuff is left to the discretion and standards

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 125 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 126 of 239

125

1   by Dr. Schneider?

2   A.  No.  I think it would be the, to the discretion of the

3   Court here sitting in equity.

4   Q.  How is it that a statement in an affidavit rises to the

5   level of some sort of an enforceable promise, sir?

6   A.  I'm not sure that it does.

7   Q.  You've been a lawyer for how many years, sir?

8   A.  Eight and a half.

9   Q.  And you've been with this department for how long?

10  A.  Two and a half.

11  Q.  You know how to draft settlement agreements that create

12  binding, enforceable promises, don't you?

13  A.  I would hope so.

14  Q.  And this affidavit is not one, is it?

15  A.  This is not a settlement, no.

16  Q.  Okay.  It's not even a contract, is it?

17  A.  No.

18          MR. COSSITT:  Okay, thank you very much.  That

19  concludes the examination, Your Honor.

20          THE COURT:  Okay.  Mr. York.

21                  REDIRECT EXAMINATION

22  BY MR. YORK:

23  Q.  Mr. Kakuk, the affidavit is not a settlement, correct?

24  A.  Correct, it is not.

25  Q.  And it's not a contract?

```
 1    A.  No, it's not.

 2    Q.  But it is a sworn statement.

 3    A.  Yes, it is.

 4              MR. YORK:  Thank you.

 5              THE COURT:  You may step down.

 6              THE WITNESS:  Thank you, Your Honor.

 7              THE COURT:  And I believe you're free to go and

 8    may be excused from court.

 9              Correct?

10              MR. YORK:  Yes, Your Honor.

11              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

12              THE COURT:  Thank you.  You may.  Safe travels

13    back to Helena.

14              THE WITNESS:  Thank you.

15              THE COURT:  Who wishes to proceed next?

16    Mr. Patten?

17              Did he call you?

18              THE WITNESS:  What's that?

19              THE COURT:  Did he call you?

20              THE WITNESS:  He didn't, but I assumed you wanted

21    to go with me next.

22              THE COURT:  Who were you calling as a witness?

23              MR. PATTEN:  Well, I was going to finish -- or

24    start my cross of Mr. Womack.

25              THE COURT:  Okay, very good.
```

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 127 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 128 of 239

127

1          MR. PATTEN:  Sorry.

2          THE COURT:  Okay.  Mr. Womack, I'll remind you

3     you're still under oath.

4          THE WITNESS:  Yes, Your Honor.

5                    CROSS-EXAMINATION

6     BY MR. PATTEN:

7     Q.  Good afternoon, Mr. Womack.

8     A.  Good afternoon, Mr. Patten.

9     Q.  Can I call you "Joe"?

10    A.  Yes.

11    Q.  Thank you.  Joe, on page 6 of your motion to approve

12    the settlement, when addressing the probability of

13    success --

14    A.  Yes.

15    Q.  -- you state that you're confident and you will prevail

16    in your complaint to deny discharge.

17    A.  Yes.

18    Q.  And then in your -- through your amended complaint, you

19    set out a series of allegations that form the basis of your

20    complaint to deny discharge.

21    A.  Yes.

22    Q.  One of those is that the debtor has engaged in a scheme

23    to hinder, delay, or defraud creditors and the trustee by

24    removing or concealing property.

25    A.  That's correct.

1    Q.   What facts do you believe you can establish to prove

2    this allegation?

3    A.   Well, the most glaring example was the creation of an

4    account in Billings that had money deposited into it at

5    Dr. Schneider's direction but held in the name of his

6    sister, Kathleen Burrows.

7         That, that money was, in my view, clearly attributable

8    to Dr. Schneider from a period of 2012 through 2000 --

9    through the time that the bankruptcy was filed and was not

10   disclosed to me as part of the debtor's schedules or

11   statement of financial affairs.  And after the bankruptcy

12   was filed at Dr. Schneider's direction, his sister

13   transferred that property to his wife, Michelle.

14   Q.   What was the source of the money in this account?

15   A.   Well, there were multiple sources.  There was a piece

16   of real property out on the Molt road near Billings that --

17   there were a series of transfers, but ultimately it was put

18   into Dr. Schneider's name and then to Kathleen Burrows who

19   then sold it, on behalf of Dr. Schneider, at his direction

20   according to Kathleen Burrows.  She deposited 146,000 of

21   that into the U.S. Bank account in Billings and retained

22   about 150 of that for herself.

23        In addition to that, Dr. Schneider deposited some

24   checks payable to Rocky Mountain newer spine and to himself

25   into the account.  The total deposits in the account were

1    about $546,000, I believe.

2    Q.  And were these deposits made prior to the filing of the

3    bankruptcy?

4    A.  Yes.

5    Q.  Was the -- and on what basis do you believe that the

6    debtor had access to the funds in the account?

7    A.  Well, Kathleen Burrows testified under oath that the

8    money was not hers even though the account was held solely

9    in her name, that she was directed to --

10             MR. COSSITT:  I'm going to object.  This is

11   hearsay.  This witness is testifying about what another

12   human being testified to in another proceeding.  It's

13   backdoor hearsay, Your Honor, and we object.

14             MR. PATTEN:  Your Honor, the question that I

15   asked Mr. Womack was what he believed he can prove.  And

16   ultimately, there will be a trial -- unless the settlement

17   is approved, ultimately there will be a trial, but for

18   purposes -- at which time, the evidence will have to come

19   in, and so forth.

20             But for purposes of today, one of the

21   considerations for the Court is the likelihood of success,

22   and so Mr. Womack, I think, can appropriately testify as to

23   those factors that cause him to believe that he has a, he

24   testified a 90 percent of prevailing on the discharge case.

25   And so --

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 130 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 131 of 239

130

1        THE COURT:  But he can also do that by not

2   necessarily stating the hearsay in his answer.

3        MR. PATTEN:  Well, Your Honor, it isn't

4   necessarily offered for the proof of what it's asked for.

5        THE COURT:  No.  All I'm saying is he can address

6   his answer to take that into account based upon the

7   factors.

8        MR. PATTEN:  Okay.  Are you --

9        THE COURT:  I'm going to sustain the objection

10   and allow you to rephrase the question.  And I think

11   Mr. Womack can, can answer it as to what factors he's

12   relying upon under his complaint --

13        MR. PATTEN:  Okay.

14        THE COURT:  -- but he can do it without having to

15   recite hearsay as the basis.

16        MR. PATTEN:  Okay.

17   Q.  (By Mr. Patten)  So, Mr. Womack, have you been provided

18   any documentation regarding this bank account?

19   A.  Yes.

20   Q.  What bank was it at?

21   A.  U.S. Bank of Billings.

22   Q.  Do you have exhibits in front of you?

23   A.  Yes.

24   Q.  Do you have, I believe it's Meridian's Exhibit No. 17,

25   which is a Document 285-29?

```
 1              THE COURT:  Let's make sure we use the exhibit
 2    numbers that are off of the docket when we're -- I mean,
 3    you can clarify here, but I want to make sure the record's
 4    clear that we're using 285-29 as the exhibit; otherwise,
 5    we're going to have real confusion in the record.
 6              MR. PATTEN:  It is Meridian Exhibit No. 17.
 7              THE COURT:  Yeah, but these aren't on the docket,
 8    is what I'm saying, as I understand it.  Isn't there -- you
 9    just -- I thought you just said it was 285-29.
10              MR. PATTEN:  That's the docket number, but on
11    Meridian's exhibit list, it's No. 17.  And when it was,
12    when it was filed, it's at Docket No. 285-29.
13              THE WITNESS:  I have it.  It's Docket No. 285-29.
14              THE COURT:  Okay, okay, we already have
15    confusion.  Let's say we have an appellate judge looking at
16    this.  We're talking about Exhibit 17, we're talking about
17    some other exhibit.  There is nothing like that in this
18    docket.  And I'm not admitting these exhibits; I'm
19    admitting these exhibits.
20              And so I think we need to be clear that if we're
21    talking about one exhibit here, that we also give the
22    corresponding number off the docket.  Do you see what I'm
23    saying?  So there's no confusion that it's 285-29 off the
24    docket that we're using as the actual exhibit.  That's what
25    I'm admitting.
```

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 132 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 133 of 239

132

1          MR. PATTEN:  Okay.

2          THE COURT:  Make any sense?

3          MR. PATTEN:  Well, maybe I'm -- I don't follow,

4    Your Honor.  It's marked as Exhibit 17, and then it has a

5    docket number at the --

6          THE COURT:  But these aren't admitted.  These are

7    just for informational -- for purposes of use here in the

8    courtroom, right?

9          MR. PATTEN:  Well, correct, but I'm getting to

10   that, to the point of trying to get it admitted.

11         THE COURT:  Well, but isn't it on the docket

12   already?

13         MR. PATTEN:  I don't -- it's, it's on the docket

14   only as a prefiled exhibit for this hearing.

15         THE COURT:  Well, those are the exhibits I admit.

16   I don't turn around and have -- then Mr. James is going to

17   have to go back to his office and put all of these other,

18   these exhibits in as you've referred to them as, what, 17

19   or whatever.

20         THE CLERK:  Judge, it actually is -- on the

21   Docket 285, it is marked as Exhibit 17.  It's just the 29th

22   attachment to Docket 285.

23         THE COURT:  Thanks for the clarification, okay.

24         THE CLERK:  No problem.

25         MR. PATTEN:  I'm sorry if I created confusion,

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 133 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 134 of 239

133

```
 1        Your Honor.

 2              THE COURT:  No, I was thinking they were -

 3        (inaudible) - numbers, you know, Exhibit 27 was Exhibit --

 4        really 27 --

 5              MR. PATTEN:  Okay.

 6              THE COURT:  -- not 16.4.

 7              MR. PATTEN:  Okay.

 8              THE COURT:  Now I'm up to speed with you.  Thank

 9        you.

10              MR. PATTEN:  Thank you, Patti.

11        Q.  (By Mr. Patten)  Mr. Womack, did you look at

12        Exhibit 17?

13        A.  Yes.  Docket No. 285-29, if that helps.

14              THE COURT:  Yeah, thank you.

15        Q.  (By Mr. Patten)  And is the information that is set out

16        on Exhibit 17, did that enter into your belief that you

17        have a 90 percent chance of prevailing?

18        A.  Yes.

19        Q.  And what do you understand the transactions were that

20        Dr. Schneider had access to the funds in this account?

21        A.  My belief is based on my investigation and evidence

22        collected.  That indicated to me that Dr. Schneider

23        received the ATM card for the U.S. Bank account that, even

24        though the account was held in another name, that it was,

25        in fact, controlled by Dr. Schneider, that the funds were
```

1   owned by Dr. Schneider, and that nothing was done with

2   those funds in that account except at his direction.  That

3   was my belief based on my investigation, and that, I

4   believe, I can show at trial.

5   Q.  Was that investigation done as part of the discovery in

6   AP 15-20?

7   A.  No.  It was done as part of my duties as a trustee

8   prior to filing a lawsuit against Kathleen Burrows and then

9   as part of the lawsuit against Kathleen Burrows on the

10  preference claim that we brought against her.

11          MR. PATTEN:  Your Honor, I would move the

12  admission of Meridian's Exhibit No. 17.

13          THE COURT:  Okay.  Any objection?

14          MR. COSSITT:  Yeah, authentication, lack of

15  foundation.

16          MR. PATTEN:  The witness has authenticated it by

17  saying that he obtained it in the course of his duties as

18  trustee, and he obtained it in -- and also as part of the

19  adversary proceeding.  I don't remember the number, 15-8,

20  or something --

21          THE WITNESS:  Dash eight.

22          MR. PATTEN:  -- the one against Burrows.

23          THE COURT:  I'm going to overrule and allow it

24  in, admit it.

25          MR. PATTEN:  Thank you, Your Honor.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 135 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 136 of 239

135

1  Q.  (By Mr. Patten)  Mr. Womack, was -- did the debtor's

2  schedules reflect anywhere the debtor's access to the funds

3  in this U.S. Bank account?

4  A.  No.

5  Q.  Did the debtor testify at his 341 meeting that his

6  schedules were complete and accurate?

7  A.  Yes, he did.

8  Q.  Did the debtor, in any -- how many 341 meetings were

9  there?

10 A.  I don't know, I lost count after awhile.  At least

11 three or four -- three, I believe.

12 Q.  And did the debtor ever identify that he had access to

13 the funds in his U.S. Bank account?

14 A.  No, he did not.

15 Q.  Do you know where the funds on -- out of this account

16 ultimately went, the ones that weren't otherwise drawn

17 down?

18 A.  Yes.

19 Q.  Where?

20 A.  To Michelle Schneider.

21 Q.  Are there other instances, other actions or failures to

22 disclose that you believe give you the 90 percent chance of

23 prevailing on the discharge suit?

24 A.  Yes.

25 Q.  What is that?  What else?

1    A.  Well, another instance was with respect to a

2    Harley-Davidson motorcycle.  We did a search of the

3    division of motor vehicle records to determine what titled,

4    registered vehicles were held by Dr. Schneider or his wife

5    or his children, and a Harley-Davidson motorcycle came up

6    as part of that.

7              THE CLERK:  Judge?

8              UNIDENTIFIED SPEAKER:  We're still connected.

9              (Pause in recording.)

10             UNIDENTIFIED SPEAKER:  (Inaudible) -- can you

11   hear me?

12             THE CLERK:  Yes, we can.

13             UNIDENTIFIED SPEAKER:  Okay.  Thank you,

14   Ms. Mahoney.  Sorry, Your Honor.

15             THE COURT:  Thank you, Michael.

16             UNIDENTIFIED SPEAKER:  Michael?

17             UNIDENTIFIED SPEAKER:  Yes.

18             UNIDENTIFIED SPEAKER:  Can you please get on the

19   four-person view?  We can only see the judge right now.

20   Thank you very much.

21             UNIDENTIFIED SPEAKER:  How is that?

22             THE CLERK:  We've got the four quadrants up,

23   Michael.  Thank you.  The pictures are horrible, but we'll

24   make due.

25             Your Honor, I'm sorry, I'm not sure what

1    happened.  We lost you right when Joe was saying they found

2    out about the Harley-Davidson.

3            UNIDENTIFIED SPEAKER:  The system got turned off.

4            THE COURT:  Which time?

5            THE CLERK:  Right -- I am so sorry.  Right when

6    they were talking about they did the, the title search

7    through the Department of Motor Vehicles in Mr. and

8    Mrs. Schneider's name and their children's name.  And Joe

9    said that's when they discovered the Harley, and that was

10   at like 2:01.

11           THE COURT:  So does it include the three

12   objections by Mr. Gardner, Mr. Cossitt, and Mr. Parker?

13           THE CLERK:  (Inaudible) -- Billings' whole system

14   shut down.

15           THE COURT:  I know, but I'm just trying to figure

16   out where we were at in the process as to --

17           THE CLERK:  Joe had just said how he discovered

18   the Harley-Davidson, and then we lost you.  We got no

19   objections on the record.

20           THE COURT:  Okay.  Do you know where you were in

21   your questioning there?

22           MR. PATTEN:  Yeah.  I think it was a long time

23   ago.

24           THE COURT:  That's my concern.

25           MR. PARKER:  Your Honor, maybe I can be an aid to

1     Court.  It sounds to me like Mr. Womack holds the view that

2     he could win the discharge case and he views that he could

3     win it 90 percent of the time.

4             THE COURT:  Correct.

5             MR. PARKER:  I think once -- I do not believe

6     that the cross-examination is designed to knock him off

7     that notion; I think it's just designed to have it repeated

8     as many times as possible.  We know what his opinion is,

9     they're not trying to knock him off of it, so why don't

10    we -- I would suggest we move on.

11            MR. COSSITT:  Could I add some gloss to that?

12            THE COURT:  Mr. Cossitt.

13            MR. COSSITT:  You know, Your Honor, the cases

14    hold (quoted as recorded):

15            "A mini-trial on the merits of the claims or the

16    bankruptcy judge's independent investigation into the

17    underlying dispute sought to be compromised is not

18    required," Walsh Construction 669 F.2d 1335.

19            THE COURT:  Exactly, exactly.

20            MR. COSSITT:  And then further, the -- In Re:

21    Lee Way Holding Company, 120 BR 881 at page 891,

22    bankruptcy, Southern District of Ohio, 1990, that case

23    stands for the proposition that, again, the Court's role in

24    reviewing the compromise is not to conduct a trial or a

25    mini-trial or decide the merits of the individual issues:

1        "The more complex and novel the subject

2    litigation is, the less thorough a factual record is

3    necessary to obtain approval of a settlement that will

4    substantially benefit the bankruptcy estate."

5        My objection is relevance.  I think we're getting

6    down to the point in these proceedings where we're drilling

7    down into the minutia of factual detail that's necessary to

8    prove up the underlying claims.  My clients objections on

9    the basis of relevance and requests the Court to sustain

10   the objection.  Thank you.

11       THE COURT:  Well, at this point, with you having

12   asked about the probabilities, I think Mr. Patten's

13   questions are going to those probability questions in

14   cross.  That's how I'm looking at it.

15       And maybe he -- Mr. Patten, are you disputing

16   those percentages?

17       MR. PATTEN:  No.  I want the record to be clear

18   that the trustee has a very strong case on denial of

19   discharge.  And if, if the defendant will acknowledge that

20   there's a prima facie case that Mr. Womack can prove at

21   trial, then I think that probably meets my objective,

22   but --

23       THE COURT:  Well, based on what you just said, I

24   concur with Mr. Cossitt, Mr. Parker, and Mr. Gardner that I

25   think the testimony this morning established his

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 140 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 141 of 239

140

1    percentages of 90 percent in the dischargeability case, and

2    I think you're just adding to that at this point unless

3    you're questioning that percentage, which it doesn't sound

4    like you are.

5              MR. PATTEN:  I'm -- 90 percent is pretty good,

6    Your Honor.

7              THE COURT:  Yeah.  So, in essence, in essence, we

8    should move on.

9              MR. PATTEN:  Okay.

10   Q.  (By Mr. Patten)  Mr. Womack, you acknowledge that

11   the -- at least from the amount of the claims that have

12   been filed, the unsecured creditors overwhelmingly object

13   to the settlement.

14   A.  They do; although, as the point has been made, many of

15   them, if not the majority, are contingent, unliquidated,

16   disputed.

17   Q.  And do you know how many of them were in some legal

18   process for becoming liquidated and noncontingent at the

19   time the bankruptcy was filed?

20   A.  Several very large claims were in that process.

21   Q.  Okay.

22   A.  In fact, they were on -- one in particular was on the

23   verge of trial, and it was only because the bankruptcy was

24   filed that the trial was vacated.  I believe the bankruptcy

25   was filed on a -- if I'm not mistaken, the bankruptcy was

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 141 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 142 of 239

141

 1    filed on a Friday and trial was to commence the following

 2    Monday.

 3    Q.  Would you agree that the filing of the bankruptcy

 4    precludes our clients from liquidating and making

 5    noncontingent their claims in this case?

 6    A.  Yes.

 7    Q.  And --

 8    A.  Well, without relief from stay.

 9    Q.  Would you agree that the claims have been filed for

10    approximately a year?

11    A.  More than that.

12    Q.  Okay.  And the objections to the claims were just filed

13    within the last 30 days?

14    A.  Yes.

15    Q.  So nobody took any steps prior to this -- your motion

16    for settlement being opposed by my clients, until that

17    happened, nobody objected to my client's claims?

18    A.  That's correct.

19    Q.  Do you, Joe, believe that, that Mr. Moyers and my

20    clients are incapable of determining what is in their best

21    interest with respect to the settlement --

22    A.  No.

23    Q.  -- as proposed?

24    A.  No.  They have to make their own independent judgment.

25    They have that right.

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 142 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 143 of 239

142

1     MR. PATTEN:  Excuse me a second, Your Honor.

2  Q.  (By Mr. Patten)  Are you aware of any policies with

3  respect to a debtor buying a discharge?

4  A.  There's a lot of case law with respect to that issue.

5  Yes, I am aware of policy considerations, and I addressed

6  that in my brief.

7  Q.  Does the debtor's honesty play into implementing --

8  A.  Yes.

9  Q.  -- that public policy?

10  A.  Yes.

11  Q.  And do you have an opinion as to whether the debtor's

12  been honest in this case?

13  A.  Yes.

14  Q.  What's that opinion?

15  A.  He has not.

16     MR. PATTEN:  Okay, thank you.

17     MR. JAMES:  Good afternoon, Your Honor.  Doug

18  James on behalf of Meridian.

19     Good afternoon, Mr. Womack.

20     THE COURT:  You know, Mr. James, I hate to delay

21  your cross-examination, but it kind of came up -- I mean,

22  really, the real important thing here, and I think we

23  started off this morning having some discussion about it,

24  you know, if you look at the compromise in 15-15 without

25  the tie to 15-20, I think there's probably some very good

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 143 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 144 of 239

143

1    reasons, justifiably, to accept that offer to bring cash in

2    in some very litigious litigation that's going to go

3    forward over a long length of time and be very expensive.

4         Unfortunately, 15-20 is tied with it, with the

5    dollar amount that's imposed there, which really is the

6    most concerning thing.  And I think I raised this with

7    Mr. Gardner early on.  That's, that's the issue that I have

8    to wrestle with.

9         And am I going to go down the road with, with a

10   debtor coming forward and saying, "Well, I'll give you 'X'

11   dollars.  Let me have my discharge"?

12        Which obviously is one, one approach, but it

13   certainly flies in the face of tenets of bankruptcy for the

14   honest but unfortunate debtor.  And I think I mentioned

15   that that's a real difficult precedent to set because in

16   one instance, somebody has some money that maybe they can

17   put into the estate for distribution to creditors that gets

18   them a discharge.

19        There's another debtor that comes in -- there's,

20   there's just no way that they have the resources to do that

21   and yet they get stuck with, with a nondischargeable --

22   nondischargeability.  And that's what I have to wrestle

23   with from a policy standpoint.

24        You know, and we've heard a lot of testimony

25   about the nature and the factors -- the nature of the

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 144 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 145 of 239

144

1    claims, the factors that I need to look at under A & C, but

2    the one thing that I'm going to really focus on is a

3    pretty -- not "insignificant" factor, but one factor in

4    this, of the 450 -- 450,000 being put in AP 20 with a tie

5    to 15-15, and does that constitute an inappropriate

6    distribution of money to the estate to get -- to buy a

7    discharge?

8            That's what I'm going to have a look at.  I mean,

9    that's the real issue here.  As you know, every one of you

10   in this room, as counsel, know that we've dealt with

11   compromises and settlements, and the bankruptcy code

12   supports that, and especially in litigation like this that

13   could go on for years and be costly and may not be

14   recoverable ever, as Mr. Womack testified to this morning

15   has happened in other cases.

16           And so I guess I'd really like to focus you to

17   that, that element, that question that I've got to look at

18   in:  How does that fit into the fair and equitable

19   resolution whether I approve the compromises or I throw

20   this into continuing litigation for which may not be in the

21   best interests of the creditors, ultimately, based upon the

22   testimony I've heard today?

23           So I guess if we could focus to that, I think

24   that's really the issue that I've got to wrestle with.  If

25   anyone disagrees, you can certainly bring it up in your

1  cross-examination or testimony, but that's how I see it.

2          MR. JAMES:  May I proceed, Your Honor?

3          THE COURT:  Pardon?

4          MR. JAMES:  May I proceed?

5          THE COURT:  You may proceed.

6          MR. JAMES:  Thank you.

7                    CROSS-EXAMINATION

8  BY MR. JAMES:

9  Q.  Mr. Womack, if the Court denies your motion to approve

10  the settlement of the discharge case, AP 20, will you

11  continue trying to settle the balance of the case?

12  A.  Yes.

13  Q.  Do you think that it would be worth your efforts and

14  your time to try and settle this case without the discharge

15  being a part of the settlement?

16  A.  I'm always willing to try.  And I think it, yes, I

17  think it will be worth my efforts to try.  I certainly

18  will.

19  Q.  Under the settlement as proposed, Dr. Schneider retains

20  his 401(k) account with approximately $1.5 million,

21  correct?

22  A.  Yes.

23          MR. COSSITT:  Objection; leading.  Counsel's

24  testifying.

25          MR. JAMES:  It's an adverse witness, Your Honor.

```
 1    I am objecting to his settlement.
 2              THE COURT:  Overruled.
 3    Q.  (By Mr. James)  And MedPort will retain the California
 4    mansion that it purchased at roughly $1.9 million, correct?
 5    A.  Yes.
 6    Q.  And you recorded a notice of lis pendens against the
 7    California mansion, correct?
 8    A.  Yes.
 9    Q.  Earlier, you testified regarding the Meridian
10    arbitration.  I just wanted to focus on a couple of things
11    with respect to that.
12         Have you read all of the pleadings in the Meridian
13    arbitration?
14    A.  Not every, not every one of them.
15    Q.  Have you attended all of the depositions?
16    A.  No.
17    Q.  Do you know who's been deposed?
18    A.  Not every single party.  I do know a significant
19    number, but I couldn't tell you every one.
20    Q.  Okay.  Can you tell me who has been deposed?
21    A.  Dr. Schneider has been deposed; expert witnesses have
22    not, although reports have been submitted; the principals
23    in the case I believe have been deposed; and the people
24    with Meridian Surgical Partners, I believe some of those
25    people have been deposed.
```

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 147 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 148 of 239

147

 1    Q.  Have you reviewed the documents that have been produced

 2    in the arbitration?

 3    A.  Some of them, yes.

 4    Q.  Have you reviewed the expert disclosures?

 5    A.  Yes, so far.

 6    Q.  And Dr. Schneider valued his individual claim against

 7    Meridian in his bankruptcy schedules at $15 million,

 8    correct?

 9    A.  Yes.

10    Q.  And did you conclude that his claim was not worth

11    $15 million?

12    A.  Yes.

13    Q.  Do you know if Meridian has filed a motion for summary

14    judgment to dismiss Dr. Schneider's individual claim in the

15    arbitration?

16            MR. COSSITT:  I'm going to renew the objection I

17    made a little while ago, Your Honor.  We're drilling down

18    to the mini-trial that the four factors tell us isn't

19    necessary.  So my objection is relevance, cumulative, and

20    redundant; and particularly, relevance.

21            THE COURT:  I'm going to overrule that and allow

22    him to answer.

23            THE WITNESS:  I believe you did, did you not -- I

24    mean, sorry, Judge, yes.

25    Q.  (By Mr. James)  Mr. Womack, under the proposed

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 148 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 149 of 239

148

1    settlement of the discharge adversary, the bankruptcy

2    estate will receive property or $450,000 cash, correct?

3    A.   Under AP 20.

4    Q.   Yes.

5    A.   Property that would be attributable to AP 20 of

6    450,000.

7    Q.   And Dr. Schneider's home has been listed for sale in

8    2015 and 2016, correct?

9    A.   Yes.

10   Q.   And what was the listing price?

11   A.   It was less than that.  It was six -- I'm trying to

12   recall.  It was like 620,000, I believe, or something in

13   that neighborhood, perhaps even less.  I was not a party to

14   that listing agreement.

15   Q.   Would you turn to Exhibit 9, and can you identify that

16   document for us?

17   A.   Yes.  That is the advertisement.  And apparently,

18   during the last listing, it was for $599,900.

19   Q.   Exhibit 9 was the listing advertisement for

20   Dr. Schneider's house?

21   A.   Correct.

22           MR. JAMES:  I would move the admission of

23   Exhibit 9.

24           THE COURT:  Any objection?

25           UNIDENTIFIED SPEAKER:  No.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 149 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 150 of 239

149

1          MR. COSSITT:  Yes.  First, I don't understand

2    which -- is it Document No. 285-15?

3          THE COURT:  Yes.  Correct, Mr. James?

4          MR. JAMES:  It is our Exhibit 9, which is part of

5    285.  I don't have the particular --

6          THE COURT:  Okay.

7          THE CLERK:  It's 15, Your Honor, and Mr. Cossitt.

8          THE COURT:  Yeah, it is 15.

9          THE WITNESS:  Yes.

10          MR. COSSITT:  All right.  We object to

11   authentication.  There's not -- this looks like a web page,

12   and it's not properly authenticated.

13          MR. JAMES:  Perhaps I can clarify, Your Honor.

14   Q.  (By Mr. James)  Mr. Womack, in connection with your

15   investigation of the assets of Dr. Schneider, have you seen

16   Exhibit 9 before?

17   A.  Yes.

18   Q.  And is this something you took into consideration in

19   deciding whether or not to enter into these settlements?

20          MR. GARDNER:  Objection, Your Honor.  This is

21   dated well after -- or after the settlement was entered.

22          THE COURT:  Sustained.

23   Q.  (By Mr. James)  Have you received any offers to

24   purchase the home on Tommy Armour Circle?

25   A.  No.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 150 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 151 of 239

150

1    Q.  So if the settlement is approved, you will then have to

2    maintain and sell the home, correct?

3    A.  Yes.

4    Q.  And you'll have to employ and pay a realtor, correct?

5    A.  Yes.

6    Q.  And the standard residential real estate commission in

7    Billings is 7 percent?

8    A.  You can usually get them to do it for six.

9    Q.  So if Dr. Schneider's home sold for $450,000, a 6 or

10   7 percent commission would be roughly $30,000?

11   A.  Yes.  I think that's a low -- 450 is far lower than

12   what I think it will sell for.

13   Q.  And the bankruptcy estate would incur other costs and

14   expenses in connection with the sale of the home such as

15   title insurance and closing fees, correct?

16   A.  Yes.

17   Q.  So if the estate has to sell Dr. Schneider's home, it's

18   likely to net less than $450,000?

19   A.  I disagree with that assessment.  I think it will net

20   more than 450,000.

21   Q.  From the sale of the house?

22   A.  Yes.

23   Q.  And that will -- what are you projecting as the sales

24   price?

25   A.  Six hundred fifty.  I had a drive-by done on the

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 151 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 152 of 239

151

1    property by a realtor early in the case.  And based on

2    that, they believed that 650 was reasonable.

3    Q.  But if it sells for 650, only 450 of that would still

4    be allocated towards AP 20, correct?

5    A.  Towards AP 20, but it will still come -- the full

6    amount will come into the estate.

7    Q.  Okay.  Prior to the first meeting of creditors, did you

8    request some documents from Dr. Schneider?

9    A.  Yes.

10   Q.  And did Dr. Schneider provide you with the requested

11   documents 14 days prior to the first meeting of creditors?

12   A.  No, not all of them.

13   Q.  These are the documents that are required pursuant to

14   local bankruptcy rule in Form 33?

15   A.  Yes.

16   Q.  And did Dr. Schneider provide you with the documents

17   that you asked for at the first meeting of creditors?

18   A.  No, not all of them.

19   Q.  Did you continue the first meeting of creditors more

20   than once because Dr. Schneider hadn't provided you with

21   all of the requested documents?

22       MR. COSSITT:  I'm going to renew the objection

23   again, Your Honor.  Again, we don't need to conduct a

24   mini-trial on the specific allegations in the 727

25   complaint.  We've received extensive testimony on it this

1    morning, and I -- with all due respect, I think this line

2    of questioning drills down well below the level that the

3    appropriate -- or the applicable case law that I cited a

4    few minutes ago tells this court that it doesn't need to

5    get to.  Thank you.

6           MR. JAMES:  Well, Your Honor, I'm leaning towards

7    the policy issues that you had raised earlier.  And with a

8    little latitude, I will get to that briefly.

9           THE COURT:  Like in the next question or two.

10          MR. JAMES:  Yes.

11          THE COURT:  I'll sustain the objection.

12   Q.  (By Mr. James)  Can you identify Exhibit 1, please?

13   A.  Exhibit 1, Document No. 285-1 is a letter from myself

14   to Harold Dye, Dr. Schneider's attorney, with respect to

15   documents needed.

16          MR. JAMES:  I would move the admission of

17   Exhibit 1.

18          THE COURT:  Any objection?

19          (No audible response.)

20          THE COURT:  Hearing none, Exhibit 1 is admitted.

21   Q.  (By Mr. James)  Did Dr. Schneider provide you with the

22   documents requested in Exhibit 1 -- (inaudible)?

23          MR. COSSITT:  Objection, same objection, Your

24   Honor:  Relevance, drilling down into the mini-trial on the

25   merits that we don't need to go to.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 153 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 154 of 239

153

1          THE COURT:  Well, I'm going to give Mr. James at

2     least a couple questions on this because I'm not sure that

3     he's drilling down.

4     Q.  (By Mr. James)  Mr. Womack, could you identify

5     Exhibit 2?

6     A.  Yes.  Exhibit 2, Docket No. 285-2, is my motion for a

7     turnover of documents that I had requested -- or that I

8     wanted that had not been supplied to me.

9     Q.  And can you identify Exhibits 4 and 5, please?

10    A.  Exhibit 4, Document No. 285-4, is the order of the

11    Court granting the motion for turnover of the documents.

12         Exhibit 5, Document No. 285-5, is a copy of the motor

13    vehicle search that was, of a motor vehicle search that --

14    Q.  Excuse me, I misspoke.  It was Exhibit 4 that I was

15    asking about.

16    A.  Exhibit 4?

17    Q.  That was --

18    A.  Exhibit 4 is -- 285-4 is the order granting the motion

19    for turnover.

20         MR. JAMES:  I would move the admission of

21    Exhibits 2, 3, and 4.

22         THE COURT:  Any objection?

23         UNIDENTIFIED SPEAKER:  I have no objection.

24         MR. COSSITT:  You know, the same relevance

25    objection, Your Honor.  We're heading right down into the

1    mini-trial on the merits.  I object.

2            THE COURT:  Okay, you may object.  I'm going to,

3    I'm going to admit them, two, three, and four, but

4    Mr. Womack, aren't these the same documents that you've

5    utilized in analyzing your claims in the Adversary 15-20.

6            THE WITNESS:  Yes, the lack of production of

7    those; yes.

8            THE COURT:  I mean, I don't know what else you

9    need.

10           MR. JAMES:  Just one question, Your Honor.

11   Q.  (By Mr. James)  And that is:  Mr. Womack, did

12   Dr. Schneider disobey a lawful order of this court with

13   exhibit to Exhibit No. 4?

14   A.  In my opinion, yes.

15   Q.  He did not produce to you the documents that he was

16   ordered to produce by the Court's order of Exhibit 4,

17   correct?

18           MR. COSSITT:  Objection --

19           UNIDENTIFIED SPEAKER:  Objection.

20           MR. COSSITT:  -- asked and answered, cumulative,

21   and redundant.

22           THE COURT:  I'm going to sustain.

23           MR. GARDNER:  What he said.

24           THE COURT:  I'm going to sustain because I think

25   he's already testified that he took into those matters -

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 155 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 156 of 239

155

1    (inaudible) - in his 15-20 complaint.

2    Q.  (By Mr. James)  Mr. Womack, I would ask you to turn to

3    Exhibit 11 and identify that document, please.

4    A.  Exhibit 11, Document No. 285-11, is my objection to

5    Debtor's motion to continue the hearing for today.

6    Q.  And would you read Paragraph 8, please?

7    A.  (Quoted as recorded):  "Trustee is deeply concerned

8    that debtor and Michelle will continue to violate the stay

9    and to dissipate assets and potential assets of the estate

10   and are attempting to delay the hearing regarding the

11   settlement agreements and attempt to obliterate potential

12   assets for recovery should the settlements not be

13   approved."

14          MR. JAMES:  I would move the admission of

15   Exhibit 11.

16          THE COURT:  Any objection?

17          UNIDENTIFIED SPEAKER:  Hearsay.

18          MR. COSSITT:  Objection in terms of

19   authentication because this appears to be a printout from a

20   social media or web page and --

21          THE COURT:  I don't think we have the right

22   exhibit here.

23          MR. COSSITT:  Eleven?  Eleven is a motion, and

24   attached to the motion there's extensive printouts, there's

25   email that's attached to it.  If I've got the right one,

```
 1          it's Docket No. 285-17.  Exhibit 11 --

 2                  THE COURT:  My Exhibit 11 is a trustee's

 3          objection.

 4                  MR. COSSITT:  Trustee's objection.  And it's

 5          my -- the pdf I downloaded is 20 pages, and it contains

 6          email, web pages, a whole bunch of stuff.  I'll stipulate

 7          to the admission of what I believe to be the first seven

 8          pages.

 9                  MR. JAMES:  I believe you have the wrong exhibit,

10          Mr. Cossitt.

11                  MR. COSSITT:  I'm sorry.

12                  THE COURT:  Well, he --

13                  THE CLERK:  No, he doesn't.

14                  MR. GARDNER:  No, he has the right exhibit.

15                  THE COURT:  No, he may have the right exhibit

16          because at the end of it, there's all kinds of materials

17          attached regarding their house.

18                  THE WITNESS:  Those were attachments to the

19          motion, Your Honor.

20                  THE COURT:  Yeah, to your - (inaudible) -

21          objection.

22                  THE WITNESS:  Yeah, to my objection.  I'm sorry.

23                  MR. GARDNER:  Your Honor?

24                  THE COURT:  Mr. Gardner.

25                  MR. GARDNER:  I object on relevance.  This
```

1    postdates the settlement, it postdates the filing of the

2    discharge complaint, it postdates anything that went into

3    entering into the settlement.

4            THE COURT:  It merely goes to the continuance of

5    the hearing that we were going to have because of absence

6    of parties, I believe, right?

7            MR. JAMES:  Your Honor, I think it goes to the

8    misconduct of the debtor and the egregiousness of the

9    unusual circumstances here.

10           The Court is facing a huge public policy decision

11   as to whether or not to grant someone a discharge.  We

12   believe it is relevant and important for the Court to take

13   into consideration the debtor's misconduct prepetition,

14   postpetition, and post-settlement.  And this exhibit

15   clearly shows that even after the settlement, the trustee

16   had continuing concerns that the debtor was going to

17   dissipate the estate and transfer and conceal assets.  And

18   we think that's very material and is further reason why

19   this court should not accept the settlement.

20           MR. PARKER:  Your Honor, if I can be heard, the

21   agreement with -- in this case - (inaudible) - continuing

22   duties and continuing promises and representations.

23   It's -- nothing's been hidden.  The discharge will not

24   affect that so far as I'm aware.  And so if something's

25   hidden out there, the discharge won't affect it an iota,

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 158 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 159 of 239

158

 1    and I -- and we would object to this line of inquiry.

 2              THE COURT:  Mr. Cossitt.

 3              MR. COSSITT:  You know, Your Honor, again,

 4    foundation with respect to everything except the first

 5    seven pages of 285-17, the first -- my client stipulates to

 6    admissibility of the first seven pages of 285-17.  We

 7    object to the rest of it because it hasn't been properly

 8    authenticated as web pages or email.

 9              And last but not least, Counsel seems to be

10    embarking on a line of questioning that's prohibited by

11    Federal Rule of Evidence 404, character evidence that is

12    admissible only in very limited circumstances.  So in

13    addition to my other grounds of obligations, we further

14    object under Rule 404.  Thank you.

15              THE COURT:  Well, the first seven pages are going

16    to be admitted.

17    Q.  (By Mr. James)  Dr. Schneider owns a home located at

18    3611 Tommy Armour Circle in Billings, correct?

19    A.  He and his wife Michelle do.

20    Q.  Did you authorize Dr. Schneider to list, market, and

21    advertise, and sell that home postpetition?

22    A.  No.

23    Q.  Was Dr. Schneider attempting to sell the home without

24    authority?

25    A.  Yes.

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 159 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 160 of 239

159

1  Q.  Postpetition, did you learn that Dr. Schneider was

2  attempting to sell the contents of the home?

3  A.  Yes.

4  Q.  And how was he attempting to do that?

5       MR. COSSITT:  Objection; relevance, Your Honor.

6  This does have no connection of the four factors in the

7  A & C test, the legal standards that govern today's

8  proceedings.

9       MR. JAMES:  Your Honor, it is material because

10  the home was filled with contents that were not listed on

11  the bankruptcy schedules, the expensive home furnishings of

12  a successful physician.  And postpetition, those assets

13  were being sold and liquidated through an ad on Craigslist,

14  and I would like to ask the trustee about that.

15       This misconduct is unprecedented, and I think

16  this misconduct is something the Court should be aware of

17  and should be able to take into consideration in

18  formulating a decision.

19       MR. YORK:  Your Honor, if I may.

20       THE COURT:  Mr. York.

21       MR. YORK:  There's been a lot today about four

22  factors.  I believe there's another factor, which is

23  whether or not the settlement is tainted, and the cases

24  recite that as a factor.  The case, I believe, is In Re:

25  Bullis.  So whether or not the settlement is tainted is

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 160 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 161 of 239

160

 1   also a factor, and that is a very equitable consideration.

 2             MR. PATTEN:  Your Honor, may I be heard?

 3             THE COURT:  Mr. Patten.

 4             MR. PATTEN:  Your Honor, bankruptcy is a

 5   process --

 6             THE COURT:  I don't know if they're going to pick

 7   you up.

 8             MR. PATTEN:  Bankruptcy a process where everybody

 9   is supposed to play by the rules, and someone shouldn't be

10   able to violate the rules continually and then come in and

11   say, "I still get a discharge because I'm going to throw a

12   bunch of money at you."

13             And I think that's what's offensive to our

14   clients.  I believe that the debtor really is trying to buy

15   a discharge here.  He's trying to buy a discharge without

16   producing any number of documents that Mr. James has been

17   questioning Mr. Womack about.  There hasn't been full

18   compliance with all of the rules that all the rest of us

19   have to play all the time, and he shouldn't get the benefit

20   of a discharge simply because he's able to reach into some

21   other resources and throw them at the creditors,

22   particularly, Your Honor, when the creditors --

23             THE COURT:  Well, he hasn't yet.

24             MR. PATTEN:  -- don't want to accept the amount

25   that he's throwing.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 161 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 162 of 239

161

1          But I think this is all important to this policy

2    question that you raised about:  What sort of conduct must

3    a debtor comply with in order to get a discharge, in order

4    to meet the -- and comply with the public policy about not

5    buying a discharge?

6          THE COURT:  Well, this may be conduct beyond

7    bankruptcy.

8          You know, based upon the -- the settlement is of

9    the claims alleged in 15-15 and 15-20.  That's what I'm

10   considering when I apply the factors and look at what's

11   there.  Now, Mr. York raises another potential element on

12   tainting, but -- it is a big public policy issue, I don't

13   disagree with you, but I think that there's been sufficient

14   evidence submitted as to why Mr. Womack is submitting these

15   proposals as well as conduct that's occurred both

16   prepetition and postpetition.

17         I don't know what more you can really put in the

18   record - although, you certainly have the opportunity to do

19   so - that's going to necessarily further impact where I'm

20   going to go with this.  I mean, all of those issues have

21   been testified to by Mr. Womack in one way or another, so

22   I'm not sure -- it may become, as we've heard before, more

23   cumulative than anything.

24         MR. JAMES:  And we'll be brief, Your Honor.

25         THE COURT:  Okay.  I will allow you to proceed

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 162 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 163 of 239

162

 1    briefly.

 2            MR. JAMES:  Thank you.

 3    Q.  (By Mr. James)  Mr. Womack, could you explain to the

 4    Court what you learned about the debtor selling assets on

 5    Craigslist?

 6    A.  I learned, after the mediation was concluded, that he

 7    had submitted an advertisement to sell the contents, the

 8    remaining contents of the Tommy Armour property and the

 9    Whispering Winds Ranch property for cash until, until

10    everything was gone.

11    Q.  Could you identify Exhibit 10, please?

12    A.  Exhibit 10 is what I understood to be a Craigslist

13    advertisement for the contents of the Tommy Armour and

14    Whispering Winds Ranch residences, the furniture and other

15    things that were in there.

16    Q.  Are these -- is this a document that you reviewed in

17    your capacity as trustee for the estate?

18    A.  Yes.

19            MR. JAMES:  I move the admission of Exhibit 10.

20            THE COURT:  Any objection?

21            MR. COSSITT:  Yeah, I object.  Authentication,

22    improper foundation, lack of personal knowledge, too.  This

23    witness just testified "I understand it to be."

24            MR. JAMES:  Your Honor, this is not being offered

25    for the truth of what's contained in the document, but for

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 163 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 164 of 239

163

1    the fact that this is a document that the trustee reviewed

2    as a part of his administration of the estate and what he

3    found and learned as a part of his investigation.

4            MR. GARDNER:  If, if that --

5            THE COURT:  But he's using it for the truth of

6    what's there, that there was property sold.

7            MR. JAMES:  I can ask him about that, Your Honor.

8            THE COURT:  Mr. Gardner, do you -- did you have a

9    comment?

10           MR. GARDNER:  My comment was simply:  If it's

11   just for what the trustee reviewed, I still object on

12   relevance as it's all post-settlement and post filing of

13   the subject litigation.

14           MR. COSSITT:  And again, under Rule 404, Your

15   Honor, if we were litigating the underlying adversary

16   proceeding, then we can conjure up bad conduct all day

17   along, but we're not litigating the underlying adversary

18   proceedings.

19           I've sat here in the courtroom and listened to

20   the comments from other counsel, including the

21   representative of the United States Government.  Those are

22   all important considerations, we don't deny that.  The

23   question is:  What are the evidentiary standards that

24   govern what this court wants to receive today?

25           Again, my client urges the Court to continue to

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 164 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 165 of 239

164

1    stick to the four-factor test and objects to this entire

2    line of questioning, that it is inappropriate for this

3    proceeding but it may well be appropriate for an underlying

4    trial on the merits.  Thank you.

5              MR. YORK:  Your Honor, I actually disagree with

6    that.  I think it's more likely that this information is

7    relevant in this proceeding than in the underlying action.

8    We're not going to decide today whether or not

9    Dr. Schneider is, is not going to get his discharge.  What

10   we're deciding today is whether he can pay money in

11   settlement and obtain a discharge.  I think the

12   considerations are broader in this proceeding than they

13   might be in the underlying adversary.

14             And again, the main factor being:  Is this

15   settlement tainted?

16             THE COURT:  I'm going to overrule the objection.

17   I'll allow Exhibit 10.

18   Q.  (By Mr. James)  Mr. Womack, has Dr. Schneider provided

19   you with a list of the assets that he sold on Craigslist?

20   A.  No.

21   Q.  You've toured his home on Tommy Armour, correct?

22   A.  Yes.

23   Q.  Had most of the furnishings been removed?

24   A.  At that time, yes.

25   Q.  Did you ask Dr. Schneider for a list of the furnishings

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 165 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 166 of 239

165

1    that had been removed?

2    A.  I did.

3    Q.  And did he ever provide that to you?

4    A.  No.

5    Q.  Did Dr. Schneider cooperate with you, as the trustee,

6    to the extent that you expect a debtor to cooperate?

7    A.  No.

8              MR. JAMES:  I have nothing further, Your Honor.

9              THE COURT:  Mr. York.

10                        CROSS-EXAMINATION

11   BY MR. YORK:

12   Q.  Mr. Womack, I just have one question for you:  Would

13   you be asking the Court to approve this settlement of the

14   discharge action if Dr. Schneider was not offering to

15   pay -- not offering to pay the estate $450,000?

16             MR. GARDNER:  Objection; speculation.

17             THE WITNESS:  It is.  It's not just, it's not

18   just the 400 --

19             THE COURT:  Just a moment, just a moment.

20             THE WITNESS:  Sorry.

21             MR. YORK:  This is not speculation.  This is what

22   the trustee himself is thinking, Your Honor.  What he, what

23   he settled --

24             THE COURT:  I'm going to overrule that objection.

25             I'm going to allow you to answer it if you know.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 166 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 167 of 239

166

1   Q.   (By Mr. York)   Would you settle the discharge action

2   without him offering to pay $450,000 today?

3   A.   That wasn't the only reason the discharge action was

4   being settled.   The way you phrased the question isn't an

5   accurate representation of what is going on and what

6   occurred here.

7        The reason for this:   It's linked to AP 15-15 and all

8   of those assets and the recovery of that.   I wanted more --

9   I wanted nonrecoverable assets, you know, exempt assets.

10  That was why that was included in there as part of this.

11  But to say -- I mean, it was a total package.

12       And the biggest thing for me was I thought that the PI

13  people would be satisfied with this amount of money because

14  it's substantial.   And I think, frankly, the bottom line, I

15  think it's better that -- the more we're going to end up

16  when we go all the way through trial after everything is

17  said and done and what's available for the people that have

18  been harmed here in this case, and that's why I did it.

19       To say that, "Because he paid me $450,000, I'm willing

20  to do this," is simply, that's inaccurate, Mr. York.

21  Q.   But it is the payment of money that's driving your

22  quest to settle the discharge action; is that correct?

23  A.   Not just the 450,000.   It's, it's the, it's the global

24  assessment, everything that we've talked about.   I never

25  entered into this settlement just viewing them separately.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 167 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 168 of 239

167

1   Okay?

2       This is a, it's a global, it's a global issue, and what

3   is going to be available to the creditors at the end of the

4   day, and what's going to happen, the amount of resources

5   that are going to be consumed by the Court, by everybody in

6   this rule -- room, by the PI attorneys having to go and

7   prove up their cases down in state court -- or Federal

8   Court in Wyoming, I mean, all of those things.

9       This was an effort to bring everything to an end.  And

10  you keep talking about "tainted."  And frankly, I

11  understand why you're saying that, I understand the public

12  policy considerations of the U.S. Trustee's Office against

13  any kind of settlement of a, of a claim to deny discharge.

14      I disagree with that.  I think that there are other

15  human considerations that sometimes have to come into play.

16  So, so it wasn't just the $450,000, it wasn't just the

17  money; it was the entire package that we talked about here

18  today that was the reason I brought this forward.

19          MR. YORK:  I said I would ask one, and I just

20  asked one.  Thank you.

21          THE COURT:  Thank you.  Any redirect?

22          MR. PARKER:  Just briefly, Your Honor, I do

23  have --

24          THE COURT:  Mr. Parker.

25          MR. PARKER:  At this time, Your Honor, Michelle

 1   Schneider and the remainder of my clients will join in the

 2   trustee's motion to approve the settlement so we're

 3   formally on the record with that.

 4                         CROSS-EXAMINATION

 5   BY MR. PARKER:

 6   Q.  Mr. Womack, did you require, as part of the agreement,

 7   that Dr. Schneider make representations as to his current

 8   assets?

 9   A.  Yes.

10   Q.  Will those representations survive even if he --

11   survive and create liability for him even if he is

12   discharged?

13   A.  Yes.

14              MR. PARKER:  That's all I have, Your Honor.

15              THE COURT:  Mr. Patten?

16              MR. PATTEN:  (Inaudible) -- Your Honor.

17              THE COURT:  Mr. Patten?

18              (No audible response.)

19              THE COURT:  Mr. Gardner, did you have any

20   questions?

21              MR. GARDNER:  I'll let Mr. Patten go.  I don't

22   believe so.

23                         CROSS-EXAMINATION

24   BY MR. PATTEN:

25   Q.  Joe, who is at risk if the settlement is not approved?

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 169 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 170 of 239

169

1   A.   Primarily, the creditors.

2   Q.   The creditors that are opposed to the settlement.

3   A.   Yes.

4             MR. PATTEN:  Thank you.

5             THE COURT:  Mr. Womack, you may step down.

6             THE WITNESS:  Thank you, Your Honor.

7             I'll -- do you want your exhibits back?

8             MR. GARDNER:  You can leave them up there.

9             THE WITNESS:  Okay.

10            THE COURT:  Next witness?

11            MR. PARKER:  Yes, Your Honor.  It may be a little

12   bit -- (inaudible.)

13            THE COURT:  Well, let me just double -- confirm

14   with Mr. Gardner.

15            Any further witnesses, Mr. Gardner?

16            MR. GARDNER:  I believe my -- the people who are

17   supporting this motion are going to call Dr. Schneider and

18   Michelle Schneider.  I was going to let them call them

19   instead of me.

20            THE COURT:  Okay.  Mr. Parker?

21            MR. PARKER:  Michelle Schneider calls Michelle

22   Schneider.

23            THE COURT:  Okay.  Ms. Schneider, if you could

24   come to the podium, please, to be sworn.

25                 MICHELLE SCHNEIDER, WITNESS, SWORN

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 170 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 171 of 239

170

1                    DIRECT EXAMINATION

2  BY MR. PARKER:

3  Q.  Would you please state your name for the record,

4  please?

5  A.  Michelle Renee Schneider.

6  Q.  And where do you live now?

7  A.  California.

8  Q.  And are you a -- are you married to John Schneider?

9  A.  Yes.

10 Q.  How long have you been married?

11 A.  Twenty-five years in March.

12 Q.  And do you have any children?

13 A.  I have three.

14 Q.  And can you give the judge their first names and their

15 ages?

16         THE COURT:  You know, I'd just as soon not do the

17 names, even, the first names.

18 Q.  (By Mr. Parker)  Okay.  You have three children.  Can

19 you just give ages?

20 A.  Eighteen, twenty-one, twenty-two.

21 Q.  Are any living with you?

22 A.  Eighteen-year-old.

23 Q.  And during the course of your marriage to

24 Dr. Schneider, who was the major breadwinner?

25 A.  My husband.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 171 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 172 of 239

171

1    Q.   And what did he do?

2    A.   He was a neurosurgeon.

3    Q.   And what did you do while he was practicing surgery?

4    A.   I raised the children and ran the house and whatever

5    was asked of me as far as -- I raised our children.

6    Q.   Did you ever homeschool?

7    A.   Absolutely, all three.

8    Q.   And how did they do their post-scholastic life after

9    being homeschooled?

10   A.   Two are in college presently, and one has graduated

11   early, the 18-year-old, and she will entering college in

12   September.

13   Q.   Are you an RN?

14   A.   Yes, sir.

15   Q.   Are you in the position now to currently practice in

16   nursing, however?

17   A.   Yes.  I am currently trying to get my ACLS and PALS,

18   which is necessary enter a unit in a hospital.

19   Q.   During the course of your marriage, Dr. Schneider, can

20   you describe, because of his work, any extraordinary

21   impacts on family life that, I hate to say you endured but

22   were part of your life in terms of him -- like Target, for

23   example, at the Target store when he gets called?

24   A.   Oh, well, there were numerous times, well, because of

25   his work and because of his dedication to his work, we were

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 172 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 173 of 239

172

1   left at stores and I had to get home or he was -- he had to

2   quickly leave us in different situations in order to attend

3   to the, the emergencies that he had to attend to because he

4   was so dedicated and we were a partnership.  I knew what

5   that entailed.  And he had to go, and I was the responsible

6   party for our three children.

7   Q.  And during that time, do you have an opinion as to

8   whether or not Dr. Schneider would have been able to even

9   accumulate the wealth we have here if you wouldn't have

10  attended the home front?

11  A.  I think if you look at financial along with the

12  American dream as far as having children and a family, I

13  think it would have been totally impossible.

14      I think we were a partnership.  I raised the children.

15  I would get up very early in the morning, send them to

16  school, offer them the love and nurturing that they needed.

17  If they went to school -- or if I stayed at home, I taught

18  them math, I taught them English, I taught them rules, I

19  made sure they ate correctly.  I was responsible for their

20  nutrition, I was responsible for their exercise, I was

21  responsible for their faith.

22      The three children were my responsibility, and whatever

23  came with that in order to keep them safe.

24  Q.  Other than what attorneys and accountants have told you

25  over this last three or four years, do you have any really

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 173 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 174 of 239

173

1  knowledge about the accounting, the intricacies, the

2  businesses?

3  A.  No, I do not, because again, we were a partnership.

4  And early in our marriage, we knew -- it may be

5  old-fashioned, but we knew what my responsibilities were

6  going to be.  And that's why I stopped nursing, to take

7  care of our children.

8      And I knew what his --

9  Q.  When you say "nursing," practicing nursing?

10  A.  Practicing, yes, sir.  And I -- and it was very clear,

11  his responsibilities.  I trusted him, he trusted me, and

12  that's how he forged the success of, of what we did.

13          MR. PARKER:  That's all I have.

14          THE COURT:  Any cross-examination?

15          (No audible response.)

16          THE COURT:  It doesn't appear so.

17          You may step down.  Thank you -- (inaudible.)

18          Next witness?

19          MR. COSSITT:  I guess if -- is the trustee

20  concluded?

21          THE COURT:  That is my understanding.

22          MR. GARDNER:  Yes.  I was going to you to call

23  Dr. --

24          MR. COSSITT:  Then I guess if the Court's so

25  inclined, those of us that are proponents of the

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 174 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 175 of 239

174

```
 1   settlement, I guess that comes down to me.  And we'll call

 2   Dr. Schneider.

 3              THE COURT:  Very good.  Mr. Schneider, if you'll

 4   come forward to be sworn, please.

 5              If you could just stand right there by the

 6   podium, and the clerk will come on.

 7                  JOHN HENRY SCHNEIDER, DEBTOR, SWORN

 8                         DIRECT EXAMINATION

 9   BY MR. COSSITT:

10   Q.  Good afternoon, Doctor.

11   A.  Sir.

12   Q.  While you're on the witness stand, don't forget that if

13   you need a bathroom break, water, or you just need a break,

14   you need to say something to the Court.  Okay?

15   A.  Yes, sir.

16   Q.  Okay.  Your name, please?

17   A.  John H. Schneider.

18   Q.  Address?

19   A.  Up until recently, 5611 Tommy Armour Circle; Billings,

20   Montana 59106.

21   Q.  Where are you living now, then?

22   A.  Most of the time in the last two months has been at 543

23   Camino De Orchidia; Encinitas, California.

24   Q.  Okay.  Would you briefly share with the Court your

25   educational background?
```

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 175 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 176 of 239

175

1  A.  Yes.  I'm a -- I graduated from high school in 1979 in

2  Southern California, went to the University of Southern

3  California where I graduated summa cum laude in 1983.

4      I went to medical school and graduated at the top of my

5  class in 1987, was -- received a full scholarship through

6  the United States Air Force to go to medical school.

7  Q.  So you were, what, a medical officer in the Air Force?

8  A.  Ultimately.

9  Q.  Oh, okay.

10 A.  After medical school, I was accepted into a residency

11 training program in first general, then neurological

12 surgery at LA County-USC Medical Center in Southern

13 California.  I participated in that residency program

14 obtaining ultimately a chief residency certification in

15 1992 going into '93.

16     '93 into '94, I was hired as a junior staff member

17 working at the -- those same institutions as a full-fledged

18 neurosurgeon.

19 Q.  Did you do any fellowship training after residency?

20 A.  I did -- I actually included it or intwined it within

21 the residency.  I did a six-month reconstructive spine

22 surgery fellowship.

23 Q.  Okay.  Then post-residency and post-fellowship, you

24 served in the Air Force?

25 A.  Yes, sir.  So the Air Force paid for my medical school.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 176 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 177 of 239

176

1   Q.  What years were you in the Air Force?

2   A.  Went -- so once -- with the completion of my academic

3   year at the University of Southern California, I entered

4   the Air Force in early 1994 and was there until 1997.

5   Q.  And you received an honorable discharge?

6   A.  I did.  I was, I was a major, and then I -- I started

7   as a major in the United States Air Force as a neurosurgeon

8   at Wilford Hall Medical Center and ultimately was a

9   lieutenant colonel select, but left the Air Force in 1997

10  with an honorable discharge.

11  Q.  When was the last time that you actively engaged in

12  practice as a neurosurgeon?

13  A.  I practiced in neurosurgery up until February of 2013

14  in my own private practice located in Montana and northern

15  Wyoming.  After February of 2013, my neurosurgical

16  experience has been participating in surgeries outside of

17  this country as well as teaching neurosurgical techniques

18  inside of this country.

19  Q.  When and where did you first become acquainted with or

20  learn of estate or asset protection planning?

21  A.  In medical school, and it certainly was reiterated in

22  residency.

23  Q.  Which topic, estate or asset protection?

24  A.  A combination of both, but since I was being trained by

25  neurosurgeons and neurosurgery is the highest litigious

1    subspecialty in medicine, the -- every academic professor

2    had significant influence on every resident that protecting

3    one's asset and protecting one's family was critical, as we

4    were all going to get sued multiple times.  I believe I can

5    quote them on that.

6    Q.  And that's -- that information you said was topics of

7    discussion, did you say during residency --

8    A.  Yes, sir.

9    Q.  -- or post residency?

10   A.  During residency.

11   Q.  Okay.  And this was the, the doctors that were the, the

12   senior doctors that the residents practiced under who were

13   sharing this information?

14   A.  Right, the attending surgeons.

15   Q.  "Attending," yeah.  That's the word, excuse me.

16       As a result of the awareness of the asset and estate

17   protection planning commentary and advice you were

18   receiving, did you investigate it further?

19   A.  I did.

20   Q.  Briefly, what did your -- what did you do?

21           MR. PATTEN:  Your Honor?

22           THE COURT:  Yes.

23           MR. PATTEN:  I would object on relevance.  I

24   don't know what this has to do with the four elements of

25   the A & C factor or the additional element that Mr. York

1    has identified.  This isn't a mini-trial, as we've been

2    told repeatedly this afternoon, so I don't know what

3    relevance the need for asset protection is in connection

4    with the settlement.

5             THE COURT:  Mr. Cossitt?

6             MR. COSSITT:  It goes to the first factor of the

7    four-factor test, success on the merits.  My client --

8    you're going to receive, the Court will receive testimony

9    on the percentage chance of success of the merits that

10   varies significantly from what the trustee offered a few

11   minutes ago during his testimony.  And this is

12   foundational, foundational information that's going to

13   buttress the opinion that I'll try to elicit from this

14   witness with respect to success on the merits, which is the

15   first factor of the test.

16            THE COURT:  I'm going to --

17            MR. COSSITT:  And it's a fundamental rule on --

18            THE COURT:  -- overrule and allow him to -- some

19   latitude.

20            MR. COSSITT:  I'm sorry, excuse me.

21            THE COURT:  You may proceed.

22            MR. COSSITT:  Thank you.

23   Q.  (By Mr. Cossitt)  Dr. Schneider, what was the -- oh,

24   the question was:  Did you act on the advice and commentary

25   that you had been exposed to?

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 179 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 180 of 239

179

1    A.  I did.

2    Q.  What did you do?

3    A.  Well, certainly throughout my residency, we were

4    working over 100 hours a week.  I had --

5    Q.  The question is "What did you do to act on the

6    advice" --

7    A.  I understand.

8    Q.  -- "about asset protection?" sir, not how many hours

9    you were working.

10   A.  I ultimately hired the Brown Law Firm in 1998 here in

11   Billings, Montana, to create our first estate and asset

12   protection plan.

13   Q.  And that was '98?

14   A.  '98.

15   Q.  A firm here in town?

16   A.  Brown Law Firm.

17   Q.  Okay.  And did they create such a plan?

18   A.  A complicated one, yes.

19   Q.  Did you follow their advice and implement it?

20   A.  To the letter.

21   Q.  Did the Brown Law Firm advise you that these were

22   appropriate planning and risk management tools?

23   A.  Yes.

24   Q.  Then what, then what trans -- so you implemented this

25   plan.  Then what?

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 180 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 181 of 239

180

1    A.  In 2007, I had changed practice locations.  I was

2    practicing in northern Wyoming.  I was a Wyoming resident.

3    I hired new counsel, new counsel of the Greear Law Firm,

4    Greear Clark King in Worland, Wyoming.  Their specialty

5    is --

6    Q.  Did you say "Worland," sir?

7    A.  Worland --

8    Q.  Okay.

9    A.  -- Wyoming.  Their specialty is estate planing and

10   business law.  I trusted them and had many, many meetings

11   with them as far as creating and re-creating estate plan --

12   the estate plan.

13   Q.  Okay.  So that's the asset protection plan that was in

14   place at the time you filed this bankruptcy case?

15   A.  It is the estate plan of which asset protection is part

16   of the plan, correct.

17   Q.  Did the Greear Clark law firm in Worland give you

18   extensive advice and counsel with respect to this course of

19   action?

20   A.  They did.

21   Q.  Did you follow their advice?

22   A.  I did.

23   Q.  Have they advised you at any time that this asset

24   protection planning or estate planning was inappropriate?

25   A.  They did not.

1    Q.  At the time you set up the initial plan back in '98

2    with the Brown Law Firm, did you have any claims or

3    lawsuits pending against you?

4    A.  I did not.

5    Q.  And in 2007, at the time you updated it and implemented

6    it with the law firm down in Worland, were there any claims

7    or lawsuits pending against you?

8    A.  No.

9    Q.  What -- I'd like to ask you to briefly summarize the

10   events that led up to the bankruptcy filing.

11   A.  Well, I was involved in litigation.  I had spent a

12   considerable amount of money on a single claim -- excuse

13   me, on a single defense.  I reviewed that in detail with

14   Mr. Ron Jurovich, who is a -- participated in some of those

15   defenses.  And his specialty is bankruptcy law, he lives in

16   Thermopolis, Wyoming.

17       Mr. Jurovich looked at all of the assets that we had

18   that were owned by the various entities that had been set

19   up by Mr. Greear, and he ultimately recommended that

20   consideration of Chapter 7 bankruptcy was the most

21   important thing to do.

22   Q.  So the events leading up were just multiple lawsuits.

23   A.  I had litigation.  And based upon the ownership of the

24   assets, which had been appropriately placed into various

25   estate planning tools to primarily avoid inheritance tax

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 182 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 183 of 239

182

1   should something happen to my wife and I, I did not have

2   access.  Those were not my assets; although, they were part

3   of the estate's.

4       So I was running up against a limited amount of

5   resources in order to address litigation expenses, and I

6   was spending all the money on paying for defense lawyers.

7   I knew there were creditors, and I was trying to come to

8   some type of reasonable conclusion on how to, how to move

9   forward with that litigation and get it concluded.

10  Q.  Did your, did your practice end in approximately

11  February of 2013?

12  A.  Functionally, yes.

13  Q.  And what happened to your revenue stream at that point?

14  A.  Declined significantly.

15  Q.  So we had a decline in revenue and increased

16  liabilities needed to defend -- cost of defending the

17  liabilities.  Are those the events that preceded the

18  bankruptcy?

19  A.  That is correct.

20  Q.  So you mentioned Mr. Jurovich, although he's not the,

21  your counsel of record in this case, is he?

22  A.  He is not.

23  Q.  How did we go from Mr. Jurovich to Mr. Dye?

24  A.  In 2012, we relocated back to Montana, myself and my

25  family.  We were Montana residents.  Beginning at the end

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 183 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 184 of 239

183

1     of 2012 and - (inaudible) - 2013, 2014, Mr. Jurovich

2     provided extensive counsel and extensive recommendations,

3     and ultimately he actually participated in interviewing

4     Mr. Dye on the phone whom I identified as a bankruptcy

5     attorney with extensive experience here in Montana.

6     Q.  And then did you ultimately decide to -- obviously, you

7     decided to file a Chapter 11 case.

8     A.  Based on my conversations, extensive conversations with

9     Mr. Jurovich and based upon extensive conversations and

10    preplanning with Mr. Dye, they both recommended that was

11    the best course of action.

12    Q.  Did you have any idea or warning that the events that

13    have engulfed you since you filed this case were going --

14    might occur?

15    A.  Absolutely none.

16              MR. PATTEN:  Relevance, Your Honor.

17              THE COURT:  Pardon?

18              MR. PATTEN:  Relevance.  What does the advice

19    about filing bankruptcy have to do with any of the factors

20    that the Court's supposed to --

21              THE COURT:  Well, I've only treated this as

22    background because we've -- we're really beyond that anyway

23    at this point with the settlements, but -- I'm going to

24    overrule, but I'm going to ask Mr. Cossitt to kind of move

25    it along.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 184 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 185 of 239

184

1    Q.  (By Mr. Cossitt)  He overruled the objection.  You can

2    answer the question, sir.

3    A.  Would you repeat it, Mr. Cossitt?

4    Q.  The question was:  Did either of these lawyers warn you

5    that you might get the living daylights sued out of you and

6    your family?

7    A.  Absolutely not.

8    Q.  Had you known of this risk, would you have filed the

9    case?

10   A.  Absolutely not.

11   Q.  Okay.  Let's, let's talk a little bit about the lawsuit

12   called "Adversary 15-15."  That's the collection lawsuit

13   that Mr. Womack filed against you and your family members.

14   A.  I understand.

15   Q.  Okay.  Do you have an estimate of the length of time it

16   would take to get that case prepared for trial?

17            MR. PATTEN:  Objection; foundation.  There's

18   no --

19            THE COURT:  Sustained.

20   Q.  (By Mr. Cossitt)  Okay.  Have you been involved in

21   lawsuits as a litigant?

22   A.  I have.

23   Q.  How many?

24   A.  Litigant or defendant?  I'm sorry.

25   Q.  Plaintiff or defendant, as a litigant.  Not as an

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 185 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 186 of 239

185

1    expert witness but as a litigant, either a plaintiff or

2    defendant, how many lawsuits have you been involved in in

3    your adult life?

4    A.  A dozen.

5    Q.  Are you familiar with the respective rules of

6    plaintiffs and defendants?

7    A.  Very much so.

8    Q.  Have you hired many, many lawyers over the years to

9    represent you?

10   A.  I have.

11   Q.  How many?

12   A.  Probably 20 to 25.

13   Q.  Okay.  And have you prosecuted or defended many number

14   of lawsuits to conclusion?

15   A.  No.

16   Q.  Settled them?

17   A.  Settled some, some were dismissed, but when they were

18   settled, it was fairly far in the game.

19   Q.  You've worked closely with lawyers and had a chance to

20   receive their advice and counsel with respect to litigation

21   management?

22   A.  Yes, sir.

23   Q.  Have you served as an expert witness?

24   A.  Yes, sir.

25   Q.  How many cases?

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 186 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 187 of 239

186

1    A.   Approximately, 50.

2    Q.   Have you, during the course of serving as an expert

3    witness, have you had an opportunity to work closely with

4    lawyers preparing your expert testimony in the cases?

5    A.   Yes, sir.

6    Q.   Okay.  Do you have an estimate, based on your, your

7    experience, then, do you have an estimate of how much

8    pretrial discovery and dispositive motions and things, how

9    much time it will take to prepare Adversary 15-15 for

10   trial?

11             MR. PATTEN:  Objection --

12             UNIDENTIFIED SPEAKER:  Objection.

13             MR. PATTEN:  -- there's no foundation that the

14   witness has any knowledge of the procedures of Bankruptcy

15   Court.

16             MR. COSSITT:  You know what?  I'll respond to the

17   objection by saying this is a lay opinion.  The Court's got

18   wide discretion and the Court can determine how much weight

19   it wants to give this testimony, but it does come -- I urge

20   the Court to overrule the objection because it does come in

21   as lay opinion testimony.

22             THE COURT:  For what purpose?

23             MR. COSSITT:  It goes to the four-factor test and

24   the complexity and the expense and the delay of attending

25   to it.  And this witness's opinions are going to vary from

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 187 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 188 of 239

187

1    the opinions that were expressed by the trustee.

2              THE COURT:  I really see those factors going more

3    to the trustee's review, investigation, and conclusions

4    than necessarily from the parties.

5              MR. COSSITT:  We ask the Court to overrule the

6    objection so that we can provide our testimony and help

7    guide the Court to a better informed overall resolution of

8    the thing.  And the Court is equipped to sift through

9    divergent testimony, receive and sift through divergent

10   testimony.

11             And to -- my offer of proof on this would be that

12   if this --

13             THE COURT:  Do an offer of proof --

14             MR. COSSITT:  All right.  If this --

15             THE COURT:  -- because I'm going to sustain the

16   objection.

17             MR. COSSITT:  If this -- okay.  If this testimony

18   were allowed, I would expect to elicit testimony from this

19   witness that he has had extensive experience with lawyers,

20   he's familiar with the litigation process, that he's

21   qualified to offer a lay, lay opinion on the same topics

22   that the trustee testified earlier today that his opinion

23   would be different.

24             And I could go into the specifics of what I

25   expect to elicit, but I'll just leave it at that, that his

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 188 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 189 of 239

188

1    opinions on a number of the four -- the expense,

2    complexity, and delay, and cost of attending to this will

3    be divergent from the trustee's opinions expressed earlier.

4    That concludes my offer of proof, and I would just ask the

5    Court to reconsider its ruling and allow the testimony.

6              THE COURT:  The ruling stands.  You may proceed.

7    Q.   (By Mr. Cossitt)  Dr. Schneider, do you have an opinion

8    on what you -- what your lawyers, either Mr. Dye or myself,

9    have told you as to the percent of chance of successfully

10   defending Adversary No. 15-15?

11   A.   The collection -- I think we'll have at least an

12   80 percent chance of being successful with defending it.

13   Q.   Do you believe the trustee might encounter any

14   difficulties in collecting any judgments that he may

15   obtain?

16   A.   I think that we will spend every resource necessary in

17   order to litigate that to within our powers and within the

18   court system and that the amount that, regardless of

19   judgment, that the amount that would be -- that Mr. Womack

20   or his attorneys could obtain would be dramatically less

21   than that is offered in the settlement.

22   Q.   You heard the trustee's testimony earlier today about

23   the complexity, the expense, and the inconvenience of the

24   litigation, didn't you?

25   A.   Yes.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 189 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 190 of 239

189

```
 1    Q.   Do you agree with his testimony?

 2    A.   Yes.

 3              MR. COSSITT:   Your Honor, may I approach the

 4    witness?

 5              THE COURT:   You may.

 6              MR. COSSITT:   The record should reflect that

 7    we'll be handing the witness the settlement agreement that

 8    is at Docket 29-2.   That's Docket 290-2, and it's also

 9    labeled Exhibit TT-2.

10    Q.   (By Mr. Cossitt)   Dr. Schneider, do you know what

11    Docket 290-2 is?

12    A.   I do.

13    Q.   What is it?

14    A.   It's the settlement agreement and release.

15    Q.   In which case?

16    A.   Both cases.

17    Q.   Take a closer look, Doctor.   Maybe take a look at

18    Paragraph B on page 2.

19    A.   I apologize.   It's for AP 15.

20    Q.   Okay.   Let's move to the section on page 2 that talks

21    about agreement and release, Paragraph 2 where it says

22    "terms."

23    A.   I'm there.

24    Q.   Okay.   The Term 2(a) is the Tommy Armour house or the

25    Billings house?
```

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 190 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 191 of 239

190

1    A.  Correct.

2    Q.  What's your opinion as to the value of that?

3    A.  At least $600,000.

4    Q.  And is it your view that your wife, Michelle, owns half

5    of it?

6    A.  She does.

7    Q.  And then let's move to Paragraph C.  That's the

8    Whispering Winds Ranch.  What's your opinion of value on

9    that?

10   A.  The remainder of the ranch that's for sale is actually

11   listed at over $1.8 million.  And that, like Mr. Womack had

12   testified to, the current real estate agent has indicated

13   there are several parties that are interested at that

14   level.

15   Q.  What's your opinion of value?  Not who's interested;

16   what's your opinion of value?

17   A.  1.8 to $2 million.

18   Q.  Okay.  Let's move on to Paragraph F on page 3, sir.

19   A.  I'm there.

20   Q.  And what is -- what's that?

21   A.  This refers to the current trust account, moneys that

22   are held in Mr. -- in the Goetz law firm trust account

23   relative to the prior sale of a smaller guest home and a

24   small amount of property that surrounded that guest home

25   from Whispering Winds Ranch.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 191 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 192 of 239

191

1   Q.  And that's got -- the trust account has roughly 350

2   grand in it, doesn't it?

3   A.  To my understanding, yes.

4   Q.  I mean, didn't some money come out to pay the mediator

5   and that sort of thing?

6   A.  Yes.

7   Q.  But roughly 350 grand?

8   A.  Yes.

9   Q.  Okay.  Then the Paragraph G, it discusses the REIT.

10  And as a practical matter, is the REIT going to be

11  available to the trustee?

12  A.  It will be with a court order.

13  Q.  But you need a court order to -- why don't you explain

14  that a little bit, please.

15  A.  So the REIT is not a liquid; it's -- asset; it is, it's

16  real estate.  And it's controlled by K - (inaudible) - S.

17  They have their -- there are specific requirements for

18  distribution of that asset.  I inquired after the mediation

19  and agreement to settle this case as to the ability to

20  liquidate that.  They indicated they would only do so or

21  consider doing so based upon a court order.

22  Q.  Okay.  And if, if it can't be liquidated, then the --

23  Paragraph F, G, and H read together basically means that

24  the trustee gets 200 -- out of the 350 grand in the Goetz

25  firm account, the trustee gets 240 and Michelle gets 110?

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 192 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 193 of 239

192

1   A.  Correct.

2   Q.  Okay.  On Paragraph I -- do you see that?

3   A.  I do.

4   Q.  Yeah.  And that's, that's an agreement to split the tax

5   refund, right?

6   A.  Correct.

7   Q.  So how much does that net the bankruptcy estate?

8   A.  $62,000.

9   Q.  And then overall, did you add up the value of all of

10  these various assets?

11  A.  We did, yes.

12  Q.  And what did you come up with?

13  A.  Just under $3 million.

14  Q.  And that's the value of the consideration that you and

15  your family members are putting in to fund the settlement?

16  A.  Yes.

17  Q.  Okay.  And then in addition to that consideration,

18  you've got -- or MedPort owns some property in California?

19  A.  It does.

20  Q.  What's that worth?

21  A.  Just under $2 million.

22  Q.  So if I understand this right, your testimony is that

23  the, the pile of assets that have been under consideration

24  is worth about five, right?

25  A.  Correct.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 193 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 194 of 239

193

1    Q.  All right.  And then I further understand your

2    testimony that, that the -- you think the value of what's

3    being put in here is in the 2.9 or 3.0 million range?

4    A.  Yes.

5    Q.  Let's talk about the case that's known as

6    "Adversary 15-20."  Okay?

7    A.  Yes, sir.

8    Q.  What do you understand the claims to be in that case?

9    A.  Mr. Womack has filed that case to deny the discharge

10   requested under my Chapter 7 bankruptcy.

11   Q.  And did you carefully review the allegations in the

12   case with Mr. Dye?

13   A.  I carefully reviewed them with Mr. Dye, yes.

14   Q.  Did he prepare and file an answer in the case?

15   A.  He did.

16   Q.  And tell us, what's, what does the answer basically

17   say?

18   A.  After going through it in great detail with him, giving

19   him all the evidence, it was his opinion and so filed that

20   in general, we deny --

21           MR. PATTEN:  Objection; hearsay, Your Honor.

22           THE WITNESS:  -- we deny the --

23           THE COURT:  Just a moment.

24           UNIDENTIFIED SPEAKER:  Objection.

25           MR. PATTEN:  Objection; hearsay.  The witness is

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 194 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 195 of 239

194

1    testifying as to somebody else's opinion.

2              THE COURT:  I understand.  I'm going to sustain,

3    even though I would like to know what he said.  But I'm

4    going to sustain.

5    Q.  (By Mr. Cossitt)  Did he file an answer on your behalf?

6    A.  He did.

7    Q.  What did the answer say?

8    A.  In general:  Deny the claims.

9    Q.  And that's in the, I think -- excuse me.

10             MR. GARDNER:  It's Trustee's 5, Mr. Cossitt.

11             MR. COSSITT:  May I approach the witness, Your

12   Honor?

13             THE COURT:  You may.

14             MR. COSSITT:  The record should reflect that I'm

15   going to hand the witness Docket 287-1.  That's

16   Docket 287-1, which is also labeled Schneider Exhibit JS-1.

17   And I'm proud to announce that that is the only exhibit

18   that I've prepared for today's proceedings.

19   Q.  (By Mr. Cossitt)  Dr. Schneider, do you have

20   Docket 287-1 there in front of you, sir?

21   A.  I do.

22   Q.  Okay.  What is it?

23   A.  It's the answer to the first amended complaint in

24   Adversary No. 15-00020.

25   Q.  And do you recognize the signature block in the upper

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 195 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 196 of 239

195

1    left-hand corner --

2    A.  I do.

3    Q.  -- on the first page?

4    A.  I do.

5    Q.  Who is it?

6    A.  Mr. Dye.

7    Q.  Was he your lawyer?

8    A.  He was.

9    Q.  And do you think this is a true and accurate copy of

10   the answer that he filed on your behalf?

11   A.  I do.

12          MR. COSSITT:  Your Honor, we move to admit

13   Exhibit JS-1, which is located at Docket 287-1.

14          THE COURT:  Any objection?

15          MR. PATTEN:  I think the Court can take judicial

16   notice of it anyway, Your Honor.

17          THE COURT:  The exhibit's admitted.

18          MR. COSSITT:  I want it in substantive evidence.

19   Q.  (By Mr. Cossitt)  Dr. Schneider, is that the document

20   that you're suggesting in which you deny the allegations

21   that the Chapter 7 trustee has made against you?

22   A.  Yes.

23   Q.  And it raised defenses?

24   A.  Yes.

25   Q.  Did Attorney Dye express thoughts or opinions about

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 196 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 197 of 239

196

1    your chances of beating this thing?

2    A.  He did.

3    Q.  What does he think?

4    A.  (Inaudible.)

5            MR. PATTEN:  Objection -- (inaudible.)

6            THE COURT:  Pardon, Mr. Patten?

7            MR. PATTEN:  Hearsay.

8            THE COURT:  Sustained.

9    Q.  (By Mr. Cossitt)  What's your view about winning this

10   lawsuit?

11   A.  After careful consideration in talking with my

12   attorneys, I believe it's better than 80 percent.

13   Q.  Do you have an opinion as to how long it will take to

14   prepare this case for trial?

15   A.  (Inaudible) -- six months.

16   Q.  Do you have an opinion as to how long the trial might

17   last?

18   A.  I would assume at least a week.

19   Q.  Do you have any idea or have you budgeted for what it

20   might cost to properly defend the allegations in this

21   thing?

22   A.  Approximately, $300,000.

23   Q.  Are you prepared to commit those resources to defend

24   it?

25   A.  No.

```
 1    Q.  Pardon?

 2    A.  I will have to obtain those resources by liquidating

 3    the assets that are currently in -- offered in the

 4    settlement agreement.

 5    Q.  You and your family members.

 6    A.  Correct.

 7    Q.  Okay.  You know, let's talk about that for a little

 8    bit.  Your --

 9              THE COURT:  Property other than property of the

10    estate.

11              MR. COSSITT:  I'm sorry, Your Honor?

12              THE COURT:  Property other than property of the

13    estate.

14              MR. COSSITT:  Well, that will be the testimony I

15    would like to elicit.

16    Q.  (By Mr. Cossitt)  The trustee has made allegations that

17    a bunch of those assets belong to his bankruptcy estate,

18    right?

19    A.  He has.

20    Q.  But as of right now, they're titled in the names of

21    other LLCs and trusts, right?

22    A.  They are.

23    Q.  And nothing's changed, right?

24    A.  Correct.

25    Q.  So the moneys that are tied up in the Gardner trust
```

1   account, if this settlement's not approved, what is the

2   Schneider clan's plans with respect to those?

3   A.  Well, the -- we would ask -- that money is legally

4   owned by the children's irrevocable trust, and we would ask

5   their representative counsel to move aggressively to

6   liberate that entire amount as there is excellent case law

7   and Supreme Court opinion from Wyoming where that

8   location -- where that ranch is located that shows --

9           MR. YORK:  Your Honor, excuse me.  Now I'm going

10  to object to the lack of foundation.

11          THE COURT:  Sustained.

12  Q.  (By Mr. Cossitt)  Did you -- have you and your family

13  members engaged Montana counsel to take a look at the

14  validity of the lis pendens that the trustee has filed?

15  A.  We have.

16  Q.  And have your lawyers engaged Wyoming counsel where the

17  Whispering Ranch, where the Whispering Ranch lands are

18  located?

19  A.  They have.

20  Q.  And did Wyoming counsel provide case law and other

21  materials to your Montana lawyers?

22  A.  They did.

23  Q.  Did they share that with you?

24  A.  They did.

25          MR. YORK:  Objection; hearsay, one more question.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 199 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 200 of 239

199

1          THE COURT:  Well, I'm going to overrule that, and

2    I'll allow you to --

3    Q.  (By Mr. Cossitt)  Did they share the Wyoming case law

4    with you?

5    A.  They did.

6    Q.  Was it a topic of discussion with respect to freeing up

7    the funds that are sitting in the Goetz firm trust account?

8    A.  Yes.

9    Q.  Did you receive advice and counsel from your lawyers?

10   A.  Yes.

11   Q.  What was it?

12          MR. YORK:  Objection; hearsay.

13          UNIDENTIFIED SPEAKER:  Objection; hearsay.

14          THE COURT:  I'm going to sustain that.  I'll

15   allow you to rephrase.

16   Q.  (By Mr. Cossitt)  What did you understand -- given the

17   experience, your experience with lawsuits that we elicited

18   from you earlier, sir, did you read the case and the other

19   materials that were provided to you in the emails?

20   A.  In detail.

21   Q.  Did you form your own opinions?

22   A.  I did.

23   Q.  What is your own opinion with respect to --

24          MR. PATTEN:  Objection, Your Honor.  Is he going

25   to render a legal opinion?  I don't think he's competent to

1  do that, Your Honor.

2          THE COURT:  No.  He's rendering a personal

3  opinion, based upon his own knowledge.

4          MR. COSSITT:  I think that he's --

5          THE COURT:  It goes to weight.

6          MR. COSSITT:  The objection is overruled?

7          THE COURT:  It is.

8  Q.  (By Mr. Cossitt)  You may answer, if you remember the

9  question.

10  A.  I reviewed the, the material provided by the Wyoming

11  attorneys to the Montana attorneys, and it's my

12  understanding and belief that we would prevail in --

13  under -- based upon that material in recapturing all the

14  moneys that -- from any, from any past or future sale of

15  the Wyoming Whispering Winds Ranch.

16  Q.  Is it your family's intention to -- if this

17  settlement's not approved, is it your family's intention to

18  assert your ownership to the Whispering Winds Ranch,

19  liquidate it, and use that to fund continued litigation

20  costs?

21  A.  To the fullest extent possible, yes.

22  Q.  Has the trustee obtained an injunction or other

23  prejudgment remedy with respect to any of those sale

24  proceeds?

25  A.  No.

1    Q.  Now, in settling Adversary No. 15-20, you and Michelle

2    have included the Billings house, right?

3    A.  Yes.

4    Q.  And I think you said you thought it was worth about 600

5    grand.

6    A.  At least.

7    Q.  Okay.  And so is it -- who owns the Billings house?

8    A.  John and Michelle Schneider.

9    Q.  So do you folks own that 50/50?

10   A.  We do.

11   Q.  Okay.  So the value of her interest is about 300 grand,

12   right?

13   A.  It is.

14   Q.  And is it your view or the Schneider clan's view that

15   that 300 grand is off the table --

16   A.  It is.

17   Q.  -- other than involuntarily providing it in the context

18   of this settlement?

19   A.  Yes.

20   Q.  And, then, with respect to your half, you claimed a

21   homestead exemption in your half, right?

22   A.  Yes.

23   Q.  And that -- the trustee did not object to that, did he?

24   A.  He did not.

25   Q.  So you -- is your homestead exemption worth 125 in that

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 202 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 203 of 239

202

1    property, or do you know?

2    A.  It is worth 125,000.

3    Q.  Okay.  So if I understand this right, the consideration

4    that, that the Schneider clan is offering with respect to

5    this discharge case is right about $425,000.  Right?

6              MR. YORK:  Objection; leading.

7              THE COURT:  I'm going to overrule and allow him

8    to answer.

9              THE WITNESS:  You're -- it is about $425,000,

10   yes.

11   Q.  (By Mr. Cossitt)  And what did you, what did you

12   testify you thought it would cost to try that discharge

13   case?

14   A.  At least 300,000.

15   Q.  So you're putting in the cost of defense plus a little

16   bit extra, huh?

17   A.  Yes, expert witnesses, etc.

18   Q.  At the time of the mediation, do you know if there were

19   any claim objections on file?

20   A.  There were not.

21   Q.  And do you know the aggregate amount of claims that

22   were filed in this case?

23   A.  I do.

24   Q.  How much is that?

25   A.  Approximately, $11 million.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 203 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 204 of 239

203

1   Q.  So at the time of mediation, you were sitting across

2   the table from a mediation opponent who was asserting

3   $11 million worth of claims.

4   A.  He was.

5   Q.  Do you believe some of those claims are contingent?

6   A.  They are.

7   Q.  Do you believe some of those claims are unliquidated?

8   A.  They are.

9   Q.  Do you believe some of those claims are overstated?

10  A.  Profoundly.

11  Q.  Had you requested that the trustee object to claims

12  earlier in this case?

13  A.  Yes.

14  Q.  If the claims objection process had been begun and

15  concluded -- let me withdraw that question.

16      You have since filed a number of claim objections on

17  your own, haven't you?

18  A.  We have.

19  Q.  When the dust settles on this whole claim objection

20  process, what's your best estimate as to the amount of

21  allowed unsecured claims that will be remaining against

22  this estate?

23  A.  Somewhere between 1.0 and 1.5 million.

24  Q.  Had that process been begun and concluded prior to the

25  mediation, would you have conducted and postured yourself

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 204 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 205 of 239

204

1    differently at the mediation?

2            MR. GARDNER:  Objection; speculation and

3    relevance.

4            THE COURT:  I'm going to sustain.

5    Q.  (By Mr. Cossitt)  You've looked at the objection by

6    Attorney Patten in this case, haven't you?

7    A.  I have.

8    Q.  And what's the basic thrust of the Patten objection,

9    the PI -- we'll call it the "PI claimants' objection."

10   A.  Mr. Patten has -- is representing medical malpractice

11   claimants that have vastly overstated and -- very

12   defensible claims against me, and so therefore, they're

13   vastly overinflated as to their value.

14   Q.  Okay.

15   A.  That's it.

16   Q.  And his -- the claimants that he's represented, they're

17   represented by counsel, aren't they?

18   A.  They are.

19   Q.  And with your background in medicine and being an

20   expert witness, are you familiar with how medical

21   malpractice litigation is normally financed?

22   A.  Yes.

23   Q.  And how is it normally financed?

24   A.  Through insurance companies.

25   Q.  On the plaintiff's side.

1    A.   Oh, contingency fees.

2    Q.   Okay.  And do you know what the range of a reasonable

3    and normal contingency fee is in southern Montana and

4    northern Wyoming?

5              MR. PATTEN:  Objection --

6              MR. YORK:  Objection --

7              MR. PATTEN:  -- irrelevant.

8              THE COURT:  I'm going to sustain.

9              MR. COSSITT:  It goes to the fourth factor, this

10   court's deference to the reasonable views of creditors.

11   And the thrust of the Patten objection is that we didn't

12   put enough money on the table.  The testimony I would like

13   to elicit is that's not the problem.  The problem here is,

14   is that 80 percent of what we're putting into this case is

15   going to the lawyers.

16             The line of questioning -- and to the extent that

17   the objection on behalf of the creditors - and that is the

18   fourth factor of the test - goes to the reasonable views,

19   I'm trying to elicit testimony to demonstrate that the

20   views that are being expressed in the objection are

21   misguided and therefore not reasonable.

22             THE COURT:  Mr. Patten.

23             MR. PATTEN:  Your Honor, I think we have a number

24   of our clients here that I think would be happy to take the

25   stand and express their views on the reasonableness of

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 206 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 207 of 239

206

1    these views.  That's an irrelevant consideration for this

2    court.  The Court is -- what is in the best interest of the

3    creditors?

4            And if the creditors are saying, "We don't like

5    the settlement, we don't want the settlement, it falls on

6    us.  If the settlement's not approved, it's on us," I think

7    that speaks exactly what the deference of the creditors is.

8            MR. COSSITT:  May I respond?

9            THE COURT:  You may.

10            MR. COSSITT:  You know, Your Honor, at

11   Docket 227, the objectors assert 7.1 million in claims,

12   61 percent of the total.  In Paragraph 4 of that same

13   document, they calculate a 4 percent dividend.

14            And the thrust of their objection at Docket 227

15   is:  There ain't enough money here for this court to make a

16   finding that this is a fair and equitable settlement.

17            Their thrust in their objection is:  They didn't

18   put enough money in.

19            And with all due respect to Counsel's position

20   here, Your Honor, I think it goes to the fourth factor, the

21   reasonableness of their views.  And we are trying to meet

22   head-on with this testimony the written objection that he's

23   raised in Docket No. 227.  We request a little bit of

24   latitude.

25            MR. JAMES:  Your Honor.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 207 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 208 of 239

207

```
 1              THE COURT:  Mr. James.

 2              MR. JAMES:  I join in Mr. Patten's objection.

 3    And I go back to the Court's comments earlier today that

 4    there is a public policy issue here.  And you asked us to

 5    steer towards that issue, and this is an unprecedented

 6    issue.

 7              And, you know, if I'm understanding this now, the

 8    issue before the Court, as Mr. Cossitt is framing it, is

 9    simply whether or not Dr. Schneider is paying enough money

10    to purchase his discharge.  That's not the public policy

11    issue.

12              The amount of the settlement certainly is

13    critical, but the public policy issue here is:  Can someone

14    purchase their discharge when they have not followed the

15    bankruptcy code, they haven't followed the rules, they've

16    disobeyed lawful orders of the Court, they haven't

17    disclosed all of their assets, they've hidden and

18    transferred assets, they haven't cooperated with the

19    trustee, they've misbehaved prepetition and postpetition?

20              And so, I mean, I think this is all irrelevant.

21    I mean, I think we have to get back to the public policy

22    issue that's been framed.

23              THE COURT:  I'm going to sustain the objection.

24    Q.  (By Mr. Cossitt)  Do you know how much the trustee and

25    his lawyers are receiving for their fees in this case?
```

 1   A.  Yes.

 2   Q.  How much?

 3   A.  Forty percent.

 4   Q.  Okay.  And have you had the opportunity to review any

 5   fee agreements in the medical malpractice cases against

 6   you?

 7   A.  I'm generally aware of them, but I have not reviewed

 8   the exact documents.  They're between --

 9   Q.  What do you understand to be the types of contingency

10   fees that are contained within those?

11   A.  Thirty-five to forty percent.

12           MR. PATTEN:  Objection.  I thought he didn't

13   know.

14           THE COURT:  Yeah, I'm going to sustain.

15           MR. COSSITT:  I'd like just a minute here --

16           THE COURT:  Certainly.

17           MR. COSSITT:  -- to take a look at my notes, Your

18   Honor, before I conclude my direct.

19           THE COURT:  Certainly.

20           MR. COSSITT:  Thank you.

21           That concludes by direct examination.

22           THE COURT:  Okay, thank you.

23           Mr. Gardner.

24                    CROSS-EXAMINATION

25   BY MR. GARDNER:

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 209 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 210 of 239

209

1    Q.   Dr. Schneider, good afternoon.

2    A.   Hello.

3    Q.   Do you have any idea how much it's going to cost for

4    you and the other defendants in AP 15-15 for the defense of

5    that action?

6    A.   At least a million and a half dollars.

7    Q.   And if I understood your testimony -- well, first, do

8    you or the various entity defendants have a million and a

9    half dollars in liquid funds to fund that defense?

10   A.   We do not.

11   Q.   And if I understood your testimony correctly, I believe

12   you will expend every resource necessary to try to get the

13   $350,000 released from my trust account.  Correct?

14   A.   We will.

15   Q.   And in order so you -- for you to have that money to

16   spend on defense of the litigation or whatever other

17   purpose you deem appropriate, correct?

18   A.   Correct.

19   Q.   And likewise, with the lis pendens we have on the

20   Whispering Winds Ranch in Wyoming, if I understand your

21   testimony correctly, you will expend every effort available

22   to get that lis pendens released or removed so that you can

23   liquidate that property and use those funds, correct?

24   A.   We will.

25   Q.   For litigation or for whatever other purpose you deem

1   appropriate, correct?

2   A.  Yes.

3   Q.  And by the way, you don't own the Whispering Winds

4   Ranch, do you?

5   A.  I do not.

6   Q.  Your children's trusts own that?

7   A.  From the purchase of the property through the

8   construction, all of, all of which was completed by 2008 -

9   2009, the children's trusts, first their company BCS, LLC,

10  which was set up by an attorney in Wyoming, and then the

11  children's irrevocable trusts, which was set up for the

12  correct ownership of that property, at all times has been

13  owned by the children.

14  Q.  So the children's trusts own these --

15  A.  The children's irrevocable trusts own that property,

16  yes.

17  Q.  And who is the trustee of that trust?

18  A.  Michelle Schneider.

19  Q.  Okay.  And as to the lis pendens filed on the

20  California home by the trustee, if I understand your

21  testimony correctly, you will seek to do everything you can

22  to remove that protection as well, correct?

23  A.  The investment property from MedPort is located in

24  California.  Michelle Schneider rents that property as her

25  home, and I'm living there at this point.  We will expend

 1    every effort to get the lis pendens removed and, if

 2    necessary, liquidate that entire property to defend this

 3    litigation.

 4    Q.  Okay.  So if I understand you correctly, in essence,

 5    your testimony is without this settlement, you will make

 6    every effort you can to fully defend this litigation.  You

 7    anticipate that will eat up a bulk of any assets that are

 8    available at the end of the day.

 9    A.  Yes.

10          MR. JAMES:  Objection; leading question, and it

11    is restating testimony given prior to this.

12          THE COURT:  I'm going to overrule.  He's answered

13    as well, so -- are you done?

14          MR. GARDNER:  That's all I have.

15          THE COURT:  Okay.  Mr. Parker.

16                    CROSS-EXAMINATION

17    BY MR. PARKER:

18    Q.  Dr. Schneider, were you in the courtroom for

19    Mrs. Michelle Schneider's testimony?

20    A.  I was.

21    Q.  Did she tell the truth?

22    A.  She did.

23          MR. PARKER:  That's all I have.

24          THE COURT:  Mr. Patten.

25                    CROSS-EXAMINATION

```
 1   BY MR. PATTEN:

 2   Q.  Dr. Schneider, you stated you estimate the various

 3   malpractice claims have a total value of 1 million to

 4   1.5 million?

 5   A.  I do.

 6   Q.  You remember Russell Monaco, do you not?

 7   A.  I do.

 8   Q.  He died under your care, did he not?

 9   A.  He died at -- he died, yes.

10   Q.  Your license in Wyoming was suspended because of your

11   actions with respect to Mr. Monaco, correct?

12           MR. COSSITT:  Objection; relevance, badgering the

13   witness.

14           THE COURT:  Oh, come on, Mr. Cossitt, that wasn't

15   badgering, but I don't know that it's relevant.

16           MR. PATTEN:  Your Honor, the witness testified

17   that the total claims had a value of a million to a

18   1.5 million.

19           THE COURT:  Correct.

20           MR. PATTEN:  And I'm trying to bring out that

21   there was far more than that.

22           THE COURT:  Well, I'll allow you to cross on

23   that.  The objection is overruled.

24   Q.  (By Mr. Patten)  Your license was suspended because of

25   your care of Mr. Monaco?
```

1    A.  Because of the care that was rendered to Mr. Monaco by

2    the physician's assistant and myself.

3    Q.  How old was Mr. Monaco when he died?

4    A.  Forty-seven.

5              MR. PATTEN:  Excuse me a minute, Your Honor.

6              No other questions.  Thank you.

7              THE COURT:  Mr. James.

8                        CROSS-EXAMINATION

9    BY MR. JAMES:

10   Q.  Good afternoon, Dr. Schneider.  The adversary discharge

11   case is set for trial in approximately one month.  How do

12   you expect to spend $300,000 on defense costs in that case

13   in the next month?

14             MR. COSSITT:  Objection; misstates the record.

15             THE COURT:  You know, I'm going to, I'm going to

16   sustain that because I probably -- you're basing on --

17   you're relying upon what I said at the beginning of this

18   hearing today that we had a scheduled time.

19             That was also held in abeyance during the time of

20   mediation, and obviously you know, Mr. James, there's a lot

21   of factors that go into it.  That date and time is

22   available and it may be set for that time, but at this

23   point in time, it's not, so --

24             MR. COSSITT:  Your Honor, may I be heard briefly?

25             Just to clarify the record, I'm looking at

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 214 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 215 of 239

214

1    Docket 22 in that adversary proceeding.  And Docket 22 says

2    very clearly:  Trial scheduled for May 25 - 27, 2016, is

3    vacated and subject to being reset.

4              And that's a direct quote from the order on

5    Docket --

6              THE COURT:  Well, it could be reset on the same

7    dates.

8              MR. COSSITT:  Very good, Your Honor.  Thank you

9    for allowing me to be heard.

10             MR. JAMES:  Let me rephrase the question, Your

11   Honor.

12   Q.  (By Mr. James)  Dr. Schneider, how are you going to

13   spend $300,000 defending the discharge adversary?

14   A.  Paying defense attorneys.

15   Q.  You believe that the attorneys that you've employed to

16   represent you will charge you $300,000 with respect to

17   AP 20?

18   A.  I do.

19   Q.  During your bankruptcy, have you cooperated fully with

20   the trustee?

21   A.  To the best of my ability.

22   Q.  Were your bankruptcy schedules true and correct?

23   A.  Mr. Dye admitted during the mediation that he had made

24   a mistake to the trustee in discussing -- in providing the

25   correct value of my capital account in Schneider Limited

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 215 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 216 of 239

215

1    Partnership.  I overlooked that.  I'm not familiar with the

2    document when it was -- the detail of the document.  I

3    signed it in good faith believing it was accurate.

4    Q.  Other than that, were your schedules true and accurate?

5    A.  To the best of my ability.

6    Q.  Have you provided the trustee with all of the documents

7    that he has requested from you in this bankruptcy?

8    A.  Mr. Womack had requested what I believe is over

9    5 gigabytes of documents over the course of this, my 341

10   hearings.  To the best of my ability to get extensive

11   documents from multiple different parties, I provided them

12   in a timely fashion to Mr. Dye.  I do not know how long it

13   took Mr. Dye to get them to Mr. Womack.

14   Q.  Did you provide Mr. Womack with everything he requested

15   and everything the Court ordered you to produce?

16   A.  To the best of my ability.

17   Q.  You testified at the first meeting of creditors under

18   oath, correct?

19   A.  All the meetings of creditors were under oath, correct.

20   Q.  And was your testimony at the first meeting of

21   creditors true and correct?

22   A.  To the best of my recollection.

23   Q.  And is it your intention now to attend law school?

24   A.  No.

25   Q.  And are you taking a law course by correspondence?

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 216 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 217 of 239

216

1          MR. COSSITT:  Objection; relevance.

2          MR. JAMES:  It goes to his future ability to earn

3     income, Your Honor.  The trustee got into --

4          THE COURT:  What does that have to do with, what

5     does that have to do with the settlement?

6          MR. JAMES:  The trustee got into the ability of

7     whether or not creditors are going to be able to collect

8     from Dr. Schneider and his income.  They've opened this up.

9     I think I'm entitled to explore it.

10          THE COURT:  They did, they did.  I'll overrule,

11     and you may, you may answer, if you recall the question.

12          THE WITNESS:  I don't.  Please repeat it.

13     Q.  (By Mr. James)  Are you taking a correspondence course

14     or have you been taking a correspondence course recently?

15     A.  Well, I'm enrolled in a master's program through

16     Creighton University, Creighton Law School.

17     Q.  And what are you studying?

18     A.  Conflict resolution, alternative dispute resolution.

19     Q.  And do you intend to take additional law courses?

20     A.  No.

21     Q.  How are you currently earning income?

22     A.  I'm paid as an independent contractor from MedPort for

23     providing medical expert consultation for several

24     income-generating streams, including expert witness

25     testimony through my work with Alphatec Spine, and

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 217 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 218 of 239

217

```
 1   education, and participating in the management of websites

 2   owned by MedPort.

 3   Q.  Have you participated in training physicians from

 4   foreign countries?

 5   A.  Yes.

 6   Q.  From what countries?

 7   A.  Ecuador; Japan; China; Mexico; Peru; some were in the

 8   eastern European bloc, I believe, the Ukraine.

 9   Q.  And have you traveled to any of those countries to

10   assist with surgeries?

11   A.  I have.

12   Q.  What countries have you traveled to?

13   A.  China, Mexico, and recently had a cancellation in

14   Ecuador because of the earthquake.

15   Q.  Are you still licensed as a physician in the state of

16   Montana?

17   A.  Yes.

18             MR. JAMES:  I have nothing further, Your Honor.

19             THE COURT:  Thank you.  Anyone else?

20             UNIDENTIFIED SPEAKER:  I don't have anything for

21   this witness, Your Honor.

22             THE COURT:  Okay.  Any redirect?

23             MR. COSSITT:  Could I have just a moment to

24   collect my thoughts?

25             THE COURT:  Certainly.
```

```
 1              THE WITNESS:  Could I ask a question?

 2              THE COURT:  Certainly.

 3              THE WITNESS:  There have been many allegations as

 4    to my character and whether I've done something wrong in

 5    communicating with Mr. Womack.  Do I have a chance to

 6    address that?

 7              THE COURT:  Those are only issues that you should

 8    discuss with your counsel --

 9              THE WITNESS:  Okay.

10              THE COURT:  -- and take his lead from there.

11              THE WITNESS:  Thank you.

12              MR. COSSITT:  Judge, no redirect.

13              THE COURT:  Okay, very good.  You may step down.

14              THE WITNESS:  Thank you.

15              MR. COSSITT:  No further witnesses on behalf of

16    Dr. Schneider, Your Honor.

17              THE COURT:  Okay, thank you.  Mr. Parker, any

18    witnesses?

19              MR. PARKER:  No witnesses.  I have Mr. Holden

20    from -- MedPort's attorney has been with us today, but

21    there's no room at the counsel table.  And he asked, when I

22    got the mic next, if I would point that out for the record.

23    He's been, been here all day.

24              And I believe I can say MedPort also joins in the

25    motion to --
```

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 219 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 220 of 239

219

1          THE COURT:  Okay.  I appreciate your indicating

2     his presence.

3          Mr. Patten.

4          MR. PATTEN:  Your Honor, I have a witness that I

5     would like to call.

6          THE COURT:  Okay.  Mr. York, do you have

7     witnesses?

8          MR. YORK:  No, Your Honor, but I do have some

9     documents that I would like to get admitted into the

10    record, if I can.

11         THE COURT:  Okay.  Counsel has all seen them?  Is

12    there an understanding --

13         MR. YORK:  They are part of the exhibits that we

14    filed.

15         THE COURT:  Okay.  Is there an agreement at all?

16    Have you discussed it with --

17         MR. YORK:  I have not discussed it with them, but

18    if you want me to do that now, I would be happy to do that

19    now.

20         THE COURT:  Well, no.  Let's -- I'm just trying

21    to see what we've got left.  Mr. James, do you have

22    witnesses?

23         MR. JAMES:  No, Your Honor.

24         THE COURT:  Okay.  Mr. Patten.

25         MR. PATTEN:  If I can call my witness.

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 220 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 221 of 239

220

```
 1              THE COURT:  Please.

 2              MR. PATTEN:  I'm going to call Mallory Monaco.

 3              THE COURT:  Okay.  If I could have you come to

 4   the podium to be sworn, please.  The clerk, you will hear

 5   her voice, and she'll administer the oath.

 6                   MALLORY MONACO, WITNESS, SWORN

 7                        DIRECT EXAMINATION

 8   BY MR. PATTEN:

 9   Q.  Will you please state your name?

10   A.  Mallory Monaco.

11   Q.  Mallory, was Russell Monaco your father?

12   A.  Yes.

13              MR. PATTEN:  May I approach the witness, Your

14   Honor?

15              THE COURT:  You may.

16   Q.  (By Mr. Patten)  Mallory, I've handed you a document

17   labeled PI-7.  Do you have that?

18   A.  Yes.

19   Q.  Do you recognize that document?

20   A.  Yes.  I wrote it.

21   Q.  That's a letter?

22   A.  Hm-hmm, yes.

23              MR. PATTEN:  Your Honor, I would like Ms. Monaco

24   to have the opportunity to read the letter to the Court.

25              THE COURT:  Is there a waiver of the
```

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 221 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 222 of 239

221

```
 1    question-and-answer of this witness?

 2                UNIDENTIFIED SPEAKER:  Yes.

 3                MR. GARDNER:  Yes, Your Honor.

 4                UNIDENTIFIED SPEAKER:  Yes, Your Honor.

 5                UNIDENTIFIED SPEAKER:  Yes, Your Honor.

 6                THE COURT:  Okay.

 7                MR. PATTEN:  Thank you.

 8                THE COURT:  You may read the letter.

 9                THE WITNESS:  Okay:  I want people to understand

10    how this whole ordeal has changed my family's lives

11    forever.

12                My dad passed away when I was in eighth grade and

13    my sister was in fifth.  We were just 14 and 10.  He left

14    us a few weeks before Christmas on December 2, 2011.  I

15    remember that day like it just happened yesterday.

16                I still have all the amazing memories we all

17    shared as a family, and I wish we could have had the chance

18    to make a lot more.  I am scared that since he passed while

19    my sister and I were so young, that I'll forget all the

20    little memories I cherished the most.  That is one of my

21    biggest fears in my life.

22                A lot of people ask how this affects my family.

23    It has been really tough growing up with just one parent

24    when my sister and I could have had two amazing parents

25    raising us.  It's also difficult knowing his death could
```

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 222 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 223 of 239

222

```
1    have been prevented.  It's just really hard accepting that

2    he is gone because of someone's mistake.  It's very hard

3    knowing that he won't be able to see all the important

4    milestones coming up in our lives.

5              My mom is such an incredible woman for putting

6    herself as the mom and dad role in the family.  My dad was

7    always the one who disciplined us while my mom was the

8    laid-back one.  My dad was a very quiet guy, but he always

9    made everyone he met feel like they've known him for years.

10   He was just a sweet, down-to-earth guy who everyone loved.

11             He used to be my coach in softball since I

12   started when I was around eight.  Him and, and his friends

13   started a travel team for my friends and I.  He was a great

14   coach and cheerleader.  Softball was my dad and I's thing

15   together.  Since he passed, it was really hard for me to

16   continue playing softball with that team he started.  I

17   played for them for two years after he passed, but it just

18   got to be too much pain and sadness that went along with

19   the game that I loved so much.

20             I know he is still around and he would still

21   be -- I would still be playing my heart out, and he would

22   still be cheering me on.  I do miss softball, but I miss my

23   dad so much more.

24             My sister and my dad were so alike, it was crazy.

25   It's difficult knowing my dad didn't, didn't get to see her
```

1   get out of her awkward stages and see and be a part of the

2   beautiful teenager she is becoming.

3           I know he is watching over us, but that isn't the

4   same as him being here while we grow up.  He was a great

5   man and loved by so many.  He will never be forgotten as

6   long as we all live.  He will and has already missed so

7   many big milestones in our life, but no matter what, he

8   will always watch over us and be proud of the

9   accomplishments we have succeeded in.

10          I know for sure he is very proud of my mom for

11  raising my sister and me all by herself, which none of us

12  ever thought she would have to do.  I know he would do

13  anything to be here with her and us again, and we all would

14  do anything for him to be here, too.  I love him so much,

15  and I just wish I could tell him that.

16          MR. PATTEN:  Thank you, Mallory.  Your Honor, I

17  would move the admission of Exhibit PI-7.

18          THE COURT:  Any objection?

19          UNIDENTIFIED SPEAKER:  No objection.

20          THE COURT:  Exhibit PI-7 will be admitted.

21          MR. PATTEN:  Thank you.

22          Thank you, Mallory.

23          THE WITNESS:  Thank you.

24          THE COURT:  You may step down.  If you could

25  leave that letter with me, and I'll take it and have it

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 224 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 225 of 239

224

 1   filed.

 2            Mr. York.

 3            MR. YORK:  Thank you, Your Honor.  At this time,

 4   I would like to ask the Court to take judicial notice of

 5   two exhibits that I've filed with my exhibit list.  These

 6   are documents related to a defamation lawsuit filed against

 7   Dr. Schneider in the United States District Court for the

 8   District of Wyoming.  And, well, you can take judicial

 9   notice of these documents under Federal Rule of Evidence

10   201 as, as court documents.

11            One of them is a transcript in the proceeding,

12   and that is -- it's Exhibit UST-B.  So I'd ask the Court to

13   admit that at this time.

14            THE COURT:  And this is under Docket 292, and it

15   would be 292-4?

16            MR. YORK:  Your Honor, I'm sorry.  What I'm

17   trying to get admitted is actually UST-C.  My mistake.

18            THE COURT:  Okay, "C," which is 292-5.  Is there

19   any objection?

20            MR. PARKER:  Yes, I object.  It's hearsay.

21            MR. COSSITT:  Authentication, foundation, lack of

22   relevance.

23            MR. YORK:  Your Honor, what we have here --

24   again, I think the critical element that we need to address

25   here is whether or not this settlement is tainted, and the

1    case that addresses that issue is In Re: Bullis.

2          And I think that the issue there is whether or

3    not a dishonest debtor is entitled to a discharge in this

4    court proceeding.  And Dr. Schneider's conduct in prior

5    court and judicial proceedings is directly relevant to that

6    issue, and it speaks to his motives and plans in what he's

7    done in this particular case.

8          And in particular, Rule of Evidence 404 does

9    allow character evidence if, for example, the evidence is

10   admissible for another purpose other than -- for example,

11   showing lack of accident, character, character evidence is

12   irrelevant.

13         Under Federal Rule of Evidence 405:  When a

14   person's character trait is an essential element of a

15   charge, claim, or defense, the character or trait may also

16   be proved by relevant specific instances of the person's

17   conduct.

18         This transcript, it says on its face that it's a

19   certified copy.  It reflects a certificate at the back of

20   it, and it is a transcript of a proceeding in the United

21   States District Court for the District of Wyoming.  I don't

22   believe there's any reasonable basis to dispute its

23   authenticity.

24         And in terms of the hearsay objection itself,

25   Your Honor, the statements that are in this transcript that

1    I would like to read into the record are statements by

2    Dr. Schneider's own lawyer in the case, who was acting

3    within the scope of his employment.  As a result, they are

4    not hearsay under the rules of evidence.

5         MR. PARKER:  They're hearsay as to Michelle

6    Schneider.

7         MR. YORK:  Well, then, we can admit them as to

8    Dr. Schneider.

9         MR. COSSITT:  We object under 901 --

10        THE COURT:  You know --

11        MR. COSSITT:  We object under 901 for lack of

12   authentication.  The threshold for 901(a) is very low.

13   901(b) gives us a road map on how to get this stuff

14   admitted which hasn't been filed.  So we object based on

15   authentication, we further object based on best evidence

16   and Rule 404.

17        MR. GARDNER:  The trustee objects on relevance

18   and hearsay.

19        THE COURT:  Yeah.  I think from the standpoint of

20   the document and to take judicial notice of it for this

21   proceeding is improper.  I'm going to deny its admission

22   and deny taking judicial notice of it.

23        MR. YORK:  Okay, Your Honor.  The other document

24   that I request the Court to take judicial notice of is a,

25   is a published opinion from Westlaw.  This is UST

 1    Exhibit D.

 2              THE COURT:  Okay.  This would be 292-6 as well?

 3              MR. COSSITT:  Are we -- Your Honor, are we

 4    looking at -- did you say "292-6"?

 5              THE COURT:  Yeah.

 6              MR. COSSITT:  Okay.  I just want to make sure I'm

 7    on the same page.

 8              THE COURT:  Yeah.

 9              MR. YORK:  And Your Honor, this --

10              THE COURT:  Well, as it relates to a reported

11    decision, obviously it's available in the resources to

12    everyone in this room.  I'm going to take judicial notice

13    of it.  I'm not sure for what purpose I would use it, but I

14    mean, it's a published decision.  Whether it's relevant,

15    I'll decide when I'm considering this matter.

16              MR. YORK:  Yeah, that's correct, Your Honor.  And

17    I would like to read it into the record because it reflects

18    an investigation of one of Dr. Schneider's lawyers in the

19    litigation connected in the United States District Court

20    for the District of Wyoming.  And it is a public record

21    under Federal Rule of Evidence 803(8) as it is a record of

22    a public office -- (inaudible.)

23              THE COURT:  Well, before you do that, let me just

24    ask:  Is there any objection to the Court taking judicial

25    notice of this case?

```
1              MR. PARKER:  Yes.

2              UNIDENTIFIED SPEAKER:  No.

3              MR. PARKER:  If it's judicial notice of this case

4   for the purpose that there was, in fact, a case, of course

5   there's no objection, but if the Court is going to try to

6   tease an adjudicated fact in this case out of an

7   adjudicated fact in a case where no one at this table is a

8   party, then --

9              THE COURT:  Mr. Parker.

10             MR. PARKER:  Yeah.

11             THE COURT:  The Court has no intent of doing

12  that --

13             MR. PARKER:  Okay.

14             THE COURT:  -- because it's -- in fact, I --

15             MR. PARKER:  There's --

16             THE COURT:  Even though I can take judicial

17  notice of any published decision, I don't know that it's

18  relevant.

19             MR. YORK:  Your Honor, it reflects a pattern of

20  Dr. Schneider's conduct in connection with a litigation

21  proceeding.  The investigation of his counsel was based on

22  Dr. Schneider's conduct in that litigation, and there's a

23  published investigative finding concerning that conduct in

24  this opinion.

25             UNIDENTIFIED SPEAKER:  Your Honor, none of us at
```

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 229 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 230 of 239

229

1    this table were parties to that.  We object.

2            MR. COSSITT:  I object --

3            THE COURT:  The objection's noted.

4            MR. COSSITT:  I object to the judicial notice

5    that the Court's inclined to do based on the fact that

6    these are, these are adjudicated facts, they are not

7    generally known within the territorial jurisdiction of this

8    court, and they are not capable of accurate or ready

9    determination.

10           This is essentially an attempt to use issue -- to

11   cite this opinion and use -- attempt to use issue or claim

12   preclusion to get evidence into the record --

13           THE COURT:  Mr. Cossitt, it will not be used for

14   that purpose.

15           MR. COSSITT:  Okay.  Thank you, Your Honor.

16           MR. JAMES:  Your Honor, if I might just comment.

17           THE COURT:  Mr. James.

18           MR. JAMES:  Dr. Schneider just testified that

19   he's been honest, cooperative, and in his mind probably an

20   ideal debtor throughout this entire proceeding.  He's not

21   repentant one bit.  And the issue is:  Is he a dishonest

22   debtor?

23           Dr. Schneider has testified "no," he has not

24   been, and this is evidence that shows that he has been a

25   dishonest person and it's a continuing pattern.  And it is

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 230 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 231 of 239

230

1   clearly relevant to the issues that are before the court

2   today.

3           THE COURT:  You don't think there's already some

4   of that testimony that's already been submitted in this

5   case today?

6           MR. JAMES:  I think this, I think this is

7   separate evidence, and I think it is important for this

8   court to hear it.  It won't take long.  I think it's

9   material, and I think that it should be presented.

10          MR. YORK:  It goes to lack of accident, Your

11  Honor, under Rule 404(b)(2).  And again, under Rule 405(b)

12  -- as specific evidence of a character trait of the

13  defendant if that's a critical element, which I believe it

14  is here.  The question is:  Is he an honest and

15  misfortunate debtor?

16          And I think his prior conduct in litigation

17  against him is relevant to whether or not his -- what he

18  has failed to disclose here is an accident --

19          THE COURT:  Well, the problem I have is, isn't

20  that relevant to the underlying A 20 -- AP 20?  It's not to

21  the merits of the settlement and the factors associated

22  therewith.

23          MR. YORK:  It goes to whether or not the

24  settlement is tainted.  And the settlement is tainted if

25  the debtor is buying a discharge to which he is not

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 231 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 232 of 239

231

1      entitled.

2             THE COURT:  Well, whether it's tainted or not,

3      I'm going to make a decision on whether I'm going to allow

4      a debtor to put money forth to extract a discharge, whether

5      it's tainted or not.  I see that being a very open question

6      whether -- and you know the approaches.  Some have just

7      taken the approach that it's not -- and it's a bright line,

8      it's not allowed.

9             MR. YORK:  That's correct.

10             THE COURT:  And there are two other approaches,

11      at least, that courts have taken and looked at that.  And I

12      think Mr. James briefed those, as I recall, and maybe you

13      did as well, Mr. York.

14             MR. YORK:  I did, Your Honor.

15             THE COURT:  But again, I need to take the, take

16      the evidence that's before me, weigh, and balance.  And as

17      I started this morning, I'm very concerned about a dollar

18      amount even being in the settlement for AP 20, and I'm not

19      so certain -- I mean, I think that there could have been a

20      different structure to the settlement to have eliminated or

21      avoided that whole issue.

22             And so I'm not going to utilize this case as it

23      relates to character on the basis -- or for the basis of

24      deciding these motions before me.

25             Now, they may -- it may very well be important if

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 232 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 233 of 239

232

1   this case goes forward on dischargeability as to character.

2   It may well be, but I'm not going to -- I don't believe

3   it's important in this time.

4           MR. YORK:  Thank you, Your Honor.

5           THE COURT:  Now, I may be proven wrong, but I

6   just think that that's how I'm going to approach it.

7           MR. YORK:  Thank you.

8           THE COURT:  Okay.

9           MR. YORK:  That's all I had, Your Honor.

10          THE COURT:  Thank you.  Do the parties have

11  anything else?  Attorneys have anything else?

12          UNIDENTIFIED SPEAKER:  Two seconds, Your Honor.

13          THE COURT:  Mr. Parker, anything else?

14          MR. PARKER:  No, Your Honor.

15          THE COURT:  Okay.  Mr. Gardner?

16          UNIDENTIFIED SPEAKER:  No, Your Honor.

17          THE COURT:  I'll just go around and ask, I guess.

18  Anything else?

19          MR. GARDNER:  Just very quickly.  Thank you for

20  your time.  I think the testimony has shown today --

21  thumbs-up or thumbs-down, we appreciate your prompt

22  consideration --

23          THE COURT:  Sure, certainly.

24          MR. GARDNER:  -- because there's, there's a lot

25  of very -- (inaudible.)

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 233 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 234 of 239

233

1          THE COURT:  Yeah.  And let me address

2    Mr. Cossitt's concern on my comment on trial setting.  The

3    order says what it says, I acknowledge that and understand

4    that.  And at the time it was entered, it -- obviously, I

5    wanted to allow the parties to pursue resolution and

6    settlement, if they could.

7          And obviously, it was probably a little in jest

8    and I probably shouldn't have done it, but those dates are

9    open and so there is, there is that opportunity.  But I

10   would not reschedule this until I had another status

11   conference to see where all the parties are at, what their

12   schedules are, obviously, and plan accordingly as it

13   relates to this if I were inclined to not approve the

14   settlements.

15         So Mr. Patten.

16         MR. PATTEN:  May I make one brief comment, Your

17   Honor?

18         THE COURT:  You may.

19         MR. PATTEN:  Your Honor, I think the reason we've

20   been in court all day is that everyone on that side of the

21   table, other than Mr. Parker, maybe, didn't participate in

22   the mediation.

23         And I think that had all of the players

24   participated in a mediation, maybe the outcome would be the

25   same but without opposition, or maybe the outcome would be

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 234 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 235 of 239

234

1    different.  But I do think that it may merit all of the

2    parties getting together to see if there's a settlement

3    that can be worked out.

4                THE COURT:  Yeah.  I'll be honest, when I heard

5    there was going to be a mediation, I thought it was a

6    mediation of -- when they said "global resolution," I was

7    anticipating it was across the board.  I didn't realize

8    there was some limitation, and I maybe should have

9    clarified that at the time I issued my order.

10               But obviously, I was informed this morning that

11   claimants were not included and that only the parties that

12   were named in the litigation were, which would be the --

13   obviously, that would also be a normal process that those

14   that are named in the party -- or in the lawsuit would be

15   the ones in the mediation, so --

16               MR. PATTEN:  Well, I think there's -- you know,

17   it's unfortunate that, that we didn't.  I understand that

18   it may not be the ordinary course, but I do think that it

19   would be worthwhile if we made an effort with all of us

20   involved in it.

21               THE COURT:  Well, I'm going to take -- I'm not

22   ruling from the bench on this.  I'm going to take it under

23   submission and advisement.  I will issue a decision.  If,

24   obviously, the parties do something between now and when I

25   issue that decision, let the Court know.

14-61357-JDP Doc#: 447 Filed: 07/06/16 Entered: 07/06/16 14:40:38 Page 235 of 238
Case 1:17-cr-00077-SPW Document 58-18 Filed 09/04/18 Page 236 of 239

235

1          MR. JAMES:  Could I make a short comment, Your

2     Honor?

3          THE COURT:  You may, Mr. James.

4          It still doesn't -- just a follow-up to

5     Mr. Patten's comment:  It still doesn't resolve the issue

6     of settlements of dischargeability claims, objections to

7     discharge.  And obviously, the U.S. Trustee has a very

8     interested role in those as well that needs to be

9     considered.

10          Certainly, the Court has approved settlements in

11     that regard in the past; few, but there have been a few.

12     But I think it, it -- one has to be careful.

13          MR. PATTEN:  I do think, Your Honor, that if all

14     of us were in front of the Court advocating for the

15     approval of the settlement, including the U.S. Trustee,

16     then, then that would be meaningful, certainly, even though

17     it was -- there was a discharge that was resulting.  And

18     that's why I think that -- when I mean all of us to get

19     together, I include the U.S. Trustee's Office.

20          But it's a, it's a -- I think it's upsetting the

21     norm a little bit to settle a discharge claim, but

22     certainly everybody here, everybody in the courtroom

23     probably has an interest in the outcome, and they ought to

24     have a chance to participate in --

25          THE COURT:  Well --

14-61357-JDP  Doc#: 447  Filed: 07/06/16  Entered: 07/06/16 14:40:38  Page 236 of 238
Case 1:17-cr-00077-SPW  Document 58-18  Filed 09/04/18  Page 237 of 239

236

1          MR. PATTEN:  -- coming to a consensual

2    resolution.

3          THE COURT:  I appreciate the comments.

4          Mr. James.

5          MR. JAMES:  Your Honor, I echo Mr. Patten's

6    sentiments to a large extent.  I am a strong believer in

7    settlement, and I think when attorneys do their job and the

8    system works, we can get most things settled.

9          We would love the opportunity to participate in a

10   meaningful settlement; what we're asking this Court to do,

11   however, is to direct that the discharge cannot be a part

12   of that discussion.  The discharge and whether or not a

13   debtor can get a discharge should not be commoditized.

14   This should not be something the trustee can make a

15   decision on, whether to sell or not to sell.

16          That should be a decision that's left to the

17   judge whether or not a debtor has met the requirements for

18   a discharge under the bankruptcy code adopted by Congress.

19   And I hope and I pray that this court will deny the

20   settlements and direct the parties to go back and try to

21   settle this case without the discharge being on the table.

22   Thank you.

23          THE COURT:  I appreciate the comment.

24          MR. YORK:  And, Your Honor, obviously the United

25   States Trustee's Office would echo those comments.

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 237 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 238 of 239

237

1          THE COURT:  Well, with that, I believe that

2     concludes the record.  I appreciate your presentations.

3     And with that, court is in recess.

4

5                         *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

14-61357-JDP   Doc#: 447   Filed: 07/06/16   Entered: 07/06/16 14:40:38   Page 238 of 238
Case 1:17-cr-00077-SPW   Document 58-18   Filed 09/04/18   Page 239 of 239

238

```
 1                    C E R T I F I C A T E

 2

 3      I certify that the foregoing is a correct transcript

 4  from the electronic recording of the proceedings in the

 5  above-entitled matter, all done to the best of my skill and

 6  ability.

 7

 8  _____      _____

 9  Jonny B. Nordhagen                    07/06/16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```