(1 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 1 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 1 of 303

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NOTICE OF MOTION
FOR CONTINUED STAY
OF SENTENCE OR BAIL
PENDING APPEAL

-----------------------------------------------------------X

UNITED STATES OF AMERICA,

v.

CASE NO.: 18-30187
D.C. No. 1:17-cr-00077-
SPW-1

JOHN HENRY MICHAEL SCHNEIDER,
Appellant

-----------------------------------------------------------X

PLEASE TAKE NOTICE that upon the annexed Affirmation of Stephen N. Preziosi, Esq., and the exhibits attached hereto, Stephen N. Preziosi, attorney for the Appellant, John Henry Michael Schneider, will move the Ninth Circuit Court of Appeals located at The James R. Browning Courthouse 95 7th Street San Francisco, CA 94103 on the 20th day of November 2018, or as soon thereafter as counsel can be heard, for an Order granting/extending a stay of execution of the sentence or, in the alternative, granting bail pending the appeal pursuant to Rule 38 of the Federal Rules of Criminal Procedure, Rule 9 of the Federal Rules of Appellate Procedure or for bail pending the appeal pursuant to 18 U.S.C.A. § 3143 and for such other and further relief as to the Court seems just and proper.

Dated: New York, New York
November 20, 2018

Law office of Stephen N. Preziosi, Esq.
48 Wall Street, Fifth Floor
New York, New York 10005
212-960-8267
stephenpreziosi@gmail.com

TO: US Attorney
Assistant US Attorney Colin Rubich
Billings, Montana

(2 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 2 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 2 of 303

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

AFFIRMATION IN
SUPPORT OF MOTION
FOR CONTINUED STAY
OF SENTENCE OR BAIL
PENDING APPEAL

-------------------------------------------------------------X

UNITED STATES OF AMERICA,

v.

JOHN HENRY MICHAEL SCHNEIDER,
Appellant

CASE NO.: 18-30187
D.C. No. 1:17-cr-00077-
SPW-1

-------------------------------------------------------------X

AFFIRMATION OF ATTORNEY IN SUPPORT OF
OR IN THE ALTERNATIVE BAIL PENDING APPEAL

STEPHEN N. PREZIOSI, ESQ., an attorney duly admitted before the bar

of this Court, affirms, under the penalties of perjury, that the following facts, upon

information and belief, are true. The source of your Affirmant's information and

the basis for his beliefs is a review of the Court transcripts from the lower court,

conversations with my client, Mr. John Henry Michael Schneider ("Dr.

Schneider"), and review of various documents attached hereto as exhibits.

1.    This affirmation is respectfully submitted in support of Appellant's motion

for an Order, Pursuant to Rule 38 of the Federal Rules of Criminal Procedure and

Rule 9 of the Federal Rules of Appellate Procedure to stay the execution of the

sentence or, in the alternative, to set bail pending the appeal pursuant to 18

U.S.C.A. § 3143 as this Court is authorized to do so where 1) the defendant is not

(3 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 3 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 3 of 303

likely to flee or pose a danger to the safety of any other person or the community if released; 2) the appeal is not for the purpose of delay; 3) the appeal raises a substantial question of law or fact; and 4) if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in a sentence that does not include a term of imprisonment or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

2.     Eligibility for release pending sentence or pending notice of appeal shall be in accordance with 18 U.S.C. § 3143. The burden of establish that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant.   *United States v. Loya*, 23 F.3d 1529 (9th Cir. 1994), *United States v. Wheeler*, 795 F.2d 839 (9th Cir. 1986).

3.     It is respectfully submitted to this Court that Dr. Schneider, as demonstrated through this motion, fulfills all of the above criteria and therefore this Court should stay the execution of the sentence pending appeal or, in the alternative, set bail pending appeal.

## PROCEDURAL HISTORY OF THIS CASE

4.     Dr. John H. Schneider, MD is a board certified neurological surgeon with a

3

(4 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 4 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 4 of 303

Master's degree in Alternative Dispute Resolution from Creighton School of Law. On April 18, 2018 he pleaded guilty to Count III of a superseding indictment to the offense of concealment of bankruptcy assets, a felony in violation of 18 U.S.C. § 152(1). (**Exhibit N** - plea minutes) He was subsequently sentenced to 24 months imprisonment on August 15, 2018 before the Honorable Susan P. Watters of the United States District Court of Montana, Billings Division. (**Exhibit I** - sentencing minutes) Dr. Schneider thereafter made an application for a stay of the execution of the sentence on September 6, 2018 to the Montana District Court. That application was denied.

5.     He filed a timely Notice of Appeal (**Exhibit O** – Notice of Appeal) Upon application, the Ninth Circuit Court of Appeals issued a temporary stay of sentence on September 10, 2018, ordering that Dr. Schneider respond by October 5, 2018. (**Exhibit P** – Order of Ninth Circuit) Dr. Schneider was assigned appellate counsel by the Court and the assigned appellate counsel was given until November 2, 2018 to file a superseding Rule 9(b) motion for a stay. (**Exhibit Q** - Ninth Circuit order for assigned counsel)

6.     Dr. Schneider made many attempts to contact his assigned counsel for the purpose of meeting the November 2, 2018 deadline imposed by this Court, but,

4

(5 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 5 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 5 of 303

after many phone calls and attempts at communicating with assigned counsel, there was no response. Unable to contact assigned counsel, Dr. Schneider subsequently retained Stephen Preziosi (the undersigned) for the purpose of appeal and to make this superseding Rule 9(b) motion.

## LEGAL STANDARD FOR GRANTING STAY OR BAIL PENDING APPEAL

7.     Where an application is made for a stay of execution of the sentence or bail pending an appeal the legal standard is set out in FRCP Rule 38(b), FRAP Rules 8 and 9, and in 18 U.S.C. 3143 whereby the defendant must first move in the district court for a stay. This was already done and the Ninth Circuit has granted Dr. Schneider a temporary stay of sentence, dated September 10, 2018 and ordered that a superseding motion pursuant to Rule 9(b) by made by counsel.

8.     The movant, pursuant to FRAP Rule 9 (b) and (c) and under 18 U.S.C.A. § 3143, must show that 1) the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released; 2) the appeal is not for the purpose of delay; 3) the appeal raises a substantial question of law or fact; and 4) if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in a sentence that does not include a term of imprisonment or a reduced sentence to a term of imprisonment less than the total

5

(6 of 303)

Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 6 of 303
Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 6 of 40

of the time already served plus the expected duration of the appeal process. *United States v. Loya*, 23 F.3d 1529 (9th Cir. 1994), *United States v. Wheeler*, 795 F.2d 839 (9th Cir. 1986), *United States v. Randell*, 761 F.2d 122 (2d Cir. 1985); *United States v. Santiago*, 695 F.Supp. 1490 (S.D.N.Y. 1988).

## MOTION FOR STAY OF SENTENCE

9.     Dr. Schneider makes this motion pursuant to Rule 9(b) of the Federal Rules of Appellate Procedure, entitled Release After Judgment of Conviction whereby he requests review of the district-court order regarding release after a judgment of conviction, and as he has filed a notice of appeal from that judgment and a copy of the judgment of conviction is attached hereto. (**Exhibit A**) Rule 9(c) states that the criteria for release must be in accordance with 18 U.S.C. 3143(b), entitled Release or detention of a defendant pending appeal.

*Dr. Schneider Is Not A Risk Of Flight – 18 U.S.C. § 3143(b)(A)*

10.    Dr. Schneider is not likely to flee or pose any danger to any member of the community if this Court should grant the stay pending the appeal.

11.    It is highly relevant that Dr. Schneider was arrested in Carlsbad, California as he was exiting his Church, The Four Square Christian Church North Coast in Carlsbad, California not far from his home on a Sunday while with his family.

(7 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 7 of 40
Case 1:17-cr-00077-SPW     Document 72     Filed 11/26/18     Page 7 of 303

The next morning, he appeared before the Honorable Karen S. Crawford in the U.S. District Court for the Southern District of California in San Diego, California. He was released on his own recognizance without bail or bond and no restrictions on travel within the United States. (**Exhibit B** Order from U.S. District Court Judge Karen Crawford)

12.    He was ordered to appear in the U.S. District Court of Montana, Billings Division, thousands of miles away before Magistrate Judge Timothy Cavan. Dr. Schneider appeared in the U.S. District Court while released on his own recognizance, without bail or bond in a timely manner and without incident. Upon his appearance and arraignment before Magistrate Cavan, it was noted that Dr. Schneider was not a flight risk (**Exhibit C**) and he was once again released on his own recognizance without bail or bond. Ultimately, the case was transferred to U.S. District Court Judge Susan P. Watters and Dr. Schneider appeared on all the assigned dates, making every single court appearance thereafter without incident from September 18, 2017 through September 2018.

13.    Dr. Schneider's appearance in Montana while released on his own recognizance without bail or bond is strong evidence of the fact that he is not at all likely to flee and is not a risk of flight.  Two Federal Judges and one

7

(8 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 8 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 8 of 303

Magistrate have assessed Dr. Schneider and his ability to appear in court when required and, after being thoroughly vetted and the issue being thoroughly argued, it has been determined by two federal judges and a federal magistrate that he is not a risk of flight.

14.    He was arrested in California and ordered to appear thousands of miles away while no bail or bond was set on him. He made the initial and all subsequent appearances. His history of timely reporting in another State, thousands of miles away, is the strongest evidence possible that he is not a risk of flight.

15.    Dr. Schneider took the additional step of hiring private counsel in Montana in the lower court to represent him there. This is additional evidence that he willingly subjects himself to the legal process, and has demonstrated that he has been consistently prepared to come to court with counsel and confront the charges against him. He now comes to the Ninth Circuit equally prepared to make legal arguments with hired counsel and is prepared to make any and all legal arguments within the boundaries of the law and to avail himself of the appellate process before the Ninth Circuit Court of Appeals.

(9 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 9 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 9 of 303

16.    In every step of the legal proceedings, Dr. Schneider has demonstrated, and it is incontrovertible, that he comes to court when he is supposed to, he is prepared with legal counsel by his side, he is prepared to move forward with his appeal, and he will demonstrate here that he does indeed have substantial questions of law to pose to this Court.

*Personal Information – Dr. Schneider Has Strong Family Ties And Is Not A Risk Of Flight*

17.    Dr. Schneider has been married to his wife Michelle for 26 years. She worked as nurse with a California nursing license and later in her career became a professional Chef and gourmet cook. They have raised three children together: Brandon is 25 years old, Shannon is 24 years old, and Caitlin is 21 years old. Brandon completed his college degree at Hamlin University in St. Paul, Minnesota as a triple major; he now works as a financial analyst for Wells Fargo. His daughter Shannon graduated from the University of Utah and majored in Hotel Management; she now works in Vista California as an event planner at Lego Land.

18.    Shannon will be married on March 1, 2019, and Dr. Schneider's greatest desire is to walk his daughter down the aisle on her wedding day. His youngest

9

(10 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 10 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 10 of 303

daughter, Caitlin, is 21 years old and is in college part time studying to be a veterinarian.

19.     Dr. Schneider strongly supports his wife and three children morally, psychologically and financially. He has a special bond with his middle daughter, Shannon who, as a child, had three open-heart surgeries and was not expected to survive. He would do anything to be present with his daughter on her wedding day in the next few months.

20.     Dr. Schneider's strong family ties, his station in the community, his dedication to the practice of medicine and to improving the healthcare industry are all clear demonstrations that he is not a risk of flight. Most importantly, as his daughter's wedding day approaches, he is focused on walking her down the aisle and being with his family on this important day.

*Dr. Schneider Will Not Pose A Danger To The Safety Of Any Other Person Or The Community If Released – 18 U.S.C. § 3143(b)(A)*

21.     Dr. Schneider does not pose a danger to the safety of any other person. To the contrary, he has dedicated his entire life to helping and saving others and treating the sick. It has never been alleged that he committed any crime of violence or that there is any violent or dangerous aspect about him.

10

(11 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 11 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 11 of 303

22. Dr. Schneider has gone to great lengths and lived a life dedicated to treating the sick as a medical doctor and neurosurgeon. His accomplishments, both academic and professional, and his service to his community and his country are more than extraordinary.

23. While he was a young man, he entered the University of Southern California on a full academic scholarship and studied biological science and genetic engineering. After graduating *cum laude* in 1983, he entered the University of Southern California medical school in the fall of 1983 with a full scholarship from the U.S. Air Force as a commissioned officer (2nd Lieutenant).

24. During medical school, he spent time volunteering as a Senior Student Representative on the Medical Education and Curriculum Committee and the Long Range Curriculum Planning Committee. He was appointed as a student leader and assigned to the Clinical Curriculum Revision Committee at the Los Angeles County Hospital. He completed his medical degree in 1987 graduating in the top 5% of his class with a number of honors: he received the AOA Honor Medical Society and the Dean's Scholar for Academic Excellence in Clinical Medicine.

(12 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 12 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 12 of 303

25. Dr. Schneider began his medical residency program in neurological surgery at U.S.C., one of the toughest residency programs in all of medicine. He practiced medicine in the very dangerous gang infested area in Los Angeles, California until 1994.

26. One night while walking between hospitals during a night shift, he was robbed at gunpoint by a gang member. Afterward, Dr. Schneider continued working and completed his 24-hour shift. It was during that time that Dr. Schneider had a run-in with the law when he was charged in a misdemeanor complaint for carrying a loaded firearm in his vehicle. The misdemeanor count was eventually dismissed and Dr. Schneider was convicted of disturbing the peace under California Penal Code § 415. (**Exhibit D**)

27. During this same time period, he was acknowledged for his impact on the field of medicine by the Congress of Neurological Surgeons, granting him the Mahaley Brain Tumor Research Award in 1993; he received the Senior Resident Award from the Internship class of 1994, further demonstrating Dr. Schneider's dedication to academic education. (**Exhibit E** – Dr. Schneider's Degrees and Awards)

(13 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 13 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 13 of 303

28.    After completing Fellowship training in 1992 in Complex Reconstructive

Spine Surgery, Dr. Schneider was awarded a Senior Residence and junior faculty

position at LA County/USC Medical Center as a staff Neurosurgeon from June

1993 to June 1994. Dr. Schneider achieved Board Certified status as a

neurological surgeon in 1997, the highest honor for neurosurgeons,

acknowledging both clinical and academic expertise.

*Dr. Schneider Will Not Pose Any Threat If Released During The Pendency Of His*
*Appeal: Dr. Schneider's Service To His Country*

29.    Although Dr. Schneider had graduated in an elite field of medicine, he did

not forget the need to serve to his country.    From 1994 through 1997 Dr.

Schneider fulfilled his duty to the Air Force and served as an active duty

neurosurgeon, earning the rank of Major.    He served in the Air Force's

preeminent medical institution, Lackland Air Force Base in San Antonio, Texas,

treating active duty soldiers, their families, veterans, and San Antonio's civilian

gangland population who were diagnosed with brain and spinal pathologies.

30.    One of his patients, a USAF intelligence officer, was critically injured in a

car crash and her story was featured in the Reader's Digest in 1996. (**Exhibit F** –

13

Reader's Digest Article)   The article demonstrates the dedication that Dr. Schneider has to his patients with severe injuries.

31.   Dr. Schneider was honorably discharged from active duty in 1997 and then released from his inactive reserve status in 2008. While he was performing his military service, he served as an Adjunct Clinical Assistant Professor of Neurosurgery in the University of Texas, San Antonio, teaching civilian residents at the Air Force trauma hospital.

*For The Past Twenty Years Dr. Schneider Has Dedicated His Entire Career To Helping Others And Treating Those With Neurological Diseases.*

32.   After his stint in the Air Force, Dr. Schneider entered private practice and provided neurological and surgical services for families in Billings, MT, Northern WY, Bountiful, UT, and Salt Lake City, UT. Dr. Schneider's dedication and expertise transformed the practice of neurosurgery and provided more proficient care for patients with neurological ailments. Prior to his arrival in Billings, complex pediatric and adult brain aneurisms were transferred to larger academic institutions in Salt Lake City and Denver. Dr. Schneider established the Neuroscience Center of Excellence and the Northern Rockies Neurological

(15 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 15 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 15 of 303

Foundation, a 501(c)(3) entity serving the Billings, Montana community, where Dr. Schneider served as president from 1998 to 2004.

33.    While working in collaboration with 5 other area neurosurgeons, similar patients were able to remain locally for treatment and recovery under Dr. Schneider's surgical care. The most complex surgeries were now conducted as outpatient surgeries with minimally invasive reconstructive techniques being used where as before they required extensive procedures with months of recovery time. His patients incurred a fraction of the hospital costs and routinely returned to productive work and family activities in less than a month.

34.    In 2004 and 2005, motivated by the belief that every skilled surgeon has a duty to mentor and train the next generation of surgeons, Dr. Schneider took on additional responsibilities as an Assistant Professor and Director of Spine deformity surgeries at the University of Utah. Dr. Schneider continued to practice neurosurgery as both a clinician and educator until retiring from clinical medicine in early 2018.

35.    After filing for bankruptcy, Dr. Schneider rededicated himself to assisting veterans and joined the surgery department at the Iowa City Department of Veterans Affairs at the University of Iowa. He was appointed as Director of

15

(16 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 16 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 16 of 303

Neurosurgery and there used his skills to help fellow veterans who are so often left without adequate medical care in the field of neurosurgery. Although he was forced to resign that position because of his legal troubles here, he undoubtedly had a positive impact on the patients he treated. (**See Exhibit S** – numerous letters from patients thanking Dr. Schneider for his work).

36.     Over the past thirty years, Dr. Schneider has dedicated himself to healing the sick, caring for those with neurological diseases, and training others to do the same. To say that he would never cause harm to anyone in the community should this Court grant him a stay of sentencing is a great understatement. His life has been an example of service to his country, service to healing the sick and dedication to his family.

37.     In the wake of adversity, Dr. Schneider has found a new direction and a new way to assist physicians. Graduating first in his class, he earned a Master's degree in Alternative Dispute Resolution from Creighton School of Law and he now runs his own business handling dispute resolutions for healthcare providers at a company that he founded called Provider Resolutions LLC located in Southern California (https://provider-resolutions.com). The company does ADR with a focus on health care; Dr. Schneider even wrote a book entitled *The*

16

(17 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 17 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 17 of 303

*Healthcare Practitioners Guide to Conflict Engagement and Dispute Resolution.*

**(Exhibit G** – Book Title)

38.     He wrote the textbook with the objective of improving the quality of the medical practice, patient safety, and to provide a sense of fulfillment to those in the medical profession encumbered by hostile co-workers and patients as well as legal and administrative conflicts. The book also provides hospital administration with a guide to establishing necessary programs within their systems, recognizing conflict engagement as an important learning tool for total quality improvement.

39.     Dr. Schneider now lives in Encinitas, California in North San Diego County with his wife Michelle where he has lived for the past five years. He poses no threat to anyone in his community. In fact, the crime he pleaded guilty to was not a violent crime and it was never alleged that he made any threats or ever posed any physical danger to anyone.

40.     Quite the contrary, Dr. Schneider, although now retired as a surgeon, has worked his entire career and dedicated his entire life to assisting and healing others.

*Dr. Schneider continues to invent ways to help others: DiveVeterans and The WAVE Project*

(18 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 18 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 18 of 303

41. Dr. Schneider continues his dedication to assisting others with traumatic injuries and has recently establish two non-profit organizations call DiveVeterans and The WAVE Project.

42. Both of these organizations assist injured veterans by experiencing the freedom and challenge of SCUBA diving as a type of therapy. Through training in an aquatic environment, Dr. Schneider assists wounded veterans rehabilitate from various injuries received in combat such as amputations, spinal cord injuries, PTSD and traumatic brain injuries. (**Exhibit U**)

43. Once again, Dr. Schneider has created a way to dedicate his talents in the medical field and his love for SCUBA diving to assist others.

*The Appeal Is Not For The Purpose Of Delay And There Is A Substantial Question Of Law And Fact Likely To Result In No Jail Or A Reduced Sentence – 18 U.S.C. 3143(b)(B)(iii) and (iv)*

44. Dr. Schneider is not filing an appeal or requesting a stay for the purpose of delay. This is evidenced by the quick resolution of his case in the lower court. Dr. Schneider first appeared in the U.S. District Court in September 2017. His case was resolved and he pleaded in April 2018 and was sentenced in August 2018. There were no delaying tactics used in the lower court and there are no delay tactics being used here.

18

(19 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 19 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 19 of 303

45.    Dr. Schneider was assigned appellate counsel by this Court on October 4, 2018 and given a deadline to file a superseding motion under Rule 9(b) of November 2, 2018. When Dr. Schneider had trouble contacting his assigned counsel, who was not returning his phone calls or messages, he wasted no time in hiring private counsel to represent him on appeal and to file the Rule 9(b) motion in accordance with the scheduling order set out by this Court.

46.    At every turn, Dr. Schneider has acted expeditiously to meet every deadline the courts have set before him. He has made every court date, travelled thousands of miles to do so at great personal sacrifice, he has not missed any deadlines set by this Court or any other. The filing of the appeal is his right and is in no way an attempt to delay the process. He has not delayed the courts to this point and is not delaying now.

*Dr. Schneider Has A Meritorious Appeal And Raises Substantial Questions Of Law And Fact Likely To Result In A No Jail Sentence Or A Reduced Sentence – 18 U.S.C 3143 (B)(B)(iii) And (iv)*

47.    Defense counsel for Dr. Schneider was ineffective in several significant ways concerning the sentence. First, he failed to object to the loss calculation in the presentence report, which added an additional 12 offense level points to the

(20 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 20 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 20 of 303

sentence. This led to a significant increase in the offense level and consequently the sentence under USSG § 2B1.1 and ultimately the sentence of Dr. Schneider.

48. Second, defense counsel failed to object to the victim statements at the sentencing hearing. Several witnesses presented themselves as personal injury claimants at the sentencing hearing without any valid support demonstrating that they had legitimate claims against Dr. Schneider in the underlying bankruptcy case. These victim impact statements at sentencing significantly swayed the sentencing court and defense counsel did not refute the erroneous and illegitimate claims made by the alleged victims.

49. Additionally, the bankruptcy trustee made several false statements concerning the handling of an insurance fund, NRIC, making claims that the funds were mishandled by Dr. Schneider when this was not true. These false statements went unrefuted by defense counsel when he had in his possession evidence to show that they were not true.

*Ineffective Assistance Under The Strickland v. Washington Standard: Substandard Performance and Substantial Prejudice.*

50. There are substantial questions of law and fact regarding the sentencing hearing in this case. Dr. Schneider was deprived of his Constitutional right to effective assistance of counsel under the VI[th] Amendment of the United States

20

(21 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 21 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 21 of 303

Constitution, and his attorney's ineffectiveness under the two prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). His attorney's substandard performance contributed substantially to the incorrect calculation of the offense level attributable to Dr. Schneider and to the substantial prejudice he suffered at the sentencing hearing when the sentencing court heard victim impact statements that contained fabrications and outright untruthful statements.

51. Historically, the phrase "substantial question" has referred to questions that are "fairly debatable". Included within this definition have been questions that are novel and not readily answerable. The question may be 'substantial' even though the judge or justice hearing the application for bail would affirm on the merits of the appeal. *U.S v. Handy*, 761 F.2d 1279, 1281 (9th Cir. 1985) quoting *D'Aquino v. United States*, 180 F.2d 271, 272 (11th Cir. 1950).

52. The questions of ineffective assistance of counsel presented here concerning defense counsel's failure to object are more than fairly debatable; they are clear demonstrations of a lack of any reasonable strategy and, instead, evidence a substandard performance that led to a 12 point increase in the offense level of Dr. Schneider and consequently a substantial increase in the sentence.

*Defense Counsel Was Ineffective At Sentencing When He Failed To Object To The Offense Level, The Amount Of Loss, And The Amount of Restitution*

21

(22 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 22 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 22 of 303

53.   Dr. Schneider was deprived of effective assistance of counsel when his attorney failed to object to the amount of loss in the pre-sentence report and at sentencing. The amount of loss, three hundred and eight thousand nine hundred and forty-five dollars ($308,945.00), was in a bank account (account 2881) that was not entirely owned by Dr. Schneider. The amount of loss drove the offense level up by 12 points, which increased the total offense level from 8 points to 20 points. Defense counsel failed to make any argument at all regarding the amount of loss and the additional 12 offense level points.

54.   All of the parties in this case were aware that the money in question here from account 2881 did not belong entirely to Dr. Schneider: the probation officer who prepared the presentence report was aware of this, defense counsel was aware of this, the bankruptcy trustee was aware of this, and the sentencing court was aware of this. Defense counsel's failure to object to the amount of loss, to the additional offense level points added, and to the increase in Dr. Schneider's sentence, constituted ineffective assistance of counsel.

55.   To prevail on a claim of ineffective assistance of counsel, a defendant must show both deficient performance and prejudice under the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674

22

(23 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 23 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 23 of 303

(1984). Deficient performance requires a showing that counsel's advice fell below an objective standard of reasonableness. Prejudice exists when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *U.S. v. Salazar-Lopez*, 252 Fed.Appx. 169 (9th Cir. 2007).

56. An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*. *Hernandez v. Chappell*, 878 F.3d 843 (2017) Circuit Courts have held that defense counsel was ineffective when he fails to argue or object to an increased offense level or he miscalculates the sentencing guidelines. *Johnson v. United States*, 313 F.3d 815 (2d Cir. 2002); *United States v. Manzo*, 675 F.3d 1204 (9th Cir. 2012).

57. In this case, defense counsel's failure to argue that Dr. Schneider was not the owner of account 2881 in its entirety was fundamental to the case. This singular fact drove the offense level up by 12 points. Defense counsel was supplied with documentation that showed Dr. Schneider was not the owner of the entirety of those funds. Moreover, the record was replete with the issue being, as a minimum, debatable.

23

## Ownership Of The "2881 Account" And The Offense Level

58. The presentence report stated that account 2881 contained the proceeds of the sale of a property on January 11, 2013 for $325,000 and the net proceeds ($296,501.70) of the sale went to Kathleen Burrows, defendant's sister. The 2881 account was in the name of Kathleen Burrows and the account contained the proceeds of the sale of the Molt property and monies dedicated in trust for Dr. Schneider's children.

59. Dr. Schneider and Kathleen Burrows agreed that $150,000 of that money would belong to Kathleen Burrows (**Exhibit H** - presentence report page 6) and only $146,000 would belong to Schneider LLP, which was half owned by Dr. Schneider and half owned by Michelle Schneider.

60. Additional monies were owed to Kathleen Burrows for the work she did for Dr. Schneider. Those monies were to be paid to her from the sale of the Molt property. The 2012 tax document (1099-Misc) reflects that a total of $340,000.00 was paid to Kathleen Burrows for the work she did for Dr. Schneider. (**Exhibit T** – 1099 Misc. of Kathleen Burrows)

61. Moreover, the funds in account 2881 were put there in trust for Dr. Schneider's children (**Exhibit V** –affidavit of Brandon Schneider) and the account

24

was in the name of Kathleen Burrows. Dr. Schneider only had access to the account to provide funds to his children while they were at University. Both Michelle Schneider and the three children's' trusts had legitimate claims to those funds.

62.    The fact that half of that money in the 2881 account was the property of Michelle Schneider would have substantially decreased the offense level to a maximum of 8 offense level points and decreased Dr. Schneider's over all offense level to 16, and minus the 3 point reduction would have reduced his offense level further to 13 points with a Guidelines range of 12 to 18 months.

63.    The legitimate claims of Dr. Schneider's children's' trusts to those funds would have reduced the 2B1.1 calculations even further and consequently reduced the offense level well below 8 offense level points with a final guidelines range of less than 13 points.

64.    These arguments were never put forth to the sentencing court and defense counsel was ineffective because he did not make the appropriate legal arguments to reduce the offense level points added under USSG § 2B1.1.

65.    Although defense counsel made mention that some of the funds belonged to Michelle Schneider, it was never argued that because half of the assets in

25

Schneider LLP owner of account 2881 were owned by Michelle Schneider that

the offense level should be reduced to less than 8 points. Additionally, the

sentencing court stated as follows:

*At the time the bankruptcy is filed, you still have a little over $300,000 in that*
*account, but you lie on your financial forms I the bankruptcy and don't*
*disclose that money to the bankruptcy trustee. And by lying to the trustee, you*
*lie to the Court and cause that bankruptcy estate to incur hundreds of hours of*
*effort to try to locate all of your assets. **Now, Mr. Smith argues it's not all***
***related that that account, and I think that's probably true**. That makes sense*
*to me.* [emphasis added] (**Exhibit I** pg. 57)

66.    The sentencing judge was aware that not all of the funds in that account

belonged to Dr. Schneider. Thus, the full $308,945 did not belong to him at the

time of the filing of the bankruptcy and the 12 offense level points should not

have been added to his offense level. It should have been far less because not

only was Michelle Schneider owner of half those funds, but the funds had been

earmarked as a trust for Dr. Schneider's children. (**Exhibit J** - Michelle

Schneider's affidavit)

67.    Furthermore, defense counsel was aware that Dr. Schneider was advised by

his bankruptcy counsel that the 2881 account, legally owned by Kathleen

Burrows, was to be reported by Kathleen Burrows who was under a document

subpoena from the bankruptcy trustee and failed to report that account. This is

(27 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 27 of 40
Case 1:17-cr-00077-SPW Document 72 Filed 11/26/18 Page 27 of 303

additional evidence that Dr. Schneider was poorly advised by his defense attorney

as to what his offense level should have been.

*The Amount Of Loss Had A Disproportionate Impact On The Sentencing And The Prosecution Must Be Held To The Higher Standard Of Proving This Factor By Clear And Convincing Evidence.*

68.    The amount of loss in this case had a disproportionate impact on the

Guidelines range assessed and, ultimately, the sentence. The base offense level

was 6 offense level points and the amount of loss, with 12 additional points added

double the base offense level.

69.    The Ninth Circuit has recently held that although there is no bright-line rule

for the disproportionate impact test, the court examines the totality of the

circumstances using six factors articulated in *United States v. Valensia*, 222 F.3d

1173 (9th Cir. 2000) i.e. the *Valensia* factors.

70.    The *Valensia* factors are as follows: (1) whether the enhanced sentence falls

within the maximum sentence for the crime alleged in the indictment; (2) whether

the enhanced sentence negates the presumption of innocence or the prosecution's

burden of proof for the crime alleged in the indictment; (3) whether the facts

offered in support of the enhancement create new offenses requiring separate

punishment; (4) whether the increase in sentence is based on the extent of a

(28 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 28 of 40
Case 1:17-cr-00077-SPW Document 72 Filed 11/26/18 Page 28 of 303

conspiracy; (5) whether an increase in the number of offense levels is less than or

equal to four; and (6) whether the length of the enhanced sentence more than

doubles the length of the sentence authorized by the initial sentencing guideline

range in a case where the defendant would otherwise have received a relatively

short sentence.

71.    Although not each of the factors is fulfilled here, an overall analysis of

these factors and the totality of the circumstances demonstrate that the additional

12 offense level points had a disproportionate effect on Dr. Schneider's sentence.

72.    For example, the second factor of the *Valensia* test is fulfilled.    The

enhanced sentence negates the presumption of innocence and the prosecution's

burden of proof because the prosecution was not put to the burden of showing

even by a preponderance standard that all of the funds in the 2881 account

belonged to Dr. Schneider. And, indeed, those funds did not entirely belong to

Dr. Schneider and he, as a result of the enhanced sentence, suffers

disproportionate punishment.

73.    Additionally, factor three of the *Valensia* factors is fulfilled because the

facts offered in support of the enhancement create new offenses. As the victim

impact statements at sentence demonstrated, Dr. Schneider was accused of

(29 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 29 of 40
Case 1:17-cr-00077-SPW Document 72 Filed 11/26/18 Page 29 of 303

medical malpractice, of being responsible for the death of a patient, of hiding funds to avoid responsibility and other devious behavior regarding personal injury claimants. All of which were unsubstantiated.

74. Furthermore, factor five is fulfilled because the increase in the number of offense levels is greater than four offense level points where the offense level was increased by 12 points.

75. And finally, factor six of the *Valensia* factors is fulfilled where the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guidelines range and Dr. Schneider would probably have received a no jail sentence without it.

76. Because all theses factors are fulfilled, the higher standard of proof of clear and convincing evidence should have been applied to the amount of loss and the allegations in the victim impact statements made at sentencing. The lower standard of proof led to extreme prejudice in this case and, indeed, rose to the level of a Due Process violation of his right to a fair sentencing hearing.

*Defense Counsel Was Ineffective When He Failed To Object To The Many False Statements Made In The Victim Impact Statements In Written Form And At Sentencing*

(30 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 30 of 40
Case 1:17-cr-00077-SPW Document 72 Filed 11/26/18 Page 30 of 303

77. At sentence, the lower court allowed several alleged victims to make statements to the court. Many of the statements made to the court, and relied on by the court, were either inherently false or incorrect. Defense counsel failed to take any steps to correct the false information provided to the court by the alleged victims.

78. At sentence, four people spoke and one letter was read: Joe Womack, the bankruptcy trustee, Jon Moyers, attorney for personal injury plaintiffs, and Mallory Monaco and Judy Monaco. (**Exhibit I** - sentencing min pg. 6)

79. The significant misrepresentations made to the lower court were 1) Dr. Schneider admitted to committing medical malpractice; 2) Dr. Schneider used the funds from a captive insurance fund (the NRIC fund) to pay off a civil lawsuit (*Biles v. Schneider*); 3) Dr. Schneider had no medical malpractice insurance; 4) Dr. Schneider prescribed medications that were the cause of death to one of his patients – a creditor in the bankruptcy proceedings; 5) the bankruptcy trustee never revealed the fact that Dr. Schneider waived discharge of the debts to any personal injury claims so that those claimants could pursue those claims against him.

80.    The trial court relied heavily on these misrepresentations in sentencing Dr.
Schneider and defense counsel, although in possession of information that would
have refuted the factual misrepresentations made to the court, did not do so.

## *Dr. Schneider Never Admitted To Medical Malpractice*

81.    The bankruptcy trustee spoke at the sentence and made several material
misstatements concerning the case.

82.    First, he stated that Dr. Schneider admitted to committing medical
malpractice.   This was a plainly untrue and direct misrepresentation to the
sentencing court. At **Exhibit I** pages 9 and 13 of the sentencing minutes, Mr.
Womack told the lower court that Dr. Schneider admitted to medical malpractice.
This was a false statement.

83.    Dr. Schneider never admitted to committing medical malpractice in any
court. In fact, Mr. Womack later in the sentencing proceeding had to walk back
his deliberately false statements to the lower court and stated that Dr. Schneider
did not admit to medical malpractice, but it was only in the mind of Mr. Womack
that there was an admission because of the agreement to a $3 million claim.
**(Exhibit I** sentencing minutes page 31-32)

31

(32 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 32 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 32 of 303

84.    This was a clear demonstration that Mr. Womack had presented false

information to the sentencing court and was now trying to mitigate the untruths he

had already told the court.

85.    Most important was the fact that Dr. Schneider's lawyer never objected to

any of the falsehoods told by the trustee who had taken over $1 million dollars in

fees from Dr. Schneider's estate or the personal injury attorney who hoped to

recover millions of dollars for his law firm.

*Dr. Schneider Never Raided The Captive Insurance Fund, NRIC, And Never Used*
*Those Funds To Pay Off The Civil Lawsuit With Dr. Biles*

86.    Another misrepresentation made by the bankruptcy trustee and the personal

injury attorney at sentencing was that Dr. Schneider had used the funds in the

captive insurance fund – the NRIC fund for medical malpractice insurance – to

pay off a civil lawsuit.

87.    Dr. Schneider had a captive insurance fund that he kept fully funded for the

purpose of paying any medical malpractice claims. The name of that fund was

the Northern Rockies Insurance Company (NRIC).

88.    The bankruptcy trustee falsely accused Dr. Schneider of using those funds

to pay off civil litigation claims in a lawsuit captioned *Biles v. Schneider*. In fact,

the bankruptcy trustee convinced the lower court that this was the case, and the

32

(33 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 33 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 33 of 303

lower court relied heavily on this false information when formulating Dr. Schneider's sentence.

89.     The truth was that the Northern Rockies Insurance Company paid out proper medical malpractice claims and followed appropriate medical malpractice claims management and administrative management in the proceedings against Dr. Schneider. The Exhibit attached shows all the medical malpractice claims paid by NRIC and refutes the false claims made by the bankruptcy trustee and shows that the multi-million dollar settlement with Dr. Biles was never paid out of NRIC. (**Exhibit M** – chart of payments from NRIC).

90.     Additionally, the settlement agreement in the *Biles v. Schneider* litigation is attached hereto (**Exhibit K** – settlement agreement) and it is dated May 7, 2012. Additionally, the bank statements of NRIC dated August 2012 are attached hereto, showing that after the settlement in the civil litigation, NRIC was still fully funded with an ending balance on August 31, 2012 of \$2,953,558.00. (**Exhibit L** – NRIC bank statement)

91.     This is irrefutable evidence that the statements by the bankruptcy trustee and the personal injury attorney at sentence were completely false.    More

(34 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 34 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 34 of 303

important, however, is Dr. Schneider's attorney's failure to correct this false

information when he had these documents in his possession.

92.     These plainly false statements were made to the lower court and were relied

on heavily by the lower court in sentencing. The false statements about Dr.

Schneider raiding the insurance funds to pay civil litigation settlements were

never refuted by defense counsel and could have been easily disproven.

93.     Consequently, the lower court relied heavily on these misrepresentations

when it sentenced Dr. Schneider.

94.     For example, the lower court stated the following at sentence:

*I think that what you did as to the malpractice insurance account is a window into*
*your character, at least at that point in time. I don't think that you can explain*
*away to me that monies held for malpractice insurance could somehow be used to*
*settle a claim for defamation is appropriate.* (**Exhibit 1** - sentencing minutes pg.
54 lines 19-24)

The lower court also stated:

*So I believe you raided that fund to pay that settlement with Dr. Biles. And what*
*that ended up doing is depriving these unsecured creditors of an opportunity to go*
*through the normal course of things when they believe that they have suffered*
*from medical malpractice, which is to bring a lawsuit in court, and to have a hope*
*of recovering some money if the jury agrees with their position, because they*
*believe that doctors have medical malpractice insurance, and you represented*
*that you did.* (**Exhibit 1** - sentencing minutes pg. 55 lines 1-9)

95.     The lower court's statements show that it relied heavily on the

misrepresentations made in the victim impact statements by the bankruptcy

(35 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 35 of 40
Case 1:17-cr-00077-SPW Document 72 Filed 11/26/18 Page 35 of 303

trustee and the personal injury attorney. The lower court's statements show the extreme prejudice that Dr. Schneider suffered at sentence because of the misleading information provided in the victim impact statements and his attorney's complete failure to refute this when he could have easily demonstrated that NRIC never paid the settlement in the *Biles* litigation.

96.    The lower court's statements demonstrate a fundamental misunderstanding of the facts. Dr. Schneider had waived the discharge of the bankruptcy claims so these personal injury claimants could make their claims in court if they wanted to sue Dr. Schneider. It was the claimants who chose not to pursue Dr. Schneider in a civil lawsuit; they chose to settle in bankruptcy court so they would not have to prove their claims in a normal court of law. As a result none of their claims were ever proven.

97.    Most importantly, none of the personal injury claims or the insurance fund had anything to do with the criminal allegations in this case. All of the allegations from the witnesses who appeared at sentencing could have been easily refuted by defense counsel, who had in his possession the appropriate documentation to show contrary facts. Those facts were never presented to and never considered by the sentencing court. The Judge incorrectly assumed those facts demonstrated past

35

(36 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 36 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 36 of 303

uncharged criminal activity when neither civil claims nor criminal charges were
ever filed against Dr. Schneider with regard to any of the allegations made at
sentence.

98.    All of this caused substantial prejudice to Dr. Schneider because the
sentencing court gave more than considerable weight to the claims of these victim
impact statements when, in fact, their claims as victims were never proven, and
they had no legitimate claims as creditors of Dr. Schneider.

*The Victim Impact Statements Stemmed From Unproven Charges And Were
Intended As Inflammatory And To Substantially Prejudice Dr. Schneider At
Sentence*

99.    At sentence, two family members, Judy Monaco and Mallory Monaco, of a
deceased patient of Dr. Schneider, made statements to the court. Although the
two statements made claims that Dr. Schneider had committed malpractice and
that he had written prescriptions that led to the death of a family member, none of
this was ever substantiated and was, in fact, untrue. However, their statements
were powerful and inflammatory. Again, defense counsel made no arguments to
refute these claims. Dr. Schneider had provided to his attorney expert reports that
could have refuted or at least blunted the impact of these unproven personal injury
claims against him.

(37 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 37 of 40
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 37 of 303

100.   There was significant evidence provided to defense counsel to disprove the claims made by the Monaco family regarding the cause of death of Dr. Schneider's former patient.

101.   Both the bankruptcy trustee and the Monaco family made claims that it was Dr. Schneider who prescribed medication to the patient and the overdose of drugs was the cause of death. This was not true.

102.   There was strong evidence that the attending physician's assistant prescribed medication as well and one of the family members administered the pharmaceuticals incorrectly and this incorrect dosage of prescribed drugs was the cause of death. (**Exhibit R** – expert medical report for *Monaco v. Schneider*).

103.   Once again, defense counsel for Dr. Schneider failed to bring these facts to light at sentence, and the lower court made a sentencing decision based on incorrect and incomplete facts.

104.   The highly prejudicial and false allegations of medical malpractice, and that he refused to take responsibility, refused to compensate the family, and attempted to hide funds was so highly prejudicial that Dr. Schneider must be resentenced as a matter of his Due Process rights to a fair sentencing hearing.

(38 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 38 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 38 of 303

*The Trial Court Did Not Properly Consider All Of The Factors Under 3553(a)
And Did Not Give Sufficient Weight To Those Factors At Sentence.*

105. In imposing sentence, the district court may not presume that the

Sentencing Guidelines range is reasonable, and guidelines factors cannot be given

more or less weight than any other factor. Although the guidelines are to be

respectfully considered, they are but one factor among the statutory sentencing

factors that are to be taken into account in arriving at an appropriate sentence.

The sentencing court must impose a sentence sufficient, but not greater than

necessary, to reflect the seriousness of the offense, promote respect for the law,

and provide just punishment, to afford adequate deterrence, to protect the public,

and to provide defendant with needed educational or vocational training, medical

care, or other correctional treatment. *United States v. Carty*, 520 F.3d 984 (9th

Cir. 2008) see also 18 U.S.C. § 3553(a).

106. In this case, the trial court drastically undervalued the 3553(a) factors when

it sentenced Dr. Schneider to 24 months in prison, especially where he has no past

criminal history and in light of his past accomplishments and contributions to

society as a physician, as a veteran of the U.S. Air Force, as a teacher in various

schools of medicine, as a volunteer in assisting veterans and people in his

community and most especially as a neurosurgeon, having helped and cured tens
of thousands of people over the course of his 30-year career.

107. The trial court barely mentioned these factors and relied all too heavily on
the false statements of the trustee and a personal injury attorney who, ironically,
were paid more than $1 million dollars from Dr. Schneider's bankruptcy estate,
and then they complained that Dr. Schneider was not compensating other personal
injury victims. The bankruptcy estate paid out close to $2 million dollars to
claimants and will pay out more than $2 million dollars by the time Dr. Schneider
has finished paying restitution.

108. Under 18 U.S.C. § 3553(a) the lower court's sentence must be sufficient,
but not greater than necessary. A sentence of restitution, community service and
probation would have fulfilled all of these factors. However, the lower court was
so hyper-focused on the allegations made by the victim impact statements that it
barely focused on the work of saving lives and healing the sick that Dr. Schneider
has performed with such selfless dedication for over 30 years.

(40 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-1, Page 40 of 40
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 40 of 303

## CONCLUSION

109.   The Appellant has more than demonstrated that he is not a risk of flight and would not harm anyone should this Court grant the stay pending the outcome of the appeal.

110.   Additionally, the legal arguments here are substantial concerning ineffective assistance of counsel and the prejudice that Dr. Schneider suffered at sentence because of the false evidence against him and his attorney's failure to make the appropriate legal arguments.

111.   Dr. Schneider, through counsel, respectfully requests that this Court grant and extend the stay of the execution of his sentence for the time that the appeal is pending.

Dated: November 20, 2018
      New York, New York

Stephen Preziosi, Esq.
48 Wall Street, Fifth Floor
New York, New York 10005
212-960-8267
stephenpreziosi@gmail.com

# EXHIBIT A

(42 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 36-2, Page 42 of 138
Case 1:17-cr-00077-SPW Document 43 Filed 08/16/18 Page 1 of 7

AO 245B (Rev. 02/18)  Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Montana

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| John Henry Schneider | Case Number: CR 17-77-BLG-SPW |
| | USM Number: 64084-298 |
| | John Smith |
| | Defendant's Attorney |

**THE DEFENDANT:**

☑ pleaded guilty to count(s)   3  *Superseding Indictment*

☐ pleaded nolo contendere to count(s)
  which was accepted by the court.

☐ was found guilty on count(s)
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18usc152(1) | Concealment of Bankruptcy Assets | 12/12/2014 | 3 SI |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)   1, 2, 4, 5,   ☐ is  ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/15/2018
Date of Imposition of Judgment

*Susan P. Watters*
Signature of Judge

**FILED**

AUG 1 6 2018

Clerk, U S District Court
District Of Montana
Billings

Susan P. Watters, District Judge
Name and Title of Judge

8/15/2018
Date

(43 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 36-2, Page 33 of 138
Case 1:17-cr-00077-SPW Document 43 Filed 08/16/18 Page 2 of 7

AO 245B (Rev. 02/18) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT: John Henry Schneider
CASE NUMBER: CR 17-77-BLG-SPW

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

24 months

☑ The court makes the following recommendations to the Bureau of Prisons:

The defendant be placed at Taft CI because it is close to family.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

   ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on _____ .

   ☑ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

(44 of 303)

Case 1:18-30187 11/31/2018 ID: 11095749 DktEntry: 38-2 Page 4 of 138
Case 1:17-cr-00077-SPW Document 43 Filed 08/10/18 Page 3 of 7

AO 245B (Rev. 02/18) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page __3__ of __7__

DEFENDANT: John Henry Schneider
CASE NUMBER: CR 17-77-BLG-SPW

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

3 years

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

(45 of 303)

Case 1:18-30187-14/31/2018 ID: 11095749 DktEntry: 36-2, Page 5 of 139
Case 1:17-cr-00077-SPW Document 43 Filed 08/16/18 Page 4 of 7

AO 245B (Rev. 02/18)  Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | | |
|---|---|---|---|
| | Judgment—Page | 4 | of | 7 |

DEFENDANT: John Henry Schneider
CASE NUMBER: CR 17-77-BLG-SPW

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

AO 245B(Rev. 02/18) Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page __5__ of __7__

DEFENDANT: John Henry Schneider
CASE NUMBER: CR 17-77-BLG-SPW

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant will provide the United States Probation Officer with any requested financial information and shall incur no new lines of credit without prior approval of the United States Probation Officer. You must notify the Probation Officer of any material changes in your economic circumstances that might affect your ability to pay restitution, fines or special assessments.

2. The defendant shall pay restitution in the amount of $308,945.00. The defendant is to make payments at a rate of $12,872.70 per month, or as otherwise directed by United States Probation. Payment shall be made to the Clerk, United States District Court, 2601 2nd Avenue North, Billings, MT 59101 and shall be disbursed to Joseph Womack, Chapter 7 Panel Bankruptcy Trustee.

3. The defendant shall submit their person, residence, place of employment, vehicles, and papers, to a search, with or without a warrant by any probation officer based on reasonable suspicion of contraband or evidence in violation of a condition of release. Failure to submit to search may be grounds for revocation. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. The defendant shall allow seizure of suspected contraband for further examination.

(47 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 28-2  Page 7 of 138
Case 1:17-cr-00077-SPW  Document 43  Filed 08/16/18  Page 6 of 303

AO 245B (Rev. 02/18)  Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

| | Judgment — Page | 6 | of | 7 |

DEFENDANT: John Henry Schneider
CASE NUMBER: CR 17-77-BLG-SPW

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ | $ 308,945.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Joseph Womack | | $308,945.00 | |

| **TOTALS** | $ 0.00 | $ 308,945.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☑ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the  ☐ fine  ☐ restitution.

☐ the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 02/18) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

| | | | Judgment — Page | 7 | of | 7 |

DEFENDANT: John Henry Schneider
CASE NUMBER: CR 17-77-BLG-SPW

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☑   Lump sum payment of $   100.00   due immediately, balance due

     ☐   not later than         , or
     ☑   in accordance with ☐ C,   ☐ D,   ☐ E, or   ☑ F below; or

B   ☐   Payment to begin immediately (may be combined with     ☐ C,    ☐ D, or    ☐ F below); or

C   ☐   Payment in equal      *(e.g., weekly, monthly, quarterly)* installments of $      over a period of      *(e.g., months or years)*, to commence      *(e.g., 30 or 60 days)* after the date of this judgment; or

D   ☐   Payment in equal      *(e.g., weekly, monthly, quarterly)* installments of $      over a period of      *(e.g., months or years)*, to commence      *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E   ☐   Payment during the term of supervised release will commence within      *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☑   Special instructions regarding the payment of criminal monetary penalties:

     Criminal monetary penalty payments are due during imprisonment at the rate of not less than $25.00 per quarter, and payment shall be through the Bureau of Prisons' Inmate Financial Responsibility Program. Criminal monetary payments shall be made to the Clerk, United States District Court, James F. Battin U.S. Courthouse, 2601 2nd Ave North, Ste 1200, Billings, MT 59101.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

     Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

# EXHIBIT B

(50 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 10 of 139
Case: 3:17-cr-00977-SPW   Document 72   Filed 09/14/18   PageID.896 50 of 303
Case 3:17-mj-03412-KSC

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | Plaintiff, ) | **CRIMINAL CASE NO.17MJ3412-KSC** |
| v. | ) | |
| SCHNEIDER | ) | **ORDER AND CONDITIONS OF PRETRIAL** |
| | Defendant. ) | **RELEASE: BAIL** (18 U.S.C. § 3142(c)) |

A hearing was held to determine pretrial conditions of release of the defendant pursuant to 18 U.S.C. § 3142. The Federal Judge determined an unconditional release pursuant to 18 U.S.C.§ 3142(b) is not sufficient to assure the appearance of the defendant and the safety of the community. Thus, conditions of pretrial release are necessary pursuant to 18 U.S.C.§ 3142(c). *Good cause appearing,*
**IT IS ORDERED** that the defendant shall be released subject to the condition that the defendant: *(a) not commit a federal, state or local crime during the period of release,* (b) make all court appearances and (c) comply with the conditions itemized below, as indicated by (✓), in accordance with 18 U.S.C.§ 3142(c)(2):

## STANDARD CONDITIONS:
✓ 1. restrict travel to ☐ San Diego County, ☐ Southern District of California, ☐ Central District of California, ☐ State of California, ☑ United States, ☑ do not enter Mexico,☐ other:_____ ;
2. report for supervision to Pretrial Services Agency (PSA) as directed by the assigned PSO and pay for the reasonable costs of supervision in an amount determined by PSA and approved by the court;
✓ 3. not possess or use any narcotic drug or controlled substance, (defined in 21 U.S.C. § 802), without a lawful medical prescription;
✓ 4. not possess any firearm, dangerous weapon or destructive device during the pendency of the case;
✓ 5. read, or have explained, and acknowledge understanding of the Advice of Penalties and Sanctions Form;
✓ 6. provide a current residence address and phone number prior to release and keep it current while case pending.

## ADDITIONAL CONDITIONS:
___ 7. Comply with all government agency conditions to be able to legally remain in the United States during pendency of the proceedings;
___ 8. submit to treatment, and/or testing, at the discretion of the pretrial officer assigned to your case, no more than___times per month, for:
☐ drugs or alcohol, and/or ☐ psychiatric or psychological counseling;
___ 9. the defendant shall be monitored by the form of location monitoring indicated below and abide by all technology requirements under the following components. Defendant and sureties are responsible for all equipment associated with this program including loss or damage.
1) ☐ a Global Positioning System (GPS) ☐ RF Monitoring ☐ Voice Recognition
2) ☐ Home Incarceration ☐ Home Detention ☐ Curfew – Remain at your residence every day from ___ A.M./P.M. to ___ A.M./P.M. or as directed by the Pretrial Services Officer; ☐ defendant shall pay all or part of the costs of monitoring as directed by the court and/or the Pretrial Services Officer; ☐ Defendant to be released to PSA custody the following business day by 10:00 a.m. ;
✓ 10. actively seek and maintain full-time employment, schooling, or combination of both;
✓ 11. execute a personal appearance bond in the amount of $_____ secured by:
☐ a trust deed to the United States on real estate approved by a Federal Judge;
☐ the co-signatures of _____ financially responsible (related) adults,
☐ Nebbia hearing ☐ Exam of Sureties ☑ other: _O R_
___ 12. provide the court with: ☐ a cash bond and/or ☐ execute a bail bond by an approved solvent corporate surety in the amount of $_____ that covers **ALL** conditions of release (not just appearances).
___ 13. 18 U.S.C.§ 3142(d) hold until _____; if no detainer is lodged by then, these conditions take effect;
___ 14. clear all warrants/FTAs and pay all fines within _____ days of release;
___ 15. Defendant is to reside with _____ or defendant's residence be approved by PTS;
✓ 16. Defendant to surrender any valid passport and may not apply for new travel documents.
✓ 17. all conditions previously set will remain the same.
✓ 18. Other conditions: _Not to have any contact_
_with Kathleen Burrows._

DATED: 9/18/2017          FILED

SEP 1 8 2017          _Federal Judge, Karen S. Crawford_

CLERK, U S DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          DEPUTY

Form Crim-49b(CASDRev. 4/14)

# EXHIBIT C

Local AO 199 Order Setting Conditions of Release                                    Page 1 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

RECEIVED

OCT 1 6 2017

CLERK, U.S. DISTRICT COURT
DISTRICT OF MONTANA
BILLINGS, MONTANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CR 17-77-BLG-SPW |
| v. | **ORDER SETTING CONDITIONS OF RELEASE** |
| JOHN HENRY SCHNEIDER | |
| *Defendant.* | |

**IT IS ORDERED** that the Defendant's release is subject to these conditions:

(1)   Defendant must not violate **federal, state, local, or tribal law** while on release.

(2)   Defendant must cooperate in the collection of a **DNA sample** if it is authorized by 42 U.S.C. § 14135a.

(3)   Defendant must advise the Pretrial Services Officer in writing before making any **change of residence or telephone number.**

(4)   Defendant must **appear in court** as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

## ADDITIONAL CONDITIONS OF RELEASE

**IT IS FURTHER ORDERED** that the Defendant's release is subject to the following additional conditions:

(5)   [d] Defendant must surrender to the Pretrial Services Officer any **passport** or other international travel document.

(6)   [e] Defendant must not obtain a **passport** or other international travel document.

(7)   Defendant shall have no contact with Kathleen Burrows.

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

A violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of release, an order of detention, and a prosecution for contempt of court and could result in a term of imprisonment, a fine, or both.

The commission of a Federal offense while on pretrial release will result in an additional sentence of a term of imprisonment of not more than ten years, if the offense is a felony; or a term of imprisonment of not more than one year, if the offense is a misdemeanor. This sentence shall be in addition to any other sentence.

Federal law makes it a crime punishable by up to 10 years of imprisonment, and a $250,000 fine or both to obstruct a criminal investigation.  It is a crime punishable by up to ten years of imprisonment, and a $250,000 fine or both to tamper with a witness, victim or informant; to retaliate or attempt to retaliate against a witness, victim or

(53 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 13 of 139
Case 1:17-cr-00057-SPW Document 22 Filed 10/12/17 Page 2 of 303

Local AO 199 Order Setting Conditions of Release                                    Page **2** of **2**

informant; or to intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If after release, you knowingly fail to appear as required by the conditions of release, or to surrender for the service of sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more, you shall be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years, you shall be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony, you shall be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor, you shall be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender shall be in addition to the sentence for any other offense. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of Defendant

I acknowledge that I am the Defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
Signature of Defendant

**IT IS FURTHER ORDERED** that the Defendant is **RELEASED** after processing by the United States Marshal Service.

DATED this 12th day of October, 2017.

_____
Timothy J. Cavan
United States Magistrate Judge

# EXHIBIT D

Case 1:17-cr-00074-SPW Document 20 Filed 11/26/18 Page 15 of 139

# IN THE MUNICIPAL COURT OF THE BURBANK JUDICIAL DISTRICT

## COUNTY OF LOS ANGELES, STATE OF CALIFORNIA

The People of the State of California,

Plaintiff,

vs.

JOHN HENRY SCHNEIDER JR.

Defendant

M.C. No.

D.A. No.

COMPLAINT — Misdemeanor

91M00029

COUNT I    The undersigned declarant and complainant states that he is informed and believes and upon

such information and belief declares that on or about    December 25, 1990    , at and

in the above-entitled Judicial District, in the County of Los Angeles, State of California, a misde-

meanor, to wit, **a violation of Section 12031(a) of the Penal Code of the State of California,**

was committed by    JOHN HENRY SCHNEIDER JR.

who did willfully and unlawfully **carry a loaded firearm on his/her person or in a vehicle while in a public place.**

Burbank Police Report #DR_____dated_____is attached hereto and incorporated by reference as though fully set forth herewith.

Said declarant and complainant therefore prays that a warrant may be issued for the arrest of said defendant who may then be dealt with according to law.

Executed on _____ in the County of Los Angeles, State of California.

I declare upon information and belief that the foregoing is true and correct.

_____
Declarant and Complainant

INVESTIGATING AGENCY    Burbank Police Department

WITNESSES

| | |
|---|---|
| Case Number: | BUR91M0029-01 |
| Defendant Name: | SCHNEIDER, JOHN HENRY JR |
| Violation Date: | |
| Filing Date: | January 3, 1991 |
| Courthouse: | Burbank Courthouse |

## CASE INFORMATION

| Count | Charge Section | Charge Statute | Plea | Disposition | Disposition Date |
|-------|----------------|----------------|------|-------------|------------------|
| 01 | 12031(A) | Penal Code | | Dismissed or Not Prosecuted | 02/08/1991 |
| 02 | 12025(B) | Penal Code | | Dismissed or Not Prosecuted | 02/08/1991 |
| 03 | 415 | Penal Code | | Guilty/Convicted | 02/08/1991 |

## EVENTS

**Upcoming Scheduled Events**

None

**Past Events**

None

## BAIL

No Information Found

## SENTENCING INFORMATION

THE INFORMATION PROVIDED ON THIS WEBSITE CONTAINS ONLY AN EXTRACTION FROM THE COURT RECORD. IT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A FULL AND COMPLETE RECORD OF COURT PROCEEDINGS.

No Information Found

STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**PENAL CODE**

**Section 415**

---

415.  Any of the following persons shall be punished by imprisonment in the county jail for a period of not more than 90 days, a fine of not more than four hundred dollars ($400), or both such imprisonment and fine:

(1)  Any person who unlawfully fights in a public place or challenges another person in a public place to fight.

(2)  Any person who maliciously and willfully disturbs another person by loud and unreasonable noise.

(3)  Any person who uses offensive words in a public place which are inherently likely to provoke an immediate violent reaction.

(Amended by Stats. 1983, Ch. 1092, Sec. 283.  Effective September 27, 1983.  Operative January 1, 1984, by Sec. 427 of Ch. 1092.)

# <u>EXHIBIT E</u>

# University of Southern California

The Trustees of the University by virtue of the authority vested in them and on the recommendation of the faculty of

The School of Medicine

have conferred the degree of

Doctor of Medicine

on

John Henry Schneider, Jr.

who has successfully completed the requirements

Given at Los Angeles, in the State of California, on the eighth day of May, in the year one thousand nine hundred and eighty-seven



James N. Zumberge
President of the University

Geo. T. Scharffenberger
Chairman of the Board of Trustees

Robert C. Langmade
Dean





(62 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 22 of 139
Case 1:17-cv-00173-SPW Document 26-1 Filed 02/03/17 Page 6 of 13



# SENIOR RESIDENT AWARD

# JOHN SCHNEIDER, M.D.

For

Excellence in Teaching

and

Outstanding Leadership

From

The Internship Class of 1994

University of Southern California

Los Angeles County Hospital

USC

UNIVERSITY
OF SOUTHERN
CALIFORNIA

Keck School of Medicine
University of Southern California

**Department of
Neurological Surgery**

Steven L. Giannotta, M.D.
Chairman

Arun P. Amar, M.D.
Michael L. J. Apuzzo, M.D.
Thomas C. Chen, M.D., Ph.D.
John Peter Gruen, M.D.
Patrick C. Hsieh, M.D.
Mark D. Krieger, M.D.
Donald W. Larsen, M.D.
Stefan M. Lee, Ph.D.
Mark A. Liker, M.D.
Charles Y. Liu, M.D., Ph.D.
William J. Mack, M.D.
J. Gordon McComb, M.D.
Martin H. Weiss, M.D.
Cheng Yu, Ph.D.
Gabriel Zada, M.D.

Verification of Postgraduate Training: Neurological Surgery

Re:    **John Henry Schneider, M.D.**
       **DOB: 10/21/1961**

Sponsoring Institution:
LAC+USC Medical Center
1200 N State Street
Los Angeles, CA 90033

PGY1
6/24/1987 – 6/23/1988
Successfully completed an internship year in Surgery

PGY2-6
7/1/1988-6/30/1993
Successfully completed Neurosurgery Residency

PGY7
7/1/1993-6/30/1994
Successfully completed Neurosurgery Chief Residency Year

If you have any questions or require further information please do not
hesitate to contact my office.

Sincerely yours,

Steven L. Giannotta, M.D.
Program Director
Professor and Chair

Academic Office
1200 North State Street
Suite 3300
Los Angeles
California 90033
Tel: 323 226 7421
Fax: 323 226 7833
neurosurg@usc.edu
www.usc.edu/schools/
neurosurgery

(64 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 21-3, Page 64 of 303
Case 1:17-cv-00075-SPW Document 33-1 Filed 12/01/18 Page 64 of 303

Los Angeles County
+
University of Southern California
Medical Center

Hereby Certifies that

# John Henry Schneider, Jr., M.D.

has served faithfully and satisfactorily as a Chief Resident Physician in Neurological Surgery

at this Medical Center from July First, 1993 to June Thirtieth, 1994

In Testimony Whereof this Diploma is granted this Thirtieth day of June, 1994







# THE AMERICAN BOARD OF

# NEUROLOGICAL SURGERY

HEREBY CERTIFIES THAT

## John Henry Schneider, Jr., M.D.

HAS FULFILLED THE REQUIREMENTS OF

THIS BOARD FOR CERTIFICATION IN

NEUROLOGICAL SURGERY

November 13, 1997

CHAIRMAN

VICE-CHAIRMAN

SECRETARY

97106

(66 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 26 of 139

Case 1:17-cr-00077-SPW   Document 38-1   Filed 07/31/18   Page 9 of 62



# Honorable Discharge

**from the Armed Forces of the United States of America**

*This is to certify that*

JOHN H. SCHNEIDER, 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, MAJ, USAFR

*was Honorably Discharged from the*

# United States Air Force

*on the* 5TH *day of* FEBRUARY 2001 *This certificate is awarded as a testimonial of Honest and Faithful Service*

Laura C. Counts, Col, USAF
Commander
Air Reserve Personnel Center

DD FORM 256 AF
1 NOV 81

THIS IS AN IMPORTANT RECORD — SAFEGUARD IT!

(67 of 303)

# CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

CAUTION: NOT TO BE USED FOR IDENTIFICATION PURPOSES. THIS IS AN IMPORTANT RECORD. ANY ALTERATIONS IN SHADED AREAS RENDER FORM VOID

| 1. NAME (Last, First, Middle) | | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. |
|---|---|---|---|
| SCHNEIDER JOHN HENRY JUNIOR | | AIR FORCE -- USAFR | 582 33 0790 |

| 4.a. GRADE, RATE OR RANK | 4.b. PAY GRADE | 5. DATE OF BIRTH (YYMMDD) | 6. RESERVE OBLIG. TERM. DATE |
|---|---|---|---|
| MAJ | O4 | 611021 | Year 2003 Month Jul Day 03 |

**7.a. PLACE OF ENTRY INTO ACTIVE DUTY**
BURBANK, CA

**7.b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known)**
BURBANK, CA

**8.a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND**
59 MEDICAL WG (AETC)

**8.b. STATION WHERE SEPARATED**
LACKLAND AFB TX

**9. COMMAND TO WHICH TRANSFERRED**
USAFR

**10. SGLI COVERAGE** ☐ None
Amount: $ 200,000

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) | 12. RECORD OF SERVICE | Year(s) | Month(s) | Day(s) |
|---|---|---|---|---|
| T04583F-Surgeon, Neurological, 3 years. | a. Date Entered AD This Period | 1994 | Jul | 05 |
| | b. Separation Date This Period | 1997 | Jul | 11 |
| | c. Net Active Service This Period | 03 | 00 | 07 |
| | d. Total Prior Active Service | 00 | 00 | 00 |
| | e. Total Prior Inactive Service | 11 | 01 | 10 |
| | f. Foreign Service | 00 | 00 | 00 |
| | g. Sea Service | 00 | 00 | 00 |
| | h. Effective Date of Pay Grade | 1994 | Jul | 05 |

**13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service)**
Air Force Achievement Medal, Air Force Outstanding Unit Award, Air Force Training Ribbon.

**14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed)**
Health Profession Officer Indoctrination Course, 4 wks, Mar 84. Military Indoctrination Medical Service Orientation, 4 wks, Aug 94.

| 15.a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | Yes | No X | 15.b. HIGH SCHOOL GRADUATE OR EQUIVALENT | Yes | No X | 16. DAYS ACCRUED LEAVE PAID 0.0 |
|---|---|---|---|---|---|---|

| 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | Yes | X No |
|---|---|---|

**18. REMARKS**
Member has completed first full term of service.
Member subject to recall to active duty and/or annual screening.
///////////////////NOTHING FOLLOWS////////////////////////

Data herein are subject to computer matching within DoD or with other agencies for verification purposes and determining eligibility or compliance for Federal benefits.

**19.a. MAILING ADDRESS AFTER SEPARATION (Include Zip Code)**
25533 LIMESTONE RIDGE
SAN ANTONIO, TX 78255

**19.b. NEAREST RELATIVE (Name and address - Include Zip Code)**
MICHELLE SCHNEIDER
25533 LIMESTONE RIDGE
SAN ANTONIO, TX 78255

| 20. MEMBER REQUESTS COPY 6 BE SENT TO TX DIR. OF VET AFFAIRS | X Yes | No | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) |
|---|---|---|---|
| 21. SIGNATURE OF MEMBER BEING SEPARATED | | | ROBERT D. MARTIN, GS-09, DAFC Chief, Retirements/Separations |

**SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only)**

**23. TYPE OF SEPARATION**
RELEASE

**24. CHARACTER OF SERVICE (Include upgrades)**
HONORABLE

**25. SEPARATION AUTHORITY**
AFI 36-3207

**26. SEPARATION CODE**
MGQ

**27. REENTRY CODE**
NOT APPLICABLE

**28. NARRATIVE REASON FOR SEPARATION**
INTRADEPARTMENTAL TRANSFER

**29. DATES OF TIME LOST DURING THIS PERIOD**
NONE

**30. MEMBER REQUESTS COPY 4**
Initials

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 28 of 139

American Association of Neurological Surgeons

founded in 1931

as

The Harvey Cushing Society

recognizes

# John H. Schneider Jr., MD, FAANS

as a Fellow of the American Association of Neurological Surgeons

effective

July 18, 2010



American
Association of
Neurological
Surgeons

President: James T. Rutka, MD, PhD, FAANS, FRCS(C)                    Secretary: William T. Couldwell, MD, PhD, FAANS

(69 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 29 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 69 of 303

# EXHIBIT F

Case: 18-35949    05/20/2018    ID: 10890349    DktEntry: 26-2    Page 56 of 139



**DRAMA IN REAL LIFE®**

The driver watched in shock as the big rock hurtled toward the other car's windshield

# Saved by Strangers

BY JOHN PEKKANEN

A S SHE DROVE HOME along Route 1604, which rings San Antonio, Air Force Capt. Margaret Herring, 35, savored the beauty of the Texas countryside—the afternoon sunlight glinting off amber fields of waist-high grass lining the road.

That Thursday, May 11, 1995, Herring had just finished work at Kelly Air Force Base, where she was chief of education services, and she looked forward to being home soon with her husband Mike, 40, and their two children, Mack, four, and Cammie, two.

Cruising at close to 45 miles per hour on a straight stretch of road, Herring took little notice of a dump truck approaching from the opposite direction. Suddenly a cantaloupe-size rock tumbled from the truck's load. It bounced high off the pavement, directly into the path of her blue 1991 Honda Accord. At an impact speed of nearly 100 m.p.h.,

80                    PHOTO ILLUSTRATION: DAVID LOEW

the stone exploded through the Honda's windshield, slamming into the left side of Herring's head. The time was 5:06 p.m. The truck driver, apparently unaware of what had happened, kept going.

For the entire school year Noelia Guajardo's second-grade class had been saving for a trip to San Antonio's Sea World. Unfortunately the youngsters hadn't been able to raise enough money to charter a bus. Guajardo, other teachers and some parents volunteered to drive the children themselves. Guajardo's friend, Marlon McAllister, a 41-year-old massage therapist, offered his car and came along.

The trip to Sea World was a big success. When it came time to leave, however, the three children traveling with Guajardo and McAllister begged to feed the dolphins one last time. Finally they left at about 4:45 p.m.—long after the rest of the class.

Rush-hour traffic was already heavy as Guajardo steered onto Route 1604, soon heading north behind a blue Honda. Then suddenly she saw a large rock bounce on the pavement ahead of the Honda and smash into it. The Honda came to a brief stop. Looking into the car as she passed slowly by, Guajardo at first thought the driver was okay. But then, as the Honda swerved to the side of the road, she saw the driver slumped over. Realizing the woman had been hit by the rock, Guajardo drew back in horror.

"That lady's hurt!" Guajardo screamed.

82

"Stop the car!" McAllister shouted. Leaping from the back seat, he sprinted toward the Honda, which rolled to a stop 40 yards from the road. McAllister gasped when he saw the blood-splattered interior. The left side of the woman's skull was caved in from ear to eye socket. Blood flowed from the gaping wound. He pulled off his T-shirt, folded it into a compress and held it against the injury.

Joe Corcoran, a 48-year-old registered nurse, was driving toward the San Antonio home of his fiancée. In the six years they'd been dating, he'd driven there hundreds of times, but he'd never once taken Route 1604. Yet for no particular reason, that's the road he chose on this day, May 11.

Suddenly a woman ran out waving her arms in front of his pickup truck. Corcoran slammed on his brakes.

"We need help!" Noelia Guajardo implored. "Someone's been hurt."

Corcoran drove his truck as far as he could through the thick grass, then ran to Herring's car. "How bad is it?" he asked McAllister.

The massage therapist lifted his bloody T-shirt from Herring's skull. *My God!* Corcoran thought. *I can see her brain!*

Corcoran climbed into the passenger's seat. With a pocketknife he cut Herring's seat belt, reclined her seat, then cradled her head and neck in his hands. Keeping her head and neck supported, he knew, could prevent a paralyzing spinal injury and would also help keep her airway clear.

Suddenly Herring's eyes opened.

"My head hurts so bad," she murmured.

"Just hang on," Corcoran encouraged. "We're getting help."

Herring closed her eyes. Once more, she was unconscious.

Moments later her back arched, and her arms and legs began thrashing wildly. Corcoran knew this was a physical response to her brain injury. "We've got to keep her steady," he said, holding her head and neck. McAllister held her arms. The thrashing soon ended.

They were doing all they could to keep her alive, yet Corcoran knew this wasn't enough. Years earlier he'd rushed to the aid of a young, critically injured man at another highway accident. Corcoran did all he could, but medical help didn't arrive in time. He held the young man in his arms and watched as his life slipped away.

He didn't want this to happen again. *We've got to get you to a hospital fast,* he thought.

Mike Herring had started dinner a little after 5 p.m. Margaret usually arrived home by 5:15. He knew she'd be on time. Thursday was his night to throw darts in a local league, and Margaret was always home in time to take care of the kids.

The two had met in Korea in 1988, when they were stationed at Osan Air Base. They were married that October.

In September 1993, when Mike completed 20 years of service, he retired. That same month, Margaret was assigned to Kelly Air Force Base. Mike

enrolled at the University of Texas at San Antonio, planning to become a technical writer. For both Mike and Margaret, life was going well.

Deputy Sheriff Francisco Gonzalez was driving on Route 1604 when he noticed several cars had pulled off. He pulled over.

"A woman's been hurt," someone shouted.

Gonzalez radioed for an ambulance, then waded through the tall grass toward Herring's car.

"This woman's critically injured," Corcoran said. "She needs to be airlifted."

"My God!" Gonzalez said when he saw the wound. "We have a life-threatening situation here," he shouted into his radio. "We need AirLife!"

Moments later an ambulance arrived. Paramedic Conrad Gonzales quickly examined Herring. After putting in the call to dispatch Air-Life, which was on standby, Gonzales motioned to the others. "Let's get her out of the car," he shouted.

Before moving Herring, Gonzales immobilized her head, neck and spine with a cervical collar. As he did, she again regained consciousness. "My daughter. Where's my daughter?" Herring asked before losing consciousness once more. Although her speech was disoriented, Gonzales was amazed that in spite of the seriousness of her injury, she was actually talking to him. In his 15 years of helping accident vic-

83

tims, he'd never seen a case like this. Corcoran and McAllister helped maneuver a backboard through the driver's-side door. As they lifted Herring onto the board, though, she again became combative, flailing her arms and legs. They restrained her and angled her through the car door. Setting her down on a wheeled stretcher, they heard the distant throb of the AirLife helicopter.

Corcoran looked at Herring. Now she was turning grayish-blue. *We're losing her,* he thought.

Gonzales grabbed his radio. "Get the succs ready," he said to flight paramedic Jim Kadric. Succinylcholine was a drug that would temporarily paralyze Herring so paramedics could put a tube down her throat and into her lungs. This would bring life-giving oxygen to her brain.

At 5:27, 21 minutes after the accident, the helicopter touched down. Jim Kadric and flight nurse Diana Montez rushed to Herring. After the succinylcholine was injected, Montez held Herring's head steady and Kadric slid the breathing tube down her throat.

As oxygen flooded into Herring's lungs, her color returned. Then she was loaded onto the helicopter and flown to nearby Wilford Hall Medical Center, the nation's premier Air Force hospital.

JOHN SCHNEIDER, a 33-year-old neurosurgeon, sat patiently in a shoe store as his eight-month-old daughter Shannon squirmed in his arms. His wife Michelle was trying a new pair of shoes on their

84

1½-year-old son Brandon. At 5:40 p.m. his pager sounded.

"We have a major head trauma," the dispatcher said. "AirLife has an ETA of 5:45."

Schneider handed Shannon to his wife. "I've got an emergency."

Schneider made the ten-mile drive through rush-hour traffic in just over ten minutes. In the emergency room he immediately noticed Herring's uniform. *One of our own,* he thought.

The hospital's CAT scanner showed that two jagged pieces of Herring's skull had been driven deep into the left temporal lobe of her brain. Equally alarming: there was a blood clot in her brain. This clot, combined with the swelling of the injured brain tissue, was cutting away the fragile thread that kept Herring alive.

As Herring was wheeled toward the operating room, her blood pressure suddenly rose. *She's herniating down into her brain stem,* Schneider realized. The brain stem is the control center for the body's most vital functions: blood pressure, heart rate and breathing. *She could die in minutes.* Then Herring's heartbeat slowed. *No time to scrub,* Schneider thought, pulling on surgical gloves. There wasn't even time for making a surgical entry into Herring's brain. He'd have to go the fastest way possible: through the injury itself.

Deep inside Herring's brain, Schneider located the blood clot. As he suctioned it out, her heart rate and blood pressure slowly returned to normal.

With Herring stabilized, Schnei-

der walked to the scrub sink. *Now comes the real challenge,* he thought.

MIKE HERRING was becoming annoyed. It was 6 p.m., and Margaret was late. Just as he finished dinner, the phone rang.

The caller was Joe Corcoran. "I just stopped to help at an accident on 1604. The woman was wearing military fatigues and driving a blue Honda. Her name was Margaret Herring. Has anyone told you about this?"

"No," Mike said in a tight voice. "How badly is she hurt?"

"It could be serious. I think they took her to Wilford Hall."

"Oh, God!" Mike gasped.

After dropping off Cammie and Mack with a neighbor, Mike raced his car along 1604 toward the hospital. Less than ten minutes from home, he saw Margaret's Honda off the side of the road. He pulled over and ran to it, glancing quickly at the broken windshield and blood-splattered interior. Then he noticed Margaret's smashed glasses on the front seat. A chill swept over him.

Back in his car, Mike raced toward Wilford Hall. One thought echoed through his mind: *I can't lose Margaret.*

THE LEFT SIDE of Margaret Herring's skull looked like a potato chip crushed by a hammer. Bone fragments, gravel and dirt were scattered through the injury. At its center was a hole more than three inches in diameter that opened to her brain.

Of most concern to Dr. Schnei-

der, however, was her left temporal lobe. Besides the two chunks of skull embedded there, a blackened, prune-size area had been destroyed. This was where language, face recognition and memory were mainly based.

Moving with utmost delicacy, Schneider enlarged the hole in Herring's skull. He carefully plucked out bone fragments and gravel, and cut away destroyed brain tissue. He cringed at the damage. *She may never talk again,* he thought.

Schneider collected more than 50 bone fragments. However, only 22 were large enough to use in reconstructing her skull.

The orbital bone around Herring's left eye had been completely shattered. He couldn't find orbital bone fragments big enough to rebuild the socket, so he took a fragment from her skull. It proved a good fit.

Like assembling a jigsaw puzzle, Schneider matched bone fragments to the jagged gaps in her skull. Once he had these in place, he attached them to one another with titanium plates and screws.

There weren't enough bone fragments to cover the hole in Herring's skull, so he tapped a chisel-like instrument against undamaged areas of her skull. This shaved off small segments of bone. He could do this safely because the skull had two hard surfaces, with a softer core in between. He removed the shavings only from the outer surface. Piece by piece, he repaired the last remaining openings in the skull.

At 1 a.m., six hours after surgery began, Margaret was wheeled to

85

*READER'S DIGEST • OCTOBER 1996*

intensive care unit. Moments later Schneider faced Mike Herring in the waiting room. "We've reconstructed her skull," the surgeon said. "But she's suffered a serious brain injury."

"How serious?" Mike asked.

"Only time will tell."

To Mike, the fact that Margaret was alive was miracle enough. He thanked Schneider, then walked to the ICU. Leaning over his wife's bed, Mike gently squeezed her hand. "I love you," he said. Margaret showed no glimmer of recognition. *Please come back to me, Margaret,* Mike pleaded.



*Margaret Herring today*

ON FRIDAY, the day after her accident, Margaret stirred for the first time. Dr. Schneider watched her closely. Would she be able to move her arms and legs? When she did, he breathed a sigh of relief.

The joy then he and others felt, however, was muted by the looming possibility of irreversible brain damage. One question haunted Mike as he stood vigil at her bedside. *Will Margaret still be Margaret?*

On Saturday she made signs that she was trying to communicate. "Do you want something to write on?" Mike asked. Margaret blinked.

Mike held up a clipboard and handed her a pen. The letters were shaky, but her message was clear: "Where's Mom and Dad?"

Tears of relief flooded Mike's eyes. "They went out to eat," he said. "They'll be back in a few minutes."

Margaret blinked again, and Mike held the clipboard for her. "Aren't you going to give me a kiss?" she wrote.

Mike felt a wave of joy as he leaned over and kissed his wife.

BY THE END of August, less than four months after the accident, Margaret Herring resumed her full-time duties at Kelly Air Force Base. Her recovery stunned her doctors.

Even so, Herring still could not recall any details of the accident. The more she heard about it, however, the more she came to appreciate the skill and courage of the strangers who'd helped her.

"Something terrible happened to you that day," Dr. Schneider told her. Then he thought of the trained people who, by extraordinary coincidence, were driving that road and stopped to help. "But something miraculous happened too."

---

### Counter Culture

SHOPPING FOR A COMPUTER for my son, I asked the clerk if the store honored credit cards.

"Honor them?" he said. "We worship them!"     —Contributed by Bob Patton

86

---

## LIFE IN THESE UNITED STATES

MY 20-YEAR-OLD niece, Laura, often helps out a couple with their three-year-old son and five-month-old twins. One evening when the husband was out of town, she was asked to accompany the rest of the family on a grocery-store trip.

All went well at first, with Laura pushing the twins in their double stroller and the toddler tagging alongside the mother's shopping cart. But when the mother momentarily left the cart to pick out some grapes, a small traffic jam resulted. Attempting to clear the aisle, Laura pulled on the cart and called to the three-year-old, all the while pushing the double stroller. As the mother returned with the grapes, another shopper was watching Laura's struggle. "My goodness," the shopper said to the mother with a nod toward Laura. "Wouldn't you hate to be in her shoes?"

—Martha Hartley
*(Pine Mountain, Ga.)*

EVERY MORNING at 5:30, my friend Jim and I go out for a run, accompanied by his dog, Nipper. Without fail, Nipper always stays at Jim's side—with the exception of one morning. We had just finished a vigorous three-mile run when, about 200 yards down the street, a man began loading furniture onto a van. Suddenly Nipper sprinted forward, perused the items, lifted his leg and "christened" a couch.

Jim was mortified. He ran up, yelling at Nipper. Then he began apologizing profusely to the man.

"Oh, don't worry," the man told Jim. "My wife and I just got a divorce, and she got all the furniture. Would your dog like to try for the coffee table?"

—George Coombs (*West Warwick, R.I.*)

ONE DAY WHILE OUT SHOPPING, my aunt, my mother and I stopped for lunch. With nothing to do the rest of the afternoon, we decided to have a cocktail or two. After the third round, we were acting a bit giddy, giggling a lot and talking quite loudly. Suddenly



*"They say it's more efficient."*

# EXHIBIT G

11/2/2018  Amazon.com: The Healthcare Practitioners Guide to Conflict Engagement and Dispute Resolution eBook: Michael Schneider: Kindle Store

(75 of 303)

Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 75 of 303



11/2/2018

Amazon.com: The Healthcare Practitioner's Guide to Conflict Engagement and Dispute Resolution eBook: Michael Scheidler: Kindle Store

(76 of 303)

Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 76 of 303

**ASIN:** B07DTMNZSY

**Text-to-Speech:** Enabled 

**X-Ray:** Not Enabled

**Word Wise:** Not Enabled

**Lending:** Not Enabled

**Screen Reader:** Supported

**Enhanced Typesetting:** Enabled

**Amazon Best Sellers Rank:** #235,990 Paid in Kindle Store (See Top 100 Paid in Kindle Store)

#105 in Kindle Store > Kindle eBooks > Medical eBooks > Reference

#165 in Kindle Store > Kindle eBooks > Nonfiction > Science > Reference

#273 in Books > Reference > Encyclopedias & Subject Guides > Medical

Would you like to **tell us about a lower price?**

## Related Video Shorts (0)   Upload your video



**Be the first video**

Your name here



SOLIMO

**Big saves on everyday favs**

Learn more ›

Ad feedback

## 1 customer review

5.0 out of 5 stars

| | | |
|---|---|---|
| 5 star | | 100% |
| 4 star | | 0% |
| 3 star | | 0% |
| 2 star | | 0% |
| 1 star | | 0% |

### Review this product

Share your thoughts with other customers

Write a customer review

**Showing 1-1 of 1 reviews**

Top Reviews

Lisa Fallon

**Excellent information**

June 26, 2018

Format: Paperback

Excellent information for all those in the health care industry. Clear, concise, with guidelines to find resolution that all parties can feel good about. I will definitely encourage my staff to follow.

Helpful   Comment   Report abuse

**See the review**

Write a customer review



KENNETH COLE

SHOP NOW

Ad feedback

Set up an Amazon Giveaway

11/2/2018      Amazon.com: The Healthcare Practitioners Guide to Conflict Engagement and Dispute Resolution eBook: Michael Schneider: Kindle Store

(77 of 303)

Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 77 of 303

Amazon Giveaway allows you to run promotional giveaways in order to create buzz, reward your audience, and attract new followers and customers. Learn more about Amazon Giveaway

**This item:** The Healthcare Practitioners Guide to Conflict Engagement and Dispute Resolution

Set up a giveaway

---

**Feedback**

If you need help or have a question for Customer Service, contact us.

Would you like to report poor quality or formatting in this book? Click here

Would you like to report this content as inappropriate? Click here

Do you believe that this item violates a copyright? Click here

---

Back to top

**Get to Know Us**
Careers
Blog
About Amazon
Press Center
Investor Relations
Amazon Devices

**Make Money with Us**
Sell on Amazon
Sell Under Private Brands
Sell on Amazon Handmade
Sell Your Services on Amazon
Sell on Amazon Business
Sell Your Apps on Amazon
Become an Affiliate
Advertise Your Products
Self-Publish with Us
› See all

**Amazon Payment Products**
Amazon Rewards Visa Signature Cards
Amazon.com Store Card
Amazon Business Card
Amazon.com Corporate Credit Line
Shop with Points
Credit Card Marketplace
Reload Your Balance
Amazon Currency Converter

**Let Us Help You**
Your Account
Your Orders
Shipping Rates & Policies
Amazon Prime
Returns & Replacements
Manage Your Content and Devices
Amazon Assistant
Help

English    United States

| | | | | | | |
|---|---|---|---|---|---|---|
| Amazon Music Stream millions of songs | Amazon Advertising Find, attract, and engage customers | Amazon Drive Cloud storage from Amazon | 6pm Score deals on fashion brands | AbeBooks Books, art & collectibles | ACX Audiobook Publishing Made Easy | Alexa Actionable Analytics for the Web |
| Amazon Business Everything For Your Business | AmazonFresh Groceries & More Right To Your Door | AmazonGlobal Ship Orders Internationally | Home Services Handpicked Pros Happiness Guarantee | Amazon Inspire Digital Educational Resources | Amazon Rapids Fun stories for kids on the go | Amazon Restaurants Food delivery from local restaurants |
| Amazon Web Services Scalable Cloud Computing Services | Audible Download Audiobooks | Book Depository Books With Free Delivery Worldwide | Box Office Mojo Find Movie Box Office Data | ComiXology Thousands of Digital Comics | CreateSpace Indie Print Publishing Made Easy | DPReview Digital Photography |
| East Dane Designer Men's Fashion | Fabric Sewing, Quilting & Knitting | Goodreads Book reviews & recommendations | IMDb Movies, TV & Celebrities | IMDbPro Get Info Entertainment Professionals Need | Junglee.com Shop Online in India | Kindle Direct Publishing Indie Digital Publishing Made Easy |
| Prime Now Ultrafast Delivery on Everyday Items | Amazon Photos Unlimited Photo Storage Free With Prime | Prime Video Direct Video Distribution Made Easy | Shopbop Designer Fashion Brands | Whole Foods Market America's Healthiest Grocery Store | Withoutabox Submit to Film Festivals | |
| Woot! Deals and Shenanigans | Zappos Shoes & Clothing | Souq.com Shop Online in the Middle East | Subscribe with Amazon Discover & try subscription services | PillPack Pharmacy Simplified | Amazon Renewed Refurbished products with a warranty | |

Conditions of Use   Privacy Notice   Interest-Based Ads   © 1996-2018, Amazon.com, Inc. or its affiliates

# EXHIBIT H

CONFIDENTIAL-DO NOT
REDISCLOSE OR DUPLICATE

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:**   **0977 1:17CR00077-001** |
| **JOHN HENRY SCHNEIDER** | ) | |
| | ) | |

**Prepared for:**      The Honorable Susan P. Watters
United States District Judge

**Prepared by:**       Ally Guldborg
United States Probation Officer
2601 2nd Ave North, Suite 1300
Billings, MT 59101
406-657-5923
ally_guldborg@mtp.uscourts.gov

**Assistant U.S. Attorney**
Colin M. Rubich
2601 2nd Avenue, Suite 3200
Billings, MT 59101
406-247-4684
Colin.Rubich@usdoj.gov

**Defense Counsel**
Colin M. Stephens
315 West Pine Street
Missoula, MT 59802-4119
406-721-0300
colin@smithstephens.com

John E. Smith
315 West Pine Street
Missoula, MT 59802-4119
406-721-0300
john@smithstephens.com

**Sentence Date:**      August 15, 2018 @ 1:30 PM

**Offense:**       **Count 3**:
Concealment of Bankruptcy Assets
18 U.S.C. § 152(1)
Not more than 5 years imprisonment/$250,000 fine
(Class D Felony)

**Release Status:**      Detained from September 17, 2017 to September 18, 2017

**Days Custody:**      1 day

**Date Report Prepared:  06/18/2018**          **Date Report Revised:  07/19/2018**

(80 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 40 of 139
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 80 of 303

**PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER**

**Detainers:**        None.

**Codefendants:**     None.

**Related Cases:**    None.

(81 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 41 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 81 of 303

# PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER

## Identifying Data:



| | |
|---|---|
| **Date of Birth:** | October 21, 1961 |
| **Age:** | 56 |
| **Race:** | White |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |

| | |
|---|---|
| **SSN:** | ███████ |
| **FBI#:** | ███████ |
| **USM#:** | █████ |
| **State ID#:** | None |
| **ICE#:** | None |
| **PACTS#:** | █████ |

| | |
|---|---|
| **Education:** | Doctorate |
| **Dependents:** | 0 |
| **Citizenship:** | U.S. Citizen |

| | |
|---|---|
| **Legal Address:** | 543 Camino De Orchidia |
| | Encinitas, California 92024 |

| | |
|---|---|
| **Residence Address:** | 543 Camino De Orchidia |
| | Encinitas, California 92024 |

| | |
|---|---|
| **Alias(es):** | Also Known As: Schneider Jr., John Henry |
| | Also Known As: Schneider, John Michael |
| | Also Known As: Schneider, John H |

| | |
|---|---|
| **Alternate IDs:** | None. |

*Restrictions on Use and Redisclosure of Presentence Investigation Report. Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.*

**PRESENCE REPORT FOR JOHN HENRY SCHNEIDER**

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.      On June 22, 2017, the Grand Jury for the District of Montana handed down a five-count Indictment charging the defendant, John Henry Schneider. Count I charged that on or about December 12, 2014, at Billings, in the State and District of Montana, the defendant knowingly and fraudulently made a false material statement under oath and in relation to a case under Title 11, In re: John Henry Schneider, Case No. 14-61357, by falsely swearing under oath in the Statement of Financial Affairs filed with the United States Bankruptcy Court on December 12, 2014, that the Statement of Financial Affairs was true and correct, when, in fact, it was not true or correct as it had omitted financial transfers of approximately $539,736.22, personal property valued at approximately $15,495 and financial assets of approximately $309,686.00, in violation of 18 U.S.C. § 152(2). Count II charged that on or about January 23, 2015, at Billings, in the State and District of Montana, the defendant knowingly and fraudulently made a false material statement under oath and in relation to a case under Title 11, In re: John Henry Schneider, Case No. 14-61357, by falsely testifying under oath in a proceeding before the case trustee at a meeting of creditors that the Statement of Financial Affairs filed with the United States Bankruptcy Court on December 12, 2014, was accurate and complete, when, in fact, it was not accurate or complete as it had omitted financial transfers of approximately $539,736.22, personal property valued at approximately $15,495 and financial assets of approximately $309,686.00, in violation of 18 U.S.C. § 152(2). Count III charged that on or about December 12, 2014, at Billings, in the State and District of Montana, the defendant, John Henry Schneider, did knowingly and fraudulently conceal property belonging to his bankrupt estate, Bankruptcy Case No. 14-61357, specifically U.S. Bank Account Number 1-500-9160-2881 containing approximately $309,686.00, from the trustee charged with control of the debtor's property and from the creditors and the United States Trustee, in violation of 18 U.S.C. § 152(1). Count IV charged that on or about December 12, 2014, at Billings, in the State and District of Montana, the defendant did knowingly and fraudulently conceal property belonging to his bankrupt estate, Bankruptcy Case No. 14-61357, specifically a 2001 Harley Davidson Motorcycle, from the trustee charged with control of the debtor's property and from the creditors and the United States Trustee, in violation of 18 U.S.C. § 152(1). Count V charged that from on or about March 11, 2013 until on or about May 3, 2014, at Billings, in the State and District of Montana, the defendant, in contemplation of bankruptcy against his personal estate, did knowingly and fraudulently transfer approximately $539,736.22 to an individual known as K.B. with the intent to defeat the provisions of Title 11, all in violation of 18 U.S.C. § 152(7). A summons was issued for the defendant on that date.

2.      On July 24, 2017, the Grand Jury for the District of Montana handed down a five-count Superseding Indictment charging the defendant. Count I charged that on or about December 12, 2014, at Billings, in the State and District of Montana, the defendant knowingly and fraudulently made a false material statement under oath and in relation to a case under Title 11, In Re: John Henry Schneider, Case No. 14-61357, by falsely swearing under oath in the Statement of Financial Affairs filed with the United States Bankruptcy Court on December 12, 2014, that the Statement of Financial Affairs was

4

(83 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 43 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 83 of 303

PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER

true and correction, when, in fact, it was not true or correction as it had omitted financial transfers of approximately $539,736.22, personal property valued at approximately $15,495 and financial assets of approximately $309,686.00, in violation of 18 U.S.C. § 152(2). Count II charged that on or about January 23, 2015, at Billings, in the State and District of Montana, the defendant knowingly and fraudulently made a false material statement under oath and in relation to a case under Title 11, In re: John Henry Schneider, Case No. 14-61357, by falsely testifying under oath in a proceedings before the case trustee at a meeting of creditors that the Statement of Financial Affairs filed with the United States Bankruptcy Court on December 12, 2014, was accurate and complete, when, in fact, it was not accurate or complete as it had omitted financial transfers of approximately $539,736.22, personal property valued at approximately $15,495 and financial assets of approximately $309,686.00, in violation of 18 U.S.C. § 152(2). Count III charged that on or about December 12, 2014, at Billings, in the State and District of Montana, the defendant dis knowingly and fraudulently conceal property belonging to his bankrupt estate, Bankruptcy Case No. 14-61357, specifically U.S. Bank Account number 1-500-9160-2881 containing approximately $309,686.00, from the trustee charged with control of the debtor's property and from the creditors and the United States Trustee, in violation of 18 U.S.C. § 152(1). Count IV charged that on or about December 12, 2014, at Billings, in the State and District of Montana, the defendant did knowingly and fraudulently conceal property belonging to his bankrupt estate, Bankruptcy Case No. 14-61357, specifically a Harley Davidson Motorcycle, from the trustee charged with control of the debtor's property and from the creditors and the United States Trustee, in violation of 18 U.S.C. § 152(1). Count V charged that from on or about March 11, 2013, until on or about May 3, 2014, at Billings, in the State and District of Montana, the defendant, in contemplation of bankruptcy against his personal estate, did knowingly and fraudulently transfer approximately $539,736.22 to an individual known as K.B. with the intent to defeat the provisions of Title 11, all in violation of 18 U.S.C. § 152(7). A summons was issued for the defendant on that date.

3.   On August 29, 2017, a docket call for the defendant was held before United States Magistrate Judge Timothy J. Cavan. The defendant failed to appear for this hearing. The Court was advised the defendant had not accepted service of the summons and a warrant was issued for the defendant on that date. *(The defendant asserts at the time the Summons was issued, the defendant was living and working in Iowa City, Iowa, as a neurosurgeon at the Veteran's Administration hospital there. The Marshals Service, apparently unaware of the defendant's living address in Iowa, attempted service by certified mail at the defendant's prior Billings, Montana, address and at the home in Encinitas, California, where the defendant's wife, Michelle Schneider, was residing at that time. Michelle Schneider never claimed the certified mail, thus she never knew its' contents. The defendant was not aware that he had been criminally charged until his arrest in California on September 17, 2017, as he exited Sunday church services with his wife and youngest daughter.)*

4.   On September 17, 2017, the defendant was arrested in the Southern District of California. He made a Rule 5 initial appearance before United States Magistrate Judge Karen S. Crawford on September 18, 2017, and was released on his own recognizance pending removal to the district in which he was charged.

PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER

5.   On October 12, 2017, the defendant appeared before Judge Cavan for an Arraignment. The defendant pled not guilty to the Superseding Indictment and was released without Pretrial supervision.

6.   On April 18, 2018, the defendant appeared before United States District Judge Susan P. Watters for a Change of Plea Hearing. The defendant pled guilty to Count III of the Superseding Indictment.

7.   The defendant was released with no Pretrial supervision.

**The Offense Conduct**

8.   Investigative reports from the United States Attorney's file and contact with the case agent revealed the following:

9.   In 2008, John Henry Schneider purchased a property located at 12735 Hidden Valley Trail in Molt, Montana, for $325,000. In June 2009, he conveyed the property to Schneider LP. On May 30, 2012, Schneider LP deeded the property back to Schneider. At Schneider's direction, his sister, Kathleen Burrows, executed the deed to Schneider in her capacity as manager of Schneider Management, which was the general partner of Schneider LP. On the same date, Schneider deeded the property to Burrows in her individual capacity. Schneider received no consideration or value for this transfer.

10.  Burrows sold the Molt property on January 11, 2013, for $325,000, with net proceeds to Kathleen Burrows of $296,501.70. Burrows and Schneider agreed that Burrows would keep approximately $150,000 and Schneider would get $146,000 of the net proceeds from this sale. Schneider specifically instructed Burrows not to give the money back to him, but instead, to open a new bank account in US Bank in her name, in which to keep the remainder of the sale proceeds.

11.  On March 11, 2013, Burrows opened US Bank account number 1-500-9160-2881 in her own name. On that date, Burrows deposited $146,000 from the property sale into the account. At the same time, Schneider deposited $55,000 of his money into the new account.

12.  On March 18, 2013, Schneider deposited an additional $338,736.22 of his own funds into the account.

13.  Between the time the account was opened and December 12, 2014, Schneider deposited a total of approximately **$539,736.22** into the account. These assets belonged to Schneider. Despite the account being in Burrows's name, Schneider exercised complete actual control over the funds in the account. He had possession of the ATM card for this account and regularly withdrew money for his personal use.

14.  On December 4, 2014, Schneider filed a chapter 7 bankruptcy case. He filed his Schedules of Assets and Liabilities and Statement of Financial Affairs on December 12, 2014, under penalty of perjury. His summary of schedules listed assets valued at $20,938,721 and liabilities totaling $5,558,993. He later amended his schedules several

**PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER**

times, first to add other unsecured creditors, and then to add a 2007 GMC van as an asset, and the Montana Commissioner of Securities and Insurance as a disputed creditor. *(The defendant asserts that of the $20,313,720.78 in assets declared in the defendant's bankruptcy schedules, the defendant listed three highly speculative civil claims totaling $18,335,000, which represented between 87% and 88% of the total assets he listed. These claims were all later determined by the Trustee to have no value, so they were not pursued.)*

15.    In his Schedule B (Personal Property), Schneider listed only one vehicle, namely a 2001 GMC Sierra. On December 15, 2014, Womack ran a DMV search which indicated Schneider was the record owner of a 2001 Harley Davidson motorcycle. Schneider told Womack he had given this motorcycle to his brother-in-law, Alan Burrows, in 2002. During a deposition of Kathleen Burrows, Burrows denied any ownership interest in the motorcycle. Instead, she stated Schneider owned the motorcycle and kept it at his residence in Billings.

16.    In February 2015, Burrows informed Schneider that given his bankruptcy, she did not want his funds in a bank account in her name. Schneider provided Burrows with Michelle Schneider's bank account information, and Burrows transferred the remaining **$305,045.50** into Michelle Schneider's bank account. Though this account closure occurred during the bankruptcy proceedings, this check and the assets were not turned over to the bankruptcy trustee and were never disclosed by Schneider.

17.    When Schneider declared bankruptcy on December 12, 2014, there was **$308,945.00** remaining in the account. Once bankruptcy was declared, this bank account and the monies it contained were assets that rightfully belonged to the bankrupt estate. As such, Schneider should have declared these assets on the Statement of Financial Affairs which was filed when Schneider declared bankruptcy. Schneider failed to do this. Schneider was fully aware of these assets and had access to them during this time.

18.    During the course of the bankruptcy, Schneider was repeatedly given opportunities to disclose this bank account and other assets that belonged to him, but he failed to do so. The initial meeting of creditors was conducted by Joseph Womack on January 23, 2015. During that meeting, Schneider testified under oath and affirmed that all of the information contained in his Schedules and Statement of Financial Affairs was accurate and complete to the best of his knowledge, and that he did not have any corrections or amendments to make. Additionally, during a creditors meeting held on March 23, 2015, Schneider was asked about his interest in bank accounts. Schneider did not reveal the bank account in his sister's name, and he claimed to have only $500 on the bankruptcy petition date.

**Victim Impact**

19.    The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense. The United States Probation Office has received several victim impact statements. These statements will be provided to the Court prior to sentencing.

**PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER**

20.     Joseph Womack, Chapter 7 Panel Bankruptcy Trustee, submitted a victim impact statement in which he requested restitution in the following amount: $309,686.00, which was the average balance of the bank account between November 20, 2014, and December 16, 2014, $604,142.93 in attorney's fees incurred by the bankruptcy estate, $16,032.89 in costs related to adversary litigation, and at $250,000 to be paid to the estate. The Probation Office contacted Joseph Womack, who advised he is requesting restitution in the amount of $309,686.00. Mr. Womack indicated he intends to collect restitution into the bankruptcy estate to disburse to the defendant's unsecured creditors, including several personal injury claimants, as well as the Wyoming Board of Medicine. Mr. Womack advised at this time, there is only enough money in the bankruptcy estate to cover approximately 25% of these claims.

21.     It is recommended restitution in the amount of **$308,945.00** be awarded in this case. This number represents the actual amount of money in the bank account at the time the defendant filed for bankruptcy.

### Adjustment for Obstruction of Justice

22.     The probation officer has no information indicating the defendant impeded or obstructed justice.

### Adjustment for Acceptance of Responsibility

23.     The defendant provided a statement to the probation officer wherein admitting involvement in the offense. Further, the defendant provided the following written statement (verbatim):

> *"John H. Schneider: Statement accepting responsibility.*
>
> *I accept full and exclusive responsibility for my actions recognizing that my knowing failure to disclose a particular bank account (described in Count III of the Indictment and Section 4 of my Plea Agreement) during my federal bankruptcy proceedings, concealed this account from the Trustee which was fraudulent.*
>
> *Dated this 18 day of April 2018.*
>
> *John H. Schneider"*

### Offense Level Computation

24.     The 2016 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

### Count 3: Concealment of Bankruptcy Assets

25.     **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 152(1) is USSG §2B1.1. The base offense level is 6. USSG §2B1.1(a)(2).                    **6**

(87 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 47 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 87 of 303

PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER

26. **Specific Offense Characteristics:** Pursuant to USSG § 2B1.1(b)(1)(G), if the loss exceeded $250,000, the offense level should be increased by 12 levels. **+12**

27. **Specific Offense Characteristics:** Pursuant to USSG § 2B1.1(b)(9)(B), if the offense involved misrepresentation or other fraudulent action during the course of a bankruptcy proceeding, the offense level should be increased by 2 levels. **+2**

28. **Victim Related Adjustment:** None. **0**

29. **Adjustment for Role in the Offense:** None. **0**

30. **Adjustment for Obstruction of Justice:** None. **0**

31. **Adjusted Offense Level (Subtotal):** **20**

32. **Chapter Four Enhancement:** None. **0**

33. **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a). **-2**

34. **Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b). **-1**

35. **Total Offense Level:** **17**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

36. A criminal record check was conducted through NCIC and State of Montana Identification Bureau. Contact was also made with Los Angeles County Superior Court.

   **Juvenile Adjudication(s)**

37. None.

   **Adult Criminal Conviction(s)**

38. None.

   **Criminal History Computation**

39. The criminal convictions above result in a subtotal criminal history score of zero.

40. The total criminal history score is zero. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I.

(88 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 48 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 88 of 303

PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER

### Other Criminal Conduct

41.  None.

### Pending Charges

42.  None.

### Other Arrests

| | Date of Arrest | Charge | Agency | Disposition |
|---|---|---|---|---|
| 43. | 12/25/1990 (Age 29) | Carry a Loaded Firearm on Person or in Vehicle while in a Public Place (M); Case No.: 91M0029 | Burbank Municipal Court, Burbank, CA | Unknown |

Attorney representation is unknown. Due to the age of the offense, no information regarding the circumstances was available. All California Municipal and lower courts were converted to Superior Courts in 2001. Records have been requested from Los Angeles County Superior Court; however, due to the age of the offense, all court records have been purged.

## PART C. OFFENDER CHARACTERISTICS

The following information was gathered through an interview with the defendant and contact with the defendant's wife, Michelle Schneider.

### Personal and Family Data

44.  The defendant, age 56, was born in Norwalk, Connecticut, to the union of John and Ann Mary Schneider. The defendant reported his father passed away as the result of a heart attack in 1994, and his mother passed away due to emphysema in 1994. The defendant's wife confirmed this.

45.  The defendant has two siblings: Charles Schneider, age 54, and Kathleen Burrows, age 58. The defendant reported he has not had contact with his brother for four years and does not know where his brother resides. According to the defendant, he has had no contact with his sister since 2015, as she was involved in the instant offense. The defendant reported his sister resides in Chino Hills, California. The defendant's wife reported the defendant has not had contact with his brother or sister because he "stopped loaning them money."

**PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER**

46.    The defendant described his upbringing as normal, indicating his family lived a "lower-middle class suburban" lifestyle. The defendant denied any history of abuse, although he reported his mother would punish him by giving him "the silent treatment" and emotionally disconnecting from him for weeks at a time.

47.    The defendant reported when he was approximately two years old, his family moved to Hingham, Massachusetts, where they resided until the defendant was approximately 14 years old. They then moved to Mission Viejo, California, for approximately one year. The defendant reported after this, his family moved to Thousand Oaks, California. The defendant resided in Thousand Oaks until he moved to Los Angeles, California, to attend college. From approximately 1994 to 1997, the defendant resided in San Antonio, Texas. He resided in Billings, Montana, from 1997 to 2004. In 2004 and 2005, he resided in Bountiful, Utah. From 2005 to 2012, the defendant resided in Powell, Wyoming. The defendant then resided between Billings, Encinitas, California, and Utah until 2017, when he moved to Iowa City, Iowa. The defendant has resided in Encinitas, California, since December 2017.

48.    In 1992, the defendant married Michelle Schneider in Los Angeles. They have three children. Brandon Schneider, age 25, resides in Bloomington, Minnesota, and works as an analyst for investment firms. Shannon Schneider, age 24, resides in Vista, California, and works in marketing and food service for Lego Land. Caitlin Schneider, age 20, resides with the defendant in Encinitas. She works with a Wildlife Rescue Center and Human Society. The defendant reported he has frequent contact with all of his children. The defendant's wife reported the defendant is a good father and is very close with his three children.

### Physical Condition

49.    The defendant stands 5'7" tall, weighs 195 pounds, has brown hair and brown eyes. The defendant reported no identifiable scars or tattoos.

50.    The defendant reported he suffers from osteoarthritis in both knees. He reported he also suffers from peptic ulcer disease. The defendant reported he has presbyopia sicca, which is a condition in which his tear ducts are drying out. He believes he also suffers from borderline hypertension and sleep apnea; however, he has not received medical treatment for these conditions. The defendant's wife confirmed this information.

### Mental and Emotional Health

51.    The defendant reported he has never been diagnosed with a mental health condition. He reported when he was 41 years old, he sought counseling for stress. He denied any need for further mental health treatment. The defendant's wife reported she does not believe the defendant needs any sort of mental health treatment.

PRESENCE REPORT FOR JOHN HENRY SCHNEIDER

### Substance Abuse

52.   The defendant reported he first consumed alcohol when he was a medical student at approximately age 24 or 25. He reported he consumes approximately four to five alcoholic beverages per week. The defendant denied any use of illicit substances and he does not believe he needs substance abuse treatment.

### Educational, Vocational and Special Skills

53.   The defendant reported he graduated from Thousand Oaks High School in Thousand Oaks, California, in 1979.

54.   He advised he received a Bachelor's Degree from the University of Southern California in 1983. A transcript from the University of Southern California reflects the defendant was awarded a Bachelor of Science in Biological Sciences on May 13, 1983.

55.   The defendant advised he graduated from medical school at the University of Southern California in 1987. He later went on to become a board-certified neurosurgeon. Records received from the University of Southern California, Department of Neurological Surgery confirmed the defendant completed postgraduate training in 1994. Records received from the American Board of Neurological Surgery confirmed the defendant became board-certified on November 13, 1997.

56.   In 2016, the defendant received a Master's Degree in Negotiation Dispute Resolution from Creighton Law School in Omaha, Nebraska.  A transcript from Creighton University School of Law indicated the defendant was awarded a Master of Science Degree in Negotiation and Dispute Resolution on December 17, 2016.

57.   The defendant has an expired Physician & Surgeon license from the State of Utah. This license was issued on January 31, 2016, and expired on January 31, 2018. The defendant relinquished his State of Montana Medical Doctor License on April 15, 2018.

58.   The defendant reported he served in the Air Force from 1994 to 2001. Records received from the United States Air Force confirm the defendant enlisted on July 5, 1994. During his time in service, he received the Air Force Achievement Medal, the Air Force Outstanding Unit Award, and the Air Force Training Ribbon. The defendant was honorably discharged on February 5, 2001. The defendant remained on inactive reserve with the Air Force until 2008.

### Employment Record

59.   Since approximately 2005, the defendant has been self-employed. He advised he has been self-employed as Chief Medical Officer and Medical Director at MedPort, LLC. since approximately September 2014. He reported he was in private practice in Bountiful, Utah, from June 2014 to January 2017. Prior to this, from June 2005 to June 2014, he was employed full time as a private practice Neurological Surgeon. He reported he operated clinics in Billings and Bountiful, Utah. The defendant reported during this time, his pay

(91 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 51 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 91 of 303

**PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER**

varied depending on how many surgeries he performed and insurance billing. The defendant's wife confirmed this.

60.   The defendant reported he is currently working on opening a healthcare-specific dispute resolution firm called Principal-Provider Resolutions.

61.   From May 2017 to December 2017, the defendant was employed as a neurosurgeon at the VA Medical Center at the University of Iowa. He earned a salary of $385,000 per year and was fired because his medical license had been revoked in Wyoming. Records received from the U.S. Department of Veterans Affairs confirmed the defendant was hired as a neurosurgeon on May 1, 2017, and was terminated on November 29, 2017. *(The defendant asserts that he was not fired from his employment with the Veteran's Administration in 2017. When he applied for the position in December 2016, he disclosed that his medical licenses in Montana and Utah were current and active. He also disclosed that Wyoming had revoked his medical license there. He was hired as the neurosurgeon and began work on May 1, 2017. A USA Today article aimed at VA practices at facilities nation-wide included information that the defendant's hiring had been in violation of VA policies due to the status of his medical license in Wyoming. When this was discovered, the defendant had no choice but to resign, which he did on November 29, 2017.)*

62.   The defendant reported from September 2014 to October 2016, he was employed as a Surgical Consultant. He also reported he performed on-site education, product development, and remote international surgical instruction at Elite Spine Surgeons and Alphatec Spine Corporation in Carlsbad, California.

**Financial Condition: Ability to Pay**

63.   The following information was obtained from a personal financial statement from the defendant, a review of the defendant's 2017 tax return, and a review of financial documents provided by the defendant.

64.   The defendant resides at 543 Camino De Orchidia in Encinitas, California. This residence was purchased by Medport, LLC for $1,900,000. The current value of this home is $2,414,628.00. The home is owned by the irrevocable trusts of his children, Brandon Schneider, Shannon Schneider and Caitlin Schneider, as well as the Michelle Schneider Benefit Trust as Tenants in Common. John Schneider has no ownership interest or equity in this residency. Each of these trusts is currently worth $603,657.00; however, the value of these trusts is not static but is tied to the fair market value of the property, which can fluctuate up and down.

65.   The defendant has a USAA IRA-pension/401K (Account No. RRU-740309) valued at $1,746,987.79.

(92 of 303)

Case: 18-30187 11/21/2018 ID: 11095749 DktEntry: 26-2 Page 52 of 139
Case 1:17-cr-00077-SPW Document 72 Filed 11/26/18 Page 92 of 303

**PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER**

66.     The defendant is currently in control of a commercial checking account in the name of Northern Rockies Neuro-Spine, PC, which has a balance of $1,500. He has a commercial savings account in the name of Medport, LLC with a balance of -$9.85. *(The defendant asserts that he is a signor only on the Medport, LLC account. He does not own the bank account or the company.)*

67.     The defendant has three life insurance policies. He has a Riversource variable life insurance policy with a face amount of $5,000,000. He also has a Minnesota Life term life insurance policy with a face amount of $1,500,000. The defendant has a Prudential term life insurance policy with a face amount of $2,000,000.

68.     The defendant expects to receive $50,000 from the estate of his aunt, Mary Lu Cuthrell.

69.     According to the defendant, he is involved in litigation in Yellowstone County (Northern Rockies Neuro-Spine, P.C.; Schneider Limited Partnership v. ONI Realty Investors, LLC; Ty Samples Investments, Inc., f/k/a Samples Properties, Inc; Prime Healthcare Properties, LLC; Tyrone Samples; Mark Samples; DOES 1-10) The defendant reported he expects to receive $50,000 as a result of this litigation.

70.     A review of the defendant's 2017 tax return revealed the defendant reported losses in the amount of $233,867.00 in 2017.

71.     The following information was obtained from a personal financial statement provided by the defendant and a TransUnion credit report.

**Assets**

| | | |
|---|---|---|
| Vehicle | 2007 GMC Savanna Van | $2,500.00 |
| Personal Checking Account | USAA | $12,600.00 |
| **Total Assets** | | $15,100 |

**Liabilities**

| | | |
|---|---|---|
| Credit Card | Amex | $9,898.00 |
| Credit Card | USAA | $3,840.00 |
| Other Liability Type | Harold V. Dye Attorney Fees | $15,350.00 |
| Other Liability Type | Watts Group Break of Lease in Iowa City, IA | $4,518.03 |
| Other Liability Type | Collection Professional NRNS | $4,100.00 |
| **Total Liabilities** | | $37,706.03 |
| **Total Net Worth** | | ($22,606.03) |

14

PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER

### Monthly Income

| | |
|---|---:|
| Business Income | $35.00 |
| Dividend Income | $240.69 |
| Interest Income | $0.49 |
| Spouse Income | $791.58 |
| **Total Monthly Income** | **$1,067.76** |

### Monthly Expenses

| | | |
|---|---|---:|
| Groceries and Supplies | | $750.00 |
| Utilities | Electric | $395.20 |
| Utilities | Heating | $327.61 |
| Gas | | $125.00 |
| Auto Insurance | | $278.75 |
| Medical Expenses | | $75.00 |
| Life Insurance | Minn Life | $140.44 |
| Life Insurance | Prudential | $220.05 |
| Home/Mortgage | Property Taxes (1/3 Share) | $638.89 |
| **Total Monthly Expenses** | | **$2,950.94** |
| **Total Monthly Cash Flow** | | **($1,883.18)** |

72.    The defendant reported the following business holdings:

| Business entity | Approx. date | Established location | Active | Ownership, including changes | Current Value owned by John Schneider |
|---|---|---|---|---|---|
| Northern Rockies Neuro Spine, PC | July 2008 | Yellowstone County, MT | No | JHS 100% 2005-2014 | Only active insofar as Collection Professionals are working old A/R account – approximately $35/ month. Business (no longer in practice) is a plaintiff in claim against Samples et al, filed in Yellowstone County MT. NRNS was a medical practice; John Schneider no longer |

15

**PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER**

|  |  |  |  |  | practices medicine |
|---|---|---|---|---|---|
| B S C, LLC | June 2006 | Park County WY | No | 1/3 ownership each of three Schneider children 2006-2010 when company closed. Was the owner of Whispering Winds Ranch, WY | $0.00. Forfeited in settlement AP 15-20 for all Schneider entities. |
| Schneider Management, LP | May 2012 | Park County WY | Yes | Inception – company owned 50/50 by the revocable trusts of John and Michelle Schneider. Asset was 1% and only general partner to Schneider limited partnership | $0.00. Upon chapter 7 BK filing, operational documents call for all shares and rights to be forfeited to other partner. In addition, settlement agreement (May 2016) in AP 15-20 details Michelle Schneider 100% ownership of this asset. |
| Schneider Limited Partnership, LLC | May 2012 | Park County WY | Yes | Inception – the revocable trusts of John and Michelle Schneider each owned 49% of Schneider limited partnership class B shares. | $0.00. Upon chapter 7 BK filing, operational documents call for all shares and rights to be forfeited to other partner. In addition, settlement agreement (May 2016) in AP 15-20 details Michelle Schneider 100% ownership of this asset. |
| John Schneider revocable trust | May 2007 | Park County, WY | No | 100% owned by John H Schneider | Trust value was in its ownership of Schneider management and Schneider limited partnership. Forfeited in chapter |

16

PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER

| | | | | | 7 filing and settlement in AP 15-20. The trust was NOT revoked in the BK. |
|---|---|---|---|---|---|
| Medport, LLC | May 2012 | Park County, WY | Yes | Initial 50/50 ownership between Kathleen Burrows and Brandon Schneider. Funded by John Schneider. After 11/02/2014, Burrows's involvement as manger and share owner dropped to zero with shares transferred to Michelle Schneider and Brandon Schneider. Medport, LLC is currently owned by his children and wife's irrevocable trusts. | $ 0.00. John Schneider functions as chief medical officer and accepted board position in 2016. John Schneider has never owned any shares of this company and only became a signer on US Bank account noted in PSR net worth scheduled. Current savings account value (as of arrest of John Schneider is zero. |
| Schneider Children's Irrevocable trusts (three separate trusts) | 3/2012 | Park County, WY | Yes | 100% owned by individual Schneider child. Initial trustee Kathleen Burrows until 3/2015, changing to Michelle Schneider. | $0.00 Michelle Schneider has exclusive access to trust finances. Trusts own real estate at 543 Camino De Orchidia, Encinitas Ca. |

73.    Based on information contained in this presentence report, it appears the defendant does have the ability to pay a fine within the guideline range.

(96 of 303)

Case: 18-30187 11/21/2018 ID: 11095749 DktEntry: 26-2 Page 56 of 139
Case 1:17-cr-00077-SPW Document 72 Filed 11/26/18 Page 96 of 303

**PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER**

## PART D. SENTENCING OPTIONS

### Custody

74.  **Statutory Provisions:** The maximum term of imprisonment is five years. 18 U.S.C. § 152(1).

75.  **Guideline Provisions:** Based upon a total offense level of 17 and a criminal history category of I, the guideline imprisonment range is 24 months to 30 months.

### Impact of Plea Agreement

76.  The plea agreement adequately reflects the seriousness of the offense conduct. Had the defendant pled guilty to all counts, the loss would have been greater; therefore, the plea agreement has impacted the defendant's Guideline calculation.

### Supervised Release

77.  **Statutory Provisions:** The Court may impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2).

78.  **Guideline Provisions:** Since the offense is a Class D Felony, the guideline range for a term of supervised release is 1 year to 3 years. USSG §5D1.2(a)(2).

### Probation

79.  **Statutory Provisions:** The defendant is eligible for not less than one nor more than five years probation because the offense is a Class D Felony. 18 U.S.C. § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service.

80.  **Guideline Provisions:** Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. USSG §5B1.1, comment.(n.2).

### Fines

81.  **Statutory Provisions:** The maximum fine is $250,000. 18 U.S.C. § 3571(b).

82.  A special assessment of $100 is mandatory. 18 U.S.C. § 3013.

83.  **Guideline Provisions:** The fine range for this offense is from $5,000 to $50,000. USSG §§5E1.2(c)(3) and (h)(1).

84.  Costs of prosecution shall be imposed on the defendant as required by statute. USSG §5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. USSG §5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol

**PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER**

treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated July 13, 2017, provides the following monthly cost data:

|  | Bureau of Prisons Facilities | Community Correction Centers | Supervision by Probation Officer |
|---|---|---|---|
| Daily | $95.00 | $80.00 | $12.00 |
| Monthly | $2,898.00 | $2,440.00 | $366.00 |
| Annually | $34,770.00 | $29,280.00 | $4,392.00 |

### Restitution

85.   **Statutory Provisions:** Pursuant to 18 U.S.C. § 3663A, restitution in the total amount of $308,945.00 shall be ordered in this case. Restitution, as set forth below, is due and owing to the following victims: Joseph Womack, Chapter 7 Panel Bankruptcy Trustee.

86.   **Guideline Provisions:** Restitution shall be ordered. USSG §5E1.1.

### Denial of Federal Benefits

87.   **Statutory Provisions:** None.

88.   **Guideline Provisions:** None.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

89.   The probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.

## PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

90.   The Court may consider factors under 18 U.S.C. § 3553(a) that might warrant sentencing the defendant outside the advisory guideline range.

*Based on information contained in the presentence report, the Court may wish to consider imposing the following special conditions:*

### Recommendation

91.   The defendant will provide the United States Probation Officer with any requested financial information and shall incur no new lines of credit without prior approval of the United States Probation Officer. You must notify the Probation Officer of any material changes in your economic circumstances that might affect your ability to pay restitution, fines or special assessments.

(98 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 58 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 98 of 303

PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER

92.    The defendant shall pay restitution in the amount of $308,945.00. The defendant is to
       make payments at a rate of $12,872.70 per month, or as otherwise directed by United
       States Probation. Payment shall be made to the Clerk, United States District Court, 2601
       2nd Avenue North, Billings, MT 59101 and shall be disbursed to Joseph Womack,
       Chapter 7 Panel Bankruptcy Trustee.

93.    The defendant shall submit their person, residence, place of employment, vehicles, and
       papers, to a search, with or without a warrant by any probation officer based on
       reasonable suspicion of contraband or evidence in violation of a condition of release.
       Failure to submit to search may be grounds for revocation. The defendant shall warn any
       other occupants that the premises may be subject to searches pursuant to this condition.
       The defendant shall allow seizure of suspected contraband for further examination.

                              Respectfully Submitted,

                              Thomas M. Holter
                              Chief United States Probation Officer

                  By:    Ally Guldborg
                         United States Probation Officer

Approved:

Brian R. Farren
Supervising United States Probation Officer

## ADDENDUM TO THE PRESENCE REPORT

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### UNITED STATES V. JOHN HENRY SCHNEIDER, DKT. 0977 1:17CR00077-001

### OBJECTIONS

#### By the Government

The government has not provided the probation office with any outstanding objections or corrections to the presentence report.

#### By the Defendant

Neither the defendant nor counsel has any outstanding objections or corrections to the presentence report.

The following changes have been made to the final presentence report:

- Paragraph 3: An explanation from the defendant was added.
- Paragraph 10: This paragraph was updated following clarification from defense counsel.
- Paragraph 14: An explanation from the defendant was added.
- Paragraph 17: The monetary value of the bank account was updated following clarification from defense counsel.
- Paragraph 20: This paragraph was updated following a conversation with Joseph Womack.
- Paragraph 21: The amount of restitution recommended has been updated to reflect the opinion of the U.S. Supreme Court in *Lagos v. U.S.,* 2018 U.S. Lexis 3209(2018).
- Paragraph 43: This paragraph was updated following receipt of information from Los Angeles County Superior Court.
- Paragraph 58: An explanation from the defendant was added.
- Paragraph 61: An explanation from the defendant was added.
- Paragraph 64: This paragraph was updated following clarification from defense counsel.
- Paragraph 66: An explanation from the defendant was added.
- Paragraph 68: This paragraph was updated following clarification from defense counsel.
- Paragraph 71: The defendant's lease break was updated to reflect it occurred in Iowa City, Iowa.
- Paragraph 72: Information regarding Medport, LLC was updated following clarification from defense counsel.

**ADDENDUM TO THE PRESENTENCE REPORT FOR JOHN HENRY SCHNEIDER**

Respectfully Submitted,

Thomas M. Holter
Chief U.S. Probation Officer

By:    Ally  Guldborg
United States Probation Officer

Approved:

Brian R. Farren
Supervising United States Probation Officer

2

# EXHIBIT I

(102 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 62 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 102 of 303          1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )   Criminal Docket
                                   )
JOHN HENRY SCHNEIDER,              )   No. CR 17-77-BLG-SPW
                                   )
          Defendant.               )
_____    )

Transcript of Sentencing

Heard in Snowy Mountains Courtroom
James F. Battin United States Courthouse
2601 Second Avenue North
Billings, Montana
Wednesday - August 15, 2018
1:31 p.m. - 3:20 p.m.

BEFORE THE HONORABLE SUSAN P. WATTERS

UNITED STATES DISTRICT JUDGE

REBECCA M. SABO, RPR, CRR
United States Court Reporter
James F. Battin United States Courthouse
2601 Second Avenue North, Room 4209
Billings, Montana 59101
rebecca_sabo@mtd.uscourts.gov
(406) 855-6410

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

APPEARANCES


PRESENT ON BEHALF OF THE PLAINTIFF,
THE UNITED STATES OF AMERICA:

      Colin M. Rubich
      Assistant U.S. Attorney
      OFFICE OF THE U.S. ATTORNEY
      2601 Second Avenue North, Room 3200
      Billings, Montana 59101


PRESENT ON BEHALF OF THE DEFENDANT,
JOHN HENRY SCHNEIDER:

      John E. Smith, Esq.
      SMITH & STEPHENS
      P.O. Box 7337
      Missoula, Montana 59807-7337

(104 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 64 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 104 of 303         3

                              PROCEEDINGS

 1

 2         (Open court.)

 3         (Defendant present.)

 4              THE COURT:  Please be seated.

 5              Emily, would you please call the next matter on the

 6  calendar.

 7              THE CLERK:  Yes, Your Honor.

 8              The Court has set aside this time to hear the matter

 9  of CR 17-77-BLG-SPW, United States versus John Henry Schneider.

10  This is the time set aside for a sentencing.

11              THE COURT:  For the record, Colin Rubich appears on

12  behalf of the government, John Smith appears on behalf of the

13  defendant, and the defendant is present.

14              I have received and reviewed the presentence report,

15  the sentencing memoranda filed by counsel, the letters and the

16  victim impact statements that were provided.

17              Mr. Rubich, did you receive and review the

18  Presentence Investigation Report?

19              MR. RUBICH:  I did, Your Honor.

20              THE COURT:  And do you have any objections to that

21  report?

22              MR. RUBICH:  No, Your Honor.

23              THE COURT:  Are you recommending that the defendant's

24  offense level be decreased by 2 levels for acceptance of

25  responsibility pursuant to Section 3E1.1(a), and do you move

01:32:15PM   1   for an additional 1-level decrease for timely notification of

01:32:19PM   2   plea pursuant to Section 3E1.1(b)?

01:32:21PM   3           MR. RUBICH:  I recommend and I do so move.

01:32:24PM   4           THE COURT:  That request and motion are granted.

01:32:27PM   5       Mr. Smith, did you receive the presentence report?

01:32:32PM   6           MR. SMITH:  Yes, I did, Judge.

01:32:33PM   7           THE COURT:  Did you have an opportunity to go through

01:32:34PM   8   that report in its entirety with Mr. Schneider?

01:32:37PM   9           MR. SMITH:  Yes, I did.

01:32:39PM  10           THE COURT:  And do you have any objections to the

01:32:40PM  11   presentence report?

01:32:41PM  12           MR. SMITH:  We have no objections.

01:32:42PM  13           THE COURT:  Thank you.

01:32:43PM  14       I will adopt the presentence report without objection

01:32:46PM  15   and rely on it for purposes of calculating the advisory

01:32:50PM  16   sentencing guidelines.

01:32:51PM  17       I will accept the plea agreement that has been filed

01:32:54PM  18   in this case, and I will now summarize the applicable

01:32:58PM  19   punishments for the offense under both the United States

01:33:02PM  20   Sentencing Guidelines and the applicable statute.

01:33:04PM  21       With regard to the guidelines, the adjusted offense

01:33:06PM  22   level is 20.  And we arrive at that by beginning with a base

01:33:12PM  23   offense level of 6, adding 12 levels for the reason that the

01:33:16PM  24   loss exceeded $250,000, and then adding an additional 2 levels

01:33:22PM  25   for the reason that the offense involved the misrepresentation

01:33:26PM 1    or fraudulent action during a bankruptcy proceeding.  Then

01:33:32PM 2    subtracting 3 levels for acceptance of responsibility and

01:33:35PM 3    timely notification of plea, we arrive at a total offense level

01:33:38PM 4    of 17.  Dr. Schneider has zero criminal history points, so his

01:33:44PM 5    criminal history category is I.  The resulting advisory

01:33:47PM 6    guideline range is 24 to 30 months imprisonment.

01:33:51PM 7            Under the guidelines, Dr. Schneider is not eligible

01:33:54PM 8    for probation, he is subject to one to three years of

01:33:57PM 9    supervised release, a fine of 5,000 to $50,000, and a special

01:34:04PM 10   assessment of $100, and restitution is applicable under the

01:34:08PM 11   guidelines.

01:34:08PM 12           For the charge of Count III, Concealment of

01:34:12PM 13   Bankruptcy Assets, in violation of 18 United States Code

01:34:17PM 14   Section 152(1), the maximum punishment is five years

01:34:21PM 15   imprisonment, the maximum fine is $250,000, no more than three

01:34:27PM 16   years of supervised release, and the $100 special assessment.

01:34:31PM 17   Under the statute, Dr. Schneider is eligible for probation for

01:34:36PM 18   a period of one to five years, and, again, restitution is

01:34:39PM 19   applicable.

01:34:39PM 20           Mr. Rubich, do you agree that's an accurate statement

01:34:41PM 21   of the statutory and guideline provisions?

01:34:43PM 22           MR. RUBICH:  I do, Your Honor.

01:34:44PM 23           THE COURT:  Do you also agree, Mr. Smith?

01:34:46PM 24           MR. SMITH:  Yes, I do, Judge.

01:34:49PM 25           THE COURT:  And the restitution that, I believe, both

(107 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 67 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 107 of 303          6

01:34:52PM  1    parties have agreed to is the amount of $308,945, correct?

01:34:58PM  2              MR. RUBICH:  That is correct, Your Honor.

01:34:59PM  3              THE COURT:  And your client agrees with that?

01:35:01PM  4              MR. SMITH:  Yes.

01:35:02PM  5              THE COURT:  Okay.

01:35:03PM  6              Mr. Rubich, are there any persons here who would be

01:35:06PM  7    considered a victim who wish to be heard before sentencing?

01:35:09PM  8              MR. RUBICH:  Yes, Your Honor, there are four.  The

01:35:11PM  9    first is the trustee of the bankruptcy estate, which is Joe

01:35:15PM 10    Womack; the second is an attorney on behalf of some of the

01:35:20PM 11    plaintiffs named Jon Moyers; and two individuals involved in

01:35:22PM 12    one of the malpractice suits, Mallory Monaco and Judy Monaco.

01:35:27PM 13              THE COURT:  Okay.  Please call your first witness.

01:35:28PM 14              MR. RUBICH:  Your Honor, I -- it wasn't my intent to

01:35:28PM 15    call witnesses, Your Honor.

01:35:28PM 16              THE COURT:  Oh.

01:35:30PM 17              MR. RUBICH:  I was going to allow them to make a

01:35:34PM 18    statement, as is required.

01:35:36PM 19              THE COURT:  Well, call your first one up, is what I

01:35:40PM 20    really meant to say.

01:35:40PM 21              MR. RUBICH:  Yes, Your Honor.

01:35:40PM 22              THE COURT:  Okay.

01:35:41PM 23              MR. RUBICH:  Joe Womack will be first to be heard.

01:35:45PM 24              THE COURT:  Okay.

01:35:51PM 25              JOE WOMACK:  I'm not familiar with how the

01:35:53PM   1    proceedings go in this matter, Your Honor.  Do you just wish me
01:35:56PM   2    to make a statement to the Court regarding my views on what's
01:36:00PM   3    going on here today?
01:36:02PM   4             THE COURT:  This is a victim impact statement, so --
01:36:06PM   5    and I did read the written statement that you provided to the
01:36:10PM   6    government.  But if you'd just identify yourself by name and
01:36:14PM   7    your relationship to the case, and then tell me how the case
01:36:18PM   8    has impacted you either personally or professionally.
01:36:21PM   9             JOE WOMACK:  Okay.  Thank you, Your Honor.
01:36:22PM  10             THE COURT:  Mm-hmm.
01:36:23PM  11             JOE WOMACK:  Yes.  My name is Joe Womack, I'm the
01:36:27PM  12    Chapter 7 bankruptcy trustee that was assigned to the
01:36:31PM  13    bankruptcy -- Chapter 7 bankruptcy that was filed by
01:36:37PM  14    Dr. Schneider back in 2014.
01:36:40PM  15             In terms -- I have laid out pretty much my position
01:36:48PM  16    in full in the letter that you have already read, so I'm not
01:36:52PM  17    going to go through and reiterate everything that is in there.
01:36:57PM  18    There are a couple of points that I did want to add, or make.
01:37:03PM  19             As I've been a trustee now -- a bankruptcy trustee
01:37:06PM  20    since about 1994 here in Montana, I know that many people don't
01:37:14PM  21    really like bankruptcy or the process.  They think it's a way
01:37:18PM  22    for people to get out of paying their debts and obligations,
01:37:23PM  23    and they disagree with that.  I think most individuals think
01:37:26PM  24    that there's a moral obligation as well as a legal and ethical
01:37:31PM  25    one to pay obligations that they have, so they disagree with

1    the idea that with bankruptcy they can have a discharge of

2    their obligation to pay certain debts.  So I know that the

3    process of the bankruptcy system is not necessarily popular

4    with the American public.

5         I will say, though, that I think it serves important

6    functions and a service to the people in the United States, but

7    the -- but that benefit that exists there for people comes with

8    obligations.  It's not a right, it's a privilege that's granted

9    by the government.  And with that privilege comes an obligation

10   on the part of those who participate in the program to be

11   completely honest and forthright in their filing so that any

12   assets that they have are utilized to pay creditors as set out

13   under the law.

14        The integrity of the bankruptcy system relies on the

15   enforcement of that basic fundamental principle.  And I think

16   what we have seen here today with Dr. Schneider is a complete,

17   utter abuse of the bankruptcy process, and he has admitted that

18   he deliberately, fraudulently concealed over $300,000 from the

19   bankruptcy estate.  I think that it is important that he be

20   made an example for what he has done.  I think it's important

21   that the public know that this is not a matter that is taken

22   lightly by the federal government.  That if you're going to

23   file bankruptcy, if you're going to seek the benefits of the

24   bankruptcy system, you need to adhere to what is required for

25   you to do.

01:39:23PM   1          In this case, particularly, the people that have been

01:39:29PM   2   harmed -- I mean, I'm the trustee for the estate, so that I'm

01:39:34PM   3   essentially the victim, but with the estate are the claimants,

01:39:40PM   4   people who have been hurt by this because they were his

01:39:45PM   5   patients.  He had a doctor-patient relationship with these

01:39:49PM   6   people.  He has admitted that he committed malpractice against

01:39:52PM   7   those people.  He admitted that the estate of Russell Monaco,

01:39:56PM   8   that Mr. Monaco has suffered $3 million in damages at his hands

01:40:02PM   9   by prescribing opioids that resulted in Mr. Monaco's death.

01:40:09PM   10          These are real human beings.  These are not faceless

01:40:13PM   11   credit card companies or corporations who can absorb those kind

01:40:19PM   12   of damages easily.  Those are the kind of people that we

01:40:22PM   13   usually see that are victims in a bankruptcy case.  That is not

01:40:26PM   14   the case here.  These are individuals that have suffered at his

01:40:30PM   15   hands as a neurosurgeon when he committed this malpractice.

01:40:35PM   16   And when they went to try to get compensation for that, they

01:40:39PM   17   found out that he had basically taken every penny that had he

01:40:44PM   18   in his self-insured malpractice fund and taken every penny out

01:40:49PM   19   of it and had put it -- had taken it to pay a slander/libel

01:40:56PM   20   claim that he had made against a doctor in Cody, Wyoming, named

01:41:01PM   21   Jimmie Biles.  So he looted that malpractice fund that he had

01:41:07PM   22   and then used it to pay this slander claim, and then there was

01:41:12PM   23   no money to pay these malpractice claims that he admits he

01:41:16PM   24   committed.

01:41:16PM   25          Sherry Lee is here today, the family of Russell

01:41:21PM  1  Monaco, I understand, is here today, and they'll speak here to

01:41:25PM  2  the Court, but they are real people, Your Honor, that have been

01:41:29PM  3  harmed by this man's actions.  And I think that it's egregious.

01:41:37PM  4        As a result of his concealment, the bankruptcy estate

01:41:41PM  5  had to go forward and hire attorneys on a contingency fee

01:41:46PM  6  basis, because there was no money in this estate.  Nothing.  He

01:41:49PM  7  went from $12 million in net assets, according to his financial

01:41:53PM  8  statements several years earlier, to a net worth of zero when

01:41:58PM  9  he filed this bankruptcy.

01:42:01PM  10       We had to go and try to unravel all of those things

01:42:04PM  11  and pursue these assets that he concealed, including the

01:42:09PM  12  308,000 that you're talking about restitution for here today.

01:42:13PM  13  And as a result of that, the bankruptcy estate did recover

01:42:15PM  14  assets, but we also incurred over 600,000 in attorneys' fees in

01:42:22PM  15  order to go after this guy because of his scheme.

01:42:25PM  16       I don't know -- I heard you talk about the sentencing

01:42:30PM  17  guidelines.  I don't know how that plays in with victim impact

01:42:36PM  18  statements.  But I can tell you that I truly believe that

01:42:42PM  19  Dr. Schneider needs to feel the full impact of his actions,

01:42:48PM  20  that he needs to be sentenced to the maximum here, to the full

01:42:52PM  21  five years, if that is possible.  He needs to have the full

01:42:56PM  22  fine imposed.  If he can be ordered to repay restitution for

01:43:02PM  23  the attorneys' fees that the bankruptcy estate has suffered of

01:43:07PM  24  over $600,000, as well as the 308,000, I think that that should

01:43:13PM  25  be done and so that we've got some chance of full compensation

(112 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 72 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 112 of 303

11

01:43:17PM 1    here.

01:43:18PM 2            And in terms of the jail time, the time he spends in

01:43:22PM 3    prison, I've come to know Dr. Schneider fairly well through

01:43:28PM 4    these proceedings.  I don't believe that he has any regrets

01:43:31PM 5    about what he did except that he got caught.  And I think that

01:43:34PM 6    that is the only thing that punishment is going to act as a

01:43:41PM 7    deterrent to him, not only serve as an example to others, but

01:43:45PM 8    as a deterrent to him to engage in bad behavior in the future.

01:43:52PM 9            And in terms of restitution, I really think that

01:43:55PM 10   there has to be a strong incentive for him to go to the people

01:43:59PM 11   that he transferred all of his assets to, to try to get money

01:44:04PM 12   from them to make restitution.  Because I believe -- and I

01:44:09PM 13   haven't seen current financial statements or reports, but after

01:44:14PM 14   dealing with this, this guy for three and a half years, what I

01:44:19PM 15   see is someone who will put himself as an employee of one of

01:44:25PM 16   his shell corporations, working for a minimal amount of money,

01:44:29PM 17   that will allow him then to make minimal restitution payments.

01:44:34PM 18   That's what I believe.

01:44:35PM 19           Now, I hope I'm wrong.  I hope that the system can

01:44:39PM 20   provide an incentive or that he can fess up and provide

01:44:43PM 21   restitution at a level that is meaningful to Sherry Lee, who is

01:44:51PM 22   one of his -- is here today, is one of the people that suffered

01:44:54PM 23   injuries, to the family of Russell Monaco, who died, you know,

01:45:00PM 24   after receiving care and treatment from Dr. Schneider.  I hope

01:45:05PM 25   that it can be something that is meaningful here.

(113 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 73 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 113 of 303          12

01:45:08PM   1          So other than that, that's what I -- that's all I

01:45:13PM   2   really have to say, Your Honor.  And I hope you will take that

01:45:15PM   3   into account in making sentence here.

01:45:18PM   4          THE COURT:  Thank you, Mr. Womack.

01:45:24PM   5          MR. RUBICH:  Your Honor, I believe next is Mr. Jon

01:45:28PM   6   Moyers.

01:45:28PM   7          THE COURT:  Okay.

01:45:35PM   8          JON MOYERS:  Good afternoon, Judge.

01:45:37PM   9          THE COURT:  Good afternoon.

01:45:38PM  10          JON MOYERS:  Mr. Womack spoke eloquently about the

01:45:42PM  11   integrity of the legal system, and I will speak to the same.

01:45:45PM  12          Fred Paoli, myself, Paul Warren, and other attorneys

01:45:50PM  13   have committed a substantial part of our professional career in

01:45:55PM  14   pursuing medical malpractice and fraudulent conveyance claims

01:46:00PM  15   against Mr. Schneider in various courts.  Behind the

01:46:04PM  16   bankruptcy, as Mr. Womack spoke, are the sufferings of these

01:46:09PM  17   individuals whose claims have not been able to receive the full

01:46:13PM  18   compensation they're entitled to.

01:46:16PM  19          In this bankruptcy, Mr. Schneider has admitted to the

01:46:20PM  20   fact of his malpractice as well as to the valuation that was

01:46:25PM  21   set out in the proof of claims that we had filed.  But at the

01:46:29PM  22   end of the day, he did not have insurance that he had committed

01:46:34PM  23   to have available to the medical facility where he practiced as

01:46:39PM  24   a neurosurgeon that would be in place to compensate the victims

01:46:43PM  25   of his malpractice.

01:46:45PM  1    We believe that as a consequence of his purposeful

01:46:50PM  2  and willful movement of funds that denied these families just

01:46:57PM  3  compensation that he should suffer the full restitution and

01:47:01PM  4  maximum fines that are permissible by this court and the

01:47:05PM  5  harshest punishment possible under the guidelines and the

01:47:10PM  6  agreement that has been reached with the government.

01:47:12PM  7    As Mr. Womack spoke, this has been a purposeful

01:47:18PM  8  effort in a complex scheme by Mr. Schneider to hide his assets

01:47:22PM  9  from those who are most deserving of the money.  We represent

01:47:27PM 10  individuals who have had their lives turned upside-down by his

01:47:31PM 11  medical errors, who will live in chronic pain, who will not

01:47:34PM 12  enjoy the benefits of their father or their husband due to

01:47:40PM 13  malpractice that he's admitted that he has committed.  There is

01:47:45PM 14  no punishment great enough for that, but we believe that this

01:47:48PM 15  Court has the ability to effect a just remedy for the errors

01:47:54PM 16  that he has made.

01:47:56PM 17    In the bankruptcy matter, Mr. Womack has spoken to

01:47:59PM 18  the decision by Dr. Schneider to withhold over $300,000 from

01:48:05PM 19  the estate.  That revelation was learned by us after we had

01:48:10PM 20  reached a settlement agreement with Mr. Schneider, an attempt

01:48:14PM 21  to resolve these bankruptcy issues as expeditiously as possible

01:48:18PM 22  to preserve what funds would be available in the estate to pay

01:48:22PM 23  these injured claimants.  Our actions would have been entirely

01:48:27PM 24  different had we known the extent of the fraud that he had

01:48:28PM 25  committed on the trustee.  And we believe as a result of that,

(115 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 75 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 115 of 303

14

01:48:32PM   1   the compensation that would have been obtained in the

01:48:35PM   2   bankruptcy, had he been honest, should be paid as part of this

01:48:39PM   3   Court's sentencing against Mr. Schneider.

01:48:43PM   4          And with that, Your Honor, those conclude my remarks.

01:48:48PM   5   I appreciate your deliberation in this, and I appreciate you

01:48:52PM   6   hearing the testimony from Russ Monaco.

01:48:56PM   7          Just by a little way of background, to set the table

01:48:58PM   8   for the family's testimony, Russ Monaco was a surgical patient

01:49:01PM   9   of Mr. Schneider when he was practicing in Wyoming.  And

01:49:05PM  10   post-operatively, he prescribed a transdermal fentanyl patch

01:49:09PM  11   that we hear quite a bit about in the news.  And that, in

01:49:12PM  12   combination with other medications that had been prescribed by

01:49:16PM  13   Mr. Schneider had caused Mr. Monaco to lose his life shortly

01:49:21PM  14   after discharge from the hospital.

01:49:23PM  15          The Wyoming Board of Medicine considered that to be a

01:49:28PM  16   gross violation of the Wyoming Rules of Practice and commenced

01:49:31PM  17   an action against him that required him to -- to go to trial,

01:49:38PM  18   and that resulted in a conviction that he had violated the

01:49:42PM  19   professional standards in Wyoming, and then a revocation of his

01:49:44PM  20   license, which, for a neurosurgeon in Wyoming, in a poorly

01:49:49PM  21   served medical state, like ours, was a pretty exceptional

01:49:53PM  22   result.  But there is no doubt about the merits of any of these

01:49:57PM  23   claims that have been brought against Mr. Schneider.  And you

01:50:01PM  24   will hear now from the Monaco family about how his conduct has

01:50:06PM  25   affected them forever.

(116 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 76 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 116 of 303          15

01:50:07PM  1         Thank you.

01:50:08PM  2         THE COURT:  Thank you, Mr. Moyers.

01:50:12PM  3         MR. RUBICH:  Mallory Monaco, Your Honor.

01:50:31PM  4         MALLORY MONACO:  I'm Mallory Monaco, and Russ is my

01:51:27PM  5  dad.  And I want people to understand how this whole ordeal has

01:51:32PM  6  changed my family's lives forever.

01:51:34PM  7         "My dad passed away when I was in eighth grade and my

01:51:37PM  8  sister was in fifth; we were just 14 and 10.  He left us a few

01:51:41PM  9  weeks before Christmas on December 2nd, 2011.  I remember that

01:51:46PM 10  day like it just happened yesterday.

01:51:51PM 11         "I still have all these amazing memories we shared as

01:51:54PM 12  a family, and I wish we could have had the chance to make a lot

01:51:58PM 13  more.  I am scared that since he passed away while my sister

01:52:02PM 14  and I were so young that I will forget the little memories I

01:52:07PM 15  cherish the most.  That is one of my biggest fears in life.

01:52:11PM 16         "A lot of people have asked how this affects my

01:52:14PM 17  family.  It's been really tough growing up with just one

01:52:16PM 18  parent, and my sister and I could have had two amazing parents

01:52:20PM 19  raising us.  It's also difficult knowing his death could have

01:52:24PM 20  been prevented.  I feel guilty like I could have done

01:52:27PM 21  something, and I know my mom feels the same.  I know, no matter

01:52:31PM 22  what we believe, that it's not our fault.  It's just really

01:52:36PM 23  hard accepting that he's gone because of someone's mistake.

01:52:40PM 24         "It's very hard knowing that he won't be able to see

01:52:43PM 25  all the important milestones coming up in our lives.  My mom is

(117 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 77 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 117 of 303          16

01:52:48PM 1  such an incredible woman for putting herself as a mom and dad

01:52:52PM 2  role in the family.  My dad was a very quiet guy, but he always

01:52:57PM 3  made everyone he met feel like they've known him for years.  He

01:53:04PM 4  was just a sweet, generous guy who everyone loved.

01:53:06PM 5        "He was my coach in softball ever since I started

01:53:09PM 6  when I was around eight.  Him and his friends started a travel

01:53:12PM 7  team for my friends and I.  He was a great coach and a great

01:53:16PM 8  cheerleader, except to the umpires.  Softball is my dad and I's

01:53:23PM 9  thing together.  Since he passed, it was really hard for me to

01:53:26PM 10 continue playing softball with the team that he started.

01:53:29PM 11       "I played with them for two years after he passed,

01:53:33PM 12 but it just got to be too much pain and sadness that went along

01:53:37PM 13 with the game that I loved so much.  I know that if he was

01:53:40PM 14 still around, I'd still be playing my heart out on the field

01:53:45PM 15 and he would still be cheering me on.  I do miss softball, but

01:53:50PM 16 I miss my dad so much more.

01:53:55PM 17       "My sister and my dad are so alike.  It is difficult

01:53:58PM 18 knowing my dad didn't get to see her get out of her awkward

01:54:03PM 19 stages and be a part of the beautiful teenager she's becoming.

01:54:08PM 20 I know he is watching over us, but that isn't the same as him

01:54:12PM 21 being here while we grow up.  He was a great man and loved by

01:54:16PM 22 so many.  He will never be forgotten as long as we all live.

01:54:21PM 23       "He has already missed so many big milestones in our

01:54:25PM 24 lives.  But no matter what, he will always watch over us and be

01:54:27PM 25 proud of the accomplishments we have succeeded in.

(118 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 78 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 118 of 303          17

01:54:30PM   1        "I know for sure he's very proud of my mom for

01:54:33PM   2   raising my sister and me all by herself, which none of us

01:54:37PM   3   thought she would ever have to do.  I know he would do anything

01:54:40PM   4   to be here with her and us again, and we would all do anything

01:54:44PM   5   for him to be here too.  And I love him so much and I wish I

01:54:51PM   6   could still tell him that."

01:55:01PM   7        MR. RUBICH:  Judy Monaco, Your Honor.

01:55:13PM   8        JUDY MONACO:  Good afternoon, Judge.

01:55:24PM   9        THE COURT:  Good afternoon.

01:55:25PM  10        JUDY MONACO:  My name is Judy Monaco, and I'm Russell

01:55:29PM  11   Monaco's mother.  I'm going to do this.  I'm going to get

01:55:34PM  12   through this.  This is the last thing I can ever do for my son.

01:55:40PM  13        "I would like to take this opportunity to tell you a

01:55:43PM  14   little bit about Russ.  Russ had two brothers, an older

01:55:48PM  15   brother, Rob, who you just saw, and a younger brother, Reece.

01:55:52PM  16   His dad and I worked hard to give our boys a good life, and we

01:55:55PM  17   were a normal, happy family.

01:55:57PM  18        "Russ graduated from West High School here in

01:55:59PM  19   Billings and went on to get his degree from North Dakota School

01:56:02PM  20   of Science.  Russ was a master machinist and was very good at

01:56:06PM  21   it.  There was nothing Russ couldn't do from his trade,

01:56:10PM  22   carpentry, or working on cars, and Russ was always there and

01:56:13PM  23   willing to help anyone that needed help from family to friends

01:56:18PM  24   or anyone.  Russ liked to hunt and fish and coach girls

01:56:22PM  25   softball.

01:56:23PM  1       "Russ was proud of his brothers.  Rob is a news

01:56:26PM  2   director and photographer for Q2 TV in Billings, and Reece is a

01:56:29PM  3   sportscaster for the University of Wyoming and the director of

01:56:32PM  4   the Wyoming's Cowboy News Network that covers 30 stations in

01:56:37PM  5   the state.

01:56:40PM  6       "Russ absolutely adored his wife, Kathy, and his two

01:56:43PM  7   daughters, Mallory and Madison.  He also loved his dog, a

01:56:47PM  8   Siberian Husky named Timba.  Russ loved to cook for his family

01:56:52PM  9   and made the greatest spaghetti ever.  Russ was proud of his

01:56:54PM 10   Italian heritage, as are his brothers.

01:56:58PM 11       "In 2008 Russ's dad died suddenly.  I would have not

01:57:03PM 12   made it through this time if it had not been for Russ and his

01:57:06PM 13   brother, Rob.  We were just beginning to get some closure and

01:57:11PM 14   move on when the tragedy of our lives happened and Russ was

01:57:14PM 15   taken from us.  My beautiful, happy family was now broken and

01:57:20PM 16   nothing will ever fix it.

01:57:22PM 17       "I would now like to talk a little bit about what has

01:57:26PM 18   happened since Russ died and how it has affected our lives.

01:57:31PM 19       "First of all, I would like you to know that it was I

01:57:35PM 20   that instigated the lawsuit against Mr. Schneider.  I was so

01:57:39PM 21   very angry about his incompetence as a doctor that I felt this

01:57:46PM 22   was our only recourse.  We only wanted to provide some kind of

01:57:51PM 23   financial security for Mallory and Madison so that their

01:57:54PM 24   education would be provided for.  We figured that his

01:57:57PM 25   malpractice insurance would settle and that it would be the end

01:58:00PM   1   of it, but what a shock when we found out that he had none.  It

01:58:05PM   2   is now obvious to us that Russ's life meant nothing to him.  It

01:58:11PM   3   is all about the money.

01:58:12PM   4          "I would guess that Mr. Schneider started trying to

01:58:15PM   5   hide his assets days after Russ's death.  Because of his

01:58:18PM   6   actions, we have been put through hell as a family for the last

01:58:22PM   7   five years.  Just when we have had a few good months, and here

01:58:29PM   8   it is again in the papers for all to see, and how can we ever

01:58:32PM   9   forget, as if we could.  We sat in this courtroom and had to

01:58:36PM  10   listen to him get on the stand and lie.  Now it appears that

01:58:40PM  11   there will be no consequences for that.

01:58:44PM  12          "Russ's birthday is May 7th.  I went to the cemetery

01:58:49PM  13   and sat on a bench and looked at my son's headstone.  I hope to

01:58:55PM  14   God that Dr. Schneider never has to know what that feels like,

01:58:59PM  15   but then there is no God for people like him.

01:59:03PM  16          "Please, Your Honor, do not let him walk out of this

01:59:06PM  17   courtroom without having to suffer some serious consequences

01:59:11PM  18   for what he has done, not only to my family, but also for his

01:59:15PM  19   total disregard for the laws of this court."

01:59:18PM  20          And now I'd like to read a statement from my other

01:59:23PM  21   son.

01:59:23PM  22          "My name is Reece Monaco.  And, first, let me

01:59:27PM  23   apologize to the Court for not being able to be there today.

01:59:31PM  24          "Russ Monaco was one of my older brothers, and

01:59:34PM  25   unfortunately his life was taken from him way too early.  I am

(121 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 81 of 139
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 121 of 303

20

01:59:39PM  1  older now than he was when his life ended while sitting on his

01:59:44PM  2  couch in his living room for his young daughter to find him

01:59:48PM  3  while getting ready for school that morning.  I don't think

01:59:51PM  4  there is anything I can say that will be more powerful or

01:59:55PM  5  heartfelt than the comments from his wife, Kathy, or his

01:59:59PM  6  daughters, Mallory and Madison, who have had to deal with life

02:00:02PM  7  without their husband and father, just like my mother has had

02:00:06PM  8  to deal with the loss of her son, and just like my older

02:00:10PM  9  brother, Rob, and I have had to deal with life without our

02:00:14PM  10  brother, Russ.

02:00:14PM  11      "Russ was a big man with a big character, and it's

02:00:18PM  12  too bad that his daughters have had to sit in this courtroom

02:00:22PM  13  today and look at the man that is responsible for his death who

02:00:26PM  14  has such little character.  It is also absolute shame that this

02:00:31PM  15  has come down to a decision about dollars and cents and not the

02:00:35PM  16  loss of a life that was taken way too early.

02:00:38PM  17      "When I say this man has no character, all the Court

02:00:42PM  18  has to do is look at his track record.  Just ask the doctor in

02:00:46PM  19  Cody that was run down by this man's lack of character, and

02:00:50PM  20  look at the extent he went to hide his money because he knew

02:00:54PM  21  what he did to my brother, Russ, was wrong.  This man has shown

02:00:58PM  22  no remorse or regard -- regret, for his action has always

02:01:03PM  23  pointed the finger at others for his failures in which another

02:01:07PM  24  example of his -- which is another example of his lack of

02:01:11PM  25  character.

| | |
|---|---|
| 02:01:11PM | 1 |
| 02:01:16PM | 2 |
| 02:01:20PM | 3 |
| 02:01:24PM | 4 |
| 02:01:28PM | 5 |
| 02:01:31PM | 6 |
| 02:01:34PM | 7 |
| 02:01:39PM | 8 |
| 02:01:43PM | 9 |
| 02:01:49PM | 10 |
| 02:01:52PM | 11 |
| 02:01:56PM | 12 |
| 02:02:00PM | 13 |
| 02:02:04PM | 14 |
| 02:02:08PM | 15 |
| 02:02:09PM | 16 |
| 02:02:12PM | 17 |
| 02:02:16PM | 18 |
| 02:02:21PM | 19 |
| 02:02:26PM | 20 |
| 02:02:29PM | 21 |
| 02:02:34PM | 22 |
| 02:02:38PM | 23 |
| 02:02:42PM | 24 |
| 02:02:49PM | 25 |

"Doctors are sworn to preserve life and better humanity.  This man did not preserve life, and the only human whose life he is concerned about bettering is his own with deception and lies, no matter who he has to hurt along the way.

"While our family and Russ's daughters are coming to grips with the sudden loss of Russ's life, this man immediately began scheming and lying, blaming others and covering up his assets, because that's what this is all about right now; money, not a man's life.  So he hid behind the legal system and enlisted the help of his family to perpetrate his lies.  He has proven to be a liar and a cheat.  And when asked to tell the whole truth and nothing but the truth, he sat on the stand and lied to the Court, which also shows he has no character to speak of, but which is also against the law; that is why he is here today.

"Your Honor, please take into consideration this man's past, his actions and lack of guilt or remorse in everything he has done, and at the very least sentence him to some time behind bars.  While some jail time would not be the justice we are looking for, it's the least that could be done. While he might think his life would be over if he goes to jail -- has to do jail time, my brother Russ's life is over because of the actions of this selfish, arrogant, lying, unethical, worthless man.

"Punishment won't hurt his character, because he has

(123 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 83 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 123 of 303                22

02:02:51PM 1    none.  But my brother, who at times was larger than life, had

02:02:55PM 2    his character and life taken from him by the worthless human

02:02:58PM 3    being sitting in this courtroom today.

02:03:00PM 4            "Thank you."

02:03:02PM 5            THE COURT:  Thank you.

02:03:08PM 6            MR. RUBICH:  I think that's everyone, Your Honor.

02:03:10PM 7            THE COURT:  Okay.

02:03:13PM 8            And, Mr. Rubich, you may be heard as to sentencing.

02:03:16PM 9            MR. RUBICH:  Thank you, Your Honor.

02:03:16PM 10           Obviously, I submitted a sentencing memorandum in

02:03:20PM 11   this case, and I'm not sure where to begin, because there's so

02:03:27PM 12   much to say.

02:03:28PM 13           I've been working with this case for quite some time,

02:03:33PM 14   and I've seen a lot of bankruptcy, fraudulent situations, but

02:03:37PM 15   this one is, I have to say, unique, and unique in its

02:03:42PM 16   egregiousness.  And when you -- when you look at this -- I

02:03:47PM 17   tried to lay that out in my sentencing memorandum.  You know,

02:03:49PM 18   you have to take into consideration how he ended up in

02:03:53PM 19   bankruptcy in the first place.

02:03:55PM 20           There is the bizarre litigation involving Dr. Biles

02:03:59PM 21   down in Wyoming.  I don't know what led to do that, but, you

02:04:04PM 22   know, this is a man who engaged systematically in coercing

02:04:09PM 23   another person to make fraudulent allegations against another

02:04:13PM 24   person, and then actively trying to subvert a federal court

02:04:16PM 25   proceeding that was dealing with that.

02:04:19PM  1    So to begin from that -- and that, in and of itself,

02:04:22PM  2    is concerning.  But once all of that wrapped up, Dr. Biles, who

02:04:26PM  3    is a surgeon, who ought to know that what -- the business that

02:04:30PM  4    he is engaged in by its very nature is high risk.  Anytime you

02:04:34PM  5    put someone underneath a knife, it's going to be dangerous.

02:04:38PM  6    And to do so without the benefit of insurance, which he knew he

02:04:42PM  7    did not have as a result of funneling all the money that he had

02:04:45PM  8    in his captive insurance company to pay for this defamation

02:04:50PM  9    claim, it's utterly reckless.

02:04:52PM  10   I mean, I don't understand how someone could be so --

02:04:56PM  11   and, again, I'm not getting into -- I'm not going to get in --

02:04:58PM  12   because I wasn't involved in the merits of the malpractice

02:05:02PM  13   claims.  But what I do know is the act of performing surgery on

02:05:12PM  14   someone without having a safety net in place should something

02:05:16PM  15   go wrong suggests that you have an inability to understand how

02:05:19PM  16   your actions affect other people.  It's scary, it's terrifying.

02:05:23PM  17   You know, lawyers do the same thing, we are expected to keep

02:05:30PM  18   insurance for a reason, because if we make a mistake, the

02:05:30PM  19   consequences are devastating.

02:05:33PM  20   So the fact that he did that, and the fact that he

02:05:35PM  21   did that in a way to -- and that's what should be said, is that

02:05:40PM  22   this is a guy, before bankruptcy, he has vast assets; he had

02:05:45PM  23   several luxury properties in Wyoming and here, he owned a large

02:05:49PM  24   house -- still does own a large house down in Wyoming -- or

02:05:52PM  25   sorry, in California.

02:05:53PM  1         And I don't say that to begrudge the man anything.

02:05:57PM  2   You know, if you're successful in life, that's great.  But what

02:05:59PM  3   will you do to preserve what is essentially money and things?

02:06:07PM  4   And it seems to me that Dr. Schneider was willing to do just

02:06:11PM  5   about anything, including take my insurance, I'm going to pay

02:06:15PM  6   off this settlement, despite the fact that, I assume, he must

02:06:18PM  7   have had, based on the assets that I've seen as a result of

02:06:21PM  8   this bankruptcy proceeding, more than enough assets in his

02:06:23PM  9   personal holdings to pay this thing.  But he made that

02:06:27PM 10   decision.

02:06:27PM 11         And with that background, and after he's released

02:06:31PM 12   from the Montana Insurance Commission, after he says, "I'm

02:06:34PM 13   going to pay this off.  I'm going to make this right," he

02:06:37PM 14   enters into bankruptcy.  And after all those facts are set

02:06:40PM 15   down, he has the audacity, the greed, the recklessness to

02:06:45PM 16   continue to put his own personal well-being, his own finances

02:06:50PM 17   above what -- about doing the right thing, about -- at least at

02:06:56PM 18   that point making -- doing what he could to make these people

02:07:01PM 19   whole.  It's shocking.

02:07:05PM 20         And someone who has dedicated his life to the idea

02:07:08PM 21   that this justice system, this court system means something,

02:07:12PM 22   that what we do here is important, that the rules that we have

02:07:15PM 23   set down as a society are important and that they're there for

02:07:20PM 24   a reason, it baffles me to see someone like Dr. Schneider

02:07:27PM 25   who -- he's given so many opportunities to do the right thing,

(126 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 86 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 126 of 303                25

02:07:31PM   1   and just time after time after time he says, no, I'm not going

02:07:35PM   2   to do the right thing.  I'm going to do the right thing that's

02:07:38PM   3   best for me.  Because that's what matters at the end of this

02:07:40PM   4   thing.  It doesn't matter how many people I've hurt, it doesn't

02:07:43PM   5   matter what I do.

02:07:44PM   6        So from my perspective, I look at the 3553(a)

02:07:48PM   7   factors, Your Honor, and I see someone who has no respect for

02:07:50PM   8   the law.  And, in fact, we talk about lack of respect for the

02:07:53PM   9   law all the time, but I've never seen someone who gave us such

02:07:57PM  10   concrete examples of his inability to respect the law.  He

02:08:01PM  11   disrespected the federal court system down in Wyoming, he

02:08:04PM  12   disrespected the Montana Insurance Commission, then he

02:08:06PM  13   disrespects the bankruptcy proceeding.  So at multiple levels,

02:08:11PM  14   he has no regard for the administration of legal proceedings.

02:08:18PM  15   And, again, it goes back to, as far as I can tell, greed and

02:08:21PM  16   the idea that he might not get to have everything that he has.

02:08:25PM  17        And at the same time, I see someone who is unable to

02:08:31PM  18   appreciate the gravity of his actions.  How else do we get here

02:08:37PM  19   today?  So under these circumstances, Your Honor, I look at the

02:08:39PM  20   guidelines, the guidelines for me are the heartlands of where

02:08:43PM  21   we belong, and 24 months is what I'm asking for.

02:08:45PM  22        I would like to note, Your Honor -- I know there's

02:08:47PM  23   been some statements from the victims -- they would like more.

02:08:52PM  24   It would be nice if they were able to get more in restitution.

02:08:57PM  25   I can assure Your Honor that, unfortunately, after researching

02:09:00PM 1  the case law and every other thing, that 308,000 that was

02:09:04PM 2  arrived at was the maximum that the Supreme Court will allow.

02:09:07PM 3  The attorneys' fees.  There was literally just a case

02:09:11PM 4  that came down from the Supreme Court that says that because

02:09:13PM 5  the way the statute is written you cannot assign restitution

02:09:18PM 6  amounts for attorneys' fees that are not directly connected

02:09:20PM 7  with the criminal investigation.  The criminal investigation

02:09:22PM 8  was done by John Teeling and myself largely, so none of the

02:09:26PM 9  attorneys' fees can really be applied to restitution.

02:09:28PM 10  And that's the last thing that I'll say, is that the

02:09:35PM 11  amount that was used to calculate the guidelines in this case,

02:09:38PM 12  the amount of restitution, is the number.  But if you look at

02:09:42PM 13  the harm that was caused, I do think, and I do want you to

02:09:45PM 14  consider, Your Honor, that this bankruptcy proceeding was much

02:09:48PM 15  more expensive, was much more lengthy, and much more

02:09:51PM 16  complicated than it would have been absent his fraud, and that

02:09:56PM 17  had costs associated with it.  It's not restitution that we can

02:09:57PM 18  give, but it is something that I would like you to consider as

02:09:59PM 19  you contemplate a sentence.

02:10:01PM 20  So I would ask for 24 months, Your Honor, followed by

02:10:04PM 21  three years of supervised release.

02:10:06PM 22  Thank you.

02:10:08PM 23  THE COURT:  So, Mr. Rubich, what consequence was

02:10:12PM 24  there, if any, to Dr. Schneider for raiding his self-funded

02:10:21PM 25  malpractice insurance account?

(128 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 88 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 128 of 303

27

02:10:24PM  1        MR. RUBICH:  Your Honor, it's my understanding -- I

02:10:26PM  2   wasn't involved in those proceedings, but I submitted that

02:10:28PM  3   letter.  It was my understanding that --

02:10:30PM  4        THE COURT:  Well, wasn't that from the Montana

02:10:33PM  5   Insurance Commission?

02:10:33PM  6        MR. RUBICH:  It was, Your Honor.

02:10:34PM  7        THE COURT:  But was that -- maybe I'm

02:10:37PM  8   misunderstanding.  I was thinking that it was in Wyoming that

02:10:41PM  9   he had that malpractice fund, but maybe it was in Montana.  I

02:10:47PM 10   know he used the funds to pay off Dr. Biles.

02:10:50PM 11        MR. RUBICH:  It's my understanding that that was

02:10:51PM 12   his -- wherever he practiced, that was how he had insurance,

02:10:55PM 13   was this Montana corporation that was regulated by the Montana

02:11:00PM 14   Insurance Commission.  If I'm incorrect, the defense can

02:11:03PM 15   correct me, but that's my understanding of how it worked.

02:11:06PM 16        THE COURT:  Well, I think Mr. Moyers knows.  Maybe

02:11:08PM 17   Mr. Moyers or Mr. Womack will help me.

02:11:12PM 18        I'm not sure that it has a whole lot of bearing, but

02:11:16PM 19   it seems to me that, you know, lawyers are required to have

02:11:19PM 20   malpractice insurance, doctors are required to have malpractice

02:11:22PM 21   insurance, all kinds of professions are required to have errors

02:11:27PM 22   and omissions insurance.  But is there a penalty for not having

02:11:31PM 23   it?  That, I don't know the answer to.

02:11:34PM 24        JON MOYERS:  There was not.  So Mr. Schneider

02:11:38PM 25   practiced in four surgical areas in Wyoming.  He was insured by

(129 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 89 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 129 of 303

28

02:11:41PM   1   a captive insurance company that he had created that was under
02:11:44PM   2   his control here in Montana that was called Northern Rockies
02:11:47PM   3   Insurance Company.  He had maintained in excess of $3 million
02:11:50PM   4   in cash in that; that was for the express purpose of covering
02:11:54PM   5   victims of malpractice.  That was a part of the credentialing
02:12:00PM   6   privilege requirements of the surgical facilities that he'd
02:12:04PM   7   operated.  Wyoming, like Montana, doesn't have a state statute
02:12:07PM   8   that mandates surgeons to carry professional liability
02:12:11PM   9   insurance, but that was what he had committed every year, is
02:12:13PM  10   that he carry that insurance.  And then as the Court knows,
02:12:15PM  11   then he raided that to pay Dr. Biles.
02:12:18PM  12          When the Montana commission became aware of that
02:12:22PM  13   fraud, then they shut down -- or they suspended Northern
02:12:27PM  14   Rockies Insurance Company and entered an order requiring
02:12:29PM  15   Mr. Schneider then to repay those funds, which he never did,
02:12:32PM  16   and that matter has remained open and is unresolved.  But there
02:12:38PM  17   has been no other penalties assessed to him because of that.
02:12:42PM  18          THE COURT:  Well, what teeth does that have?  What
02:12:45PM  19   can the insurance commission do if he doesn't repay the money
02:12:49PM  20   that he promised to repay?
02:12:51PM  21          JON MOYERS:  I've asked for them to pursue that or
02:12:53PM  22   I've asked them to deputize us to pursue that.
02:12:56PM  23          THE COURT:  But I mean what can you do?  Get a
02:12:59PM  24   judgment against him and that's about it?
02:13:01PM  25          JON MOYERS:  Correct.

| | | |
|---|---|---|
| 02:13:01PM | 1 | THE COURT:  Yeah. |
| 02:13:02PM | 2 | JON MOYERS:  That's why we've asked -- so that's what |
| 02:13:06PM | 3 | prompted the -- you know, he claimed he didn't have any other |
| 02:13:08PM | 4 | assets, Mr. Womack spent a lot of time trying to figure out |
| 02:13:12PM | 5 | where they were, but then that provided the basis for him to |
| 02:13:15PM | 6 | claim bankruptcy. |
| 02:13:16PM | 7 | THE COURT:  How much was in the fund? |
| 02:13:18PM | 8 | JON MOYERS:  The fund itself had to have in excess of |
| 02:13:21PM | 9 | $3 million, because the hospitals and the surgery centers |
| 02:13:25PM | 10 | required him to have a 1 million/$3 million coverage, the |
| 02:13:29PM | 11 | $3 million to be aggregated claims.  And so they maintained |
| 02:13:33PM | 12 | a -- so he maintained an account that held $3 million, which |
| 02:13:37PM | 13 | were then depleted to either pay his attorneys or to pay |
| 02:13:44PM | 14 | Dr. Biles.  And that claim, under the policy that existed at |
| 02:13:49PM | 15 | the time, for what it's worth, was an improper claim, so the -- |
| 02:13:52PM | 16 | THE COURT:  Right.  It wasn't any malpractice or |
| 02:13:57PM | 17 | anything related to his medical practice. |
| 02:13:58PM | 18 | JON MOYERS:  Right. |
| 02:13:59PM | 19 | And then after the horse was out of the barn, then he |
| 02:14:02PM | 20 | made a resolution to have that policy changed to permit payment |
| 02:14:06PM | 21 | for libel claims, but it had already been paid contrary to what |
| 02:14:11PM | 22 | had been the policy.  So that's why we've asked for the full |
| 02:14:13PM | 23 | restitution here, because there's nowhere else to get it. |
| 02:14:18PM | 24 | THE COURT:  Right.  And you can't get it here -- |
| 02:14:18PM | 25 | JOE WOMACK:  I agree with what Mr. Moyers said; that |

(131 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 91 of 139
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 131 of 303

30

02:14:23PM  1   is accurate. We've spent a lot of time investigating this.

02:14:26PM  2   Everything is correct.

02:14:27PM  3           THE COURT: So, Mr. Womack, as far as the $600,000

02:14:31PM  4   plus in attorney fees that the bankruptcy -- that you, as

02:14:35PM  5   bankruptcy trustee, had to -- and then the estate had to incur,

02:14:40PM  6   what is your recourse to collect that?

02:14:43PM  7           JOE WOMACK: We have no further recourse. We brought

02:14:47PM  8   fraudulent conveyance claims seeking to set aside, to transfer

02:14:53PM  9   of many, several -- you know, quite a few million dollars in

02:14:57PM 10   assets from Dr. Schneider into various shell entities and other

02:15:04PM 11   entities that he had set up with his wife and children as --

02:15:08PM 12   and sister originally as controlling directors or officers.

02:15:17PM 13   And our investigation showed that he had retained actual

02:15:21PM 14   control of those entities through his wife, his children.

02:15:28PM 15           We ended up compromising and settling the claim for

02:15:31PM 16   less than what -- half of what we believe we could get because

02:15:36PM 17   of the -- so many problems in pursuing it and the time. We did

02:15:40PM 18   recover probably about, roughly $1.8 million in assets. But --

02:15:48PM 19   and that's the basis for the attorneys' fees. We had to hire

02:15:52PM 20   attorneys on a contingency fee to pursue those. The attorneys

02:15:57PM 21   will be paid, but that has depleted the amount that's available

02:16:01PM 22   to pay the actual claimants in the case itself. Had there been

02:16:06PM 23   full disclosure by Dr. Schneider and he had not entered into

02:16:09PM 24   this fraud and these schemes to conceal and transfer assets, we

02:16:14PM 25   wouldn't have had to employ attorneys, or the amount that we

(132 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 92 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 132 of 303        31

02:16:18PM   1  would have had to pay would have been far less.

02:16:23PM   2          THE COURT:  Well, you'd have at least 1.8 million,

02:16:28PM   3  right --

02:16:29PM   4          JOE WOMACK:  We do have --

02:16:31PM   5          THE COURT:  -- in assets?

02:16:31PM   6          You have that, but you have to subtract the 600,000

02:16:35PM   7  in attorneys' fees.

02:16:36PM   8          JOE WOMACK:  And we have to pay the attorneys' fees

02:16:36PM   9  out of that.

02:16:37PM  10          THE COURT:  Right.

02:16:37PM  11          JOE WOMACK:  And then there's also been other costs

02:16:39PM  12  of administration of the estate.

02:16:40PM  13          THE COURT:  Sure.

02:16:41PM  14          JOE WOMACK:  So in the end, we've paid tax claims out

02:16:44PM  15  of that.  He had 150,000 in tax claims owed to the Montana

02:16:49PM  16  Department of Revenue that we've paid.

02:16:49PM  17      (Off-the-record discussion between Jon Moyers and Joe

02:16:49PM  18  Womack.)

02:16:57PM  19          JOE WOMACK:  He also incurred a fine to the Wyoming

02:17:02PM  20  Board of Medicine for revocation of his license and the

02:17:04PM  21  attorneys' fees incurred in that process.  So we are paying

02:17:09PM  22  that claim as well, and then the claims to the families.

02:17:15PM  23          And, you know, Mr. Moyers said he didn't -- I think

02:17:19PM  24  there was some talk about whether or not he actually committed

02:17:23PM  25  malpractice.  But in the bankruptcy, he admitted, or agreed to

(133 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 93 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 133 of 303          32

| | | |
|---|---|---|
| 02:17:27PM | 1 | the allowance of the $3 million claim by the Monaco family, a |
| 02:17:33PM | 2 | million dollars by Sherry Lee and other people based on the |
| 02:17:37PM | 3 | malpractice that was alleged.  So in my mind, those -- that is |
| 02:17:43PM | 4 | an admission that he actually committed malpractice and that |
| 02:17:47PM | 5 | those people suffered that damage. |
| 02:17:49PM | 6 | Now, I suppose you can argue that that was a |
| 02:17:53PM | 7 | compromise, and I'm sure it was, but at the same time it is an |
| 02:17:56PM | 8 | admission of guilt, I think, of medical malpractice that he |
| 02:18:01PM | 9 | committed against those people. |
| 02:18:03PM | 10 | THE COURT:  Okay.  Thank you both. |
| 02:18:07PM | 11 | Mr. Smith, you may be heard. |
| 02:18:14PM | 12 | MR. SMITH:  Thank you, Judge. |
| 02:18:15PM | 13 | Judge, a lot's been said.  I'd like to clarify a few |
| 02:18:20PM | 14 | things, if I may, about the bankruptcy proceeding.  And I |
| 02:18:26PM | 15 | will -- Dr. Schneider is going to allocute on his own behalf, |
| 02:18:29PM | 16 | and I'll let him address some of the wrongs, some of the things |
| 02:18:32PM | 17 | that he did that he's not proud of back then, but there are a |
| 02:18:36PM | 18 | few things that I think need to be straightened out. |
| 02:18:39PM | 19 | The bankruptcy was filed on December 4, 2014.  The |
| 02:18:43PM | 20 | trustee hired Trent Gardner, a lawyer out of Bozeman, to help |
| 02:18:48PM | 21 | him when he realized this was likely a sizeable bankruptcy |
| 02:18:52PM | 22 | estate.  He hired Trent Gardner as early as February 20, 2015. |
| 02:18:57PM | 23 | From the records that I've reviewed, it looks like, yeah, |
| 02:19:01PM | 24 | sometime in February Mr. Gardner was brought on board. |
| 02:19:03PM | 25 | About a month later, Mr. Gardner and the trustee on |

(134 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 94 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 134 of 303

33

02:19:08PM  1   March 24, 2015, filed an adversary proceedings against Kathleen

02:19:14PM  2   Burrows.  Kathleen Burrows is Dr. Schneider's sister.  Because

02:19:18PM  3   the trustee and Mr. Gardner had, in the normal course of their

02:19:22PM  4   investigation, rather easily, because you can do title

02:19:26PM  5   searches, figured out that some property in Molt, Montana, had

02:19:29PM  6   transferred from Mr. Schneider -- Dr. Schneider to Kathleen

02:19:35PM  7   Burrows.  So once they figured that out, they wanted to undo,

02:19:38PM  8   as the trustee has the power to do, undo that transfer as a --

02:19:42PM  9   when it's a called a fraudulent conveyance, I'm sure the Court

02:19:46PM  10  knows, that's a civil term for a conveyance that occurred prior

02:19:50PM  11  to the bankruptcy that the trustee can reach back and undo.  So

02:19:54PM  12  that's what the trustee sought to do.

02:19:56PM  13          Soon thereafter, probably in April, maybe as late as

02:19:58PM  14  May, but not much later, they deposed Kathleen Burrows.  At the

02:20:03PM  15  time they deposed Kathleen Burrows, she told them about this

02:20:06PM  16  Molt property, about the sale, about the money that

02:20:10PM  17  Dr. Schneider took from that sale and used it as the initial

02:20:13PM  18  seed money for account 2881 in the U.S. Bank, the account for

02:20:18PM  19  which he sits here today, the account that was not disclosed in

02:20:22PM  20  his bankruptcy.  So as early as May, they knew about the

02:20:27PM  21  account -- all about the account.

02:20:32PM  22          THE COURT:  But the funds were gone.

02:20:34PM  23          MR. SMITH:  The funds had been transferred around,

02:20:36PM  24  and they --

02:20:37PM  25          THE COURT:  They'd been transferred to his wife and

(135 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 95 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 135 of 303          34

02:20:40PM   1   children's trusts.

02:20:41PM   2          MR. SMITH:  Correct.  That's right.  305,000 of it;

02:20:45PM   3   that's correct.  And so that's the money now that we've settled

02:20:49PM   4   on as -- that needs to be returned to the estate by

02:20:52PM   5   Dr. Schneider in restitution.

02:20:53PM   6          When the bankruptcy was filed in December 2014, the

02:21:00PM   7   home here in Billings was listed.  And not long after that,

02:21:04PM   8   through this process with Kathleen Burrows, and then into the

02:21:09PM   9   summer of 2015 when they finally filed the AP 1515, which was

02:21:13PM  10   the big adversary proceeding in which the trustee and his

02:21:19PM  11   lawyer, John and his lawyer basically fought over what was

02:21:23PM  12   going to be -- what were going to be the parameters of the

02:21:27PM  13   bankruptcy estate.

02:21:27PM  14          The house here in Billings and the Whispering Pines

02:21:31PM  15   Ranch -- or Whispering Winds Ranch -- I always call it pines --

02:21:35PM  16   Whispering Winds Ranch in Wyoming turned out to be 80

02:21:38PM  17   percent -- approximately 80 percent of the value -- recovered

02:21:42PM  18   value in the bankruptcy estate.  So I guess I take a little bit

02:21:45PM  19   of issue that all of these attorneys' fees and all of the

02:21:49PM  20   contingency and the expense was as a result of John Schneider's

02:21:54PM  21   fraud, because I just simply think it wasn't.

02:21:56PM  22          He had definitely set in place, years before he filed

02:22:01PM  23   bankruptcy, with lawyers advice, some estate planning, some

02:22:06PM  24   asset protection, as it were.  All right.  But all of that was

02:22:11PM  25   discovered through the process of AP 1515, which, in May of

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 96 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 136 of 303

(136 of 303)

35

02:22:17PM   1   2016, so fast forward a year, the parties entered into a

02:22:22PM   2   settlement agreement in order to finish the AP 1515.  In

02:22:32PM   3   addition to other assets, the settlement allowed that the

02:22:35PM   4   bankruptcy estate would have the Schneider home and would have

02:22:39PM   5   the Whispering Winds Ranch.

02:22:42PM   6          I wanted to read to the Court what the trustee wrote

02:22:47PM   7   in his motion to the Court -- to the bankruptcy court asking

02:22:50PM   8   the court to approve the settlement.

02:22:51PM   9          In that motion it was filed 5/19 of 2016, quote:

02:22:57PM  10   While the trustee is confident in his claims, the defendants

02:23:00PM  11   are equally confident that they have done nothing wrong and

02:23:03PM  12   insist that any transfers were legitimate estate planning and

02:23:07PM  13   asset protection.

02:23:08PM  14          The defendants are represented by able and

02:23:10PM  15   experienced counsel, and the trustee has no doubt that

02:23:13PM  16   defendants will fight tooth and nail on every legal and factual

02:23:16PM  17   issue.  Further, the bulk of the available assets flow from

02:23:19PM  18   Schneider LP, an entity formed in 2007 with debtor and Michelle

02:23:25PM  19   Schneider as equal owners.

02:23:26PM  20          The defendants are adamant that, therefore, even if

02:23:29PM  21   the trustee is fully successful in bringing the assets back to

02:23:33PM  22   Schneider LP, the estate is only entitled to half of the value

02:23:37PM  23   of such assets, because Michelle Schneider has a claim of

02:23:40PM  24   ownership of half of all such assets.

02:23:42PM  25          By the way, Judge, Michelle Schneider was

(137 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 97 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 137 of 303

36

02:23:44PM  1    independently represented by Mark Parker here -- from Billings

02:23:47PM  2    here, and I believe that was the assertion.  I wasn't a part of

02:23:52PM  3    all of this, of course.  I'm re-creating the past through some

02:23:55PM  4    of these documents.

02:23:56PM  5            But the trustee went on to say:  The bottom line is

02:23:59PM  6    that the trustee believes strongly that he will be successful

02:24:02PM  7    on many of his claims.  However, there are varying levels of

02:24:05PM  8    potential success, many of which do not result in a better

02:24:09PM  9    outcome than what is achieved in this settlement.  Further,

02:24:12PM 10    there is an enormous amount of uncertainty.  The probability of

02:24:17PM 11    success on the merits favor settlement, unquote.

02:24:21PM 12            Last week, the trustee filed a final application for

02:24:25PM 13    fees and costs with the bankruptcy court in that case.  And the

02:24:29PM 14    report -- he reports collecting 1.888, so round numbers,

02:24:38PM 15    $1.9 million in assets to the bankruptcy estate.  Judge, when

02:24:41PM 16    you add the $308,925 that Dr. Schneider is going to owe in

02:24:48PM 17    restitution, that puts the bankruptcy estate at $2.2 million.

02:25:06PM 18            Judge --

02:25:06PM 19            THE COURT:  Well, can I ask you about that

02:25:08PM 20    restitution figure --

02:25:11PM 21            MR. SMITH:  Sure.

02:25:10PM 22            THE COURT:  -- Mr. Smith?

02:25:11PM 23            MR. SMITH:  Yes.

02:25:12PM 24            THE COURT:  What is your client's plan to pay it?

02:25:14PM 25            MR. SMITH:  Well, Judge, as we promised in the

02:25:17PM   1   settlement -- I'm sorry, in our sentencing memorandum,

02:25:22PM   2   Dr. Schneider has taken $35,000 out of a retirement account

02:25:27PM   3   that he has, and he has a check today to give to the Clerk of

02:25:32PM   4   Court, once restitution is ordered, as a way of getting

02:25:37PM   5   started.

02:25:38PM   6            He -- as I have stated in our memorandum, he has

02:25:43PM   7   begun work using his master's degree in negotiation and dispute

02:25:48PM   8   resolution to start a business doing alternative dispute

02:25:53PM   9   resolution with healthcare providers.  I've explained to you in

02:25:57PM  10   our memorandum about the book that he wrote.

02:25:59PM  11            And so that is what -- he plans to go around the

02:26:02PM  12   country to, if he's free, of course, to, like, American Medical

02:26:09PM  13   Association meetings and meetings involving neurological

02:26:12PM  14   association, other medical provider meetings, and sell, not

02:26:18PM  15   just his book, buy, really, sell his services to major

02:26:23PM  16   hospitals, if possible, to help them integrate a program with

02:26:27PM  17   their personnel that will, well, smooth out the wrinkles that

02:26:33PM  18   happen when, in large hospitals, among staff, intra-hospital

02:26:39PM  19   and between hospitals and between medical providers and

02:26:44PM  20   patients, administrators and vendors, you know, there's a whole

02:26:49PM  21   slough of interrelated things that happen in a hospital

02:26:53PM  22   setting, as you might guess.  And so he -- his book -- and I

02:26:57PM  23   wanted to read a section of it -- from it to you -- is his

02:27:03PM  24   whole course of study -- here it is -- is aimed at that.

02:27:08PM  25            And, Judge, I guess the bottom line, Judge, is all of

02:27:11PM   1   the things we're talking about Dr. Schneider happened in 2011,
02:27:15PM   2   '12, '13, '14, and maybe into '15.  But since then, he has
02:27:21PM   3   tried very hard to change his life and to have a new path.
02:27:25PM   4   He's not happy -- you're going to hear from him, but he's not
02:27:28PM   5   happy with what happened during those years.  That was -- that
02:27:33PM   6   was not -- obviously, that was very bad behavior on his part,
02:27:37PM   7   but also just a bad way for him to be living his life, and it
02:27:41PM   8   got seriously out of control.
02:27:44PM   9          But in 2015 and into 2016, while this bankruptcy is
02:27:49PM  10   boiling around, and he takes the time to go to Creighton law
02:27:53PM  11   school and get a master's degree in negotiation and alternative
02:27:57PM  12   dispute resolution as a means of maybe -- well, first and
02:28:02PM  13   foremost, of learning something.  He has spent a lot of time
02:28:05PM  14   reflecting, and with introspection, and this course of study
02:28:11PM  15   really helped him with that, to understand how it was he got to
02:28:15PM  16   where he was and is now, which I think is -- that's commendable
02:28:21PM  17   that he would take that time.  I mean, everybody says he
02:28:25PM  18   doesn't care and he isn't sorry.  That isn't true.  That just
02:28:29PM  19   simply isn't true, Judge.  Yes, he's had transgressions, but he
02:28:34PM  20   wants to make good on them.
02:28:35PM  21          If I could, Judge, I just have a paragraph to read.
02:28:39PM  22   And he wrote at page 19, it's in the first chapter.
02:28:42PM  23          He says, "The underlying theme in this textbook are
02:28:46PM  24   founded in generativity theory, to create a legacy enabling
02:28:49PM  25   providers to avoid the mistakes the author witnessed or made

(140 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 100 of 139
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 140 of 303          39

02:28:53PM 1    over a thirty-year neurosurgery career.  Please begin by

02:28:56PM 2    learning the art of active listening.  Empathetic attention

02:29:00PM 3    during conversation reveals your opponent's perspective and

02:29:03PM 4    dismisses your urge to interrupt, qualify, and correct their

02:29:07PM 5    understanding of events and issues.  In time you will develop a

02:29:10PM 6    deeper appreciation of inclusion, diversity of views,

02:29:14PM 7    perspective and become tolerant of opinions that may differ,

02:29:17PM 8    recognizing that in the end, we all have common needs,

02:29:21PM 9    interests and goals.  Combining the tools of leadership,

02:29:25PM 10   adherence to policy, and working from an interest-based

02:29:27PM 11   perspective, healthcare providers learn how to work through the

02:29:32PM 12   inevitable issues that occur while caring for patients.  By

02:29:34PM 13   proactively addressing problematic situations you will receive

02:29:37PM 14   a profoundly valuable personal payoff - reduced stress and

02:29:41PM 15   wasted time, efficient accurate patient care, and comfortable

02:29:45PM 16   rewarding professional satisfaction."

02:29:47PM 17        And that's just a piece of this, Judge.  But I think

02:29:50PM 18   it shows what -- you know what, I don't think -- I know

02:29:55PM 19   Dr. Schneider could not have written that paragraph in 2014.

02:30:00PM 20   His life was not -- he wasn't in a place where he could

02:30:02PM 21   recognize the things that he's come to recognize over the last

02:30:05PM 22   several years.  You know, I guess the statement comes to mind,

02:30:11PM 23   if he knew then what he knows now, we wouldn't be here, Judge;

02:30:15PM 24   but he didn't.  But, yet, he's taken the time to rehabilitate

02:30:20PM 25   himself in that way.

(141 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 101 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 141 of 303

40

02:30:23PM  1    Before I go on about that, I would like to address

02:30:26PM  2  something about the personal injury claimants, or the claims

02:30:31PM  3  that were made by the personal injury -- by Jon Moyers

02:30:35PM  4  discussed and Joe Womack discussed too.

02:30:39PM  5    When those claims came into bankruptcy, Judge, as you

02:30:43PM  6  know, they were contingent, unliquidated claims for money.  And

02:30:49PM  7  during the -- they were very involved during the process that

02:30:53PM  8  AP 1515 took between the trustee and Mr. Schneider and his

02:30:59PM  9  lawyers and the trustee's lawyer.

02:31:04PM  10    The trustee, in his final application for fees, just

02:31:08PM  11  last week -- I'm sorry, I lost my place, but I will find it --

02:31:25PM  12  said it better than I said it in our -- more concisely than I

02:31:30PM  13  said it in our sentencing memorandum, Judge.  He said to the

02:31:47PM  14  Court last week, in explaining to the Court how he had come to

02:31:54PM  15  have the trustee fees that he did and the attorneys' fees that

02:31:56PM  16  he did, and he explained about the personal injury claimants.

02:32:01PM  17  And I'm sorry, it took me a second there.  He stated to the

02:32:05PM  18  Court, on August 9th of 2018, "The trustee was also successful

02:32:10PM  19  in getting the debtors' discharge denied, with no attorneys'

02:32:13PM  20  fees being charged by the trustee for this legal work."

02:32:17PM  21    It is true that John Schneider, he voluntarily, as

02:32:24PM  22  part of the discussions and settlement of AP 1515, he

02:32:29PM  23  voluntarily agreed to waive his discharge in the bankruptcy

02:32:32PM  24  proceeding.  There was some pressure from the court to do that,

02:32:35PM  25  but John did that.  And in so doing, he put the plaintiffs --

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 102 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 142 of 303

(142 of 303)

41

02:32:43PM 1    the personal injury claimants in a position to seek, to pursue

02:32:48PM 2    their claims in a court of law, and the trustee acknowledges

02:32:51PM 3    that.

02:32:52PM 4          This allowed creditors the opportunity to pursue the

02:32:55PM 5    debtor for any unpaid portion of their claim should they wish

02:32:59PM 6    to do so.  Originally, the PI claimants were very concerned

02:33:02PM 7    that the debtor did not receive his discharge so that they

02:33:04PM 8    could pursue him later outside of the bankruptcy.  In the end,

02:33:08PM 9    they waived their right to pursue Schneider outside the

02:33:11PM 10   bankruptcy in return for not having to prove up their claims.

02:33:15PM 11         And that's exactly what happened, Judge.  They --

02:33:18PM 12   their claims were never proven.  And I have to disagree -- I

02:33:23PM 13   mean, John Schneider was a surgeon and performed high risk type

02:33:28PM 14   surgeries.  He has never acknowledged -- he has never admitted,

02:33:33PM 15   as they say, that he committed malpractice.  I mean, that

02:33:39PM 16   whole -- that whole factual issue is way outside of a

02:33:42PM 17   bankruptcy proceeding.

02:33:44PM 18         The trustee mentioned that he allowed the PI

02:33:47PM 19   claimants' claims.  Well, okay, in a bankruptcy proceeding,

02:33:51PM 20   both the trustee in this case and John's attorney, Jim Cossitt,

02:33:57PM 21   objected to the PI claims when they were -- came in to the

02:34:01PM 22   bankruptcy estate.  And then when the settlement happened and

02:34:06PM 23   John agreed to -- that he'd waive his discharge in bankruptcy,

02:34:10PM 24   part of the deal was that both the trustee and John, through

02:34:15PM 25   his lawyer, would then take away their objections to those

(143 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 103 of 139
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 143 of 303

42

02:34:21PM   1   claims and, quote, unquote, allow them.  That's a process that
02:34:25PM   2   happens in bankruptcy.  But it certainly is no admission that
02:34:28PM   3   he committed malpractice over the course of five or six, or
02:34:33PM   4   whatever -- how many claimants there are, Judge.  That's just
02:34:35PM   5   not a fair statement, I don't think.
02:34:37PM   6           The trustee also acknowledged the unsecured
02:34:44PM   7   creditors, the group that is represented by Mr. Moyers in his
02:34:48PM   8   filing last week, when he said to the judge, quote:  The group
02:34:51PM   9   of unsecured creditors that express concerns are generally
02:34:55PM  10   described as the personal injury plaintiffs, PI claimants.  The
02:34:59PM  11   PI claimants are represented by attorneys on a contingency
02:35:03PM  12   basis.  The amount recovered for the PI claimants will impact
02:35:05PM  13   the amount the PI claimant attorneys and their clients will
02:35:09PM  14   receive.  So they're motivated to cause the attorney fees and
02:35:12PM  15   trustee fees to be reduced as much as possible in order to
02:35:16PM  16   increase their respective recoveries.  Applicant is not aware
02:35:19PM  17   of the legal or factual basis of their objections.
02:35:22PM  18           So he addressed that.  And with this filing last
02:35:28PM  19   week, he gave the judge a -- basically an accounting of the
02:35:34PM  20   bankruptcy estate.  And it's true, the final report shows the
02:35:38PM  21   total recovery into the estate was one point eight eight eight
02:35:43PM  22   seven twenty-three, so approximately $1.9 million.  Of that,
02:35:48PM  23   there were administrative fees, attorneys' fees, both for the
02:35:52PM  24   trustee and for the trustee's attorney, and then trustee fees,
02:35:56PM  25   leaving, Judge, a total of $568,928, so $569,000, to be

(144 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 104 of 139
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 144 of 303

43

02:36:05PM  1  distributed among the unsecured creditors, which includes all

02:36:09PM  2  of the PI claimants, as they are called.

02:36:15PM  3      The report -- I'll add one last thing, Judge.  The

02:36:26PM  4  report reflects that of the -- and maybe I should take a step

02:36:32PM  5  back -- of the claims -- the unsecured claims, what each

02:36:37PM  6  claimant will receive is approximately 7.9 percent of their

02:36:42PM  7  overall claim.  Okay.  That sounds like peanuts, 7.9 cents on

02:36:48PM  8  the dollar, right?  But that's really not atypical in a

02:36:53PM  9  bankruptcy proceeding, I don't believe.

02:36:55PM  10     And what I came to learn in preparing this case for

02:36:59PM  11  Dr. Schneider was, when, for instance -- well, I can just look

02:37:04PM  12  at them, but when the PI claimants came in to the bankruptcy,

02:37:10PM  13  they came in suggesting that their claims were worth

02:37:15PM  14  $1 million.  Harley Morrell, the PA that is claiming some kind

02:37:19PM  15  of contract dispute, $300,000.  I don't want to name names, but

02:37:25PM  16  you know, a million dollars, $1.5 million, a million dollars,

02:37:28PM  17  $2 million.

02:37:29PM  18     And, Judge, these are personal injury claims; who

02:37:34PM  19  knows what a jury would award.  Maybe it'd be way more, maybe

02:37:39PM  20  it'd be way less, maybe it'd be a defense verdict.  Those are

02:37:43PM  21  just estimates based upon the plaintiffs' attorneys' assessment

02:37:46PM  22  of his case.  And they put that claim in, I'm sure, in good

02:37:49PM  23  faith.  But all it does in the end is define what the pro rata

02:37:55PM  24  share will be for them when the dust settles and the

02:38:00PM  25  disbursement happens with the rest of the recovered assets.

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 105 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 145 of 303

44

02:38:05PM   1        So, you know, I just don't -- I mean, and, again,

02:38:08PM   2    they had a chance to go sue and try to get $2 million, or a

02:38:13PM   3    million dollars, or $1.5 million, and they huddled with their

02:38:17PM   4    attorneys and they decided, no, we want to come -- we want to

02:38:22PM   5    come back into the bankruptcy -- because when he waived his

02:38:24PM   6    discharge, they had not signed off on any settlement at that

02:38:28PM   7    point yet.  They will only a few days later, but -- and then

02:38:33PM   8    they decided, no, we'll take what we can get in the bankruptcy.

02:38:36PM   9    And I just -- that's how it really went down.  That's how it

02:38:40PM  10    went.

02:38:40PM  11        Since that time, Judge -- again, Dr. Schneider has

02:38:44PM  12    pursued this ADR.  I think it's going to be a great career,

02:38:50PM  13    second career for him, because he can really help hospitals and

02:38:54PM  14    administrators and physicians, based on his experience that

02:38:59PM  15    hasn't all been good but that he's learned a ton from, and that

02:39:04PM  16    I think he can actually have an income eventually from this,

02:39:07PM  17    because he's a very energetic guy and somebody who -- he'll

02:39:12PM  18    give his all to it.  He's already written a book about it, and

02:39:15PM  19    he's already preparing materials that can be presented in

02:39:18PM  20    classwork for nursing students and other kinds of students, and

02:39:22PM  21    medical students coming up through the system.

02:39:24PM  22        You know, he's also, Judge, using his experience from

02:39:29PM  23    numerous medical missions to Latin America, working with his

02:39:33PM  24    son, Brandon, to develop and operate a nonprofit that will send

02:39:37PM  25    medical professionals into areas around the world when disaster

(146 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 106 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 146 of 303          45

02:39:41PM  1    strikes, to put stethoscopes on the ground, so to speak, in a
02:39:46PM  2    hurry, when and where they're needed most.  Puerto Rico, for
02:39:49PM  3    instance, after the last hurricane, comes to mind.

02:39:53PM  4            But perhaps the most rewarding thing that John is
02:39:56PM  5    doing right now is -- and I've given you information about
02:39:58PM  6    this, Judge, is doing the scuba diving with veterans, combat
02:40:02PM  7    veterans.  He finds amazing reward in that, because it is -- he
02:40:09PM  8    can bring his -- not only his scuba diving experience, but also
02:40:12PM  9    his medical, his neurological training to bear, because these
02:40:18PM 10    folks are suffering from post-traumatic stress, they're
02:40:22PM 11    suffering from horrific combat wounds and physical
02:40:26PM 12    disabilities.  And when he gets them in the water and it's
02:40:28PM 13    quiet under water and they're able to float, free of gravity,
02:40:32PM 14    you know, which is not like it is on land for them, and he's
02:40:35PM 15    able to help them.  And I've given you information that he's
02:40:39PM 16    going to go forward with programs, and not just diving with
02:40:42PM 17    them, but trying to help the people that are running these
02:40:46PM 18    programs establish themselves to a greater extent.

02:40:50PM 19            You've got a lot of combat veterans coming back from
02:40:53PM 20    the Middle East.  I see them all the time in my criminal
02:40:57PM 21    defense practice, because they are suffering.  This is
02:41:00PM 22    something that he can do and he can do in a specialized way
02:41:04PM 23    that I think can make a really big impact in Southern
02:41:07PM 24    California where these two groups are headquartered.

02:41:11PM 25            So I guess, Judge, over the past several years,

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 107 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 147 of 303

(147 of 303)

46

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
| 02:41:15PM | 1  | despite all the bad things that Mr. Rubich and others have to            |
| 02:41:18PM | 2  | say about what he did before that, I think John is trying to             |
| 02:41:21PM | 3  | show you that he's capable of changing, he's capable of                  |
| 02:41:25PM | 4  | redemption, he's capable of correcting his past wrongs, he's             |
| 02:41:31PM | 5  | capable of helping others who are in dire need of help.  He              |
| 02:41:35PM | 6  | brings a multitude of skills to the table, as I've said, that            |
| 02:41:38PM | 7  | enable him to really make a difference.                                  |
| 02:41:41PM | 8  | Judge, his post-defense rehabilitation is                                |
| 02:41:43PM | 9  | significant, is significant and extensive.  And he has no                |
| 02:41:48PM | 10 | substance abuse issues with which we deal all the time in the            |
| 02:41:52PM | 11 | Criminal Justice System.                                                 |
| 02:41:53PM | 12 | With all of this in mind, Judge, I'm asking that you                     |
| 02:41:56PM | 13 | sentence John to a period of five years probation, with a                |
| 02:41:59PM | 14 | substantial community service component in lieu of a fine,               |
| 02:42:02PM | 15 | leaving John to focus on his continuing work with the Dive Vets          |
| 02:42:06PM | 16 | and the WAVES Project and to build his ADR business so that he           |
| 02:42:11PM | 17 | can pay the remaining restitution.  He owes the restitution to           |
| 02:42:15PM | 18 | the estate, there's no question about it, so we expect that.             |
| 02:42:19PM | 19 | He will pay 35,000 today, plus the hundred dollar assessment.            |
| 02:42:25PM | 20 | Judge, I'd ask that you waive the interest on the                        |
| 02:42:28PM | 21 | restitution, as it's a sizeable amount, even after the 35,000            |
| 02:42:32PM | 22 | is paid, because that would just be very difficult to pay that           |
| 02:42:37PM | 23 | and the principal, too.                                                  |
| 02:42:42PM | 24 | Judge, John does want to address the Court and                           |
| 02:42:44PM | 25 | exercise his right to allocution, so I'd ask that you listen to          |

02:42:48PM  1   John now.

02:42:49PM  2          Thank you.

02:43:00PM  3          THE DEFENDANT:  Your Honor, thank you for this

02:43:01PM  4   opportunity to speak.

02:43:03PM  5          "I am so very sorry.  Please know that, unlike what

02:43:10PM  6   was represented, I do have absolute respect for the law and the

02:43:14PM  7   bankruptcy rules.  I am embarrassed and ashamed to have

02:43:18PM  8   disrespected this process.

02:43:20PM  9          "I was wrong in failing to disclose a bank account

02:43:23PM 10   and concealing money from the bankruptcy estate and my

02:43:27PM 11   creditors.  I understand it's an insult to a judicial

02:43:31PM 12   proceeding which serves a very important function in our

02:43:34PM 13   society.

02:43:34PM 14          "I'm not here to make excuses for my past behavior,

02:43:39PM 15   but I want to let you know who I was and who, with convictions

02:43:43PM 16   of my faith, I'm trying to become.

02:43:45PM 17          "I alone am responsible for this transgression.  I've

02:43:51PM 18   always had an unwavering commitment to the rules that govern

02:43:54PM 19   our society, and I passed this on to my children.  I have

02:43:59PM 20   always been a law-abiding citizen before and after this

02:44:02PM 21   criminal act.  But there's no defense for my behavior.  Yet, I

02:44:09PM 22   would like to share with you the context in which I committed

02:44:13PM 23   this crime.

02:44:13PM 24          "This was an incredibly stressful time in my life.

02:44:18PM 25   The profound impact this stress had on my family and the

(149 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 109 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 149 of 303        48

02:44:21PM 1   absolute threat, I felt, against my professional career did

02:44:26PM 2   cause me to make several bad decisions, including

02:44:30PM 3   misrepresentation of my bankruptcy finances.  There's no

02:44:34PM 4   justification for my actions.  But the rest of my life

02:44:39PM 5   demonstrated that my behavior in the bankruptcy was shamefully

02:44:42PM 6   out of character.  I've always tried to conduct myself as a

02:44:45PM 7   gentleman and an officer above reproach.  Any crime that I

02:44:50PM 8   would be guilty of is at odds with my core values and has led

02:44:56PM 9   to my psychological and spiritual reflection.

02:44:58PM 10          "Your Honor, I did not come from wealth and

02:45:02PM 11  privilege.  I worked incredibly hard for everything I've

02:45:06PM 12  earned, sacrificed decades away -- decades of time away from my

02:45:10PM 13  family.  As a young, small, chubby boy in the '60s, I grew up

02:45:14PM 14  in the rough streets of Irish Catholic South Boston at the

02:45:17PM 15  hands of a predatory Catholic church.  I was severely bullied

02:45:22PM 16  and lived through physical and emotional abuse.  In addition,

02:45:25PM 17  my parents, God rest their soul, were strict Irish Germans and

02:45:30PM 18  they could be ruthless with punishment.  I buried all that

02:45:34PM 19  psychological trauma and refused to acknowledge its effect.

02:45:39PM 20          "From those experiences, I did hold deep-seated scars

02:45:46PM 21  and the seeds of anger and resentment toward anyone that I

02:45:50PM 22  perceived a bully.  As I matured and my challenges magnified,

02:45:55PM 23  so did the intensity of my resolve for retribution when I or

02:45:58PM 24  anyone close to me were again victims of tormenters or thugs.

02:46:03PM 25          "I do, Your Honor, hold honor, integrity and respect

(150 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 110 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 150 of 303                49

02:46:08PM  1  for all that are so very important.  These values are witnessed
02:46:13PM  2  in my own children's behavior.
02:46:15PM  3          "Unfortunately, when my family and my career were
02:46:20PM  4  under continuous threaten -- were continuous attack, threatened
02:46:22PM  5  by vicious competitors at a time that I was so intense and so
02:46:24PM  6  passionate about my vision, I ignored sound judgment.  I let my
02:46:31PM  7  anger and rage overwhelm my actions.  I did behave very badly;
02:46:38PM  8  escalating a conflict and then suffering the consequences of
02:46:41PM  9  that unchecked fury.  That was a childish and misguided
02:46:47PM 10  crusade.
02:46:48PM 11          "As that dispute raged, Your Honor, I was heartbroken
02:46:57PM 12  when the husband of one my employees who worked for me for
02:47:02PM 13  years, people that I considered my medical family, died on my
02:47:07PM 14  watch.  I was happy that Kathy Monaco continued to work for me
02:47:13PM 15  ten months after her husband died.  We spoke frequently, and I
02:47:19PM 16  did ask her many times to forgive mistakes that several people
02:47:24PM 17  had made that caused that tragedy.
02:47:28PM 18          "Your Honor, I do have great compassion and empathy
02:47:31PM 19  for all my patients and their families.  I'm a parent, and I
02:47:35PM 20  grieve for the children who lost parents at a young age.
02:47:41PM 21  Compounding all of this was my desire to open the Omni Center
02:47:45PM 22  after a massive financial and personal commitment.
02:47:49PM 23          "Your Honor, I haven't sought fortune and fame, but I
02:47:54PM 24  did become obsessed and competitive.  I had a vision for a
02:47:59PM 25  suite of medical services in the region, and I did pursue it

02:48:02PM   1   with blinding passion.  I overextended myself, and this caused

02:48:06PM   2   my personal and professional life to implode under that strain.

02:48:12PM   3   I burdened myself and my family with the constant stress.  I

02:48:14PM   4   was type A and intense and highly competitive, and, frankly, I

02:48:21PM   5   didn't know how to handle shock and demoralization and the

02:48:25PM   6   severe depression I felt during that time.  Exhaustion and the

02:48:29PM   7   pending doom I felt on my entire life clouded sound judgment

02:48:34PM   8   and caused me to make a criminal mistake in my bankruptcy

02:48:37PM   9   reporting.

02:48:38PM   10       "Your Honor, as a physician, I was privileged and

02:48:44PM   11  honored to serve and save thousands of lives and improve the

02:48:48PM   12  quality of life for so many.  I personally operated and was

02:48:51PM   13  responsible for over 17,000 patients.  I was blessed with a

02:48:57PM   14  technical gift and the skill to provide a very difficult

02:49:00PM   15  medical service.

02:49:03PM   16       "I am profoundly disappointed that every patient

02:49:07PM   17  didn't have a perfect outcome, and my practice was not free of

02:49:11PM   18  complications and rabidity.  Neurosurgery is an incredibly

02:49:17PM   19  risky endeavor.  Unfortunately, during all this litigation that

02:49:21PM   20  occurred between 2012 and 2014, the fatigue, regret, and

02:49:30PM   21  self-doubt I experienced overwhelmed any intelligent or logical

02:49:34PM   22  reasoning.  This was a time of absolute chaos for me and my

02:49:40PM   23  family.  I was overcome with anxiety and constant fear that

02:49:45PM   24  still exists today.  I pray for the turmoil to end.  I simply

02:49:51PM   25  don't want to fight it anymore.

(152 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 112 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 152 of 303

51

02:49:53PM 1      "Your Honor, I actually believe the bankruptcy

02:49:59PM 2   process would be a simple matter, and I'd be happy to answer

02:50:02PM 3   questions about the insurance company issues that have been

02:50:06PM 4   mischaracterized.  But after filing bankruptcy, I thought I

02:50:10PM 5   could easily move on, close the Billings chapter of my life,

02:50:15PM 6   restart my medical practice and find some peace with my family.

02:50:20PM 7   I was sure I could recover and purge what were truly bizarre

02:50:25PM 8   and petty obsessions.

02:50:27PM 9      "I did not make the bankruptcy process simple,

02:50:30PM 10   however.  I sabotaged my goals and the bankruptcy process.  I

02:50:36PM 11   did want to keep funds out of the bankruptcy estate to care for

02:50:41PM 12   my family until I could get back on my feet, so I put money in

02:50:46PM 13   someone else's account, and I did try to cheat the process, and

02:50:49PM 14   I did make Mr. Womack's job harder.

02:50:54PM 15      "Your Honor, I stand before you today a man in

02:50:57PM 16   transformation.  I've learned valuable lessons from all this

02:51:01PM 17   conflict and this criminal act.  My priorities are realigned

02:51:04PM 18   and I'm blessed by His grace.  And God isn't done with me yet.

02:51:09PM 19   Having hit rock bottom with this criminal behavior, I know now

02:51:13PM 20   where to find courage, guidance, and perseverance to be a

02:51:18PM 21   righteous man.  I did take a new field of study to help me

02:51:21PM 22   understand my past, my past behavior over those difficult

02:51:26PM 23   years, and it still guides me now.

02:51:28PM 24      "I returned to my neurosurgical practice helping as

02:51:32PM 25   many people as I could, and I'm dedicated to live in peace,

(153 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 113 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 153 of 303

52

1   supporting my family and repairing relationships that I
2   strained.
3        "I only wish that someone who had learned the hard
4   lessons that I have was there to mentor me during those
5   difficult years.  I now fully understand my misdeeds and
6   recognize the feeling that blinded my behavior.  Your Honor, I
7   know I spurned the rules.  And when I was arrested at church
8   with my wife, that was a disgraceful reminder that I wasn't
9   done repenting for my sins.
10       "Your Honor, I'm working hard to be the best reformed
11  man I can; a man of character, temperance and integrity for my
12  family, community and my God.  The best I can do is heartfully
13  acknowledge and apologize for my mistake, accept responsibility
14  and make restitution.
15       "I am truly sorry, Your Honor.  I can't undo the harm
16  that I've caused the people I've cared about, and I carry that
17  shame and responsibility with me every day.  All I can do now
18  is try to be a living testimonial atonement and hopefully make
19  amends where I've hurt, reconstruct personal life damage by my
20  mistakes, but always ashamed and humiliated as a criminal.  I
21  stand before you today, Your Honor, praying for the Court's
22  leniency.  This illicit experience has profoundly humbled me.
23  Whatever you decide, Your Honor, I won't allow this failure to
24  define my life.
25       "I'm working hard in my new profession, cautioned by

02:53:10PM   1   my own experience.  I remain a dedicated servant to those less

02:53:17PM   2   fortunate and in turmoil.  I strive daily, reflecting in

02:53:21PM   3   prayer, determined to be a good father, a good husband, and a

02:53:24PM   4   good man.  If anything, Your Honor, my life is a cautionary

02:53:29PM   5   tale and I share it openly.  But whatever you decide, Your

02:53:34PM   6   Honor, I accept as my due punishment."

02:53:36PM   7          Thank you.

02:53:40PM   8          THE COURT:  Well, the question before the Court today

02:53:43PM   9   is what is a sufficient, but not greater than necessary

02:53:48PM  10   sentence that will accomplish the purposes of sentencing, which

02:53:52PM  11   include punishment, deterrence, protection of the public and

02:53:56PM  12   rehabilitation.  And the sentence needs to reflect the

02:54:00PM  13   seriousness of the crime and promote a respect for the law.

02:54:02PM  14          In determining what is a sufficient, but not greater

02:54:07PM  15   than necessary sentence, I consider not only the advisory

02:54:09PM  16   sentencing guideline range but also the sentence provided for

02:54:12PM  17   by statute and also the sentencing factors that are set forth

02:54:17PM  18   in 18 United States Code Section 3553(a).  And as I will

02:54:24PM  19   explain, I find that a custodial sentence of 24 months,

02:54:28PM  20   followed by a three-year term of supervised release with

02:54:31PM  21   conditions does constitute a sufficient, but not greater than

02:54:36PM  22   necessary sentence.

02:54:36PM  23          When I look at the 3553(a) factors, beginning with

02:54:41PM  24   the nature and circumstances of the offense, it's a serious

02:54:47PM  25   offense, it's a serious offense whenever anyone lies in a

(155 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 115 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 155 of 303

54

02:54:55PM   1   federal court proceeding.  And you lied, Dr. Schneider, and you

02:55:05PM   2   lied multiple times, because you were given multiple

02:55:11PM   3   opportunities to correct the original lie and did not ever

02:55:17PM   4   choose to do that.  And so concealment of these bankruptcy

02:55:22PM   5   assets is now the crime that you are convicted of, and it's

02:55:27PM   6   quite appropriate.

02:55:28PM   7          But looking at the circumstances of this particular

02:55:32PM   8   case, which I think are somewhat unique, under the guidelines,

02:55:39PM   9   I'm to consider the amount of harm that is done.  And I think

02:55:46PM  10   that the harm in this case is greater than the harm might be in

02:55:55PM  11   a typical bankruptcy case where assets are concealed.  And

02:56:02PM  12   it's -- that's because of the nature of the creditors who were

02:56:07PM  13   deprived of an opportunity to recover from you monies to make

02:56:17PM  14   them whole again.  I understand their claims have not been

02:56:21PM  15   litigated.  And despite Mr. Womack and Mr. Moyers' belief that

02:56:29PM  16   you have admitted malpractice, that's not your position.

02:56:34PM  17          But in looking at who you were, your history and

02:56:41PM  18   characteristics, which is also one of the 3553(a) factors,

02:56:46PM  19   leading up to this bankruptcy fraud, I think that what you did

02:56:56PM  20   as to the malpractice insurance account is a window into your

02:57:04PM  21   character, at least at that point in time.  I don't think that

02:57:10PM  22   you can explain away to me that monies held for malpractice

02:57:19PM  23   insurance could somehow be used to settle a claim for

02:57:25PM  24   defamation is appropriate.  I don't think that you -- well, I

02:57:32PM  25   know my imagination won't be stretched that far.

(156 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 116 of 139
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 156 of 303

55

02:57:37PM   1      So I believe you raided that fund to pay that

02:57:40PM   2  settlement with Dr. Biles.  And what that ended up doing is

02:57:44PM   3  depriving these unsecured creditors of an opportunity to go

02:57:49PM   4  through the normal course of things when they believe that they

02:57:53PM   5  have suffered from medical malpractice, which is to bring a

02:57:56PM   6  lawsuit in court, and to have a hope of recovering some money,

02:58:01PM   7  if the jury agrees with their position, because they believe

02:58:05PM   8  that doctors have medical malpractice insurance, and you

02:58:10PM   9  represented that you did.

02:58:11PM  10      So I believe that that behavior, you're not on -- you

02:58:15PM  11  know, you're not convicted of anything for that, but that gives

02:58:19PM  12  me a window into the way that you were thinking in that period

02:58:22PM  13  of time, which was, for whatever reason, was just about you and

02:58:27PM  14  your own survival and not about other individuals.  And if I

02:58:32PM  15  understand the timeline correctly, Mr. Monaco had died by then.

02:58:40PM  16      Is that correct, Mr. Moyers?  By the time he raided

02:58:45PM  17  the insurance fund, had Mr. Monaco passed away?

02:58:51PM  18      JON MOYERS:  We both believe that he was aware of the

02:58:55PM  19  claim.

02:58:56PM  20      THE COURT:  Right.  That's what I heard one of you

02:58:59PM  21  say, is Dr. Schneider would be aware of the claim prior to him

02:59:05PM  22  raiding that insurance fund.

02:59:07PM  23      So, you know, I read the government's exhibit, which

02:59:15PM  24  was quite enlightening, that is the -- I'm not exactly sure how

02:59:23PM  25  these get published in the Pacific Reporter, but the opinion of

(157 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 117 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 157 of 303          56

02:59:27PM  1   the Board of Professional Responsibility, which was actually a

02:59:32PM  2   proceeding against your attorney, Mr. Stinson, for his

02:59:37PM  3   professional misconduct, but it sets forth the facts

02:59:42PM  4   surrounding that whole episode with Dr. Biles.

02:59:51PM  5           And thereto, Dr. Schneider, you exhibited a real lack

03:00:01PM  6   of respect for legal process, for the law, for -- you know, you

03:00:08PM  7   talk about being a man of honor.  Well, when you take an oath

03:00:12PM  8   to tell the truth and then you lie, that's not honorable,

03:00:19PM  9   Dr. Schneider.  And the facts are set out of this whole kind of

03:00:25PM  10  sorted episode that led to Dr. Biles suing you, nothing is

03:00:31PM  11  honorable about any of your conduct in that situation either,

03:00:37PM  12  and, again, gives me kind of a window into how, at the time, at

03:00:42PM  13  least, you think, or were thinking and the extent of your

03:00:47PM  14  criminal thinking.  And then, you know, when things, I guess,

03:00:53PM  15  were kind of falling apart, but prior to the filing of the

03:00:58PM  16  bankruptcy in 2013, you get your sister to open this bank

03:01:03PM  17  account in her name and you deposit half a million dollars plus

03:01:08PM  18  in that account.  And despite the fact it's in her name, you

03:01:14PM  19  have complete control over those funds.

03:01:16PM  20          And then the bankruptcy gets filed.  At the time the

03:01:20PM  21  bankruptcy is filed, you still have a little over $300,000 in

03:01:24PM  22  that account, but you lie on your financial forms in the

03:01:29PM  23  bankruptcy and don't disclose that money to the bankruptcy

03:01:34PM  24  trustee.  And by lying to the trustee, you lie to the Court and

03:01:41PM  25  cause that bankruptcy estate to incur hundreds of hours of

(158 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 118 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 158 of 303

57

03:01:51PM  1    effort to try to locate all of your assets.

03:01:56PM  2         Now, Mr. Smith argues it's not all related to that

03:02:00PM  3    account, and I think that's probably true.  That makes sense to

03:02:04PM  4    me.  But I don't get the feeling that you were really very

03:02:08PM  5    forthcoming when it came to various assets, Dr. Schneider.  And

03:02:15PM  6    so, again, your level of criminal thinking at the time, and

03:02:21PM  7    your desire, really, there's no other way to say it but to

03:02:25PM  8    defraud your creditors is pretty extreme.

03:02:34PM  9         And I remember at your change of plea, you know, we

03:02:38PM  10   go through the offer of proof and -- at plea changes, and we

03:02:45PM  11   did that at yours.  Mr. Rubich read the offer of proof, and I

03:02:49PM  12   asked you if you agreed with the offer of proof, and the

03:02:55PM  13   only -- and when people don't, I write down what they disagree

03:02:59PM  14   with.

03:03:00PM  15        And I must have asked you where the funds went after

03:03:09PM  16   you -- after your sister closed the account and gave the funds

03:03:15PM  17   from that account to you, and that's how I know, when I

03:03:22PM  18   interjected earlier in this hearing, you told me that the funds

03:03:26PM  19   went to your wife to put in your children's trust account, and

03:03:34PM  20   that was after the bankruptcy was filed and ongoing.  And you

03:03:42PM  21   knew that you had this money, you knew you were supposed to

03:03:45PM  22   disclose all of your assets.  Then you get the money back from

03:03:49PM  23   your sister.  Do you tell anybody about it?  No.  You're still

03:03:54PM  24   in that extreme criminal thinking.  And you give it to your

03:04:00PM  25   wife to put in your children's trust.

(159 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 119 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 159 of 303

58

03:04:02PM   1         The home you live in is worth over $2 million, but no

03:04:07PM   2 one can touch it because you put it in a trust.  And I don't

03:04:12PM   3 begrudge your success at all, Dr. Schneider.  More power to

03:04:17PM   4 you.  That's the American way.  I don't begrudge your estate

03:04:22PM   5 planning.  But this -- you know, taking these funds in the

03:04:27PM   6 midst of the bankruptcy and placing them -- first, you hide

03:04:30PM   7 them, don't disclose them.  Then when you get them back, you

03:04:34PM   8 put them in a trust so nobody can have access to them.  So

03:04:38PM   9 there's just this continuing criminal thinking that's going on

03:04:43PM 10 over a fairly long period of time.  And now there's -- you

03:04:52PM 11 know, there's nothing left as far as that money is concerned.

03:05:01PM 12         And, frankly, you come today with $35,000; that's

03:05:06PM 13 good.  Something's better than nothing.  But I had a guy last

03:05:14PM 14 week who hardly has anything, but he had a house -- and he

03:05:19PM 15 stole money from a local business -- and he sold his house to

03:05:25PM 16 come with the $94,000 worth of restitution that he owed.  And

03:05:32PM 17 he doesn't really have much other than that.  He manages some

03:05:37PM 18 mobile homes.

03:05:40PM 19         You could certainly have access to much greater

03:05:45PM 20 assets to come in here with a check and pay your restitution

03:05:49PM 21 today.  I understand they're all in trust, but these trusts are

03:05:53PM 22 managed by your wife, your children.  And you could have the

03:06:00PM 23 means by which to come in here and pay your restitution in full

03:06:05PM 24 and really demonstrate, in good faith, how remorseful you are.

03:06:15PM 25 Thirty-five thousand dollars is what you come with today.

(160 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 120 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 160 of 303          59

03:06:19PM  1  I'm -- you know, you've made a statement today.  In

03:06:24PM  2  the presentence report you had an opportunity to submit a

03:06:30PM  3  statement accepting responsibility, and it's set forth in

03:06:35PM  4  paragraph 23 of the presentence report.  I would have to say

03:06:37PM  5  that there is very little in the way of any acceptance of

03:06:43PM  6  responsibility in that very brief statement and absolutely no

03:06:54PM  7  remorse expressed.

03:06:55PM  8  I mean, we can have the lowest or highest drug dealer

03:06:58PM  9  in this courtroom, and they say -- I mean, and they're very

03:07:00PM 10  sorry.  They seem to understand what they've done and how

03:07:04PM 11  they've negatively impacted their community.  I don't really

03:07:09PM 12  get that feeling from you, Dr. Schneider.

03:07:17PM 13  And, you know, it's been a while since this crime

03:07:20PM 14  occurred.  Maybe you have had time to contemplate the extent of

03:07:26PM 15  the harm, and the extent of your criminal thinking, and lack of

03:07:33PM 16  respect and flaunting of the judicial system, but I still think

03:07:42PM 17  that you put you first.  And without some real remorse, your

03:07:57PM 18  ability to empathize with these creditors and so forth, it's

03:08:04PM 19  not really been demonstrated to me.  And I think it's only

03:08:08PM 20  through that that people -- that they understand the

03:08:13PM 21  far-reaching consequences of their criminal conduct that they

03:08:16PM 22  can understand why they shouldn't be doing stuff like that.

03:08:26PM 23  And in this case, I think that a term of custody is

03:08:33PM 24  appropriate.  It avoids sentencing disparities.  The individual

03:08:40PM 25  who comes to mind is Angela Corson Smith, and she got 27 months

(161 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 121 of 139
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 161 of 303                60

03:08:46PM 1  of custody, and she had about half as much restitution.  But

03:08:52PM 2  the lying and flaunting of the law and so forth, I think that

03:08:55PM 3  this sentence achieves what the guidelines are set to achieve,

03:09:00PM 4  which is a lack -- or which is disparity in sentencing.

03:09:06PM 5      I think that it reflects the seriousness of the

03:09:13PM 6  offense, I hope it promotes a respect for the law in you, and

03:09:17PM 7  it does provide a just punishment.  You don't have any other

03:09:23PM 8  criminal history, and I've taken that into consideration in

03:09:30PM 9  giving you a low-end guideline sentence here today.

03:09:35PM 10     So it is the judgment of the Court that you be

03:09:39PM 11 committed to the custody of the Bureau of Prisons for a term of

03:09:43PM 12 24 months.  And that upon your release from imprisonment, you

03:09:47PM 13 shall be placed on supervised release for a term of three

03:09:51PM 14 years.

03:09:51PM 15     I don't know if you've thought about any facility

03:09:56PM 16 that you would like me to recommend to the Bureau of Prisons,

03:10:01PM 17 Mr. Smith.

03:10:02PM 18     MR. SMITH:  Yes, Judge.  Thank you.

03:10:03PM 19     Taft Federal Correctional Institute, which is fairly

03:10:07PM 20 near his family who will be able to visit him there.  It's in

03:10:12PM 21 Taft, California.

03:10:14PM 22     THE COURT:  I will recommend the Bureau of Prisons

03:10:16PM 23 place you at the Taft facility due to its proximity to your

03:10:20PM 24 family.

03:10:21PM 25     And then upon of your release from imprisonment, you

(162 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 122 of 139
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 162 of 303

61

03:10:24PM  1   shall be placed on supervised release for a term of three

03:10:27PM  2   years.

03:10:27PM  3          Within 72 hours of your release from the custody of

03:10:32PM  4   the Bureau of Prisons, you shall report in person to the

03:10:35PM  5   probation office in the district to which you are released.

03:10:38PM  6          While on supervised release, you shall not commit any

03:10:42PM  7   federal, state, or local crimes, and shall not possess a

03:10:44PM  8   controlled substance.

03:10:44PM  9          You are prohibited from owning, using, or being in

03:10:48PM 10   constructive possession of firearms, ammunition, or other

03:10:52PM 11   destructive devices while on supervision and anytime after the

03:10:56PM 12   completion of the period of supervision unless granted relief

03:11:00PM 13   by the Secretary of the Treasury.

03:11:01PM 14          You shall cooperate in the collection of DNA as

03:11:05PM 15   directed by your probation officer.

03:11:06PM 16          Further, you shall comply with the standard

03:11:09PM 17   conditions of supervision as recommended by the United States

03:11:14PM 18   Sentencing Commission and which have been approved by this

03:11:16PM 19   court.

03:11:16PM 20          You shall also comply with the following special

03:11:19PM 21   conditions:

03:11:19PM 22          You will provide your probation officer with any

03:11:23PM 23   requested financial information and shall incur no new lines of

03:11:27PM 24   credit without prior approval of your probation officer.  You

03:11:31PM 25   must notify your probation officer of any material changes in

(163 of 303)

Case: 18-30187  11/21/2018, ID: 11095749, DktEntry: 26-2, Page 123 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 163 of 303        62

03:11:34PM   1   your economic circumstances that might affect your ability to

03:11:38PM   2   pay restitution, fines, or special assessments.

03:11:42PM   3          You shall pay restitution in the amount of $308,945.

03:11:48PM   4   You are to make payments at the rate of $12,872.70 per month or

03:11:54PM   5   as otherwise directed by your probation officer.  Payments

03:11:58PM   6   shall be made to the clerk of this court and shall be disbursed

03:12:03PM   7   to Joseph Womack, Mr. Womack, who is the Chapter 7 Panel

03:12:10PM   8   Bankruptcy Trustee.

03:12:11PM   9          You shall submit your person, residence, place of

03:12:14PM  10   employment, vehicles and papers to a search, with or without a

03:12:18PM  11   warrant, by any probation officer based on reasonable suspicion

03:12:21PM  12   of contraband or evidence in violation of a condition of

03:12:25PM  13   release.  Failure to submit to search may be grounds for

03:12:29PM  14   revocation.  You shall warn any other occupants that the

03:12:31PM  15   premises may be subject to searches pursuant to this condition.

03:12:35PM  16   You shall allow seizure of suspected contraband for further

03:12:40PM  17   examination.

03:12:40PM  18          What is most important to me -- two things, I guess,

03:12:49PM  19   Dr. Schneider -- is some punishment, first off, and then

03:12:52PM  20   restitution.  And in an effort to get restitution paid more

03:12:59PM  21   quickly, I'm, right or wrong, going to make a finding that you

03:13:06PM  22   don't have the ability to pay a fine and waive the fine.  But I

03:13:10PM  23   am going to order that interest be paid on the restitution

03:13:16PM  24   amount, because I do believe that you have the ability to pay

03:13:20PM  25   interest on the amount as you go forward in your endeavors.

03:13:28PM   1        You are ordered also to pay to the United States a

03:13:31PM   2   special assessment of $100 which shall be due immediately.

03:13:36PM   3        During the period of your incarceration, you are

03:13:38PM   4   ordered to pay criminal monetary penalty payments at the rate

03:13:42PM   5   of not less than $25 per quarter.  Those payments shall be made

03:13:47PM   6   through the Bureau of Prisons Inmate Financial Responsibility

03:13:50PM   7   Program to clerk of this court.

03:13:55PM   8        And I think you have a motion as to some of these

03:13:58PM   9   counts, Mr. Rubich.

03:13:58PM  10        MR. RUBICH:  Yes, Your Honor.

03:13:58PM  11        Your Honor, at this time I would move to dismiss

03:14:02PM  12   Counts I, II, IV, and V.

03:14:13PM  13        THE COURT:  That motion is granted.

03:14:14PM  14        Mr. Smith, I understand, based on the plea agreement,

03:14:19PM  15   that your client has waived his right to appeal his sentence;

03:14:22PM  16   is that correct?

03:14:22PM  17        MR. SMITH:  That is correct, Judge.

03:14:24PM  18        THE COURT:  Any legal objection to the sentence,

03:14:25PM  19   Mr. Rubich?

03:14:25PM  20        MR. RUBICH:  No, Your Honor.

03:14:26PM  21        THE COURT:  Any legal objection to the sentence,

03:14:28PM  22   Mr. Smith?

03:14:29PM  23        MR. SMITH:  No objection -- no legal objection to the

03:14:31PM  24   sentence, Judge.

03:14:32PM  25        Before we end this hearing, I'd like to address

64

| | | |
|---|---|---|
| 03:14:37PM | 1 | voluntary surrender whenever you're ready. |
| 03:14:39PM | 2 | THE COURT:  I'm ready right now. |
| 03:14:41PM | 3 | MR. SMITH:  Okay. |
| 03:14:41PM | 4 | Judge, Dr. Schneider, as you said, has no criminal |
| 03:14:46PM | 5 | history whatsoever.  He's been released pending all the |
| 03:14:48PM | 6 | proceedings in this case.  He's never missed any court, he's |
| 03:14:52PM | 7 | always been very accessible to me and to the person who was not |
| 03:14:56PM | 8 | supervising him but that was kind of keeping track of him from |
| 03:15:00PM | 9 | the probation office, and I'd just ask that you allow him, |
| 03:15:03PM | 10 | under -- at his own expense and under his own power to report |
| 03:15:07PM | 11 | to wherever the Bureau of Prisons directs him to report when |
| 03:15:10PM | 12 | they send him the letter. |
| 03:15:11PM | 13 | THE COURT:  What's the government's position? |
| 03:15:12PM | 14 | MR. RUBICH:  Your Honor, this case is a very serious |
| 03:15:19PM | 15 | case, and my hesitation is twofold.  When we initially indicted |
| 03:15:26PM | 16 | this individual, I put out a summons.  And after he didn't show |
| 03:15:33PM | 17 | up for his initial appearance in court, I had no choice but to |
| 03:15:36PM | 18 | put out a warrant for his arrest.  And apparently, according to |
| 03:15:39PM | 19 | him, it was because of logistical issues and he didn't know it |
| 03:15:42PM | 20 | was sent, but it gives me a distressed feeling.  And, frankly, |
| 03:15:45PM | 21 | Your Honor, given the defendant's course of conduct in this |
| 03:15:53PM | 22 | case, I think that it's wholly appropriate that today he goes |
| 03:15:59PM | 23 | into custody and he starts his time.  So I would recommend that |
| 03:16:04PM | 24 | he be arrested today. |
| 03:16:07PM | 25 | THE COURT:  Well, I of course knew this would come |

(166 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 126 of 139
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 166 of 303

65

03:16:10PM 1    up, this issue.  And so what I was not clear about, given that

03:16:15PM 2    the summons and that whole proceeding occurred before the

03:16:20PM 3    magistrate judge, I did notice in CM/ECF that there was a

03:16:28PM 4    summons issued, and there was a hearing set, and that I believe

03:16:33PM 5    you moved to continue that hearing because service of the

03:16:36PM 6    summons had not been accomplished.  Is that correct?

03:16:39PM 7            MR. RUBICH:  So, yes, Your Honor, there were a series

03:16:42PM 8    of events.

03:16:42PM 9            THE COURT:  Right.  And I'm just trying to go through

03:16:44PM 10   them.

03:16:39PM 11           MR. RUBICH:  Yeah.

03:16:44PM 12           THE COURT:  And if I understand correctly, you then

03:16:47PM 13   asked for that hearing to be vacated, correct?

03:16:50PM 14           MR. RUBICH:  Correct, Your Honor.

03:16:51PM 15           THE COURT:  And, obviously, Dr. Schneider wasn't

03:16:55PM 16   there.  And if I understand correctly, you believed that the

03:16:58PM 17   address that you had for service of the summons was incorrect.

03:17:03PM 18           MR. RUBICH:  Initially, Your Honor.  So it was sort

03:17:05PM 19   of three-step process.  The first time we served it on one

03:17:08PM 20   of -- his former residence here in Montana; we realized that

03:17:11PM 21   wasn't correct.  Then we found -- you know, we realized it was

03:17:13PM 22   the residence in California where he's, I presume, still living

03:17:18PM 23   today, and that's where the -- during that second continuance,

03:17:21PM 24   that summons was served.  It was also not answered, and that is

03:17:26PM 25   why eventually the warrant was issued.

(167 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 127 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 167 of 303

66

| | | |
|---|---|---|
| 03:17:28PM | 1 | MR. SMITH:  Judge, may I? |
| 03:17:30PM | 2 | THE COURT:  Just a second.  I'll let you respond. |
| 03:17:32PM | 3 | So the July 11th, 2017, hearing was vacated. |
| 03:17:37PM | 4 | MR. RUBICH:  Yes. |
| 03:17:38PM | 5 | THE COURT:  You issued a new summons to his residence |
| 03:17:40PM | 6 | in California. |
| 03:17:41PM | 7 | MR. RUBICH:  Correct, Your Honor. |
| 03:17:42PM | 8 | THE COURT:  And was that summons served? |
| 03:17:44PM | 9 | MR. RUBICH:  It was by registered mail, Your Honor, |
| 03:17:47PM | 10 | but it was not responded to.  So, in other words -- |
| 03:17:49PM | 11 | THE COURT:  Meaning he didn't pick it up, or what? |
| 03:17:51PM | 12 | MR. RUBICH:  Correct, Your Honor, he didn't pick it |
| 03:17:53PM | 13 | up. |
| 03:17:56PM | 14 | THE COURT:  And then -- so he didn't appear for the |
| 03:18:01PM | 15 | arraignment on August 29th, 2017 -- |
| 03:17:51PM | 16 | MR. RUBICH:  Correct, Your Honor. |
| 03:18:10PM | 17 | THE COURT:  -- as a result of that. |
| 03:18:10PM | 18 | MR. RUBICH:  Yes, Your Honor. |
| 03:18:11PM | 19 | THE COURT:  And then -- |
| 03:17:51PM | 20 | MR. RUBICH:  I was given no course but to issue a |
| 03:17:51PM | 21 | warrant. |
| 03:18:12PM | 22 | THE COURT:  -- you requested the arrest warrant. |
| 03:18:14PM | 23 | MR. RUBICH:  Yes. |
| 03:18:15PM | 24 | THE COURT:  Mr. Smith. |
| 03:18:17PM | 25 | MR. SMITH:  Judge, Dr. Schneider was not living in |

03:18:20PM  1  Encinitas at the time; his wife was living there.  Why his wife

03:18:23PM  2  didn't go pick up a registered letter, I don't know, but she

03:18:26PM  3  didn't.  And he was not even aware that there was a registered

03:18:29PM  4  letter to pick up.  He was living in Iowa City, Iowa, working

03:18:34PM  5  for the Veterans Administration and had no idea.  He had no

03:18:37PM  6  idea there was a summons or a warrant or anything of the sort

03:18:40PM  7  until he was arrested walking out of church on a Sunday

03:18:44PM  8  morning.  So he had absolutely no control over that.  Had he

03:18:47PM  9  received a summons, he would have appeared in Montana before

03:18:51PM  10  the court; I have no doubt of that.

03:19:04PM  11        THE COURT:  Well, and I know I did look at the

03:19:06PM  12  pretrial services report that would have been filed after his

03:19:11PM  13  arraignment, then, and it indicated that he was living in Iowa

03:19:15PM  14  and was not back in California.  But I don't know, it was maybe

03:19:22PM  15  six days in I don't know how long a period of time of

03:19:25PM  16  something.

03:19:25PM  17        MR. SMITH:  Pardon me?

03:19:25PM  18        THE COURT:  He hadn't been back in California for a

03:19:28PM  19  long time, and had only been there in California maybe a total

03:19:32PM  20  of six days or something over a period of time.

03:19:35PM  21        MR. SMITH:  True, Judge.  He was working very hard as

03:19:38PM  22  a neurosurgeon at the VA facility in Iowa City.

03:19:43PM  23        THE COURT:  Okay.  I'll allow you to self-surrender,

03:19:50PM  24  Dr. Schneider.  You'll receive a letter from the United States

03:19:53PM  25  Marshals telling you what facility.  Because I recommend Taft,

(169 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 129 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 169 of 303                68

| | | |
|---|---|---|
| 03:19:55PM | 1 | but that doesn't necessarily mean that's where you're going. |
| 03:19:58PM | 2 | So they will send you a letter telling you where and when to |
| 03:20:02PM | 3 | appear.  If you fail to appear as ordered, then a warrant will |
| 03:20:06PM | 4 | be issued for your arrest and the marshals will get you there. |
| 03:20:09PM | 5 | We have a marshal here in the courtroom, and I'm sure |
| 03:20:13PM | 6 | he'll confirm the address where the letter can go.  I don't |
| 03:20:18PM | 7 | want any excuses about you didn't get the letter. |
| 03:20:21PM | 8 | Do you understand what I'm saying, Dr. Schneider? |
| 03:20:24PM | 9 | THE DEFENDANT:  Yes, Your Honor. |
| 03:20:24PM | 10 | THE COURT:  Where you are living is the address you |
| 03:20:27PM | 11 | give to the marshal here.  And then when you get the letter, |
| 03:20:32PM | 12 | you comply with the directions contained therein. |
| 03:20:36PM | 13 | THE DEFENDANT:  I understand. |
| 03:20:36PM | 14 | THE COURT:  We're adjourned. |
| 03:21:07PM | 15 | (Whereupon, the Court adjourned at 3:21 p.m.) |
| 03:21:07PM | 16 | --oo0oo-- |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

(170 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 130 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 170 of 303

69

1                    REPORTER'S CERTIFICATE

2          I, REBECCA M. SABO, a Registered Professional

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore mentioned;

6    that the proceedings were reported by me in machine shorthand

7    and thereafter reduced to typewriting using computer-assisted

8    transcription; that after being reduced to typewriting, a

9    certified copy of the transcript will be filed electronically

10   with the Court.

11         I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14         IN WITNESS WHEREOF, I have set my hand at Billings,

15   Montana, this 29th day of August, 2018.

16

17                              /s/ Rebecca M. Sabo

18                              Rebecca M. Sabo, RPR, CRR
                                United States Court Reporter
19

20

21

22

23

24

25

# EXHIBIT J

Michelle Schneider Affidavit in the Ninth circuit court Appellate case # 18-30187

1. My name is Michelle Renee Schneider and I live at 543 Camino De Orchidia, Encinitas, CA 92024.

2. I am married to John H Schneider Jr from March 22nd, 1992 to current.

3. I live with John H Schneider at the above address.

4. I participated with John H Schneider in the discussions with estate planning lawyers as early as 2002 and specifically with Michael Greear of Worland Wyoming beginning in 2007.

5. I am currently the Trustee of the Brandon Schneider Irrevocable Trust, established in Wyoming in March of 2012; the Shannon Schneider Irrevocable Trust established in Wyoming in March of 2012; and the Caitlin Schneider Irrevocable trust established in Wyoming in March of 2012; all by Mr. Greear as part of John Schneider and mine estate planning portfolio.

6. I am currently the sole owner of Schneider Limited Partnership, LLC and Schneider Management, LP established by Mr Greear as part of the estate planning activity by John Schneider and myself. Prior to the settlement of the bankruptcy lawsuit from John Schneider's bankruptcy, both John and I, through our revocable trusts, owned 50% of these companies. At various times I was the manager of these companies.

7. I am aware of the many real estate investments of Schneider Limited Partnership, including the 2008 purchase of rental property in Montana, referenced as "the Molt property' in further proceedings.

8. John H Schneider received salary and bonus from his medical practice and as per Montana and Wyoming law, as his long time married spouse, I received and was entitled to one half of all of those funds.

9. John Schneider and I routinely used our mutually owned cash to invest in mutually agreed upon additional assets owned by our vehicle, Schneider Limited Partnership, LLC.

10. I participated in conversations with my sister in law, Kathleen Teresa Burrows, when my husband John H Schneider solicited her employment in 2011 as part of his medical practices, Northern Rockies Neuro-Spine and the Orthopedic Musculoskeletal Neurological Institute (OMNI) in Billings Montana.

11. Kathleen Burrows on her own and with her husband visited the homes John Schneider and I built or owned in Billings Montana and Powell Wyoming between 2008 and 2014. While at the Billings house and ranch in Wyoming, Alan Burrows used and drove many of the recreational

i

(173 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-2  Page 133 of 139
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 173 of 303

vehicles located there, including ATV, dune buggies and motorcycles. I witnessed this personally.

12. I am aware that John H Schneider as part of his medical practice, offered Kathleen Burrows a salary of $150,000 per year for three years as a guaranteed income beginning in late 2011.

13. After John H Schneider opened the OMNI center at high costs in an investment through Schneider Limited Partnership, for which I was fully participant, his medical practice was negatively affected by a temporarily license suspension in Wyoming in early 2012. This created great on-going financial stress on John H Schneider, and severely impacted our personal cash flow from his work.

14. I was well aware in 2012 that based upon John Schneider's personnel needs ( Burrows became the practice manager and Teresa Trier was fired from his medical practice), the Schneider limited Partnership asset "Molt property" was no longer needed as an investment.

15. I am aware sometime in 2012 that John Schneider and Kathleen Burrows discussed non-cash methods of compensating Kathleen Burrows per her contract, including the use of the Molt property asset owned by Schneider limited Partnership, LLC.

16. Per my conversation with Michael Greear, our estate planning lawyer, I agreed that Schneider Limited Partnership could distribute the Molt property asset to John H Schneider for his use in 2012. I did not take an equivalent distribution, as was my right, from Schneider Limited Partnership, LLC at that time.

17. I was aware that John H Schneider used this asset in full to compensate his sister Kathleen T Burrows for working at Northern Rockies Neuro-Spine and the OMNI Center. It was my understanding the value of the Molt property was for Burrows independent contract employment in 2013 and 2014.

18. I am aware that Kathleen Burrows on her own accord sold the Molt property she now owned and kept control of all proceeds from the sale in accounts owned exclusively by her.

19. I am aware that Kathleen Burrows neither received OR provided to John or I, a federal gift tax income statement showing she received the Molt asset as a gift. Equally, neither John or I ever received a federal gift income statement from her for any value of the sale of the Molt property once it was transferred to her ownership.

20. I never agreed that John H Schneider could take the Molt property Asset distribution from Schneider limited partnership for the purposes of "gifting" this investment to Kathleen Burrows,

as I understood this asset use was for compensation to Burrows as an independent contractor for my husband's medical practices in 2013 and 2014.

21. John H Schneider would have no reason to simply gift a large amount of money or assets to his sister. Prior to Kathleen Burrows' interest in working with John in his medical practice, we as a family were neither close or in frequent contact with Kathleen Burrows or her family.

22. Factually neither John nor I were even invited to Kathleen Burrows only sons marriage a few years before these events, reflecting our distant relationship with Burrows until 2011.

23. I agreed with John H Schneider and Michael Greear in 2012 to name Kathleen T Burrows as trustee of my three children's irrevocable trusts and that Kathleen T Burrows was named as guardian of my three children in the Will created for John H Schneider and Michelle R Schneider by the law office of Michael Greear in Worland Wyoming. At that time, Kathleen Burrows was our best option when considering other responsible family members.

24. I participated in conversations with John H Schneider and Kathleen T Burrows in which Kathleen represented a need to have access to cash reserves for the care and management of my three children, should John Schneider and myself become incapacitated or die unexpectedly.

25. John H Schneider and I participate in dangerous sports such as scuba diving, back country skiing, remote location backpacking, car racing, rock climbing and canyoning.

26. At the time Kathleen T Burrows was named as guardian and trustee for my children, I trusted her with the care and management of my children's lives should John and I become unable to care for our children.

27. I was aware that Kathleen T Burrows desired and filed for unemployment from the state of California in 2013 forgoing part of the remaining cash reserves created by the sale of the assigned Molt property asset, dedicated for use to pay her compensation.

28. I was participant in subsequent conversation regarding Burrows desire to continue as Trustee of the children's trusts with ultimate control of bank account xxx2881 in 2013.

29. I was aware that since the inception of the US Bank account, Kathleen Burrows did not expect to work through 2014 for John H Schneider and that the US Bank account 2881 would be held under her control and referenced as the "children's trust account" designated for the care and management of the Schneider children by their trustee Kathleen T Burrows.

30. I was aware and participated in conversations with Kathleen T Burrows in which John and I would contribute to this fund adequate additional funds for Kathleen T Burrows to continue the uninterrupted care and management of my children, including costs of private college

3

education, room and board and the daily needs of these children. Collectively, John, Kathleen and I frequently referred to this account as the "children's trust account."

31. I agreed with John and Kathleen that this funds should maintain a balance of $500,000 for the care and management of my children at the direction of Kathleen T Burrows in 2013.

32. In lieu of my rightful distributions and ownership of Schneider limited Partnership funds, including businesses owned or invested in by Schneider Limited Partnership, including Northern Rockies Insurance Group, Stable Spine, or claim to insurance proceeds from Hartford Insurance Company for the OMNI building flood damage, I agreed with John that these funds would be used to fulfill the desired funding of Burrows controlled US Bank account 2881.

33. I know that Kathleen T Burrows exclusively received all of the monthly account balance statements on account 2881 was fully aware that John and I would, and did, contribute additional funds to this account. When John and I did contribute these funds, Kathleen T Burrows called me and acknowledged these deposits in conversations I had with her.

34. I was participant in the decision with John Schneider, at the approval and full knowledge of Kathleen Burrows, to contribute funds to the US Bank account 2881. I would otherwise traditionally and equitably be entitled to 50% of the value of these contributions.

35. I received an ATM card from this account from Kathleen T Burrows in 2013 for US Bank account ending in 2881.

36. Either John or I were in possession of this ATM card while the funds were in the Burrows account ending in 2881.

37. Except for the ATM card as a restricted daily withdrawal instrument, neither John nor I had any other access, directly or electronically to this Burrows 2881 US Bank account.

38. John Schneider and I received negligible or no salary from 2012 through 2015 from John's Medical practice or work I performed outside of medicine.

39. Although I continued to work in various retail sales capacities from 2012-2015, this was not adequate compensation for the care and management of three children, two of which were in college and required support for tuition, living and recreational expenses.

40. I spoke with Kathleen Burrows many times in 2013 and 2014 and requested use of the US Bank funds in 2881, as my own cash reserved dwindled, for the direct care and needs of my three children. Kathleen Burrows agreed and authorized access to these funds for this purpose, referencing this account as the children's "trust fund" in our conversation.

(176 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 136 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 176 of 303

41. Both John and I at various times accessed the ATM account through February 2015, withdrawing typically the daily maximum amount from ATM located primarily in Montana and California.

42. I am aware of business trips John and my son Brandon took to Florida and Texas.  John told me at a later date he accessed account 2881 via the single ATM card, providing this cash to Brandon for his needs.

43. To the best of my knowledge, I withdrew over $40,000 from the US Bank account in cash using the ATM card while in Montana and California and used these funds to pay for the ongoing care and needs of my three children, including college educational expenses and living expenses for each of the children.

44. In addition, I requested a cash distribution from this account from Kathleen Burrows in 2014 as my own cash reserves dwindled, for the continued care and wellbeing of my children.  My request was directly to Kathleen Burrows who agreed, and Kathleen Burrows wrote a check to me for $100,000 and inquired if additional funds were needed.

45. I requested Kathleen Burrows pay credit card and bills from both AMEX and USAA.  Kathleen Burrows paid these bills on her own volition and I understand now that she utilized an electronic bill pay system from this 2881 US Bank account that neither John nor I had access to.

46. I am aware that through her frequent access to this account, Kathleen Burrows must have known that John and Michelle Schneider contributed additional funds to account 2881, despite her later testimony.

47. I am aware that John Schneider withdrew approximately the same amount of cash that I did using the ATM card provided by Kathleen Burrows on the 2881 account.

48. Brandon Schneider, the son of John and I required significant cash during his travel to Shanghai and Beijing China for six months in 2015.  Brandon's cash need were for enrollment in educational foreign exchange programs, living , travel and recreational expenses while in China.

49. I am aware that Brandon and John, who accompanied Brandon when he first went to China and then visited Brandon once in China, each entered the country twice in early 2015.

50. I am aware that Brandon and John each carried slightly less than $10,000 US Dollars in cash, each time they entered China and that these funds were kept in their entirety by Brandon Schneider while in China for his care and expenses.

51. I am aware that John accessed the Burrows account 2881 using the ATM card she provided, the only ATM card in John's possession, and kept this cash in our home safe until all of the cash was

(177 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 137 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 177 of 303

transported by Brandon and John to China for the benefit of Brandon Schneider's six month study abroad trip in China.

52. To the best of my knowledge, Brandon used all of this cash and returned none of it to John or myself.

53. I am not aware of any cash removed from account 2881 by ATM being used by John for his personal needs.

54. I was aware of John H Schneider's individual bankruptcy was filed at the recommendation and after counsel with lawyers Harold Dye of Montana, and Ron Jurovich and Michael Greear of Wyoming.

55. I am aware of the thousands of documents requested by Trustee Womack that John and I tried diligently to provide.

56. I discussed with John at the time, conversations he had between bankruptcy lawyer Dye who instructed John that accounts and investments not under his control or directly benefitting him were not to be reported on his chapter seven bankruptcy filing paperwork.

57. I understood this meant that assets owned by me directly and through my interest in Schneider Management and Schneider limited Partnership, my children's trusts and Kathleen Burrows controlled accounts, including in her capacity as manager of Schneider Limited Partnership, and owner/,manager of Medport, LLC, businesses held and developed by my family.

58. I am aware from my conversations with her that Kathleen Burrows demanded and then hired lawyer Ross Richardson of Montana to represent her in all communication with trustee Womack in early 2015, based upon trustee Womack's abusive declarations for documents and information from Burrows.

59. I know factually John H Schneider expected Kathleen Burrows to provide all financial information trustee Womack demanded from her, if he was entitled to that information, including financial statements from US Bank account 2881.

60. I understand Kathleen Burrows was working with Ross Richardson to provide documents Womack was entitled to.

61. I was aware in February of 2015 that Kathleen Burrows was psychologically unable to handle the beratement she received from trustee Womack and she desired to withdraw her support position as trustee of my children's irrevocable trusts.

62. John and I discussed account 2881 with Kathleen Burrows in February of 2015 and I requested she transfer the remaining funds into my personal account for the ongoing care and

6

(178 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 138 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 178 of 303

management of the lifestyle, education and needs of my three children, after my lawyer Michael Greear suggested I assume the role of temporary trustee of my three children's independent irrevocable trusts.

63. John and I discussed my on going role as trustee in place of Burrows at that time and I expressed the need to assume control of the funds set aside, currently held in account 2881, as the "kids trust fund".

64. In early February 2015 I returned the 2881 ATM card I was using to John Schneider who planned on talking to Kathleen Burrows in person about her desire to withdraw from the various businesses and relinquish her position as trustee for my children.

65. I am aware that since Kathleen Burrows filed and received unemployment compensation when she left John's medical practice, she was not entitled to any part of the remaining funds in 2881.

66. In February 2015 Kathleen Burrows liquidated the remaining 2881 account and provide me a check for the balance sum that I deposited into my bank account for the care and management of my children. John Schneider has never had access, control or benefited from these funds.

67. In March 2015 Michael Greear completed the necessary legal paperwork naming me, Michelle R. Schneider, the legal trustee of the three children's independent irrevocable trusts.

68. I am aware that trustee Womack sued Kathleen Burrows and she made many inflammatory and unsubstantiated claims in her deposition.

69. I am aware this lawsuit created great acrimony between John Schneider and Kathleen Burrows.

70. I am aware they have not spoken or communicated since immediately after Burrows received this lawsuit on Easter Sunday in 2015.

71. I am aware that Kathleen Burrows lied to federal investigators after trustee Womack referred John H Schneider for criminal investigation based upon misinformation regarding ownership, use and control of funds in US Bank account 2881, told by Kathleen Burrows.

72. To the extent John Schneider would be considered the legal owner of any funds in US Bank 2881 at the time of his bankruptcy filing in December 2014, I Michelle Schneider a married legal resident of Montana, based upon Montana law acknowledging my ownership rights in Schneider limited Partnership, my rights as trustee for the children's irrevocable trusts, and as an individual married to John H Schneider at the time his chapter seven bankruptcy with equitable ownership of our combined assets, claim at least equal value ownership and rights to these funds for all of the above entities.

(179 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-2, Page 139 of 139
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 179 of 303

73. As a rightful owner of assets in account 2881, as an individual and as trustee for my children's trusts, I Michelle Schneider settled all claims against these funds in the lawsuit against me, my family and these trusts, by trustee Womack, referenced as AP 15-15, in which these funds were an itemized line item in the amended complaint.

74. On advice of counsel, Mr Parker from Billings Montana, for myself and the children's trusts in the lawsuit AP 15-15, I agreed to a settlement with trustee Womack that included all assets arising from account US Bank 2881, now in my possession and control. By this settlement, John Schneider and/or the bankruptcy estate of John H Schneider, has no further rightful claim to this asset which was not owned by John H Schneider.

75. Furthermore, John H Schneider had no legal right to represent exclusive ownership of the 2881 asset in the criminal plea agreement he entered into when he plead guilty in the Montana District court to concealment of a bankruptcy asset.

Respectfully-

Date 11/15/18

Michelle R Schneider
543 Camino De Orchidia
Encinitas, CA 92024

SEE ATTACHED
FOR OFFICIAL
ACKNOWLEDGMENT

8

# EXHIBIT K

## FULL AND FINAL SETTLEMENT AGREEMENT
## AND MUTUAL RELEASE OF ALL CLAIMS

THIS FULL AND FINAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE OF ALL CLAIMS (the "Settlement Agreement") is effective as of the 7th day of May, 2012, by and between the following identified persons and entities, all of whom are collectively referred to herein as "the parties" with reference to the facts and for the considerations hereinafter set forth. The parties are:

- Jimmie G. Biles, Jr., MD ("Biles");
- Lisa Shaurette Fallon ("Fallon");
- John H. Schneider, Jr., MD;
- Michelle Schneider;
- John H. Schneider, Jr., MD, P.C., a dissolved Montana corporation;
- Northern Rockies NeuroSpine, P.C, a Wyoming corporation;
- BSC, LLC, a dissolved Wyoming limited liability company; and
- Schneider Limited Partnership, a Wyoming limited partnership.

Parties John H. Schneider, Jr., MD, Michelle Schneider, John H. Schneider, Jr., MD, P.C., Northern Rockies NeuroSpine, P.C., BSC, LLC and Schneider Limited Partnership all together are referred to herein as "Schneider".

### RECITALS:

A.  Biles initiated and has pending in U.S. District Court, District of Wyoming, the following two cases: *Jimmie G. Biles, Jr., MD v. Lisa Shaurette Fallon*, Civil No. 11-CV-294-F, and *Jimmie G. Biles, Jr., MD v. John Henry Schneider, Jr., MD, Michelle Rene Schneider, husband and wife, and John Henry Schneider, Jr., MD, P.C.*[1], Civil No. 11-CV-366-F (both cases hereinafter referred to as the "Litigation").

B.  The parties have agreed to compromise and settle any and all claims which have been or which could have been asserted in the Litigation by or against any other party hereto, and have agreed to enter into this Settlement Agreement to end all disputes between the parties, and to resolve

---

[1]John Henry [sic] Schneider, Jr., MD, PC is a dissolved Montana corporation. John H. Schneider, Jr., MD, P.C. [correct name] was dissolved in 2011 because it had no continuing business activity. Schneider in 2008 created Northern Rockies NeuroSpine, P.C., a Wyoming corporation, to operate the medical practice which formerly had been operated as John H. Schneider, Jr., MD, P.C.

fully all controversies which exist, have existed or may exist in the future between them arising from or related in any way to any of the allegations, claims, facts or circumstances involved in any way in the Litigation.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. For and in consideration of the undertakings and mutual covenants contained herein, the parties, and each of them, do hereby release, remise, acquit and forever discharge each of the other parties hereto, their owners, directors, officers, shareholders, members, employees, agents, consultants, attorneys, servants, representatives, affiliates, successors and assigns, and all of them, from any and all claims, demands, actions, causes of action, suits, losses, damages, costs, expenses, compensation, and liabilities of every kind and nature, whether now known or unknown, presently or prospectively maintainable, accrued or unaccrued, fixed or contingent, arising out of, related to, or in any way connected with the allegations, claims, facts and circumstances involved in any way in the Litigation.

2. In consideration of the releases, understandings and representa-

REDACTED TERMS of Settlement

REDACTED
Terms of
Settlement

(184 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 5 of 124
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 184 of 303

REDACTED
TERMS of
Settlement

3.     The parties agree to keep the details and amount of the settlement confidential, including keeping all matters not currently in the public record (defined as the Court files and documents or newspapers) confidential, and they will not reveal confidential matters to any persons or entities unless required to do so according to law. It is specifically stated that this provision will not prevent any party from testifying in any proceeding if required to do so according to law. Nothing in this Settlement Agreement prevents any party from testifying truthfully as required or instructs him to testify in a particular manner. Moreover, the parties may disclose the terms of this Settlement Agreement to their own professionals (i.e., lawyers, accountants, tax specialists) employed as necessary for professional advice. In the event of a request from a third party for confidential information, Biles and his counsel, the Spence Law Firm, agree to send notice of the request within two business days via email to laurence@bonnerstinsonpc.net and also by certified mail to Bonner Stinson, P.C., 1421 Rumsey Avenue, Cody, Wyoming 82414. If new counsel is designated for Schneider, Biles and his counsel shall be immediately informed, and whomever Schneider designates will be substituted. By sending the notice via email and certified mail as prescribed herein, notice is deemed received. Biles and his counsel will comply with any lawful request for information unless a motion to quash/protective order is timely filed with the appropriate court. The confidentiality provision is material, and upon proof of an improper revelation of any confidential matter, the parties agree the offending party will pay the other party a liquidated damage payment of $250,000.00.

4.     On or before 5 p.m. May 9, 2012, the Spence Law Firm shall provide to Bonner Stinson, P.C., written certification that the Spence Law Firm has disclosed to Bonner Stinson, P.C. all documents in its possession or control involving communication of any kind between Lisa Fallon and either John H. Schneider, Jr., MD or Michelle Schneider.

5.      The parties together will inform the US District Court (Judge Freudenthal), the US Attorney and the Park County Attorney that the Litigation has been settled and all matters therein are fully resolved. In addition, on or before 5 p.m. May 9, 2012, Biles, through his counsel, will provide a letter to be provided to the above persons which states, "The matter has been completely and finally settled, and I am satisfied with the resolution. My lawsuit is finished, and I believe it was settled in a satisfactory manner. It is done as far as I am concerned." The parties together will request a telephone hearing before Judge Freudenthal to occur as soon as possible following execution of this Settlement Agreement. During the telephone hearing, the parties will make the communication identified herein to Judge Freudenthal. The parties together will request that due to the nature of the 3.3 disclosure on April 26, 2012, that the transcript of that hearing (a) be sealed and (b) not be further disclosed. Except for the communications specified herein to Judge Freudenthal, the Park County Attorney and the US Attorney, if the press or anyone else requests of Biles or his counsel (the Spence Law Firm), Schneider or its counsel (Bonner Stinson, P.C.) or Fallon or her counsel (Williams, Porter, Day & Neville) a statement or other information about the settlement or its terms, the parties and their counsel will state only that the case is settled, the terms are confidential and that they have no further comment concerning the matter.

6.      The parties agree not to disparage each other personally or professionally or to use surrogates or other entities to do the same. This Settlement Agreement fully ends their dispute and puts this matter behind them.

7.      The parties executing this Settlement Agreement covenant each to the other that the terms of the Settlement Agreement have been completely read and are fully understood and voluntarily accepted for the purpose of making a full and final accord and satisfaction and compromise of any and all claims, disputed or otherwise, on account of the above-mentioned controversies, disputes, differences and claims and for the express purpose of precluding forever any further or additional claims arising out of said controversies, disputes, differences and claims, and that each of them shall sign and execute the same as its own free act and deed, it being expressly understood and warranted that the persons who shall sign and execute this document on behalf of each party are acting with the full knowledge, consent and approval of such parties, and that such persons are authorized and empowered, whether by appropriate bylaw or resolution, to bind said parties to this Settlement Agreement.

8.      This Settlement Agreement contains the entire agreement between the parties with respect to the subject matter hereof, and the terms

hereof are contractual and not a mere recital. All communications, negotiations, representations or understandings by or between the parties are reflected in this Settlement Agreement, and no additional terms or conditions are set forth other than those expressly incorporated into and represented in this Settlement Agreement. Should any of the terms, conditions or provisions of this Settlement Agreement be determined unenforceable and/or void, the remaining terms, conditions and provisions set forth herein shall remain in full force and effect.

9.   This Settlement Agreement may be signed in counterparts, each of which shall be effective as an original. Facsimile or email copies of signatures shall be effective as an original.

10.   Upon completion of all contingencies and full payment of all settlement funds, the parties and/or their attorneys shall sign and file all documents necessary to accomplish the dismissal with prejudice of the Litigation, each party to bear its own costs and attorney's fees.

11.   Should any party be required to undertake valid legal action to enforce the terms of this Settlement Agreement, the non-prevailing party in such action shall be required to pay the reasonable legal costs, including attorney's fees, of the prevailing party.

12.   This Settlement Agreement shall be binding upon and shall inure to the benefit of the respective representatives, wards, agents, owners, directors, officers, employees, servants, affiliates, successors and assigns of the parties hereto.

13.   This Settlement Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of Wyoming.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Settlement Agreement effective as of the day and year first above written.

(187 of 303)

Case 1:17-cr-00077-SPW Document 72 Filed 11/26/18 Page 187 of 303
Case 18-30187 11/21/2018 ID: 11095749 DktEntry: 26-3 Page 8 of 124

**JIMMIE G. BILES, JR., MD**

Signature                                    Date 5/9/12

STATE OF WYOMING          )
                                           ) SS.
COUNTY OF PARK             )

    Subscribed and sworn to before me this _9_ day of May, 2012, by Jimmie G. Biles, Jr., MD, to me personally known.

WITNESS my hand and notarial seal.

Teresa Van               Notary Public
COUNTY OF    STATE OF
PARK         WYOMING
MY COMMISSION EXPIRES JUNE 18, 2015

My Commission Expires:

June 15, 2015

(188 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 9 of 124
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 188 of 303

JOHN H. SCHNEIDER, JR., MD

Signature                                    Date  5. 8. 2012

MICHELLE SCHNEIDER

Signature                                    Date  5 - 9 - 2012

STATE OF WYOMING            )
                            ) SS.
COUNTY OF PARK              )

Subscribed and sworn to before me this 9th day of May, 2012, by
John H. Schneider, Jr., MD and Michelle Schneider, to me personally known.

WITNESS my hand and notarial seal.

CHRISTINE K. EDWARDS  NOTARY PUBLIC
COUNTY OF          STATE OF
PARK              WYOMING
MY COMMISSION EXPIRES JANUARY 25, 2016

My Commission Expires                          Notary Public

Jan. 26, 2016

NORTHERN ROCKIES NEUROSPINE, P.C.

By: _____ MD

Title: President

Date: 5.9.2012


STATE OF WYOMING      )
                      ) SS.
COUNTY OF PARK        )

    Subscribed and sworn to before me this 9th day of May, 2012, by John H. Schneider, Jr., President _____ of Northern Rockies NeuroSpine, P.C., a Wyoming corporation, to me personally known.

    WITNESS my hand and notarial seal.

CHRISTINE K. EDWARDS NOTARY PUBLIC
COUNTY OF PARK    STATE OF WYOMING
MY COMMISSION EXPIRES JANUARY 26, 2016

My Commission Expires:

_____ Notary Public

Jan. 26, 2016

(190 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 11 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 190 of 303

JOHN H. SCHNEIDER, JR., MD, P.C.

By: _____ MS

Title: President

Date: 5. 9. 2012


STATE OF WYOMING        )
                        ) SS.
COUNTY OF PARK          )

        Subscribed and sworn to before me this 9th day of May, 2012, by
John H. Schneider, Jr., President _____ of John H. Schneider,
Jr., MD, P.C., a dissolved Montana corporation, to me personally known.

        WITNESS my hand and notarial seal.

CHRISTINE K. EDWARDS  NOTARY PUBLIC
COUNTY OF          STATE OF
PARK               WYOMING
MY COMMISSION EXPIRES JANUARY 26, 2016

My Commission Expires:

_____
                                        Notary Public

Jan. 26, 2016

BSC, LLC

By: _____

Title: Managing Partner

Date: 5.9.2012

STATE OF WYOMING  )
                   ) SS.
COUNTY OF PARK    )

    Subscribed and sworn to before me this 9th day of May, 2012, by John H. Schneider, Jr., Managing Partner of BSC, LLC, a dissolved Wyoming limited liability company, to me personally known.

    WITNESS my hand and notarial seal.

CHRISTINE K. EDWARDS  NOTARY PUBLIC
COUNTY OF PARK        STATE OF WYOMING
MY COMMISSION EXPIRES JANUARY 26, 2016

_____
Notary Public

My Commission Expires:

_____Jan. 26, 2016_____

**SCHNEIDER LIMITED PARTNERSHIP**

By: _____

Title: MANAGING PARTNER

Date: 5.9.2012


STATE OF WYOMING      )
                      ) SS.
COUNTY OF PARK        )

Subscribed and sworn to before me this 9th day of May, 2012, by John H. Schneider, Jr., Managing Partner of Schneider Limited Partnership, a Wyoming limited partnership, to me personally known.

WITNESS my hand and notarial seal.

CHRISTINE K. EDWARDS   NOTARY PUBLIC
COUNTY OF PARK         STATE OF WYOMING
MY COMMISSION EXPIRES JANUARY 26, 2016

My Commission Expires:

_____
Notary Public

Jan. 26, 2016

(193 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 14 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 193 of 303

LISA SHAURETTE FALLON

Signature                                    Date: 5/10/12

STATE OF INDIANA      )
                      ) SS.
COUNTY OF Marion      )

Subscribed and sworn to before me this 10th day of May, 2012, by
Lisa Shaurette Fallon, to me personally known.

WITNESS my hand and notarial seal.

Notary Public    Carl J. Stavreti

My Commission Expires:

11-29-2012

OFFICIAL SEAL
CARL STAVRETI
NOTARY PUBLIC—INDIANA
MARION COUNTY
My Comm. Expires 11/29/2012

(194 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 15 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 194 of 303

APPROVED BY:

R. Daniel Fleck, counsel for Biles

Bradley D. Bonner, counsel for Schneider

Craig Silva, counsel for Fallon

(195 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 16 of 124
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 195 of 303

## APPROVED BY:

_____

R. Daniel Fleck, counsel for Biles

_____

Bradley D. Bonner, counsel for Schneider

_____

Craig Silva, counsel for Fallon

APPROVED BY:

_____
R. Daniel Fleck, counsel for Biles

_____
Bradley D. Bonner, counsel for Schneider

_____
Craig Silva, counsel for Fallon

# EXHIBIT L

**us**bank

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

5260    TRN    Y    ST01

**Business Statement**

Account Number:
‎0796

Statement Period:
==Aug 1, 2012==
==through==
==Aug 31, 2012==

Page 1 of 1

000080625 1 SP    106481758672291 S
==NORTHERN ROCKIES INSURANCE COMPANY LLC==
1739 SPRING CREEK DR STE 200
BILLINGS MT 59102-6756



☎    _To Contact U.S. Bank_

**24-Hour Business
Solutions:**    1-800-673-3555

**Telecommunications Device
for the Deaf:**    1-800-685-5065

**Internet:**    usbank.com

---

## PREFERRED BUSINESS MONEY MARKET                    _Member FDIC_

U.S. Bank National Association                    Account Number ‎-0796

### Account Summary

|  | # Items | | |  |  |
|---|---|---|---|---|---|
| Beginning Balance on Aug 1 |  | $ | 2,953,344.31 | Annual Percentage Yield Earned | 0.10% |
| Customer Deposits | 1 |  | 2,800,000.00 | Interest Earned this Period | $ | 214.58 |
| Other Deposits | 3 |  | 268.58 | Interest Paid this Year | $ | 245.59 |
| Other Withdrawals | 3 |  | 2,800,054.00 - | Number of Days in Statement Period | 31 |

==Ending Balance on Aug 31, 2012  $    2,953,558.89==

### Customer Deposits

| Number | Date | Ref Number | Amount |
|---|---|---|---|
|  | Aug 6 | 9798747710 | 2,800,000.00 |

| | | Total Customer Deposits | $ | 2,800,000.00 |
|---|---|---|---|---|

### Other Deposits

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Aug 8 | Reversed Fee | Returned Deposited Item | $ | 19.00 |
| Aug 8 | Refunded Overdraft Charge |  | | 35.00 |
| Aug 31 | Interest Paid |  | 3100005779 | 214.58 |

| | | Total Other Deposits | $ | 268.58 |
|---|---|---|---|---|

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Aug 2 | Returned Deposited Item | Fee | 1000104244 | $ | 19.00- |
| Aug 2 | Deposited Item Returned |  | 1000104244 | 2,800,000.00- |
| Aug 3 | Overdraft Charge |  | 1000104244 | 35.00- |

| | | Total Other Withdrawals | $ | 2,800,054.00- |
|---|---|---|---|---|

## BALANCE YOUR ACCOUNT

To keep track of all your transactions, you should balance your account every month. Please examine this statement promptly. We will assume that the balance and transactions shown are correct unless you notify us of an error.

### Outstanding Deposits

| DATE | AMOUNT |
|------|--------|
|      |        |
|      |        |
|      |        |
|      |        |
| TOTAL | $ |

### Outstanding Withdrawals

| DATE | AMOUNT |
|------|--------|
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
| TOTAL | $ |

1. List any deposits that do not appear on your statement in the Outstanding Deposits section at the left. Record the total.

2. Check off in your checkbook register all checks, withdrawals (including Check Card and ATM) and automatic payments that appear on your statement.  Withdrawals that are NOT checked  off should be recorded in the Outstanding Withdrawals section at the left.  Record the total.

3. Enter the ending balance shown on this statement. $_____

4. Enter the total deposits recorded in the Outstanding Deposits section. $_____

5. Total lines 3 and 4. $_____

6. Enter the total withdrawals recorded in the Outstanding Withdrawals section. $_____

7. Subtract line 6 from line 5.  This is your balance. $_____

8. Enter in your register and subtract from your register balance any checks, withdrawals or other debits (including fees, if any)  that appear on your statement but have not been recorded in your register.

9. Enter in your register and add to your register balance any deposits or other credits (including interest, if any) that appear in your statement but have not been recorded in your register.

10. The balance in your register should be the same as the balance shown in #7.  If it does not match, review and check all figures used, and check the addition and subtraction in your register. If necessary, review and balance your statement from the previous month.

### IMPORTANT DISCLOSURES TO OUR CONSUMER CUSTOMERS
### In Case of Errors or Questions About Your Checking, Savings, ATM, Check Card, ACH, Bill Pay and Other Electronic Transfers

If you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt, we must hear from you no later than 60 days* after we sent you the FIRST statement on which the error or problem appeared. Telephone us at the number listed on the front of this statement or write to us at U.S. Bank P.O. Box 64991 St. Paul, MN 55164-9505.

- Tell us your name and account number.
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

We will tell you all the results of our investigation within 10 business days and will correct any error promptly. If we need more time, we may take up to 45 days to investigate your complaint. In that case, we will provisionally credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. For transfers initiated outside the United States or transfers resulting from point of sale debit card transactions, the time period for provisional credit is 10 business days and the time to resolve the investigation is 90 days.

    *Please note: Paper draft and paper check claims must be disputed within 30 days per Your Deposit Account Agreement.

### CONSUMER BILLING RIGHTS SUMMARY
### What To Do If You Think You Find A Mistake on Your Statement

If you think there is an error on your statement, write to us at: U.S. Bank, P.O. Box 64991, St. Paul, MN 55164-9505.  In your letter, give us the following information:

- Account information: Your name and account number.
- Dollar Amount: The dollar amount of the suspected error.
- Desicription of problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement. You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:

- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

### SPECIAL RULE FOR CREDIT CARD PURCHASES

If you have a problem with the quality of the goods or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the goods or services. You have this protection only when the purchase price was more than $50 and the purchase was made in your home state or within 100 miles of your mailing address.  If we own or operate the merchant, or if we mailed you the advertisement for the property or services, all purchases are covered regardless of amount or location of purchase.

### RESERVE LINE

Reserve Line Balance Computation Method: To calculate the **Balance Subject to Interest Rate**  (sometimes referred to as the "average daily balance"), we take the beginning balance of your account each day, add any new advances, and subtract any payments, credits and unpaid interest charges. This gives us a daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This is your **Balance Subject to Interest Rate**. The ***INTEREST CHARGE*** begins from the date of each advance.

### REPORTS TO AND FROM CREDIT BUREAUS

We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

### IMPORTANT DISCLOSURES TO OUR BUSINESS CUSTOMERS

Errors related to any transaction on a business account will be governed by any agreement between us and/or all applicable rules and regulations governing such transactions, including the rules of the National Automated Clearing House Association (NACHA Rules) as may be amended from time to time.  If you think this statement is wrong, please telephone us at the number listed on the front of this statement immediately.



Member FDIC

# <u>EXHIBIT M</u>

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 22 of 124

**Northern Rockies Insurance Company (NRIC) - As of 11/1/2013**
**Claims Paid/Legal Fees/Reserves/Expenses:**

| Case | Attorney Representation | Monies Spent to Date/Payee | Amount of claim reserve paid To date | Reserves paid on claim filed by NRNS Jan 2013. | Case Status | Notes: |
|---|---|---|---|---|---|---|
| | | | | | | |
| Biles v John H Schneider, MD | Bonner Stinson/Kline Law Firm | Bonner Stinson/Kline Law Firm | | | | Biles v Schneider |
| | | Boner Stinson | 206,860.00 | 206,860.00 | | Attorney's Fees Biles v Schneider and Med Mal |
| | | | | | | |
| | Steve Kline/ Kline Law Firm and Steve Emery/Williams Porter Day & Neville/Meals Law Firm | Kline Law Firm | 369,945.44 | 400,000.00 | | Reserve includes BOM 1206. Thirteen patient complaints/Med Mal issues |
| Monaco Med Mal/BOM | | Williams Porter Day and Neville | 123,820.40 | 200,000.00 | ongoing | Reserve includes Defense, Expert Fees and Appellette costs |
| Monaco Med Mal/BOM | | Meals Law Firm | 22,500.00 | | ongoing | |
| Monaco Med Mal/BOM | | Accumen Assmts | 6,500.00 | | ongoing | Required by WY BOM - Psychological Evaluation |
| Monaco Med Mal/BOM | | Air Travel | 750.00 | | ongoing | Approximate - Billings to Kansas City MO |
| Monaco Med Mal/BOM | | Hotel | 800.00 | | ongoing | Approximate 4 days at 200/day |
| Monaco Med Mal/BOM | | Vehicle | 1,100.00 | | ongoing | Approximate - Kansas Airport shut down had to drive back to Billings |
| Monaco Med Mal/BOM | | Meals | 400.00 | | ongoing | Approximate - 100 times 4 |
| Monaco Med Mal/BOM | | Vanderbilt University | 2,450.00 | | ongoing | Required by WY BOM - Attended Feb 29-March2, 2012 Prescribing Controlled Drugs Course |
| Monaco Med Mal/BOM | | Air Travel | 634.00 | | ongoing | Billings to Nashville |
| Monaco Med Mal/BOM | | Hotel | 750.00 | | ongoing | Approximate 3 days at 250 |
| Monaco Med Mal/BOM | | Vehicle | 300.00 | | ongoing | Approximate 3 days at 100 |
| Monaco Med Mal/BOM | | Meals | 300.00 | | ongoing | Approximate 3 days at 100 |
| | | | | | | |
| Monaco Med Mal/BOM | | WY BOM Case hearing costs, non legal | 1,855.00 | | ongoing | Contested case administrative hearing |
| Monaco Med Mal/BOM | Jurovich Law Firm | | 18,500.00 | | | |
| Monaco Med Mal/BOM | Greear Law Firm | | 32,500.00 | | | |
| Monaco Med Mal | Steve Emery/Williams Porter Day and Neville | Claim and Lawsuit filed,Federal court | 15,000.00 | 150,000.00 | ongoing | |
| | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Wyoming Board of Medicine | | Complaint defense and appeal | | 350,000.00 | ongoing | Projected defense; costs on going investigations and defense |
| Harper Med/Mal/BOM | Steve Emery/Williams Porter Day and Neville | | 302,000.00 | | settled | defense costs and settlement fees |
| Clark Med/Mal/BOM | Steve Emery/Williams Porter Day and Neville | Williams Porter Day and Neville | 410,965.55 | | Settled | defense costs and settlement fees |
| Rasmussen/Med Mal | Dave Clark/Worrall Greear | claim filed | 17,000.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| Cox/ Med Mal | Steve Emery/Williams Porter Day & Neville | Claim filed | 25,000.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| Thomas/Med Mal/BOM | Steve Emery/Williams Porter Day & Neville | Claim/Lawsuit filed, Sheridan County | 30,000.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| Lee/Med Mal/BOM | Steve Emery/Williams Porter Day & Neville | Claim/Lawsuit filed, Sheridan County | 10,000.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| Platt/Med Mal/BOM | Steve Emery/Williams Porter Day & Neville | complaint filed | 10,000.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| Turner/Med Mal/BOM | Steve Emery/Williams Porter Day & Neville | complaint filed | 10,000.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| McMahill/Med Mal/BOM | Steve Emery/Williams Porter Day & Neville | complaint filed | 2,500.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| Davis/Med Mal/BOM | Steve Emery/Williams Porter Day & Neville | complaint filed | 2,500.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| Ewen/Med Mal/BOM | Steve Emery/Williams Porter Day & Neville | complaint filed | 2,500.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |

| | | | | | | |
|---|---|---|---|---|---|---|
| Brockus/Med mal/BOM | Steve Emery/Williams Porter Day & Neville | complaint filed | | 2,500.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| Mickelson/Medmal/BOM | Steve Emery/Williams Porter Day & Neville | complaint filed | | 2,500.00 | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| Beatty/Medmal | Steve Emery/Williams Porter Day & Neville | complaint pending per records | | | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| Rein/Medmal | Steve Emery/Williams Porter Day & Neville | complaint pending per records | | | 150,000.00 | ongoing | Reserve secured for Defense and Expert Fees |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Totals** | | | | **1,632,430.39** | **3,256,860.00** | | |
| | | | | | | |
| Note: Reserves include cost of defense, expert fees, trial costs | | | | | | |
| | | | | | | |

# EXHIBIT N

(205 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 26 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 205 of 303          1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION


UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
      vs.                        )  Criminal Docket
                                 )
JOHN HENRY SCHNEIDER,            )  No. CR 17-77-BLG-SPW
                                 )
            Defendant.           )
_____  )


Transcript of Change of Plea


Heard in Snowy Mountains Courtroom
James F. Battin United States Courthouse
2601 Second Avenue North
Billings, Montana
Wednesday - April 18, 2018
2:32 p.m. - 3:03 p.m.


BEFORE THE HONORABLE SUSAN P. WATTERS

UNITED STATES DISTRICT JUDGE

REBECCA M. SABO, RPR, CRR
United States Court Reporter
James F. Battin United States Courthouse
2601 Second Avenue North, Room 4209
Billings, Montana 59101
rebecca_sabo@mtd.uscourts.gov
(406) 855-6410

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

APPEARANCES


PRESENT ON BEHALF OF THE PLAINTIFF,
THE UNITED STATES OF AMERICA:

        Colin M. Rubich
        Assistant U.S. Attorney
        OFFICE OF THE U.S. ATTORNEY
        2601 Second Avenue North, Room 3200
        Billings, Montana 59101


PRESENT ON BEHALF OF THE DEFENDANT,
JOHN HENRY SCHNEIDER:

        John E. Smith, Esq.
        SMITH & STEPHENS
        P.O. Box 7337
        Missoula, Montana 59807-7337

|       |    |                                                                                 |
|-------|----|---------------------------------------------------------------------------------|
|       | 1  | PROCEEDINGS                                                                      |
|       | 2  | (Open court.)                                                                   |
|       | 3  | (Defendant present.)                                                            |
|       | 4  | THE COURT:  Please be seated.                                                   |
|       | 5  | Amanda, would you please call the next matter on the                           |
|       | 6  | calendar.                                                                       |
|       | 7  | THE CLERK:  Yes, Your Honor.                                                    |
|       | 8  | The Court has set aside this time to hear the matter                           |
| 02:32:44PM | 9 | of CR-17-77-BLG-SPW, U.S.A. versus John Henry Schneider.  This             |
| 02:32:52PM | 10 | is the time set for a change of plea.                                        |
| 02:32:54PM | 11 | THE COURT:  For the record, Colin Rubich appears on               |
| 02:32:57PM | 12 | behalf of the government.                                                    |
| 02:32:57PM | 13 | And you, sir, must be John Smith?                                            |
| 02:33:00PM | 14 | MR. SMITH:  Yes, I am.  Thank you, Judge.  It's my            |
| 02:33:03PM | 15 | first time in your courtroom.                                                |
| 02:33:05PM | 16 | THE COURT:  It is.  Nice to meet you.                                        |
| 02:33:07PM | 17 | Mr. Smith appears on behalf of the defendant, and the        |
| 02:33:10PM | 18 | defendant is present.                                                        |
| 02:33:10PM | 19 | This matter is set for hearing on the defendant's           |
| 02:33:13PM | 20 | motion to change his plea.                                                   |
| 02:33:15PM | 21 | And, Mr. Rubich, I understand there is a plea               |
| 02:33:17PM | 22 | agreement in this case.  So if you'd could please state the |
| 02:33:20PM | 23 | essence of that agreement on the record.                                     |
| 02:33:22PM | 24 | MR. RUBICH:  Yes, Your Honor.                                                |
| 02:33:22PM | 25 | The agreement is ruled by federal rule of criminal         |

02:33:27PM   1   procedure 11(c)(1)(A) and (B).  It calls for the defendant to

02:33:31PM   2   plead guilty to Count III of the indictment.  In exchange, at

02:33:35PM   3   time of sentencing, and provided that the plea agreement is

02:33:40PM   4   accepted by the Court, the United States will move to dismiss

02:33:42PM   5   Counts I and II as well as IV and V.

02:33:45PM   6          Additionally, the parties agree to recommend that the

02:33:53PM   7   base offense level be 18, in accordance with U.S. Sentencing

02:33:59PM   8   Guideline Section 2B1.1(b)(1)(J).  And, additionally, that the

02:34:03PM   9   defendant shall receive a 2-level increase in accordance with

02:34:07PM  10   Section 2B1.1(b)(9)(B).

02:34:11PM  11          The government and the defense agrees that no other

02:34:15PM  12   additions or subtractions will be applied other than those

02:34:17PM  13   points given for acceptance of responsibility pursuant to U.S.

02:34:17PM  14   Sentencing Guideline Section 3E1.1(a) and (b).  And in

02:34:24PM  15   accordance with that, we will be recommending 3 points for

02:34:32PM  16   acceptance of responsibility under 3C1.1(A) and (B).

02:34:35PM  17          And, finally, Your Honor, the United States has

02:34:39PM  18   agreed to recommend at the low end of the calculated guideline

02:34:43PM  19   range, which we believe, tentatively, if the calculation that

02:34:46PM  20   we agree to in the plea agreement is accepted, that that would

02:34:52PM  21   be 24 months incarceration.

02:34:55PM  22          THE COURT:  And does the plea agreement represent the

02:34:57PM  23   most favorable offer the government made to Mr. Schneider?

02:35:00PM  24          MR. RUBICH:  It does, Your Honor.

02:35:01PM  25          THE COURT:  Thank you.

02:35:02PM  1          Mr. Smith, do you agree that's an accurate

02:35:04PM  2   representation of the essence of the plea agreement?

02:35:08PM  3          MR. SMITH:  Yes, I do, Judge.

02:35:09PM  4          THE COURT:  And do you also agree that the plea

02:35:11PM  5   agreement represents the most favorable offer your client

02:35:13PM  6   received?

02:35:14PM  7          MR. SMITH:  Yes, that's correct.

02:35:16PM  8          THE COURT:  Mr. Schneider, if you'd please stand,

02:35:18PM  9   raise your right hand and be sworn.

02:35:21PM 10          JOHN HENRY MICHAEL SCHNEIDER, JR.,

02:35:21PM 11   after having been first duly sworn to testify the truth, the

02:35:26PM 12   whole truth, and nothing but the truth, testified as follows:

02:35:32PM 13          THE COURT:  Mr. Schneider, do you understand that you

02:35:32PM 14   are now under oath, and if you answer any of my questions

02:35:34PM 15   falsely that your answers could later be used against you in

02:35:38PM 16   another prosecution for perjury or making a false statement?

02:35:41PM 17          THE DEFENDANT:  I do, Your Honor.

02:35:42PM 18          THE COURT:  Today I must determine whether your plea

02:35:44PM 19   of guilty is entirely voluntary and being made on an informed

02:35:47PM 20   basis, and that you fully understand the following: the charge

02:35:51PM 21   against you, the consequences of pleading guilty, the potential

02:35:55PM 22   penalties you face, the rights you are waiving, and I must

02:35:59PM 23   satisfy myself that the government could prove the charge in

02:36:02PM 24   Count III of the superseding indictment beyond a reasonable

02:36:05PM 25   doubt.

| | | |
|---|---|---|
| 02:36:05PM | 1 | Do you understand all of that? |
| 02:36:07PM | 2 | THE DEFENDANT:  Yes, Your Honor. |
| 02:36:08PM | 3 | THE COURT:  Would you state your full name for the |
| 02:36:09PM | 4 | record, please. |
| 02:36:11PM | 5 | THE DEFENDANT:  John Henry Michael Schneider, Jr. |
| 02:36:13PM | 6 | THE COURT:  And where were you born. |
| 02:36:15PM | 7 | THE DEFENDANT:  Norwich, Connecticut. |
| 02:36:23PM | 8 | THE COURT:  Norwich? |
| 02:36:24PM | 9 | THE DEFENDANT:  Norwich, Connecticut. |
| 02:36:26PM | 10 | THE COURT:  Okay. |
| 02:36:26PM | 11 | MR. SMITH:  Yeah. |
| 02:36:27PM | 12 | THE COURT:  And how old are you? |
| 02:36:30PM | 13 | THE DEFENDANT:  56. |
| 02:36:32PM | 14 | THE COURT:  Are you married? |
| 02:36:32PM | 15 | THE DEFENDANT:  I am. |
| 02:36:33PM | 16 | THE COURT:  Do you have any children under the age of |
| 02:36:35PM | 17 | 18? |
| 02:36:36PM | 18 | THE DEFENDANT:  I do not. |
| 02:36:38PM | 19 | THE COURT:  And what education have you had? |
| 02:36:40PM | 20 | THE DEFENDANT:  I have a medical degree and a |
| 02:36:43PM | 21 | master's degree from Creighton law school. |
| 02:36:46PM | 22 | THE COURT:  And are you working? |
| 02:36:48PM | 23 | THE DEFENDANT:  I am. |
| 02:36:48PM | 24 | THE COURT:  And what do you do for a living? |
| 02:36:51PM | 25 | THE DEFENDANT:  Up until November -- excuse me, |

| | | |
|---|---|---|
| 02:36:54PM | 1 | December of 2017, I was a board-certified neurosurgeon.  In the |
| 02:36:58PM | 2 | last several months, I have a business called Provider |
| 02:37:04PM | 3 | Resolutions that takes my alternative dispute resolution legal |
| 02:37:09PM | 4 | degree and merges it with my experience in medicine. |
| 02:37:20PM | 5 | THE COURT:  And what do you do?  Do you mediate? |
| 02:37:22PM | 6 | THE DEFENDANT:  Co-mediate, co-arbitrate, facilitator |
| 02:37:25PM | 7 | in healthcare disputes. |
| 02:37:27PM | 8 | THE COURT:  Okay.  Have you ever been treated for any |
| 02:37:29PM | 9 | kind of mental illness? |
| 02:37:30PM | 10 | THE DEFENDANT:  No, ma'am. |
| 02:37:31PM | 11 | THE COURT:  Have you ever been treated for an |
| 02:37:32PM | 12 | addiction to alcohol or drugs of any kind? |
| 02:37:35PM | 13 | THE DEFENDANT:  No. |
| 02:37:37PM | 14 | THE COURT:  Do you take any prescription medication? |
| 02:37:39PM | 15 | THE DEFENDANT:  No. |
| 02:37:42PM | 16 | THE COURT:  Would you say you are under the influence |
| 02:37:44PM | 17 | of drugs, alcohol, or any medication today? |
| 02:37:47PM | 18 | THE DEFENDANT:  I am not. |
| 02:37:48PM | 19 | THE COURT:  And what do you understand the purpose of |
| 02:37:50PM | 20 | today's hearing to be? |
| 02:37:53PM | 21 | THE DEFENDANT:  For -- I am entering a plea of guilty |
| 02:37:55PM | 22 | to Count III of the indictment. |
| 02:37:58PM | 23 | THE COURT:  And we're actually operating off of a |
| 02:38:02PM | 24 | superseding indictment.  Did you receive a copy of that? |
| 02:38:05PM | 25 | THE DEFENDANT:  Yes, ma'am. |

02:38:05PM  1      THE COURT:  And did you read that document?

02:38:06PM  2      THE DEFENDANT:  I did, Your Honor.

02:38:07PM  3      THE COURT:  And have you had an opportunity to go

02:38:09PM  4  over the superseding indictment with Mr. Smith?

02:38:12PM  5      THE DEFENDANT:  I have, Your Honor.

02:38:13PM  6      THE COURT:  Do you understand what you've been

02:38:14PM  7  charged with in that document?

02:38:15PM  8      THE DEFENDANT:  I do.

02:38:17PM  9      THE COURT:  And has Mr. Smith discussed your case

02:38:19PM 10  with you?  For example, has he talked to you about the facts

02:38:22PM 11  the government would have to prove in order to convict you of

02:38:25PM 12  these charges?

02:38:26PM 13      THE DEFENDANT:  He has, Your Honor.

02:38:27PM 14      THE COURT:  Has he talked to you about the evidence

02:38:29PM 15  the government has against you?

02:38:32PM 16      THE DEFENDANT:  Yes, Your Honor.

02:38:32PM 17      THE COURT:  And has he talked to you about any

02:38:34PM 18  possible defenses you might have to these charges?

02:38:37PM 19      THE DEFENDANT:  Yes, Your Honor.

02:38:38PM 20      THE COURT:  Has he also discussed with you the

02:38:42PM 21  tactical and strategic implications of pleading guilty to

02:38:44PM 22  Count III as opposed to going to trial on all of the charges?

02:38:48PM 23      THE DEFENDANT:  Yes, Your Honor.

02:38:49PM 24      THE COURT:  Did he investigate the case to your

02:38:54PM 25  satisfaction?

(213 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 34 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 213 of 303        9

02:38:54PM   1              THE DEFENDANT:  Yes, Your Honor.

02:38:55PM   2              THE COURT:  And are you satisfied with Mr. Smith's

02:38:57PM   3   representation and advice in the matter?

02:38:59PM   4              THE DEFENDANT:  Yes, Your Honor.

02:39:00PM   5              THE COURT:  Do you need any more time to talk to

02:39:02PM   6   Mr. Smith before we proceed?

02:39:03PM   7              THE DEFENDANT:  I do not.

02:39:05PM   8              THE COURT:  Do you understand that relevant to

02:39:09PM   9   today's hearing that you've been charged in Count III of the

02:39:12PM  10   superseding indictment with concealment of bankruptcy assets,

02:39:17PM  11   in violation of 18 United States Code Section 152(1)?

02:39:23PM  12              THE DEFENDANT:  Yes, Your Honor.

02:39:23PM  13              THE COURT:  And do you have an understanding of what

02:39:25PM  14   the maximum potential sentence is if you plead guilty to the

02:39:30PM  15   charge in Count III and if I accept your plea?

02:39:33PM  16              THE DEFENDANT:  Yes, Your Honor.

02:39:34PM  17              THE COURT:  And what do you understand the maximum

02:39:36PM  18   potential sentence to be?

02:39:37PM  19              THE DEFENDANT:  Five years.

02:39:40PM  20              THE COURT:  Five years imprisonment, a $250,000 fine,

02:39:44PM  21   three years of supervised release, and a $100 special

02:39:48PM  22   assessment, right?

02:39:49PM  23              THE DEFENDANT:  Yes, Your Honor.

02:39:50PM  24              THE COURT:  Does any of that come as a surprise to

02:39:52PM  25   you?

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 35 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 214 of 303

10

| | | |
|---|---|---|
| 02:39:52PM | 1 | THE DEFENDANT:  No, ma'am. |
| 02:39:53PM | 2 | THE COURT:  Okay.  And are you aware that parole has |
| 02:39:55PM | 3 | been abolished with respect to federal crimes.  So if you are |
| 02:39:59PM | 4 | sentenced to a term of imprisonment, that you will have to |
| 02:40:02PM | 5 | serve the entire sentence, less any good time, you won't be |
| 02:40:05PM | 6 | released on parole? |
| 02:40:07PM | 7 | THE DEFENDANT:  Yes, Your Honor. |
| 02:40:08PM | 8 | THE COURT:  Do you understand that if you are |
| 02:40:10PM | 9 | sentenced to a term of supervised release that there will be |
| 02:40:13PM | 10 | numerous conditions you'll have to comply with? |
| 02:40:15PM | 11 | THE DEFENDANT:  Yes, Your Honor. |
| 02:40:16PM | 12 | THE COURT:  Do you also understand that if you do not |
| 02:40:17PM | 13 | comply with those conditions that your supervised release could |
| 02:40:20PM | 14 | be revoked and you could be sent back to prison? |
| 02:40:23PM | 15 | THE DEFENDANT:  Yes, Your Honor. |
| 02:40:27PM | 16 | THE COURT:  Now I'd like to talk to you about the |
| 02:40:29PM | 17 | plea agreement.  Do you have a copy of the plea agreement in |
| 02:40:31PM | 18 | front of you, Mr. Schneider? |
| 02:40:33PM | 19 | THE DEFENDANT:  I do. |
| 02:40:33PM | 20 | THE COURT:  And could you turn to the very last page |
| 02:40:35PM | 21 | of that agreement, please, page 9. |
| 02:40:40PM | 22 | THE DEFENDANT:  (Complies.) |
| 02:40:42PM | 23 | THE COURT:  Do you see where your name is typed on |
| 02:40:44PM | 24 | that page? |
| 02:40:44PM | 25 | THE DEFENDANT:  I do, Your Honor. |

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 36 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 215 of 303

(215 of 303)

11

| | | |
|---|---|---|
| 02:40:46PM | 1 | THE COURT:  And is that your signature immediately |
| 02:40:47PM | 2 | above your typed name? |
| 02:40:49PM | 3 | THE DEFENDANT:  It is, Your Honor. |
| 02:40:50PM | 4 | THE COURT:  Did you sign this plea agreement after |
| 02:40:52PM | 5 | you had read the entire agreement and discussed its terms with |
| 02:40:55PM | 6 | Mr. Smith? |
| 02:40:56PM | 7 | THE DEFENDANT:  Yes, ma'am. |
| 02:40:57PM | 8 | THE COURT:  And you've also initialed each page; is |
| 02:41:00PM | 9 | that true? |
| 02:41:00PM | 10 | THE DEFENDANT:  I have. |
| 02:41:01PM | 11 | THE COURT:  And what did you intend to indicate by |
| 02:41:03PM | 12 | initialing each page? |
| 02:41:04PM | 13 | THE DEFENDANT:  That I have read and understand each |
| 02:41:06PM | 14 | page. |
| 02:41:06PM | 15 | THE COURT:  And do you feel like you understand the |
| 02:41:08PM | 16 | terms of the plea agreement that you've signed? |
| 02:41:11PM | 17 | THE DEFENDANT:  Yes, Your Honor. |
| 02:41:11PM | 18 | THE COURT:  Do you have any questions whatsoever |
| 02:41:13PM | 19 | about the terms of the plea agreement? |
| 02:41:15PM | 20 | THE DEFENDANT:  No, ma'am. |
| 02:41:16PM | 21 | THE COURT:  Does the plea agreement represent the |
| 02:41:19PM | 22 | entire agreement that you have with the United States |
| 02:41:22PM | 23 | government? |
| 02:41:22PM | 24 | THE DEFENDANT:  It does. |
| 02:41:24PM | 25 | THE COURT:  Has anyone made any promises to you that |

(216 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 37 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 216 of 303          12

| | | |
|---|---|---|
| 02:41:25PM | 1 | aren't contained within the plea agreement to get you to sign |
| 02:41:28PM | 2 | it and to plead today? |
| 02:41:30PM | 3 | THE DEFENDANT:  No, ma'am. |
| 02:41:30PM | 4 | THE COURT:  Has anyone promised you that I would |
| 02:41:32PM | 5 | impose a certain sentence in exchange for your plea of guilty |
| 02:41:36PM | 6 | today? |
| 02:41:36PM | 7 | THE DEFENDANT:  No, ma'am. |
| 02:41:38PM | 8 | THE COURT:  You understand that the terms of the plea |
| 02:41:40PM | 9 | agreement are merely recommendations to the Court? |
| 02:41:43PM | 10 | THE DEFENDANT:  I do. |
| 02:41:44PM | 11 | THE COURT:  And that means that I can reject the |
| 02:41:46PM | 12 | recommendations without allowing you to withdraw your plea of |
| 02:41:52PM | 13 | guilty.  Do you understand that? |
| 02:41:53PM | 14 | THE DEFENDANT:  I do, Your Honor. |
| 02:41:55PM | 15 | THE COURT:  Is anyone forcing you to plead guilty |
| 02:41:57PM | 16 | today? |
| 02:41:58PM | 17 | THE DEFENDANT:  They are not. |
| 02:41:59PM | 18 | THE COURT:  Has anyone threatened you in any way to |
| 02:42:01PM | 19 | get you to do so? |
| 02:42:02PM | 20 | THE DEFENDANT:  No, ma'am. |
| 02:42:03PM | 21 | THE COURT:  Have you ever been convicted of a felony |
| 02:42:06PM | 22 | in state or federal court before? |
| 02:42:08PM | 23 | THE DEFENDANT:  No, ma'am. |
| 02:42:11PM | 24 | THE COURT:  Do you understand that by pleading guilty |
| 02:42:13PM | 25 | here today, you lose valuable civil rights, such as the right |

(217 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 38 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 217 of 303          13

| | | |
|---|---|---|
| 02:42:16PM | 1 | to vote, to hold public office, to serve on a jury, and you |
| 02:42:20PM | 2 | won't ever be allowed to possess a firearm, ammunition, or |
| 02:42:24PM | 3 | other dangerous devices as defined by federal law? |
| 02:42:27PM | 4 | THE DEFENDANT:  I understand. |
| 02:42:28PM | 5 | THE COURT:  Do you understand that if you are not a |
| 02:42:30PM | 6 | citizen of the United States, in addition to the other possible |
| 02:42:33PM | 7 | penalties you are facing, a plea of guilty may subject you to |
| 02:42:36PM | 8 | deportation, exclusion, or voluntary departure from the United |
| 02:42:40PM | 9 | States, and prevent you from obtaining United States |
| 02:42:45PM | 10 | citizenship? |
| 02:42:47PM | 11 | THE DEFENDANT:  I understand. |
| 02:42:47PM | 12 | THE COURT:  Now, with regard to sentencing, do you |
| 02:42:49PM | 13 | understand that your sentence will be determined by a |
| 02:42:52PM | 14 | combination of the advisory sentencing guideline range, any |
| 02:42:56PM | 15 | possible variances or authorized departures from that range, |
| 02:42:59PM | 16 | and other sentencing factors? |
| 02:43:02PM | 17 | THE DEFENDANT:  Yes, ma'am. |
| 02:43:04PM | 18 | THE COURT:  And has Mr. Smith talked to you about how |
| 02:43:06PM | 19 | the advisory sentencing guidelines might apply to your case? |
| 02:43:09PM | 20 | THE DEFENDANT:  He has, yes. |
| 02:43:10PM | 21 | THE COURT:  Now, before we get to sentencing, a |
| 02:43:12PM | 22 | presentence report will be prepared.  And the presentence |
| 02:43:17PM | 23 | author will calculate two numbers; the first is your offense |
| 02:43:20PM | 24 | level and the second is your criminal history, and, |
| 02:43:23PM | 25 | specifically, your criminal history category.  Do those terms |

(218 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 39 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 218 of 303          14

02:43:27PM   1   sound familiar to you?

02:43:28PM   2           THE DEFENDANT:  They do, Your Honor.

02:43:35PM   3           THE COURT:  And there are various factors that are

02:43:35PM   4   taken into consideration in determining the offense level.  For

02:43:36PM   5   example, if you plead guilty to Count III today and take

02:43:39PM   6   responsibility for the crime, then that offense level can go

02:43:43PM   7   down.  And once we've made all of the adjustments that apply,

02:43:46PM   8   then we arrive at what's called your total offense level.  Does

02:43:49PM   9   that process sound familiar to you?

02:43:51PM  10           THE DEFENDANT:  Yes, ma'am.

02:43:52PM  11           THE COURT:  And then with regard to your criminal

02:43:56PM  12   history, the presentence author will look at every encounter

02:43:58PM  13   you've ever had with law enforcement and score them according

02:44:01PM  14   to the guidelines.  And then those scores will be totaled up,

02:44:05PM  15   and that total will be converted to one of six criminal history

02:44:09PM  16   categories.  Does that process sound familiar?

02:44:12PM  17           THE DEFENDANT:  It does, Your Honor.

02:44:14PM  18           THE COURT:  And I think there's a sentencing table

02:44:16PM  19   there on counsel table.

02:44:16PM  20           MR. SMITH:  (Indicating.)

02:44:18PM  21           THE COURT:  Yes, Mr. Smith.

02:44:19PM  22           Mr. Schneider, have you seen one of those before?

02:44:21PM  23           THE DEFENDANT:  I have, Your Honor.

02:44:23PM  24           THE COURT:  So you will note that on the left margin

02:44:25PM  25   are the offense levels and on the top are the criminal history

02:44:34PM  1  categories, correct?

02:44:34PM  2  THE DEFENDANT:  Yes, ma'am.

02:44:34PM  3  THE COURT:  So once I have reviewed the final

02:44:38PM  4  presentence report and ruled on any objections to that report,

02:44:40PM  5  if there are any, then I will determine what your total offense

02:44:43PM  6  level is and what your criminal history category is.  And then

02:44:46PM  7  I simply go down and across to where those columns intersect,

02:44:50PM  8  and that tells me the applicable guideline range.  Do you

02:44:53PM  9  understand that?

02:44:54PM  10  THE DEFENDANT:  I do, Your Honor.

02:44:55PM  11  THE COURT:  And so I can't determine your total

02:45:00PM  12  offense level and your criminal history category and the

02:45:03PM  13  resulting advisory guideline range until I've reviewed the

02:45:07PM  14  final presentence report.  So what that means for you today,

02:45:10PM  15  Mr. Schneider, is if you intend to plead guilty to Count III,

02:45:13PM  16  you'll have to do so without knowing for certain what the

02:45:17PM  17  advisory guideline range will be that will apply ultimately.

02:45:20PM  18  Do you understand that?

02:45:21PM  19  THE DEFENDANT:  I understand, Your Honor.

02:45:23PM  20  THE COURT:  Once I have determined that guideline

02:45:25PM  21  range, then I consider the sentencing factors that are set

02:45:29PM  22  forth in 18 United States Code Section 3553(a).  And this

02:45:36PM  23  statute includes such factors as your history and

02:45:40PM  24  characteristics, the nature and circumstances of the offense,

02:45:43PM  25  the need for just punishment, the need to promote a respect for

02:45:47PM   1    the law, et cetera.  And based on those factors, I do have the

02:45:51PM   2    authority to vary above or below the advisory sentencing

02:45:56PM   3    guideline range.

02:45:57PM   4          So, of course, what that means is that I could

02:46:03PM   5    sentence you to a term of imprisonment that is longer than that

02:46:06PM   6    suggested by the guideline range or shorter than that suggested

02:46:09PM   7    by the guideline range.  You understand that?

02:46:11PM   8          THE DEFENDANT:  I do, Your Honor.

02:46:13PM   9          THE COURT:  Now, in some circumstances, you or the

02:46:15PM  10    government would have a right to appeal any sentence that I

02:46:19PM  11    impose.  And pursuant to the plea agreement, and specifically

02:46:24PM  12    pursuant to paragraph 8 of that agreement, you have waived your

02:46:29PM  13    right to appeal the sentence and any conditions if the sentence

02:46:33PM  14    that I impose is within or below the guideline range as I

02:46:38PM  15    calculate it regardless of whether you agree with that range.

02:46:41PM  16    Do you understand that?

02:46:42PM  17          THE DEFENDANT:  I do, Your Honor.

02:46:43PM  18          THE COURT:  Do you have any questions at all about

02:46:46PM  19    the waiver of your right to appeal that you've agreed to in

02:46:49PM  20    this plea agreement?

02:46:50PM  21          THE DEFENDANT:  I have no questions, Your Honor.

02:46:51PM  22          THE COURT:  Okay.

02:46:53PM  23          In addition, if you plead guilty to Count III today,

02:46:56PM  24    you will be waiving other rights.  For example, you have the

02:46:59PM  25    right to persist in your not guilty pleas and have all of these

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 42 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 221 of 303

(221 of 303)

17

02:47:04PM   1   charges tried to a jury of your peers.  And that jury would be

02:47:08PM   2   comprised of 12 people randomly selected from the jury pool in

02:47:12PM   3   the counties that make up the Billings Division of this court.

02:47:16PM   4   But you understand if you plead guilty to Count III and if I

02:47:19PM   5   accept your plea, there will be no trial?

02:47:22PM   6                THE DEFENDANT:  I understand that, Your Honor.

02:47:23PM   7                THE COURT:  Do you understand that you have the right

02:47:25PM   8   to be represented by an attorney at trial and during every

02:47:28PM   9   stage of these proceedings?

02:47:30PM  10                THE DEFENDANT:  Yes.

02:47:34PM  11                THE COURT:  Mr. Smith, are you retained or -- yes,

02:47:36PM  12   you're retained.  Correct?

02:47:37PM  13                MR. SMITH:  Yes.

02:47:39PM  14                THE COURT:  Okay.  Now, if you went to trial,

02:47:43PM  15   Mr. Schneider, do you understand that the jury would be

02:47:46PM  16   instructed as follows: that you are presumed to be innocent,

02:47:50PM  17   that the government is required to prove the offense charged

02:47:54PM  18   beyond a reasonable doubt to the satisfaction of all 12 jurors,

02:47:57PM  19   and that all 12 jurors would have to unanimously agree that the

02:48:01PM  20   government had proved your guilt beyond a reasonable doubt?

02:48:04PM  21                THE DEFENDANT:  I understand that, Your Honor.

02:48:05PM  22                THE COURT:  Do you understand that at trial you'd

02:48:06PM  23   have the right to confront and cross-examine each of the

02:48:09PM  24   government's witnesses through Mr. Smith?

02:48:12PM  25                THE DEFENDANT:  I do, Your Honor.

(222 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 43 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 222 of 303

18

02:48:12PM  1          THE COURT:  Do you understand that at trial you'd

02:48:14PM  2   also have the right to present evidence and witnesses in your

02:48:20PM  3   defense?

02:48:20PM  4          THE DEFENDANT:  I understand that, Your Honor.

02:48:21PM  5          THE COURT:  And are you aware that if there were

02:48:24PM  6   people who you wanted to come and testify on your behalf who

02:48:27PM  7   were refusing to do that, that you could call upon the power of

02:48:30PM  8   the court to compel them to come to court and testify?

02:48:33PM  9          THE DEFENDANT:  I understand that, Your Honor.

02:48:34PM 10          THE COURT:  Do you understand that at trial, you have

02:48:36PM 11   the right to remain silent and not testify unless you chose

02:48:40PM 12   voluntarily to waive that right?

02:48:42PM 13          THE DEFENDANT:  I understand, Your Honor.

02:48:44PM 14          THE COURT:  Do you also understand today, however,

02:48:46PM 15   you will have to waive your right against self-incrimination

02:48:49PM 16   and tell me what it is that you did that makes you plead

02:48:51PM 17   guilty?

02:48:52PM 18          THE DEFENDANT:  I understand that, Your Honor.

02:48:53PM 19          THE COURT:  Now, if you went to trial and chose not

02:48:55PM 20   to testify or present any evidence, do you understand that the

02:48:59PM 21   jury would be instructed that your decision could not be used

02:49:03PM 22   against you in determining your guilt or innocence?

02:49:07PM 23          THE DEFENDANT:  I understand, Your Honor.

02:49:08PM 24          THE COURT:  And do you understand the burden to prove

02:49:10PM 25   you guilty rests entirely upon the government and that you

(223 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 44 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 223 of 303          19

02:49:12PM  1    don't have to prove anything or present any evidence?

02:49:16PM  2             THE DEFENDANT:  Yes, Your Honor.

02:49:17PM  3             THE COURT:  And if you were convicted at trial, you

02:49:20PM  4    would have the right to appeal that conviction and the

02:49:22PM  5    resulting sentence to the Ninth Circuit Court of Appeals.  Do

02:49:26PM  6    you understand that?

02:49:27PM  7             THE DEFENDANT:  I do, Your Honor.

02:49:28PM  8             THE COURT:  And are you aware that that court has the

02:49:30PM  9    authority to reverse a conviction or a sentence if it feels

02:49:33PM  10   that errors were made or the trial wasn't fair?

02:49:36PM  11            THE DEFENDANT:  I do, Your Honor.

02:49:37PM  12            THE COURT:  So do you fully understand that by

02:49:40PM  13   entering a plea of guilty today, and if I accept your plea,

02:49:43PM  14   that there will be no trial?

02:49:45PM  15            THE DEFENDANT:  I understand that, Your Honor.

02:49:46PM  16            THE COURT:  Do you understand that you will have

02:49:48PM  17   waived all of the rights I've just gone over with you?

02:49:50PM  18            THE DEFENDANT:  Yes.

02:49:51PM  19            THE COURT:  And you understand that these are

02:49:54PM  20   important constitutional rights, rights that are guaranteed to

02:49:57PM  21   you by the United States Constitution that you're waiving?

02:50:02PM  22            THE DEFENDANT:  I do, Your Honor.

02:50:02PM  23            THE COURT:  Mr. Rubich, could you please explain the

02:50:04PM  24   elements that the government would have to prove beyond a

02:50:07PM  25   reasonable doubt before the defendant could be convicted of

| | | |
|---|---|---|
| 02:50:10PM | 1 | Count III. |
| 02:50:10PM | 2 | MR. RUBICH:  Yes, Your Honor. |
| 02:50:11PM | 3 | First, there was a bankruptcy proceeding; |
| 02:50:13PM | 4 | Second, U.S. Bank account No. 1-500-9160-2881, |
| 02:50:22PM | 5 | containing approximately $309,686 was identified as an asset |
| 02:50:28PM | 6 | that belonged to the bankrupt estate; |
| 02:50:31PM | 7 | Third, the defendant knowingly concealed the |
| 02:50:33PM | 8 | above-identified asset from United States Trustee who was |
| 02:50:36PM | 9 | charged with the custody or control of such property; and |
| 02:50:39PM | 10 | Fourth, the defendant's concealment of the identified |
| 02:50:42PM | 11 | asset was an act of fraud committed during the course of his |
| 02:50:46PM | 12 | bankruptcy. |
| 02:50:47PM | 13 | THE COURT:  Mr. Smith, do you agree that's an |
| 02:50:48PM | 14 | accurate statement of the legal elements? |
| 02:50:51PM | 15 | MR. SMITH:  Yes, it is, Judge. |
| 02:50:54PM | 16 | THE COURT:  And, Mr. Schneider, you understand what |
| 02:50:56PM | 17 | the government would have to prove before you could be found |
| 02:50:58PM | 18 | guilty of the offense? |
| 02:51:00PM | 19 | THE DEFENDANT:  I do, Your Honor. |
| 02:51:00PM | 20 | THE COURT:  And, Mr. Rubich, could you tell us what |
| 02:51:02PM | 21 | your proof would be if you had to prove Count III to a jury. |
| 02:51:05PM | 22 | MR. RUBICH:  Yes, Your Honor. |
| 02:51:05PM | 23 | If this case were tried in the United States District |
| 02:51:07PM | 24 | Court, the United States would prove the following: |
| 02:51:09PM | 25 | On December 12th, 2014, John Henry Schneider declared |

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 46 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 225 of 303

(225 of 303)

21

02:51:14PM  1  bankruptcy.  Prior to this declaration, Schneider had convinced

02:51:17PM  2  another individual, identified here as K.B., to open U.S. Bank

02:51:22PM  3  account number 1-500-9160-2881 in K.B.'s name.  Though it was

02:51:29PM  4  in K.B.'s name, the bank account remained completely in

02:51:33PM  5  Schneider's control.  Between the time the account was opened

02:51:36PM  6  and December 12th, 2014, Schneider deposited approximately

02:51:40PM  7  $539,736.22 into the account.  These assets belonged to

02:51:46PM  8  Schneider.

02:51:46PM  9      When Schneider declared bankruptcy on December 12th,

02:51:50PM 10  2014, there was $309,686 remaining in the account.  Once

02:51:54PM 11  bankruptcy was declared, this bank account and the monies it

02:51:58PM 12  contained were assets that rightfully belonged to the bankrupt

02:52:02PM 13  estate.  As such, Schneider should have declared these assets

02:52:05PM 14  on the Statement of Financial Affairs which was filed when

02:52:08PM 15  Schneider declared bankruptcy.  Schneider failed to do this.

02:52:11PM 16  Schneider was fully aware of these assets and had access to

02:52:14PM 17  them during this time.

02:52:15PM 18      During the course of the bankruptcy, Schneider was

02:52:17PM 19  repeatedly given opportunities to disclose this bank account

02:52:20PM 20  and other assets that belonged to him, but he failed to do so.

02:52:24PM 21  On January 23rd, 2015, Schneider was asked if the Statement of

02:52:27PM 22  Financial Affairs was accurate and complete.  Schneider

02:52:29PM 23  incorrectly said that it was in an effort to conceal the bank

02:52:33PM 24  account.  Eventually K.B., concerned that he/she could be

02:52:37PM 25  involved in illegal activity, closed the account and turned

02:52:40PM  1    over the remaining assets to Schneider via a check.  Though

02:52:43PM  2    this account closure occurred during the bankruptcy

02:52:46PM  3    proceedings, this check and the assets were not turned over to

02:52:49PM  4    the bankruptcy trustee and were never disclosed by Schneider.

02:52:53PM  5             THE COURT:  Mr. Schneider, did you hear anything in

02:52:55PM  6    the government's offer of proof that you disagree with?

02:52:59PM  7             THE DEFENDANT:  Yes, Your Honor.

02:53:00PM  8             I believe the date that I actually filed bankruptcy

02:53:02PM  9    was December 14th, 2014.

02:53:06PM  10            The elements of the last -- excuse me, on page 4, I

02:53:14PM  11   disagree with the prosecutor's -- some of the prosecutor's

02:53:20PM  12   statements, but I do agree that it was my responsibility to

02:53:23PM  13   declare this asset since I had access to it, despite it being

02:53:27PM  14   in someone else's name.  And I had failed -- in failing to do

02:53:29PM  15   that -- to meet that responsibility that I was fraudulent in

02:53:33PM  16   not disclosing that information to the bankruptcy trustee.

02:53:37PM  17            I believe the last sentence of the account closure --

02:53:41PM  18   excuse me, the last two sentences, K.B. did not turn over the

02:53:46PM  19   remaining assets to myself via check.  The assets were handled

02:53:52PM  20   in a different manner, but were still -- they were repatriated

02:53:58PM  21   to my estate, and in the repatriation to my estate, that

02:54:04PM  22   information was available to Trustee Womack during the course

02:54:08PM  23   of the bankruptcy as well as the litigation that occurred

02:54:13PM  24   within the bankruptcy itself.  Nevertheless, it was my

02:54:17PM  25   responsibility to declare this on the original petition.  And

| | | |
|---|---|---|
| 02:54:22PM | 1 | when asked, during the course of the 341 bankruptcy |
| 02:54:27PM | 2 | depositions, I did not identify this as an asset, and I |
| 02:54:32PM | 3 | understand now that that's fraudulent misrepresentation. |
| 02:54:48PM | 4 | THE COURT:  So you agree with everything except that |
| 02:54:55PM | 5 | the funds, when the account was closed, weren't returned to you |
| 02:55:02PM | 6 | via check in that last paragraph? |
| 02:55:07PM | 7 | THE DEFENDANT:  Yes, Your Honor. |
| 02:55:08PM | 8 | THE COURT:  And so where did the funds go? |
| 02:55:10PM | 9 | THE DEFENDANT:  The funds were -- K.B. is the trustee |
| 02:55:14PM | 10 | of my children's irrevocable trust, and the funds went to |
| 02:55:17PM | 11 | Michelle Schneider, my then current wife, who became the |
| 02:55:21PM | 12 | trustee of the children's irrevocable trusts.  So the funds |
| 02:56:09PM | 13 | went to Michelle Schneider, and Michelle Schneider's bank |
| 02:55:30PM | 14 | accounts were under open -- subpoenaed by Trustee Womack, and |
| 02:55:36PM | 15 | Trustee Womack, when he filed AP 1520 litigation against myself |
| 02:55:41PM | 16 | and all entities related to me, the specific account in |
| 02:55:44PM | 17 | Michelle Schneider's name was named in that adversarial |
| 02:55:49PM | 18 | proceeding. |
| 02:55:50PM | 19 | THE COURT:  And so did the funds ever go into the |
| 02:55:52PM | 20 | bankruptcy estate? |
| 02:55:55PM | 21 | THE DEFENDANT:  A portion of them, yes, Your Honor. |
| 02:56:17PM | 22 | THE COURT:  And so the funds that were in this |
| 02:56:19PM | 23 | account that's been referenced in the offer of proof, you |
| 02:56:22PM | 24 | agree, belonged to the bankrupt estate? |
| 02:56:26PM | 25 | THE DEFENDANT:  A portion of them, Your Honor. |

02:56:27PM 1          THE COURT:  Okay.

02:56:27PM 2          Well, we're talking about five hundred thousand and

02:56:31PM 3   something to begin with, and three hundred and something

02:56:35PM 4   thousand to end with?

02:56:36PM 5          THE DEFENDANT:  Yes, Your Honor.

02:56:37PM 6          THE COURT:  So how much of that was supposed to be in

02:56:39PM 7   the bankruptcy estate?

02:56:41PM 8          THE DEFENDANT:  It was my responsibility to declare

02:56:44PM 9   that as an asset under my control, and I understand that that

02:56:49PM 10  should have been declared to the trustee, and the trustee may

02:56:54PM 11  or may not have claimed it.

02:56:56PM 12         THE COURT:  But the intent -- or but the entire

02:56:59PM 13  amount was to be disclosed, correct?

02:57:01PM 14         THE DEFENDANT:  Yes, Your Honor.

02:57:06PM 15         MR. SMITH:  Judge, I would just add, as of the date

02:57:09PM 16  of the filing of the bankruptcy, that account essentially

02:57:12PM 17  became the property of the bankruptcy estate and under the

02:57:15PM 18  control of the trustee, and it was not disclosed.

02:57:18PM 19         THE COURT:  Right.  Okay.

02:57:31PM 20         And, Mr. Smith, based on your representation and

02:57:35PM 21  investigation in this case, and I don't know if you were

02:57:39PM 22  involved in the bankruptcy or not, but other than what your

02:57:45PM 23  client has disputed or clarified on the record here, did you

02:57:49PM 24  hear anything in the government's offer of proof that you

02:57:52PM 25  thought was incorrect?

02:57:53PM  1          MR. SMITH:  No.

02:57:54PM  2          Again, the date is December 14, 2014, upon which the

02:57:58PM  3  bankruptcy was filed.  I was not involved in the bankruptcy,

02:58:01PM  4  however I did make contact with his current bankruptcy attorney

02:58:05PM  5  so that I was fully apprised of what occurred during the

02:58:09PM  6  bankruptcy so that I was able to give proper advice to

02:58:13PM  7  Dr. Schneider.

02:58:13PM  8          THE COURT:  Sure.

02:58:14PM  9          MR. SMITH:  And I agree with everything in the offer

02:58:17PM  10  of proof except for what Dr. Schneider has now clarified.  And

02:58:20PM  11  I also agree, and I know Dr. Schneider does as well, that the

02:58:24PM  12  facts, as recited by Mr. Rubich, would be proven by the

02:58:28PM  13  government, and that proof would be sufficient to convict

02:58:32PM  14  Dr. Schneider of Count III.

02:58:34PM  15          THE COURT:  Okay.  Thank you.

02:58:35PM  16          Well, I will grant the defendant's motion to change

02:58:38PM  17  his plea and allow him to withdraw his not guilty plea to the

02:58:42PM  18  charge in Count III of the indictment.

02:58:44PM  19          So I guess I should be referring to you as

02:58:47PM  20  Dr. Schneider.  I apologize.

02:58:52PM  21          MR. SMITH:  It's -- yes.

02:58:55PM  22          THE COURT:  How do you plead to the charge in

02:58:56PM  23  Count III of concealment of bankruptcy assets, in violation of

02:59:00PM  24  18 United States Code Section 152(1)?

02:59:04PM  25          THE DEFENDANT:  Guilty, Your Honor.

02:59:05PM  1         THE COURT:  And I think you've pretty much told us

02:59:08PM  2    what it is that you did that makes you plead guilty to

02:59:10PM  3    Count III.

02:59:16PM  4         So there's an element of you knowingly concealing

02:59:21PM  5    these funds in this bankruptcy account.

02:59:23PM  6         So when you filed bankruptcy on December 14th, 2014,

02:59:29PM  7    this account had already been created; is that correct?

02:59:31PM  8         THE DEFENDANT:  Yes, Your Honor.

02:59:36PM  9         THE COURT:  And based upon your understanding of what

02:59:39PM  10   was required in this Statement of Financial Affairs, did you

02:59:46PM  11   believe that you were required to set forth this bank account

02:59:52PM  12   on that document?

02:59:54PM  13        THE DEFENDANT:  Yes, Your Honor.

02:59:55PM  14        THE COURT:  And do you agree that you knowingly

02:59:57PM  15   concealed these funds from the bankruptcy trustee and the Court

03:00:04PM  16   for a period of time?

03:00:06PM  17        THE DEFENDANT:  Yes, Your Honor.

03:00:07PM  18        THE COURT:  It is the Court's finding in the case of

03:00:09PM  19   the United States of America versus John Henry Schneider,

03:00:14PM  20   CR 17-77-BLG-SPW, that the defendant is fully competent and

03:00:19PM  21   capable of entering an informed plea, that he is aware of the

03:00:23PM  22   nature of the charge and the consequences of the plea, and that

03:00:26PM  23   his plea of guilty is knowingly and voluntarily made, supported

03:00:31PM  24   by an independent basis in fact that establishes each of the

03:00:33PM  25   essential elements of the offense.

03:00:36PM  1          Dr. Schneider, I believe that if a jury heard the

03:00:40PM  2   proof that the government has put on the record today that the

03:00:42PM  3   jury would find beyond a reasonable doubt that you are guilty.

03:00:46PM  4   And I'm further satisfied, based on your sworn testimony, that

03:00:49PM  5   you are guilty of the offense charged in Count III of the

03:00:53PM  6   superseding indictment.  Therefore, your guilty plea is

03:00:57PM  7   accepted and you are now adjudged guilty of the offense charged

03:01:00PM  8   in Count III of the superseding indictment.  And I will reserve

03:01:06PM  9   my decision of whether to accept or reject the plea agreement

03:01:09PM  10  until I've had an opportunity to review the final presentence

03:01:12PM  11  report.

03:01:12PM  12         You may be seated.

03:01:16PM  13         THE DEFENDANT:  (Complies.)

03:01:17PM  14         THE COURT:  The next thing that will happen in this

03:01:19PM  15  process is that the Presentence Investigation Report will be

03:01:21PM  16  prepared.  Ms. Ally Guldborg, who is seated here in the

03:01:26PM  17  courtroom, is the United States probation officer who will be

03:01:28PM  18  interviewing you for purposes of that report.  You need to be

03:01:31PM  19  truthful when you answer her questions, or that will negatively

03:01:35PM  20  affect your sentencing.  You do have the right to have

03:01:38PM  21  Mr. Smith present with you during that interview and to follow

03:01:42PM  22  his advice if he were to advise you not to answer a particular

03:01:45PM  23  question.  Then Ms. Guldborg will verify the information you

03:01:48PM  24  provide, and she'll gather other information, and she will

03:01:51PM  25  prepare a draft of the presentence report.

03:01:54PM   1          Please review the draft carefully.  If you think it

03:01:57PM   2   contains information that is not correct, you need to bring

03:02:01PM   3   that to the attention of Mr. Smith, and he'll try resolve any

03:02:06PM   4   issues you have with the presentence report informally with

03:02:10PM   5   Ms. Guldborg.  But Mr. Smith will have the right to file formal

03:02:14PM   6   objections to the final presentence report on your behalf if he

03:02:18PM   7   feels that it's appropriate, as will Mr. Rubich on behalf of

03:02:22PM   8   the government.  And if formal objections are filed, then I'll

03:02:26PM   9   rule on those at the time of sentencing.

03:02:28PM  10          At the sentencing hearing, the government will make

03:02:30PM  11   an argument to the Court regarding what the government feels is

03:02:34PM  12   an appropriate sentence.  Mr. Smith will be given an

03:02:38PM  13   opportunity to argue what he feels is an appropriate sentence,

03:02:41PM  14   and you'll also be given an opportunity to speak on your own

03:02:45PM  15   behalf at sentencing.

03:02:46PM  16          I will set sentencing to occur on Wednesday,

03:02:50PM  17   August 15th at 1:30 p.m. in this courtroom.

03:02:53PM  18          And it's my understanding that you are on pretrial

03:02:58PM  19   release, Dr. Schneider, pursuant to the release order issued by

03:03:03PM  20   Judge Cavan on October 12th of last year.  Is that correct?

03:03:08PM  21          THE DEFENDANT:  Yes, Your Honor.

03:03:09PM  22          THE COURT:  And I don't have any information that you

03:03:11PM  23   have violated any of those conditions.

03:03:13PM  24          So any objection that the defendant continue on

03:03:21PM  25   pretrial release, Mr. Rubich?

| | | |
|---|---|---|
| 03:03:24PM | 1 | MR. RUBICH:  No objection, Your Honor. |
| 03:03:24PM | 2 | THE COURT:  So you will continue on release pending |
| 03:03:28PM | 3 | sentencing, Dr. Schneider, under the same conditions as set |
| 03:03:30PM | 4 | forth in this release order issued by Judge Cavan. |
| 03:03:34PM | 5 | THE DEFENDANT:  I understand, Your Honor. |
| 03:03:36PM | 6 | THE COURT:  And we're adjourned. |
| 03:03:48PM | 7 | (Whereupon, the Court adjourned at 3:03 p.m.) |
| 03:03:48PM | 8 | --oo0oo-- |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

(234 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 55 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 234 of 303          30

1                    REPORTER'S CERTIFICATE

2              I, REBECCA M. SABO, a Registered Professional

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore mentioned;

6    that the proceedings were reported by me in machine shorthand

7    and thereafter reduced to typewriting using computer-assisted

8    transcription; that after being reduced to typewriting, a

9    certified copy of the transcript will be filed electronically

10   with the Court.

11             I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14             IN WITNESS WHEREOF, I have set my hand at Billings,

15   Montana, this 6th day of September, 2018.

16

17                              /s/ Rebecca M. Sabo

18                              Rebecca M. Sabo, RPR, CRR
                                United States Court Reporter
19

20

21

22

23

24

25

(235 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 56 of 124
Case 1:17-cr-00077-SPW Document 34 Filed 03/27/18 Page 235 of 303

**COLIN M. RUBICH**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**2601 Second Ave. N., Ste. 3200**
**Billings, MT 59101**
**Phone: (406) 247-4684**
**Fax: (406) 657-6989**
**E-mail: Colin.Rubich@usdoj.gov**

FILED

MAR 2 7 2018

Clerk, U S. District Court
District Of Montana
Billings

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| UNITED STATES OF AMERICA, | CR 17-77-BLG-SPW |
|---|---|
| Plaintiff, | PLEA AGREEMENT |
| vs. | |
| JOHN HENRY SCHNEIDER, | |
| Defendant. | |

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United

States, represented by Assistant U.S. Attorney Colin M. Rubich, and the defendant,

John Henry Schneider, and his attorney, John Smith, have agreed upon the

following:

1.     **Scope:** This plea agreement is between the United States Attorney's

Office for the District of Montana and the defendant. It does not bind any other

AUSA     DEF     ATTY     Date     Page 1

(236 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 57 of 124
Case 1:17-cv-00057-SPW Document 34 Filed 03/27/18 Page 236 of 303

federal, state, or local prosecuting, administrative, or regulatory authority, or the
United States Probation Office.

    **2.**     **Charges:**   The defendant agrees to plead guilty to count III of the
indictment. Count III of the indictment charges the crime of concealment of
bankruptcy assets in violation of 18 U.S.C. §152(1). This offense carries a
maximum punishment of five years imprisonment, a $250,000 fine, three years of
supervised release, and a $100 special assessment.

    At the time of sentencing, the United States will move to dismiss counts I-II
and IV-V of the indictment, if the Court accepts this plea agreement.

    **3.**     **Nature of the Agreement:**   This plea agreement is governed by
Federal Rule of Criminal Procedure 11(c)(1)(A) and (B). The defendant
acknowledges that the agreement will be fulfilled provided the United States:
a) moves to dismiss, and the Court agrees to dismiss, counts I-II and IV-V of the
indictment; and b) makes the recommendations provided below. The defendant
understands that if the agreement is accepted by the Court, and counts I-II and IV-
V are dismissed, there will not be an automatic right to withdraw the plea even if
the Court does not accept or follow the recommendations made by the United
States.

AUSA     DEF     ATTY     Date                 Page 2

(237 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 58 of 124
Case 1:17-cr-00057-SPW  Document 34  Filed 03/27/18  Page 3 of 303

4.    **Admission of Guilt:**  The defendant will plead guilty because the defendant is guilty of count III contained in the indictment.  In pleading guilty, the defendant acknowledges that:

**First**, there was a bankruptcy proceeding;

**Second**, U.S. Bank account number 1-500-9160-2881, containing approximately $309,686.00, was ultimately identified as an asset that belonged to the bankrupt estate;

**Third**, the defendant knowingly concealed the above identified asset from the United States Trustee who was charged with control or custody of such property; and

**Fourth**, his concealment of the identified asset was an act of fraud committed during the course of his bankruptcy.

5.    **Waiver of Rights by Plea:**

(a)    The government has a right to use against the defendant, in a prosecution for perjury or false statement, any statement given under oath during the plea colloquy.

(b)    The defendant has the right to plead not guilty or to persist in a plea of not guilty.

(c)    The defendant has the right to a jury trial unless, by written waiver, the defendant consents to a non-jury trial.  The United States must also consent and the Court must approve a non-jury trial.

766                                 3/27/18
AUSA      DEF      ATTY      Date                                    Page 3

(d)     The defendant has the right to be represented by counsel and, if necessary, have the Court appoint counsel at trial and at every other stage of these proceedings.

(e)     If the trial is a jury trial, the jury would be composed of 12 laypersons selected at random.  The defendant and the defendant's attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges.  The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty.  The jury would be instructed that the defendant is presumed innocent, and that it could not convict unless, after hearing all the evidence, it was persuaded of the defendant's guilt beyond a reasonable doubt.

(f)     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not the judge was persuaded of the defendant's guilt beyond a reasonable doubt.

(g)     At a trial, whether by a jury or a judge, the United States would be required to present its witnesses and other evidence against the defendant.  The defendant would be able to confront those government witnesses and the defendant's attorney would be able to cross-examine them.  In turn, the defendant could present witnesses and other evidence.  If the witnesses for the defendant

zbb        3/27/18
AUSA    DEF    ATTY    Date                                    Page 4

(239 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 60 of 124
Case 1:17-cv-00057-SPW Document 34 Filed 03/27/18 Page 5 of 303

would not appear voluntarily, their appearance could be mandated through the subpoena power of the Court.

      (h)    At a trial, there is a privilege against self-incrimination so that the defendant could decline to testify and no inference of guilt could be drawn from the refusal to testify. Or the defendant could exercise the choice to testify.

      (i)    If convicted, and within 14 days of the entry of the Judgment and Commitment, the defendant would have the right to appeal the conviction to the Ninth Circuit Court of Appeals for review to determine if any errors were made that would entitle the defendant to reversal of the conviction.

      (j)    The defendant has a right to have the district court conduct the change of plea hearing required by Rule 11, Federal Rules of Criminal Procedure. By execution of this agreement, the defendant waives that right and agrees to hold that hearing before, and allow the Rule 11 colloquy to be conducted by, the U.S. Magistrate Judge, if necessary.

      (k)    If convicted in this matter, a defendant who is not a citizen of the United States may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

The defendant understands that by pleading guilty pursuant to this agreement, the defendant is waiving all of the rights set forth in this paragraph.

AUSA    DEF    ATTY    Date                    Page 5

(240 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 61 of 124
Case 1:17-cr-00057-SPW Document 34 Filed 03/27/18 Page 6 of 303

The defendant's attorney has explained those rights and the consequences of waiving those rights.

**6.      Recommendations:**  The Parties jointly agree that the applicable guideline in this case is USSG §2B1.1.  The parties jointly agree that the base offense level shall be 18 in accordance be §2B1.1(b)(1)(J) and that the defendant shall receive a two-level increase in accordance with §2B1.1(b)(9)(B). This yields an adjusted offense level of 20.  The parties jointly agree that no other additions or subtractions shall be applied to the Guidelines with the exception of points given for acceptance of responsibility pursuant to USSG §3E1.1(a) and (b).

The United States will recommend the defendant's offense level be decreased by two levels for acceptance of responsibility, pursuant to USSG §3E1.1(a), unless the defendant is found to have obstructed justice prior to sentencing, pursuant to USSG §3C1.1, or acted in any way inconsistent with acceptance of responsibility.  The United States will move for an additional one-level reduction, pursuant to USSG §3E1.1(b), if appropriate under the Guidelines.

Additionally, the United States agrees to recommend a sentence at the low end of the calculated Guideline range. The parties reserve the right to make any other arguments at the time of sentencing.  The defendant understands that the Court is not bound by these recommendations.

(241 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 62 of 124
Case 1:17-cr-00071-SPW Document 34 Filed 03/27/18 Page 7 of 9

7. **Sentencing Guidelines:** Although advisory, the parties agree that the U.S. Sentencing Guidelines must be applied, and a calculation determined, as part of the protocol of sentencing to determine what sentence will be reasonable.

8. **Waiver of Appeal of the Sentence – Conditional:** The defendant understands that the law provides a right to appeal and collaterally attack the sentence imposed in this case. 18 U.S.C. § 3742(a). The prosecution has a comparable right of appeal. 18 U.S.C. § 3742(b). By this agreement the defendant waives the right to appeal any aspect of the sentence, including conditions of probation or supervised release, if the sentence imposed is within or below the guideline range calculated by the Court, regardless of whether the defendant agrees with that range. The United States waives its right to appeal any aspect of the sentence if the sentence imposed is within or above the guideline range calculated by the Court. The restitution order is not included in the waiver specified in this section.

The defendant also waives the right to challenge the sentence in a collateral proceeding pursuant to 28 U.S.C. § 2255. This waiver does not prohibit the right to pursue an action alleging ineffective assistance of counsel.

9. **Voluntary Plea:** The defendant and the defendant's attorney acknowledge that no threats, promises, or representations have been made to

3/27/18

AUSA  DEF  ATTY  Date  Page 7

(242 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 63 of 124
Case 1:17-cv-00057-SPW Document 34 Filed 03/27/18 Page 3 of 9

induce the defendant to plead guilty, and that this agreement is freely and voluntarily endorsed by the parties.

    **10.**    **Detention/Release After Plea:** Pursuant to 18 U.S.C. § 3143(a)(1), the defendant acknowledges that he will be detained upon conviction unless the Court finds, by clear and convincing evidence, that he will not likely flee or pose a danger to the community. Assuming that the defendant is in full compliance with the conditions of his release at time of the change of plea, the United States agrees not to move for detention and will leave the issue to the discretion of the court.

    **11.**    **Breach:** If the defendant breaches the terms of this agreement, or commits any new criminal offenses between signing this agreement and sentencing, the U.S. Attorney's Office is relieved of its obligations under this agreement, but the defendant may not withdraw the guilty plea.

    **12.**    **Entire Agreement:** Any statements or representations made by the United States, the defendant, or defense counsel prior to the full execution of this plea agreement are superseded by this plea agreement. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. This plea agreement constitutes the entire agreement between the parties. Any term or condition which is not expressly stated as part of this plea agreement is not to be considered part of the agreement:

//

| zbb | | | 3/27/18 | |
|-----|---|---|---------|---|
| AUSA | DEF | ATTY | Date | Page 8 |

//

//

//

//

KURT G. ALME
United States Attorney

_____
COLIN M. RUBICH
Assistant U. S. Attorney
Date: 3/27/18

_____
JOHN HENRY SCHNEIDER
Defendant
Date: 3/23/2018

_____
JOHN SMITH
Defense Counsel
Date: 03.26.18

# EXHIBIT O

John H. Michael Schneider, Jr.
543 Camino De Orchidia
Encinitas, CA 92024
760-828-0754
omnineuro@live.com
Pro Se Defendant-Appellant

**FILED**

**AUG 27 2018**

Clerk, U.S. Courts
District Of Montana
Billings Division

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff – Appellee, | ) D.C. No. CR 17-77-BLG-SPW |
| | ) U.S. District Court for Montana, |
| | ) Billings |
| vs. | ) |
| | ) |
| | ) **APPELLANTS'** |
| John H. Michael Schneider, Jr., | ) **NOTICE** |
| | ) **OF APPEAL** |
| Defendant – Appellant. | ) |
| | ) |

Pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), Defendants-Appellant

John H. Michael Schneider Jr. ("Defendant/Appellant") does hereby notify Plaintiff-

Appellee United States of America of Appellant's appeal of the District Court's

Judgment in a Criminal Case filed on August 16, 2018, and does hereby state the

following:

1.      Transcripts

Appellant intends to order any transcripts from the District Court

proceedings in this case pursuant to 18 U.S.C. § 3742(d). Appellant will seek to have

the entire record to-date brought before the Ninth Circuit.

(246 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 67 of 124
Case 1:17-cr-00077-SPW  Document 48  Filed 08/27/18  Page 2 of 13

2.    Issues on Appeal

Appellant Schneider was not provided his Sixth Amendment constitutional right to effective assistance of counsel by defense counsel John Smith throughout Smith's involvement in the litigation of CR 17-77-BLG-SPW. In particular, Appellant Schneider was denied his constitutional right to effective assistance of counsel arising from the erroneous, deceptive, inaccurate, biased, and prejudicial Sentencing Memorandum and subsequent sentencing allocution by the U. S. Government and the witnesses called by the U.S. Government in support of the Appellee's victim impact statement at sentencing.

Defense counsel further demonstrated ineffective assistance of counsel by failing to object and defend Appellant throughout the inaccurate and spurious testimony of bankruptcy trustee Joseph Womack, personal injury attorney Jon Moyers, and the alleged victims of Appellant's crime of bankruptcy asset concealment, who were the relatives of a past medical patient, Russell Monaco, of Appellant Schneider. The relatives of Monaco wrongly claimed that Appellant Schneider committed medical malpractice but refused to adjudicate their case and seek judgement against Schneider. Accordingly, their testimony that they were victims of Appellant's concealment of assets from the bankruptcy estate is misleading and biased the sentencing proceeding against Appellant Schneider, for which Schneider's attorney Smith failed to object or otherwise defend Appellant.

Defense counsel Smith had ample time and resources, and was instructed by Appellant Schneider, to obtain and prepare a defense based on the records and

(247 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 68 of 124
Case 1:17-cv-00077-SPW Document 48 Filed 08/27/18 Page 3 of 13

other documentation of Appellant's past civil and administrative conflicts that would mitigate against the false allegations, mischaracterizations, and deceptive testimony entered into the record by adverse parties in the pre-sentencing submissions (e.g., the Presentence Investigation Report (PSR) and the U.S. Sentencing Memorandum) and at the sentencing hearing. This lack of preparation, inadequate rebuttal, and failure to object to the proffered testimony substantially prejudiced Appellant Schneider after Appellant Schneider and Schneider's previous legal and accounting representatives had provided extensive mitigating and rebuttal evidence to counsel Smith.

This mitigating and rebuttal evidence that Smith failed to present included evidence that addressed allegations in the *Biles v. Schneider* litigation, evidence relating to the management of Schneider's captive insurance company Northern Rockies Insurance Company ("NRIC"), evidence substantially rebutting the Monaco family's claim that Appellant committed medical malpractice, and extensive evidence of Schneider's compliance and accurate representations in his Chapter 7 bankruptcy proceedings, except for Appellant lack of disclosure of a single bank account that was in the possession and control of a third party trustee, K.B., who managed Appellant Schneider's childrens' irrevocable trusts during the litigation of CR 17-77-BLG-SPW.

Appellant Schneider predicted and forewarned defense counsel Smith to prepare for the exact mischaracterizations of past civil and administrative conflicts that the Appellee used to taint the Honorable Watters' opinion of Appellant

(248 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 69 of 124
Case 1:17-cr-00077-SPW  Document 48  Filed 08/27/18  Page 4 of 13

Schneider's ethics and character, inferring that Schneider was guilty of extensive past criminal planning, activity, and *mens rea*, despite Appellant Schneider having never been charged for any previous crime or ever having a judgement of civil liability entered against him in the *Biles, Monaco* or NRIC matters. The Honorable Watters was misled by Appellee, during which counsel Smith consistently failed to rebut, resuscitate, or object to numerous statements by the prosecutor and the called witnesses, and therefore Judge Watters accepted the Appellee's and witnesses' misleading arguments as findings of fact.

Ineffective counsel Smith failed to comprehend the significance of past issues in Appellant's history of practicing high risk surgery in Montana and Wyoming, and thus failed to assert mitigating factors in support of Appellant, and by failing to object, defense counsel Smith allowed Appellee's false characterizations to unfairly prejudice the District Court's sentencing. Accordingly, Appellant's mitigation evidence was never entered into the Court's records despite Appellant's insistence that counsel Smith do so. Without Smith's presentation of mitigating evidence, the District Court could not render a fair, non-prejudicial, and objective review of the single criminal act affirmed in Appellant's Plea Agreement.

Moreover, the prosecution's allocution was replete with mischaracterizations and misleading testimony regarding the use of assets in Schneider's captive malpractice insurance company NRIC. Defense counsel Smith failed to object to these mischaracterizations, and thereby failed to establish a court record at sentencing which would have, at a minimum, mitigated the prosecutions'

(249 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 70 of 124
Case 1:17-cv-00057-SPW  Document 48  Filed 08/27/18  Page 249 of 303

allegations and established a finding of fact that fairly and accurately reflected Appellant Schneider's management of NRIC policies and assets.

As further evidence of ineffective counsel, when the prosecution alleged malfeasance in Appellant Schneider's management of NRIC, defense counsel scribbled a note to Schneider, just prior to his allocution, which stated: "You'll have to defend yourself on this one," referencing the mischaracterization of NRIC typified in Appellee's allegations. Having prepared an allocution statement consistent with defense counsel Smith's earlier advice, Appellant Schneider was unprepared to offer substantive mitigating testimony rebutting Appellee's spurious allegations given the complexity and extensive history pertaining to the management of NRIC.

Further evidence of ineffective counsel that prejudiced Appellant was manifest when trustee Womack opined with false and derogatory accusations regarding Appellant Schneider's behavior in the bankruptcy proceedings. The prosecution possibly misled defense counsel Smith by telling him that the prosecution would call no witnesses and that trustee Womack would not attend the sentencing hearing. As the record demonstrates, trustee Womack's presence and unchallenged testimony further caused extreme bias and severe prejudice to Appellant when the Honorable Watters considered the § 3553 factors in imposing a sentence. Defense counsel Smith at all times possessed sufficient evidence to object to Womack's testimony and thereby establish a truthful record of Appellant's conduct in the Chapter 7 bankruptcy which would have exonerated Appellant Schneider from further inferences of malfeasance and criminal behavior.

The actions and omissions by Appellant's ineffective counsel extends far beyond a simple defense strategy. Despite Appellant Schneider's multiple presentencing requests to Smith, Appellant's provision of copious documentation, and the existence of affirmative evidence to challenge the adversarial inferences and accusations presented by Appellee during sentencing, ineffective counsel Smith nonetheless failed to provide a reasonably competent defense for Appellant Schneider. Counsel Smith was, at a minimum, required to assure that the sentencing Court had adequate information to mitigate against the spurious innuendo and distorted allegations that created unwarranted prejudice and bias before the District Court judge during Appellant's sentencing.

Specifically, Defendant-Appellant intends to raise the following issues before the Ninth Circuit Court of Appeals:

1) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive an unbiased and fair sentencing hearing and application of the § 3553 sentencing factors by repeatedly failing to object to or provide mitigating evidence concerning the allegations, aspersions and misrepresentation of facts by Appellee and Appellee's witnesses regarding Appellant Schneider's actions in the *Biles v. Schneider* litigation?

2) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive an unbiased and fair sentencing hearing and application of the § 3553

sentencing factors by repeatedly failing to object to or provide mitigating evidence concerning the allegations, aspersions and misrepresentation of facts by Appellee and Appellee's witnesses regarding Appellant Schneider's management of Northern Rockies Insurance Company?

3) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive an unbiased and fair sentencing hearing and application of the § 3553 sentencing factors by repeatedly failing to object to or provide mitigating evidence concerning the allegations, aspersions and misrepresentation of facts by Appellee and Appellee's witnesses regarding Appellant Schneider's conduct in the *Monaco v. Schneider* litigation?

4) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive an unbiased and fair sentencing hearing by failing to object to the testimony or otherwise mitigate the false characterizations presented by the Monaco family and their counsel, who were not direct and proximate victims of Appellant's bankruptcy fraud?

5) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive an unbiased and fair defense by failing to object to allegations, errors, and misrepresentation of facts in the Presentence Investigation Report (PSR)?

(252 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 73 of 124
Case 1:17-cr-00077-SPW Document 48 Filed 08/27/18 Page 8 of 13

6) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive an unbiased and fair defense by failing to object to allegations, errors, and misrepresentation of facts in the U.S. Sentencing Memorandum submitted by Appellee?

7) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive an unbiased and fair defense and sentencing hearing by failing to object to the testimony or otherwise mitigate the false characterizations in the victim impact statement and at the sentencing hearing presented by Bankruptcy trustee Womack?

8) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive an unbiased and fair defense and sentencing hearing by failing to argue mitigating factors favoring downward variance from the federal guideline sentencing recommendations as set forth in the Departure and Variance Primer authored by the Office of the General Counsel U.S. Sentencing Commission, particularly by not arguing for the application of downward departures including, but not limited to, subsections 5K2.10, 5K2.12, 5K2.13, and 5K2.20?

9) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive an

(253 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 74 of 124
Case 1:17-cr-00077-SPW  Document 48  Filed 08/27/18  Page 9 of 13

unbiased and fair defense and sentencing hearing by failing to present the
District Court with evidence that Appellant had already suffered extreme
atypical punishment, loss of reputation and livelihood from the single
criminal act affirmed in Appellant's Plea Agreement?

10) Did Appellant's counsel's performance fall below an objective standard of
reasonableness and thereby prejudice Appellant's ability to receive an
unbiased and fair defense and sentencing hearing by failing to present the
District Court with any cases involving defendants with similar records
who have been found guilty of similar conduct? In other words, was
Appellant's sentence substantively unreasonable as a result of Appellant's
counsel's failure to present relevant cases of similar conduct that should
have received significant weight by the District Court but did not?

11) Did Appellant's counsel's performance fall below an objective standard of
reasonableness and thereby prejudice Appellant's ability to receive an
unbiased and fair defense and sentencing hearing based on the totality of
the circumstances of Appellant's counsel's failure to subject the
prosecution's case to meaningful adversarial testing, including counsel's
egregious neglect of facts, lack of argument, failure to call character
witnesses or any other witnesses, and otherwise lack of zealous
representation, which caused extreme prejudice and profound bias as
reflected in the District Court's records indicating that Appellant was

(254 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 75 of 124
Case 1:17-cr-00077-SPW Document 248 Filed 08/29/18 Page 10 of 13

unreasonably sentenced based on theoretical charges of remote criminal activity that were wholly unrelated to charges in CR 17-77-BLG-SPW?

12)Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive the benefit of Appellant's bargain by failing to object to Appellee's breach of the Plea Agreement when, during the prosecution's allocution, the prosecution recommended that the District Court impose a sentence beyond the low end of the calculated Guideline range?

13)Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby prejudice Appellant's ability to receive the benefit of Appellant's bargain by failing to object to Appellee's breach of the Plea Agreement when the prosecutor solicited victim impact statements that suggested a higher sentence for Appellant than was otherwise agreed to in the Plea Agreement?

14)Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby deprive Appellant of a voluntary and intelligent entering of the Plea Agreement by failing to advise Appellant and submit evidence to the Court indicating that the concealed bank account value at the time of Appellant's bankruptcy filing was equally owned by Michelle Schneider, the legal spouse of Appellant Schneider?

15) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby deprive Appellant of a voluntary and

(255 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 76 of 124
Case 1:17-cr-00037-SPW Document 48 Filed 08/20/18 Page 11 of 303

intelligent entering of the Plea Agreement by failing to establish a correct federal offense level under the Sentencing Guidelines based on the value of assets concealed that were attributable to Appellant?

16) Did Appellant's counsel's performance fall below an objective standard of reasonableness and thereby deprive Appellant of a voluntary and intelligent entering of the Plea Agreement based on Appellant counsel's advice to Appellant regarding the likelihood of success on the merits of Appellant's case?

Appellant Schneider also moves the court to stay the current sentence filed on Aug 16th, 2018 and thereby afford Schneider an extension of time to secure competent and effective counsel for Appellant's appeal and further advocacy. A stay of Appellant's sentence is fair and just as Appellant Schneider has consistently and faithfully submitted himself to the custody of the U.S. government when required to do so upon receipt of notice of the same. Appellant Schneider will not flee nor does Appellant Schneider pose any danger to the community.

This Notice of Appeal was prepared with the assistance of limited scope legal counsel Gregory Costanza, Esq. pursuant to Rule 1.2, Rule 4.2, and Rule 4.3 of the Montana Rules of Professional Conduct. Counsel Costanza is one of Appellant's past and current civil legal counselors who has agreed to provide limited assistance to Appellant given the short deadline for this Notice of Appeal and Appellant's inability to retain any criminal appellate defense counsel in this short timeframe.

(256 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 77 of 124
Case 1:17-cr-00037-SPW Document 48 Filed 08/29/18 Page 12 of 13

Opposing counsel or other adverse parties may communicate with counsel Costanza to convey messages or other information to Appellant pending Appellant's retention of competent criminal defense counsel.

Respectfully Submitted this 27th day of August 2018

John H. Michael Schneider, MD, MS-ADR
Defendant and *pro se* Appellant

Case: 18-30187   11/21/2018   ID: 11095749   DktEntry: 26-3   Page 78 of 124
Case 1:17-cr-00037-SPW   Document 48   Filed 08/29/18   Page 13 of 13

## CERTIFICATE OF SERVICE

I, Gregory G. Costanza, hereby certify that on August 27th, 2018, I filed the

foregoing Notice of Appeal with the Clerk of U.S. District Court pursuant to Rule

4(b) F.R.A.P.

Gregory G. Costanza, Esq.

# EXHIBIT P

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

SEP 10 2018

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.    18-30187 |
| Plaintiff-Appellee, | D.C. No. |
| | 1:17-cr-00077-SPW-1 |
| v. | District of Montana, |
| | Billings |
| JOHN HENRY SCHNEIDER, | |
| Defendant-Appellant. | ORDER |

Appellant's September 7, 2018 emergency motion (Docket Entry No. 9) is a motion under Federal Rule of Appellate Procedure 9(b).  Accordingly, appellant's self-surrender date is stayed pending disposition of the motion.  *See* 9th Cir. R. 9-1.2(e).

Appellant's response to the court's September 6, 2018 order remains due on October 4, 2018.

Briefing and all pending motions are stayed pending compliance with the court's September 6, 2018 order.


FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT


By: Susan Landsittel
Deputy Clerk
Ninth Circuit Rule 27-7

# EXHIBIT Q

FILED

UNITED STATES COURT OF APPEALS

OCT 04 2018

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff-Appellee,<br><br>   v.<br><br>JOHN HENRY SCHNEIDER,<br><br>                Defendant-Appellant. | No. 18-30187<br><br>D.C. No. 1:17-cr-00077-SPW<br>District of Montana,<br>Billings<br><br><br>ORDER |

Before:  Peter L. Shaw, Appellate Commissioner.

The court has received and reviewed appellant's motion for appointment of

counsel (Docket Entry No. 11).

It is unclear whether appellant may have sufficient resources to retain

counsel.  The proper approach in this situation is to appoint counsel and address

the eligibility issue later.  Accordingly, appellant is granted leave to proceed in

forma pauperis, and counsel will be appointed for purposes of this appeal.

Appellee shall, however, seek an order from this court, within 180 days after the

date of this court's decision on the merits, seeking reimbursement of funds

expended under the Criminal Justice Act for the cost of providing representation if

appellee believes that appellant has access to sufficient funds.  *See* 18 U.S.C.

§ 3006A(f); 7A Guide to Judiciary Policy §§ 210.40.30, 210.40.40.  Counsel will be appointed by separate order.

The Clerk shall electronically serve this order on the appointing authority for the District of Montana, who will locate appointed counsel.  The appointing authority shall send notification of the name, address, and telephone number of appointed counsel to the Clerk of this court at counselappointments@ca9.uscourts.gov within 14 days after locating counsel.

The Clerk shall also serve a Form CJA 24 on the appointing authority, who shall provide the form to newly appointed counsel.  *See* 28 U.S.C. §753(f).  If appellant seeks transcripts of proceedings requiring special authorization, that authorization should be obtained from the district court.  *See* 6 Guide to Judiciary Policy §550.40.

The Clerk shall amend the docket to reflect that appellant is proceeding in forma pauperis.

Briefing remains suspended pending further order of the court.

The Clerk shall serve this order on appellant individually at 543 Camino De Orchidia, Encinitas, California 92024.

(264 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 85 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 264 of 303

# EXHIBIT R

# Edson O. Parker, MD

---

Diplomate, American Board of Anesthesiology
Diplomate, American Board of Pain Medicine
Anesthesiology & Pain Medicine  VASNHS

PO Box 29209, Las Vegas, NV  89126  USA
Tel 702.499.9994
eoparker@aol.com

April 2, 2014

Stephenson D. Emery, Esq.
Williams, Porter, Day & Neville, PC
159 N. Wolcott St., Suite 400
PO Box 10700
Casper, WY  82602

Tel:  307-265-0700

semery@wpdn.net

## Re: Expert Medical Report for Monaco v. Schneider

Dear Mr. Emery,

    This report is based on my review of medical records which you sent to me on January 28, February 23, March 10 and March 17, 2014.  Opinions stated herein are within a reasonable degree of medical probability.  I am a medical doctor licensed to practice medicine in the States of Nevada, California, Utah and Georgia.  I am Board Certified in both Anesthesiology and Pain Medicine, as indicated on my Curriculum Vitae, which describes in detail my education, training, certifications, experience, publications and presentations. Furthermore, having practiced both as an Anesthesiologist and as a Pain Medicine Specialist in my own office, the Pain Institute of Nevada from 1989 until 2005, and currently practicing as a Pain Medicine Specialist in the Veterans Administration, I am very familiar with the practice of medicine in both hospitals and private clinical practice and am qualified to render an opinion in this case.

    You have requested that I render opinions on the medical care provided to Mr. Russell Monaco concerning treatment during his hospitalization for lumbar spine surgery from 11/28/11 to 12/1/11 and his subsequent death on the morning of 12/2/11, specifically  addressing deviations from the standards of care as they apply to postoperative pain management in this patient.

**I.Factual Summary**: At your request, I have reviewed the following medical and billing records concerning this case, which you provided to me:

1. Billings Clinic (Family Practice) – 8/16/11 to 11/22/11
2. John H. Schneider, MD – 11/28/11 to 12/1/11
3. West Park Hospital, Cody Wyoming – 11/28/11 to 12/1/11
4. Kenneth W. Kulig, MD - Deposition 5/20/13
5. Transdermal Fentanyl FDA Black Box Warning
6. Report of Postmortem Examination/Thomas L. Bennett, MD – 1/25/12
7. Four Medical Articles/Studies/Letters Concerning Fentanyl TTS for Post-Op Pain
8. Donlin M. Long, MD, PhD Letter – 8/23/12

2

9. Answer to First Amended Complaint – 1/9/14 – By Dr. Schneider and Northern Rockies Neuro-Spine (NRNS)
10. Respondent's Proposed Findings of Fact and Conclusions of Law – 1/17/14
11. Schneider Pre-Op Neuro Orders; Schneider Post Op Orders; Schneider Inpatient Standing Orders for WestPark Hospital
12. Target Pharmacy Records, Billings, MT – 5/22/09 to 8/30/11
13. Northern Rockies Neuro-Spine (NRNS) Prescription Protocol

**II. History**: Mr. Monaco was a 47 year old man with several significant medical conditions, to include morbid obesity (283 pounds day of surgery), diabetes, hypertension, hyperlipidemia and allergy to morphine. He was admitted to West Park Hospital on 11/28/11 for urgent lumbar spinal decompression surgery for severe spinal stenosis and progressive decline in his lumbosacral neurological function, with severe back and leg pain. He was taken to surgery that same day, having a bilateral L23, L34 and L45 laminectomy, facetectomy and foraminotomy, without any described complications. He was going to be discharged home the next day, on 11/29/11, but developed increasing back pain that day, could not ambulate independently, and that planned discharge was cancelled by Dr. Schneider. Mr. Monaco developed "the worst pain of his life" shortly after midnight on 11/30/11 and required increased pain medication, receiving at least 14 doses of various pain medications during the next 24 hours, including oral oxycodone, hydrocodone, Dilaudid, IM Demerol and the transdermal fentanyl patch at 08:09 hrs that morning. Dr. Schneider visited Mr. Monaco at 15:00 hrs on 11/30/11, counseled Mr. Monaco and his wife on the use of analgesics after discharge (fentanyl patch and one Percocet prn every eight hours for breakthrough pain). Mr. Morrell visited Mr. Monaco at 07:00 hrs on 12/1/11, found him medically stable, excellent pain control, oxygen saturation of 94% on room air, was walking independently and wrote discharge orders, to include prescriptions for post-discharge medications, to include Dilaudid, Percocet, Valium and transdermal fentanyl patches. Dr. Schneider came to visit Mr. Monaco at 07:50 hrs, but Mr. Monaco was not in his room. Dr. Schneider noted the discharge orders. Dr. Schneider did not see any evidence of the prescriptions for Mr. Monaco written by Mr. Morrell, because Mr. Morrell gave those prescriptions directly to Mr. Monaco. Mr. Monaco was discharged from all inpatient services and medications at 07:00 hrs on 12/1/11 by Mr. Morrell. He was eventually discharged home at 10:30 hrs. Please refer to para III. 2. for specific events leading up to his discharge.

**III. Discussion**: In my opinion there are two major issues involving the standard of care which had a direct impact on Mr. Monaco's death: 1) the use of strong opioid medication for his post-operative pain management and 2) his discharge from the hospital in less than optimal condition. This discussion will not cover information in all the documents reviewed, but summarize the pertinent data.

1. **Post operative pain management with strong opioid medications**:
   a. **Prescription of transdermal fentanyl for post-operative treatment of pain:**
      i. It is not new nor unprecedented (see articles under para I.7. above), and is as effective as IV morphine in post-operative patients who cannot take oral medications, requiring those medications be delivered by some other route, i.e., IV, transdermal, rectal.

3

    ii. The FDA "Black Box Warning" does not prohibit the use of nor indicate the use of transdermal fentanyl in Mr. Monaco's specific case was below the standard of care.

        1. He was opioid tolerant, not only from the hydrocodone he had been taking for several weeks before surgery, but from the strong opioids he had received intraoperatively (fentanyl 300 mcg) and those starting immediately postoperatively.

        2. His pain was not acute, it was a post-surgical increase of his chronic low back pain

        3. It was not post-operative pain of the type described in the black box warning, i.e., not pain in an opioid naïve patient, departing an out-patient surgery center after a surgical procedure, to return home, without any medical monitoring of any type, a clearly dangerous situation. The Black Box Warning was designed to prevent scenarios potentially harmful to patients, e.g., surgeon discharging an opioid-naïve patient home after having a hernia operation in a surgery center on a transdermal fentanyl patch. This clearly did not occur in this case with Mr. Monaco.

        4. His pain was not mild. Shortly after midnight on 11/30/11, prior to implementation of the transdermal fentanyl, the patient described back and leg pain as the worst pain of his life. The intermittent oral and IV opioid analgesics were not working and he needed a stronger, sustained type of opioid (IV or transdermal). With the intent to discharge him home, an IV system was not practical. The transdermal system was ideal.

   iii. Dr. Schneider was conservative and selective in using transdermal fentanyl for post-operative pain control, prescribing it to only 19 out of 1900 patients (1%) of his patients in the first two weeks postoperatively.

   iv. Mr. Monaco had difficulty tolerating strong oral opioid analgesics and could not be discharged without having a strong baseline (constant blood level) of opioid analgesic medication, unless he was able to use some type of IV PCA opioid analgesic (such as morphine) at home, a very undesirable option, especially with his refusal to follow medical advice, such as refusing to use home oxygen.

   v. Dr. Kulig, who has not and does not actively treat patients for pain conditions as discussed in this case (as I have done for many years), states in his deposition, "the fentanyl patch is not to be used for the management of acute pain or post-op pain, and his pain was both of those, and the fentanyl patch would, in my opinion, not have been a good choice to use at that time." That statement is not correct - Surgery was completed/patient entered the PACU at 16:28 hrs on 11/28/11. The transdermal fentanyl patch was ordered at 07:00 hrs on 11/30/11 (applied at 08:09 hrs), over 36 hours after completion of surgery, simply and clearly not used for immediate post-operative pain

4

as is the intended meaning of the black-box warning. Due to Mr. Monaco's severe pain shortly after midnight on 11/30/11, as described in para ii. 4. above, the transdermal fentanyl was not only a good choice, it was an excellent choice.

b. **Prescription of multiple analgesic medications to be used in addition to the transdermal fentanyl** for a patient with chronic low back pain, on which is added the moderate to severe pain associated with lumbar spine surgery, is not only not unusual, it is routine. I make this statement based on my experience of working with a group of spine surgeons for 15 years and managing thousands of their patients personally - pre, intra and postoperatively. Some patients do not require a lot of post-operative analgesics, but most do. As Dr. Schneider states multiple times in numerous documents, he and his PA-C, just as I always did, counseled and admonished their patients to be very careful with the "prn" (as needed) medications, to avoid overdosing themselves. We want the patient to be as comfortable as possible, but not endanger themselves. With that goal in mind, even though prescribing multiple controlled substance analgesic medications may be routine, there must be some rationale or protocol followed in prescribing such medications to prevent such potential risk to the patient. Dr. Schneider had such a protocol in his NRNS practice, a "Prescription Protocol". In prescribing the Dilaudid, Percocet, Valium and transdermal fentanyl patches for Mr. Monaco on the morning of his discharge, Mr. Morrell violated the NRNS Prescription Protocol, i.e., In compliance with the Prescription Protocol, Mr. Morrell could have prescribed Dilaudid or Percocet or transdermal fentanyl patch, but not all three of those medications together. One critical point must be understood by those not in the health care field – It is routine medical practice to prescribe patients in pain (not just spine surgery patients) an amount of pain medication, such as hydrocodone 5 or 10 mg pills, to take 3 to 4 times per day as needed for pain, dispense #120. It is expected the patient will comply with the prescription. It is also understood by health care providers, but rarely verbalized, that any such patient given that very common analgesic prescription has the capability to take all those pills at one time and end their life. That risk is always present and it is not below the standard of care to prescribe that amount of medication. It is well-documented that Dr. Schneider, Mr. Morrell and the Nurses all counseled Mr. Monaco and his wife on the proper use of his strong analgesic and other medications. How the patient and his family actually manage the patient's medications at home is beyond the control of medical providers. During my 32 years of medical practice, several patients for whom were prescribed strong opioid analgesic medications did die due to taking excessive doses of those medications and there was never any inference from anyone that the prescribing of those medications was at fault.

5

2. **Hospital events on the morning of discharge:** Unfortunately, many documents and deposition testimony on what transpired the morning of discharge, 12/1/11, do not all correlate, e.g., Mr. Morrell acknowledges receiving a call from Nurse Fulkerson, but he denies being informed by Nurse Fulkerson of Mr. Monaco's precise oxygen saturation level, etc.

    a. **Administration of IM Demerol/Phenergan combination to the patient after he was ordered to be discharged from the hospital at 07:00 hrs.** There is conjecture whether he received one or two injections of that Demerol/Phenergan combination, i.e. one injection at 07:30 or 07:40 hrs and a second one at 10:00 hrs on 12/1/11, when there was only one order written for that medication. There is no conjecture about the 10:00 hrs injection, as the discharge Nurse testified to that fact, leaving the administration of the first injection in some question. With discharge orders written by Mr. Morrell at 07:00 hrs, neither of those injections should have been administered to Mr. Monaco by the nursing staff, especially the second dose. Thus, even if the first injection was not actually given, the second injection at 10:00 hrs should not have been given. Not only was the injection at 10:00 hrs not indicated as it appears to not have been ordered, but it was not indicated clinically – Ms. Monaco, the patient's wife, testified that at the time of the 10:00 hrs injection, Mr. Monaco was obtunded, he was extremely lethargic and barely able to be aroused at the time of his discharge at 10:30 hrs. Nurse Fulkerson noted that shortly after 09:00 hrs on 12/1/11, one hour before his IM Demerol/Phenergan injection at 10:00 hrs, his oxygen saturation declined to 75% on room air. Nurse Fulkerson testified that Mr. Monaco was not stable for discharge home, which she did not discuss with her charge nurse. The patient was also given oral Dilaudid, Percocet and Valium after 07:00 hrs, but prior to discharge at 10:30 hrs.

    b. **Discharge of Mr. Monaco from the hospital in a compromised medical condition**: Mrs. Monaco testified that Mr. Monaco became progressively more lethargic after her arrival on the date of discharge (12/1/11) and that he was extremely lethargic and barely able to be aroused at the time of his discharge at 10:30 hrs. When Mr. Monaco was off oxygen supplementation, he continued to trigger the low pulse oximetry monitor in his room throughout the day and never regained a normal state of consciousness. Nurse Fulkerson noted and documented that shortly after 09:00 hrs on 12/1/11 that Mr. Monaco's oxygen saturation declined to 75% upon a room air challenge. Nurse Fulkerson stated she called the offices of Dr. Schneider and spoke directly to Mr. Morrell about Mr. Monaco's low oxygen saturation level. Mr. Morrell acknowledged he received a call from Nurse Fulkerson, but denies being informed of Mr. Monaco's precise oxygen saturation levels, only that they had dropped. Mr. Morrell's conversation was overheard by Lisa Parker in Dr. Schneider's office, who testified that Mr. Morrell made the decision to send Mr. Monaco home without oxygen supplementation without speaking with Dr. Schneider. Thus, Mr. Monaco was discharged home by the Westpark

(270 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 91 of 124
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 270 of 303

6

Hospital Nursing staff in an obtunded state, hypoxic on room air, in violation not only of both Dr. Schneider's and West Park Hospital's discharge policies, but contravening even minimum medical practice standards, no matter what order was given by a medical provider to discharge the patient.

## IV. Conclusions:

My conclusions are based on my extensive experience not only as an Anesthesiologist, but as a Pain Medicine Specialist in my 30+ years as a physician. Unlike other respondents in this case, as an Anesthesiologist, I have personally administered anesthesia and post-operative pain management treatment to hundreds of patients who have undergone spine surgery, just like Mr. Monaco. As a Pain Medicine Specialist, I have personally prescribed strong opioid analgesics, including all the medications discussed in this case, to thousands of patients during their ongoing treatment for years.

1. **The post-operative pain management with strong opioids by Dr. Schneider** was not below the standard of care. The supervision of and coordination with his PA-C Mr. Morrell did not reach the level of violating the standard of care and in and of itself, it did not cause patient harm.

2. **Discharge from West Park Hospital on the morning of December 1, 2011,** was clearly below the standard of care – It should never have taken place. No matter what the physician or his assistant ordered, the hospital nursing staff should not have discharged Mr. Monaco in his obtunded and hypoxic condition, especially when he had stated he would not use supplemental oxygen, which he needed to maintain adequate life-sustaining oxygenation, even if it was ordered. A hospital is a safe environment for patients, in which it is expected they will receive appropriate treatment for their medical conditions and not be sent away if doing so places them in a position of continued or increased serious and life-threatening illness. Although his condition was not immediately life threatening, it was no different from a patient experiencing slow, but active bleeding after surgery, in which case the cause for aborting the discharge would be very obvious. Mr. Monaco's case may have been less dramatic, but was clearly no less life threatening. In and of itself, his discharge from the hospital, in violation of its own discharge criteria, was clearly below the standard of care and did lead to the ultimate patient harm, i.e., death.

3. **Incorrect use of post-discharge analgesic and anxiolytic medications taken by the patient and administered by his wife**. In contravention to instructions given by Dr. Schneider, Nurses at the hospital and a pharmacist, as determined by pill count of medication containers, at home after discharge, Mr. Monaco ingested 6 Percocet (oxycodone 7.5 mg), 3 Valium 5 mg and 1 Dilaudid 4 mg. The oxycodone and Dilaudid, combined, equaled approximately 90 mg of morphine ("morphine equivalents"), a substantial amount of opioid. As stated in para III. 1. b. above, the patient and family/caregivers at home are responsible for medicating the patient, a status which is beyond the control and responsibility of any health-care providers. We can counsel patients to do the right thing, but once they leave our controlled

(271 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 92 of 124
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 271 of 303

7

medical environment, we cannot make them do it and cannot be responsible for their noncompliance with our instructions to them to maintain good medical care in their home environment.

My opinions expressed throughout this report are made to a reasonable degree of medical probability. Furthermore, I reserve the right to modify my opinions if and when additional information becomes available.

Respectfully Submitted

Edson O. Parker, MD

# EXHIBIT S

Case 1:17-cr-00077-SPW   Document 38-1   Filed 07/31/18   Page 44 of 62

Dan Kamienski

| | |
|---|---|
| **From:** | Dr. Schneider MD <omnineuro@live.com> |
| **Sent:** | Monday, December 18, 2017 1:12 PM |
| **To:** | John Smith; Colin Stephens; Dan Kamienski; James Cossitt |
| **Subject:** | Fwd: [External] |

From the VA in IC.
thanks JHS

Get Outlook for iOS

**From:** Dietzler, Dena <Dena.Dietzler@va.gov>
**Sent:** Monday, December 18, 2017 11:51:41 AM
**To:** Cullen, Joseph; Dr. Schneider MD
**Subject:** RE: [External]

Hi Dr. Schneider,

Hope you are doing ok.
Here are the two official compliments that came through PATS (Patient Advocate Tracking System).

Mr. Smith called to say in July 2017 Dr. John Schneider performed his surgery and it was a "miracle". Mr. Smith is upset by all the negative publicity regarding Dr. Schneider and wanted to say something on his behalf an show his support for the fine job he did.  12/7/2017

Mr. Miller comes in to say he thought Dr. John Schneider did an "excellent" job when he had extensive back surgery (L1-L5 fusion) in September 2017. Mr. Miller says Dr. Schneider took the time to explain his surgery, post op questions and what to expect. Mr. Miller is very happy with the outcome and is feeling stronger each day. 12/14/17

One of the urology NPs told me that several veterans spoke positively to the Iowa City VA in general and one in particular that was a neurosurgery patient.

Thanks,
Dena

**From:** Cullen, Joseph [mailto:joseph-cullen@uiowa.edu]
**Sent:** Thursday, December 14, 2017 10:21 AM
**To:** Dr. Schneider MD <OMNINeuro@LIVE.COM>
**Cc:** Dietzler, Dena <Dena.Dietzler@va.gov>
**Subject:** [EXTERNAL] RE: [External]

John--Dena has a number of these compliments and will send them to you at this address. Joe

**From:** Dr. Schneider MD [OMNINeuro@LIVE.COM]
**Sent:** Wednesday, December 13, 2017 6:00 PM

1

| | |
|---|---|
| **From:** | Dani Blain |
| **To:** | Amanda Johnson |
| **Subject:** | Dr. Schneider |
| **Date:** | Friday, October 13, 2017 9:55:18 AM |

Hi Amanda,

My name is Dani Blain, I spoke on the phone with you this morning. When I was seven years old I fell off a horse and bumped my head. The bump looked like nothing, but my mom decided to take me to the hospital anyway. It was at the hospital they discovered I had a brain bleed and had only 15 minutes to live. Dr. Schneider operated on me and saved my life. I have been to many neurologists since this, and all say the same thing, the surgeon who operated on me did an amazing job. Many were concerned I would get seizures as I grew from the scar tissue that naturally results from surgeries like these, but every brain scan shows that there is no scar tissue on my brain.

We also got to know Dr. Schneider and his family, they even came to Christmas dinner at our house. He is an amazing person and I will never be able to thank him enough for what he did 15 years ago.

If there is anything at all me or my family can do to help him, we would love to. My phone number is (406) 671-3106.

Thank you,
Dani Blain

Dear Dr. Schneider,

We would like to take this opportunity to show our utmost support for you and your family.

We are really unsure what all of the legal problems are, but we felt the need to let you know that you are in our prayers and our confidence in you will never change.

We began our journey with you 16 years ago when you performed very successful brain surgery on our daughter. Since then, our family, including myself, has been operated on by you a total of 5 times. Each and every time, we have been very pleased with the outcome. We are very saddened to know that if we require additional services from you in the future, we will be unable to receive that same excellent care due to this current situation.

I am writing this letter for our entire family and we all want you to know that we will always love and respect you. We feel that God gave you a very special talent and circumstances are prohibiting you from using that talent to help others. For this we are very sad.

If there is ever anything we can do to support you in this struggle, please feel free to call on us. My phone number is 307-851-9130.

We wish you and your family all of God's richest blessings this Christmas Season and throughout the years to come.

Love and prayers,

Alan and Kaye Westlake

Lori (daughter) and Jim Birt

Becky (daughter) and Mark Mortimore

Scott Westlake (son)

Lisa (daughter) and Doug Lineen

(276 of 303)

Case: 18-30187 11/21/2018 ID: 11095749 DktEntry: 26-3 Page 97 of 124
Case 1:17-cr-00077-SPW Document 72 Filed 11/26/18 Page 276 of 303
Case 1:17-cr-00077-SPW Document 38-1 Filed 07/31/18 Page 43 of 62



Dear Dr. Snider,

I have waited a long time for this surgery. There were some days I wasn't sure I could continue living with the pain. You have literally saved my life. No words can express my thanks I have for you and your staff but ...

Thank-you,

Sencerely

David Baker.

Dear Dr. Schneider,

This card is just a small "Thank you" for all you did for me on October 13th. I have been praying for the Lord to bring the right doctor for a long time to do my neck and back (later).

The Lord blessed me with you and the gift of your hands and wisdom.

Thank your team who also worked beside you. My surgery was a miracle of answered prayers.

Our church was praying for me and for you. The Lord is good.

Your hands are a gift to help others lives become whole again. Every emotion in your encouragement helps us believe in ourselves that will be alright. I know that there can be bad days. But, with me all is well. I get better and stronger each day. You and the Lord are a "team" and you bless many people.

Thank You Again,

Mrs. Anna S. Haines)



UNIVERSITY
*of* IOWA
HEALTH CARE

Department of Surgery
Division of General Surgery
200 Hawkins Drive
Iowa City, Iowa 52242-1086
319-356-8378 **Fax**
319-356-2902 **Scheduling**
www.surgery.uiowa.edu **Web Site**

November 20, 2017

To whom it may concern,

Dr. Schneider, M.D. has worked as a Neurosurgeon at the Iowa City VA Medical Center from May 2017 until November, 2017. I have known Dr. Schneider during this time in his role as a neurosurgeon at the Iowa City VA. Dr. Schneider has done an outstanding job in that appointment at the VA. The administrative and clinical burden in this position is substantial yet Dr. Schneider is able to manage these tasks very well. As Chief of Surgery Services at the VA, I have constant contact with Dr. Schneider and he is very good to work with and extremely collaborative. His initial Focused Professional Practice Evaluation (FPPE) has been excellent, his complication rate is very low, and his outcomes are excellent.

Dr. Schneider is an outstanding clinician and is very busy in the neurosurgery clinics and in the operating room. These complex veteran patients are truly a challenge and Dr. Schneider is very diligent and conscientious in the management of these patients. There is a scarcity of quality Neurosurgery at many VAMCs. However, neurosurgeons like Dr. Schneider fill a necessary void at our medical center with outstanding care.

Sincerely Yours,

*Julle —*

Joseph J. Cullen
Professor of Surgery
University of Iowa College of Medicine
Chief, Surgical Services
Iowa City VA Medical Center

(279 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 100 of 124
Case 1:17-cr-00077-SPW    Document 72    Filed 11/26/18    Page 279 of 303

## Richard

I had an old back injury from high school. I'd been going to chiropractors for 25 years but it got to the point where the disc was gone and it was bone on bone. They couldn't do anything for me anymore. I was so impressed with Dr. Schneider after my wife's surgery that when my back started hurting I went directly to him.

Before Dr. Schneider put in an artificial disc, getting out of a vehicle was excruciating; I had to wait until the leg spasms quit before I could walk. I couldn't lift anything, and then it got to the point that I couldn't do anything. Now I can do all the daily activities at work and at home. It's like getting 10 years of my life back.

That Dr. Schneider is willing to work with chiropractors and try other things that he thought would help you before he would operate is unique. And he's just like talking to one of your friends. He'll tell you his prognosis and if he thinks he can help you and what percentage of the pain will be gone. Then he lets you make the decision.

He's very down to earth and so is his staff. When you walk in they shake your hand, ask how you're doing and it's all very genuine.

Dr. Schneider a very specialized surgeon and could be in the city making tons of money, but he prefers living out West. You usually don't find this kind of a surgeon in a small town, and I recommend him to everyone I know that has back problems.

(280 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 101 of 124
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 280 of 303

**Nina**

I had a disc in my spine that had deteriorated to virtually nothing. I had symptoms for about a year and a half before my regular doctor referred me to Dr. Schneider in 2001. We tried shots, prednisone and physical therapy, but none of them worked, so Dr. Schneider fused two of the vertebrae together. After a gradual recovery process, I felt free.

Then in 2009 I had a bad fall and herniated the neck disc. Every movement hurt, so I had to learn how to do things without bending. I even had to learn how to get in and out of bed to minimize the pain. I went back to Dr. Schneider, and he fused L3,4 and 5. The pain was gone when I woke up.

Dr. Schneider and his team know what they're doing, and take the time to get to know their patients. I wasn't rushed right through so that I wasn't left wondering what was going on. He explained what had happened very thoroughly and what he could do to fix it. I've always felt that I could ask as many questions as I needed to. He pays attention to what his patients say and if you've ever been a patient you know how important that is.

Dr. Schneider's just a very warm, caring human being who also happens to be an excellent surgeon.

**Minka King**

In March of 2010 I had a breast cancer relapse in my spine after being clear for nearly 10 years. An MRI exposed a tumor that was entwined on my spinal cord, compressing the cord to my spine. I couldn't feel my legs from my upper thigh to my feet.

My oncologist sent me to Dr. Schneider and he removed the tumor from my spinal cord. I was told later that the only thing being said in the OR was "oh, she is so lucky." After my surgery, I was up and walking within 3 hours

About 6 weeks later I was getting into a pickup when I heard something crack. I thought, "wow, that hurt" but I went about my daily routine. Later I went in for an MRI later and it showed that I had actually broken my neck, because the cancer in my spine was eating away bones. Dr. Schneider put a plate on the C7 and C6 vertebrae, fusing two discs in my neck together.

After the disc fusion, I had to go have radiation on my cervical spine. I was in the hospital for 9 days and lost 33 pounds. Throughout all of this the only person who I thought really cared and took an interest in me was Dr. Schneider. He was my rock, always there for positive reinforcement. He and Harley took me through a really hard event that could have been life altering and they got me through it without any fanfare. They just did it.

If I hadn't connected with him I would've gone back to work and guaranteed I would've been in a wheelchair. I wouldn't be able to walk my dog, ride my four-wheeler, shovel rocks or ride my lawnmower, which I love doing.

When people ask me who I am or what I am I say I'm a healthy 55-year old woman that just happens to have cancer. And I can say that because of Dr. Schneider. He made it possible for me to retain the life I had prior to my relapse. I couldn't have asked for better care.

Suggested Quote:
**If I hadn't connected with him I would've gone back to work and guaranteed I would've ended up in a wheelchair.**

(282 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 103 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 282 of 303

**Melissa**

About 10 years ago I lost the use of my triceps muscle in my left arm. I wasn't able to pick up anything with because I couldn't grasp it and lifting anything over 5 pounds was impossible. I'm also a person that wanted to get back to work and wanted to do well. I didn't wait until I had a lot of neurological deficit before I got operated on.

As a nurse, I knew Dr. Schneider pretty well and so went to him.  I saw him on Tuesday and had he did a fusion my neck on Thursday.

Later, around 2006, I experienced sciatic pain going into both legs.  I wasn't sure what I'd done, but suspected it was the result of a horse injury many years before. Dr. Schneider performed surgery; however, he had to do another surgery after I herniated the disc picking up a bale of hay.

Since my surgeries, I've been able to lead a normal life. I have to be careful with how much I pick up with my upper body, but for everyday activities I'm basically 100%.

Dr. Schneider is quite personable and he's always been there when I need him. I've really enjoyed having him as my physician.   The only thing I'm sorry about is that he gave up his old cowboy boots.

**Kaye**

I've had headaches for as long as I can remember. I had been seeing my family physician and getting pill after pill but nothing worked. I went to Dr. Schneider because he had performed my daughter's brain surgery and I knew he was an excellent doctor.

Dr. Schneider found that I had some crushed vertebrae and discs in my neck, so he performed spine surgery. He explained everything in great detail to the point where I could understand, and that meant a lot. I had the confidence that he was going to do the right thing.

Since my surgery I've been a different person. I'm walking three miles a day. Before, I couldn't sit at all; it was impossible for me to go anywhere. Now I'm back to where I can live again.

I just can't say enough good about Dr. Schneider. I love him to death; he's almost a part of the family.

**Cheryl**

I was in a car accident in 2000, which left me with horrible headaches and a lot of pain with my neck. I was seeing a chiropractor for treatments, but the pain wasn't going away. All I could do is lay on the couch because my neck muscles were so tight. My chiropractor sent me to a neurologist in Cutbank, who sent me to a neurologist in Billings who referred me to Dr. Schneider.

Before deciding on the best treatment option, he ordered a digital motion x-ray. It showed that my neck was fractured, and that my neck muscles had to support my head.

Dr. Schneider completed a fusion on my neck, adding a plate and four screws. After the surgery, he told me the damage was worse than the digital imaging showed. He said it was more deteriorated than he could have imagined, it was like pulling out shards of paper.

Because Dr. Schneider went in through the front of my neck, there wasn't any muscle cutting. That meant I was only out of work for just a few days. My headaches went away and I don't have neck pain anymore.

The one thing he said to me was, "You're gonna get your life back. You can do the stuff that you've always done." He was right. Now I have mobility to do pretty much whatever I want to.

Meeting Dr. Schneider and having him do my surgery was really a blessing.

(285 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 106 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 285 of 303

**Debra**

I couldn't bend over for very long. I couldn't get off my motorcycle without pain. I finally got to the point where I didn't want to do any active thing – mowing the yard, doing normal house things. At first I thought I was getting old, but after an MRI learned that I had a severely bulged disc.

I had a friend who used to work for a hospital and I always referred to her to for recommendations. She recommended Dr. Schneider right away. I actually would enjoy going to see him. He would put my films up on the screen, then he would talk me through all the steps. He fixed the disc then replaced it a year later with an artificial disc.

I recovered quickly, and when I went into physical therapy they were shocked that I just had back surgery. My sister was shocked with how much I was up and going. He's doing something right if you recover fast.

Dr. Schneider wanted me to have my life back the way it was and to stay active. Now I do it all, just the way I did it before. The fact that he told me I can do anything I want means a lot to me. If I was told I wouldn't be able to ride my motorcycle it would be devastating.

Dr. Schneider's just a nice guy, and his whole team are nice people.   I'm completely happy with everything.

I'm fixed and I can ride my motorcycle!

(286 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 107 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 286 of 303

# EXHIBIT T

(287 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 108 of 124
Case 1:17-cr-00077-SPW  Document 72  Filed 11/26/18  Page 287 of 303

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|
| NORTHERN ROCKIES Neuro-Spine | $ | 2012 | |
| 3611 TOMMY ARMOUR CIRCLE | 2 Royalties | Form 1099-MISC | |
| Billings MT 59106 | $ | | |
| 406-671-1070 | 3 Other income $ ~~insurance settle~~ | 4 Federal income tax withheld $ Ø | Copy A For Internal Revenue Service Center |

| PAYER'S federal identification number | RECIPIENT'S identification number | 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
|---|---|---|---|---|
| 26-3110210 | 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 | $ | $ | |

| RECIPIENT'S name | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act and Paperwork Reduction Act Notice, see the 2012 General Instructions for Certain Information Returns. |
|---|---|---|---|
| Kathleen T. Burrows | $340,000.00 | $ | |
| Street address (including apt. no.) 15836 ASTRAL ST | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| City, state, and ZIP code Chino Hills, Ca. 91709 | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ |

| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ 0.00 | 17 State/Payer's state no. | 18 State income $ |
|---|---|---|---|---|

Form 1099-MISC

Department of the Treasury - Internal Revenue Service
38-2099803

**Do Not Cut or Separate Forms on This Page  --  Do Not Cut or Separate Forms on This Page**

---

9595  ☐ VOID  ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|
| | $ | 2012 | |
| | 2 Royalties | Form 1099-MISC | |
| | $ | | |
| | 3 Other income $ | 4 Federal income tax withheld $ | Copy A For Internal Revenue Service Center |

| PAYER'S federal identification number | RECIPIENT'S identification number | 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
|---|---|---|---|---|
| | | $ | $ | |

| RECIPIENT'S name | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act and Paperwork Reduction Act Notice, see the 2012 General Instructions for Certain Information Returns. |
|---|---|---|---|
| | $ | $ | |
| Street address (including apt. no.) | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| City, state, and ZIP code | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ |

| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ | 17 State/Payer's state no. | 18 State income $ |
|---|---|---|---|---|

Form 1099-MISC

Department of the Treasury - Internal Revenue Service
38-2099803

**Re: OMNI Invoices**

| | |
|---|---|
| Notebook: | Dve/Burrows email strings |
| Created: | 11/11/2017 7:23 AM |
| Tags: | Burrows working in 6/13 for NRNS - Unemployment benefits the sametime? |
| URL: | https://outlook.office.com/owa/#ItemID=AQMkADAwATM3ZmYAZS1hY2ZmAC1kMDYvLTAwAi0wMAoARqAAAA4Fqi1%2BTRb5BaLH1ddWP%2Bu... |

this date of 6/13 shows Burrows was still working for me, taking care of bills, etc - challenge her idea that the house was not compensation for her on going work.

---

**Subject:** Re: OMNI Invoices
**From:** John Schneider (omnineuro@live.com)
**To:** Kathleen (Kathleen@montanaspine.com); kfrazier@feltmartinlaw.com (kfrazier@feltmartinlaw.com); Kathleen (Kathleen@montanaspine.com)
**Date received:** Thu Jun 13 2013 10:47:56 GMT-0500 (Central Daylight Time)

Perfect, thanks.

John Schneider, MD

On Jun 13, 2013, at 8:41 AM, "Kathleen" <Kathleen@montanaspine.com> wrote:

I will send Samples a check for $7,977.86 and PDF both of you a copy of the check.  See breakdown below:

| | | |
|---|---|---|
| November 2012 Operating Expense | | |
| Reimb | 1,386.50 | |
| November 2012 Rent | 10,524.20 | |
| December 2012 Operating Expense | | |
| Reimb | 1,386.50 | |
| December 2012 Rent | 10,680.67 | |
| Total | | 23,977.87 |
| Less Quarterly Distribution | 16,000.00 | |
| | | |
| Total | 7,977.87 | |

---

**From:** John Schneider [mailto:omnineuro@live.com]
**Sent:** Thursday, June 13, 2013 9:29 AM
**To:** Kathleen
**Cc:** kfrazier@feltmartinlaw.com; Kathleen
**Subject:** Re: OMNI Invoices

Kathleen, please send rent for nov and dec of 2012 to Samples.  Please deduct the expected 16k quarterly distributions that should have been paid from ONI realty.  This will bring us up to date in our rent at OMNI and sine Ken has confirmed that it is not my job to fix the damaged building, we will not be in default for nonpayment of rent from Jan. 2013 forward.  Thanks.

John Schneider, MD

On Jun 13, 2013, at 8:15 AM, "Kathleen" <Kathleen@montanaspine.com> wrote:

Hi John and Ken,

Just following up on this.  Please let me know if I should send a payment to Samples.  If so, how much.

Thanks,

Kathleen

---

**From:** Kathleen
**Sent:** Tuesday, June 04, 2013 7:59 PM
**To:** John H Schneider, MD
**Cc:** kfrazier@feltmartinlaw.com
**Subject:** Re: OMNI Invoices

Would it be appropriate to deduct the 16k 2012 in expected distributions from the Nov and Dec rent payments?

Just wanted to put that out there.

Sent from my iPhone

On Jun 4, 2013, at 4:15 PM, "John H Schneider, MD" <omnineuro@live.com> wrote:

I would not pay the 5 K extra.  I have received no distributions as an investor in the building (which should be 8K a quarter) this year, so ONI realty owes me 16K.  After we send in our two months' rent, I will send a demand letter for the 16K for my quarterly profit distributions.

> **From:** Kathleen [mailto:Kathleen@montanaspine.com]
> **Sent:** Tuesday, June 04, 2013 3:46 PM
> **To:** omnineuro@live.com; kfrazier@feltmartinlaw.com
> **Cc:** Kathleen
> **Subject:** OMNI Invoices
>
> Hi John and Ken,
>
> Attached is a rental invoice statement that includes Nov, Dec, Jan, and Feb.  I think we were talking about paying the November and December 2012 <image001.png>.
>
> The statement also includes 5,047 as a 2012 operating expense overage.  I attached the e-mail I received from Samples I received the request for payment of the operating expense overage.
>
> PS, sorry I got cut off the call.  All of a sudden I could only hear piano playing.
>
> Kathleen

---

**Subject:** Re: OMNI Invoices
**From:** John Schneider (omnineuro@live.com)
**To:** Kathleen (Kathleen@montanaspine.com); kfrazier@feltmartinlaw.com (kfrazier@feltmartinlaw.com); Kathleen (Kathleen@montanaspine.com)
**Date received:** Thu Jun 13 2013 10:29:25 GMT-0500 (Central Daylight Time)

Kathleen, please send rent for nov and dec of 2012 to Samples.  Please deduct the expected 16k quarterly distributions that should have been paid from ONI realty.  This will bring us up to date in our rent at OMNI and sine Ken has confirmed that it is not my job to fix the damaged building, we will not be in default for nonpayment of rent from Jan. 2013 forward.  Thanks.

John Schneider, MD

On Jun 13, 2013, at 8:15 AM, "Kathleen" <Kathleen@montanaspine.com> wrote:

> Hi John and Ken,
>
> Just following up on this.  Please let me know if I should send a payment to Samples.  If so, how much.
>
> Thanks,
>
> Kathleen

> **From:** Kathleen
> **Sent:** Tuesday, June 04, 2013 7:59 PM
> **To:** John H Schneider, MD
> **Cc:** kfrazier@feltmartinlaw.com
> **Subject:** Re: OMNI Invoices
>
> Would it be appropriate to deduct the 16k 2012 in expected distributions from the Nov and Dec rent payments?
>
> Just wanted to put that out there.
>
> Sent from my iPhone
>
> On Jun 4, 2013, at 4:15 PM, "John H Schneider, MD" <omnineuro@live.com> wrote:
>
> > I would not pay the 5 K extra.  I have received no distributions as an investor in the building (which should be 8K a quarter) this year, so ONI realty owes me 16K.  After we send in our two months' rent, I will send a demand letter for the 16K for my quarterly profit distributions.
> >
> > > **From:** Kathleen [mailto:Kathleen@montanaspine.com]
> > > **Sent:** Tuesday, June 04, 2013 3:46 PM
> > > **To:** omnineuro@live.com; kfrazier@feltmartinlaw.com
> > > **Cc:** Kathleen
> > > **Subject:** OMNI Invoices
> > >
> > > Hi John and Ken,
> > >
> > > Attached is a rental invoice statement that includes Nov, Dec, Jan, and Feb.  I think we were talking about paying

the November and December 2012 <image001.png>.

The statement also includes 5,047 as a 2012 operating expense overage.  I attached the e-mail I received from Samples I received the request for payment of the operating expense overage.

PS, sorry I got cut off the call.  All of a sudden I could only hear piano playing.

Kathleen

(291 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 112 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 291 of 303

# EXHIBIT U

(292 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 113 of 124
Case 1:17-cv-00075-SPW Document 38-1 Filed 07/31/18 Page 53 of 63

---------- Forwarded message ---------



Doctor John

Research has shown that scuba diving improves one's psychological well-being and reduces stress and anxiety.

Dive Veterans first SCUBA OPEN WATER CERTIFICATION CLASS will start on **SATURDAY, JULY 21, 2018 at 9AM** at Scuba Schools of America (SSA) Dive Shop. Here's the address:

**4420 Holt Blvd.,**
**Montclair, CA 91763**

For questions, please email: **diveveterans@gmail.com**

Look forward to see you on the 24th to help our Veterans recover from brain and spinal cord injury, and help those suffering from PTSD.

Have a wonderful day!

*Dr. Ola and Your Dive Veterans Family*

diveveterans@gmail.com

(293 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 114 of 124
Case 1:17-cv-00075-SPW  Document 73-1  Filed 07/31/18  Page 54 of 62



4420 Holt Blvd., Montclair, CA 91763

John Michael Schneider, MD, MS-ADR

July 23, 2018

Dear Dr. John,

It is with great pleasure to thank you for your on going work with Dive Veterans, a disabled
veteran non-profit organization(501c3), as a dive-buddy, volunteer, instructor, etc.

Your experience and specialty will be very valuable to the organization especially to our fellow
veterans.

We look forward to having your ongoing  presence in our scuba classes, ocean and
beach dives and other activities of the organization. Your help over this last year was invaluable
and your co-directing our projects with UC Riverside this fall is critical to our success.

Serving those who served,

Dr. Ola Madsen
(US Navy)

(294 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 115 of 124
Case 1:17-cv-00075-SPW   Document 38-1   Filed 07/31/18   Page 59 of 62



WWW.WAVESPROJECT.ORG/ABOUT/

## OUR MISSION

# To offer the unique opportunity of experiencing SCUBA Diving to our wounded American veterans.

## ABOUT WAVES PROJECT

## WOUNDED AMERICAN VETERANS EXPERIENCE SCUBA

WAVES PROJECT was established to help our wounded veterans experience the freedom and challenge of SCUBA Diving. If you or a loved one has suffered from a major, life-changing injury, scuba diving therapy may help. Importantly, talk with your doctor and therapists about your interest to see if this type of therapy is right
for you.

The unique properties of this aquatic environment enhances interventions that are ideal for combat wounded veterans as they rehabilitate from various injuries received in combat such as amputations, spinal cord injuries, PTSD, Traumatic Brain Injuries, along with a host of other injuries received in battle. Scuba diving takes the advantages of the properties of water, including weightless and limited audio input, allowing  Combat wounded veteran's to exercise in a therapeutic environment. Underwater, there is the soothing sound of breathing through your regulators as your bubbles float effortlessly to the surface. Movements are slower, gravity is sapped of it strength and muscles move more freely. The disabled diver underwater  is now an equal to his or her able body dive buddy!

Our training includes specialized SCUBA equipment suited to the person based on their physical needs. These items may include webbed gloves, diver propulsion vehicles and customized exposure protection.

Our WAVES Instructors have extensive, specialized training from both PADI (Professional Association of Diving Instructors) and HSA (Handicapped Scuba Association) to insure safe and suitable instruction.

(296 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 117 of 124
Case 1:17-cv-00075-SPW  Document 38-1  Filed 07/31/18  Page 296 of 303

**On Jun 25, 2018, at 1:43 PM, MS MD, MS-ADR <omnineuro@gmail.com> wrote:**

6/25/2018

To:      Waves project administrator

From:   J. Michael Schneider, MD,FACS, MS-ADR
        omnineuro@gmail.com
        760-828-0754
        www.provider-resolutions.com

Dear Colleagues,

It was a pleasure meeting the representatives of Waves project nonprofit at this years Long Beach Scuba Show. I am interested in working with your organization, helping US Veterans. By way of introduction, I am a board certified physician and surgeon specializing in neuroscience and have over 1000 dives as an advanced open water rescue certified scuba diver.  I also hold a master's degree in legal studies and conflict resolution from Creighton law school.  I am former O4 Air Force Officer stationed with the 59th Medical Wing out of Lackland AFB completing my active duty in 1997 and inactive reserves in 2008. I also provided medical and surgical services to the VA facilities in Salt Lake City and Iowa City during my academic medical career.  I currently live in North San Diego County California and am transitioning my medical practice to an administrative role through my business Provider Resolutions, LLP.

I am very interested in a volunteer position with your organization, merging my medical knowledge, love of scuba diving and the beneficial impact this sport could have on wounded US Veterans with PTSD, TBI and SCI.  I think my specialization in neuroscience, avid self-study in Dive Medicine and desire to serve the needs of wounded warriors affords me the capability to assist these deserving and disabled men and women. In addition, my legal training inspires peace communication in social justice as part of my dispute resolution role, an advocacy position that may help your fund raising mission with state and federal elected authorities.

 I could be available 8-16 hour per week, over a weekend dive trip or longer on specific excursions coordinated with my work schedule.  I am available to participate with your organization beginning this summer should you be interested in my service.

Should you be interested, please drop me a quick note or email and let me know how best I might proceed with your organization

Thank you and best in health,


Dr Mike.

4

**On Tue, Jun 26, 2018 at 07:41 Steve Rubin <Steve@wavesproject.com> wrote:**

Thanks Dr Mike,

I'm forwarding your email to Dr. Naomi A. Achondo, OTD, OTR/L,SWC, to discuss a study we are planning to conduct, measuring the benefits of diving as it relates to PTSD, we are current discussing this with Loma Linda University and Loma Linda Veteran Administration Hospital, ( Mental Heath).

We can talk about other opportunities how your diving and vocational talents can be of help, however at first thought with your initial email, this seemed to be a natural fit.

Thank you

Steve Rubin
WAVES Project
951-233-1873
www.wavesproject.org

**On Jun 26, 2018, at 7:43 AM, MS MD, MS-ADR <omnineuro@gmail.com> wrote:**

Sounds great, thank you!

---------- Forwarded message ----------
From: **Nja Therapy** <njatherapy01@gmail.com>
Date: Thu, Jun 28, 2018 at 8:19 AM
Subject: Re: Dive volunteer
To: "MS MD, MS-ADR" <omnineuro@gmail.com>
Cc: Steve Rubin <Steve@wavesproject.com>


Hello Steve and Dr. Mike!

It will be pleasure to have you on board WAVES Project.
I am Naomi Achondo, Doctor of Occupational Therapy and volunteer with WAVES, too.

Steve and I have conducted some pilot study regarding SCUBA and OT. We will re-start an OT mindfulness based class this August, Under the WAVES. We will also have a research on going with Loma Linda University Department of OT and planning to partner with LL VA for this new study.

I would like to meet you and Steve soon so we can do more for our veterans. I will be on vacation starting tomorrow and will be back on July 5.

Thank you and looking forward to meeting and collaborating with you regarding WAVES Project!


Best regards,
Naomi A. Achondo, OTD, OTR/L,SWC
NJA Therapy Services, Inc
Nachondo@njatherapy.com
T: 909.833.1099 F:909.992.3173

On Tue, Jul 17, 2018 at 4:24 PM, MS MD, MS-ADR <<u>omnineuro@gmail.com</u>> wrote:

Nja - Hopefully this letter finds you well.  I would like to meet you and see how I could help as a non-treating physician and neuroscientist, through research, dive experiences, etc, focusing on neurological issues affecting veteran patients.  Please let me know.  I have Steve copied to see what he is thinking.

Thanks -

J Michael Schneider, MD MS-ADR
Former Major USAF 59th Medical Wing
<u>www.provider-resolutions.com</u>


On Tue, Jul 17, 2018 at 5:30 PM, Nja Therapy <<u>njatherapy01@gmail.com</u>> wrote:

Hello Dr. Michael,

We can set up a meeting possibly next week with Steve, if they are available.
There is a study that we will be conducting in partnership with the Loma Linda University, Department of Occupational Therapy.

I would like to have you be involved in it. We are hoping to have a sample size of 60 and look at the therapeutic function of diving to veterans and non-veterans.

We will be running another Under the WAVES program in August, is that still the plan Steve? This is our mindfulness OT program.

Looking forward to meeting you,

Best regards,

Naomi Achondo, OTD, OTR/L, SWC

(300 of 303)

Case: 18-30187  11/21/2018  ID: 11095749  DktEntry: 26-3  Page 121 of 124
Case 1:17-cv-00075-SPW  Document 73-1  Filed 02/01/18  Page 32 of 62

**From:** MS MD, MS-ADR [mailto:omnineuro@gmail.com]
**Sent:** Tuesday, July 17, 2018 7:20 PM
**To:** Nja Therapy <njatherapy01@gmail.com>
**Cc:** Steve Rubin <Steve@wavesproject.com>
**Subject:** Re: Dive volunteer

Excellent - I would love to be involved in the research study.

I have something I have to do around Aug 14 and 15th but if I can participate in any way, I can arrange my schedule to meet your needs.

Looking forward to our visit -



Best in Health

J Michael Schneider MD MS-ADR
www.provider-resolutions.com
760-828-0754



(301 of 303)

Case: 18-30187, 11/21/2018, ID: 11095749, DktEntry: 26-3, Page 122 of 124
Case 1:17-cr-00077-SPW   Document 72   Filed 11/26/18   Page 301 of 303

# EXHIBIT V

Affidavit of Brandon Michael Schneider for the Ninth Circuit Appellate Court
for case: 18-30187

1. I Brandon Michael Schneider am the biological son of John and Michelle Schneider.

2. I currently reside at 1665 Thomas Ave West, Saint Paul, Minn. 55104.

3. I am aware of the bankruptcy filing of John H Schneider in Billings Montana in December of 2014.

4. I participated in the settlement of AP 15-15, the lawsuit filed by bankruptcy trustee Womack against John and Michelle Schneider and all of the Schneider entities, including Medport, LLC, a company that I represented in this litigation.

5. I formed Medport, LLC with my aunt Kathleen T Burrows in 2012 and was an active participant in 2013 and 2014 in the development of the robust business and website owned by Medport, LLC at https://www.healthcare-malpractice.com.

6. I participated in the settlement of AP 15-15 that absolved any further liability from the bankruptcy trustee or its creditors with regard to Medport, LLC.

7. From January of 2015-July of 2015 I attended an internship and then academic studies at the International University in Shanghai China as an exchange student.

8. I entered China twice and returned to the United States both times. The first time, for my six week internship, and then again after a two week break between internship and academic studies.

9. My father John H Schneider accompanied me on my first entrance to China and then visited me approximately 8 weeks into my academic studies.

10. My father, John H Schneider supplied me with nearly USD $40,000 in cash for my six months in China where I used these funds, converting them to Yuan or paying in US dollars for all of my academic needs and all of my living, recreational and travel expenses while in China.

11. My father and I each carried just under $10,000 US dollars in cash when we each entered China, an amount that did not require we declare this cash on our immigration forms as both my father and I feared the Chinese may confiscate the cash.

12. I kept this cash in a safe in my dormitory room at the International University in Shanghai and used all of these funds during my stay in China. This was particularly necessary as I did not have a credit card and my bank account at US Bank was not available for access during my stay in China.

13. The importance of adequate cash became particularly important during my first six weeks in China when I traveled to Beijing from Shanghai with my classmates and we became separated. I did not bring enough cash with me on this trip, and although my parents attempted to send funds through Western Union, these were never received. My access to cash as my only form of purchasing power while in China was critical for my needs.

14. I also recall that my father John H Schneider periodically provided me cash for my own personal needs in 2013 and 2014 as I was a student in University in Saint Paul Minnesota.

15. I recall traveling with my father on business trips in which Medport LLC product lines were discussed and advocated by myself and my father.

Signed and witnesses on this day _2ⁿᵈ_ ~~October~~ 2018
                                                    November

Brandon M Schneider

NOTARY:

JASON LOUIS MYKKANEN
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2022